## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) ) |
| *Plaintiff*, | ) **PUBLIC VERSION** |
| v. | ) ) |
| THE UNITED STATES, | ) Consol. Court No. 21-00616 |
| | ) |
| *Defendant*, | ) Business Proprietary Information ) Deleted from Pages: 27, 30, 31, 32, |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, et al., | ) 33, 34, 35, 41, 44. ) ) ) |
| *Defendant-Intervenors*. | ) ) ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Leah N. Scarpelli
Matthew M. Nolan
Yun Gao

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6013
Fax: (202) 857-6395
Email: leah.scarpelli@afslaw.com

May 23, 2022

**TABLE OF CONTENTS**

**Page**

I.   STATEMENT PURSUANT TO RULE 56.2(C)(1) ........................................................ 1

    A.   Administrative Record To Be Reviewed ............................................................ 1

    B.   Issues Presented And Summary Of Argument .................................................... 2

II.  STATEMENT OF FACTS ......................................................................................... 4

III. STANDARD OF REVIEW ....................................................................................... 9

IV.  ARGUMENT ........................................................................................................ 10

    A.   Section 232 Tariffs Are "Special" Tariffs That Should Not Be Deducted From Export Price .......................................................................................... 10

        1.   The Statute Does Not Contemplate Adjustments For "Special" Tariffs ........................................................................................... 11

        2.   The Section 232 Tariffs On Steel and Aluminum Imports Are "Special" Tariffs ......................................................................... 13

            a.   Section 232 Tariffs Are Remedial ............................... 14

            b.   Section 232 Tariffs Are Temporary ............................. 18

            c.   Section 232 Tariffs Were Implemented Under Congress's Specific Delegation of Authority to the Executive ..................... 20

        3.   There Is A Clear Interplay Between Section 232 Tariffs and Antidumping Duties Such That Deducting Section 232 Tariffs Imposes A Double Remedy ..................................................... 23

    B.   Commerce's Duty Drawback Methodology Unlawfully Limited The Adjustment To U.S. Price ............................................................................. 26

        1.   Commerce Improperly Included U.S. Sales Not Covered By A Closed IPC In Its Calculation of Assan's Per Unit Drawback Adjustment ........................................................................... 26

        2.   There Is No Lawful Basis To Offset The Duty Drawback Adjustment For Assan's Filing Penalties .................................. 31

    C.   Commerce's Weight Averaging of Reported DIRMATMP Costs Is Distortive .......................................................................................... 32

    D.   Management Fees Incurred By Assan's Parent Company in Turkey Should Not Be Treated As Indirect Selling Expenses for U.S. Sales .......................... 39

        1.   The Management Fees As Issue Were Not Associated with Selling or Economic Activities Occurred in the U.S. ........................... 40

        2.   The Management Fees At Issue Were Incurred in Turkey .................. 44

V.   PRAYER FOR RELIEF ......................................................................................... 46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
  988 F.Supp.594 (Ct. of Int'l Trade 1997) ..............................................................................24

*Am. Inst. for Int'l Steel, Inc. v. United States*,
  376 F.Supp.3d 1335 (Ct. Int'l Trade 2019), *aff'd,* 806 F. App'x 982 (Fed. Cir.
  2020), *cert denied,* 139 S. Ct. 133 (2020) ...........................................................................19

*ArcelorMittal USA Inc. v. United States*,
  32 C.I.T. 440 (May 15, 2008) ................................................................................................33

*Asociacion Colombiana de Exportadores de Flores v. United States*,
  6 F.Supp.2d 865 (1998) ............................................................................................................9

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
  494 F.Supp.3d 1365 (Ct. Int'l Trade 2021) ................................................................. *passim*

*Carbon Activated Tianjin Co. v. United States*,
  503 F.Supp.3d 1278 (Ct. Int'l Trade 2021) ..........................................................................44

*Chevron. Union Steel v. United States*,
  713 F.3d 1101 (Fed. Cir. 2013) ...............................................................................................9

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ..................................................................................................................9

*DuPont Teijin Films USA, LP v. United States*,
  407 F.3d 1211 (Fed. Cir. 2005) ...............................................................................................9

*Forest Lab'ys, Inc. v. United States*,
  403 F.Supp.2d 1348 (Ct. Int'l Trade 2005), *aff'd,* 476 F.3d 877 (Fed. Cir.
  2007) .........................................................................................................................................22

*LG Chem, LTD. v. United States*,
  534 F.Supp.3d 1386,1397-1398 (Ct. Int'l Trade 2021) ........................................................38

*Marmen Inc. v. United States*,
  545 F.Supp.3d 1305 (Ct. Int'l Trade 2021) ..........................................................................38

*Maverick Tube Corp. v. United States*,
  861 F.3d 1269 (Fed. Cir. 2017) .............................................................................................30

-ii-

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)...................................................................9

*NMB Sing. Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009).................................................................14

*Paul Muller Industrie Gmbh v. United States*,
    435 F.Supp.2d 1241 (Ct. Int'l Trade 2006) ............................................44

*Rhone-Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990)................................................................26

*Rhone-Poulenc, Inc. v. United States*,
    927 F.Supp.451 (Ct. Int'l Trade 1996) ......................................................9

*Saha Thai Steel Pipe (Pub.) Co. v. United States*,
    635 F.3d 1335 (Fed. Cir. 2011).................................................................28

*Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*,
    415 F.Supp.3d 1195 (Ct. Int'l Trade 2019) ............................................30

*Ticaret A.S. v. United States*,
    222 F. Supp. 3d 1255 (Ct. Int'l Trade 2017) ..........................................30

*Transpacific Steel LLC v. United States*,
    4 F.4th 1306 (Fed. Cir. 2021) ..................................................................19

*U.S. Steel Corp. v. United States*,
    179 F.Supp.3d 1114 (Ct. Int'l Trade 2016) ......................................37, 43

*U.S. Steel Corp v. United States*,
    712 F.Supp.2d 1330 (Ct. Int'l Trade, 2010) .....................................43, 44

*Ulasim Sanayi, A.S. v. United States*,
    429 F.Supp.3d 1353 (Ct. Int'l Trade 2020) ...........................................33

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007)..................................................... *passim*

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................9

19 U.S.C. § 1671.......................................................................................16, 17

19 U.S.C. § 1673...............................................................................11, 16, 17

19 U.S.C. § 1673a...........................................................................................4

19 U.S.C. § 1677(7)(C) ...........................................................................................16

19 U.S.C. § 1677a(a) .............................................................................................11

19 U.S.C. § 1677a(b) .............................................................................................11

19 U.S.C. § 1677a(c)(1)(B) .........................................................................28, 30, 32

19 U.S.C. § 1677a(c)(2)(A) ........................................................................11, 12, 13, 14

19 U.S.C. § 1677a(d)(1) ....................................................................................41, 42

19 U.S.C. § 1677b(f)(1)(A) .....................................................................................37

19 U.S.C. § 1862 ...........................................................................................16, 22

19 U.S.C. § 1862(c)(1)(A)(ii) ...........................................................................19, 23

19 U.S.C. § 1862(d) .......................................................................................16, 23

19 U.S.C. § 2251 ...........................................................................................16, 17

19 U.S.C. § 2251(a) .............................................................................................16

19 U.S.C. § 2252 ................................................................................................17

Tariff Act of 1930 ...........................................................................................4, 41

Trade Expansion Act of 1962 ............................................................................. *passim*

**Administrative Determinations**

*Aluminum Foil From Armenia, Brazil, Oman, Russia, and Turkey*, 86 Fed. Reg.
 62845 (Int'l Trade Comm'n Nov. 12, 2021) ....................................................8

*Aluminum Foil From Armenia, Brazil, Russia, and Turkey,* 85 Fed. Reg. 73748
 (Int'l Trade Comm'n November 19, 2020) ........................................................5

*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market
 Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg.
 61716
 (Dep't Commerce Oct. 19, 2006). ...................................................................29

*Brass Shet and Strip from Germany*, 75 Fed Reg. 66347
 (Dep't Commerce Oct. 28, 2010) ..............................................................39, 40

*Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of
    Oman, the Russian Federation, and the Republic of Turkey: Antidumping Duty
    Orders*, 86 Fed. Reg. 62790
    (Dep't Commerce Nov. 12, 2021) ...........................................................................2, 8

*Certain Aluminum Foil from the Republic of Armenia, Brazil, the Sultanate of
    Oman, the Russian Federation, and the Republic of Turkey*: Initiation of Less-
    Than-Fair-Value Investigations, 85 Fed. Reg. 67711
    (Dep't Commerce Oct. 26, 2020) .................................................................................4

*Certain Aluminum Foil From the Republic of Turkey: Final Affirmative
    Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52880
    (Dep't Commerce Sep. 23, 2021) ...................................................................... *passim*

*Certain Aluminum Foil from the Republic of Turkey: Preliminary Negative
    Determination of Sales at Less Than Fair Value, Postponement of Final
    Determination*, 86 Fed. Reg. 23686
    (Dep't Commerce May 4, 2021) ...................................................................................6

*Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From
    Korea*, 62 Fed. Reg. 18404
    (Dep't Commerce Apr. 15, 1997) ..............................................................................12

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results
    of Antidumping Duty Review*; 2016-2017, 84 Fed. Reg. 32720
    (Dep't of Commerce Jul. 9, 2019) .............................................................................43

*Duty Drawback Practice in Antidumping Proceedings,* 70 Fed. Reg. 37764
    (Dep't Commerce June 30, 2005) .........................................................................31, 32

*Light-Walled Rectangular Pipe and Tube from Turkey*, 69 Fed. Reg. 53675
    (Dep't Commerce Sept. 2, 2004) ...............................................................................33

*Porcelain-on-Steel Cookware From Mexico: Final Results of Antidumping Duty
    Administrative Review; 1997-1998*, 65 Fed. Reg. 30068
    (Dep't Commerce May 10, 2000) ..............................................................................43

*Procedures To Consider Additional Requests for Exclusion of Particular Products
    From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6670
    (USTR Feb. 14, 2018) ................................................................................................20

*Proclamation 9704 of March 8, 2018, Adjusting Imports of Aluminum Into the
    United States*, 83 Fed. Reg. 11619 (Mar. 15, 2018) . *Proclamation 9704* ........18, 20

*Proclamation 9710 of March 22, 2018: Adjusting Imports of Aluminum Into the
    United States*, 83 Fed. Reg. 13355 (Mar. 28, 2018) ...............................................20

*Proclamation 9739 of April 30, 2018: Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 20677 (May 7, 2018)...................................................20

*Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United States*, 88 Fed. Reg. 20683 (May 7, 2018)...................................................21, 23, 26

*Proclamation 9758 of May 31, 2018: Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 25849 (June 5, 2018)...................................................20

*Proclamation 9980 of January 24, 2020: Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States*, 85 Fed. Reg. 5281 (Jan. 29, 2020) ...................................................20

*Report on the Effect of Imports of Aluminum on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40508 (Dep't Commerce Jul. 6, 2020)..............10, 17, 18, 25

*Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202 (Dep't Commerce Jul. 6, 2020) ......................................18, 25

*Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19153 (Dep't Commerce Apr. 12, 2004) ........................................................11, 12, 15, 24

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2018-2019, 86 Fed. Reg. 28574 (Dep't Commerce May 27, 2021) ...........................................................31

*Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46026 (Dep't Commerce Sept. 11, 2018) ...................................................19, 20

*Welded Line Pipe From the Republic of Turkey*, 80 Fed. Reg. 61362 (Dep't Commerce October 13, 2015) ...................................................33

**Other Authorities**

*Conversion of the Tariff Schedules of the United States Into the Nomenclature Structure of the Harmonized System*, Inv. No. 332-131, USITC Pub. 1400 (June 1983) ...........................................21, 23

Memorandum from C. Showers to P. Lee Smith, Re: Issues and Decision Memorandum for the Final Normal Value Calculations to be Effective from Release of the Final Normal Values through June 30, 2019, under the Agreement Suspending the Antidumping Duty Investigation on *Certain Oil Country Tubular Goods from Ukrain*e (A-823-815)  (Dept. of Commerce Feb. 15, 2019)........................................................14

U.S. Const. Article I, § 8..............................................................................................22

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.
    No. 103-316 (1994)............................................................................................37, 41

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) |
| | ) |
| *Plaintiff*, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant*, | ) ) |
| | ) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, et al., | ) ) ) |
| | ) |
| *Defendant-Intervenors.* | ) ) |

**PUBLIC VERSION**

Consol. Court No. 21-00616

Business Proprietary Information
Deleted from Pages: 27, 30, 31,
32, 33, 34, 35, 41, 44.

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

Pursuant to the Court's Order dated March 18, 2022, ECF No. 24, Plaintiff Assan

Aluminyum Sanayi ve Ticaret A.S. ("Assan" or "Plaintiff"), a foreign manufacturer and exporter

of certain aluminum foil from Turkey, hereby submits this memorandum of points and authorities

in support of its motion for judgment on the agency record challenging the final affirmative

determination as set forth below.

**I.    STATEMENT PURSUANT TO RULE 56.2(C)(1)**

**A.    Administrative Record To Be Reviewed**

This is an appeal from the final determination in the sales at less-than-fair-value

("LTFV") investigation of *Certain Aluminum Foil from the Republic of Turkey*. The period of

investigation ("POI") is July 1, 2019 through June 30, 2020.

On September 23, 2021, the U.S. Department of Commerce, International Trade Administration, Enforcement and Compliance ("Commerce") published its final antidumping duty determination finding that aluminum foil from Turkey is being or is likely being sold at LTFV. *Certain Aluminum Foil From the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52880 (Dep't Commerce Sep. 23, 2021) ("*Final AD Determination*")(Appx007669-007671).[1] Commerce's factual and legal conclusions underlying the *Final AD Determination* are set forth in its Issues and Decision Memorandum. Memorandum from A. Villanueva to J. Maeder, Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of *Certain Aluminum Foil from the Republic of Turkey* (Sep. 23 2021) ("*Final I&D Memo*") (Appx007617-007668).

On November 12, 2021, Commerce published the AD duty order. *Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 62790 (Dep't Commerce Nov. 12, 2021) ("*AD Order*")(Appx0078210-007824).

### B.    Issues Presented And Summary Of Argument

Plaintiff raises the following four issues in this brief:

1.    Whether Commerce should not deduct Section 232 tariffs paid by Assan from the export price of its U.S. sales because the Section 232 tariffs are "special" tariffs imposed pursuant to a specific congressional delegation of tariff making authority to the executive branch, rather than ordinary U.S. import duties within the meaning of the antidumping statute. The Section 232 tariffs are remedial, temporary, and treated differently than normal customs duties in the Harmonized Tariff Schedule, and their deduction from U.S. price imposes a double remedy

---

[1] Per "Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden," all record citations are to bates-numbered appendix pages.

that is contrary to the statute. Commerce's treatment of the special Section 232 tariffs as ordinary customs duties and deduction of the full amount of tariffs paid from Assan's export price in the *Final AD Determination* is thus unsupported by substantial evidence and otherwise not in accordance with law.

2.     Whether Commerce's decision to limit Plaintiff's claimed duty drawback adjustment is contrary to law and unsupported by substantial evidence on the record. Consistent with the plain language of the statute, and Commerce's longstanding two-prong test for determining whether a drawback adjustment may be granted, Assan was entitled to a full drawback adjustment to U.S. price for the amount of the import duty rebated or not collected on its export sales. Commerce's use of all U.S. exports, rather than the total quantity of exports under the closed import processing certificates ("IPCs") as the denominator in its per unit drawback calculation, resulted in an inconsistent numerator/denominator and significantly limited the amount of per unit duty drawback added to U.S. price. Commerce further reduced the drawback benefit to which Assan was statutorily entitled by offsetting the drawback adjustment by the amount of filing penalties incurred by Assan. Commerce's duty drawback methodology in the *Final AD Determination* is inconsistent with other recent cases involving the Turkish drawback regime, improperly limits Assan's duty drawback adjustment in a manner not contemplated by the statute, and is thus unsupported by substantial evidence and otherwise not in accordance with law.

3.     Whether Commerce's weight averaging of reported DIRMATMP costs for all CONNUMs, which introduced distortions in Commerce's cost calculations, is contrary to law and unsupported by substantial evidence on the record. Commerce's methodology ignored fundamental cost differences related to yield loss for specific CONNUMS and productions runs.

Commerce should have instead relied on the metal premium element in DIRMATMP originally provided by Assan, as it is the method Assan uses in its books and records, is a more accurate calculation of relative costs, and is consistent with Turkish GAAP. Commerce's decision to reject Assan's actual recorded costs in favor of an average raw material premium, which unreasonably results in all subject merchandise having the same unit metal cost, is unsupported by substantial evidence and otherwise not in accordance with law.

4.      Whether Commerce's treatment of certain management fees as indirect selling expenses, and its inclusion of those expenses in INDIRSU with a corresponding offset to Assan's reported general and administrative ("G&A") expenses, is contrary to law and unsupported by substantial evidence on the record. Management fee charges were incurred by Assan's parent company in Turkey for overall group support (*i.e.* head office administrative activities to manage group operations) and did not relate to Assan's sales or economic activities occurring in the United States. Deduction of these expenses is thus contrary to Commerce's long-standing policy to only deduct expenses associated with sales economic activity in the United States. Because only elements of the management fee related to U.S. sales economic activity should be deducted, Commerce's inclusion of all management fee charges in its calculation of INDIRSU is unsupported by substantial evidence and otherwise not in accordance with law.

## II.      <u>STATEMENT OF FACTS</u>

Commerce initiated the antidumping duty investigation of Aluminum Foil from Turkey pursuant to Section 732 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673a. *See Certain Aluminum Foil from the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations,* 85 Fed. Reg. 67711 (Dep't Commerce Oct. 26, 2020) ("*Initiation Notice*")(Appx001044-001050). On November 13, 2020, the United States International Trade Commission ("ITC") preliminarily

4

determined that there is a reasonable indication that imports of Aluminum Foil from Turkey are materially injuring the U.S. industry. *See Aluminum Foil From Armenia, Brazil, Russia, and Turkey,* 85 Fed. Reg. 73748 (Int'l Trade Comm'n November 19, 2020) (prelim. determ.) (Appx007830).

Assan was a mandatory respondent in Commerce's investigation and participated throughout the proceeding through the filing of initial questionnaire responses, verification of the data submitted, and submission of legal arguments. *See, e.g.*, Assan Aluminyum Sanayi ve Ticaret A.S. ("Assan") and Kibar Dis Ticaret A.S. ("Kibar")'s Response to Section A Questionnaire (Dec. 22, 2020) ("Section A QR") (Appx80027-81039); Assan. and Kibar's Response to Section B Questionnaire (Jan. 14, 2021) ("Section B QR") (Appx81093-81935); Assan and Kibar's Response to Section C Questionnaire (Jan. 14, 2021) ("Section C QR") (Appx81936-82227); Assan and Kibar's Response to Section D Questionnaire (Jan. 19, 2021) ("Section D QR") (Appx82581-82879). In addition to its initial questionnaire responses, Assan also filed responses to a staggering thirteen supplemental questionnaires issued by Commerce. *See, e.g.*, Assan and Kibar's Response to the March 8, 2021 Section D Second Supplemental Questionnaire (Mar. 29, 2021) ("Fifth Supp. QR") (Appx85481-85989); Assan and Kibar's Response to the March 12, 2021 Section C Second Supplemental Questionnaire (Qs 1-20) (Mar. 31, 2021) ("Sixth Supp. QR Part I") (Appx86010-86703); Assan and Kibar's Response to the March 12, 2021 Section C Second Supplemental Questionnaire (Qs 21-28) (Apr. 2, 2021) ("Sixth Supp. QR Part II") (Appx86704-87297); Assan and Kibar's Response to the May 4, 2021 Section D Fifth Supplemental Questionnaire (Qs 2a-4) (May 14, 2021) ("Tenth Supp. QR Part I") (Appx89073-89112); Assan and Kibar's Response to the May 4, 2021 Section D Fifth

Supplemental Questionnaire (Qs 1, 2d, 3) (May 17, 2021) ("Tenth Supp. QR Part II")

(Appx89113-89171).

On May 4, 2021, Commerce published its negative preliminary determination that

Aluminum Foil from Turkey is not being, or is not likely to be, sold in the United States at LTFV.

*Certain Aluminum Foil from the Republic of Turkey:* Preliminary Negative Determination of

Sales at Less Than Fair Value, Postponement of Final Determination, 86 Fed. Reg. 23686 (Dep't

Commerce May 4, 2021) ("*Preliminary AD Determination*") (Appx006672- 006674). Because

Commerce preliminary determined that Assan did not make sales of aluminum foil at LTFV,

Assan was assigned a preliminary weighted-average dumping margin of 0.00 percent.

*Preliminary AD Determination*, 86 Fed. Reg. at 23687 (Appx006673).

Following the *Preliminary AD Determination*, Assan submitted its response to

Commerce's request for documents in lieu of verification on July 20, 2021. Assan Aluminyum

Sanayi ve Ticaret A.S., Kibar Dis Ticaret A.S. and Ispak Esnek Ambalaj Sanayi A.S.'s Response

to the Questionnaire in Lieu of Verification. (Jul. 20, 2021) ("Verification QR") (Appx89527-

91161). On August 2, 2021, Assan filed a case brief. Assan Aluminyum Sanayi ve Ticaret A.S.,

Kibar Dis Ticaret A.S. and Ispak Esnek Ambalaj Sanayi A.S.'s Case Brief (Aug. 2, 2021) ("Case

Br.") (Appx91253-91295). In its case brief, Assan commented on, amongst other things:

Commerce's deduction of the special 10 percent additional Section 232 tariffs on imports of

aluminum from Assan's U.S. price; Commerce's failure to grant Assan the full duty drawback

adjustment to which it was entitled; and Commerce's weight averaging of all raw material

premium costs during the POI in its cost calculation, rather than specific LME premium costs

reported by Assan. Case Br. at 3-9 (LME premium costs) (Appx91261-91267), 9-21 (deduction

of Section 232 tariffs) (Appx91267-91279), and 30-32 (duty drawback adjustment) (Appx91288-91290).

With regards to the Section 232 tariffs, Assan explained that the special tariffs are remedial, temporary, and were implemented under Congress's delegation of authority, and that, as such, their deduction from U.S. price imposes a double remedy. *Id*. at 9-21 (Appx91267-91279). Assan also challenged Commerce's duty drawback methodology, which incorrectly divided the exempted duty amount by total exports to the United States to calculate the per unit duty drawback adjustment applied to Assan's U.S. sales. *Id*. at 30-32 (Appx91288-91290). Finally, regarding raw material premium costs (DIRMATMP), Assan addressed Commerce's use of weight-averaged cost for both the LME and metal premium portions of metal costs, which introduces distortions in the cost calculations because it ignores fundamental cost differences related to yield loss. *Id*. at 3-9 (Appx91261-91267).

On August 12, 2021, Assan filed a rebuttal brief. Assan Aluminyum Sanayi ve Ticaret A.S., Kibar Dis Ticaret A.S. and Ispak Esnek Ambalaj Sanayi A.S.'s Rebuttal Brief (Aug. 12, 2021) ("Rebuttal Br.") (Appx91351-91401). In its rebuttal brief, Assan argued, amongst other things, that certain head office management fees and support services expenses, which were incurred in Turkey, relate to overall group management, and do not support U.S. sales or economic activity, should be excluded from Commerce's calculation of indirect selling expenses (INDIRSU). Rebuttal Br. at 3-13 (Appx91360-91370).

On September 23, 2021, Commerce published its *Final AD Determination* finding that Aluminum Foil from Turkey was being sold at less-than-fair-value and calculating a final weighted-average dumping margin for Assan of 2.28 percent. *See* 86 Fed. Reg. at 52881 (Appx007670). Commerce's calculations underlying its *Final AD Determination* are set forth in

the Memorandum from B. Hansen to The File, re Final Determination Analysis Memorandum

for the Assan Single Entity (Sep. 16, 2021) ("Final Analysis Memo") (Appx91402-92069).

In the *Final AD Determination*, Commerce continued to treat the Section 232 tariffs paid

by Assan as ordinary customs duties, distinct from antidumping, section 201 safeguards, and

other "special" tariffs, and thus deducted them from U.S. price. *Final I&D Memo.* at 17-18 (Cmt.

5)(Appx007633-007634). Commerce determined that Assan met its two-prong test for a duty

drawback adjustment but continued to calculate the per unit drawback adjustment by dividing the

amount of exempted duties under the closed IPCs by Assan's total exports to the U.S., rather than

exports under the closed IPCs. *Id.* at 28-29 (Cmt. 7) (Appx007644-007645). Commerce further

reduced the drawback benefit by offsetting the amount of certain filing penalties incurred by

Assan in its calculation. *Id.* at 29 (Cmt. 7) (Appx007645). Commerce continued to reject Assan's

DIRMATMP reporting, which is used in its books and records and consistent with Turkish

GAAP, in favor of a weight average the raw material aluminum premium costs for all

CONNUMs, regardless of yield loss or raw material requirements. *Id.* at 33-35 (Cmt. 8)

(Appx007649-007651). Finally, Commerce changed its calculation to treat certain management

fees as a U.S. indirect selling expense ("ISE") by revising the ISE ratio to include the fees and

making a corresponding reduction to Assan's reported G&A expenses. *Id.* at 10-11 (Cmt. 2)

(Appx007626-007627).

The ITC made an affirmative final injury determination, published as *Aluminum Foil*

*From Armenia, Brazil, Oman, Russia, and Turkey*, 86 Fed. Reg. 62845 (Int'l Trade Comm'n

Nov. 12, 2021) (final determ.) (Appx007825). Commerce published the *AD Order* on November

12, 2021. *AD Order*, 86 Fed. Reg. at 62790 (Appx007821-007824).

### III.    <u>STANDARD OF REVIEW</u>

This Court must remand any administrative determination by Commerce which is "unsupported by substantial evidence on the record" as a whole or is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

When reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 217 (1938)).

When reviewing Commerce's statutory interpretations, the Court applies the two-part framework set forth in the Supreme Court's opinion in *Chevron*. *Union Steel v. United States*, 713 F.3d 1101, 1106–07 (Fed. Cir. 2013) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, (1984)). Under *Chevron*, to determine whether an agency's interpretation of the statute is entitled to deference, the court conducts a two-part test. Under the first prong of this test, the court determines whether Congress has spoken directly to the question at issue, and if it has, the court and the agency must give effect to the unambiguously expressed intent of Congress. *See id.* Where the statute is vague or silent on an issue, the court upholds Commerce's interpretation only if the interpretation is reasonable. *See Chevron*, 467 U.S. at 843.

This Court has found Commerce's determinations unlawful "where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. v. United States*, 927 F.Supp.451, 454 (Ct. Int'l Trade 1996); *see also Asociacion Colombiana de Exportadores de Flores v. United States*, 6 F.Supp.2d 865, 880 (1998).

IV.     **ARGUMENT**

   A.     **Section 232 Tariffs Are "Special" Tariffs That Should Not Be Deducted From Export Price**

Certain aluminum foil imported by Turkish Respondents during the POI were subject to additional tariffs imposed pursuant Section 232 of the Trade Expansion Act of 1962. Section C QR at Appendix V. Section 232 tariffs are special tariffs imposed to remedy threats to national security – in this case a threat to the viability of the U.S. aluminum industry. *See Publication of a Report on the Effect of Imports of Aluminum on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40508 (Dep't Commerce Jul. 6, 2020) ("*Section 232 Aluminum Report*").

   In its *Final AD Determination*, Commerce concluded that "section 232 duties should be treated as U.S. import duties" and "thereby customs duties which are deducted from U.S. price." *Final I&D Memo* at 20-21(Appx007636-007637). However, Commerce's treatment of the Section 232 tariffs as regular U.S. import duties, rather than special tariffs is unsupported by substantial evidence. Commerce's deduction of the Section 232 tariffs from U.S. price, which effectively increases antidumping margins solely on the basis of the special tariffs imposed, is contrary to Commerce's longstanding policy of excluding adjustments for special tariffs, such as safeguards, antidumping ("AD"), and countervailing ("CVD") duties, which has been consistently upheld by the reviewing courts, and unlawfully results in a double remedy. *See, e.g.*, *Wheatland Tube Co. v. United States,* 495 F.3d 1355, 1363 (Fed. Cir. 2007).

   The Court previously considered treatment of Section 232 tariffs in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, and found that, "{w}hile Section 232 duties are 'special' in some sense . . . they are still import duties" and the "the reasoning provided by Commerce differentiating its treatment of Section 232 and Section 201 duties is {not} so

lacking in merit that the court must say it is arbitrary." 494 F.Supp.3d 1365, 1375-76 (Ct. Int'l

Trade 2021), *appeal docketed*, Fed. Cir. No. 2021-2240. For the reasons that follow, the Court

should reconsider its ruling and find that the special Section 232 tariffs are distinguishable from

ordinary U.S. import duties and may not be deducted from export ("EP") and constructed export

("CEP").

> 1.     **The Statute Does Not Contemplate Adjustments For "Special" Tariffs**

Commerce calculates a margin of dumping based on a comparison between the price of

the merchandise sold in the home market, *i.e.* the "normal value," and the price of merchandise

sold in the United States. 19 U.S.C. § 1673. The export ("EP") or constructed export ("CEP")

price in this comparison refers to ex-factory prices, which are adjusted based on specific factors

outlined in the statute. 19 U.S.C. §§ 1677a(a)-(b). Specifically, Commerce is statutorily

mandated to, amongst other things, reduce the price used to establish both EP and CEP by "the

amount, if any, included in such price, attributable to any additional costs, charges, or expenses,

and *United States import duties*, which are incident to bringing the subject merchandise from the

original place of shipment in the exporting country to the place of delivery in the United States."

*Id.* § 1677a(c)(2)(A) (emphasis added). The statute does not define "United States import duties"

and the reviewing courts have found that it is an "ambiguous phrase in the statute." *Borusan*, 494

F.Supp.3d at 1372 (citing *Wheatland Tube*, 495 F.3d at 1359–60). Relying on the legislative

history, Commerce has determined that the phrase "United States import duties" does not cover

all U.S. customs duties imposed on imported merchandise, but rather excludes special or

remedial remedies, including safeguards (Section 201) and trade remedies (AD/CVD), which

should not be treated as "United States import duties" for purposes of calculating gross U.S.

price. *See Stainless Steel Wire Rod from the Republic of Korea*, 69 Fed. Reg. 19153, 19159

(Dep't Commerce Apr. 12, 2004) (final AD review results) ("*SSWR Korea*"); *see also Certain*

11

*Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea*, 62 Fed. Reg. 18404, 18421 (Dep't Commerce Apr. 15, 1997) (final AD results); *Borusan*, 494 F.Supp.3d at 1372.

This Court has recognized Commerce's distinction between special dumping tariffs and ordinary customs duties, and the U.S. Court of Appeals for the Federal Circuit has affirmed that this interpretation of "United States import duties" as not including special tariffs is reasonable. *Wheatland Tube*, 495 F.3d at 1365-66. In *Wheatland Tube*, the CAFC concluded that Congress did not intend all duties to be considered "United States import duties" and that Section 201 safeguards were properly considered special tariffs that should not be deducted from EP and CEP. 495 F.3d at 1361. Specifically, the CAFC found that:

> Like antidumping duties, Commerce found that § 201 safeguard duties are remedial duties that provide relief from the adverse effects of imports. Antidumping duties aim to remedy sales by a foreign exporter in the U.S. market at less than fair value. Similarly, § 201 safeguard duties aim to remedy the injurious effects on the U.S. industry of a significant surge in imports. Normal customs duties, in contrast, have no remedial purpose. They are imposed regardless of whether the U.S. industry is suffering adverse effects as a result of imports.

*Id.* at 1362 (citations omitted). The court noted with approval Commerce's observation that "antidumping duties and § 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise." *Id.* "Given the similarities between antidumping duties and § 201 safeguard duties," the CAFC held:

> {I}t was reasonable for Commerce to conclude that § 201 safeguard duties are more like antidumping duties "in purpose and function than they are like ordinary customs duties." Because of Commerce's finding that § 201 safeguard duties are like antidumping duties for purposes of § 1677a(c)(2)(A), it was reasonable for Commerce to treat § 201 safeguard duties as

12

> antidumping duties and not deduct them from the EP when calculating dumping margin.

*Id.* (citations omitted). Finally, the court affirmed as reasonable Commerce's finding that "if § 201 safeguard duties were included as 'United States import duties' for purposes of determining the EP pursuant to § 1677a(c)(2)(A), then in certain situations Commerce would improperly collect § 201 safeguard duties twice." *Id.*

Consistent with CAFC precedent, Commerce has interpreted 19 U.S.C. § 1677a(c)(2)(A) to provide for the deduction only of regular customs duties and not special remedial tariffs. Because special tariffs are distinct from ordinary customs duties, their deduction from U.S. price in calculating antidumping margins is not contemplated by the statute. 19 U.S.C. § 1677a(c)(2)(A). Where, as here, Commerce has "establishe{d} a course of action . . . {it} is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009). In finding the Section 232 tariffs to be ordinary customs duties, Commerce has departed from its consistent interpretation of the statute without adequately explaining its reasons for diverging from it.

### 2. The Section 232 Tariffs On Steel and Aluminum Imports Are "Special" Tariffs

In the *Final AD Determination*, Commerce found that "Section 232 duties are not akin to antidumping or section 201 duties" and should be treated as "ordinary customs duties." *Final I&D Memo* at 20 (Appx007636). However, Commerce has itself "acknowledge{d} the extraordinary nature of 232 duties," in the absence of which the U.S. "industry will continue to decline{.}" *See* Memorandum from C. Showers to P. Lee Smith, Re: Issues and Decision Memorandum for the Final Normal Value Calculations to be Effective from Release of the Final Normal Values through June 30, 2019, under the Agreement Suspending the Antidumping Duty

13

Investigation on *Certain Oil Country Tubular Goods from Ukraine* (A-823-815) (Dept. of

Commerce Feb. 15, 2019) at 7. It is clear that Commerce and the Administration contemplated

the Section 232 tariffs as an alternate means to remedy injury and/or threat of injury to a

domestic industry, consistent with the underlying purpose of other special tariffs. Moreover,

similar to Section 201 safeguards and antidumping duties, the Section 232 tariffs are remedial,

temporary, and were implemented under Congress's delegation of authority, providing additional

support for their treatment as special tariffs in dumping calculations.

<b>a.      Section 232 Tariffs Are Remedial</b>

In finding that Section 201 safeguards are properly characterized as special tariffs,

Commerce and the CAFC found it significant that Section 201 safeguards, like antidumping

duties, are remedial in nature. *SSWR Korea*, 69 Fed. Reg. at 19159; *Wheatland Tube*, 495 F.3d at

1362. By contrast, ordinary customs duties, which are imposed "regardless of whether the U.S.

industry is suffering adverse effects as a result of imports," have "no remedial purpose."

*Wheatland Tube*, 495 F.3d at 1362.

In the *Final AD Determination*, Commerce found that the Section 232 tariffs "have no

remedial purpose" because they are "focused on addressing imports that threaten to impair

national security, separate and apart from any function performed by antidumping and 201

safeguard duties to remedy injury to a domestic industry." *Final I&D Memo* at 20-21

(Appx007636-007637). This is a distinction without a difference. Contrary to Commerce's

claims, Section 232 tariffs, as well as Section 201 and antidumping duties, "are all directed at the

same overarching purposes – protecting the bottom line of domestic producers." *Wheatland

Tube*, 495 F.3d at 1364. Though Commerce reasons that the 232 tariffs are specifically tailored

towards national security, its conclusion ignores the text and operation of the Section 232 statute,

as well as the articulated rationale of Commerce and the President in implementing the tariffs.

14

Like other special tariffs, the Section 232 tariffs are imposed "in response to trade practices in specific instances in which the welfare of key domestic industries is impacted by foreign trade." *Borusan*, 494 F.Supp.3d at 1374. Unlike import duties imposed in the normal course of trade, Section 201, antidumping and countervailing, and Section 232 tariffs may only be imposed following investigations establishing the existence of particular conditions. *See* 19 U.S.C. §§ 2251, 1671, 1673, 1862. Factors considered by the ITC in antidumping and Section 201 cases are similar to those considered pursuant to the Section 232 statute, which directs Commerce and the President to consider, amongst other things, "the impact of foreign competition on the economic welfare of individual domestic industries;" "any substantial unemployment . . . loss of skills or investment;" and "other serious effects resulting from the displacement of any domestic products by excessive imports." 19 U.S.C. § 1862(d). In assessing material injury in antidumping investigations, the ITC likewise looks to conditions of competition in the U.S. market, U.S. producers' financial experience and employment levels, and other effects related to displacement from imports, including U.S. production, shipments, apparent consumption, market shares, and pricing data. 19 U.S.C. § 1677(7)(C). In Section 201 proceedings, the Commission considers whether "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry." 19 U.S.C. § 2251(a). Under each provision, the amount of tariffs imposed is related directly to the extent of the particular conditions determined to exist with regards to the domestic industry. *See* 19 U.S.C. §§ 1862(d), 1677(7)(C), 2251(a). In other words, the remedy provided by these measures "is the same—the imposition of duties on foreign exports, which is intended to raise the United States market price for the subject merchandise and thereby increase sales and profits of domestic producers." *Wheatland Tube*, 495 F.3d at 1364.

15

While, as Commerce notes, the Section 232 tariffs address threats to national security, *Final I&D Memo* at 20-21 (Appx007636-007637), the remedial purpose of adjusting imports to safeguard national security does not make the Section 232 tariffs more like ordinary customs duties than other special tariffs. To the contrary, comparing the Section 232 tariffs with special tariffs like Section 201 and AD/CVD duties reveals a nearly identical underlying purpose— protection of the domestic industry via adjustment of imports. Indeed, like Section 232, each of the special tariff provisions require an additional finding beyond injury to domestic producers, *i.e.* a surge in imports (Section 201), that imports are sold at below fair value (AD), or that imports causing injury benefit from government subsidies (CVD). These additional factors do not obscure the same primary focus of each special measure to protect the economic welfare of U.S. domestic industries. *See* 19 U.S.C. §§ 2251-2252, 1673, 1671; *see also Wheatland Tube*, 495 F.3d at 1363-64.

The Section 232 statue is likewise broadly focused on the economic impact of imports on domestic producers and industries, as evidenced by Commerce's investigation, which considered, amongst other things, the "poor financial status" of and the "threat of impairment" to the domestic industry necessitating "reduc{tion of} imports to a level that will provide the opportunity for U.S. primary aluminum producers{.}" *Section 232 Aluminum Report*, 85 Fed. Reg. at 40565, 40566. Commerce's analysis included many of the same factors weighed by the ITC in determining injury in Section 201 and antidumping cases, including the profitability, net income, loss of revenue, capacity utilization rates, and capital expenditures of the domestic industry. *Id.* at 40519, 40530, 40561, 40563. As in those cases, Commerce's recommendation "that the President take immediate action by adjusting the level of . . . imports" was based on its conclusion that "present quantities and circumstance of aluminum imports are 'weakening our

16

internal economy,'" including the "financial health and viability" of domestic producers. *Id.* at 40509-10, 40522.

Commerce's *Section 232 Aluminum Report* to the President highlights not only the special nature of the tariffs, but also their connection to antidumping and countervailing duty orders, which are referenced in the aluminum report, as well as the accompanying report on steel imports. *See id.* at 40543; *see also Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202, 40204, 40210-11, and 40216 (Dep't Commerce Jul. 6, 2020) ("*Section 232 Steel Report*"). In implementing the 10 percent tariffs, the President emphasized that, as with other special tariffs, the Section 232 tariffs were being imposed "in response to specific requests from affected domestic parties" for the explicit purpose of protecting "domestic aluminum producers" and helping them to "achieve long-term economic viability through increased production." *Proclamation 9704 of March 8, 2018*, *Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 11619 (Mar. 15, 2018) ("*Proclamation 9704*"). *Proclamation 9704*, which implemented the tariffs, explained that the tariff is "necessary and appropriate to adjust imports of aluminum articles" due to Commerce's findings that those imports are "'weakening our internal economy,' leaving the United States 'almost totally reliant on foreign producers of primary aluminum.'" *Id.* at 11619-20. In other words, the Section 232 tariffs were recommended and implemented to serve the remedial purpose of providing relief to the domestic aluminum industry from the adverse effects of imports.

As the Court recently noted, "the purpose of Section 232 duties is . . . remedial in a broad sense." *Borusan*, 494 F.Supp.3d at 1374. That is especially true, where, as here, Commerce and the President viewed the Section 232 tariffs as an alternate means to remedy injury to a domestic

industry, equivalent to special tariffs like antidumping and Section 201 tariffs. Indeed, both the

Court and Commerce have recognized the Section 232 tariffs as "remedial" outside the context

of antidumping calculations. *Am. Inst. for Int'l Steel, Inc. v. United States,* 376 F.Supp.3d 1335,

1343 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020), *cert denied,* 139 S. Ct. 133

(2020); *Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and

Aluminum*, 83 Fed. Reg. 46026, 46054-55 (Dep't Commerce Sept. 11, 2018) (interim final rule)

("*Submission of Exclusion Requests & Objections*"). Given this reality, Commerce's claim that

that the Section 232 tariffs are now "separate and apart" from other special, remedial safeguard

provisions is disingenuous. *Final I&D Memo* at 21 (Appx007637).

Because remedying the impact of the imports on the economic welfare of U.S. domestic

industries is the primary focus of the Section 232 statute, as with both antidumping and Section

201 safeguards, the Court should find that the Section 232 tariffs have a remedial purpose.

> **b.      Section 232 Tariffs Are Temporary**

In *Wheatland Tube*, the CAFC agreed with Commerce that Section 201 tariffs, which are

temporary in nature, are distinguishable from ordinary custom duties, which have no termination

provision and are permanent unless modified by Congress. 495 F.3d at 1362. Like other special

tariffs, the Section 232 tariffs are temporary in nature and do not require congressional action to

be modified.

The Section 232 statute provides authority for the President to determine the "nature and

duration of the action" taken to adjust imports, 19 U.S.C. § 1862(c)(1)(A)(ii), which the CAFC

has found to include "coverage of a plan implemented over time, including options for

contingency-dependent choices." *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1321

(Fed. Cir. 2021). Even though Section 232 tariffs do not have a fixed termination date, this broad

"authority to pursue a continuing course of action, with adjustments (including additional

impositions) adopted over time," highlights the temporary nature of the tariffs, which can be modified or suspended by the President at any time. *Id.* at 1324; *see also Borusan*, 494 F.Supp.3d at 1374-75.

Here, the Section 232 tariffs were only found to be "necessary and appropriate" under the "current circumstances." *Proclamation 9704*, 83 Fed. Reg. at 11620. The proclamation implementing the Section 232 tariffs expressly directs the Secretary of Commerce to continue to monitor imports of aluminum articles and to periodically review the status to inform the President of any circumstances that might require modifications or circumstances that might indicate that the tariffs would no longer be necessary. *Id.* at 11621-22. Indeed, since the publication of *Proclamation 9704*, the President has modified the Section 232 tariffs on multiple occasions, including by changing the number of countries covered and by expanding the scope to include certain downstream derivative products. *See Proclamation 9710 of March 22, 2018: Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 13355 (Mar. 28, 2018); *Proclamation 9739 of April 30, 2018: Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 20677 (May 7, 2018); *Proclamation 9758 of May 31, 2018: Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 25849 (June 5, 2018); *Proclamation 9980 of January 24, 2020: Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States*, 85 Fed. Reg. 5281 (Jan. 29, 2020). As with Section 201 safeguards, specific products can also be excluded from the Section 232 tariffs for a one-year period of time. Compare *Submissions of Exclusion Requests & Objections,* 83 Fed. Reg. at 46026 (exclusion request procedures for Section 232 tariffs), with *Procedures To Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83

Fed. Reg. 6670 (USTR Feb. 14, 2018) (notice & request for cmts.) (exclusion request procedures for Section 201 tariffs).

Finally, as detailed below, the fact that the Section 232 tariffs are temporary is further evidenced by their placement in Chapter 99 of the Harmonized Tariff Schedule of the United States ("HTSUS"). *See Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United States*, 88 Fed. Reg. 20683, 20687 (May 7, 2018) ("To Modify Certain Provisions of Chapter 99") ("*Proclamation 9740*"). When Chapter 99 was created, the ITC issued a report explaining that "Chapter 99 is designed for the incorporation of legislation, proclamations, and administrative actions, which, because of their *temporary* or collateral nature, are not assimilated into the main body of the tariff schedule." *Conversion of the Tariff Schedules of the United States Into the Nomenclature Structure of the Harmonized System*, Inv. No. 332-131, USITC Pub. 1400, at 16 n.1, 28 (June 1983) (emphasis added). Thus, from the outset, Congress and the ITC envisioned Chapter 99 as a location for temporary tariffs, separate and distinguishable from the ordinary Customs duties included in Chapters 1-97 of the HTSUS.

This Court has previously found Section 232 tariffs to be "temporary in that no Congressional action is needed to end them," which is "a clear difference from normal customs duties, which are enacted by Congress." *Borusan*, 494 F.Supp.3d at 1374. This "lack of permanenc{y}" aligns the Section 232 tariffs more closely with other special tariffs than with ordinary customs duties. *Id.* at 1375. The Court should thus continue to find that Section 232 tariffs, like antidumping and Section 201 safeguards, are temporary in nature.

> **c.**   **Section 232 Tariffs Were Implemented Under Congress's Specific Delegation of Authority to the Executive**

The special nature of Section 232 tariffs is further emphasized by constitutional principles, which "vests in Congress the sole authority to impose tariffs" but allows the President

to impose special tariffs such as under the Trade Expansion Act of 1962. S. Rep. No. 90-1385, pt.

2, at 13 (1968). Specifically, the U.S. Constitution provides that Congress is responsible for

levying and collecting taxes and duties. U.S. Const. art. I, § 8. The reviewing courts have

interpreted this authority such that "{t}he general power to modify the HTSUS belongs

exclusively to Congress," with the President given by Congress "limited authority to make

modifications to the HTSUS based solely within the framework of statutorily defined

objectives." *Forest Lab'ys, Inc. v. United States*, 403 F.Supp.2d 1348, 1352 (Ct. Int'l Trade

2005), *aff'd,* 476 F.3d 877 (Fed. Cir. 2007).

The ability of the Executive Branch to impose tariffs pursuant to Section 232 thus flows

directly from an express delegation of authority through legislation from Congress. U.S. Const.

art. I, § 8. This delegation of limited authority, which authorizes the President to apply special

tariffs only where certain conditions are found to exist, is consistent with antidumping and

Section 201 tariffs. *See* 19 U.S.C. § 1862. In each case, the Executive Branch may implement

special tariffs for the remedial purposes specified in the statute. This is in stark contrast to

ordinary U.S. import duties, which are determined and imposed by Congress pursuant to the

United States' World Trade Organization ("WTO") obligations. While Congress has delegated to

the Executive Branch the limited authority to apply special tariffs in certain circumstances,

Congress has never delegated to the President any general or blanket authority to modify duty

rates or to set ordinary customs duties. This power lies solely with Congress. Any authority

delegated by Congress to the President to impose tariffs, as it has done here, is by definition a

special duty implemented to fulfill specific statutory objectives. 19 U.S.C. §§ 1862(c)(1)(A)(ii)

and (b)(3)(A) (Congress delegated its authority to the President to "determine the nature and

duration of the action that . . . must be taken to adjust the imports of the {imported} article and

21

its derivatives" if the Secretary of Commerce finds that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security").

Here, Congress delegated its exclusive authority to the Executive Branch, allowing it to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii). Congress's delegation is limited to "safeguarding national security," including the "economic welfare of individual domestic industries." 19 U.S.C. § 1862(d). This delegation is distinguishable from ordinary customs duties set by Congress and indicates that these special tariffs imposed by the Executive Branch should not be treated as "ordinary" customs duties. *Final I&D Memo* at 21 (Appx007637). Indeed, the antidumping, Section 201, and Section 232 laws each involve a delegation of legislative authority to the Executive Branch to investigate the consequences of increased imports and the resulting economic harm. *Wheatland Tube*, 495 F.3d at 1363-64.

This legal distinction is carried through to the classification of duties in the HTSUS. Though Commerce cites absence of an "express exception" in the Annex to *Proclamation 9740*, as evidence of the President's intent that the 232 tariffs be treated as U.S. import duties, *Final I&D Memo* at 21 (Appx007637), the placement of the modification in HTSUS Chapter 99 further highlights its special nature. *See Proclamation 9740*, 88 Fed. Reg. at 20687. Chapters 1 to 97 of the HTSUS are used for ordinary customs duties, whereas Chapter 99 is specifically reserved for special tariffs imposed under "Temporary Legislation, Temporary Modifications Established Pursuant to Trade Legislation, {and} Additional Import Restrictions{.}" HTSUS, ch. 99.

The HTSUS designation is not simply a matter of organization or nomenclature, but rather, reflects the critical legal distinction between regular customs duties imposed by Congress, and special duties imposed by the Executive Branch. Even Commerce has acknowledged that Chapter 99 "is reserved for special or temporary duties" and regarded the designation of Section 201 tariffs in Chapter 99 as significant to its distinction of those tariffs from ordinary customs duties. *SSWR Korea*, 69 Fed. Reg. at 19160. Having previously recognized placement in Chapter 99 as a signifier that tariffs are special, it is unreasonable for Commerce to take a different position with respect to the Section 232 tariffs in this case without further explanation.

Consistent with both Congress's delegated authority and the history of Chapter 99 of the HTSUS, the Court should find the Section 232 tariffs to be special tariffs.

> **3.      There Is A Clear Interplay Between Section 232 Tariffs and Antidumping Duties Such That Deducting Section 232 Tariffs Imposes A Double Remedy**

The reviewing courts have found that the deduction of special tariffs from U.S. price in the calculation of dumping margins results in double-counting. *See, e.g.*, *AK Steel Corp. v. United States*, 988 F.Supp.594, 607 (Ct. of Int'l Trade 1997) (treating remedial tariffs as costs "would create the same double-counting issue Commerce is seeking to avoid in its refusal to consider countervailing and antidumping duties to be U.S. import duties." *Id.* at 608 n.12). As the CAFC confirmed, because safeguards "may reduce or eliminate the injury that is required for an antidumping duty to continue and because deducting . . . safeguard duties from the EP may create an artificial dumping margin," their deduction from the calculation of dumping margins would result in the punitive collection of additional duties in contravention of the statute. *Wheatland Tube*, 495 F.3d at 1365. Indeed, "{t}o assess both a safeguard duty and an antidumping duty on the same imports without regard to the safeguard duty, would be to remedy substantially overlapping injuries twice." *Id.*

23

In its prior review of the Section 232 tariffs, the Court's decision turned on the extent of the "statutory interplay" between Section 232 and antidumping duties, *i.e.* whether Section 232 tariffs are "related to and complimentary to antidumping duties." *Borusan*, 494 F.Supp.3d at 1375. In its *Final AD Determination*, Commerce claimed that there was no such "overla{p}" because the Section 232 and antidumping duties do not provide multiple remedies for the same situation. *Final I&D Memo* at 20 (Appx007636). Contrary to Commerce's claims, the President and Commerce have frequently indicated that the Section 232 tariffs were contemplated as an alternative to other special trade remedies, most notably antidumping duties. For example, in its Report to the President, Commerce noted that "{d}espite efforts to level the playing field through AD/CVD orders, there are numerous examples of U.S. . . . producers being unable to fairly compete with foreign suppliers." *Section 232 Steel Report*, 85 Fed. Reg. at 40216. Commerce clearly viewed the Section 232 tariffs as commensurate with other special provisions, stating that "{s}maller . . . manufacturers are financially unable to afford {AD/CVD} cases, or are hesitant to file cases in light of possible market entry retaliation in foreign markets{.}" *Id.* at 40211.

The CAFC's finding in *Wheatland Tube* that "deducting the 201 duties from U.S. prices effectively would collect the 201 duties twice-first as 201 duties, and a second time as an increase in that dumping margin," *Wheatland Tube*, 495 F.3d at 1363 (citation omitted), thus applies with equal force to Commerce's deduction of Section 232 tariffs in this proceeding. To the extent that there is any preexisting dumping margin, Commerce's methodology results in a dollar-for-dollar increase in that margin equal to the amount of the Section 232 duty; if there is no preexisting dumping margin, Commerce's methodology would create one. This result is contrary both to the remedial purpose of the antidumping statue, as well as Commerce's

obligation to calculate dumping margins "as accurately as possible." *See Rhone-Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

Commerce's attempts to mask the double remedy inherent in its methodology by citing to a statement in the Annex to *Proclamation 9740* that "{a}ll anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed, except as may be expressly provided herein" is unavailing. *Final I&D Memo* at 21 (citation omitted) (Appx007637). The issue is not whether antidumping duties should continue to apply to aluminum imports like foil, but rather whether Commerce should be permitted to collect Section 232 tariffs a second time in the form of an increased antidumping margin based on their collection. Commerce's rationale does not confirm that Section 232 tariffs are to be treated as regular customs duties, nor resolve the direct conflict between its methodology and the CAFC's determination in *Wheatland Tube*. Contrary to the Court's finding in *Borusan*, there are no "crucial differences" between Section 201 and Section 232 justifying disparate treatment by Commerce. *Borusan*, 494 F.Supp.3d at 1376. Both Section 201 and Section 232 tariffs are special tariffs, more akin to antidumping duties than to ordinary customs duties. *See Wheatland Tube*, 495 F.3d at 1362 (finding Section 201 duties to be special duties because they "are more like antidumping duties in purpose and function than they are like ordinary customs duties" (citation omitted)).

Because the purpose and function of both Section 232 tariffs and antidumping duties is to remedy injury to a domestic industry, deduction of the Section 232 tariffs in the dumping calculation presents the same "unique circularity issue," *Borusan*, 494 F.Supp.3d at 1373, identified by the CAFC in *Wheatland Tube*.

**B.      Commerce's Duty Drawback Methodology Unlawfully Limited The Adjustment To U.S. Price**

In the *Final AD Determination*, Commerce found that Assan was eligible for a duty drawback adjustment and granted such an adjustment to Assan. *See* Memorandum from J. Maeder to C. Marsh, Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of *Certain Aluminum Foil from the Republic of Turkey* (Apr. 27, 2021) ("*Preliminary I&D Memo*") at 11 (Appx006530); *Final I&D Memo* at 28 (Appx007644). However, Commerce's calculation of the drawback adjustment was improperly based on an allocation "to all sales in the U.S. sales data," including sales that were not subject to a closed IPC and thus should not have been included in Commerce's determination of the per unit drawback adjustment. *Final I&D Memo* at 28 (Appx007644). This methodology conflicts with the statute and Commerce's practice in recent cases involving the Turkish drawback system, *i.e.* the Import Processing Regime ("IPR"). *Id.* at 28 (Appx007644). Assan's drawback adjustment should have been calculated based on exports subject to a closed IPC, and Commerce's determination to instead use all U.S. exports as the denominator in its calculations improperly limits the adjustment Assan is entitled to by law. There is likewise no statutory basis to reduce Assan's drawback benefit by offsetting the adjustment by the amount of filing penalties incurred, which were consistent with the requirements of the Turkish IPR.

**1.      Commerce Improperly Included U.S. Sales Not Covered By A Closed IPC In Its Calculation of Assan's Per Unit Drawback Adjustment**

The duty drawback adjustment to U.S. price is guaranteed by the statute, which unambiguously directs Commerce to increase EP or CEP by:

> the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States{.}

26

19 U.S.C. § 1677a(c)(1)(B). In determining whether to grant a duty drawback adjustment

to U.S. price under 19 U.S.C. § 1677a(c)(1)(B), Commerce applies a two-prong test in

which the party requesting the adjustment must demonstrate:

> (1) that the rebate and import duties are dependent upon one
> another, or in the context of an exemption from import duties, that
> the exemption is linked to the exportation of the subject
> merchandise, and (2) that there are sufficient imports of the raw
> material to account for the duty drawback on the exports of the
> subject merchandise.

*Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1340 (Fed. Cir. 2011) (citation

omitted); *see also, Final I&D Memo* at 28 (Appx007644).

Commerce has historically "found that the Turkish IPR satisfies the 'two-pronged' test."

*Final I&D Memo* at 28 (Appx007644). In the instant investigation, Commerce found the IPR

program utilized by Assan to satisfy the first prong of its two-prong test because "Assan imports

raw materials, i.e. [                                                        ], with a commitment to export the

finished product that is manufactured using the imported raw materials." *See* Section C QR at 40

(Appx81984). Specifically, Assan reported the "per unit amount of customs duties and fees

which Assan would have had to pay if the finished product had not been exported to the United

States," with the IPC number providing the necessary linkage for the imports and exports. *Id.* at

39-40 (Appx81983-81984). Record evidence further demonstrates that Assan received drawback

on its U.S. exports and that there were sufficient imports of the raw material to account for the

duty drawback on the exports of the subject merchandise, satisfying the statutory requirements of

19 U.S.C § 1677a(c)(1)(B) and the second prong of Commerce's test. *See* Section C QR at 41

(Appx81985).

Where, as here, an importer satisfies both criteria, it has been Commerce's longstanding

policy to grant a drawback adjustment by allocating the "total amount of duty drawback received

across all exports that may have incorporated the duty-paid input in question, regardless of destination." *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61716, 61723 (Dep't Commerce Oct. 19, 2006). Consistent with Commerce's practice and to "avoid mismatches between the numerator and denominator," Assan "calculate{d} the reported per unit amount of duty drawback by dividing the total amount of customs duties and charges corresponding to the imports made under the identified IPC by the total of exports made as a commitment against the imports to close the IPC." Section C QR at 42 (Appx81986). In its *Final AD Determination*, however, Commerce ignored Assan's reporting and instead continued to calculate the per unit drawback adjustment by dividing the duty exemption received on Assan's *closed IPC*, by *all U.S. exports*, resulting in an inconsistent numerator and denominator.  *Final I&D Memo* at 28 (Appx007644).

Notably, both Assan and the Petitioner objected to Commerce's approach, which is contradicted by both the statute and Commerce's own historic and more recent practice. As Assan stated, Commerce's division of "the duty exemptions received on {Assan's closed IPC} by ALL U.S. exports . . . seriously dilute{s} the adjustment" and results in an allocation of the benefit over an overstated denominator which includes "U.S. exports that were made pursuant to other IPCs which have no relation to {the IPC closed during the POI}." Case Br. at 30 (Appx91288). Petitioners agreed that "the only modification {to Commerce's drawback calculation} that is consistent with the statute and the Department's two-pronged test would be to divide the amount of duties not collected under the closed IPC by the volume of exports reported under that IPC," rather than by all U.S. exports. Petitioners' Rebuttal Case Brief Concerning Assan (Aug. 12, 2021) at 38 (Appx91339).

28

Indeed, while Commerce claims that its methodology is consistent with the two-prong test detailed above, *Final I&D Memo* at 29 (Appx007645), use of total U.S. sales as the denominator in Commerce's per unit drawback calculation is unsupported by law. This Court has found that Commerce must acknowledge the "statutory linkage" between the exempted duties and the products exported to the United States. *See, e.g.*, *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 415 F.Supp.3d 1195, 1203 (Ct. Int'l Trade 2019). As the Court has recognized, duty drawback adjustments should be granted "*only when there is some kind of connection* between the nonpayment of import duties and the exportation of the subject merchandise to the United States," *i.e.* where "but for the exportation of the subject merchandise to the United States, the manufacturer would have shouldered the cost of an import duty." *Maverick Tube Corp. v. United States*, 861 F.3d 1269, 1273 (Fed. Cir. 2017) (emphasis added). Commerce's methodology ignores this explicit connection between the drawback adjustment and exports, and its own requirement "to consider only *closed* IPCs to quantify the total {per unit} amount of the duty drawback". *Final I&D Memo* at 28 (emphasis in original) (Appx007644). In doing so, Commerce undermines the explicit purpose of the drawback statute to "prevent a dumping margin from being created, or artificially inflated{.}" *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 222 F. Supp. 3d 1255, 1261 (Ct. Int'l Trade 2017). Use of all U.S. sales rather than only those export sales covered by a closed IPC as the denominator in Commerce's drawback calculation improperly reduces the adjustment to U.S. sales and directly contradicts Commerce's own standard "to consider only closed IPCs to determine the {per unit} amount of duty drawback benefit." *Final I&D Memo* at 28 (Appx007644). This violates the statute's linkage of the drawback adjustment in § 1677a(c)(1)(B) to exporting under a closed IPC, pursuant to Commerce's standard.

Commerce's calculation of the duty drawback adjustment to U.S. price in the *Final AD Determination* also contradicts Commerce's consistent practice in other determinations involving the Turkish drawback system. *See, e.g., Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2018-2019, 86 Fed. Reg. 28574 (Dep't Commerce May 27, 2021), and accompanying Issues and Decision Memorandum at 12 (Cmt. 3). There is no basis for Commerce to adopt a different methodology in this investigation and Commerce has provided no explanation for its departure from its previous practice in other cases involving the Turkish IPR. *Id.*

Having found that Assan satisfied its requirements for a duty drawback adjustment, Commerce should have simply granted Assan a full duty drawback adjustment to U.S. price by dividing the amount of the uncollected duty by Assan's total exports covered a closed IPC, in accordance with its usual "practice" to determine the U.S. price adjustment for duty drawback. *Final I&D Memo* at 28 (Appx007644)*; see also, Duty Drawback Practice in Antidumping Proceedings,* 70 Fed. Reg. 37764, 37764-66 (Dep't Commerce June 30, 2005) ("*Duty Drawback Notice*"). Assan's comprehensive reporting in this case was sufficient to satisfy Commerce's two-prong test and there is thus no reason to set aside the actual exports reported by Assan under closed [                    ] on which Commerce found that duty exemptions were earned and instead to allocate the duty exemptions over all U.S. sales. Consequently, Assan requests that Commerce to revise its dumping margin calculation to apply a duty drawback adjustment of [                    ] to all U.S. sales, which is calculated solely based on the closed [                    ]. *See* Section C QR at Exh. C-13 (Appx82193-82208).

      2.      **There Is No Lawful Basis To Offset The Duty Drawback Adjustment For Assan's Filing Penalties**

During the POI, Assan [

      ] after filing a late filing penalty fee. Sixth Supp. QR Part I at 28-29 (Appx86046-86047). Assan's actions were consistent with the requirements of the Turkish IPR, which authorizes companies to export goods under an IPC within two months after the expiration date of the IPC by being subject to a fine. *Id.* at Exhibit S6C-2 (Article 7 of Decision No. 2014/6197 (Feb. 28, 2014)) (Appx86056-86067). In the *Final AD Determination*, Commerce found that "it is appropriate to offset the amount of the duty drawback benefit from {[

      ]} by the amount of the filing penalties" incurred for Assan's late filing.  *Final I&D Memo* at 29 (Appx007645). Commerce's methodology is unlawful.

      In the *Final AD Determination*, Commerce claims that "{t}here is nothing in the statute that prevents Commerce from offsetting the duty drawback adjustment by penalties incurred." *Final I&D Memo* at 29 (Appx007645). However, there is likewise nothing in the statute or Commerce's rulings to authorize offsetting a drawback adjustment based on late penalties paid, and doing so is a departure from Commerce's standard practice with regards to the Turkish IPR. As detailed in Section IV.B.1, *supra*, in determining whether to grant a duty drawback adjustment to U.S. price under 19 U.S.C. § 1677a(c)(1)(B), Commerce applies a two-prong test. *Final I&D Memo* at 28 (Appx007644). Where importers satisfy both criteria, Commerce grants a drawback adjustment to EP and CEP for the amount of the duty foregone. *Id.* at 28 (Appx007644). Use of Commerce's two-prong test has been repeatedly acknowledged and upheld by the reviewing courts, with any deviations from this standard methodology categorically rejected. *See ArcelorMittal USA Inc. v. United States*, 32 C.I.T. 440, 463 n.23 (May 15, 2008) (rejecting allocation over total shipments); *see, e.g., Icdas Celik Enerji Tersane ve*

*Ulasim Sanayi, A.S. v. United States*, 429 F.Supp.3d 1353, 1362 (Ct. Int'l Trade 2020) (rejecting allocation over total production).

This methodology has been applied by Commerce in determinations addressing the Turkish drawback system for more than 15 years and Turkey's IPR system has not changed. *See, e.g., Light-Walled Rectangular Pipe and Tube From Turkey*, 69 Fed. Reg. 53675 (Dep't Commerce Sept. 2, 2004) (final LTFV determ.), and accompanying Issues & Decision Memorandum at 9 (Cmt. 1). Indeed, during the POI, Assan utilized the same IPR drawback program considered by Commerce in previous cases involving Turkey. Commerce has analyzed the Turkish IPR in numerous cases and consistently found it to satisfy Commerce's two-prong test. *See, e.g.*, *Welded Line Pipe From the Republic of Turkey*, 80 Fed. Reg. 61362 (Dep't Commerce October 13, 2015) (final LTFV determ.), and accompanying Issues & Decision Memorandum at 7 ("*Welded Line Pipe from Turkey*"). As of February 28, 2014, the Turkish IPR allows for importers to export within two months of the expiration date of an IPC. Sixth Supp. QR Part I at Exh. S6C-2 (Appx86056-86067). Because Assan's exports pursuant to [

] were consistent with the requirements of the Turkish IPR system, which Commerce confirms "satisfies the 'two-pronged' test," Commerce should grant Assan a full duty drawback adjustment to U.S. price without any offset for late penalties.

### C.    Commerce's Weight Averaging of Reported DIRMATMP Costs Is Distortive

In the *Final AD Determination* cost calculations, Commerce calculated a single weighted-average cost for both the LME and metal premium portions of metal costs. Assan had requested that the metal premium component not be averaged as it would introduce distortions in the cost calculations. *See* Tenth Supp. QR Part II at 10-11 (Appx89131-89132). Commerce concluded that averaging metal premium was appropriate because the metal premium fluctuations in CONNUMs were unrelated to the physical characteristics of the products. *See*

Memorandum from J. Young Oh to N. Harper, Re: Cost of Production and Constructed Value

Calculation Adjustments for the Preliminary Determination – Assan Aluminyum Sanayi ve

Ticaret A.S. and Ispak Esnek Ambalaj San. A.S. (Apr. 27, 2021) ("Prelim. Cost Calculation

Memo") at 1-2 (Appx89022-89023) and at *Final I&D Memo* at 15 (Appx007631). In doing so,

Commerce has ignored Assan's actual recorded costs and failed to consider fundamental cost

differences related to yield loss for specific CONNUMs and production runs.

As noted in Tenth Supp. QR Part II filed on May 17, 2021:

> {the Company's} cost accounting system calculates costs specific
> to each production order based on the specific raw material
> consumption and conversion costs incurred for that order in that
> period (month). The cost accounting system also tracks the actual
> consumption of inputs, including consumption of purchased semi-
> finished goods, such purchased aluminum sheet, i.e. if a particular
> product is produced from purchased semi-finished goods, it
> absorbs the cost of purchased input for the given month and not the
> cost of its own produced input. The cost accounting system used
> by Assan captures any and all cost differences experienced by
> Assan on an actual basis and reflects the true and actual costs for
> each product. . . . As a direct result of the way the cost accounting
> system is setup, the costs calculated in Assan's cost accounting
> system records and tracks each material cost based on its pricing
> components, mainly [
>
>        ]

*See* Tenth Supp. QR Part II at 11 (Appx89132).

Assan agreed with Commerce's decision to average LME costs "because the LME

portion of the material cost reflects the actual LME consumption cost for the month, and LME is

subject to significant fluctuation," it is appropriate "to set a single POI average LME cost" for

this portion of material cost. *Id.* at 11 (Appx89132). In Assan's cost accounting system, "both

the raw materials consumed and scrap generated" have an LME component and, therefore, "the

LME cost component is not impacted by the yield loss." *Id.* at 11 (Appx89132).

However, because the raw material premium is set as a negative value for scrap, as explained below, the over or under usage of raw material based on the yield loss rate is reflected in Assan's raw material premium cost component and, as such, averaging DIRMATMP would distort the costs applied to individual product types.

Commerce requested that the company report per unit direct material costs (DIRMAT) in aluminum sheet production. *See* Section D QR at 47 (Appx82636). Assan itemized this key cost element into its sub elements: LME Metal Cost (DIRMAT LME), and Metal Premium Cost (DIRMATMP). *Id.* at D-47 to D-49 (Appx82636-82638). These key raw material costs are separately reflected in the price of foil. As Assan noted in its Section A response in pricing products to customers "the final agreed value … has three components [

]". *See* Section A QR at A-23 (Appx80057).

The DIRMATLME component makes up nearly [          ] of reported TOTCOM, while the DIRMATMP component is much smaller. DIRMATLME values affect all products equally consistent with the aluminum LME price fluctuations, while reported per unit raw material premium ranged from [          ] reflecting the significant varying nature of this direct material cost component based on yield loss and raw material composition. *See* Tenth Supp. QR Part I at Exh. S10D-5 (Appx89108- Appx89112). Per unit LME and raw material premium values were separately reported for primary aluminum, scrap and sheet for April 2019 to September 2020. *See* Tenth Supp. QR Part II at Exh. S10D-10 (Appx89171). Reported LME values were very similar in magnitude, while scrap had a [          ] and the [          ]. This is consistent with the value of each material input, *i.e.* [

34

]. Due to these difference in input material costs, [

] has a lower per unit raw material premium cost.
However, this would be offset by higher labor and overhead costs as additional manufacturing
stages are required when more scrap is used.  Consequently, any analysis of the cost differentials
between CONNUMs should be based on TOTCOM rather than material costs alone. In sum, the
raw material cost differences among CONNUMs are related to yield loss and material inputs
used, which also partly relate to physical characteristics.

For example, as discussed in *See* Tenth Supp. QR Part II, certain CONNUMs, *e.g.* [

] rely more on aluminum sheet rather than scrap
given quality requirements, so there are in fact applied material differences depending upon the
physical attributes of a specific CONNUM. *See* Tenth Supp. QR Part II at 12 (Appx89133).

Commerce's approach to averaging raw material premium in the *Final AD Determination*
results in all subject merchandise having the same unit metal cost regardless of yield loss or
CONNUM material requirements. It has the effect of artificially loading costs to products made
predominantly from semi-finished materials (aluminum sheet) as the higher average raw material
premium is added to additional processing costs associated with products made from scrap or
primary aluminum, while other product CONNUMS are under costed. Again, Assan's cost
accounting system tracks and records usage rates for each of these raw materials on an actual
basis as consumed to make specific foil products. Commerce ignored Assan's more detailed
actual cost accounting system, requirements for certain CONNUMS that use semi-finished
materials (not scrap), and introduced distortions into the cost calculations. It effectively caused
all subject merchandise to have the same unit metal cost regardless of sheet or scrap source,

which is incorrect given the significant yield loss and raw material premium differential between different finished products. *See* Fifth Supp. QR at 5S-13 and 5S-14 (Appx85502-85503).

The starting point for calculating production costs is 19 U.S.C. §1677b(f)(1)(A) which provides: "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . . and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).  The statute provides that, in conducting its analysis, Commerce shall consider "all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer . . . ." *Id.*

Commerce is responsible both for calculating accurate margins and for relying on the actual books and records used by a respondent to report costs unless the cost allocation is distortive. *See*, *e.g.*, *U.S. Steel Corp. v. United States*, 179 F.Supp.3d 1114, 1132 (Ct. Int'l Trade 2016) (discussing whether respondent's cost allocation methodology "allocated yield losses on a basis that reasonably reflected differences in the processing costs for merchandise with different physical characteristics"); S. Rep. No. 103-412, at 75 (1994) (Commerce is required to determine "as closely as possible the costs that most accurately reflect the resources actually used in the production of the merchandise in question."). In recent cases, this court has considered and validated Commerce's cost calculations when they departed from a company's reported costs when those recorded costs either: (a) did not reasonably reflect the costs of producing and selling the merchandise; or (b) are otherwise distortive and adjustment to costs is required to ensure the most accurate dumping margin.  *Marmen Inc. v. United States*, 545 F.Supp.3d 1305, 1314-15 (Ct.

Int'l Trade 2021); *LG Chem, LTD. v. United States*, 534 F.Supp.3d 1386,1397-1398 (Ct. Int'l Trade 2021).

In this case, Commerce made no finding that Assan's reported costs either did not reasonably reflect costs or were distortive. Assan's books and records tracked usage rates of specific materials on an actual usage basis. Assan maintains its records in accordance with Turkish GAAP rules, and Assan's allocation method reasonably reflects costs associated with specific CONNUMs. In fact, it is MORE accurate than Commerce's choice of averaging metal premium across all CONNUMs. Commerce's method of averaging material premium costs is not how Assan tracks and records these costs; rather Commerce's methodology dummies down the calculation and results in distortion in the allocation of raw material costs to each CONNUM. In past cases, in deciding whether to rely on actual cost accounting records by the respondents Commerce placed emphasis on (i) whether cost accounting system is fully integrated with the financial accounting system and reconciles to the respondent's audited financial statements and (ii) whether the costs calculated in the cost accounting system are used to value the ending inventory balances in the financial accounting system. Assan has demonstrated that both factors are satisfied in this case. Assan's cost accounting figures are directly integrated into the financial accounting system and also the inventory values are fully based on the per unit costs calculated in the cost accounting system. *See Decision Memorandum for the Final Results of Antidumping Duty Administrative Review: Carbon and Certain Alloy Steel Wire Rod from Mexico: 2017-2018*, 85 Fed. Reg. 39527 (June 24, 2020), at Comment 1 ("Unlike the alternative source, Deacero's cost accounting system is fully integrated with its financial accounting system and reconciles to Deacero's audited financial statements. Further, the costs calculated in the cost accounting

system are used to value the ending inventory balances in the financial accounting system."
(footnotes omitted)).

Commerce has deviated from the use of weight average metal costs in order to avoid distortions. In *Brass Sheet and Strip From Germany* (POR March 1, 2008 through Feb 28, 2009, A-428-602), Commerce recognized issues associated with rapidly fluctuating metal costs and accepted respondent's application of daily metal costs:

> For the final results, we have relied on Wieland's reported day-specific metal costs. Wieland uses both copper and zinc as inputs in producing the merchandise under consideration. Copper and zinc are commodity metals traded on the LME, and prices for these metals fluctuate daily. Because of the risk associated with the fluctuating metal prices, Wieland has developed a business model where they go to great lengths in the normal course of business to eliminate all risk associated with the metal fluctuations. It is Wieland's failsafe hedging mechanism which ensures metal neutrality, not the magnitude of the cost changes throughout the POR, that makes it appropriate in this case to use the reported day-specific metal costs. To use any other cost averaging methodology for the metal cost in this unique situation would lead to distortions because we would be ignoring the fact that Wieland ensures that they remain metal cost neutral and fully pass through to its customers any risk related to the volatility in the prices of copper and zinc.

*Brass Sheet and Strip From Germany*, 75 Fed Reg. 66347 (Dep't Commerce Oct. 28, 2010) (am. final AD results) ("*Brass Sheet and Strip from Germany*") and accompanying Issues and Decision Memorandum, at Comment 1, Page 5 ("*Brass Sheet I&D Memo*").

In *Brass Sheet and Strip From Germany*, Commerce explicitly recognized that a simple cost averaging methodology would lead to distortions in the cost calculations applied to CONNUMs and that the respondents methodology was more accurate and appropriate under the circumstances. The facts and logic of that case are equally applicable here given the nature of the product, Assan's active raw material hedging, and its detailed cost tracking accounting system. The Department has not alleged that Assan's method of allocating materials costs is either

38

distortive or do not "reasonably reflect the costs of production" of subject merchandise. *Dillinger France, S.A. v United States*, 981 F 3d 1318, 1322 (Fed. Cir. 2020) (stating "{a}s a general rule, an agency may either accept financial records kept according to {GAAP} in the country of exportation, or reject the records if accepting them would distort the company's true costs."); *Thai Pineapple Pub. Co. v. United State*s, 187 F.3d 1362, 1367 (Fed. Cir. 1999) ("{t}o the extent that the records of {the producer} reasonably reflect the costs of production, Commerce may rely upon them."). The Department's glossed over rational regarding physical attributes is not the end of the analysis, especially when the method Assan provided is accurate and is consistent with their books and records.  However, if Commerce determines to maintain an average cost calculation, at the least any cost differentials between CONNUMs should be based on TOTCOM rather than material costs alone.  By comparing CONNUMs using TOTCOM, the above noted distortions are minimized.

### D. Management Fees Incurred By Assan's Parent Company in Turkey Should Not Be Treated As Indirect Selling Expenses for U.S. Sales

In the *Final AD Determination*, Commerce revised Assan's CEP ISE ratio to include certain management fees incurred by Assan's U.S. reseller, Kibar Americas, and made a corresponding offset (*i.e.* reduction) to Assan's reported G&A expenses for the management fees added to the U.S. ISEs. *Final I&D Memo* at 10 (Appx007626).

Commerce's treatment of certain management fees incurred by Assan as indirect selling expenses, and its inclusion of those expenses in INDIRSU with a corresponding offset to Assan's reported G&A expenses is contrary to law and unsupported by substantial evidence on the record. The management fee charges were incurred by the parent company in Turkey for overall group support (i.e. head office administrative activities to manage group operations) which did not relate to sales or economic activities occurring in the United States. Deduction of these

39

expenses is contrary to the statute and Commerce's long-standing policy to only deduct expenses associated with sales economic activity in the United States.

     1.     **The Management Fees As Issue Were Not Associated with Selling or Economic Activities Occurred in the U.S.**

In this investigation, Commerce used CEP to define Assan Single Entity's U.S. sales price. *See* Memorandum from B. Hansen to The File, Re: Preliminary Determination Analysis Memorandum for the Assan Single Entity (Apr. 27, 2021) ("Prelim. Analysis Memo") at 1-10 (Appx88411-88412). Section 772(d)(1) of the Act directs Commerce to adjust CEP price by deducting indirect selling expenses. 19 U.S.C. § 1677a(d)(1). *See also* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) ("SAA") at 824 ("Section 772(d)(1)(D) provides for the deduction of indirect selling expenses from constructed export price.") The SAA explicitly confirms that the deductions under Section 772(d) are limited to expenses and profit "*associated with economic activities occurring in the United States,*" SAA at 823 (emphasis added).

Record evidence demonstrates that the management fees at issue were in fact expenses incurred by Assan's parent company in Turkey for overall group support which did not relate to sales or economic activities occurring in the U.S., thus should be excluded from the ISE calculation pursuant to the Statute and Commerce's standard practice.

In its responses, Assan reported a large number of indirect selling expenses associated with its U.S. sales activities, including office rent, salaries for U.S. employees, insurance, consulting services, travel expenses, entertainment expenses, postage, telephone, postage, etc. in field INDIRSU – all expenses one would expect to see in a U.S. sales operation. *See* Sixth Supp. QR Part II at Exh. S6C-34 (Appx86730-86734). These expenses, combined with all other reported expenses were taken into account, and reconciled to Kibar Americas and Assan financial

statements. *Id.* at Exh. S6C-36 (Appx86746-86752). The only excluded item was for [

] which are management fees assessed by the Turkish parent company to its

U.S. subsidiary for a portion of head office administrative activities to manage group operations.

*Id.* at Exh. S6C-35 (Appx86735-86736). It is not hard to see that a parent holding company

might assess its subsidiaries fees for a share of management and administrative services incurred

abroad. Contrary to Commerce's interpretation of the records that "{Assan} did not demonstrate

that Assan's costs for providing these services to Kibar Americas are included as part of either

U.S. ISEs incurred in Turkey, DINDIRSU, or in G&A expenses, GNA" *Final I&D Memo* at 10

(Appx007626), instead, this particular item was indeed included in Assan's G&A expenses

because the actual costs were incurred in Turkey. *See* Sixth Supp. QR Part II at 1-2 (Appx86713-

86714).

     In the *Final AD Determination*, Commerce cited to its questionnaire, the preamble to its

regulations, and administrative precedent in support of its position to classify affiliated U.S.

reseller's G&A expenses as selling expenses. *See Final I&D memo* at 10 (Appx007626).  While

it is true that it is Commerce's "general" practice to treat expenses incurred by affiliated resellers

as selling expenses, that concept is again qualified as to where the expense was incurred and

whether it relates to sales economic activity in the United States. 19 U.S.C. § 1677a(d)(1).

     In *Porcelain on Steel Cookware from Mexico*, the Department specifically excluded

indirect selling expenses incurred in Mexico in support of U.S. operations as it did not relate to

economic activity in the United States. *See Porcelain-on-Steel Cookware from Mexico: Final

Results of Antidumping Duty Administrative Review; 1997-1998,* 65 Fed. Reg. 30068 (Dep't

Commerce May 10, 2000) and accompanying Issues and Decision Memorandum at Comment 3.

In *Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, the Department declined

to include certain expenses tied to non-sales activities in the resellers ISE calculation. *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Review*; 2016-2017, 84 Fed. Reg. 32720 (Dep't of Commerce Jul. 9, 2019) and accompanying Issues and Decision memorandum (June 21, 2019) at 43 (Comment 8) ("With respect to the second item addressed in POSCO's brief on the subject of POSAM's indirect selling expenses, we agree with POSCO that line items in POSAM's financial statement that can be specifically tied to non-sales activities can be excluded from the company's indirect selling expenses").

Further, both Commerce and the Court have determined that investment expenses unrelated to sales activity should not be included in ISE. In *U.S Steel Corp*, the Petitioners challenged Commerce's determination to exclude "expenses related to POSAM's sales of non-subject merchandise and its non-selling activities" which consisted of POSAM's management of investments. *U.S. Steel Corp v. United States*, 712 F.Supp.2d 1330, 1338-1339 (Ct. Int'l Trade, 2010). The Court agreed with Commerce, remarking that POSAM's investment management function generated no sales revenue whatsoever, did not—either directly or indirectly – support POSAM's sale function (direct or indirect), except that the two otherwise separate and distinct business units shared certain common expenses, including expenses for *inter alia*, supervisory and administrative support personnel, rent, travel communications, and depreciation. *Id.* at 1345. The Court concluded, "investment management expense should be excluded from the pool of indirect selling expenses where –as here –the investment management function is '*unrelated to the sale of subject merchandise*.'" *Id.*

In *Paul Muller Industrie Gmbh*, the Court upheld Commerce treatment of Paul Mueller's affiliate's foreign exchange gains and losses as indirect selling expenses, because these exchange

42

gains and losses related directly to economic activities occurred in the U.S., i.e., "the U.S. affiliates' purchases of bearings from Paul Mueller and its corresponding sale of the merchandise to an unaffiliated purchaser." *Paul Muller Industrie Gmbh v. United States*, 435 F.Supp.2d 1241, 1261-1262 (Ct. Int'l Trade 2006).

In this investigation, Assan provided detailed worksheet and supporting documentation showing that the management fees at issue were in fact expenses incurred by Assan's parent company in Turkey for overall group support which did not relate to sales or economic activities occurring in the U.S.  *See* Sixth Supp. QR Part II at 1-2 (Appx86713-86714) and Exh. S6C-34 (Appx86730-86734). Commerce appeared to have confused the nature of the expenses at issue. In support of its decision to include such expenses in Kibar Amercias' ISE, Commerce found that Assan did not report these expenses either in U.S. ISEs incurred in Turkey or in G&A expenses; *see Final I&D Memo* at 10 (Appx007626), while at the same time, Commerce found that "the management fees incurred by Assan are related to expenses such as managers salaries that are already captured in Assan's reported G&A." *Id.* at 10 (Appx007626). The apparent contradictory interpretation of the records further suggests that Commerce failed to explain the basis for changing its position from the *Preliminary AD Determination* to the *Final AD Determination* by reallocating the management fees at issue from Assan's reported G&A to U.S. ISE. *Carbon Activated Tianjin Co. v. United States*, 503 F.Supp.3d 1278, 1286-87 (Ct. Int'l Trade 2021) (noting that "although Commerce has the flexibility to change its position from the Preliminary Results to the Final Results, the agency must explain the basis for its change and that explanation must be supported by substantial evidence." (internal quotation omitted)). Therefore, Commerce's *Final AD Determination* is not supported by substantial evidence and should be remanded consistent with the statute and Commerce practice.

## 2. The Management Fees At Issue Were Incurred in Turkey

Commerce's *Final AD Determination* characterized the management fees at issue as Kibar Amercicas purchase of management services from Assan. *Final I&D Memo* at 10 (Appx007626). Commerce appeared to suggest that these expenses were, in some way, associated with economic activities in the United States. *Id* at 10 (Appx007626)*.* However, the fact that Kibar Americas may have been assessed a management fee does not change the nature or location of the expense, nor should it allow for the expense to be double counted.

Indeed, the management fees in question are related to economic activities that occurred in Turkey, namely Assan *managing* its wholly owned subsidiary Kibar Americas in Turkey. *See* Sixth Supp. QR Part II at 1-2 (Appx86713-86714). As its wholly owned affiliate, Assan's management needs to dedicate a portion of their time to managing Kibar Americas. For example, one would expect a foreign parent to dedicate accounting/finance resources to make sure the U.S. affiliate' figures are incorporated into a group budget. A management committee would naturally help set long term goals for affiliates in the group and determine and communicate overall strategy. The bulk majority of the management fees in this case consist of [

]. *See* Sixth Supp. QR Part II at 2 (Appx86714). These are obviously management items which are not related to Kibar Americas' sales economic activity in the United States, which is importing and selling aluminum products to U.S. customers.  These are economic activities in Turkey, related to managing Kibar Americas.

To put this in context, Commerce would deduct an ocean freight charge from the U.S. price. However, Commerce would not expect the respondents to allocate a portion of the expenses of the accountant entering the freight invoice into the accounting system, the accounts payable clerk processing the payment, the company's CEO negotiating the freight rates with the shipping company or the procurement and legal departments processing the freight contract. All

44

of those expenses are captured in the company's G&A expenses. The situation is no different for the very question before Commerce. The indirect selling expenses incurred in the U.S. by the U.S. affiliate are treated as a direct deduction from U.S. selling price, like ocean freight because all elements of the indirect selling expenses are for purposes of supporting sales in the U.S. However, Assan's management fees relating to managing Kibar Americas as a wholly owned subsidiary has absolutely no connection with Kibar Americas' economic activity in the U.S. which is selling aluminum to its U.S. customers.

Under Commerce's logic, the mere act of setting up a U.S subsidiary and managing it, regardless of whether the management relates to sales in the U.S., should result in an allocation to ISE in the U.S. Indeed, Commerce's questionnaire explicitly instructs inclusion of parent company management fees/or expenses when reporting general and administrative expenses in Section D of the initial questionnaire:

> Include in your reported G&A expenses an amount for administrative services performed on your company's behalf by its parent company or other affiliated party. (emphasis added).

*See* Section D QR at D-42 (Appx82631).

No such instruction is present in Section C questionnaire as seen in field 49.2 Indirect Selling Expenses Incurred in the United States even though obviously a U.S. affiliated reseller clearly would have a parent company and management fee charges like those incurred by Kibar Americas. *See* Section C QR at 51 (Appx81995). The fact that there is no clear instruction to include parent company charges is itself evidence that it was never Commerce's intention that parent company management fee charges should be included in INDIRSU.

For these reasons, Commerce's *Final AD Determination* is unsupported by substantial evidence and otherwise not in accordance with law and must be remanded back to the agency.

V.      **PRAYER FOR RELIEF**

WHEREFORE, Turkish Respondents respectfully requests that this Court:

(a)     Hold that Commerce's *Final AD Determination* was not in accordance with law

        or unsupported by substantial record evidence with respect to the claims advanced

        by Plaintiff in this appeal;

(b)     Remand the *Final AD Determination* to Commerce for determination consistent

        with the opinion of this Court; and

(c)     Grant such additional relief as the Court may deem just and proper.


                                        Respectfully submitted,


                                        **/s/ Leah N. Scarpelli**
                                        Leah N. Scarpelli
                                        Matthew M. Nolan
                                        Yun Gao

                                        ArentFox Schiff LLP
                                        1717 K Street, N.W.
                                        Washington, DC 20006
                                        Phone: (202) 715-8403

                                        *Counsel to Assan Aluminyum Sanayi ve Ticaret*
                                        *A.S.*

May 23, 2022

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiff's 56.2 Motion for Judgment on the Agency Record filed on May 23, 2022 complies with the word limitation requirement. The word count for Plaintiff's 56.2 Brief, as computed by ArentFox Schiff LLP's word processing system is 13,904.


**/s/ Leah N. Scarpelli**
Leah N. Scarpelli

*Counsel to Assan Aluminyum Sanayi ve Ticaret A.S.*