NONCONFIDENTIAL
VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

———————————————————————

ASSAN ALUMINYUM SANAYI VE TICARET
A.S.,

                     Plaintiff,

       v.

UNITED STATES,

                    Defendant,

       and

ALUMINUM ASSOCIATION TRADE
ENFORCEMENT WORKING GROUP AND ITS
INDIVIDUAL MEMBERS, ET AL.,

               Defendant-Intervenors.

———————————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Consol. Court No. 21-00616

<u>MEMORANDUM OF LAW IN SUPPORT OF CONSOLIDATED PLAINTIFFS' RULE
56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

                JOHN M. HERRMANN
                PAUL C. ROSENTHAL
                JOSHUA R. MOREY
                JULIA A. KUELZOW
                KELLEY DRYE & WARREN LLP
                3050 K Street, N.W., Suite 400
                Washington, DC  20007
                (202) 342-8400

                Counsel to Consolidated Plaintiffs

Dated:  May 23, 2022

NONCONFIDENTIAL
VERSION

**Table of Contents**

**Page**

ADMINISTRATIVE DETERMINATION UNDER REVIEW ......................................................1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT ................................................2

STANDARD OF REVIEW ...............................................................................................3

STATEMENT OF FACTS ...............................................................................................4

I.      THE DEPARTMENT'S TREATMENT OF ASSAN'S HEDGING
        REVENUES IS UNLAWFUL...............................................................................8

        A.      Legal Background on Calculation of the Cost of Production ....................8

        B.      The Department's Determination to Offset Assan's Cost of
                Manufacture With Net Hedging Related Gains Is Unlawful ....................9

                1.      Background on Assan's Aluminum Foil Pricing
                        Methodology and Hedging Activities ..........................................9

                2.      The Department's Factual Findings In Support of Its
                        Determination Are Not Supported By Substantial Evidence....................13

                        a.      Statements in Assan's Audited Financial Statements
                                Do Not Support Commerce's Factual Finding .............13

                        b.      The Examples of Assan's Raw Material Purchases
                                and Subsequent Short Hedging Do Not Support
                                Commerce's Factual Finding.....................................14

        C.      The Department Failed to Address Detracting Evidence
                Concerning the Purpose of Assan's Futures Contracts..........................17

                1.      The Chronology of Assan's Raw Material Purchases and Its
                        Trading of Futures Contracts Demonstrate That the Futures
                        Contracts Do Not Hedge Raw Material Purchases ....................17

                2.      The Nature of Assan's Hedging Activities Indicates That
                        Those Activities Do Not Pertain to Raw Material Purchases...................19

                3.      Assan's Short Hedges Pertain to Its Sales of Finished
                        Goods .........................................................................21

NONCONFIDENTIAL
VERSION

## Table of Contents
### (continued)

Page

D.    The Department's Failure to Incorporate Assan's Hedging Related Gains and Losses In the Interest Expense Ratios Is Unlawful ............... 23

1.    The Department's Explanation for Failing to Include Hedging Gains and Losses in the Interest Expense Ratio Is Arbitrary and Unsupported By Substantial Evidence ............... 24

2.    The Department Failed to Address Evidence That Detracts From Its Findings ............................................. 27

II.    CONCLUSION ............................................................ 28

NONCONFIDENTIAL
VERSION

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,
    463 U.S. 29 (1983)..............................................................................................4

Nippon Steel Corp. v. United States,
    458 F.3d 1345 (Fed. Cir. 2006).......................................................................3, 4

SKF USA Inc. v. United States,
    263 F.3d 1369 (Fed. Cir. 2001).....................................................................4, 23

Universal Camera Corp. v. NLRB,
    340 U.S. 474 (1951)..............................................................................................4

### Statutes and Regulations

19 U.S.C. § 1516a(b)(1)(B)(i).................................................................................3, 16

19 U.S.C. § 1677b(b)(1) ...............................................................................................8

19 U.S.C. § 1677b(b)(3) ............................................................................................8-9

19 U.S.C. § 1677b(f)(1)(A)...........................................................................................9

### Administrative Determinations

Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of
    Oman, the Russian Federation, and the Republic of Turkey: Antidumping
    Duty Orders, 86 Fed. Reg. 62,790 (Dep't Commerce Nov. 12, 2021) ................... 1-2

Certain Orange Juice From Brazil:
    Final Results of Antidumping Duty Administrative Review
    and Final No Shipment Determination, 77 Fed. Reg. 63,291
    (Dep't Commerce Oct. 16, 2012), and accompanying Issues and Decision
    Memorandum (Oct. 9, 2012), aff'd, Fischer S.A. Comercio, Industria and
    Agricultura v. United States, 38 CIT 775,
    2014 Ct. Intl. Trade LEXIS 66 (2014) .....................................................................25

Certain Aluminum Foil From the Republic of Turkey:
  Final Affirmative Determination of Sales at Less Than Fair Value,
  86 Fed. Reg. 52,880 (Dep't Commerce Sept. 23, 2021)
  ("Final Determination") (Appx007669-007671) ............................................................ *passim*

Certain Corrosion-Resistant Carbon Steel Flat Products From the Republic of
  Korea: Notice of Final Results of the Sixteenth Administrative Review,
  76 Fed. Reg. 15,291 (Dep't Commerce Mar. 21, 2011), and accompanying
  Issues and Decision Memorandum (Mar. 14, 2011)...............................................................26

Certain Uncoated Paper From Brazil:
  Final Results of Antidumping Duty Administrative Review; 2018-2019,
  86 Fed. Reg. 7,254 (Dep't Commerce Jan. 27, 2021), and accompanying
  Issues and Decision Memorandum (Jan. 19, 2021). ...............................................................26

Issues and Decision Memorandum for the Final Affirmative Determination in the
  Less-Than-Fair-Value Investigation of Certain Aluminum Foil from the
  Republic of Turkey (Dep't Commerce Sept. 16, 2021)
  ("Issues and Decision Memorandum") (Appx 007617-007668) ....................................... *passim*

Phosphor Copper From the Republic of Korea:
  Final Affirmative Determination of Sales at Less Than Fair Value and
  Negative Final Determination of Critical Circumstances, 82 Fed. Reg. 12,433
  (Dep't Commerce Mar. 3, 2017), and accompanying
  Issues and Decision Memorandum (Feb. 27, 2017). ......................................................... 24-25

Polyethylene Terephthalate Resin From the Republic of Korea:
  Affirmative Final Determination of Sales at Less Than Fair Value and Final
  Affirmative Determination of Critical Circumstances, in Part,
  83 Fed. Reg. 48,283 (Dep't Commerce Sept. 24, 2018), and accompanying
  Issues and Decision Memorandum (Sept. 17, 2018) ......................................................... 25-26

NONCONFIDENTIAL
VERSION

On behalf of the Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas Inc., JW Aluminum Company, and Novelis Corporation (collectively, "Consolidated Plaintiffs"), we submit this Memorandum of Law in Support of Consolidated Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record. As set forth below, Consolidated Plaintiffs urge this Court to determine that certain aspects of the U.S. Department of Commerce's (hereinafter, "Commerce" or the "Department") final affirmative determination of sales at less-than-fair-value are not supported by substantial evidence and are not otherwise in accordance with law, and to remand the agency's determination for further proceedings.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Consolidated Plaintiffs challenge certain aspects of the Department's affirmative determination in the less-than-fair-value investigation of certain aluminum foil ("CAF") from the Republic of Turkey. See <u>Certain Aluminum Foil From the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value</u>, 86 Fed. Reg. 52,880 (Dep't Commerce Sept. 23, 2021) (hereinafter, "<u>Final Determination</u>") (Appx007669-007671) and the accompanying <u>Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Aluminum Foil from the Republic of Turkey</u> (Dep't Commerce Sept. 16, 2021) (hereinafter, "<u>Issues and Decision Memorandum</u>") (Appx 007617-007668). Following the U.S. International Trade Commission's issuance of its final unanimous affirmative injury determination, the Department published the antidumping duty order on CAF from Turkey. See <u>Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey: Antidumping Duty</u>

NONCONFIDENTIAL
VERSION

Orders, 86 Fed. Reg. 62,790 (Dep't Commerce Nov. 12, 2021) (hereinafter, the "Order")
(Appx007821-007824).

## ISSUES PRESENTED AND SUMMARY OF ARGUMENT

The Department's treatment of Assan Aluminyum Sanayi ve Ticaret A.S.'s ("Assan")
hedging revenues in the Final Determination is not supported by substantial evidence and is not
otherwise in accordance with law because the Department:

1. Unlawfully offset Assan's cost of manufacture with Assan's net hedging
   revenues purportedly associated with Assan's purchases of primary
   aluminum; and

2. Failed, in the alternative, to incorporate Assan's net hedging revenues in
   the interest expense ratio.

First, the record before the Department unequivocally establishes that Assan's finished
goods prices (including for CAF) include a component that is tied to the price of primary
aluminum at a given time identified in the sales contract. As such, fluctuations in the price of
aluminum are integral to the *prices* at which Assan sells its finished goods. The Department
wrongly interpreted the notes to Assan's financial statements, however, in concluding that
Assan's hedging revenues are related to Assan's costs, and not Assan's finished goods prices.

Moreover, the timing and chronology of Assan's hedges demonstrate that Assan's futures
contracts hedge the risk associated with the aluminum component of its finished goods *prices*,
not Assan's costs. Because Assan purchases raw materials (thereby fixing their price), before
purchasing futures contracts, the only aluminum price exposed to fluctuations remaining is the
aluminum price component of Assan's finished goods. Additionally, nearly all of Assan's
futures contracts are "short hedges" – and the record demonstrates that "short hedges" are
designed to protect against declining prices. Because declining aluminum prices would reduce

Assan's raw material cost (a positive development from Assan's perspective), its "short hedges" are clearly designed to hedge the risk associated with its finished goods prices. The Department's failure to address this detracting record evidence makes its determination unsupported by substantial evidence and not otherwise in accordance with law.

    Second, even if the Department correctly determined Assan's net hedging revenues should offset Assan's cost of production ("COP"), the Department's refusal to include these revenues in the interest expense ratio, instead of the cost of manufacture ("COM"), is wrong. The Department concluded that because Assan treats hedging revenues as part of Cost of Goods Sold ("COGS") in the financial statement, it would be incorrect for the agency to treat these revenues as an interest expense. This determination, however, is arbitrary because Assan's financial statements also classify other accounts as COGS, yet the Department did not include those accounts in Assan's cost of manufacture. Additionally, the Department has treated hedging revenues as an interest expense in prior proceedings. In the underlying administrative proceedings at issue in this action, the Department failed to explain why it treated the similarly situated accounts in Assan's financial statements and hedging revenues in past cases differently. As such, the agency's determination is arbitrary and unlawful. Further, the Department failed to address record evidence establishing that [

        ] and, therefore, the Department's determination is not supported by substantial evidence.

## STANDARD OF REVIEW

    In reviewing a challenge to a final determination by the Department, this Court will sustain a determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence

-3-

means "'more than a mere scintilla.'" <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting <u>NLRB v. Columbian Enameling & Stamping Co.</u>, 306 U.S. 292, 300 (1939)). Substantial evidence has also been determined to mean "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Id.</u> (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477 (1951)). "{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.</u>, 463 U.S. 29, 43 (1983) (citing <u>Burlington Truck Lines v. United States</u>, 371 U.S. 156, 168 (1962)). When reviewing agency determinations, the court will evaluate whether the agency action is reasonable given the record as a whole, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp.</u>, 340 U.S. at 488; <u>see also</u> <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).

In addition, an agency action may be arbitrary and capricious, "when the agency offers insufficient reasons for treating similar situations differently." <u>SKF USA Inc. v. United States</u>, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

## STATEMENT OF FACTS

On October 19, 2020, the Department initiated a less-than-fair value investigation of CAF from Turkey. Appx001044-001050.

NONCONFIDENTIAL
VERSION

On November 12, 2022, the Department selected Assan, as well as its affiliate Kibar Dis Ticaret A.S. ("Kibar Dis") (collectively, "Assan"),[1] as the sole mandatory respondent.  See Appx006521, 006524.

In its response to Section D of the Department's initial antidumping questionnaire, Assan stated that it "makes adjustments directly to the cost of sales" through its materials management module ("MM module") "without processing" the adjustments "through the cost accounting system."  Appx82608, 82623.  Among these adjustments, Assan identified [

]  Appx82623.   Assan further explained that "{b}ecause all of these adjustments relate to POI cost of production," and because the so-called costs "are not included in the COM figures obtained from the cost accounting system," Assan "calculated an adjustment factor where the total adjustments are calculated and divided by the period cost of sales," and "{t}he resultant factor is then applied to per unit COM and reported in field MANADJ in the reported COP/CV listing."   Id.   Assan's adjustment factor calculation showed that Assan's manual adjustment incorporated the following hedging-related accounts:



- [                                                                                        ]
- [
        ]
- [
                ]
- [                                                                                        ]

Appx82709-82710; see also Appx85909-85910.

---

[1]   Commerce identified these entities as if they were two separate mandatory respondents.  See id.  Assan, however, submitted a single response to the Department's questionnaire throughout the investigation, as all parties were aware the two entities were affiliates that the Department would treat as a single entity.

NONCONFIDENTIAL
VERSION

Throughout the underlying proceedings, Consolidated Plaintiffs submitted comments urging the Department to request additional information concerning Assan's hedging-related gains and losses, and submitted public information demonstrating these types of gains and losses relate to sales – and not to the cost of manufacture.  See Appx82945-82946; Appx88290-88299, 88307-88361.

In comments submitted in advance of the Department's preliminary determination, Consolidated Plaintiffs urged the Department to modify Assan's manual adjustment by excluding hedging losses and gains that relate to Assan's sales, because these revenues and losses are not related to Assan's costs.  Appx87548-87558.

Assan provided additional information concerning its hedging revenues and losses in a supplemental questionnaire response submitted shortly before the Department's preliminary determination deadline.  Appx87808-87813.

In its preliminary determination, the Department did not address Consolidated Plaintiffs' arguments that Assan's hedging gains and losses related to sales should be excluded from the manual adjustment factor, and the agency continued to include such accounts in the adjustment factor.  Appx89023, 89035.  In a post-preliminary supplemental questionnaire, however, the Department requested additional information from Assan concerning the monthly gains and losses for certain accounts.  Appx89496-89498.

In their administrative case brief, Consolidated Plaintiffs again urged the Department to disallow Assan's offset to the cost of production for hedging-related gains and losses.  Appx91201-91218.  Consolidated Plaintiffs also argued that if the Department offset the cost of production with hedging-related revenues, it should alternatively include the hedging-related

NONCONFIDENTIAL
VERSION

revenues in Assan's reported interest expenses, instead of the cost of manufacture. Appx91218-91226.

In its final determination, the Department continued to allow Assan's net hedging gains to offset the company's cost of manufacture. Appx007657. The Department disagreed with Consolidated Plaintiffs that "Assan's hedging transactions are related to Assan's sales of finished goods, and thus the hedging gains are unrelated to Assan's cost of production." Appx007658. The Department claimed that "Assan provided specific record evidence and demonstrated that the net hedging gains were directly associated with the purchases of its aluminum material inputs." Id. The record documents identified by the Department in support of the first part of its finding (i.e., that the hedging gains and losses are "directly associated with purchases of the raw material aluminum"), however, actually show that hedges are related to the aluminum price included as part of the total sales price to purchasers of Assan's finished goods – and not to Assan's purchases of material inputs consumed in manufacturing those goods.

The Department also explained that "Assan's audited financial statement accompanying footnotes state that the company enters into commodity contracts to mitigate its risk on aluminum price fluctuations (i.e., raw material inputs, not finished goods)." Appx007658. While the first part of this statement is accurate – that Assan's audited financial statement indicates the company enters into commodity contracts to mitigate its risk on aluminum price fluctuations – the later parenthetical is wrong, because, like in many aluminum contracts, aluminum prices are simply a pass through to the purchaser that is incorporated in Assan's selling price for its finished goods.

The Department also rejected Consolidated Plaintiffs' alternative argument that Assan's hedging gains and losses are financial in nature and, therefore, should be included in the interest

NONCONFIDENTIAL
VERSION

expense ratio.  Appx007659.  In particular, the Department stated that because "Assan's net hedging gains are recorded as a part of cost of goods sold in its audited financial statement," and because the gains and losses "relate to aluminum purchases used in the production of merchandise under consideration," it would be inappropriate to include the gains and losses in the interest expense ratio.  Id.  The first part of the Department's explanation, however, is inconsistent with the Department's treatment of other expenses recorded as part of COGS in Assan's audited financial statement, and the latter is not supported by the record.

This appeal followed.

## I. THE DEPARTMENT'S TREATMENT OF ASSAN'S HEDGING REVENUES IS UNLAWFUL

### A. Legal Background on Calculation of the Cost of Production

When the Department "has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product," the Department "shall determine whether, in fact, such sales were made at less than the cost of production."  19 U.S.C. § 1677b(b)(1).  Further, if the Department "determines that sales made at less than the cost of production": (1) "have been made within an extended period of time in substantial quantities"; and (2) "were not at prices which permit recovery of all costs within a reasonable period of time," the Department may disregard such sales in calculating normal value.  Id.  As a result, a higher cost of production may, but does not necessarily, increase the dumping margin, if additional home market sales that would normally match with U.S. sales in the dumping margin calculation are found to be below cost and, thus, eliminated from the Department's margin calculations.

NONCONFIDENTIAL
VERSION

"Cost of production" is defined by the statute as "an amount equal to the sum of" the following:

(1) "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;"

(2) "an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and"

(3) "the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment."

19 U.S.C. § 1677b(b)(3).

Moreover, "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).

**B.    The Department's Determination to Offset Assan's Cost of Manufacture With Net Hedging Related Gains Is Unlawful**

**1.    Background on Assan's Aluminum Foil Pricing Methodology and Hedging Activities**

In the normal course of its business, Assan is exposed to the risk of fluctuations in aluminum prices.  See Appx85522.  This is because Assan's sales are structured so that the price of aluminum consumed in manufacturing CAF is a pass through to the customer.  Assan's aluminum foil prices are the result of a contract-based formula that consists of three components:

[

] Appx80055; <u>see</u> <u>also</u> Appx80057.  The London Metal Exchange ("LME") value of aluminum is "fixed during invoicing by adding the daily close cash, monthly average, or spot cash LME" based on the specific formula to which Assan and the customer have agreed.  Appx82993-94; <u>see</u> <u>also</u> Appx83299-301, Appx83303-14.  This type of pricing structure – with the LME value of aluminum and metal premium passed through to the customer based on a formula – is utilized widely in the aluminum industry.

Similarly, the price at which Assan purchases raw materials consumed in manufacturing CAF is based on a formula that also includes the LME aluminum price, explained by Assan as follows:

> In the aluminum industry, prices are negotiated and expressed as LME+raw material premium (RMP). This is true for Assan's *sales* as well as Assan's *purchases* of raw materials such as scrap, primary aluminum and cast coils. LME denotes the current aluminum index price published by the London Metal Exchange and the raw material premium denotes the conversion cost plus profit of the raw material supplier. For example, when Assan concludes a deal to purchase primary aluminum at a price of LME+RMP of $200, and the LME price is set at the date of invoice at $1800, the supplier invoices the primary aluminum at $2000 per ton.

Appx85510 (emphasis added).

Both Assan's raw material purchase cost and its finished good selling price depend on formulas that include the LME price for primary aluminum.  Through these LME price-based formula mechanisms, declining LME aluminum prices cause Assan's raw material purchase costs and finished good selling prices to decline.  Similarly, increasing LME aluminum prices cause Assan's raw material purchase costs and finished good selling prices to increase.  Moreover, if the LME aluminum price declines between the time Assan purchases input

material, and sells finished goods incorporating that material, Assan will have lost money on the aluminum price – a risk wholly associated with changes in the LME price of aluminum.

In order to manage – or "hedge" – this risk, Assan trades LME aluminum futures contracts.  Appx89124; Appx87832.  An LME aluminum futures contract obliges the owner to buy or sell aluminum at a fixed price at the maturity of the contract, which is at a fixed point in time in the future.  Appx87832.  Buying futures contracts (i.e., a long hedge) obliges the buyer to buy aluminum at maturity, while selling futures contracts (i.e., a short hedge) obliges the seller to sell aluminum at maturity.  See Appx89125.  Assan predominantly sells futures contracts (i.e., "short hedging"), meaning the contracts oblige Assan to *sell* aluminum at a fixed price at the contracts' maturities.  See Appx89124-25.  At maturity, Assan purchases aluminum on the LME at spot (i.e., current) prices to fulfill its obligation to sell primary aluminum under the futures contract.  See Appx87808; Appx89124.

In general, Assan's short hedges generate a gain for Assan when LME aluminum prices decline and a loss for Assan when LME aluminum prices increase.  For example, suppose Assan sells a LME futures contract, obliging it to sell one metric ton of aluminum at a fixed price of 1,000 U.S. dollars ("USD") per metric ton in 30 days (i.e., the maturity).  Suppose further that the LME aluminum price declines so that aluminum costs only 900 USD per metric ton on the maturity date of the contract.  In order to meet its obligations under the contact, Assan would purchase one metric ton of aluminum on the exchange at the spot (i.e., current) price of 900 USD and would then sell it to the counterparty on the contract at the fixed price of 1,000 USD, thereby generating a gain of 100 USD.  Conversely, suppose the LME aluminum price increased to 1,100 USD per metric ton on the maturity date of the contract.  Again, in order to fulfill its obligation under the contract, Assan would purchase one metric ton of aluminum on the exchange at the

-11-

spot (i.e., current) price of 1,100 USD and sell it to the counterparty at the fixed price of 1,000 USD, thereby generating a loss of 100 USD. Importantly, none of Assan's LME transactions involve the actual **physical** sale or purchase of aluminum. See Appx89128. Rather, the transactions are resolved on the LME, without Assan's ever possessing or taking delivery of the underlying aluminum. Id.

These gains or losses resulting from the trading of futures contracts "hedge" the risk to Assan associated with the LME pass through portion of the price that is ultimately paid by Assan's customers. When Assan purchased physical aluminum input materials, it also paid an LME portion of its cost to its supplier. Appx85510. When Assan then sells CAF to its customers, if the price of primary aluminum on the LME has decreased since the time of Assan's aluminum input purchase, it will incur a loss on the LME portion of its sale. Assan's hedging activities, however, will offset that loss (or, conversely, will reduce Assan's profit on the sale, if the LME price of primary aluminum increased between the time of Assan's purchase and the time of its sale of CAF).

During the POI, Assan's hedging activities resulted in a net gain. Appx007657. In its Final Determination, Commerce allowed Assan to reduce its reported cost of production using its net hedging gains, based on Commerce's finding that Assan's net hedging gains relate to its purchases of raw material. Appx007658. As explained further below, however, the record evidence that Commerce relied on to reach this conclusion does not support such a finding.

2.      **The Department's Factual Findings In Support of Its Determination Are Not Supported By Substantial Evidence**

   a.      **Statements in Assan's Audited Financial Statements Do Not Support Commerce's Factual Finding**

The Department relied on certain statements in Assan's financial statements in support of its conclusion that Assan's hedging activities are related to raw material purchases. Appx007658. In particular, the Department stated that "Assan's audited financial statement accompanying footnotes state that the company enters into commodity contracts to mitigate its risk on aluminum price fluctuations (i.e., raw material inputs, not finished goods)." Id.

Contrary to Commerce's claim, Assan's audited financial statements do not identify the "commodity contracts" as relating to raw material inputs instead of finished goods. Specifically, Assan's financial statement describe the commodity contracts as follows:

[

]

Appx80466 (emphasis added). Therefore, [

] Id. To the contrary, Assan's financial statements explicitly identify [

] Id.

Furthermore, it is unreasonable to infer, as Commerce did, that "aluminum price fluctuations" refers only to the price of Assan's raw material inputs. Appx007658. As explained above, Assan's sales prices for CAF are based on a formula that includes the LME price of primary aluminum as a pass through to the customer. Appx80055, 80057. Thus, Assan's sales prices for CAF are exposed to the risk of changing LME primary aluminum prices between the

NONCONFIDENTIAL
VERSION

time Assan purchased the raw material, incorporated it into CAF, and sold the subject merchandise to customers.  Because changes in aluminum prices affect both Assan's purchase cost of raw materials (i.e., primary aluminum) and its selling price of finished goods (i.e., CAF) there is no reasonable basis for Commerce's inference that the reference to "aluminum price fluctuations" in Assan's audited financial statements relates only to raw material inputs. Appx007658.

> **b.**     **The Examples of Assan's Raw Material Purchases and Subsequent Short Hedging Do Not Support Commerce's Factual Finding**

In its Final Determination, Commerce also stated that "Assan provided specific record evidence and demonstrated that the net hedging gains were *directly associated* with the purchases of its aluminum material inputs."  Appx007658 (citing Exhibit S10D-7 of Part II of Assan's fourth supplemental Section D questionnaire response (Appx89140-62)) (emphasis added); see also Appx007657 (citing Exhibit S5D-36 of Assan's second supplemental Section D questionnaire response (Appx85905-06)) (stating that "the records show that Assan's hedging gains and losses are *directly associated* with purchases of the raw material aluminum") (emphasis added).  Neither of the record citations identified by the Department, however, supports the Department's finding.

In particular, [

**NONCONFIDENTIAL
VERSION**

]

Thus, Assan only started opening its short hedges after it had already purchased the raw material in question [

]   See also   Appx89144 ([

]) (emphasis added); Appx89124-25 (Assan purchases the raw material in steps one and two, and opens the "associated" short hedge in step four).   Thus, because the record demonstrates Assan's hedges were opened *after* the LME portion of its aluminum input purchases were locked in, the record instead indicates – contrary to the Department's findings – that Assan's hedges are "*directly associated*" with the LME portion of Assan's sales price for CAF.

Similarly, [

---

[2]   [

]

NONCONFIDENTIAL
VERSION

]   Again, Assan's opening of its short hedges occurred subsequent to its purchase of raw material (i.e., primary aluminum).  See also Appx87811-12; Appx85523.  At the time of Assan's short hedging – [                                    ] – Assan had already purchased the raw material [

]

Thus, the record demonstrates Assan's hedges were opened *after* the LME portion of its aluminum input purchases were concluded and, at the time Assan opened its short hedges, there was no uncertainty or risk left for Assan to manage or "hedge" with respect to its purchases of primary aluminum.  Rather, the only risk confronted by Assan at the time its futures contracts were sold was fluctuations in the primary aluminum price that would be passed through to its customers.  As a result, contrary to Commerce's assertion (Appx007658), the futures contracts are not "*directly associated*" with the risk of the LME portion of Assan's raw material purchases, but instead the LME portion of Assan's sales prices for CAF.  Indeed, in general, hedging activities pertains to expected future transactions, [

---

[3]   [



]

] See infra **Section I.C.1**. Accordingly, the examples on the record to which Commerce referred (Appx007657-58, n.277 and n.281) do not support Commerce's finding that Assan's trading in futures contracts hedged Assan's raw material purchases.

\* \* \*

As explained above in **Sections I.B.2.a and I.B.2.b**, the record evidence on which Commerce relied to find that Assan's hedging activities pertain only to its raw material purchases does not support that conclusion.    Appx007658.    Accordingly, Commerce's determination is not supported by substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).

### C.    The Department Failed to Address Detracting Evidence Concerning the Purpose of Assan's Futures Contracts

In finding that Assan's hedging activities pertain only to its raw material purchases (Appx007658), the Department also failed to address detracting evidence.  In particular, the chronology of Assan's purchases of raw material and its trading of futures contracts demonstrates that those contracts do not hedge Assan's raw material purchases.  Further, the very nature of Assan's futures contracts – which hedge declining prices – indicate that they do not manage the risk of Assan's raw material purchases, which occurred before Assan even opened the associated futures contracts.  Rather, both the chronology and nature of Assan's hedging activities indicate that their purpose is to hedge Assan's sales revenues associated with finished products such as CAF.

### 1.    The Chronology of Assan's Raw Material Purchases and Its Trading of Futures Contracts Demonstrate That the Futures Contracts Do Not Hedge Raw Material Purchases

The purpose of hedging – e.g., buying or selling LME aluminum futures contracts – is to manage the risk associated with an expected *future* transaction.  Indeed, [

**NONCONFIDENTIAL VERSION**

]

That hedges manage the risk of *future* transactions comports with other factual information on the record. According to information from the Center for Farm Financial Management at the University of Minnesota, hedging involves "buy{ing} or sell{ing} a futures contract on a commodity exchange as a temporary substitute for an intended *later* transaction in the cash market." Appx88314 (emphasis added). Similarly, the University of Missouri and The Options & Futures Guide provide examples of using short hedges to reduce the risk associated with the future sale of a commodity. See Appx88339; Appx88343-44. Similar examples explain how to use long hedges to reduce the risk associated with the future purchase of a commodity. See Appx88351; Appx88355-56.

That hedges pertain to future transactions is also intuitive. Because past transactions have already occurred at terms that have already been established, past transactions do not entail any risk. Only future transactions have uncertain prices, costs, or other terms and, therefore,

NONCONFIDENTIAL
VERSION

entail risk.  The risk associated with future transactions can be managed – or hedged – using instruments like futures contracts.

Here, the record clearly establishes that Assan enters into futures contracts only *after* it has concluded a raw material purchase.  See Appx89125 ("{Assan's creating a sell transaction in the futures market (short position)} occurs every time a new raw material purchase transaction is *concluded*.")  (emphasis added); supra **Section I.B.2.b** (addressing record information demonstrating that Assan opens a short hedge *after* its purchase of raw materials).  The fact that Assan enters into futures contracts after a raw material purchase indicates that those contracts do not manage the risk of the *past* raw material purchase (which, being a past transaction, has no remaining risk).  Rather, the futures contracts manage risks associated with *future* transactions.  In its Final Determination, the Department does not address the implications of Assan's chronology for opening its short hedges.  Appx007657-59.  Thus, the Department ignored detracting evidence, making its determination unreasonable and unlawful.

## 2. **The Nature of Assan's Hedging Activities Indicates That Those Activities Do Not Pertain to Raw Material Purchases**

Assan predominantly *short* hedges (i.e., sells future contracts).  See Appx89124-25.  As the University of Minnesota explains: "The short hedge protects the hedger against falling prices."  See Appx88314; see also Appx88343 ("Should the underlying commodity price fall, the gain in the value of the short futures position will be able to offset the drop in revenue from the sale of the underlying.").  Short hedges protect against declining prices by generating a gain when prices decline, as Assan's own examples demonstrate.  Appx85523-24, Appx87811-12

**NONCONFIDENTIAL
VERSION**

([

]).[4]

Because the purpose of short hedges is to protect against declining prices, it does not make sense that such hedges would pertain to raw material purchase costs.  In particular, as explained previously, Assan's raw material purchase costs depend on a formula that includes the LME price for primary aluminum.  Appx85510.  When the LME price for primary aluminum declines, Assan's raw material purchase costs also decline through the LME aluminum price-based formula mechanism.  Id.  Thus, with regard to raw material purchases, declining LME prices for primary aluminum are to Assan's ***benefit***, as it reduces Assan's purchase costs.  In its Final Determination, Commerce does not explain why Assan would need to protect its raw material purchase cost from declining LME aluminum prices – by short hedging – when such price declines are beneficial to Assan's raw material purchase costs.   Appx007657-59. Commerce, therefore, ignored detracting evidence, making its determination unreasonable and unlawful.

---

[4]     [

]

### 3. Assan's Short Hedges Pertain to Its Sales of Finished Goods

As explained previously (see supra **Section I.B.2.a**), Assan's finished goods selling price is determined using a formula that depends on the LME price for primary aluminum:

The price has three components: [

].

Appx80055, Appx80057. The LME price for primary aluminum, therefore, directly affects Assan's sales revenue. That Assan's trading of futures contracts pertains to its sales of finished goods (i.e., CAF) is consistent with both the chronology and nature of Assan's hedging operations.

First, Assan's examples of its hedging activities indicate that it opens its short hedges (i.e., sells futures contracts) shortly after purchasing primary aluminum. See supra **Section I.B.2.b**. Thus, at the time Assan opens the short hedges, Assan's sale of the finished good (i.e., CAF) that will incorporate the purchased raw material is a future event. The purpose of hedging is to manage the risk associated with future transactions or events. See supra **Section I.C.1**. Accordingly, the chronology of Assan's short hedges is consistent with those hedges' pertaining to Assan's sales of finished goods, such as CAF. See id.

Second, through the LME aluminum price-based formula, declining LME prices for primary aluminum lower Assan's finished good selling prices (see Appx80055, Appx85510), which in turn lowers Assan's sales revenue. The purpose of a short hedge is to protect against declining prices. See supra **Section I.C.2**. A short hedge generates a gain when LME prices for primary aluminum decline (see id.), which would help offset the revenue Assan loses when declining LME aluminum prices lower its finished goods selling price. That is, the nature of Assan's hedges – i.e., short hedges, which protect against declining LME aluminum prices – is

consistent with those hedges pertaining to Assan's sales of finished goods, because declining LME prices for primary aluminum are detrimental to Assan's sales of CAF.

That Assan's hedges pertain to its sales of finished goods comports with Assan's original example of why it hedges, with regard to which Assan stated:

> As shown in this example, the physical purchase transaction at the price of [          ] which is reflected in Assan's COM at this price did *create a loss when this material was consumed and sold*, at which time the LME price level decreased to the levels of [          ]. However, the loss in this transaction was offset with the gain from the trading of futures.

Appx85523-24 (emphasis added). That is, Assan purchases primary aluminum at the LME price, which is definitively determined at the time of Assan's purchase of the raw material. See Appx85510. If LME prices for primary aluminum decline before Assan sells the finished good that incorporates that purchased raw material, then Assan's finished good selling price would include a lower LME aluminum price, which is set at the time of Assan's sale of the finished good. See Appx80055, Appx82993-94. Assan's risk is that its revenue from the sale of the finished good includes a lower LME aluminum value than that included within the purchase cost of the raw material from which the finished good was produced. Because short hedges generate a gain when LME aluminum prices decline (see supra **Section I.C.2**), they help offset this loss. See Appx85524 ("{A} loss {was created} when this material was consumed and sold, at which time the LME price level decreased to the levels of [          ]. However, the loss in this transaction was offset with the gain from the trading of futures."). Consequently, Assan's short hedges protect Assan's *sales revenue* from the effect of declining LME prices for primary aluminum.

That Assan's short hedges pertain to its revenues from the sale of finished products such as CAF further comports with other record information, which demonstrates that short hedges inherently relate to the sale of an output, rather than the purchase of an input.  See Appx88292-93, Appx88314-15, Appx88332-33, Appx88339, Appx88343.   In fact, a short hedge is synonymous with an "output hedge."  See Appx88339, Appx88343.

*   *   *

In sum, the record indicates that Assan's trading of futures contracts does not hedge its purchases of primary aluminum that is consumed as an input in manufacturing CAF.  Rather, the record indicates that the purpose of Assan's hedging positions is to hedge its revenues from sales of finished goods. Because Commerce ignored this detracting information in concluding that Assan's hedges pertain to its purchases of raw materials (Appx007658), Commerce's determination is unreasonable and unlawful.

**D.    The Department's Failure to Incorporate Assan's Hedging Related Gains and Losses In the Interest Expense Ratios Is Unlawful**

The Department provided two explanations for why, if it deemed it appropriate to offset Assan's costs with hedging related gains and loss, such gains and losses should not be included in the interest expense ratio.   Appx007659.   As discussed above in Section I.B-C, the Department's statement that Assan's hedging gains "relate to aluminum purchases" is not supported by substantial evidence.  See supra Section I.B-C.

In addition, the Department stated that it would be inappropriate to include the gains and losses in the interest expense ratio, because "Assan's net hedging gains are recorded as a part of cost of goods sold in its audited financial statement."  Appx007659.  This explanation is arbitrary and, therefore, unlawful, as the Department did not include other accounts that Assan records as

part of cost of goods sold in its audited financial statement in the cost of manufacture.  The Department's conclusion is also inconsistent with the agency's treatment of hedging gains and losses in prior cases, and the Department failed to provide any (much less an adequate) explanation for such differing treatment.

Moreover, the record demonstrates that Assan's hedging activities are financial in nature and, therefore, the gains and losses from these activities belong in the interest expense ratio.  As a result, the Department's determination is unsupported by substantial evidence and is not in accordance with law.

**1.      The Department's Explanation for Failing to Include Hedging Gains and Losses in the Interest Expense Ratio Is Arbitrary and Unsupported By Substantial Evidence**

An agency determination is arbitrary "when the agency offers insufficient reasons for treating similar situations differently." <u>SKF USA Inc.</u>, 263 F.3d at 1382.  Here, the Department treated two accounts recorded in cost of goods sold in Assan's audited financial statement differently without providing any explanation (much less an adequate one) for the difference in treatment.  As such, the Department's determination is unlawful.

[

] The latter of these refers to Assan's LME hedging contracts.  [

NONCONFIDENTIAL
VERSION

]   This   disparate   treatment   makes   Commerce's determination arbitrary.

Additionally, in past cases, the Department has treated hedging gains and losses as part of a respondent's financial expenses.   Specifically, in Phosphor Copper from Korea, the Department explained that because the respondent "incurs gains and losses on derivative transactions," and the respondent "uses copper as the main input in producing the merchandise under consideration," a material that "is a commodity metal traded on the London Metal Exchange (LME)," it "is reasonable to include the full amount of such gains and losses in Bongsan's financial expense rate calculations."   Phosphor Copper From the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances, 82 Fed. Reg. 12,433 (Dep't Commerce Mar. 3, 2017), and accompanying Issues and Decision Memorandum at 11-12 (Comment 2) (Feb. 27, 2017).

Just like the respondent at issue in Phosphor Copper from Korea, Assan "incurs gains and losses on derivative transactions" on its most significant (or "main") material input – aluminum – which is also "a commodity metal traded on the London Metal Exchange (LME)."   Despite the very similar circumstances, the Department provided no explanation for its differing treatment of Assan's hedging revenues in the Final Determination.

Further, the Department has previously included gains and losses from the trading of derivatives in the financial expense ratio in other cases as well.  See, e.g., Certain Orange Juice From Brazil: Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination, 77 Fed. Reg. 63,291 (Dep't Commerce Oct. 16, 2012), and accompanying Issues and Decision Memorandum at 41, 44 (Comment 10) (Oct. 9, 2012) (including the respondent's hedging gains and losses from foreign exchange hedging activity in the financial expense ratio), aff'd, Fischer S.A. Comercio, Industria and Agricultura v. United States, 38 CIT 775, 783-89, 2014 Ct. Intl. Trade LEXIS 66, at *19-33 (2014); Polyethylene Terephthalate Resin From the Republic of Korea: Affirmative Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part, 83 Fed. Reg. 48,283 (Dep't Commerce Sept. 24, 2018), and accompanying Issues and Decision Memorandum at 12 (Comment 3) (Sept. 17, 2018) (stating "we have included both the gains and losses from these derivative instruments in SK Chemicals' interest expense calculation"); Certain Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Notice of Final Results of the Sixteenth Administrative Review, 76 Fed. Reg. 15,291 (Dep't Commerce Mar. 21, 2011), and accompanying Issues and Decision Memorandum at 45 (Comment 19) (Mar. 14, 2011); Certain Uncoated Paper From Brazil: Final Results of Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 7,254 (Dep't Commerce Jan. 27, 2021), and accompanying Issues and Decision Memorandum at 5-6 (Comment 1) (Jan. 19, 2021).

While Consolidated Plaintiffs cited these cases in their administrative case brief (see Appx91222-23), the Department did not address the cited authorities or explain why Assan's hedging gains and losses should be treated differently.

As a result, the Department's determination is arbitrary and, therefore, unlawful, because:

NONCONFIDENTIAL
VERSION

(1) the Department's explanation that "Assan's net hedging gains are recorded as a part of cost of goods sold in its audited financial statement" is inconsistent with the Department's treatment of other accounts recorded as part of cost of goods sold in Assan's audited financial statement; and

(2) the Department failed to distinguish the instant investigation from other prior cases where the agency treated hedging gains and losses as part of the interest expenses.

See Appx007659.

## 2.   The Department Failed to Address Evidence That Detracts From Its Findings

The record also demonstrates that [

], and the Department's failure to address this evidence

in its Final Determination is unlawful.

First, as noted above, [

]

Second, [

]

Thus, [

]. Indeed, Assan does not use the

-27-

NONCONFIDENTIAL
VERSION

futures contracts that hedge changes in the LME price for primary aluminum to purchase any inputs or sell any outputs; rather these contracts are simply a means of risk and cash management.  See Appx89128 ("Assan never takes delivery of the commodity contract.  All contracts are closed on the date of the conclusion with reverse transactions i.e. a sell transaction in the futures market is closed with a spot buy transaction on the date of the conclusion.").

Although Consolidated Plaintiffs identified this detracting evidence in their administrative case brief (see Appx91220-22),  the Department did not address it in its Final Determination.  As a result, the Department's determination is not otherwise in accordance with law.

## II.   CONCLUSION

For the reasons set forth above, Consolidated Plaintiffs respectfully urge this Court to determine that the Department's Final Determination is not supported by substantial evidence and is not otherwise in accordance with law.  Consolidated Plaintiffs urge this Court to remand the Final Determination to the Department with instructions to correct the errors addressed above.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Consolidated Plaintiffs

Dated:  May 23, 2022

**CERTIFICATE OF COMPLIANCE
WITH U.S. COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to the United States Court of International Trade Standard Chambers procedures and this Court's March 18, 2022 Order (ECF No. 24) setting the word limitation for Consolidated Plaintiffs the Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas Inc.; JW Aluminum Company; and Novelis Corporation's Memorandum in Support of Consolidated Plaintiffs' Rule 56.2 Motion for Judgment On the Agency Record to 14,000 words, counsel for Consolidated Plaintiffs certifies that this Brief contains 7,916 words, including footnotes, tables, and charts. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Consolidated Plaintiffs

Dated:  May 23, 2022