**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) |
| | ) |
| *Plaintiff,* | ) **<u>Non-Confidential Version</u>** |
| v. | ) |
| THE UNITED STATES, | ) Consol. Court No. 21-00616 |
| | ) |
| *Defendant,* | ) **Business Proprietary Information** |
| | ) **removed from pages: 6, 7, 9, 10,** |
| ALUMINUM ASSOCIATION TRADE | ) **11, 15, 16, 17.** |
| ENFORCEMENT WORKING GROUP AND | ) |
| ITS INDIVIDUAL MEMBERS, et al., | ) |
| | ) |
| *Defendant-Intervenors.* | ) |
| | ) |

**RESPONSE BRIEF OF ASSAN ALUMINYUM SANAYI VE TICARET A.S TO**
**PETITIONERS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Leah N. Scarpelli
Matthew M. Nolan
Yun Gao

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6013
Fax: (202) 857-6395
Email: leah.scarpelli@afslaw.com

August 5, 2022

AFDOCS/26101300.1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     ISSUES PRESENTED........................................................................................ 2

III.    STANDARD OF REVIEW ................................................................................ 2

IV.     ARGUMENT ..................................................................................................... 4

        A.      Hedging Revenues Are An Appropriate Offset To COM ................... 4

                1.      Commerce's Treatment of Assan's Hedging Revenues Is
                        Consistent With Assan's Audited Financial Statements........................... 4

                2.      Commerce's Finding That Assan's Hedging Is Linked To Raw
                        Material Purchases Is Supported By Substantial Evidence ...................... 8

                3.      Commerce Has Used The Same Methodology In Other Recent
                        Cases ............................................................................................... 13

        B.      Hedging Activities Are Unrelated To Assan's Interest Expense Ratio .............. 14

V.      PRAYER FOR RELIEF ................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akzo N.V. v. U.S. Int'l Trade Comm'n*,
  808 F.2d 1471 (Fed. Cir. 1986)...............................................................3

*Chevron. Union Steel v. United States*,
  713 F.3d 1101 (Fed. Cir. 2013)...............................................................3

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)...............................................................................4

*Consol. Edison Co. of New York v. NLRB*,
  305 U.S. 197 (1938)...............................................................................3

*DuPont Teijin Films USA, LP v. United States*,
  407 F.3d 1211 (Fed. Cir. 2005)...............................................................3

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)...............................................................3

*In re NuVasive, Inc.*,
  842 F.3d 1376 (Fed. Cir. 2016)...............................................................3

*USEC v. United States*,
  498 F.Supp.2d 1337 (CIT 2007)............................................................16

**Statutes**

28 U.S.C. § 2640(b) .................................................................................2

Tariff Act of 1930 ....................................................................................2

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................2, 3

19 U.S.C. § 1677b(f)(1)(A).................................................................4, 6

**Administrative Determinations**

*Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of
  Oman, the Russian Federation, and the Republic of Turkey; Antidumping Duty
  Orders*, 86 Fed. Reg. 62790
  (Dep't Commerce Nov. 12, 2021) ...........................................................2

i

*Certain Aluminum Foil From the Republic of Turkey; Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52880 (Dep't Commerce Sep. 23, 2021) ................................................................. *passim*

*Certain Oil Country Tubular Goods from the Republic of Korea; Final Results of the 2016-2017 Administrative Review of the Antidumping Duty Order*, 84 Fed. Reg. 24085 (Dep't Commerce May 24, 2019) ....................................................13

*Certain Orange Juice from Brazil; Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination,* 77 Fed. Reg. 63291 (Dep't Commerce Oct. 16, 2012) ...................................................................16, 18

*Common Alloy Aluminum Sheet from Turkey; Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 65346 (Dep't Commerce Oct. 15, 2020) ...........................................................13, 14, 18

*Low Enriched Uranium ("LEU") from Germany, Netherlands and the United Kingdom; Notice of Final Antidumping Determination*, 66 Fed. Reg. 65886 (Dep't Commerce Dec. 21, 2001) .......................................................................16, 17

*Phosphor Copper From the Republic of Korea; Final Affirmative Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances,* 82 Fed. Reg. 12433 (Dep't Commerce Mar. 3, 2017) ...............................................................................18

*Seamless Refined Copper Pipe and Tube from Mexico; Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments: 2014-2015,* 81 Fed. Reg. 89434 (Dep't Commerce Dec. 12, 2016) ..............................................................................13

*Steel Wire Rod from Trinidad & Tobago; Notice of Final Determination of Sales at Less Than Fair Value,* 63 Fed. Reg. 9177 (Dep't Commerce Feb. 24, 1998) ...........................................................................16

AFDOCS/26101300.1

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) |
| *Plaintiff*, | ) ) **Non-Confidential Version** |
| v. | ) ) |
| THE UNITED STATES, | ) Consol. Court No. 21-00616 ) |
| *Defendant*, | ) **Business Proprietary Information** |
| | ) **removed from pages: 6, 7, 9, 10,** |
| ALUMINUM ASSOCIATION TRADE | ) **11, 15, 16, 17.** |
| ENFORCEMENT WORKING GROUP AND | ) |
| ITS INDIVIDUAL MEMBERS, et al., | ) |
| | ) |
| *Defendant-Intervenors*. | ) |
| | ) |

**RESPONSE BRIEF OF ASSAN ALUMINYUM SANAYI VE TICARET A.S. TO
PETITIONERS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

## I.   INTRODUCTION

On behalf of Assan Aluminyum Sanayi ve Ticaret A.S. ("Assan"), we respectfully submit

this brief in response to the Aluminum Association Trade Enforcement Working Group, et al.'s

("Petitioners") memorandum of points and authorities in support of its motion for judgment on

the agency record filed on May 24, 2022, ECF Nos. 31 and 31-1 ("Pet. Br."), regarding *Certain*

*Aluminum Foil From the Republic of Turkey; Final Affirmative Determination of Sales at Less*

*Than Fair Value*, 86 Fed. Reg. 52880 (Dep't Commerce Sep. 23, 2021) ("*Final Determination*")

(Appx007669-007671).[1] The Department of Commerce's ("Commerce") factual and legal

conclusions underlying the *Final Determination* are set forth in its Issues and Decision

---

[1] Per "Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden," all record
citations are to include bates-numbered appendix pages.

AFDOCS/26101300.1

Memorandum. Memorandum from A. Villanueva to J. Maeder, Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of *Certain Aluminum Foil from the Republic of Turkey* (Sep. 23 2021) ("*Final I&D Memo*") (Appx007617-007668). On November 12, 2021, Commerce published the antidumping duty order. *Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey; Antidumping Duty Orders*, 86 Fed. Reg. 62790 (Dep't Commerce Nov. 12, 2021) (Appx0078210-007824).

## II.   ISSUES PRESENTED

Assan addresses the following issues raised in Petitioners' Brief, both of which involve Commerce's treatment of Assan's hedging activities:

1.      Whether Commerce's grant of an offset to the cost of manufacturing ("COM") for Assan's net hedging gains on raw material purchases and inventories used to produce subject merchandise is supported by substantial evidence and otherwise in accordance with law; and

2.      Whether Commerce's exclusion of gains and losses associated with Assan's hedging activities from the interest expense ratio is supported by substantial evidence and otherwise in accordance with law.

## III.   STANDARD OF REVIEW

The authority and scope of the Court's power to review Commerce's determinations in Antidumping cases is established by statute. 28 U.S.C. § 2640(b) provides that "{i}n any civil action commenced in the Court of International Trade under section 516A of the Tariff Act of 1930, the court shall review the matter as specified in subsection (b) of such section." 19 U.S.C. § 1516a(b)(1)(B)(i) provides that, with respect to a final determination by the Commerce, the Court "shall hold unlawful any determination, finding, or conclusion found . . . unsupported by substantial evidence on the record, or otherwise not in accordance with law." By statute,

2

Commerce determinations shall thus be upheld if they are supported "by substantial evidence on the record" and are otherwise "in accordance with law." *Id.*

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is "reasonable and supported by the record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted). To provide a reasoned explanation, Commerce "must make the necessary findings and have an adequate evidentiary basis for its findings," and "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *In re NuVasive, Inc*., 842 F.3d 1376, 1382 (Fed. Cir. 2016) (internal quotations omitted) (citations omitted); *see* 19 U.S.C. § 1516a(b)(1)(B)(i).

The Court of Appeals for the Federal Circuit ("Federal Circuit") has stated that the "substantial evidence standard does not allow a court to conduct a *de novo* investigation of the evidence on the record before it and reach an independent conclusion; rather, the court's review is limited to deciding whether there is sufficient evidence in the record considered as a whole to support the agency's findings." *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1479 (Fed. Cir. 1986). The "mere fact that a reasonable person might reach some other conclusion is insufficient for this court to overturn the agency's conclusion." *Id.* When reviewing Commerce's statutory interpretations, the Court specifically applies the framework set forth in the Supreme Court's opinion in *Chevron*. *Union Steel v. United States*, 713 F.3d 1101, 1106–07 (Fed. Cir.

2013) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842-43 (1984)).

## IV.   **ARGUMENT**

Commerce's treatment of Assan's hedging activities in the *Final Determination* is supported by substantial evidence and otherwise in accordance with law. Specifically, in the *Final Determination*, Commerce accounted for Assan's net hedging gains as an offset to the reported COM. *Final I&D Memo* at 41 (Appx007657). Commerce's treatment of Assan's hedging transactions, which exist solely to "ensure stability related to its raw material costs," was consistent with the statutory requirement that Commerce "calculate costs based on a respondent's normal books and records if they are kept in accordance with home country GAAP and reasonably reflect the costs associated with the production and sale of the merchandise." *Id.* (citing 19 U.S.C. § 1677b(f)(1)(A)) (Appx007657). Because Assan clearly established that its hedging activities directly relate to raw material purchases, and are recorded as cost of goods sold in its audited financial statements, Commerce's offset of net hedging gains was lawful and consistent with Assan's normal books and records. *Id.* (Appx007657). Petitioners' arguments, which seek only to complicate this straightforward accounting principle, ignore record evidence and should be rejected by the Court.

### A.      **Hedging Revenues Are An Appropriate Offset To COM**

#### 1.      **Commerce's Treatment of Assan's Hedging Revenues Is Consistent With Assan's Audited Financial Statements**

Assan's sales of aluminum foil are structured such that the London Metal Exchange ("LME") value of aluminum is a component in the price as a pass-through in the *sale of the final product*. Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S. 's ("Kibar')'s Response to Section A Questionnaire (Dec. 22, 2020) ("Section A QR") at A-23 (Appx80057). As Petitioners note, "{t}his type of pricing structure – with the LME value of aluminum and

metal premium passed through to the customer based on a formula – is utilized widely in the aluminum industry." Pet. Br. at 10. Separately, Assan engages in raw material hedging for the LME portion of *raw material purchases* in the normal course of business. Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S.'s Response to the April 9, 2021 Section D Fourth Supplemental Questionnaire (Qs 5-10) (Apr. 15, 2021) ("Ninth Supp. QR Part II") at 1-3 (Appx87808-87810). This practice is likewise common amongst participants in the aluminum industry, including the Petitioners. *See* Assan Aluminyum Sanayi ve Ticaret A.S., Kibar Dis Ticaret A.S., and Ispak Esnek Ambalaj Sanayi A.S. ("Ispak")'s Rebuttal Brief (Aug. 12, 2021) ("Rebuttal Br.") at 14 (citing *Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey*, International Trade Commission Investigation Nos. 701-TA-639 and 641-642 and 731-TA-1475-1479, 1481-1483, and 1485-1492 (Final)  Publication 5182 at VI-17 (April 2021)) (Appx91371).

As the Petitioners acknowledge, with regards to raw material hedging, "Assan predominantly sells futures contracts (*i.e.*, 'short hedging')," which "generate a gain for Assan when LME aluminum prices decline and a loss for Assan when LME aluminum prices increase." Pet. Br. at 11. In other words, when Assan purchases raw materials, it creates a hedge for a future sale of that material at a set price to ensure that raw material costs are fixed during the production of downstream products. Assan is not a metal trader, is not in the business of taking speculative positions, and "is not in the business to make a profit on its hedging transactions." *Final I&D Memo* at 41 (Appx007657). As Petitioners note, actual raw material costs may go up or down, resulting in a gain or a loss when the hedge is closed. Pet. Br. at 11. The hedging

NON-CONFIDENTIAL VERSION

process exists only to avoid volatility in the ultimate costing of the finished product by creating a neutral position. *Final I&D Memo* at 41 (Appx007657).

The cost of the hedge transaction, as well as the associated gains and losses, are all recorded as the costs of goods sold in Assan's audited financial statements, which have been extensively reviewed, audited, and approved by an independent auditor and by Commerce in this investigation. *Final I&D Memo* at 41 (Appx007657). Pursuant to 19 U.S.C. § 1677b(f)(1)(A):

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

The reduction of Assan's reported COM by the net hedging gains reflected in Assan's normal books and records is consistent with the treatment of those gains as cost of goods sold in Assan's audited financial statements. *Final I&D Memo* at 41 (Appx007657).

Despite this, Petitioners ask the Court to ignore generally accepted accounting principles and Assan's normal business practices based on their selective reading of Assan's audited financial statements. Pet. Br. at 13. In the *Final Determination*, Commerce correctly noted that "Assan's audited financial statement accompanying footnotes state that the company enters into commodity contracts to mitigate its risk on *aluminum price fluctuations*." *Final I&D Memo* at 42 (emphasis added) (Appx007658). This is consistent with the language excerpted by Petitioners from Assan's financial statement, which specifically notes:

[

]

Pet. Br. at 13 (citing Appx80466 (emphasis added)). As an initial matter, this portion of Assan's financial statements simply explains the IFRS principles for [

6

]. Section A QR at Exh. A-14 (Appx80367-80487). Moreover, though the description does not explicitly [                                        ], *id.*, the record clearly establishes that primary aluminum is the major raw material input in the production of aluminum foil, a finished good. *Final I&D Memo* at 42 (Appx007658); Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S.'s Response to Section D Questionnaire (January 19, 2021) ("Section D QR") at D-9 and Exhs. D-4, D-6 (Appx82598, 82654-82655, 82661-82663). Contrary to Petitioners' claims, this language clearly supports Commerce's conclusion that "Assan's hedging activities and associated net hedging gains are related to Assan's aluminum purchases." *Final I&D Memo* at 42 (Appx007658).

Still, Petitioners claim it is "unreasonable to infer, as Commerce did, that 'aluminum price fluctuations' refers only to the price of Assan's raw material inputs," Pet. Br. at 13, because both Assan's *purchases* of raw materials (aluminum) and Assan's *sales* of finished product (aluminum foil) include a provision to account for LME fluctuations. Pet. Br. at 10. Petitioners' argument improperly conflates Assan's purchases and sales, ignoring that the LME hedge in Assan's purchases of raw materials are set independently and during a separate period of time than the LME hedge in Assan's sales price for finished products. Petitioners' attempts to link Assan's raw material hedges to final product sales is contrary to record evidence. Throughout Commerce's investigation, Assan exhaustively reported its hedging activities and linked those hedges to *specific* raw material purchases. Ninth Supp. QR Part II at 1-6 and accompanying exhibits (Appx87808-87813, 87820-88263); Assan and Kibar's Response to the May 4, 2021 Section D Fifth Supplemental Questionnaire (Qs 1, 2d, 3) (May 17, 2021) ("Tenth Supp. QR Part II") at 1-9 and accompanying exhibits (Appx89122-89130, 89138-89171). In fact, in the *Final*

7

*Determination*, Commerce revised its methodology to more clearly "link the POI raw material purchases with the associated hedging gains or losses, and mitigate the timing differences," by "incorporating a ninety-day lag," which is the average duration of Assan's commodity hedging contracts. *Final I&D Memo* at 42 (Appx007658).

By contrast, there is no corresponding trace to any specific sales contract or invoice because the raw material hedge is unrelated to Assan's sales of finished goods or sales revenue. Indeed, the hedge could not occur on the sales transaction, which had not even been booked at the time of the raw material purchase. There is no support for Petitioners' erroneous premise that hedges are in any way linked to the LME portion of Assan's sales price; the hedging on raw materials is cost based on and properly treated as an offset to Assan's COM.

Commerce's finding that the Assan's net hedging gains are specifically related to its raw material purchases and inventories of aluminum, as properly reported in its audited financial statements, is reasonable and supported by substantial record evidence. *Final I&D Memo* at 42 (Appx007658).

### 2. Commerce's Finding That Assan's Hedging Is Linked To Raw Material Purchases Is Supported By Substantial Evidence

In challenging Commerce's reliance on Assan's audited financial statements, as directed by the statute, Petitioners present speculative arguments, which "suppose" and "{s}uppose further" that LME futures contracts and aluminum pricing occurred a specific way. Pet. Br. at 11. But this type of speculation is unnecessary – Assan provided numerous examples of its *actual* hedging activities, which link Assan's hedge transactions to specific raw material purchases during the period of investigation ("POI") and directly contradict Petitioners' central argument that Assan's LME transactions are unrelated to the "actual *physical* . . . purchase of aluminum." Ninth Supp. QR Part II at 4 and Exhibit S9D-9 (Appx87811, 87829-878230); Pet. Br. at 12.

8

Petitioners ask the Court to reject this clear documentation establishing that Assan's raw material hedging applies only to its raw material purchases because "Assan's hedges were opened *after* the LME portion of its aluminum input purchases were locked in." Pet. Br. at 15. Petitioners specifically claim that "there is no uncertainty or risk left for Assan to manage or 'hedge' with respect to its purchases of primary aluminum" after those purchases occur. *Id.* at 16.

Petitioners' argument is based on the erroneous assumption that "{i}f LME prices for primary aluminum decline before Assan sells the finished good that incorporates that purchased raw material, then Assan's finished good selling price would include a lower LME aluminum price." *Id*. at 22. This is not true. As Assan detailed to Commerce, the LME component of its sales price is fixed during invoicing, and may be based on the monthly average, quarterly average, or spot cash LME based on the preference of the customer. Section A QR at A-23 (Appx80057). A lower LME does not necessarily create a lower sales revenue. To the contrary, evidence presented by Assan throughout this proceeding demonstrates the importance of short hedges to protect Assan's raw material inventory against the risk of LME price decreases. Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S.'s Rebuttal to Petitioners' April 8 and April 15 Pre-Preliminary Comments (Apr. 20, 2021) ("April 20 Pre-Prelim Rebuttal Comments") at 2-3 (Appx88364-88365); Ninth Supp. QR Part II at 1-2 (Appx87808-87809).

Indeed, information presented to Commerce establishes the real impact of declining LME prices on the value of Assan's raw material inventory, resulting in substantial losses during the POI in several months and necessitating a short hedge *after* the purchase of raw materials. *See* Tenth Supp. QR Part II at Exh. S10D-8 (Appx89163-89166).  For example:

- In August 2019, LME current price was [          ] whereas Assan's average LME inventory value was [          ]. As a result. Assan had to recognize a mark to

market loss in this month of [

] *Id.*

(Appx89163-89166).[2]

- In January 2020, LME current price was [        ] whereas Assan's average LME inventory value was [        ]. As a result. Assan had to recognize a mark to market loss in this month of [

]. *Id.*

(Appx89163-89166).

- In February 2020, LME current price was [        ] whereas Assan's average LME inventory value was [        ]. As a result. Assan had to recognize a mark to market loss in this month of [

]. *Id.*

(Appx89163-89166).

- In March 2020, LME current price was [        ] whereas Assan's average LME inventory value was [        ]. As a result. Assan had to recognize a mark to market loss in this month of [

]. *Id.*

(Appx89163-89166).

In short, though Assan's hedging practices resulted in a net gain during the POI, there were substantial losses in value observed for Assan's raw material inventory during the same period.[3]

---

[2] Mark to market gain/loss is determined by the additional loss and gain the company needs to post to restate the inventory to the current value. For example, in the end of August 2019, Assan's total inventory value should be [

] Rebuttal Br. at 20, n.48 (Appx91377).

In fact, Assan recognized an overall valuation *loss* for its inventory during the POI. Ninth Supp.

QR Part II at 3 and Exhibit S9D-8 (Appx87810, 87827-87828).

These actual impacts in the value of Assan's raw material inventory directly contradict

Petitioners' baseless statement that "past transactions do not entail any risk." Pet. Br. at 18.

Though Petitioners allege that Commerce "does not address the implications of Assan's

chronology for opening its short hedges" and unlawfully ignored this "detracting evidence," Pet.

Br. at 19, the need for short hedges to protect Assan's raw material inventory value is clearly

considered by Commerce in the *Final Determination*. As Commerce notes:

> Assan explained in this investigation that to meet customer demands and offer a reasonable delivery time to its customers, Assan maintains extra raw material inventory. According to Assan, raw material purchase transactions are generally concluded within the first three weeks of each month. *However, because raw material prices are subject to significant fluctuations, Assan also engages in hedging transactions for the purchased raw materials to eliminate the risk of fluctuations in the metal cost.*

*Final I&D Memo* at 41 (emphasis added) (Appx007657). Again, Petitioners' arguments

misunderstand the purpose of Assan's raw material hedging activities – the goal is not to "protect

against declining prices", Pet. Br. at 20, for finished products, but rather, as Commerce

recognized, to "eliminate the risk of fluctuations in the metal cost" on the value of its raw

material metal inventories. *Final I&D Memo* at 41(Appx007657).

Petitioners next argue that Assan's hedging on past purchases of raw materials is

inconsistent with its own narrow definition of hedging, which Petitioners claim must necessarily

be associated with  "the future sale of a commodity." Pet. Br. at 18. However, the source of their

---

[3] Assan reported both monthly gains and losses during the POI for inventory revaluations in accordance with IFRS rules requiring monthly revaluation of inventory based on end of month LME value. Tenth Supp. QR Part II at 1 (Appx89122); Section D QR at Exh. D-6 and D-11 (Appx82661-82663, 82673-82674). While Assan reported a POI [          ] of [                    ] in its [
              ], Assan also reported a loss of [            ] during the POI for inventory related to finished goods. Ninth Supp. QR Part II at 3 and Exhibit S9D-8 (Appx87810, 87827-87828).

definition – the Center for Farm Financial Management at the University of Minnesota – describes hedging in an agricultural context (sale of crops), and its meaning is unrelated to the role of hedging in an aluminum, metals, or even a manufacturing context. *Id.* Unlike producers in the agricultural sector, such as grain or cattle, aluminum producers that utilize hedging do not have a distinct target date for harvest, nor a known pre-determined output volume that must be sold.[4] Assan does not know what end products it will manufacture, when it will manufacture them, or how much it will manufacture at the time it purchases raw materials. Assan therefore *cannot* hedge its output in the manner Petitioners describe.

Even so, the full definition cited by Petitioners still contradicts its own position. The Center for Farm Financial Management at the University of Minnesota describes a short hedge as:

> The sales of futures contracts against *cash ownership, including inventory, expected production* and/or forward purchases. The short hedge protects the hedger against falling prices.

Petitioners' Comments On and New Factual Information to Rebut Assan's April 15, 2021 Supplemental Section D Questionnaire Response (Apr. 19, 2021) ("Pet. Apr. 19 Comments") at Attach. 2, pg. 1 (emphasis added) (Appx88314). As detailed above, Assan engages in short hedges for the purpose of protecting the value of its raw material inventory *after* the raw material is purchased, but *before* the end product is manufactured. Rebuttal Br. at 17 (Appx91374). In other words, Assan is doing precisely what the University of Minnesota describes, *i.e.* engaging in short hedges to protect the value of its purchased raw materials, *i.e.* raw materials inventory,

---

[4] Petitioners have repeatedly attempted to draw comparisons between aluminum hedging and the hedging of agricultural products, including grain and cattle. Petitioners' Comments On and New Factual Information to Rebut Assan's April 15, 2021 Supplemental Section D Questionnaire Response (Apr. 19, 2021) ("Pet. Apr. 19 Comments") at 4-5 and Attach. 2-8 (Appx88292-88293, Appx88313-88362). The function of hedging for agricultural products is wholly irrelevant to its use in the aluminum manufacturing business. Rebuttal Br. at 16-18 (Appx91373-91375).

and "expected production" against LME price fluctuations. This fact does not negate Commerce's finding that Assan's hedges are "directly associated" with its purchases of raw material aluminum. *Final I&D Memo* at 41 (Appx007657); Pet. Br. at 15. Petitioners' vague claim that Assan's hedging does not manage the risk of Assan's raw material purchases, but rather some unspecified "future transactions" has no support in the record. Pet. Br. at 19.

        **3.**      **Commerce Has Used The Same Methodology In Other Recent Cases**

Commerce has historically considered both gains and losses in its cost calculations and its treatment of Assan's net hedging gains to offset the reported COM is consistent with its methodology in other recent cases. For example, in *Certain Oil Country Tubular Goods from the Republic of Korea*, Commerce found that the gains and losses on periodic raw material and WIP inventory revaluations were related to the general operations of the company as a whole and should be included in the reported costs. *Final Results of the 2016-2017 Administrative Review of the Antidumping Duty Order*, 84 Fed. Reg. 24085 (Dep't Commerce May 24, 2019), and accompanying I&D Memo at 82-83 (Cmt. 8). As in this case, Commerce's finding was based in part on the recognition of inventory valuation gains and losses in the respondent's GAAP-based financial statements. *Id.* Likewise, in *Seamless Refined Copper Pipe and Tube from Mexico*, Commerce revised the respondent's "reported total cost of manufacturing by calculating and applying a single per-unit adjustment amount for . . . hedging gains and losses{.}" *Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments: 2014-2015*, 81 Fed. Reg. 89434 (Dep't Commerce Dec. 12, 2016), and accompanying I&D Memo at 15.

Most relevant, in Commerce's concurrent investigation involving *Common Alloy Aluminum Sheet from Turkey* ("*CAAS from Turkey*"), in which Assan was also a mandatory respondent, Commerce employed the exact same methodology with regards to Assan's raw

material hedging as that utilized in this case. Specifically, Commerce "adjusted the reported cost of manufacturing (COM) to include the metal hedge position evaluation, the metal hedge position inventory evaluation, and the provision for inventory value." *Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 65346 (Dep't Commerce Oct. 15, 2020) (unchanged in final determination), and accompanying I&D Memo ("*CAAS I&D Memo*") at 15; *see also* Ninth Supp. QR Part II at Exhibit S9D-07 (Appx87820-87826). Notably, Petitioners did not take issue with Commerce's methodology in that case, despite currently challenging the final determination in an appeal pending before this Court. Consol. Ct. No. 21-246.

Given the relevance of *CAAS from Turkey*, which involved an overlapping POI, the same respondent, and the same raw material input (primary aluminum) used to produce a similar product (CAAS), it is telling that Petitioners fail to mention Commerce's determination in its opening brief. Indeed, Petitioners have provided no reasonable explanation for why Assan's hedging gains and losses should have been treated differently by Commerce in this investigation involving aluminum foil than they were in the investigation involving CAAS. Commerce's *Final Determination* with regards to the treatment of Assan's hedging activities is thus reasonable, consistent with recent precedent, and otherwise in accordance with law.

### B.    Hedging Activities Are Unrelated To Assan's Interest Expense Ratio

In the *Final Determination*, Commerce rejected Petitioners' argument that Assan's net hedging gains be included in Assan's interest expense ratio ("INTEX") because such gains "are recorded as a part of cost of goods sold in its audited financial statements and relate to aluminum purchases used in the production of merchandise under consideration{.}" *Final I&D Memo* at 43 (Appx007659). As such, Commerce concluded that "it is inappropriate to include this amount in

14

the financial expense ratio." *Id.* (Appx007659). Despite the extensive record evidence

demonstrating that Assan's hedging revenues relate to raw material purchases and inventory, as

detailed above, Petitioners allege that Commerce's determination is arbitrary because these gains

were treated differently than Assan's gains on [

        ]. Pet. Br. at 24. Petitioners' specifically challenge Commerce's exclusion of Assan's

[                                                                                    ] arguing that both

Assan's hedging gains and such [                                    ] should be included in INTEX,

rather than as an offset to the COM. *Id.* at 25.

        Petitioners are wrong. The [


        ] and commodity exchange contracts. *See* Section A QR at Exh. A-14

(Appx80367-80487). Each of these items is executed with financial institutions, which is why

they are listed in this category. *Id.* (Appx80367-80487). This does not change the fact that

"Assan's hedging gains and losses are directly associated with purchases of the raw material

aluminum{, they} are recorded as a part of cost of goods sold" in Assan's audited financial

statements. *Final I&D Memo* at 41 (Appx007657); *see also* Section D QR at Exh. D-16

(Appx82691-82706).[5] Indeed, the recording of Assan's raw material hedging gains as COGs is

approved by Assan's management and its auditor, PWC – one of the world's largest accounting

firms. Rebuttal Br. at 14 (Appx91371).

---

[5] Accounts [                                                        ] are grouped under COGS in column E titled
"P&L  Mapping". Section D QR at Exh. D-16 (Appx82691-82706). The sum of accounts labeled COGS is [
            ]. This ties to "Assan Alüminyum 2019 Solo COGS" line in Assan's Jan. 19 DQR at Exhibit D-16 in
after adding the reconciling item of [                ]. *See* Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis
Ticaret A.S.'s Response to the March 8, 2021 Section D Second Supplemental Questionnaire (Mar. 29, 2021) ("Fifth
Supp. QR") at Exh. S5D-33 (Appx85891-85892).

15

Petitioners' criticism of Commerce's "difference in treatment" between Assan's raw material hedging gains and [                    ] ignores the disparate purpose of those two items. Commerce's longstanding policy is to consider treatment of hedging activities in the context of the underlying purpose. *See* April 20 Pre-Prelim Rebuttal Comments at 3 (Appx88365). Where, as here, the hedging activity relates to manufacturing or production (including input purchases), gains and losses are included in COP and CV calculations. *See, e.g., USEC v. United States,* 498 F.Supp.2d 1337, 1353 (CIT 2007) (citing *Steel Wire Rod from Trinidad & Tobago*; *Notice of Final Determination of Sales at Less Than Fair Value,* 63 Fed. Reg. 9177, 9181–82 (Dep't Commerce Feb. 24, 1998) ("{T}he Department includes currency losses related to manufacturing operations in its calculations, but excludes those related to sales transaction")). By contrast, where the hedging activities are related to financing activities, rather than manufacturing or production, Commerce treats those gains and losses as part of the calculated financial expense ratio when related to financing activities. *See, e.g.*, *Certain Orange Juice from Brazil; Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination,* 77 Fed. Reg. 63291 (Dep't Commerce Oct. 16, 2012), and accompanying I&D Memo (Oct. 9, 2012) ("*Orange Juice from Brazil IDM*") at Cmt. 10.

Commerce's longstanding practice is perhaps best articulated in its investigation involving *Low Enriched Uranium ("LEU") from Germany, Netherlands, and the United Kingdom*, in which Commerce stated:

> We note that, in general, a company's involvement in speculative futures contracts would be considered investment activity, similar to trading of stock. However, companies are often willing to transfer risk to the speculators in order to protect their future position through the process called hedging. *Companies may be involved in different types of hedging transactions*, such as hedging profits by taking a futures position in the product they produce and sell, hedging the local currency value of the company's sales

16

> denominated in foreign currency, hedging the rate of interest they earn or pay on borrowed money by entering into interest rate futures, etc. In each of the above-mentioned examples, *it is clear that the hedging contracts would be related to the company's specific activity*, such as sales or borrowing, and should be analyzed as an intrinsic component of that activity.

*Notice of Final Antidumping Determination*, 66 Fed. Reg. 65886 (Dep't Commerce Dec. 21, 2001), and accompanying I&D Memo at Cmt. 17 (emphasis added). Like the respondents in *LEU from Germany, Netherlands, and the United Kingdom*, Assan engages "in different types of hedging transactions," including the raw material hedging considered by Commerce and the [                                    ] flagged by Petitioners. Commerce's "disparate treatment" does not make its determination arbitrary, as Petitioners claim. Pet. Br. at 25. Rather, it demonstrates that Commerce is engaging in the exact analysis it has articulated in past cases.

Again, in this case, the reported raw material hedging relates to Assan's manufacturing and production, not to its financing activities or to its sales. *See* Section IV.A, *infra*. By contrast, each of the cases cited by Petitioners involve financing-related activities, rather than hedging on raw material costs. For example, in *Phosphor Copper from the Republic of Korea*, a case cited by Petitioners as involving "very similar circumstances" to those at issue here, Commerce's determination to include gains and losses in respondent's financial expense rate calculation was based, in part, on the fact that:

> {Respondent's} investments in derivatives are *entirely unconnected* to its production operations. The record does not indicate that such derivatives are related in any way to either raw material purchases or sales, or that derivative investments were made to manage risk associated with phosphor copper operations. Respondent's foreign currency losses or gains that related to transactions were recorded in {respondent's} income statement,

17

and therefore they have already been reported in the financial expense ratio.

*Final Affirmative Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances*, 82 Fed. Reg. 12433 (Dep't Commerce Mar. 3, 2017), and accompanying I&D Memo (Feb. 27, 2017) at 11. Clearly, this scenario is distinguishable from Assan's hedging activities, which are *directly* related to Assan's raw material purchases and inventories, necessitating different treatment of hedging gains and losses.

Likewise, in *Certain Orange Juice From Brazil*, a second case cited by Petitioners, Commerce emphasized the complexity of hedging instruments, noting that they "can be extremely complicated in how they are structured and in how any related gain and losses must be reported." *Orange Juice from Brazil IDM* at 44 (Cmt. 10) . As such, Commerce stated:

> Absent the identification of specific and clear distortions in how the company normally treats the resulting gains and losses on these transactions, in accordance with home country GAAP, we consider it appropriate to rely on the gains and losses recorded in the company's . . . GAAP audited income statement.

*Id.* at 43. Again, in this case, the "net hedging gains from {Assan's} hedging activities . . . were recorded as a part of cost of goods sold in the audited financial statements." *Final I&D Memo* at 41 (Appx007657).

There are no inconsistencies between Commerce's methodology in this case and that applied in other cases, including the cases cited by Petitioner. Pet. Br. at 25-26. To the contrary, the treatment of Assan's hedging revenues was consistent with other recent cases, mostly notably *CAAS from Turkey*. *CAAS I&D Memo* at 15. Commerce's determination is therefore reasonable and should be upheld by the Court.

V.    **PRAYER FOR RELIEF**

WHEREFORE, Assan Aluminyum Sanayi ve Ticaret A.S.  respectfully requests that this

Court:

(a)    Hold that Commerce's *Final Determination* was based on substantial evidence

and in accordance with the law with respect to the claims advanced by Petitioners

in this appeal;

(b)    Grant such additional relief as the Court may deem just and proper.

Respectfully submitted,

**/s/ Leah N. Scarpelli**
Leah N. Scarpelli
Matthew M. Nolan
Yun Gao

ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 715-8403

*Counsel to Assan Aluminyum Sanayi ve Ticaret
A.S.*

August 5, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Response to Petitioners' 56.2 Motion for Judgment on the Agency Record filed on August 5, 2022 complies with the word limitation requirement. The word count for Assan's Response Brief, as computed by ArentFox Schiff LLP's word processing system is 5,631.

**/s/ Leah N. Scarpelli**
Leah N. Scarpelli

*Counsel to Assan Aluminyum Sanayi ve Ticaret A.S.*