**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) | |
| Plaintiff, | ) ) | |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP and ITS INDIVIDUAL MEMBERS, et al., | ) ) ) ) | |
| Consolidated Plaintiffs, | ) ) | |
| v. | ) ) | Consol. Court No. 21-00616 |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S AND CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

JonZachary Forbes
Staff Attorney
Office of the Chief Counsel for Trade
Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

CATHARINE M. PARNELL
TRIAL ATTORNEY
U.S. Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-3467
Fax: (202) 353-0461Email:
Catharine.M.Parnell@usdoj.gov

1

August 5, 2022                                        *Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

STATEMENT PURSUANT TO RULE 56.2 ..................................................................... 2

    Administrative Determination Under Review ................................................................ 2
    Issues Presented for Review ......................................................................................... 2

STATEMENT OF FACTS ................................................................................................. 3

SUMMARY OF THE ARGUMENT ................................................................................. 4

ARGUMENT ...................................................................................................................... 7

  I.    Standard of Review ................................................................................................ 7
  II.   Commerce's Determination That Section 232 Duties Are United States Import Duties For Purposes Of 19 U.S.C. § 1677a(c)(2)(A) Is Supported By Substantial Evidence And In Accordance With Law ................................................................. 8
      A.    Legal Framework ......................................................................................... 8
      B.    Commerce Lawfully Determined That Section 232 Duties Are Import Duties To Be Deducted From U.S. Price ............................................................. 11
  III.  Commerce's Calculation Of The Duty Drawback Adjustment Was Properly Based On An Allocation To All U.S. Sales ............................................................ 23
      A.    Legal Framework for Duty Drawback Adjustment ............................................. 23
      B.    Commerce's Duty Drawback Adjustment Allocation Methodology Is Reasonable ..................................................................................................... 25
      C.    Commerce's Determination To Offset The Duty Drawback Adjustment For Filing Penalties Is Reasonable ..................................................................... 27
  IV.  Commerce's Weight Averaging of Reported Raw Material Aluminum Premium Costs Is Reasonable ........................................................................................... 28
  V.   Commerce Reasonably Treated Management Fees Incurred By Assan's U.S. Reseller as U.S. Indirect Selling Expenses ............................................................. 32
  VI.  Commerce Reasonably Allowed Assan's Net Hedging Gains To Offset Its Reported Cost of Manufacturing ........................................................................ 34

CONCLUSION ................................................................................................................ 37

## TABLE OF AUTHORITIES

**Cases**

19 § U.S.C. 1677a .................................................................................................. 13, 28

*AK Steel Corp. v. United States*, 988 F. Supp. 594 (Ct. Int'l Trade 1997) ................................. 12

*American Institute for International Steel, Inc. v. United States*, 806 F. App'x. 982 (Fed. Cir. 2020) ................................................................................................................ 23

*Apex Exports v. United States*, 777 F.3d 1373 (Fed. Cir. 2015) ................................................ 11

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021 .................................................................................................. passim

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) .................................................................. 8

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ............................................................... 8

*Deacero S.A.P.I de C.V. v. United States*, 2021 WL 6067010 (Ct. Int'l Trade Dec. 20, 2021); .. 10

*Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283 (Fed. Cir. 2021) ............................... 8

*Fla. Citrus Mut. v. United States*, 550 F.3d 1105 (Fed. Cir. 2008). .......................................... 9

*Forest Laboratories, Inc. v. United States*, 403 F. Supp. 2d 1348 (Ct. Int'l Trade 2005) ........... 26

*Fujitsu General, Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ...................................... 15

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 415 F. Supp. 3d 1195 (Ct. Int'l Trade 2019) ................................................................................................... 31

*Hangzhou Spring Washer Co., Ltd. v. United States*, 387 F. Supp. 2d 1236 (Ct. Int'l Trade 2005). ............................................................................................................................ 32

*Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998); ..................... 14

*INS v. Elias-Zacarias*, 502 U.S. 478 (1992) .......................................................................... 8

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ................................................................................ 9

*Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144 (1991) .................... 9

*Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S.*, 861 F.3d 1269 (Fed. Cir. 2017) 30

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ........................................ 8

*Nucor Corp. v. United States*, 414 F.3d 1331 (Fed. Cir. 2005) ................................................ 23

*Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373 (Fed. Cir. 2016) ........................ 9

*Power Steel Co., Ltd. v. United States*, 2021 WL 6098309 (Ct. Int'l Trade Dec. 23, 2021) ........ 10

*Saha Thai Steel Pipe (Public) Co. Ltd. v. United States*, 635 F.3d 1335 (Fed. Cir. 2011) 28, 29, 30

*Thai Plastic Bag Indus. Co. Ltd. v. United States*, 752 F. Supp. 2d 1316 (Ct. Int'l Trade 2010). 36

*Torrington Co. v. United States*, 68 F.3d 1347 (Fed. Cir. 1995) ..................................... 10, 15, 21

*Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021) ................................... 21

*Uttam Galva Steels Limited v. United States*, 997 F.3d 1192 (Fed. Cir. 2021) ......................... 32

*Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007) ............................... passim

*Zenith Electronics Corp. v. United States*, 77 F.3d 426 (Fed. Cir. 1996) .................................. 15

**Statutes**

19 U.S.C § 2132 ................................................................................................................ 19

19 U.S.C. § 1516a ............................................................................................................... 8

19 U.S.C. § 1673 .............................................................................................................. 17

19 U.S.C. § 1675 .............................................................................................................. 19

19 U.S.C. § 1677 ............................................................................................................... 4

19 U.S.C. § 1677a ..................................................................................................... passim

19 U.S.C. § 1677b ..................................................................................................... passim

19 U.S.C. § 1677e ............................................................................................... 38
19 U.S.C. § 1862 ........................................................................................... passim
19 U.S.C. § 2251 ......................................................................................... 17, 19
19 U.S.C. § 2253 ................................................................................................ 13
19 U.S.C. § 3521 ................................................................................................ 26

**Regulations**

19 C.F.R. § 351.102 .............................................................................................. 4
19 C.F.R. § 351.401 .............................................................................................. 4

**Administrative Publications and Decisions**

*Brass Sheet and Strip from Germany: Amended Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 66,347 (Dep't of Commerce Oct. 28, 2010) ............... 38
*Certain Aluminum Foil from the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey* ............................................................... 3, 5
*Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 62,790 (Dep't Commerce Nov. 12, 2021) ................................................................................. 5
*Certain Aluminum Foil from the Republic of Turkey:  Preliminary Negative Determination of Sales at Less Than Fair Value, Postponement of Final Determination*, 86 Fed. Reg. 23,686 (Dep't Commerce May 4, 2021) (Preliminary Determination) .................................................. 4
*Certain Aluminum Foil From the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52,880 (Dep't of Commerce Sept. 23, 2021) .............. 2
*Certain Oil Country Tubular Good from the Republic of Kore: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,105 (Dep't of Commerce Apr. 17, 2017) ..................................................................................................................................... 35
*Certain Steel Nails from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2016*, 83 Fed. Reg. 4,028 (Dep't of Commerce Jan. 29, 2018) 35
*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 35,248 (Dep't of Commerce June 12, 2013) ............................................................................................................ 35
*Citric Acid and Certain Citrate Salts from Canada:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 37,286 (July 1, 2014) ............................... 39
*Proclamation 9705 of March 8, 2018:  Adjusting Imports of Steel into the United States*, 83 FR ............................................................................................................................. 16, 20, 21, 25
*Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962*, 85 Fed. Reg. 40,202 (Dep't of Commerce July 6, 2020) ........................................................................................................ 18
*Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. 19,153 19,160 ....................... 22, 26

**Legislative History**

H.R. Rep. No 571, 93rd Cong. 1st Sess. 28, 35-36 (1973) ........................................ 20

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motions of plaintiff, Assan Aluminyum Sanayi ve Ticaret A.S. (Assan), and consolidated plaintiffs, Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas Inc., JW Aluminum Company, and Novelis Corporation (collectively, Consolidated Plaintiffs), for judgment upon the agency record.  As demonstrated below, the determination of the United States Department of Commerce is supported by substantial evidence and otherwise in accordance with law. Accordingly, we respectfully request that the Court deny Assan's and Consolidated Plaintiffs' motions for judgment upon the agency record and sustain Commerce's determination.

## STATEMENT PURSUANT TO RULE 56.2

**Administrative Determination Under Review**

The determination under review is the final determination in the less-than-fair-value investigation of certain aluminum foil from the Republic of Turkey.  *See Certain Aluminum Foil From the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52,880 (Dep't of Commerce Sept. 23, 2021) (Final Determination), Appx007669-007671, and accompanying Issues and Decision Memorandum (IDM), Appx007617-007668. The period of investigation is July 1, 2019, through June 30, 2020.  Final Results, 86 Fed. Reg. at 52,880, Appx007669.

**Issues Presented for Review**

1. Whether Commerce's deduction of Section 232 duties from the export price of Assan's United States sales was supported by substantial evidence and in accordance with law;

2. Whether Commerce reasonably determined that allocating the total amount of duty drawback to all sales in the U.S. sales data was preferable to allocating that amount to only the sales associated with closed Inward Processing Certificates (IPCs);

3. Whether Commerce's determination to weight average Assan's reported raw material aluminum premium costs for all Commerce Control Numbers (CONNUMs) was reasonable;

4. Whether Commerce's determination that certain management fees incurred by Assan's U.S. reseller, Kibar Americas, should be treated as U.S. indirect selling expenses; and

5. Whether Commerce's decisions to offset Assan's cost of manufacturing with Assan's net hedging revenues associated with purchases of primary aluminum and not to include such

2

revenues in the interest expense ratio was supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

On September 29, 2020, Consolidated Plaintiffs filed an antidumping duty petition concerning imports of aluminum foil from Turkey.  On October 19, 2020, Commerce initiated a less-than-fair-value investigation of aluminum foil from Turkey.  *See Certain Aluminum Foil from the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 67,711 (Dep't Commerce Oct. 26, 2020), Appx001044-001050.  On November 12, 2020, Commerce selected Assan and Kibar Dis Ticaret A.S. (Kibar Dis) for individual examination as mandatory respondents in the investigation.  *See* Commerce Memorandum, "Antidumping Duty Investigation of Certain Aluminum Foil from the Republic of Turkey:  Respondent Selection," (Nov. 12, 2020), Appx006521-00524.

On May 4, 2021, Commerce published a negative preliminary determination finding that aluminum foil from Turkey is not being, or is not likely to be, sold in the United States at less-than-fair-value.  *See Certain Aluminum Foil from the Republic of Turkey:  Preliminary Negative Determination of Sales at Less Than Fair Value, Postponement of Final Determination*, 86 Fed. Reg. 23,686 (Dep't Commerce May 4, 2021) (Preliminary Determination), Appx006672-006674.  As part of its preliminary determination, Commerce found that Assan, Kibar Dis, and another entity, Ispak Esnek Ambalaj Sanayi A.S., were affiliated pursuant to 19 U.S.C. § 1677(33)(F) and 19 C.F.R. § 351.102(b)(3), and consistent with 19 C.F.R. § 351.401(f)(1), determined to treat the three entities as a single collapsed entity for purposes of Commerce's investigation.  *Id.* at 23,687, Appx006673.  Because Commerce preliminarily determined that

Assan did not make sales of aluminum foil at less-than-fair-value, Assan was assigned a preliminary weighted-average dumping margin of 0.00 percent.  *Id.*

On September 23, 2021, Commerce published its Final Determination finding that aluminum foil from Turkey is being sold at less-than-fair-value and calculating a final weighted-average dumping margin for Assan of 2.28 percent.  *See* 86 Fed. Reg. at 52,881, Appx007670. In the Final Determination, Commerce made certain changes from its preliminary determination, including,  (1) revising the constructed export price[1] indirect selling expense (ISE) ratio to include certain management fees, less the component of those management fees associated with non-subject merchandise, making a corresponding adjustment to general and administrative (G&A) expenses; and (2) revising Commerce's calculation of Assan's duty drawback adjustment to account for a filing penalty payment discount.  *See* IDM at 3-4, Appx007620-007621.

On November 12, 2021, the International Trade Commission made an affirmative final injury determination.  *Aluminum Foil From Armenia, Brazil, Oman, Russia, and Turkey*, 86 Fed. Reg. 62,845 (Int'l Trade Comm'n Nov. 12, 2021), Appx007825.  Commerce published the Antidumping Order on November 12, 2021.  *Certain Aluminum Foil From the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 62,790 (Dep't Commerce Nov. 12, 2021) (Order), Appx0078210-007824.

## SUMMARY OF THE ARGUMENT

Assan and Consolidated Plaintiffs raise various issues challenging aspects of Commerce's Final Determination.

---

[1] Generally, the price at which the subject merchandise is sold to an unaffiliated United States purchaser or to an unaffiliated exporter for export to the United States.

First, Commerce's determination that Section 232 duties are United States import duties for purposes of 19 U.S.C. § 1677a(c)(2)(A) is supported by substantial evidence and in accordance with law.  This Court has several times upheld this interpretation and allowed for the deduction of Section 232 duties, and Commerce's analysis of this issue is consistent with that precedent.

In allocating Assan's duty drawback adjustment, Commerce reasonably determined that allocating the total amount of duty drawback to all sales in the U.S. sales data is preferable to allocating that amount to only the sales that Assan identified as being associated with closed Inward Processing Certificates (IPCs).  Commerce reasonably explained  the  three reasons that allocation to all U.S. sales was preferable:  (i) the test Commerce uses does not require a material-input-to-exported-merchandise specific link between the imports that have import duties that have been exempted or refunded and the exports that generate the duty drawback benefit; (ii) Commerce explained that exempted import duties during the period of investigation are allocated to all production of aluminum foil and are not applied to the production of the specific sales of aluminum foil that are only associated with closed IPCs (that is, there is a single, CONNUM-specific cost of production that is generally not a sale-specific amount); and (iii), in general, individual U.S. sales may not be linked with specific exports from the country of origin, especially when U.S. sales may be made from inventory after importation into the United States. This explanation for Commerce's methodological choice is reasonable and should be upheld.

Next, Commerce reasonably determined that to mitigate the raw material aluminum premium cost (that is, DIRMATMP) differences between CONNUMs that are unrelated to the product's physical characteristics, it was reasonable to weight average the reported DIRMATMP costs for all CONNUMs.  Pursuant to 19 U.S.C. § 1677b(f)(1)(A), Commerce concluded that

Assan's reported costs are derived from its normal books and records that are kept in accordance with generally-accepted Turkish accounting principles (GAAP). But Commerce reasonably determined that Assan's reported material costs in its normal books and records did not reasonably reflect the cost to produce the merchandise under consideration based on the physical characteristics identified by Commerce, therefore warranting its methodological choice.

Commerce also reasonably determined that certain management fees incurred by Assan's U.S. reseller, Kibar Americas, should be treated as U.S. indirect selling expenses, and Commerce, therefore, revised the constructed export price indirect selling expense ratio to include these management fees with reported expenses. Assan focuses on the fact that the management service expenses were initially incurred in Turkey and therefore Commerce impermissibly treated them as U.S. indirect selling expenses. However, Assan fails to recognize that Commerce focused on the fact that Kibar Americas, in turn, incurred these expenses in the United States when Assan assessed fees to Kibar Americas for the services.

Last, Commerce reasonably allowed for Assan's net hedging gains to offset the reported cost of manufacture. Commerce calculates costs based on a respondent's normal books and records if they are kept in accordance with the home country GAAP and reasonably reflect the costs associated with the production and sale of the merchandise. 19 U.S.C. § 1677b(f)(1)(A). The records show that Assan's hedging gains and losses are directly associated with purchases of the raw material aluminum and are recorded as a part of cost of goods sold in its financial statements that are kept in accordance with the Turkish GAAP. Therefore, Commerce reasonably allowed for the offset.

# ARGUMENT

## I.    Standard of Review

This Court sustains any determination of Commerce unless it is unsupported by substantial evidence or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The possibility of drawing inconsistent conclusions from the record does not prevent Commerce's finding from being supported by substantial evidence.  *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  When an issue is inherently fact-intensive, the Court will set aside Commerce's finding only if the evidence is "so compelling that no reasonable factfinder" could reach the same conclusion.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).  Thus, the substantial evidence standard is a "high barrier to reversal."  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted) (*Nippon Steel 2006*).  Commerce's determination to apply facts available with adverse inferences implicates the substantial evidence standard.  *See Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1296 (Fed. Cir. 2021) (reviewing application of facts available with an adverse inference under substantial evidence standard); *Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016) (reviewing application of 19 U.S.C. §§ 1677e(a)-(b)).

Although the Supreme Court has recently narrowed the circumstances in which a court should defer to an agency's interpretation of its own ambiguous regulation, *see Kisor v. Wilkie*, 588 U.S. ___, 139 S. Ct. 2400 (2019), the Court has continued to recognize that "{a}gencies (unlike courts) have 'unique expertise,' often of a scientific or technical nature, relevant to applying a regulation 'to complex or changing circumstances,'"  *Id.* at 2413 (quoting *Martin v.*

*Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 151 (1991)).  Moreover,

Commerce's methodologies for calculating dumping margins are "presumptively correct."  *See*

*Fla. Citrus Mut. v. United States*, 550 F.3d 1105, 1111 (Fed. Cir. 2008).

## II.    Commerce's Determination That Section 232 Duties Are United States Import Duties For Purposes Of 19 U.S.C. § 1677a(c)(2)(A) Is Supported By Substantial Evidence And In Accordance With Law

Commerce reasonably determined that the phrase "United States import duties" within

the context of 19 U.S.C. § 1677a(c)(2)(A) encompasses Section 232 duties.  Commerce strives to

ensure that the basis for normal value[2] in its antidumping proceedings reflects an export price

that includes movement expenses.  *See* 19 U.S.C. § 1677b(a); *see also Torrington Co. v. United*

*States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (providing that the statutory framework "seek[s] to

produce a fair 'apples-to-apples' comparison between foreign market value and United States

price").  Consistent with that purpose, the broad language of the statute covers all "United States

import duties."  19 U.S.C. § 1677a(c)(2)(A).  Indeed, this Court has upheld Commerce's

interpretation that the phrase "United States import duties" includes Section 232 duties in

multiple instances.  *See, e.g.*, *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United*

*States*, 494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021); *Deacero S.A.P.I de C.V. v. United States*,

2021 WL 6067010 (Ct. Int'l Trade Dec. 20, 2021); *Power Steel Co., Ltd. v. United States*, 2021

WL 6098309 (Ct. Int'l Trade Dec. 23, 2021).

### A.  Legal Framework

The goal of Commerce's statutorily prescribed antidumping calculation is to allow

Commerce to compare the fair market value of the merchandise to the price charged in the

United States.  19 U.S.C. § 1677b(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C. § 1677b(a)(6);

---

[2] Generally, the price at which the subject merchandise is sold in the exporting country.

*see also, e.g., Apex Exports v. United States*, 777 F.3d 1373, 1374, 1375 (Fed. Cir. 2015)

(holding that "{t]}he overall goal {of the statutorily prescribed antidumping calculation

methodology} is to arrange an apples-to-apples comparison between the domestic and foreign

price of merchandise.").  Accordingly, both export price and normal value are subject to

adjustments, "so that they closely reflect the price of subject merchandise at a common point in

the chain of commerce." 19 U.S.C. § 1677b(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C.

§ 1677b(a)(6).  Under one of these adjustments, the statute directs Commerce to reduce a

respondent's export price and constructed export price by "the amount, if any, included in such

price, attributable to any additional costs, charges, or expenses, and *United States import*

*duties*. . . ." 19 U.S.C. § 1677a(c)(2)(A) (emphasis added).

    The term "United States import duties" is not defined in the statute.  *See* 19 U.S.C.

§ 1677a(c)(2)(A); *see also Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359-60 (Fed.

Cir. 2007) (holding that "Congress has not defined or explained the meaning or scope of 'United

States import duties' as set forth in 19 U.S.C. § 1677a(c)(2)").  Commerce has interpreted

section 1677a(c)(2)(A) as not including Section 201 safeguard duties,[3] antidumping duties, or

countervailing duties and thus has not deducted such duties in calculating United States export

price.  *See, e.g.*, *AK Steel Corp. v. United States*, 988 F. Supp. 594, 607 (Ct. Int'l Trade 1997);

*see also Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007) (holding that

Commerce reasonably interpreted 19 U.S.C. § 1677a(c)(2) to not include "special remedial"

---

[3] Section 201, 19 U.S.C. § 2251, "permits the President of the United States to impose safeguard duties on imported merchandise if the merchandise 'is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article.'" *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1357 (Fed. Cir. 2007) (quoting 19 U.S.C. § 2251).

duties and that Section 201 duties are not U.S. import duties within the meaning of 19 U.S.C.

§ 1677a(c)(2)).

In comparing Section 201 duties with antidumping duties, the Federal Circuit in

*Wheatland Tube* made the following observations:

> (1) "{l}ike antidumping duties, [Section] 201 duties are remedial duties that provide relief from the adverse effects of imports;"

> (2) "{n}ormal customs duties, in contrast, have no remedial purpose;"

> (3) "antidumping and {section} 201 duties, unlike normal customs duties, are imposed based upon almost identical findings that the domestic industry is being injured or threatened with injury due to the imported merchandise;" and

> (4) "{Section} 201 duties are like antidumping duties . . . because they provide only temporary relief from the injurious effects of imports," whereas normal customs duties "have no termination provision, and are permanent unless modified by Congress."

*Wheatland Tube Co.*, 495 F.3d at 1362-63.  The Federal Circuit also held that "{t]}o assess both

a safeguard duty and an antidumping duty on the same imports without regard to the safeguard

duty, would be to remedy substantially overlapping injuries twice." *Id.* at 1365.

Section 232 duties are not safeguard duties or antidumping or countervailing duties and

Commerce does not treat them similarly.  This Court agrees and has held that Commerce may

treat Section 232 duties as United States import duties to be deducted from export price and CEP

in accordance with 19 U.S.C. § 1677a(c)(2)(A), and that Commerce's treatment of antidumping

duties and Section 201 duties does not preclude a different treatment of Section 232 duties.  *See*

*Borusan*, 494 F. Supp. at 1371.  With regard to remedial purpose, this Court determined that

Section 232 duties are remedial in a different sense than Section 201 duties because Section 201

requires a finding of a particular level of injury or threat of injury, and that Section 232 could be

employed in a way when remediation is not a primary goal.  *Id.* at 1374 (comparing 19 U.S.C. §

10

2252(b) with 19 U.S.C. § 1862(b)).  Although this Court ultimately did not find that

temporariness was a suitable reason to distinguish between Section 201 and Section 232 duties,,

the Court highlighted that the way in which Section 232 duties may be terminated, that is, at any

time by the President, was different than the specific time limits placed on Section 201 duties

under 19 U.S.C. § 2253(e).  *Id.* at 1374-75.  To the question of double remedy, this Court found

that this was the greatest distinction between the two types of duties, concluding that there is a

clear statutory interplay between Section 201 duties and antidumping duties that does not exist

with respect to Section 232 duties based on the language of the statute and its legislative history.

*Id.* at 1375.  Thus, the framework for Section 232 duties and antidumping duties are separate and

distinct, with no overlap in providing remedies, unlike Section 201 duties.  *Id.*

### B. Commerce Lawfully Determined That Section 232 Duties Are Import Duties To Be Deducted From U.S. Price

Commerce correctly determined that Section 232 duties are import duties.  Consistent

with its prior analyses of "United States import duties" in 19 U.S.C. § 1677a(c)(2)(A),

Commerce analyzed whether Section 232 duties are more like "ordinary customs duties"

properly deducted from export price and CEP or "special duties" similar to Section 201

safeguard duties and antidumping duties.  *See* IDM at 20, Appx007636.  Accordingly, consistent

with its prior analyses of this statutory provision, Commerce determined that Section 232 duties

are not remedial and temporary like Section 201 duties and do not impose a double remedy and

should properly be considered United States import duties for purposes of 19 U.S.C.

§ 1677a(c)(2)(A).

In holding that the statute is ambiguous regarding the term "United States import duties,"

the Federal Circuit in *Wheatland Tube* correspondingly afforded Commerce's statutory

interpretation *Chevron* deference.  *See, e.g.*, *Wheatland Tube*, 495 F.3d at 1359; *see also*

*Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1220 (Ct. In'tl Trade 1998); *see also*

*Torrington Co. v. United States.*, 68 F.3d at 1351 ("In antidumping cases, we accord substantial

deference to Commerce's statutory interpretation, as the International Trade Administration is

the 'master' of the antidumping laws."); *see also Fujitsu General, Ltd. v. United States*, 88 F.3d

1034, 1038 (Fed. Cir. 1996) ("[W]e defer to the interpretation Commerce has given its own

governing statute."); *Zenith Electronics Corp. v. United States*, 77 F.3d 426, 430 (Fed. Cir. 1996)

("[I]f there is no unambiguously expressed congressional intent, we must interpret the statute

with deference to Commerce's interpretation. . . . ).  Thus, because the court has previously held

that the statute does not define United States import duties, deference to Commerce's reasonable

construction is appropriate, and this Court should uphold this reasonable determination as it has

done previously.

Assan contends that Section 232 duties are not import duties under 19 U.S.C.

§ 1677a(c)(2)(A) and instead should be considered special tariffs akin to Section 201 duties.  *See*

Assan Br. at 13-14.  Assan relies on the four factors from *Wheatland*, in which the Federal

Circuit held that Section 201 duties are not United States import duties.  *See Wheatland Tube,*

495 F.3d at 1359.  But, as demonstrated below, the four *Wheatland* factors weigh in favor of

upholding Commerce's determination.  Section 232 duties are not remedial or temporary like

Section 201 duties, their deduction does not create a double remedy, and the Congressional

delegation of the authority to impose Section 232 duties to the President does not necessarily

make them "special" duties.

### A.   Section 232 Duties Are Not Remedial Like Section 201 Duties

Commerce reasonably determined that Section 232 duties are not remedial and are not

similar to Section 201 duties because Section 232 duties focus on adjusting imports as a result of

national security concerns and are not aimed at remedying injury to a domestic industry.  IDM at 21, Appx007637.  Specifically, *Proclamation 9704* states that it "is necessary and appropriate to adjust imports of steel articles so that such imports will not threaten to impair { } national security{.}"  *Proclamation 9704 of March 8, 2018:  Adjusting Imports of Aluminum into the United States*, 83 Fed. Reg. 11,619, 11,620 (March 15, 2018) (*Proclamation 9704*).  Further, the text of Section 232 of the Trade Expansion Act of 1962 concerns itself with "the effects on the *national security* of imports of the article."  *See* 19 U.S.C. § 1862(b)(1)(A) (emphasis added); *see also id.* at § 1862(a) (explaining that "{n}o action shall be taken . . . to decrease or eliminate the duty or other import restrictions on any article if the President determines that such reduction or elimination would threaten to impair the national security").  As identified in *Proclamation 9704*, the particular national security risk at issue is that the "industry will continue to decline, leaving the United States at risk of becoming reliant on foreign producers of steel to meet our national security needs—a situation that is fundamentally inconsistent with the safety and security of the American people."  83 Fed. Reg. at 11,620.  Thus, the law and purpose behind Section 232 duties are rooted in national security concerns.  *See* IDM at 20, Appx007636; *see also* 19 U.S.C. § 1862.

Commerce determined that the national security purpose of Section 232 duties is more akin to an ordinary import duty within the meaning of 19 U.S.C. § 1677a(c)(2)(A) than the purpose of special import duties like antidumping duties and Section 201 safeguard measures. Antidumping duties "remedy sales by a foreign exporter in the U.S. market at less than fair value" and Section 201 duties "remedy the injurious effects on the U.S. industry of a significant surge in imports."  *See Wheatland Tube Co.,* 495 F. 3d at 1362; *see also* 19 U.S.C. § 2251; *see also* 19 U.S.C. § 1673(1).  Thus, these types of duties are "directed at the same overarching

13

purpose--protecting the bottom line of domestic producer." *Id.* at 1364.  In contrast, Section 232 duties are not focused on protecting the bottom line of domestic producers, but rather focus on protecting U.S. national security interests, which Commerce determined to be an appreciable difference in purpose.  IDM at 21, Appx007637; s*ee* 19 U.S.C. § 1862; *see also Proclamation 9704*, 83 Fed. Reg. at 11,623 (referring to the President's duties as an "ordinary customs duty.").

Further, the text of section 232 does not support Assan's argument.  The statute requires the President to "take into consideration" the effects of foreign competition on domestic industries, but that requirement does not mean that these effects are the primary focus of the statute.  Indeed, the statute directs that these effects shall be considered only to the extent that they "impair the national security."  19 U.S.C. § 1862(d) (providing also that the President shall "recognize the close relation of the economic welfare of the Nation *to our national security*" (emphasis added)).

Second, Assan misconstrues the Secretary's findings and *Proclamation 9704*.  According to Assan, the Section 232 tariffs were recommended and implemented to serve the remedial purpose of providing relief to the domestic aluminum industry from the adverse effects of imports. Assan Br.at 17 (citing *Report on the Effect of Imports of Aluminum on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, As Amended*, 85 Fed. Reg. 40,508 (Dep't of Commerce July 6, 2020) (*Aluminum Report*)).  But the report cited demonstrates that Commerce's conclusions were based on the primary evaluation of the threat and impairment of national security as defined by Section 232.  *See Aluminum Report*, 85 Fed. Reg. at 40,565 ("Based on these findings, the Secretary of Commerce concludes that the present quantities and circumstance of aluminum imports { } are 'weakening our internal

economy' and *threaten to impair the national security* as defined in Section 232." (emphasis added)).

Commerce reasonably determined that section 232 duties, unlike antidumping or Section 201 duties, are implemented pursuant to a concern of safety and security for the entire United States, and not to protect a single industry.  IDM at 20-21, Appx007636-007637.

**B.**   **Section 232 Duties Are Not Temporary Like Section 201 Duties**

 Section 232 duties are not temporary in the same way as Section 201 duties because the statute does not impose any limit on the time that Section 232 duties may remain in effect.  The statute imposes no limits on the rates or duration of Section 232 duties to be levied for national security purposes, granting the President discretion in determining the duration of duties.  *See* 19 U.S.C. § 1862(c) (providing that the President "shall . . . determine the nature and *duration of the action that* . . . must be taken to adjust the imports . . . so that such imports will not threaten to impair the national security." (emphasis added)).  In contrast, antidumping and Section 201 duties have a statutory expiration date tied to the cessation of injury.  *See* 19 U.S.C. § 2251; *see also* 19 U.S.C. § 1675(d).  The duration of Section 232 duties is at the President's discretion and is independent from a continued finding of injury as with Section 201 duties and antidumping duties.  *See* 19 U.S.C. § 1862.  Moreover, Congress did not describe Section 232 duties as "temporary" duties or set a time limit on the duration of these duties, despite doing so for other duties delegated to the President to implement.  *See*, *e.g.*, 19 U.S.C § 2132 (providing that when international payments problems require special import measures to restrict imports, "the President shall proclaim, *for a period not exceeding 150 days* (unless such period is extended by Act of Congress) – a *temporary* import surcharge" (emphasis added)).

This Court has held that Section 232 and Section 201 duties are both temporary for this purpose because no Congressional action is required to end them.  *See Borusan*, 494 F. Supp. 3d at 1374-75.  The Federal Circuit focused on the fact that Section 201 duties are generally limited to four years, similar to antidumping duty orders that provide for a termination of duties after five years unless the Government determines that revocation of the order would lead to dumping and domestic industry injury.  *See Wheatland Tube Co.*, 495 F.3d at 1362.  Although modification through Congressional action was considered by the Federal Circuit, the lack of a termination provision was an equally significant factor in the Court's decision.  *Id.*  ("Normal custom duties, however, *have no termination provision* and are permanent unless modified by Congress" (emphasis added)).  As discussed above, the statute contains no explicit provision setting any time limit for Section 232 duties.

Assan contends that Section 232 duties are temporary, relying on the fact that *Proclamation 9704* has been modified on several occasions.  Assan Br. at 19.  That the duties can be modified does not make them temporary in the same way antidumping and Section 201 duties are temporary.   Further there is no indication that the circumstances leading the President to impose the duties to protect national security will abate in the foreseeable future.  *See, e.g.*, *Proclamation 9704*, 83 Fed. Reg. at 11,622 ("The Secretary shall inform the President of any circumstances that in the Secretary's opinion might indicate the need for further action by the President under section 232 of the Trade Expansion Act of 1962, as amended.  The Secretary shall also inform the President of any circumstance that in the Secretary's opinion might indicate that the increase in duty rate provided for in this proclamation is no longer necessary.");  *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1329 (Fed. Cir. 2021) (reasoning that directive to President to act by specified time to alleviate threats to national security from

16

imports is not fairly construed to mean "by then or not at all" as to each discrete imposition that might be needed, as judged over time).

**C.   Deducting Section 232 Duties Does Not Create A Double Remedy**

The basis for normal value in Commerce's antidumping proceedings reflects a United States price that is fully built up to include movement expenses, such as import duties.  *See* 19 U.S.C. § 1677b(a); *see also Torrington Co.*, 68 F.3d at 1352 (providing that the statutory framework "seek[s] to produce a fair 'apples-to-apples' comparison between foreign market value and United States price").  In conducting the comparison between home market sales and sales made in the United States market, the price paid on goods sold in the United States market is reduced by several items, including import duties, to get back to an approximate ex-factory price that is comparable to the price of goods in the home market.  19 U.S.C. § 1677a(c); *see also* S. Rep. No. 67-16, at 12 (1921); H.R. Rep. No. 67-1, at 23–24 (1921); H.R. Rep. No. 67-79, at 2–3 (1921).

*Proclamation 9704* states that Section 232 duties are to be imposed in addition to other duties unless expressly provided for in the proclamation.  *Proclamation 9704*, 83 Fed. Reg. at 11,621 ("{t]}his rate of duty, which is in addition to any other duties, fees, exactions, and charges applicable to such imported aluminum articles . . . .").  In fact, the Annex to *Proclamation 9704* states that "{a}ll anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed, except as may be expressly provided herein."  *Proclamation 9704*, 83 Fed. Reg. at 11,623.

Commerce reasonably found that the function of antidumping duties and section 232 duties is separate and distinct, such that there would be no overlap between the two in providing remedies sought by each.  IDM at 21, Appx007637.  As explained below and consistent with this

Court's prior holding, Assan's arguments that the deduction of Section 232 duties results in a double remedy are unavailing.

When examining Section 201 duties previously, Commerce recognized that the Statement of Administrative Action states "{i}n determining whether to provide {Section 201} relief, and, if so, in what amount, the President will continue the practice of taking into account relief provided under other provisions of law, such as the antidumping" law. *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. 19,153 19,160 (quoting Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 964 (1994) reprinted in 1994 U.S.C.C.A.N. 3773) (*SSWR from Korea*). In other words, the President accounted for any potential overlap between Section 201 duties and antidumping duties when setting the level of Section 201 duties. *Id.* In contrast, the President directed that Section 232 duties should be applied in addition to "[a]ll anti-dumping or countervailing duties, or other duties." *Proclamation 9704*, 83 Fed. Reg. at 11,623. Indeed, the Federal Circuit also recently acknowledged that the President's Section 232 tariffs are to be applied "on top of already-applicable antidumping or countervailing duties." *See American Institute for International Steel, Inc. v. United States*, 806 F. App'x. 982, 986 (Fed. Cir. 2020). Therefore, unlike Commerce's concern of double-counting in the Section 201 and antidumping duty context, where the legislative history indicated that Congress did not intend for both to apply and their remedies and injuries overlapped, no such concern exists with Commerce's determination that Section 232 duties should be deducted from Assan's U.S. price. Moreover, unlike the legislative history accompanying the antidumping statute that demonstrated that Congress did not intend for antidumping duties to be treated as costs in adjusting export price, no congressional intent regarding Section 232 duties supports this conclusion. Thus, Commerce

reasonably determined adjusting for Section 232 duties would not amount to double-counting or distort the resulting calculation. *See* IDM at 21, Appx007637.

Assan's argument that Commerce's reasoning would unlawfully create a dumping margin conflicts with the Federal Circuit's precedent. In *Wheatland Tube*, the Federal Circuit recognized that for purposes of the antidumping duty law and Section 201 actions, there is an overlap in the injury caused by imports. 495 F.3d at 1362, 1365. On that basis, the Federal Circuit, relying on its decision in *Nucor Corp. v. United States*, found an overlap in remedies. *Id.* at 1365 (citing *Nucor Corp. v. United State*s, 414 F.3d 1331 (Fed. Cir. 2005)). By contrast, Section 232 duties are not limited to addressing injury, material or otherwise, to the relevant domestic industry caused by imports. *See* 19 U.S.C. § 1862. The focus of Section 232 duties is much different in that Section 232 addresses "the capacity of the United States to meet national security requirements." *Id.* Unlike the similarity in purpose and function of antidumping duties with that of Section 201 duties, Section 232 actions are not limited to addressing the injury to industries caused by import surges or unfairly traded imports, but rather consider

> domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration and development necessary to assure such growth.

19 U.S.C. § 1862(d). Moreover, Assan's reasoning would apply to any import duty, preventing Commerce from deducting any United States import duty within the meaning of 19 U.S.C. § 1677a(c)(2)(A).

Based on the above reasoning, the Court should continue to uphold its reasoning in its prior decision in *Borusan*, finding that Commerce's treatment of Section 232 duties does not create an impermissible double remedy.  *See* 494 F. Supp. 3d at 1375.

**D.  Commerce Properly Interpreted Congress's Delegation Of Section 232 Duties And The Harmonized Tariff Schedule Does Not Demonstrate That 232 Duties Are Not Import Duties**

Commerce properly interpreted Congress's delegation of the President's authority to issue Section 232 duties when it decided that Section 232 duties are normal import duties that must be deducted from Assan's United States price.  Commerce determined that Congress's grant to the President of duty-setting power pertaining to national security authority should be treated as an import duty.  IDM at 20-21, Appx007636-007637.  The 1974 Trade Act amended section 232 and provides a broad grant of authority to the President that exists separately from remedial duties.  *See* 19 U.S.C § 2137; *see also Transpacific*, 4 F.4th at 1332 (holding that Section 232 does not violate nondelegation-doctrine because statute provided intelligible principle to guide exercise of President's powers); H.R. Rep. No 571, 93rd Cong. 1st Sess. 28, 35-36 (1973) (recognizing that the bill, later the 1974 Trade Act, amended section 232, but preserved the President's "authority . . . . to adjust imports of any article when he determines that such imports threaten or impair national security").

The President explicitly stated that "the particular national security risk is that the 'industry will continue to decline, leaving the United States at risk of becoming reliant on foreign producers of steel to meet our national security needs--a situation that is fundamentally inconsistent with the safety and security of the American people.'"  *Proclamation 9705*, 83 Fed. Reg. at 11,627.

That Congress expressly delegated the authority to the President to impose Section 232 duties when national security concerns arise is not dispositive that Section 232 duties are "special" duties as Assan asserts.  *See* 19 U.S.C § 1862.  Congress's delegation of this authority does not indicate whether Section 232 duties should be considered ordinary or special within the meaning of 19 U.S.C. § 1677a(c)(2)(A).  And, as explained above, Commerce reasonably determined that Section 232 duties are akin to an ordinary "U.S import duty" within the meaning of 19 U.S.C. § 1677a(c)(2)(A).

Moreover, Assan's assertion that Congress did not grant the President the authority to modify the HTSUS to include Section 232 duties is unavailing.  *See* Assan Br. at 21 (citing *Forest Laboratories, Inc. v. United States*, 403 F. Supp. 2d 1348, 1352 (Ct. Int'l Trade 2005), *aff'd*, 476 F.3d 877 (Fed. Cir. 2007) (*Forest Laboratories*).  To advance this argument, Assan relies upon *Forest Laboratories*, *Inc. v. United States*, in which the Court examined whether Customs properly liquidated the plaintiff importer's entry at an above zero duty rate instead of its requested duty-free rate.  *See* 403 F. Supp. 2d at 1350.  *Forest Laboratories* involved President Clinton's removal of certain pharmaceutical products from the HTSUS duty-free category pursuant to the presidential authority granted by Congress in 19 U.S.C. § 3521 (granting the President authority to modify the HTSUS in accordance with World Trade Organization obligations).  *Id.* at 1352.  The Court held that because President Clinton, removed the type of product that plaintiff was importing from the duty-free category under the HTSUS subheading prior to the date of entry in accordance with this limited authority, Customs' ruling letter properly categorized plaintiff's product under the correct non-duty free HTSUS subheading.  *Id.* at 1352.  Similar to how President Clinton exercised his limited authority by removing certain pharmaceutical products from the duty-free pharmaceutical appendix in HTSUS, in this case, the

21

President exercised his limited authority granted in 19 U.S.C. § 1862 and added Section 232 duties to the HTSUS. *See id.* at 1352 (holding that "Congress has given the President limited authority to make modifications to the HTSUS based solely within the framework of statutorily defined objectives" and President Clinton acted within his limited authority to modify the HTSUS).

Assan also claims that the placement of Section 232 duties in chapter 99 of the HTSUS demonstrates that the duties are more similar to remedial duties because that chapter is reserved for temporary actions such as proclamations or legislation. Assan Br. at 22-23. Although Commerce made this observation in *SSWR from Korea*, this was not the sole basis upon which Commerce declined to adjust U.S. price for section 201 duties in those circumstances. 69 Fed. Reg. at 19,160. In *SSWR from Korea*, Commerce also explained that "{t}o some extent, section 201 duties are interchangeable with special {antidumping} duties," such that section "201 duties are more appropriately regarded as a type of special remedial duty, rather than ordinary customs duties." *Id.*

Importantly, the question before the Court is not whether it believes that Section 232 duties are more reasonably considered to be "special tariffs" but whether the reasoning provided by Commerce differentiating its treatment of Section 232 and Section 201 duties is "so lacking in merit that the court must say it is arbitrary." *See Borusan*, 494 F. Supp. 3d at 1367. As in *Borusan*, and subsequent rulings that have upheld Commerce's approach, this Court should continue to find that Commerce provided reasonable analysis based on crucial differences between Sections 201 and 232, and therefore its differentiating treatment of the two types of duties is reasonable.

III.   **Commerce's Calculation Of The Duty Drawback Adjustment Was Properly Based On An Allocation To All U.S. Sales**

    A.   **Legal Framework for Duty Drawback Adjustment**

In an antidumping duty proceeding, Commerce determines whether goods are being sold at less than fair value by comparing the export price or constructed export price with the normal value. *See* 19 U.S.C. §§ 1677a (defining export price), 1677b (defining normal value). A product is considered to be sold at less than fair value when the product's export price/constructed export price is lower than its normal value. *Saha Thai Steel Pipe (Public) Co. Ltd. v. United States*, 635 F.3d 1335, 1338 (Fed. Cir. 2011); 19 U.S.C. § 1677(35)(A).

The equation, in its basic form, is as follows:  normal value minus (-) U.S. price (export price/constructed export price) = dumping margin (if it is a positive number; if the number is zero or negative, there is no dumping). Commerce adjusts the prices used to determine export price and normal value under certain conditions. 19 U.S.C. §§ 1677a(c)-(d) (export price); 1677b(a)(6)-(7) (normal value). Under one such adjustment, commonly known as the duty drawback adjustment, Commerce increases the export price for any import duties rebated or not collected by the country of exportation "by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B). *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No.103-316, vol. 1, at 820 (1994) (SAA). "In other words, if a foreign country would normally impose an import duty on an input used to manufacture the subject merchandise but offers a rebate or exemption from the duty if the input is exported to the United States, then Commerce will increase export price to account for the rebated or unpaid import duty (the 'duty drawback')." *Saha Thai Steel Pipe*, 635 F.3d at 1338. .

A duty drawback adjustment to the export price/constructed export price is based on the principle that the "goods sold in the exporter's domestic market are subject to import duties

while exported goods are not." *Id.* at 1339.  In other words, normal value based on home market

sales prices or cost of production are import duty "inclusive," while export market sales prices

are import duty "exclusive."  As the Court held in *Saha Thai*,

> The purpose of the duty drawback adjustment is to account for the
> fact that the producers remain subject to the import duty when they
> sell the subject merchandise domestically, which increases home
> market sales prices and thereby increases normal value.  That is,
> when a duty drawback is granted only for exported inputs, the cost
> of the duty is reflected in normal value but not in export price.  The
> statute corrects this imbalance, which could otherwise lead to an
> inaccurately high dumping margin, by increasing export price to
> the level it likely would be absent the duty drawback.

*Id.* at 1338.  Thus, the Federal Circuit has recognized that the duty drawback adjustment is

intended to prevent dumping margins from being created (or affected) by the rebate or exemption

of import duties on inputs used in the production of subject merchandise.

Commerce applies a two-pronged test to determine when the statutory requirements for a

duty drawback adjustment are met.  The respondent is required to demonstrate that (1) the import

duty paid and the rebate payment are directly linked to, or precedent upon, one another (or the

exemption from import duties is linked to the exportation of subject merchandise), and (2) there

are sufficient imports of the imported raw materials to account for the drawback received upon

the export of the subject merchandise.  *See id.* at 1340-41 (affirming Commerce's two-pronged

test for duty drawback adjustment).

Commerce does not require that specific inputs be directly traced to the production of

specific exports; instead, the input upon which the duty is being rebated or forgiven on export

must be capable of being used to produce the exported product.  *See Maverick Tube Corp. v.*

*Toscelik Profil ve Sac Endustrisi A.S.*, 861 F.3d 1269, 1273-74 (Fed. Cir. 2017).  If the two-

pronged test is satisfied, Commerce will increase the export price to account for the rebated or

unpaid import duty (the duty drawback) that a foreign country offered to a particular company as

a rebate or exemption from the normal import duty on an input used to manufacture the subject

merchandise.  *See Saha Thai*, 635 F.3d at 1339.

      **B.**  **Commerce's Duty Drawback Adjustment Allocation Methodology Is Reasonable**

In allocating Assan's duty drawback adjustment, Commerce reasonably determined that

allocating the total amount of duty drawback to all sales in the U.S. sales data is preferable to

allocating that amount only to the sales that Assan identified in the U.S. sales data as being

associated with closed Inward Processing Certificates (IPCs).  IDM at 28, Appx007644.  Assan

argues that Commerce's determination was improper in that the chosen methodology ignores

"statutory linkage" between the exempted duties and the merchandise exported to the United

States and that this determination impermissibly deviated from Commerce's past methodology.

Assan Br. at 26-30.  As explained below, Commerce provided a reasonable explanation for its

determination to allocate the duty drawback adjustment to all U.S. sales rather than to only those

associated with closed IPCs.

Commerce provided three reasons why allocation to all U.S. sales was preferable.  First,

the two-pronged test does not require a material-input-to-exported-merchandise specific link

between the imports when the import duties have been exempted or refunded and the exports that

generate the duty drawback benefit.  IDM at 28-29, Appx7644-007645.  Assan relies on *Habas II*

to support the proposition that Commerce must acknowledge the "statutory linkage" between the

exempted duties and the products exported to the United States.  Assan Br. at 29 (citing *Habas

Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 415 F. Supp. 3d 1195, 1203 (Ct.

Int'l Trade 2019) (*Habas II*).  However, *Habas II* involved the question of whether it is

permissible for Commerce to allocate a respondent's exempted duties over total production,

which the Court held contravened section 1677a(c)(1)(B) because it attributes some of the duty

drawback to *domestic sales*.  In this case, however, Commerce is not allocating the duty

drawback to domestic sales, but only U.S. sales.

Second, Commerce explained that exempted import duties during the period of

investigation are allocated to all production of aluminum foil and are not applied to the

production of the specific sales of aluminum foil that are only associated with closed IPCs (that

is, there is a single, CONNUM-specific cost of production that is generally not a sale-specific

amount).  IDM at 29, Appx007645.  Third, Commerce explained that in general, individual U.S.

sales may not be linked with specific exports from the country of origin, especially when U.S.

sales may be made from inventory after importation into the United States.  *Id.*  Assan did not

address these bases for Commerce's determination.

Assan further argues that Commerce impermissibly deviated from its "consistent

practice."  Assan Br. at 30 (citing *Steel Concrete Reinforcing Bar From the Republic of Turkey:*

*Final Results of Antidumping Duty Administrative Review and Final Determination of No*

*Shipments; 2018-2019*, 86 Fed. Reg. 28,574 (Dep't Commerce May 27, 2021), and

accompanying IDM at 12.  However, Commerce is in the process of reconsidering its duty

drawback practice considering Federal Circuit precedent.  *See Uttam Galva Steels Limited v.*

*United States*, 997 F.3d 1192 (Fed. Cir. 2021).  Even in light of any deviation between the

calculation methodology between different proceedings, Commerce is permitted to deviate from

past practice when it provides a reasoned explanation.  *See, e.g.*, *Hangzhou Spring Washer Co.,*

*Ltd. v. United States*, 387 F. Supp. 2d 1236, 1250 (Ct. Int'l Trade 2005).  In this case, Commerce

provided three separate reasons explaining why allocating the total amount of duty drawback to

all sales in the U.S. sales data is preferable to allocating that amount to only the sales that Assan identified in the U.S. sales data as being associated with closed IPCs.

### C.  Commerce's Determination To Offset The Duty Drawback Adjustment For Filing Penalties Is Reasonable

Commerce reasonably determined to adjust the duty drawback calculation for filing penalties incurred by the Assan and offset the amount of the duty drawback benefit from the associated closed IPC(s) by the amount of the filing penalties.  IDM at 29, Appx007645.

Commerce explained that there is nothing in the statute that prevents Commerce from offsetting the duty drawback adjustment by penalties incurred.  *Id.*  Therefore, under *Chevron*, Commerce's determination must only be reasonable.  467 U.S. at 842-43.  Penalties paid by Assan are akin to duty liability that has not been forgiven by the Turkish government, and as such, the offset fits neatly within the plain language of the statute.  Commerce also reasonably determined to reduce the amount of the exempted import duties by the amount of the penalty as it is expressly provided for as part of the Turkish Inward Processing Regime.  IDM at 29, Appx007645.  Assan argues that because Commerce has consistently found the Turkish Inward Processing Regime to satisfy the two-pronged test, it is impermissible for to apply any offset for late penalties.  However, Commerce's determination to apply the offset does not disturb its finding that the Turkish Inward Processing Regime satisfies the two-pronged test, as Commerce reiterated.  IDM at 28, Appx007644.  Therefore, because the statute is silent as to whether Commerce may apply such an offset and Assan does not directly challenge that the offset is unreasonable, the Court should find that the application of the offset was reasonable.

IV.     **Commerce's Weight Averaging of Reported Raw Material Aluminum Premium Costs Is Reasonable**

Commerce determined that to mitigate the raw material aluminum premium cost (that is, DIRMATMP) differences between CONNUMs that are unrelated to the product's physical characteristics, it was reasonable to weight average the reported DIRMATMP costs for all CONNUMs.  IDM at 33-35, Appx7649-007650.

When Commerce evaluates a respondent's submitted costs, 19 U.S.C. § 1677b(f)(1)(A) directs that costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if those records are kept in accordance with the generally accepted accounting principles (GAAP) of the exporting country (or the producing country, when appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.  19 U.S.C. § 1677b(f)(1)(A).  Accordingly, Commerce typically relies on a company's normal books and records if two conditions are met:  (1) the books are kept in accordance with the home country's GAAP; and (2) the books reasonably reflect the cost to produce and sell the merchandise.  IDM at 33, Appx007649.

In the investigation, Commerce concluded that Assan's reported costs are derived from its normal books and records, and those books and records are kept in accordance with Turkish GAAP.  *Id.*  Thus, the remaining question facing Commerce is whether the reported material costs from Assan's normal books and records reasonably reflect the cost to produce the merchandise under consideration based on the physical characteristics identified by Commerce.

Commerce identified the physical characteristics that are the most significant to define unique products (CONNUMs), which is a concatenation of the codes reported for the physical characteristics (that is, gauge, coating, width, casting method, alloy, temper, and surface finish).  *Id.*  These physical characteristics are used to define a unique comparison market to serve as the

basis for normal value. *Id.* at 33-34, Appx007649-007650. Commerce has found that these physical characteristics differentiate the production costs between distinct, unique CONNUMs. *Id.* at 34, Appx007650. Thus, pursuant to 19 U.S.C. § 1677b(f)(1)(A), (a)(6)(c)(ii) and (iii), a respondent's reported costs should reflect meaningful cost differences attributable to these different physical characteristics. *Id.* This approach ensures that the CONNUM-specific costs that Commerce uses for the sales-below-cost test, constructed value, and difference-in-merchandise (DIFMER) adjustments accurately reflect the physical characteristics of the products used in Commerce's margin calculations. *Id.* Thus, Commerce normally does not rely on a respondent's reported costs when cost differentials between CONNUMs are driven by factors other than the difference in the physical characteristics, such as timing differences or routing variations or cost system conventions. *Id.* (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 35,248 (Dep't of Commerce June 12, 2013), and accompanying IDM at Comment 1; *Certain Oil Country Tubular Good from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,105 (Dep't of Commerce Apr. 17, 2017), and accompanying IDM at Comment 23; and *Certain Steel Nails from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2016*, 83 Fed. Reg. 4,028 (Dep't of Commerce Jan. 29, 2018), and accompanying IDM at Comment 3. This Court has upheld Commerce's reallocation of costs for the sales-below-cost test, the calculation of constructed value, and the DIFMER adjustment when a respondent's reported costs reflect cost differences due to factors other than Commerce's established physical characteristics. *See, e.g.*, *Thai Plastic Bag Indus. Co. Ltd. v. United States*, 752 F. Supp. 2d 1316, 1324-25 (Ct. Int'l Trade 2010).

Assan argues that Commerce failed to find that its reported costs did not reasonably reflect costs or were distortive, Assan Br. at 37, however, Assan does not directly address the fact that its reported cost differentials between CONNUMs are driven by factors other than the difference in the physical characteristics.

During the investigation, Assan explained that the reported portion of the aluminum cost based on the LME (DIRMATLME) for each CONNUM is based on the actual average cost for all production records, and in turn, the individual production records are based on the LME price specific to that production order in that period (month). *See* Assan Section D Second Supplemental Questionnaire Response (Mar. 29, 2021) at 5S-13-5S-14, Appx85502-85503. Consequently, according to Assan, the reported DIRMATLME may show variances between products that are due to timing and are unrelated to the differences in product's physical characteristics. *Id.* Thus, Assan provided a single average DIRMATLME for the entire period of investigation so that the differences in CONNUM-specific costs reflect only the differences in the product's physical characteristics rather than the LME fluctuations. *Id.*

In contrast, Assan stated that the weighted average of DIRMATMP is not appropriate because the CONNUM-specific yield loss rates are reflected in DIRMATMP. *Id.* Assan also stated that it has a preference to use a specific type of input for certain product because it has a preferred production routing due to certain characteristics of its production equipment. *See* Assan Section D Fifth Supplemental Questionnaire Response (May 17, 2021) at 12-13, Appx89133-89134. However, according to Assan, all raw material input types (that is, primary aluminum, aluminum sheet, or scrap) can be used interchangeably in the production of subject merchandise. *Id.*

To determine whether Assan's reported costs reflected significant raw material cost differences among CONNUMs unrelated to the product's physical characteristics, Commerce analyzed Assan's reported aluminum costs.  *See* Preliminary Cost Calculation Memorandum for Assan (Apr. 27, 2021), Appx88403-89021.  Based on the analysis, Commerce determined that the reported aluminum costs (the sum of DIRMATLME and DIRMATMP) reflected significant cost differences between CONNUMs that are unrelated to the product's physical characteristics. *Id.* As explained above, all of the raw material input types can be used interchangeably to produce all in-scope merchandise.  Consequently, with the exception of product yield losses, Commerce reasonably determined the significant DIRMATMP cost differences among CONNUMs are driven by factors other than the product's physical characteristics, such as timing and the type of raw material input used.  IDM at 35, Appx007651.

Regarding Assan's claim that Commerce ignored its reported product yield losses, Commerce acknowledged that the product yield losses are a part of the total included in the DIRMATMP costs.  *Id.*  Commerce requested that Assan identify and separately report the costs associated with yield losses for each CONNUM.  Specifically, Commerce requested that Assan break out from the reported DIRMATMP costs associated with the product yield losses. However, Assan failed to provide this information.  *See* Assan Section D Fifth Supplemental Questionnaire Response (May 17, 2021) at 14-15, Appx89135-89136.  Based on both Commerce's request and the timing of the request (that is, after the Preliminary Determination), it was clear that the requested information was necessary to properly address the issues related to the DIRMATMP cost differences unrelated to the differences in physical characteristics and the product yield losses.  However, Assan did not provide the requested cost breakout and thus this necessary information is missing from the record within the meaning of 19 U.S.C. § 1677e(a)(1).

Commerce, therefore, lawfully relied on facts otherwise available.  IDM at 35, Appx007651.  As facts available, Commerce continued to weight average the reported DIRMATMP costs for all CONNUMs for the final determination to mitigate the cost differences unrelated to the product's physical characteristics.  *Id.*  Assan does not raise any arguments challenging Commerce's findings under 19 U.S.C. § 1677e(a)(1) or its use of facts otherwise available.

Assan raises *Brass Sheet and Strip from Germany* to counter Commerce's findings, Assan Br. at 38-39 (citing *Brass Sheet and Strip from Germany: Amended Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 66,347 (Dep't of Commerce Oct. 28, 2010), and accompanying IDM at Comment 1 (*Brass Sheet and Strip from Germany*)); however that determination is distinguishable from this proceeding.  Unlike this investigation, the respondent's reported raw material costs in *Brass Sheet and Strip from Germany* did not reflect the cost differences between CONNUMs unrelated to the product's physical characteristics.  Assan's reported raw material costs, however, reflect the cost differences among CONNUMs that are unrelated to the product physical characteristics.  Thus, Commerce reasonably determined that the reasoning for relying on daily metal costs in *Brass Sheet and Strip from Germany* was inapplicable to the facts of this investigation.  Accordingly, Commerce reasonably determined to weight average Assan's reported DIRMATMP costs.

**V.    Commerce Reasonably Treated Management Fees Incurred By Assan's U.S. Reseller as U.S. Indirect Selling Expenses**

Commerce reasonably determined that certain management fees incurred by Assan's U.S. reseller, Kibar Americas, should be treated as U.S. indirect selling expenses and, therefore, revised the constructed export price indirect selling expense ratio to include these management fees with reported expenses.  IDM at 10-11, Appx007626-007627.

Commerce's questionnaire, the preamble to Commerce's regulations, and administrative precedent support the concept that general and administrative (G&A) expenses of a company that is exclusively a reseller, with no manufacturing activities, should be treated as indirect selling expenses, because the expenses can only be in support of the company's sole function as a reseller.  *See* Commerce Initial Antidumping Questionnaire (Nov. 18, 2020) at C-27, Appx001137; *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,351 ("Typically, the primary, if not sole, function of an affiliated U.S. importer is to sell.  Therefore, many or all general and administrative expenses of such firms are properly considered as selling expenses and must be deducted under [19 U.S.C. § 1677a](d)(1)(D)."); *see also Citric Acid and Certain Citrate Salts from Canada:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 37,286 (July 1, 2014), and accompanying IDM at Comment 3.

As such, the management fees incurred by Kibar Americas, Assan's U.S. reseller, should be treated as a U.S. indirect selling expense and included with expenses reported for the appropriate field (INDIRSU).  The record shows that Assan incurred these expenses to provide management services to Kibar Americas.  *See* Assan Section C Second Supplemental Questionnaire Response (Apr. 2, 2021) at 2, Exhibit SC6-34, Appx86714, Appx86730-86734. Kibar Americas, in turn, incurred these expenses when it "purchased" the management services from Assan.  *Id.* at Exhibits SC6-34, SC6-35, Appx86730-86745.

Assan's argument focuses on the fact that Assan initially incurred the management service expenses in Turkey and therefore Commerce impermissibly treated them as U.S. indirect selling expenses.  Assan Br. at 44-45.  However, Assan fails to recognize that Commerce's focus was on the fact that Kibar Americas in turn incurred these expenses in the United States when Assan assessed fees to Kibar Americas for the services.  IDM at 10-11, Appx007626-007627.  In

33

its brief, Assan acknowledges, "It is not hard to see that a parent holding company might assess

its subsidiaries fees for a share of management and administrative services incurred abroad."

Assan Br. at 41.  Although Assan argues that Commerce must only focus on where the cost was

first incurred and ignore whether the reseller incurred expenses by purchasing the management

services from its parent holding company in the U.S., this does not make Commerce's analysis

unreasonable, and therefore the Court should uphold Commerce's determination.

**VI.    Commerce Reasonably Allowed Assan's Net Hedging Gains To Offset Its Reported Cost of Manufacturing**

Commerce reasonably allowed for Assan's net hedging gains to offset the reported cost

of manufacturing.  IDM at 41-43, Appx007657-007659.  Consolidated Plaintiffs argue that

Commerce unlawfully allowed for this offset and that the net hedging gains should properly be

associated with Assan's selling price of goods and not the purchase price of the aluminum input.

Consolidated Plaintiffs Br. at 19-27.  However, as shown below, Commerce sufficiently

explained why it was reasonable to allow for the offset.

Assan explained that, to meet customer demands and to offer a reasonable delivery time

to its customers, Assan maintains extra raw material inventory.  *See* Assan Section D Fifth

Supplemental Questionnaire Response Part II (May 17, 2021) at 1-3, Appx89122-89124.

According to Assan, raw material purchase transactions are generally concluded within the first

three weeks of each month.  *Id.*  However, because raw material prices are subject to significant

fluctuations, Assan also engages in hedging transactions for the purchased raw materials to

eliminate the risk of fluctuations in the metal cost.  *Id.*  The related hedging position (sell

transactions in commodities markets) are generally opened in the third week of each month (that

is, toward the end of each month) given the consideration to its raw material inventory position

at that time.  *Id.*  Assan stated that, to ascertain this, it routinely monitors its total raw material

34

inventory "position" and the related hedging positions are updated several times each week. According to Assan, it is not in the business to make a profit on its hedging transactions, but to ensure stability related to its raw material costs. *Id.* During the period of investigation, Assan generated net hedging gains from its hedging activities, and the related gains were recorded as a part of cost of goods sold in the audited financial statements. For the costs of production reported in this investigation, Assan reduced the reported cost of manufacturing by the net hedging gains as reflected in its normal books and records. *Id.*

As explained above, Commerce calculates costs based on a respondent's normal books and records if they are kept in accordance with the home country GAAP and reasonably reflect the costs associated with the production and sale of the merchandise. 19 U.S.C. § 1677b(f)(1)(A). The records show that Assan's hedging gains and losses are directly associated with purchases of the raw material aluminum and are recorded as a part of cost of goods sold in its financial statements that are kept in accordance with Turkish GAAP. *See* Assan Section D Fifth Supplemental Questionnaire Response Part II (May 17, 2021) at Exhibit S10D-7, Appx89140-89162. Accordingly, Commerce reasonably determined that it was appropriate to include the net hedging gains as a part of the reported cost of manufacturing.

Contrary to Consolidated Plaintiffs' arguments, Commerce reasonably determined that Assan's hedging transactions are related to Assan's cost of production. IDM at 41-43. Throughout this proceeding, Assan consistently explained and demonstrated that its hedging activities are to protect the value of its purchased raw material aluminum. *See* Assan Section D Second Supplemental Questionnaire Response (Mar. 29, 2021) at 5S-33-5S-35, Appx85522-885524, *see also* Assan Section D Fourth Supplemental Questionnaire Response Part II (Apr. 15, 2021) at 3-4, Appx87810-87811; and Assan Section D Fifth Supplemental Questionnaire

Response Part II (May 17, 2021) at 1-3, Appx89122-89124.  Assan provided specific record evidence and demonstrated that the net hedging gains were directly associated with the purchases of its aluminum material inputs.  *See* Assan Section D Fifth Supplemental Questionnaire Response Part II (May 17, 2021) at Exhibit S10-D7, Appx89140-89162.  Further, Assan's audited financial statement accompanying footnotes state that the company enters commodity contracts to mitigate its risk on aluminum price fluctuations (that is, raw material inputs, not finished goods).  *See* Assan Section A Questionnaire Response (Dec. 22, 2020) at Exhibit A-14, Appx80367-80426.  Based on this reporting, Commerce reasonably found that Assan's statements are consistent with record evidence and information presented by Assan throughout this proceeding and, accordingly, reasonably found that Assan's hedging activities and associated net hedging gains are related to Assan's aluminum purchases as is consistent with Assan's financial statements.  IDM at 42, Appx007658.

Commerce also reasonably determined not to include Assan's reported net hedging gains in Assan's financial interest expense ratio.  IDM at 43, Appx007659.  This is because the net hedging gains are recorded as a part of cost of goods sold in Assan's audited financial statements and as described above relate to aluminum purchases used in the production of merchandise under consideration, therefore, Commerce reasonably determined that it would be inappropriate to include this amount in the financial expense ratio.  *Id.*

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny Assan's and Consolidated Plaintiffs' Rule 56.2 motions for judgment on the agency record and sustain the challenged determination in its entirety.

<div style="margin-left:40%">

Respectfully Submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/  Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

</div>

OF COUNSEL:
JonZachary Forbes
Staff Attorney
Office of the Chief Counsel for Trade
Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

Catharine M. Parnell
Trial Attorney
U.S. Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-3467
Fax: (202) 353-0461Email:
Catharine.M.Parnell@usdoj.gov

*Attorneys for Defendant*

August 5, 2022