NON-CONFIDENTIAL

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, ET AL., <br><br> Defendant-Intervenors. | Consol. Court No. 21-00616 |

**CONSOLIDATED PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD**

JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Consolidated Plaintiffs

August 5, 2022

NON-CONFIDENTIAL

## Table of Contents

**Page**

ADMINISTRATIVE DETERMINATION UNDER REVIEW .................................................. 1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT .............................................. 1

STANDARD OF REVIEW ................................................................................................. 4

STATEMENT OF FACTS .................................................................................................. 4

ARGUMENT ....................................................................................................................... 4

I.     COMMERCE REASONABLY DEDUCTED SECTION 232 DUTIES
FROM U.S. PRICE ................................................................................................ 4

     A.     Legal Background and Construction of the Statutory Phrase
"United States Import Duties" .................................................................. 4

     B.     Commerce Reasonably Interpreted the Phrase "United States
Import Duties" to Include Section 232 Duties ......................................... 6

     C.     Commerce Reasonably Concluded That Section 232 Duties Are
Not Akin to "Special Duties" ................................................................... 7

II.     COMMERCE'S DUTY DRAWBACK ADJUSTMENT IS LAWFUL ............. 12

     A.     Commerce Lawfully Limited the Duty Drawback Adjustment to
Closed Inward Processing Certificates ("IPCs") ................................... 12

          1.     Legal Background ....................................................................... 13

          2.     Commerce Only Grants Drawback Adjustments With
Respect to IPCs That Have Been Closed ................................... 14

          3.     Commerce Appropriately Rejected Assan's Attempts at a
Windfall Duty Drawback Adjustment ........................................ 15

     B.     Commerce's Deduction of Late Penalties from the Duty Drawback
Adjustment Is Lawful .............................................................................. 19

          1.     Assan's Closure Documents Revealed Assan [
] .................................................................................................. 19

          2.     Assan Identifies No Basis for the Court to Remand
Commerce's Deduction of Late Filing Penalties ........................ 20

NON-CONFIDENTIAL

III.   COMMERCE CORRECTLY WEIGHT-AVERAGED ASSAN'S
       DIRECT MATERIAL METAL PREMIUM COSTS ........................................ 21

       A.     Legal Background .................................................................. 21

       B.     Factual Background ................................................................ 23

       C.     Commerce Correctly Determined That Assan's Reported Costs
              Did Not Reasonably Reflect the Costs of Producing and Selling
              CAF ........................................................................................ 25

              1.     Raw Material Mix ....................................................... 26

              2.     Yield Loss ................................................................... 27

              3.     Timing ......................................................................... 29

       D.     Commerce's Adjustment to Assan's Costs Was Reasonable and
              Consistent with Legal Precedent .......................................... 30

       E.     The Cases On Which Assan Relies Are Inapposite ................. 31

       F.     Commerce Reasonably Analyzed Cost Differences Based on
              Material Costs and Not the Total Cost of Manufacture .......... 33

IV.    COMMERCE LAWFULLY TREATED KIBAR AMERICAS'
       MANAGEMENT FEES AS INDIRECT SELLING EXPENSES ..................... 34

       A.     Background on Assan's CEP ISE ........................................... 34

       B.     Commerce Correctly Included the Management Fees in Assan's
              CEP ISE .................................................................................. 35

              1.     The Management Fees Are Incurred By Kibar Americas in
                     the United States ........................................................ 35

              2.     The Management Fees Are Not Incurred In Turkey ........ 36

              3.     The Management Fees Are Associated With Commercial
                     Activity in the United States ....................................... 37

                     a.     Expenses Associated With Economic Activities In
                           the United States Are CEP ISE ........................ 37

                     b.     The Management Services at Issue Are Associated
                           With Economic Activities in the United States ....... 39

NON-CONFIDENTIAL

4.     The Management Fees Are Selling Expenses.............................. 39

C.     The Cases Cited by Assan Do Not Support Its Position That the Management Fees Should Be Excluded From CEP ISE ......................... 41

D.     The Management Fees Are Not Double Counted.................................... 43

1.     Commerce Correctly Found That Assan Did Not Establish That Its Expenses to Provide Management Services Are Captured in G&A ........................................................................ 43

2.     Commerce Reasonably Offset Assan's G&A With Its Management Fee Revenue........................................................... 44

E.     Contrary to Assan's Claims, Commerce Includes Expenses Incurred By A Parent On Behalf Of the U.S. Selling Entity in CEP ISE................................................................................................... 47

V.     CONCLUSION.................................................................................. 48

**NON-CONFIDENTIAL**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

<u>Aramide Maatschappij V.o.F. v. United States</u>,
    901 F. Supp. 353 (Ct. Int'l Trade 1995) ........................................................ 40-41, 48

<u>Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States</u>,
    494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021), <u>appeal docketed</u>,
    Fed. Cir. No. 21-2097 ............................................................................... *passim*

<u>Chevron USA Inc. v. Nat. Res. Def. Council, Inc.</u>,
    467 U.S. 837 (1984) ...................................................................... 5, 20-21

<u>Deacero S.A.P.I de C.V. v. United States</u>,
    CIT Ct. No. 20-03924, Slip Op. 21-171, 2021 Ct. Intl. Trade LEXIS 174
    (Dec. 20, 2021) ................................................................................................7

<u>Dong-A Steel Co. v. United States</u>,
    337 F. Supp. 3d 1356 (Ct. Int'l Trade 2018) ........................................23, 30, 31, 33

<u>Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States</u>,
    439 F. Supp. 3d 1342 (Ct. Int'l Trade 2020) ................................................... 14-15

<u>Marmen Inc. v. United States</u>,
    545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) .............................................23, 31, 33

<u>Mitsubishi Heavy Indus. v. United States</u>,
    54 F. Supp. 2d 1183 (Ct. Int'l Trade 1999) ...................................................... 38-39

<u>Paul Müller Industrie GmbH & Co. v. United States</u>,
    435 F. Supp. 2d 1241 (Ct. Int'l Trade 2006) .........................................................43

<u>Power Steel Co. v. United States</u>,
    CIT Ct. No. 20-03771, Slip Op. 21-173, 2021 Ct. Intl. Trade LEXIS 175
    (Dec. 23, 2021) ................................................................................................7

<u>Ranchers-Cattlemen Action Legal Found. v. United States</u>,
    74 F. Supp. 2d 1353 (Ct. Int'l Trade 1999) ..........................................................21

<u>Saha Thai Steel Pipe (Pub.) Co. v. United States</u>,
    635 F.3d 1335 (Fed. Cir. 2011)...............................................................13, 14, 18

<u>Thai Plastic Bags Indus. Co. v. United States</u>,
    746 F.3d 1358 (Fed. Cir. 2014)...........................................................22, 28, 31, 33

**NON-CONFIDENTIAL**

United States Steel Corp v. United States,
    712 F. Supp. 2d 1330 (Ct. Int'l Trade 2010) ....................................42, 43

Wheatland Tube Co. v. United States,
    495 F.3d 1355 (Fed. Cir. 2007)..........................................................5, 8, 11


## Statutes and Regulations


19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................4

19 U.S.C. § 1673 ............................................................................................13

19 U.S.C. § 1677(7)(C) ...................................................................................9

19 U.S.C. § 1677(35)(A)...............................................................................4, 7

19 U.S.C. § 1677a(a)......................................................................................13

19 U.S.C. § 1677a(b)......................................................................................34

19 U.S.C. § 1677a(c)......................................................................................13

19 U.S.C. § 1677a(c)(2)(A).............................................................................5

19 U.S.C. § 1677a(c)(2)(B).............................................................................2

19 U.S.C. § 1677a(d)(1).............................................................34-35, 37, 38

19 U.S.C. § 1677b(b)(1).................................................................................21

19 U.S.C. § 1677b(b)(3).................................................................................22

19 U.S.C. § 1677b(f)(1)(A).................................................................22, 46-47

19 U.S.C. § 1677e(a)(1).................................................................................29

19 U.S.C. § 1677e(a)(2)(A)............................................................................29

19 U.S.C. § 1862 ............................................................................................11

19 U.S.C. § 1862(a), (b)(3)..............................................................................8

19 U.S.C. § 1862(c)......................................................................................8, 9

19 U.S.C. § 1862(d)..........................................................................................9

**NON-CONFIDENTIAL**

19 U.S.C. § 2251(a) ............................................................................................9

19 C.F.R. § 351.402(b) ......................................................................................37

## Legislative

Statement of Administrative Action,
    Uruguay Round Agreements Act,  H.R. Doc. No. 316. Vol. 1,
    103d Cong. 2d Sess. 656 (1994) ("SAA") ......................................... 11-12, 34-35, 37

## Administrative Determinations

Brass Sheet and Strip From Germany:
    Amended Final Results of Antidumping Duty Administrative Review,
    75 Fed. Reg. 66,347 (Oct. 28, 2010), and accompanying Issues and Decision
    Memorandum (Oct. 28, 2010) ............................................................. 31-32

Carbon and Certain Alloy Steel Wire Rod From Mexico:
    Final Results of Antidumping Duty Administrative Review; 2017-2018,
    85 Fed. Reg. 39,527 (July 1, 2020), and accompanying Issues and Decision
    Memorandum (June 24, 2020) ............................................................. 32-33

Certain Aluminum Foil From the Republic of Turkey:
    Final Affirmative Determination of Sales at Less Than Fair Value,
    86 Fed. Reg. 52,880 (Dep't Commerce Sept. 23, 2021)
    ("Final Determination") (Appx7669-7671) ....................................... *passim*

Certain Hot-Rolled Steel Flat Products From the Republic of Korea:
    Final Results of Antidumping Duty Administrative Review; 2016-2017,
    84 Fed. Reg. 32,720 (July 9, 2019), and accompanying Issues and Decision
    Memorandum (June 21, 2019). ............................................................ 40-41

Citric Acid and Certain Citrate Salts From Canada:
    Final Results of Antidumping Duty Administrative Review; 2012-2013,
    79 Fed. Reg. 37,286 (July 1, 2014), and accompanying Issues and Decision
    Memorandum (Jun 24, 2014) ............................................................... 40-41

Dioctyl Terephthalate From the Republic of Korea:
    Final Determination of Sales at Less Than Fair Value and Final Negative
    Determination of Critical Circumstances, 82 Fed. Reg. 28,824
    (June 26, 2017), and accompanying Issues and Decision Memorandum
    (June 19, 2017) .................................................................................. 32, 42

Issues and Decision Memorandum for the Final Affirmative Determination in the
    Less-Than-Fair-Value Investigation of Certain Aluminum Foil from the
    Republic of Turkey (Dep't Commerce Sept. 16, 2021)
    ("Issues and Decision Memorandum") (Appx7617-7668) .............................................. *passim*

Issues and Decision Memorandum for the Final Results of the Administrative
    Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar
    from Turkey; 2019-2020 (Feb. 2, 2022), ref'd in 87 Fed. Reg. 7,118
    (Feb. 8, 2022) (final results) ............................................................................................ 14, 15

Issues and Decision Memorandum for the Final Results of the 2018-2019
    Administrative Review of the Antidumping Duty Order on Steel Concrete
    Reinforcing Bar from Turkey (May 21, 2021), ref'd in 86 Fed. Reg. 28,574
    (May 27, 2021) (final results) ............................................................................................ 14-15

Issues and Decision Memorandum for the Final Results of the 2017-18
    Administrative Review of the Antidumping Duty Order on Circular Welded
    Carbon Steel Standard Pipe and Tube Produces from Turkey (Jan. 14, 2020),
    referenced in 85 Fed. Reg. 36,616 (Jan. 22, 2020) ..................................................................... 7

Issues and Decision Memorandum for the Final Results of the 2018-2019
    Administrative Review of the Antidumping Duty Order on Certain Carbon
    and Alloy Steel Cut- To-Length Plate from Italy (Mar. 18, 2021),
    referenced in 86 Fed. Reg. 15,645 (Mar. 24, 2021) ................................................................... 7

Issues and Decision Memorandum for the Final Results of the 2018-19
    Antidumping Duty Administrative Review of Circular Welded Carbon Steel
    Standard Pipe and Tube Products from Turkey (Mar. 15, 2021),
    referenced in 86 Fed. Reg. 15,190 (Mar. 22, 2021) ................................................................... 7

Notice of Final Determination of Sales at Less Than Fair Value;
    Certain Hot-Rolled Carbon Steel Flat Products From Thailand,
    66 Fed. Reg. 49,622 (Sept. 28, 2001) and accompanying Issues and Decision
    Memorandum ....................................................................................................................... 40-41

Notice of Final Determination of Sales at Less Than Fair Value:
    Structural Steel Beams From Germany, 67 Fed. Reg. 35,497 (May 20, 2002) ................. 47-48

Porcelain-on-Steel Cookware From Mexico:
    Final Results of Antidumping Duty Administrative Review,
    65 Fed. Reg. 30,068 (May 10, 2000), and accompanying Issues and Decision
    Memorandum ....................................................................................................................... 37, 41, 42

NON-CONFIDENTIAL

Ripe Olives From Spain:
    Final Affirmative Determination of Sales at Less Than Fair Value,
    83 Fed. Reg. 28,193 (June 18, 2018), and accompanying Issues and Decision
    Memorandum (June 11, 2018) ........................................................................................40

Stainless Steel Wire Rod from the Republic of Korea:
    Final Results of Antidumping Duty Administrative Review,
    69 Fed. Reg. 19,153 (Apr. 12, 2004) .............................................................................5

## Miscellaneous

Antidumping Duties; Countervailing Duties,
    62 Fed. Reg. 27,296 (June 18, 1997) ("Final Rule")  ..................................38, 39, 47

Antidumping Proceedings: Treatment of Section 201 Duties and Countervailing
    Duties, 68 Fed. Reg. 53,104 (Sept. 9, 2003) ................................................................5

Proclamation 4210, Modifying Proclamation 3279, Relating to Imports of
    Petroleum and Petroleum Products, Providing for the Long-Term Control of
    Imports of Petroleum and Petroleum Products Through a System of License
    Fees and Providing for Gradual Reduction of Levels of Imports of Crude Oil,
    Unfinished Oils and Finished Products, 38 Fed. Reg. 9,645 (Apr. 18, 1973) ......................8-9

Proclamation 4907 of March 10, 1982, Imports of Petroleum,
    47 Fed. Reg. 10,507 (Mar. 11, 1982) ..............................................................................8-9

Proclamation 9704; Adjusting Imports of Aluminum Into the United States,
    83 Fed. Reg. 11,619 (Mar. 15, 2018) .............................................................................9, 12

Proclamation 9739; Adjusting Imports of Aluminum Into the United States,
    83 Fed. Reg. 20,677 (May 7, 2018) ...............................................................................12

United States – Certain Measures on Steel and Aluminum Products (DS556),
    U.S. Second Written Submission, Apr. 17, 2020, available at
    https://ustr.gov/sites/default/files/enforcement/DS/US.Sub2.fin%20(DS556).
    pdf ...................................................................................................................... 10-11

This brief is filed on behalf of the Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas Inc., JW Aluminum Company, and Novelis Corporation (collectively, "Consolidated Plaintiffs"), in opposition to the Rule 56.2 Motion for Judgement on the Agency Record and accompanying Memorandum of Law (ECF Nos. 29-30) (hereinafter, "Assan's Br.") submitted by Assan Aluminyum Sanayi ve Ticaret A.S. ("Assan"). Consolidated Plaintiffs urge this Court to reject Assan's claims and to sustain the underlying agency determination, as modified consistent with the Memorandum of Law In Support of Consolidated Plaintiffs' Rule 56.2 Motion for Judgement on the Agency Record, submitted on May 23, 2022 (ECF Nos. 31-32) (hereinafter, "Consol. Pls.' Br.").

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Assan challenges certain aspects of the Department of Commerce's ("Commerce") final affirmative determination in the less-than-fair-value investigation of certain aluminum foil ("CAF") from Turkey. Certain Aluminum Foil From the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 52,880 (Sept. 23, 2021) (hereinafter, "Final Determination") (Appx7669-7671) and the accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Aluminum Foil from the Republic of Turkey (Sept. 16, 2021) (Appx7617-7668).

## ISSUES PRESENTED AND SUMMARY OF ARGUMENT

Assan claims the Final Determination is unlawful because Commerce:

1. Deducted Section 232 duties from U.S. price;

2. Unlawfully calculated the per-unit duty drawback adjustment by:

    a.  Allocating the duty liability forgiven by the Turkish government on Assan's closed inward processing certificates ("IPC") over Assan's total exports; and

    b.  Offsetting Assan's duty drawback adjustment for filing penalties paid by Assan;

3.  Weight-averaged Assan's reported direct material metal premium costs; and

4.  Treated Kibar Americas' management fees as an indirect selling expenses.

Assan's claims are wrong and should be rejected.

First, Commerce correctly deducted Section 232 duties from U.S. price. The agency's determination is consistent with U.S. Court of International Trade's ("CIT") decision in Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) (hereinafter, "Borusan"), appeal docketed, Fed. Cir. No. 21-2097 (reply brief filed on Aug, 3, 2022; see ECF No. 56). Moreover, Commerce's determination that Section 232 duties are "United States import duties" under 19 U.S.C. § 1677a(c)(2)(B) is consistent with the statute. In particular, Commerce reasonably interpreted the phrase "import duties" to encompass the 10 percent Section 232 tariffs on United States imports of CAF, which are duties on U.S. imports. Further, Commerce's determinations that Section 232 duties: (1) do not meet the "special duties" exception to the definition of "United States import duties"; and (2) are not akin to Section 201, antidumping, or countervailing duties, are supported by substantial evidence. Section 232 duties are intended to address national security concerns and are not aimed at remedying injury to a U.S. industry, unlike Section 201, antidumping, and countervailing duties. Thus, Commerce reasonably deducted Section 232 duties from U.S. price.

Second, Commerce's well-established and court-affirmed practice is to grant a duty drawback adjustment under the Turkish inward processing regime ("IPR") only for *closed* IPCs,

a practice that Assan does not contest. Assan's requested methodology, however, would undermine this practice by allowing Assan to achieve a duty drawback adjustment as if all relevant IPCs were closed, even where they are not. The Court should reject Assan's attempt to undercut Commerce's established practice. Moreover, Commerce reasonably offset Assan's drawback adjustment with penalties Assan paid for failing to timely satisfy the Turkish government's drawback regime. These penalties are akin to duty liability the Turkish government determined would not be extinguished and, therefore, Commerce appropriately offset Assan's adjustment by the amount Assan paid.

Third, Commerce reasonably weight-averaged Assan's direct material metal premium costs. Contrary to Assan's claims, Commerce correctly departed from Assan's records in calculating costs because Assan's reported costs did not reasonably reflect the costs associated with the production and sale of the merchandise. Commerce's findings that differences in the reported direct material metal premium costs did not reflect differences in physical characteristics is supported by substantial evidence. Moreover, in such situations, the Courts have repeatedly sustained Commerce's departure from a respondent's records, as well as its use of weight-averaging, to ensure such differences do not distort the costs. As a result, Commerce's determination is supported by substantial evidence and consistent with Court precedent.

Fourth, Commerce correctly treated management fees incurred by Assan's U.S. affiliated reseller, Kibar Americas, as indirect selling expenses ("ISE"). The record demonstrates that these fees were incurred by Kibar Americas in the United States, and that because Kibar Americas' sole function is the sale of CAF, these fees were selling expenses. Each of Assan's claims regarding this issue are legally wrong or factually unsupported.

NON-CONFIDENTIAL

**STANDARD OF REVIEW**

In reviewing a challenge to a final determination by Commerce, this Court will sustain a determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**STATEMENT OF FACTS**

Consolidated Plaintiffs address below the relevant facts pertaining to each issue.

**ARGUMENT**

**I.**   **COMMERCE REASONABLY DEDUCTED SECTION 232 DUTIES FROM U.S. PRICE**

Assan contends Commerce's treatment of Section 232 duties as "ordinary customs duties" is unlawful. Assan's Br. at 10-11. According to Assan, because Section 232 duties are remedial, temporary, and implemented through a Congressional delegation of authority, they are "special" tariffs that cannot be deducted from U.S. price. Id. at 13-23. Assan further alleges that deducting the Section 232 duties results in an impermissible double remedy. Id. at 23-25. Assan's claims are counter to CIT precedent, Commerce's established practice, and ignore Commerce's careful and reasoned analysis explaining why deducting the Section 232 duties from U.S. price is warranted in this case. Accordingly, Assan's arguments should be rejected.

**A.**   **Legal Background and Construction of the Statutory Phrase "United States Import Duties"**

Commerce calculates a dumping margin as the amount by which normal value exceeds export price ("EP") or constructed export price ("CEP"). 19 U.S.C. § 1677(35)(A). Commerce must reduce the price used for the EP and CEP by:

> the amount, if any, included in such price, attributable to . . . ***United States import duties,*** which are incident to bringing the

4

> subject merchandise from the original place of shipment in the
> exporting country to the place of delivery in the United States . . . .

Id. at § 1677a(c)(2)(A) (emphasis added).  The term "United States import duties" is not defined

by the statute.  Borusan, 494 F. Supp. 3d at 1371-72; see also Wheatland Tube Co. v. United

States, 495 F.3d 1355, 1359-60 (Fed. Cir. 2007).

Following formal notice and comment, Commerce determined that safeguard duties and

antidumping duties are not "United States import duties."  Stainless Steel Wire Rod from the

Republic of Korea: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg.

19,153, 19,159 (Apr. 12, 2004); Antidumping Proceedings: Treatment of Section 201 Duties and

Countervailing Duties, 68 Fed. Reg. 53,104 (Sept. 9, 2003).  Commerce explained that the

relevant legislative history indicated Congress' intent that some duties implementing trade

remedies are distinguishable from normal duties that are deducted from EP or CEP.  Id. (citing S.

Rep. No. 67-17, at 4 (1921) (contrasting antidumping or "special dumping duties" with normal

customs duties or "United States import duties")).  Further, Commerce pointed to Congress'

endorsement of its interpretation, along with decisions of the CIT that upheld its practice of not

considering antidumping duties to be "United States import duties," along with the agency's

concern that, if safeguard duties were included as "United States import duties," Commerce

would improperly collect the safeguard duties twice.  Id.  The United States Court of Appeals for

the Federal Circuit ("CAFC") upheld Commerce's construction of 19 U.S.C. § 1677a(c)(2)(A)

and the agency's carve-out of "special" duties as reasonable using a Chevron step-two analysis.

Wheatland Tube Co., 495 F.3d at 1361-63.

**B.**   **Commerce Reasonably Interpreted the Phrase "United States Import Duties" to Include Section 232 Duties**

Assan begins its argument with the premise that Section 232 duties are "special" tariffs and "their deduction from U.S. price in calculating antidumping margins is not contemplated by the statute." Assan's Br. at 13. Assan, however, fails to address Commerce's interpretation of the statute, focusing instead on the agency's carve-out of "special duties," contrary to the CIT's recognition in Borusan that the statute's plain language serves as the appropriate starting point in analyzing this issue. As a result, Assan's assumption that Section 232 duties are "special" tariffs is wrong.

In Borusan, the Court acknowledged the statute provides that U.S. "price is to be reduced by 'United States import duties'" and "does not use the phrase '*normal* customs duties.'" Borusan, 494 F. Supp. 3d at 1372 (citing 19 U.S.C. § 1677a(c)(2)(A)) (emphasis added). Relying on CAFC precedent that the phrase "United States import duties" is ambiguous, the Borusan Court noted that the parties had incorrectly framed the statutory interpretation question because "the threshold question" is not "as the parties seem to propose, whether Section 201 duties and Section 232 duties are so similar that Commerce acts unreasonably if it does not give them identical treatment," but rather "what is the purpose of the deduction for 'import duties' in the dumping margin calculation, and does reduction of price by Section 232 duties serve that purpose." Id., 494 F. Supp. 3d at 1373 (citations omitted).

NON-CONFIDENTIAL

Accordingly, it is not unreasonable for Commerce to interpret the statute's plain language to include Section 232 duties, even though the agency previously interpreted the statute and concluded that safeguard or antidumping duties are not "United States import duties."[1]

### C.   Commerce Reasonably Concluded That Section 232 Duties Are Not Akin to "Special Duties"

Assan incorrectly suggests that Section 232 duties are not "United States import duties," given their "extraordinary nature," and argues such duties instead are similar to safeguard and antidumping duties. Assan's Br. at 13 (citing Issues and Decision Memorandum for the Final Normal Value Calculations to be Effective From Release of the Final Normal Values through June 30, 2019, under the Agreement Suspending the Antidumping Duty Investigation on Certain Oil Country Tubular Goods from Ukraine, at 7 (Feb. 15, 2019) (hereinafter, "Tubular Goods I&D Memo")).[2] Notably, the CAFC, in finding that safeguard duties are "special" duties akin to antidumping duties, has emphasized that safeguard duties are: (1) remedial in nature, (2) of

---

[1]   Assan's argument that Commerce departed from its prior interpretation of the statute in finding Section 232 duties are ordinary customs duties is misplaced. Assan's Br. at 13. Commerce has repeatedly and consistently found that Section 232 duties are "United States Import duties" that must be deducted from EP or CEP. See, e.g., Issues and Decision Memorandum for the Final Results of the 2017-18 Administrative Review of the Antidumping Duty Order on Circular Welded Carbon Steel Standard Pipe and Tube Produces from Turkey, at 30-33 (Jan. 14, 2020), referenced in 85 Fed. Reg. 36,616 (Jan. 22, 2020); Issues and Decision Memorandum for the Final Results of the 2018-2019 Administrative Review of the Antidumping Duty Order on Certain Carbon and Alloy Steel Cut- To-Length Plate from Italy, at 22-26 (Mar. 18, 2021), referenced in 86 Fed. Reg. 15,645 (Mar. 24, 2021); Issues and Decision Memorandum for the Final Results of the 2018-19 Antidumping Duty Administrative Review of Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey, at 21-24 (Mar. 15, 2021), referenced in 86 Fed. Reg. 15,190 (Mar. 22, 2021). Additionally, the CIT has affirmed the Department's interpretation on two additional occasions. See Power Steel Co. v. United States, CIT Ct. No. 20-03771, Slip Op. 21-173 at 6-7, 2021 Ct. Intl. Trade LEXIS 175, at *6-9 (Dec. 23, 2021); Deacero S.A.P.I de C.V. v. United States, CIT Ct. No. 20-03924, Slip Op. 21-171 at 7-9, 2021 Ct. Intl. Trade LEXIS 174, at *6-10 (Dec. 20, 2021).

[2]   Assan cites to the Tubular Goods I&D Memo as support that Section 232 duties are "special" duties. In that case, however, the Department found that the Section 232 duties should be treated as "United States import duties" under 19 U.S.C. § 1677(35)(A). Id. at 11.

temporary duration, and that (3) treating safeguard duties as "United States import duties" would inflate the dumping margin calculated by Commerce (by deducting the safeguard duties from EP or CEP) and, therefore, would result in double collection of duties for the same alleged injury. Wheatland Tube Co., 495 F.3d at 1363-66; see also Borusan, 494 F. Supp. 3d at 1374-76. Contrary to Assan's claims, and as Commerce explained in the underlying administrative determination, the differentiating features of Section 232 duties indicate they are "United States import duties" that should be deducted from EP and CEP. Appx7636.

First, Section 232 does not share the same remedial objective as safeguard duties or other trade remedies, and the Section 232 statute is not an "alternate means" to remedy domestic injury. Assan's Br. at 14. Section 232, by its plain terms, is concerned with identifying and addressing imports that "threaten to impair the national security." 19 U.S.C. § 1862(a), (b)(3), (c). Although the statute directs Commerce and the President to consider, among other factors, "the impact of foreign competition on the economic welfare of individual domestic industries," such an analysis is undertaken in order to determine whether imports threaten to impair the *national security*. See id. at § 1862(d). The U.S. International Trade Commission ("USITC") may consider similar factors in an antidumping or safeguards investigation, but it does so in the context of assessing whether a domestic industry is *injured* by imported merchandise that is either unfairly or fairly traded, respectively. Id. §§ 1677(7)(C), 2251(a).

In contrast, the statute plainly states that any action undertaken pursuant to Section 232[3] must "adjust the imports of the article . . . so that such imports will not threaten the *national*

---

[3]   Assan incorrectly suggests that the remedies provided by Section 232 and Section 201 are "nearly identical." Assan's Br. at 16. Section 232 permits the President to take "any action" to address the threat to national security posed by imports, and many types of remedies have been

(cont'd on next page)

*security."* Id. at § 1862(c) (emphasis added).  Safeguard measures and trade remedies redress,

and are tailored to address, injury to a domestic industry producing a product that is like the

imported product causing injury through the assessment of additional duties.  19 U.S.C. §§

1677(7)(C), 1862(d), 2251(a).  Although both Section 232 and Section 201 are remedial in a

broad sense, the specific circumstance that each section of the statute seeks to remedy are

distinct.[4]  Cf. Borusan, 494 F. Supp. 3d at 1374 (acknowledging differences between Section 232

duties and safeguard duties).  Indeed, Proclamation 9704 states that it "is necessary and

appropriate to adjust imports of aluminum articles so that such imports will not threaten to

*impair the national security,"* as in the national security risk posed by a declining industry that

would "leav{e} the United States at risk of becoming reliant on foreign producers of primary

aluminum."  83 Fed. Reg. at 11,619-20.  Assan's discussion of Proclamation 9704 omits the

stated purpose of the Section 232 tariffs to maintain national security.  Assan's Br. at 17.

---

imposed under this statute.  19 U.S.C. § 1862(c); Proclamation 4210, Modifying Proclamation 3279, Relating to Imports of Petroleum and Petroleum Products, Providing for the Long-Term Control of Imports of Petroleum and Petroleum Products Through a System of License Fees and Providing for Gradual Reduction of Levels of Imports of Crude Oil, Unfinished Oils and Finished Products, 38 Fed. Reg. 9,645 (Apr. 18, 1973); Proclamation 4907 of March 10, 1982, Imports of Petroleum, 47 Fed. Reg. 10,507 (Mar. 11, 1982) (imposing embargos and complex licensing requirements).  The remedy in affirmative antidumping investigations is the imposition of additional duties, and the same remedy is frequently implemented in affirmative safeguard investigations.  See 19 U.S.C. §§ 1677(7)(C), 1862(d), 2251(a).

[4]   All prior Section 232 investigations have focused on the national security threats posed by imports, not the threat posed to an "injured" domestic industry.  For example, a 1982 investigation into crude oil imports from Libya found that Libya was an unreliable supplier, prompting President Reagan to impose an embargo on crude oil imports from Libya to "eliminate the dependence of the United States on Libya as a source of crude oil."  Proclamation 4907 of March 10, 1982, Imports of Petroleum, 47 Fed. Reg. 10,507 (Mar. 11, 1982).  Section 232 duties may be imposed in the absence of injury to the domestic industry and, therefore, Assan is wrong to claim that the "primary focus" of the additional duties is to protect the domestic industry.  Assan's Br. at 16.

NON-CONFIDENTIAL

Moreover, Assan's argument that a delegation of authority from Congress to the Executive Branch distinguishes Section 232 duties from "ordinary customs duties" is flawed. Assan's Br. 20-23. Assan's assertion that the role of the Executive somehow removes Section 232 duties from the ambit of ordinary customs duties, as reflected in the Harmonized Tariff System of the United States ("HTSUS") and in conformity with World Trade Organization ("WTO") obligations, is misplaced. Assan's Br. at 20-23. The issue is not whether Section 232 duties are ordinary customs duties, but rather whether Commerce has reasonably interpreted the phrase "United States import duties" to include Section 232 duties. As discussed above in section II.B., Commerce's interpretation is reasonable and should be affirmed.

Additionally, Section 232 duties are addressed in Chapter 99 of the HTSUS and are "cumulative duties which apply in addition to the duties, if any, otherwise imposed on the articles involved." HTSUS (2020) Subchapter I, U.S. Note 1. In contrast, safeguard and antidumping duties are not provided for in the HTSUS. The inclusion of Section 232 duties in the HTSUS underscores the similarity of Section 232 duties to "ordinary customs duties" and further differentiates them from "special duties."

Further, the United States government has never taken the position that Section 232 duties are "special duties" akin to safeguard duties. Rather, Section 232 duties are measures that are authorized under national security exception at Article XXI of the General Agreement on Tariffs and Trade 1994 ("GATT").[5]  See, e.g., United States – Certain Measures on Steel and

---

[5]  Article XXI of the GATT, unlike Article XIX of the GATT (concerning safeguards) or Article 3 of the Anti-dumping Agreement (concerning antidumping investigations), makes no mention of injury to a domestic industry as either a justification for, or a factor in, a determination for a WTO Member to take a measure under that national security exception.
(cont'd on next page)

Aluminum Products (DS556), U.S. Second Written Submission at ¶ 137, Apr. 17, 2020, available at https://ustr.gov/sites/default/files/enforcement/DS/US.Sub2.fin%20(DS556).pdf (explaining that complainant Switzerland is "incorrect when it asserts that the objective of the {Section 232 steel and aluminum tariffs} at issue is to prevent or remedy serious injury to U.S. steel and aluminum industries allegedly caused or threatened by imports") (citations omitted).

Second, Section 232 actions may be temporary – insofar as they must cease upon resolution of the national security threat – but they are not primarily aimed at temporarily providing "relief from the injurious effects of imports," as are safeguard or antidumping duties. Cf. Wheatland Tube Co., 495 F.3d at 1362.

Third, deducting Section 232 duties from EP or CEP does not result in an impermissible double remedy. Assan incorrectly claims that deducting Section 232 duties from EP or CEP would result in an artificial dumping margin. Assan's Br. at 23-25. Section 232 duties, however, are not an "alternative" to other trade remedies, such as safeguard or antidumping duties. Cf. Wheatland Tube Co., 495 F.3d at 1363.

In Borusan, the CIT observed that "Section 201 duties are, in fact, related to and complimentary to antidumping duties" by statute – unlike Section 232 duties. Borusan, 494 F. Supp. 3d at 1375. Specifically, in the course of a safeguard investigation, the USITC is required to refer to Commerce any reason to believe that the surge in imports is attributable to dumping or actionable subsidies, and the President must consider any relief provided by the antidumping or countervailing duty laws in setting the level of surge protection. See id. (citing 19 U.S.C. § 2252(c)(5); Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep.

Section 232 itself focuses on threats to the national security in conformity with this WTO obligation under Article XXI of the GATT. Cf. 19 U.S.C. § 1862.

No. 103-316, vol. 1, at 964 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4267).  In contrast, Section 232 does not require complementary treatment, as expressed in the statute or its legislative history.  Id.  Therefore, absent this interplay between Section 232 duties with other "special" duties, deducting Section 232 duties would not result in double-counting.

Moreover, the plain language of Proclamation 9704 states that the additional duties on aluminum articles are "in addition to any other duties, fees, exactions, and charges applicable to such imported aluminum articles."  83 Fed. Reg. at 11,621.  The annex to Proclamation 9739 (Adjusting Imports of Aluminum Into the United States) even refers to the Section 232 duties as "ordinary" and, again, reiterates that "{a}ll anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed."  83 Fed. Reg. 20,677, 20,681 (May 7, 2018).  Commerce reasonably explained that the Presidential Proclamations would have stated that the antidumping duties were to be reduced by the amount of Section 232 duties, if intended.  See Appx7637.  Clearly, the Presidential Proclamations reveal the opposite intention.

The double-remedy factor, as the CIT acknowledged and as Commerce explains, clearly distinguishes Section 232 duties from safeguard and antidumping duties.  Cf. Borusan, 494 F. Supp. 3d at 1366-67;  Appx7636-7637.  Therefore, Commerce did not err in treating Section 232 duties as "United States import duties" and in deducting them from EP.

## II.     COMMERCE'S DUTY DRAWBACK ADJUSTMENT IS LAWFUL

### A.     Commerce Lawfully Limited the Duty Drawback Adjustment to Closed Inward Processing Certificates ("IPCs")

Assan claims that Commerce "improperly limit{ed}" the duty drawback adjustment to which it "is entitled by law" because the denominator of the calculation uses all of Assan's U.S.

exports – instead of only those subject to a closed IPC. Assan's Br. at 26. Assan's proposed methodology is contrary to law and Commerce's practice.

### 1.    Legal Background

If Commerce determines that a class or kind of foreign merchandise is being sold in the United States at less-than-fair-value, and the USITC determines that a domestic industry is materially injured by reason of imports of the foreign merchandise, an antidumping duty is imposed on such merchandise "in an amount equal to the amount by which the normal value exceeds the" EP or CEP "for the merchandise." 19 U.S.C. § 1673.

The statute defines EP as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States," taking into account certain adjustments. 19 U.S.C. § 1677a(a). Relevant here, the statute directs Commerce to increase EP (or CEP) by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c). This adjustment is known as a "duty drawback adjustment." Saha Thai Steel Pipe (Pub.) Co. v. United States, 635 F.3d 1335, 1338 (Fed. Cir. 2011) (citation omitted) (hereinafter, "Saha Thai").

The statute does not specify the method Commerce should use to determine whether a duty drawback adjustment is warranted. In evaluating whether to make a duty drawback adjustment, Commerce employs a two-pronged test which requires:

> (1) that the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise, and (2) that there are sufficient imports of the raw

> material to account for the duty drawback on the exports of the
> subject merchandise.

Saha Thai, 635 F.3d at 1340-41 (citation omitted); see also Appx7644.

### 2.    Commerce Only Grants Drawback Adjustments With Respect to IPCs That Have Been Closed

Under Turkish law, exporters of merchandise that has been processed in Turkey may have their duty liability on imports forgiven if the exporter satisfies certain requirements. Appx82047-82064.  Turkish law – specifically the Inward Processing Regime ("IPR") – authorizes "drawback of duties" (i.e., the extinguishing of liability for import duties) when an exporter imports and exports sufficient quantities of qualifying merchandise.  Appx82059-82060. Exporters that seek drawback of duties must open accounts or IPCs with the Turkish government that are closed only when the IPR import and export requirements are satisfied.  Appx82054.

Commerce's practice in proceedings involving merchandise from Turkey is to grant a duty drawback adjustment only with respect to IPCs that have closed.  See, e.g., Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from Turkey; 2019-2020, at 18 (Feb. 2, 2022) ("Rebar Turkey I&D Memo"), ref'd in 87 Fed. Reg. 7,118 (Feb. 8, 2022) (final results) (partially denying respondents' claimed duty drawback adjustments because the respondents failed to "provide evidence demonstrating that one of the IPCs pertaining to its duty drawback claim was closed by the GOT"); Issues and Decision Memorandum for the Final Results of the 2018-2019 Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from Turkey, at 12, 16 (May 21, 2021), ref'd in 86 Fed. Reg. 28,574 (May 27, 2021) (final results); see also Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States, 439 F. Supp. 3d 1342, 1349 (Ct. Int'l Trade 2020) (finding that "Commerce reasonably predicates its inclusion of

NON-CONFIDENTIAL

IPCs on evidence of closure as demonstrating final duty exemption"). This is because "{a} paid duty or duty liability does not qualify as a drawn back duty until the refund occurs or the liability is extinguished by the government" and therefore the second prong of Commerce's two-pronged test is not met until the IPC is closed. Rebar Turkey I&D Memo at 18.

Assan does not challenge Commerce's practice here, but instead claims that despite only having [               ] involving a [            ] portion of Assan's subject merchandise exports, Commerce should have granted a per-unit drawback adjustment for all of its U.S. sales – as if all relevant IPCs were closed. Assan's claim is wrong.

### 3.    Commerce Appropriately Rejected Assan's Attempts at a Windfall Duty Drawback Adjustment

Assan claims that Commerce erred when it "divid{ed} the duty exemption received on Assan's closed IPC, by all U.S. exports, resulting in an inconsistent numerator and denominator." Assan's Br. at 28. Further, Assan argues that "Assan and the Petitioner objected to Commerce's approach, which is contradicted by both the statute and Commerce's own historic and more recent practice." Id. Assan's claims are wrong.

There are three aspects to Commerce's calculation of a duty drawback adjustment that merit discussion. The first two involve Commerce's calculation of the per-unit amount of the adjustment, and the third involves the universe of U.S. sales to which the adjustment is applied. First, Commerce must calculate the numerator of the per-unit adjustment, which represents the amount of duty liability forgiven by the Turkish government. Second, Commerce must calculate the denominator, which represents the quantity of merchandise over which the amount of duty liability forgiven will be averaged. The resulting per-unit amount is then used to increase EP or CEP, which leads to the third aspect of the adjustment – the relevant grouping of sales in the

respondent's U.S. sales database to which the per-unit adjustment is applied. The latter two aspects of the adjustment – i.e., the denominator quantity and the universe of sales to which the adjustment is applied – must be linked to avoid overstating or understating the adjustment.

Assan identified [      ] IPCs under which it imported material inputs during the period of investigation, only [                    ] closed. Appx81984. Further, Assan explained that it was not exempt from any customs duties under [      ] of the [      ] IPCs and, as a result, Assan calculated its drawback adjustment based on the [      ] IPCs – [

] – for which Assan was exempt from duties, despite IPC [      ] not being closed. Appx81984.

In proposing its duty drawback adjustment, Assan "divid{ed} the total amount of customs duties and charges corresponding to the imports made under the identified IPC {i.e.,

[                ]} by the total of exports made as a commitment against the imports to close the IPC." Appx81986, Appx82207-08. Indeed, Assan calculated a per-unit drawback offset of

[      ] USD per metric ton by allocating [            ] USD of exempted duties on imported raw materials over an export quantity of [        ] metric tons. Id.

Notably, Assan increased the U.S. price of all sales by the per unit amount calculated, despite the record clearly demonstrating that not all of Assan's sales were exported pursuant to IPC [      ] – or even IPCs [                ] Appx 82915.

In a supplemental questionnaire response, Assan added a field to its U.S. sales database to show the IPC number under which each of its U.S. sales was exported. Appx86045. This allowed Commerce to determine which U.S. sales were "linked to" imports exempt from duties (i.e., those exported pursuant to a closed IPC), and those that were not.

In the preliminary determination, Commerce calculated the per-unit drawback adjustment using only Assan's closed IPC [      ] by calculating:

> {T}he total amount of the duty drawback benefit for exempted import duties realized by the Assan Single Entity for exports of aluminum foil to the United States during the POI of merchandise similar to scope merchandise (*i.e.,* Harmonized Tariff Schedule of the United States subheadings 7607.11 and 7607.19) . . . .

Appx88407. Then Commerce "adjusted for the difference between the export quantity in the IPC[                                        ] and the total quantity of sales in" Assan's "U.S. sales database identified to be relevant to IPC [      ]." Id. Commerce then "allocated the amount of this benefit to all U.S. sales reported by Assan." Appx88407.

In its administrative case brief, Assan argued Commerce "incorrectly calculated a per unit adjustment by dividing the duty exemptions received on [      ] by ALL U.S. exports," which Assan claimed "seriously diluted the adjustment." Appx91288. In particular, Assan argued Commerce's "approach is {} incorrect as the numerator and denominator are inconsistent." Id.

As Consolidated Plaintiffs explained in their rebuttal case brief, "{u}nder Assan's proposed approach, the company's U.S. sales not subject to a closed IPC would receive a per-unit adjustment equivalent to the full per-unit amount earned on U.S. sales that were made pursuant to a closed IPC . . . essentially revers{ing} the Department's practice of only allowing a drawback adjustment for closed IPCs." Appx91338. While Consolidated Plaintiffs acknowledged that the following alternative approach would be consistent with the statute – "divid{ing} the amount of duties not collected under the closed IPC by the volume of exports reported under that IPC, and apply the resulting per-unit adjustment to only those sales exported

under the closed IPC"[6] – Consolidated Plaintiffs also explained that Assan's proposed methodology was contrary to the statute and the agency's two-pronged test. Appx91339.

In the final determination, Commerce continued to employ the same methodology for calculating and applying Assan's per-unit duty drawback adjustment that the agency used preliminarily and rejected the parties' proposed alternative methodologies. Appx7644.

Assan seeks a windfall by arguing Commerce should have modified its adjustment by: (1) maintaining the numerator; (2) maintaining the universe of sales to which the adjustment is applied (i.e., all U.S. sales); and (3) dividing the numerator by only those sales in the U.S. sales database that were exported under IPC [       ] See Assan's Br. at 30; Appx91288. Commerce, however, reasonably explained that it would be more appropriate to allocate the amount of duty liability forgiven over all U.S. sales and then apply the duty adjustment to all U.S. sales. Appx7644-7645.

As discussed and sustained in Saha Thai, where Commerce makes a duty drawback adjustment to the U.S. price, it makes a corresponding adjustment to the cost of production, an adjustment that is not at issue in this litigation but is relevant to Commerce's reasoning for allocating the adjustment to all U.S. sales. Saha Thai, 635 F.3d at 1341-42. Specifically, Commerce explained that because it calculates a single cost, inclusive of import duties, for each CONNUM, it is preferable to apply a duty drawback adjustment to all sales to maintain the balance of the entire dumping calculation. Appx7645 ("POI-exempted import duties are allocated to all production of aluminum foil and are not applied to the production of the specific

---

[6]    Under this methodology, the Department would have granted a larger duty drawback adjustment to a small number of sales, and denied an adjustment to the remainder [       ] of Assan's U.S. sales.

sales of aluminum foil that are only associated with closed IPCs (i.e., there is a single, CONNUM-specific cost of production (COP) and COP is generally not a sale-specific amount).").  Assan has not made any cogent argument regarding why this adjustment is unreasonable, and this Court should reject Assan's attempt to obtain an unreasonable adjustment that is contrary to the statute.

> **B.**     **Commerce's Deduction of Late Penalties from the Duty Drawback Adjustment Is Lawful**

Assan also argues Commerce's determination to offset the amount of duty liability forgiven by penalties Assan paid for failing to realize exportation of merchandise under IPC [     ] in a timely manner is unlawful.  Assan's Br. at 31-32.  Contrary to Assan's claim, Commerce's treatment of penalties as akin to duty liability that was not forgiven by the Turkish government is reasonable and should be affirmed.

> **1.**     **Assan's Closure Documents Revealed Assan [                                ]**

Assan submitted the IPC [     ] closure document, which revealed that Assan [

]:

[

]

Appx82082-82100 (emphasis added).  Assan explained that "such [          ] are incurred if a company realizes exportation after the expiration date of the certificate."  Appx86046.

Commerce preliminarily deducted "penalties paid by" Assan "for reporting exports to the Turkish Government after the prescribed import/export period on the IPC."  Appx88407.

In its administrative case brief, Assan argued "{t}here is nothing in the statute or Department rulings to authorize offsetting a drawback adjustment based on late penalties paid." Appx91289.

Consolidated Plaintiffs argued that Commerce's deduction of penalties paid by Assan was a reasonable interpretation of the statute, because the penalties "are akin to duty liability that has not been forgiven by the Turkish government." Appx91339-91340.

In its final determination, Commerce continued to offset Assan's duty drawback adjustment with the late filing penalties incurred, explaining "nothing in the statute that prevents Commerce from offsetting the duty drawback adjustment by penalties incurred" and

> because the penalties do not apply to all exports but only exports under the IPC(s) which we used to calculate the duty drawback benefit and without which Assan would have no duty drawback benefit during the POI claimed on the IPC(s), we will continue to reduce the amount of the exempted import duties by the amount of the penalty which is expressly provided for as part of the IPR.

Appx7645.

### 2.  Assan Identifies No Basis for the Court to Remand Commerce's Deduction of Late Filing Penalties

Assan concedes that "that '{t}here is nothing in the statute that prevents Commerce from offsetting the duty drawback adjustment by penalties incurred,'" but argues that Commerce's determination is unlawful because "there is likewise nothing in the statute or Commerce's rulings to authorize offsetting a drawback adjustment based on late penalties paid." Assan's Br. at 31. Contrary to Assan's argument, where the statute is silent, Commerce is authorized to reasonably interpret the statute, as it did here. Chevron, 467 U.S. at 842-43 (the Court "must first ask 'whether Congress has directly spoken to the precise question at issue,'" and where it has not, the Court determines whether the agency has rendered a permissible interpretation of the

statute that Congress directed it to administer).  Because Assan availed itself of the Turkish IPR's duty liability forgiveness system (i.e., Assan never paid duties and its liability was only extinguished based on the closure of IPCs), Commerce reasonably determined that late filing penalties were akin to liability that was not forgiven.  Appx7645 (stating that "the penalty {} is expressly provided for as part of the IPR").

Assan also argues that Commerce's deduction of late filing penalties is "a departure from Commerce's standard practice."  Assan's Br. at 31.  An agency practice is predicated upon the existence of "a uniform and established procedure {} that would lead a party, in the absence of notification of a change, reasonably to expect adherence to the established practice or procedure."  Ranchers-Cattlemen Action Legal Found. v. United States, 74 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 1999).  Assan does not cite to any prior case where Commerce addressed whether offsetting a duty drawback adjustment with a late filing penalty was rejected.  Assan's Br. at 31-32.  As a result, Commerce did not depart from any agency practice, and the Court should reject Assan's claim.

## III.    COMMERCE CORRECTLY WEIGHT-AVERAGED ASSAN'S DIRECT MATERIAL METAL PREMIUM COSTS

### A.    Legal Background

When Commerce "has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product," Commerce "shall determine whether, in fact, such sales were made at less than the cost of production."  19 U.S.C. § 1677b(b)(1).  Further, if Commerce "determines that sales made at less than the cost of production": (1) "have been made within an extended period of time in substantial quantities";

and (2) "were not at prices which permit recovery of all costs within a reasonable period of time," Commerce may disregard such sales in calculating normal value. Id.

"Cost of production" includes, among other components, "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product." 19 U.S.C. § 1677b(b)(3). Moreover, "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).

The CAFC has determined that "Section 1677b(f)(1)(A) does not require Commerce to accept {a respondent's} records." Thai Plastic Bags Indus. Co. v. United States, 746 F.3d 1358, 1365 (Fed. Cir. 2014) ("Thai Plastic Bags Indus. Co."). Rather, "{i}t requires only that reported costs must 'normally' be used if they are 'based on the records ... kept in accordance with the {GAAP}' and 'reasonably reflect' the costs of producing and selling the merchandise." Id. (emphasis in original). The CAFC held that costs not based on physical characteristics are distortive and do not reasonably reflect actual costs, which justifies Commerce's decision to depart from a respondent's normal records. Id., 746 F.3d at 1367. Because the respondent's costs were influenced by factors other than the physical characteristics, "Commerce reallocated the costs by weight-averaging conversion costs evenly across all CONNUMs," a decision sustained by the Court. Id., 746 F.3d at 1367-68 (explaining that "Commerce's methodology is 'presumptively correct . . .'" and that the statute "leaves to Commerce's discretion both the meaning of 'proper allocation' and what factors can drive the assignments of those allocations") (citing 19 U.S.C. § 1677b(f)(1)(A)).

The CIT has also held that a respondent's costs did not reasonably reflect the cost of production because "the significant cost differences between {} two product control numbers could not be explained by the physical characteristic of one being painted and the other not painted, which was the single physical difference." Dong-A Steel Co. v. United States, 337 F. Supp. 3d 1356, 1370-71 (Ct. Int'l Trade 2018) ("Dong-A Steel Co."). The CIT sustained Commerce's departure from the respondent's normal records, finding that "{i}t was appropriate for Commerce to make the adjustment in order to have costs that differ only because of physical characteristics." Id., 337 F. Supp. 3d at 1371. To adjust the respondent's reported costs in that case, Commerce averaged the respondent's raw material costs so that "product control numbers that were identical in all physical characteristics except painting" would "reflect the same hot-rolled coil costs," and the Court sustained that methodology. Id., 337 F. Supp. 3d at 1369-1370; see also Marmen Inc. v. United States, 545 F. Supp. 3d 1305, 1314 (Ct. Int'l Trade 2021) ("Marmen Inc.") (sustaining Commerce's determination to "weight-average {} reported steel plate costs," which resulted in every control number being assigned the same steel plate cost, because "differences in plate costs were related to factors other than differences in the physical characteristics of the plates").

Accordingly, where a respondent's costs reflect differences that are unrelated to differences in the physical characteristics, the Courts have consistently sustained Commerce departing from the respondent's records and averaging such costs.

### B.   Factual Background

Assan's aluminum raw material costs, including "Assan's purchases of raw materials such as scrap, primary aluminum and cast coils," include two components: a London Metal Exchange ("LME") metal price, which "denotes the current aluminum index price published by

NON-CONFIDENTIAL

the London Metal Exchange" and a raw material premium, which denotes "denotes the conversion cost plus profit of the raw material supplier." Appx85510.

The cost of production database that Assan submitted to Commerce included variables DIRMATLME and DIRMATMP, which captured the LME and raw material premium components of the input aluminum cost, respectively. Appx82625. Variables DIRMATLME and DIRMATMP together capture the full cost of the input aluminum metal. Appx82637-38.

Assan agreed that Commerce should average variable DIRMATLME (i.e., the LME component) so that all control numbers ("CONNUMs") have the same DIRMATLME cost. Assan's Br. at 33; Appx85502; Appx89132. Commerce preliminarily (and correctly) found that Assan's "raw material cost differences between CONNUMs appear to be unrelated to cost differences associated with the physical characteristics of the products." Appx6534. To remedy these distortions, Commerce averaged variables DIRMATLME and DIRMATMP (i.e., the LME and metal premium components, respectively) of Assan's reported raw material costs when calculating Assan's cost of production. Id. Both Petitioners and Assan filed affirmative and rebuttal administrative briefs addressing this issue, with Petitioners arguing that Commerce should continue averaging Assan's reported DIRMATMP costs (Appx91241-47; Appx91308-12) and Assan arguing that Commerce should use its DIRMATMP costs as originally reported (i.e., without any averaging). Appx91261-67; Appx91399-400. In the Final Determination, Commerce correctly continued to average Assan's reported DIRMATMP costs in order to mitigate cost differences "between CONNUMs that are unrelated to the product's physical characteristics." Appx7649-51.

**C.      Commerce Correctly Determined That Assan's Reported Costs Did Not Reasonably Reflect the Costs of Producing and Selling CAF**

Assan claims that Commerce made no finding as to whether its reported costs reasonably reflect the costs associated with the production and sale of CAF. Assan's Br. at 37-39. Contrary to Assan's claim, Commerce identified this as a salient issue at the very outset of its analysis stating:

> {T}he question facing Commerce is whether the reported material costs from Assan's normal books and records reasonably reflect the cost to produce the merchandise under consideration based on the physical characteristics identified by Commerce.

Appx7649. In analyzing this question, Commerce determined that "the reported aluminum costs (*i.e.*, sum of DIRMATLME and DIRMATMP) reflected significant cost differences between CONNUMs that are unrelated to the product's physical characteristics." Appx7650-51. A finding that cost differences are unrelated to differences in physical characteristics indicates that those costs do not reasonably reflect the costs associated with the production of the merchandise, as both the CAFC and CIT have affirmed. See supra **Section III.A**. Having found that Assan's reported costs do not reasonably reflect the cost associated with the production of the subject merchandise, Commerce's departure from Assan's records and its use of averaging to make adjustments is appropriate. Appx7650-51.

Further, Commerce's determination that Assan's reported aluminum costs were driven by factors other than the physical characteristics is correct and supported by substantial evidence. Appx7650-51. There is significant variation in Assan's DIRMATLME and DIRMATMP costs that affects a substantial portion of its total POI production of the merchandise under consideration ("MUC"). Appx89027-32. The DIRMATLME and DIRMATMP cost differences are driven by: (1) the mix of specific inputs (primary aluminum, aluminum scrap, or purchased

aluminum sheet), (2) yield loss, and (3) the timing of production. Commerce's determination that these factors are not related to the physical characteristics is supported by substantial evidence.

### 1. **Raw Material Mix**

Assan used the three types of aluminum inputs to produce the MUC: primary aluminum, aluminum sheet, and aluminum scrap. Appx89134. Assan freely acknowledged that the choice or mix of inputs used to produce CAF drives variations in the reported DIRMATMP cost. Appx89133. The mix of inputs drives DIRMATMP costs because [

                            ] Assan's Br. at 34. For example, [


                            ] Id. Thus, [


  ] Id.

Commerce explained in the Final Determination that the mix of inputs is not related to the physical characteristics of the MUC, because the different types of inputs can be used interchangeably. Appx7650-51 (noting Assan's admission that "all raw material input types . . . can be used interchangeably in the production of subject merchandise").

Commerce's finding is supported by substantial evidence. In particular, as Assan itself explained, "primary aluminum, aluminum sheet/coil, and scrap can be interchangeably used in the production of subject merchandise" and "{i}t is not possible to say a CONNUM must be produced from either primary aluminum, scrap or aluminum sheet/coil." Appx89134. Assan also noted [                                    ] stating that due to its "production equipment,

**NON-CONFIDENTIAL**

Assan has a preferred routing for . . . [

] Id.

Assan emphasizes the [                                                    ] to

claim that the choice of inputs does, in fact, depend on the physical characteristics.  Assan's Br.

at 35.  Assan's reliance on this [                         ] fails for two reasons.  <u>First</u>, [

] does not diminish the fact that

inputs are generally interchangeable.  Appx89134.  Second, Assan failed to document its

example, as Commerce instructed it to do.  Appx89066 ("If raw material cost differences (i.e.,

sum of DIRMATLME and DIRMATMP) are driven by the differences in product physical

characteristics, identify such physical characteristic differences and explain why the reported

differences in costs are reasonable" and "***provide supporting documents for your explanation

(i.e., production records, bill of materials (BOM), cost accounting records, etc.)***") (emphasis

added).

Notably, Commerce requested this information after it preliminarily determined that

variations in Assan's reported DIRMATLME and DIRMATMP costs were unrelated to the

physical characteristics.  Appx6534; Appx6672.  Commerce, therefore, *invited* Assan to provide

relevant documentation to rebut Commerce's Preliminary Determination.  Because Assan failed

to provide the requested information, Commerce reasonably continued to conclude in the Final

Determination that the choice or mix of inputs that drives Assan's reported DIRMATMP cost

differences is unrelated to the physical characteristics.  Appx89133; Appx7650-51.

### 2.      Yield Loss

Assan's reported DIRMATMP costs are also driven by yield loss because the raw

material premium is set as a negative value for scrap.  Assan's Br. at 33-35; Appx89132-33.

Yield loss, however, does not depend on the physical characteristics.  Moreover, even if it did, Assan refused to provide CONNUM-specific information on yield loss, despite Commerce's explicit instructions to do so.  Appx89066; Appx89133.

First, Assan has identified no record evidence establishing that its yield loss depends on the physical characteristics.  In all  examples on the record, yield loss was driven not by the physical characteristics, but rather by production quantity.  For example, Assan explained that CONNUMs [                    ] and [                    ] have different costs due to the latter CONNUM having an "extremely low production quantity," which caused it to have a [                    ] Appx85501.  Assan explained the same circumstances are the reason for the differences in costs between CONNUMs [                    ] and [                    ] Appx85503.  In both examples, the differences in costs between the CONNUMs were driven by a difference in yield loss, which, in turn, was driven by a difference in ***production quantities***, not physical characteristics.   Production quantities are not physical characteristics and should, therefore, not drive costs.  Thai Plastic Bags Indus. Co., 746 F.3d at 1366-67 ("Commerce . . . properly determined that production quantities were not physical characteristics that would drive costs.").

Second, even if yield loss related to the physical characteristics, Commerce correctly found in the Final Determination that Assan failed to provide CONNUM-specific yield losses, despite Commerce's request for such information.  Appx7651.  While Commerce instructed Assan to separate the component of DIRMATMP that captures yield loss, Appx89066, Assan claimed it could not do so due to accounting system limitations.  Appx89135-36.  In the Final Determination, Commerce dismissed these supposed accounting system limitations, correctly finding that Assan's accounting system is not the only source of information available to it.

**NON-CONFIDENTIAL**

Appx7651.  Substantial evidence supports Commerce's finding.  Yield loss is simply the ratio of input quantity and output quantity.  [

] For example, [

] Compare Appx85827, subpart *PartIII* with Appx85503.  Therefore, [

] Commerce's finding that Assan could have provided CONNUM-specific yield losses "using information from production runs, engineering specifications, and other production records" is, therefore, supported by substantial record evidence.  Appx7651.

Yet, Assan choose to withhold the requested CONNUM-specific yield losses. Appx89135-36.  Notably, Assan does not address this reporting failure anywhere in the brief it submitted to this Court.  As Commerce explained, the requested CONNUM-specific yield losses were "necessary to properly address the issues related to the DIRMATMP cost."  Appx7651. Because Assan "with{held} information that has been requested by" Commerce (19 U.S.C. § 1677e(a)(2)(A)), "necessary information is not available on the record" (19 U.S.C. § 1677e(a)(1)), thereby warranting Commerce's decision to continue averaging DIRMATMP on the basis of facts available ("FA").  Appx7651.

### 3.    Timing

Commerce also found that DIRMATMP costs are driven by timing.  Appx7651.  Assan acknowledged that its raw material premium costs (i.e., DIRMATMP) are subject to "significant

NON-CONFIDENTIAL

fluctuations." Appx89130. Further, Assan itself argued that such fluctuations are a valid reason to average the LME component of its input metal costs (i.e., DIRMATLME). Assan's Br. at 33; see also Appx85502. The "significant fluctuations" in DIRMATMP (Appx89130) likewise warrant averaging this cost element.

Accordingly, Commerce's determination that DIRMATMP cost differences are driven by the timing of production, which is not a physical characteristic,[7] is supported by substantial record evidence. Appx7651.

### D.   Commerce's Adjustment to Assan's Costs Was Reasonable and Consistent with Legal Precedent

Having found that DIRMATMP cost differences are unrelated to the physical characteristics, Commerce adjusted Assan's reported costs by "weight averag{ing} the reported DIRMATMP costs for all CONNUMs." Appx7649; see also Appx6534. Assan alleges that this adjustment is distortive because it results in all CONNUMs having the same DIRMATMP, regardless of yield loss or raw material mix. Assan's Br. at 33-35. However, because neither yield loss nor the raw material mix are related to the physical characteristics, it is Assan's reported DIRMATMP costs that are distorted because those costs are differentiated by these non-CONNUM factors. See supra **Section III.A**. By adjusting DIRMATMP to be the same for all CONNUMs regardless of yield loss or raw material mix, Commerce removed the variations resulting from these non-physical characteristics, thereby remedying the distortion in Assan's reported costs.

---

[7]   "Commerce found that the timing of the coil purchase and pipe production influenced the cost, not the pipe's physical characteristics." Dong-A Steel Co., 337 F. Supp. 3d at 1370.

Commerce's remedy in this case – i.e., calculating an average DIRMATMP, which it applied to all CONNUMs – closely resembles methodologies that both the CAFC and CIT have affirmed in similar cases. See Thai Plastic Bags Indus. Co., 746 F.3d. at 1367 (sustaining Commerce's "reallocate{ion of} the costs by weight-averaging conversion costs evenly across all CONNUMs"); Dong-A Steel Co., 337 F. Supp. 3d at 1369-70 (sustaining Commerce's weight-averaging raw material costs (i.e., hot-rolled coil costs) by the paint physical characteristic); Marmen Inc., 545 F. Supp. 3d at 1314 (sustaining Commerce's decision to "weight-average{} the reported steel plate costs for all reported CONNUMs, except the CONNUM for the thickest plate").

### E.    The Cases On Which Assan Relies Are Inapposite

In challenging Commerce's determination, Assan cites to Brass Sheet and Strip from Germany, where Commerce accepted the respondent's reported day-specific metal costs. Assan's Br. at 38 (citing Brass Sheet and Strip From Germany: Amended Final Results of Antidumping Duty Administrative Review, 75 Fed. Reg. 66,347 (Oct. 28, 2010) (hereinafter, "Brass from Germany"), and accompanying Issues and Decision Memorandum (Oct. 28, 2010) at Comment 1 (hereinafter, "Brass Germany IDM")). Assan claims that applying the reasoning in that case to the instant case should have led Commerce to accept Assan's metal costs as originally reported (i.e., without any averaging). Id. Assan is wrong.

First, Commerce distinguished the instant case from Brass from Germany, explaining that, "{u}nlike this investigation, the respondent's reported raw material costs in {Brass from Germany} did not reflect the cost differences between CONNUMs that are unrelated to the product physical characteristics." Appx7651. Here, Assan's reported DIRMATMP costs do not reasonably reflect its cost of production, because those costs are driven by factors other than the

physical characteristics, like the raw material input mix.  Appx7651; see also supra **Section III.C.1**  Accordingly, the circumstances at issue in <u>Brass from Germany</u> are distinguishable from the circumstances at issue in the underlying investigation that led Commerce to average Assan's reported DIRMATMP costs.

<u>Second</u>, in <u>Brass from Germany</u>, Commerce addressed whether it should use quarterly or daily time periods in applying its alternative cost averaging methodology,[8] not whether the agency should average a respondent's raw material costs due to differences in the costs that are unrelated to physical characteristics.  That issue is completely irrelevant in the instant case wherein ***no*** party has argued that Commerce should use its alternative cost methodology of using shorter-than-annual time periods.  Appx7617-18.

Assan also cites <u>Wire Rod from Mexico</u>, claiming that case indicates Commerce should have strictly adhered to Assan's cost accounting system.  Assan's Br. at 37-38 (citing <u>Carbon and Certain Alloy Steel Wire Rod From Mexico: Final Results of Antidumping Duty Administrative Review; 2017-2018</u>, 85 Fed. Reg. 39,527 (July 1, 2020), and accompanying Issues and Decision Memorandum at Comment 1 (June 24, 2020) (hereinafter, "<u>Wire Rod Mexico IDM</u>")).  That case addressed a ***reconciliation*** issue, which is not relevant here.  See <u>Wire Rod Mexico IDM</u> at 7 (characterizing the issue as "whether the total reported costs, *i.e.*, the aggregate of the per-unit costs multiplied by the production quantities from the cost database,

---

[8]   Commerce's normal cost methodology is to calculate annual averaged costs (i.e., costs averaged over the entire period of review or period of investigation).  See <u>Dioctyl Terephthalate From the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances</u>, 82 Fed. Reg. 28,824 (June 26, 2017), and accompanying Issues and Decision Memorandum at 5-7 (Comment 1) (June 19, 2017).  In cases involving significantly changing raw material costs, however, Commerce departs from its normal annual averaged cost methodology to calculate costs over shorter time periods, which is usually quarterly periods.  Id.

should agree with the total wire rod costs in Deacero's normal books and records or to the total wire rod costs in the alternative source.").

### F.    Commerce Reasonably Analyzed Cost Differences Based on Material Costs and Not the Total Cost of Manufacture

Assan argues this Court should require Commerce to modify its analysis of cost differences using the total cost of manufacture (i.e., variable TOTCOM).  Assan's Br. at 35 and 39.  Assan's argument is wrong.

First, Assan does not analyze or refer to any record evidence establishing that the other components of the cost of manufacture – namely, direct labor (variable DIRLAB), variable overhead (variable VOH), and fixed overhead (variable FOH) – have significant cost differences that are unrelated to the physical characteristics.  Assan's Br. at 35, 39.  In previous cases, Commerce rejected and reallocated *specific* cost elements that it found to be unrelated to the physical characteristics.  Thai Plastic Bags Indus. Co., 746 F.3d at 1364-69 (affirming Commerce's rejection and reallocation of *conversion costs* specifically); Dong-A Steel Co., 337 F. Supp. 3d at 1369-71 (affirming Commerce's rejection and reallocation of *hot-rolled coil costs* specifically); Marmen Inc., 545 F. Supp. 3d at 1312-15 (affirming Commerce's  rejection and reallocation of *steel plate costs* specifically).  Here, Assan's reported aluminum costs (variables DIRMATLME and DIRMATMP, which together capture the input metal cost, Appx82637-38) are the components of cost that are distorted, and Commerce appropriately confined its analysis of cost differences to these components.

Second, Assan argues that considering the total cost of manufacture is necessary because of a supposed inverse  relationship between its reported raw material premium cost (i.e., DIRMATMP) and conversion costs.  Assan's Br. at 35.  Assan offers no record evidence for this

NON-CONFIDENTIAL

supposed relationship.  Id.  Contrary to Assan's claim, there are many example of CONNUM-pairs (two CONNUMs that differ only by one physical characteristic) for which [

] More generally, the correlation coefficient between DIRMATMP and conversion costs (i.e., the sum of DIRLAB, VOH, and FOH) in Assan's cost of production database is [          ] Appx89109-12 (file assancop03).  This [

] Assan's Br. at 35.

Accordingly, to determine whether Assan's reported aluminum costs are distorted, Commerce appropriately confined its analysis to the reported aluminum costs.

## IV.   COMMERCE LAWFULLY TREATED KIBAR AMERICAS' MANAGEMENT FEES AS INDIRECT SELLING EXPENSES

In the Final Determination, Commerce treated management fees incurred by Kibar Americas, Assan's U.S. affiliated reseller, as indirect selling expenses ("ISE") that were deducted from the CEP.  Assan contends that Commerce erred when including certain management fees in CEP ISE because the fees: (1) are incurred by Assan – not Kibar Americas; (2) are incurred in Turkey, (3) are not related to economic activity in the United States, and (4) are not selling expenses.  Assan's Br. at 45.  Assan is wrong.

### A.   Background on Assan's CEP ISE

Assan sells CAF in the United States through Kibar Americas, its U.S. affiliated reseller that is based in Chicago, Illinois.  Appx80035, 80042, 80046.  Based on these circumstances, Commerce calculated CEP pursuant to 19 U.S.C. § 1677a(b), and deducted "selling expenses associated with economic activities occurring in the United States," including "indirect selling

expenses," pursuant to 19 U.S.C. § 1677a(d)(1). Appx6529; see also Statement of Administrative Action, Uruguay Round Agreements Act, H.R. Doc. No. 316. Vol. 1, 103d Cong. 2d Sess. 656 (1994) at 824 (hereinafter, "SAA").

Commerce instructed Assan to report the unit cost of CEP ISE in variable INDIRSU. See Appx1137, Appx81995, 82209-19; Appx86735-45. Kibar Americas reported its CEP ISE by excluding the expenses recorded in its trial balance under account [

] Appx86735-45 ([

]). Assan asserted that the expenses in this account are "management fee charges from parent company Assan for overall group support." Appx86713.

In the Preliminary Determination, Commerce deducted Assan's reported CEP ISE from U.S. price without any revisions. Appx88408. In their case brief, Consolidated Plaintiffs argued that Assan's exclusion from CEP ISE of Kibar Americas' expenses in account [

] is inappropriate and that Commerce should revise Assan's reported CEP ISE to include those expenses. Appx91179-91200. It its Final Determination, Commerce correctly revised Assan's reported CEP ISE to include [          ] management fees in account [                                    ], excluding only the portion of the management fees that related exclusively to non-subject merchandise (i.e., the [

]). Appx7626-28; Appx91408.

**B.    Commerce Correctly Included the Management Fees in Assan's CEP ISE**

      **1.    The Management Fees Are Incurred By Kibar Americas in the United States**

Assan argues that the management fees at issue were incurred by Assan, not by Kibar Americas in the United States, by focusing on the expenses Assan incurs to provide management

services to Kibar Americas.  Assan's Br. at 40, 44-45.  Commerce, however, correctly found that the management fees at issue are expenses Kibar Americas incurred when it purchased management services from Assan.  Appx7626.  Commerce's determination is supported by substantial evidence.

First, Assan's description of the management fees demonstrates that these are not Assan's expenses, but Kibar Americas' expenses.  In particular, Assan stated "{t}he expenses in account [                                                    ] management fee charges from parent company Assan for overall group support."  Appx86713.  Thus, the management fees are *not* Assan's expenses to provide management services to Kibar Americas, but rather the fee that Assan charges (or "assesse{s}") to Kibar Americas for Assan's provision of such management services.

Second, the management fees are recorded in account [

] in ***Kibar Americas' trial balance***.  See Appx82209-19; Appx86735-45.  Assan reconciled this trial balance to ***Kibar Americas' financial statements***.  Appx89184; compare Appx89267-81 with Appx80644-45.  Obviously, Kibar Americas' trial balance and financial statements contain Kibar Americas' expenses, *not* Assan's expenses.  Accordingly, the management fees are Kibar Americas' expenses, not Assan's.

### 2.    The Management Fees Are Not Incurred In Turkey

Assan also argues that the management fees are incurred in Turkey, not the United States.  Assan's Br. at 44-45.  Assan provides no support – either judicial or administrative precedent, or accounting principles – for its baseless contention that the location of an expense should be determined based on the location of the vendor or supplier, rather than based on where the benefit associated with that expense is consumed.  Id. at 39-45.

NON-CONFIDENTIAL

Kibar Americas is based in the United States (Appx80042; Appx80046) and has [

] Appx80379.  As a result, Kibar Americas must consume the management services that it purchases from Assan in the United States.  Accordingly, Kibar Americas' expenses in account [

] are incurred in the United States, and where Assan incurred its own expenses to provide management services to Kibar Americas is not relevant to this issue.

### 3. The Management Fees Are Associated With Commercial Activity in the United States

Assan also that the management fees are not associated with commercial activities in the United States.  Assan's Br. at 40, 44-45.  Assan's claims are wrong because: (1) the record demonstrates the management fees are associated with commercial activities in the United States; (2) for argument's sake, even if the management fees were not incurred in the United States, Commerce's regulations, the preamble to those regulations, and judicial and administrative precedent clearly establish that incurring an expense outside of the United States does not disqualify the expense as a CEP deduction.

### a. Expenses Associated With Economic Activities In the United States Are CEP ISE

The statute instructs Commerce to deduct certain selling expenses from CEP, including ISE.  19 U.S.C. § 1677a(d)(1).  Such expenses may be deducted from CEP even if they are not incurred in the United States, so long as the expenses are "associated with economic activities occurring in the United States."  See SAA at 823.  Commerce's regulations also provide that Commerce will adjust CEP "for expenses *associated with commercial activities in the United States* that relate to the sale to an unaffiliated purchaser, *no matter where or when paid*."  19 C.F.R. § 351.402(b) (emphasis added).

**NON-CONFIDENTIAL**

Commerce defines commercial activities in the United States as "activity in support of the sale to the unaffiliated U.S. customer" – and *not* based on "the location in which the expenses are incurred or paid." <u>Porcelain-on-Steel Cookware From Mexico: Final Results of Antidumping Duty Administrative Review</u>, 65 Fed. Reg. 30,068 (May 10, 2000) (hereinafter, "<u>Porcelain-on-Steel Cookware From Mexico</u>"), and accompanying Issues and Decision Memorandum at Comment 3 (emphasis added) (hereinafter, "<u>Cookware Mexico IDM</u>"). The preamble to Commerce's regulations confirms that the threshold issue for determining whether expenses should be deducted from CEP under 19 U.S.C. § 1677a(d)(1) is whether those expenses relate to the sale to the unaffiliated U.S. customer, stating:

> The purpose of these changes is to distinguish between selling expenses incurred on the sale to the unaffiliated customer, which may be deducted under 772(d)(1), and those associated with the sale to the affiliated customer in the United States, which may not be deducted.

<u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. 27,296, 27,351 (June 18, 1997) (hereinafter, "<u>Final Rule</u>"). The preamble also emphasizes that expenses related to commercial activities in the United States (<u>i.e.</u>, related to the sale to the unaffiliated U.S. customer) should be deducted regardless of where, or by whom, those expenses are paid, stating:

> {T}he phrase "no matter where or when paid" is intended to indicate that if commercial activities occur in the United States and relate to the sale to an unaffiliated purchaser, expenses associated with those activities will be deducted from CEP even if, for example, the foreign parent of the affiliated U.S. importer pays those expenses.

<u>Id.</u>

The CIT has upheld Commerce's deduction of ISE from CEP even when the expenses were incurred outside the United States. <u>Mitsubishi Heavy Indus. v. United States</u>, 54 F. Supp.

2d 1183, 1185-86 (Ct. Int'l Trade 1999) (finding "that '{e}xpenses incurred outside of the United States could still be 'associated with' economic activities occurring in the United States'") (internal quotation omitted).

**b.**   **The Management Services at Issue Are Associated With Economic Activities in the United States**

Kibar Americas' business purpose is to sell aluminum products in the United States to unaffiliated U.S. customers.   Appx80036, 80042; Appx80379 [



].   Accordingly, the management fees at issue necessarily support Kibar Americas' sole purpose and function – the sale of aluminum products to unaffiliated U.S. customers.   As such, those expenses are associated with commercial activities in the United States.   Cookware Mexico IDM at Comment 3 (defining commercial activities in the United States as "activity in support of the sale to the unaffiliated U.S. customer"); Final Rule, 62 Fed. Reg. at 27,351.

**4.**   **The Management Fees Are Selling Expenses**

Assan also argues that Kibar Americas' management fee expenses are not associated with "sales. . . activities," and likens the management fee expenses to indirect expenses for the arrangement of ocean freight, which Assan claims should be treated as general and administrative expenses ("G&A").   Assan's Br. at 40-41, 44-45.   Even if this analogy is accurate, Commerce correctly found in the Final Determination that G&A of an entity that is exclusively a reseller should be considered as selling expenses, stating:

> Commerce's questionnaire, the preamble to Commerce's regulations, and administrative precedent support the concept that G&A expenses of a company that is exclusively a reseller, with no manufacturing activities, should be treated as indirect selling

39

> expenses, because the expenses can only be in support of the
> company's sole function as a reseller.

Appx7626 (citations omitted).  Commerce's finding is supported by substantial record evidence.

First, Kibar Americas is exclusively a reseller with no manufacturing activities of its

own.   Indeed, Kibar Americas' organizational chart reveals that it has no manufacturing

operations and [

] Appx80076, Appx80439

Second, the expenses that compose the management fee are either [

] Appx86732.  Accordingly, the management fees are

selling, general, or administrative expenses of Kibar Americas, an entity that is exclusively a

reseller.

Third, Commerce has explained that its "longstanding practice, when a company is

exclusively a reseller of products and conducts no manufacturing activities," is to treat "all

administrative expenses" as "selling expenses, because they can only be in support of the

company's sole function, which is the resale of products manufactured by another company."

Ripe Olives From Spain: Final Affirmative Determination of Sales at Less Than Fair Value, 83

Fed. Reg. 28,193 (June 18, 2018), and accompanying Issues and Decision Memorandum at 14

(Comment 4) (June 11, 2018) (hereinafter, "Ripe Olives Spain IDM").[9]  The CIT has affirmed

---

[9]      See also Citric Acid and Certain Citrate Salts From Canada: Final Results of Antidumping
Duty Administrative Review; 2012-2013, 79 Fed. Reg. 37,286 (July 1, 2014), and accompanying
Issues and Decision Memorandum at 6 (Comment 3) (June 24, 2014); Notice of Final
Determination of Sales at Less Than Fair Value; Certain Hot-Rolled Carbon Steel Flat Products

(cont'd on next page)

Commerce's inclusion in ISE of exactly the type of expenses at issue here.  See Aramide
Maatschappij V.o.F. v. United States, 901 F. Supp. 353, 359-360 (Ct. Int'l Trade 1995)
(hereinafter, "Aramide") (stating that "{f}or purposes of calculating indirect selling expenses,
Commerce generally will include G&A expenses incurred by the United States selling arm of a
foreign producer") (citation omitted).

### C.   The Cases Cited by Assan Do Not Support Its Position That the Management Fees Should Be Excluded From CEP ISE

Assan cites four cases that it claims supports its position that the management fees should
not be treated as CEP ISE, but none of these cases support Assan's arguments.  Assan's Br. at
41-43.

First, Assan refers to Porcelain on Steel Cookware from Mexico, wherein, Assan claims,
"the Department specifically excluded indirect selling expenses incurred in Mexico in support of
U.S. operations as it did not relate to economic activity in the United States."  Assan's Br. at 41.
Assan mischaracterizes the case by implying that Commerce found that certain ISE did not relate
to economic activity in the United States – and so cannot be deducted from CEP – purely
because that ISE was incurred in Mexico.  Assan's Br. at 41.  Contrary to this characterization,
while Commerce found that ISE incurred in Mexico by the Mexican producer to support the
Mexican producer's sale to its **affiliated U.S. reseller** do not relate to economic activity in the
United States and so cannot be deducted, it also found that ISE incurred to support the sale to the
**unaffiliated U.S. customer** do relate to economic activity in the United States, even when

---

From Thailand, 66 Fed. Reg. 49,622 (Sept. 28, 2001), and accompanying Issues and Decision
Memorandum at Comment 10; Certain Hot-Rolled Steel Flat Products From the Republic of
Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017, 84 Fed. Reg.
32,720 (July 9, 2019), and accompanying Issues and Decision Memorandum, at 42 (Comment 8)
(June 21, 2019).

incurred in Mexico, and so should be deducted from CEP.  Cookware Mexico IDM at Comment 3.  Similarly, as the management fee expenses support Kibar Americas' operations (Assan's Br. at 44), they support sales to unaffiliated U.S. customers and, therefore, are associated with economic activities in the United States, and should be deducted from CEP regardless of where incurred.  See also supra **Section I.B.3**.

Second, Assan refers to Certain Hot-Rolled Steel Flat Products from the Republic of Korea, where Commerce found that "line items in POSAM's financial statement that can be specifically tied to non-sales related activities can be excluded from the company's indirect selling expenses."  Assan's Br. at 41-42.  In that case, Commerce did not elaborate on the nature of the expenses that it determined to be non-sales-related.  See HR Korea IDM at 42-43 (Comment 8).  Based on respondent POSCO's  arguments in that case, however, the expenses were related to *investment* activities.  See id. at 42 (POSCO refers to administrative precedent where Commerce "excluded professional fees and bank charges incurred in the respondent's role as an ***investor***") (emphasis added).  By well-established practice, Commerce considers investment activities to be "a separate profit making activity" that is distinct from sales-related activities.  See, e.g., Dioctyl Terephthalate From the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 82 Fed. Reg. 28,824 (June 26, 2017), and accompanying Issues and Decision Memorandum at 29 (Comment 10) (June 19, 2017).

Indeed, the CIT explained this very reasoning in United States Steel Corp v. United States, the third case to which Assan refers.  Assan's Br. at 42 (citing United States Steel Corp v. United States, 712 F. Supp. 2d 1330 (Ct. Int'l Trade 2010) (hereinafter, "USSC")).  The CIT explained the crucial factor in that case as follows:

> {T}he critical, distinguishing fact here is that **POSAM is not only**
> **a sales organization**. Unlike the typical U.S. selling affiliates in
> other, similar cases, POSAM comprises two entirely separate and
> distinct business units, which perform two entirely separate and
> distinct business functions. . . POSAM's first business function is
> its sales function, which involves the sales of subject and non-
> subject steel products. . . POSAM's second, entirely distinct and
> discrete business function — the so-called "investment
> management" function — is devoted exclusively to the
> management of two POSAM subsidiaries.

USSC, 712 F. Supp. 2d at 1344-1345 (emphasis added) (citations omitted). Thus, as with

Certain Hot-Rolled Steel Flat Products from the Republic of Korea, in USSC, POSAM's

expenses could relate to either its sales-of-merchandise business, or its separate and distinct non-

selling investment management business. In contrast, however, the facts before the Court in this

action establish definitively that Kibar Americas is only a sales organization. See supra **Section**

**IV.B.4**. Accordingly, all Kibar Americas' expenses can only relate to its sole profit-generating

activity: the sale of CAF to unaffiliated U.S. customers.

Assan's also cites to Paul Müller Industrie GmbH & Co. v. United States, where the

Court affirmed Commerce's inclusion in CEP ISE of gains that were related to economic

activities in the United States. Assan's Br. at 42-43 (citing Paul Müller Industrie GmbH & Co.

v. United States, 435 F. Supp. 2d 1241 (Ct. Int'l Trade 2006)). Here, Kibar Americas'

management fees expense is associated with economic activities in the United States, see supra

**Section I.B.3.**, likewise warranting its inclusion in CEP ISE.

> **D.**     **The Management Fees Are Not Double Counted**

>      **1.**     **Commerce Correctly Found That Assan Did Not Establish That Its**
>           **Expenses to Provide Management Services Are Captured in G&A**

In its Final Determination, Commerce found that:

> Despite the Assan Single Entity's claim, it did not demonstrate that Assan's costs for providing these services to Kibar Americas are included as part of either U.S. ISEs incurred in Turkey, DINDIRSU, or in G&A expenses, GNA.

Appx7626. Assan disputes this finding, claiming the management fees item "was indeed included in Assan's G&A expenses because the actual costs were incurred in Turkey." Assan's Br. at 41. Contrary to Assan's claim, Commerce's finding is supported by substantial evidence.

Assan calculated the G&A component of its COP, as well as its Turkish ISE (i.e., variable DINDIRSU), using its trial balance. Appx82807-14; Appx81781-850. Because Assan, contrary to Commerce's explicit instructions (Appx84163), refused to identify the accounts that capture expenses associated with its management fees revenue (Appx85917), Assan failed to establish whether those expenses are captured in the G&A calculation or the Turkish ISE calculation, as Commerce explained in the Final Determination. Appx7626.

In support of its claim that these expenses are included in its G&A in the COP, Assan cites to the "Sixth Supp. QR Part II at 1-2." Assan's Br. at 41. This record citation does not identify exactly where the expenses are captured in the G&A calculation or the Turkish ISE calculation. Appx86713-14. Accordingly, Commerce's determination that Assan "did not demonstrate that Assan's costs for providing these services to Kibar Americas are included as part of either U.S. ISEs incurred in Turkey, DINDIRSU, or in G&A expenses, GNA" is supported by substantial evidence. Appx7626.

### 2. Commerce Reasonably Offset Assan's G&A With Its Management Fee Revenue

In the Final Determination, Commerce determined that the management fees " are related to expenses such as managers salaries that are already captured in Assan's reported G&A."

Appx7626.  Assan contends that this finding conflicts with one of Commerce's earlier findings.

Assan's Br. at 43.  Assan's claim is wrong.

As discussed in **Section I.D.1**, Commerce correctly found that Assan did not demonstrate

that its "costs for providing these services to Kibar Americas are included as part of either *U.S.*

*ISEs incurred in Turkey, DINDIRSU*, or in G&A expenses, GNA."  Appx7626 (emphasis

added).

Commerce next reasonably inferred "{b}ased on {its} understanding of the record," that

Assan's expenses to provide management services to Kibar Americas are captured in Assan's

G&A.  Appx7626.  As Commerce noted, Assan's expenses for providing management services

to Kibar Americas likely comprise Assan's managers' salaries.  Id. [



]  Thus, Commerce's conclusion that Assan's expenses for providing

management services to Kibar Americas are captured in the former's reported G&A in the COP

is reasonable.

Even presuming that Assan's expenses to provide management services to Kibar

Americas are in Assan's G&A, there is no double counting because any such expenses are

cancelled out by the management fee revenue that Assan received from Kibar Americas.  In

particular, Commerce explained that "the management fees are also recognized as income by

Assan," which Commerce "appl{ied} {as} an income offset to reported G&A expenses to avoid

double-counting."  Appx7627.  As explained below, this finding is supported by substantial

evidence.

In its original G&A calculation, Assan [

] but in a supplemental questionnaire response, Assan excluded this revenue item from its reported G&A expenses.    <u>Compare</u> Appx82807-08 ([

]) <u>with</u> Appx85920

([

]).

Assan explained that it excluded this "intercompany revenue from the G&A expense as the corresponding expenses were also excluded," (Appx85537) and then elaborated that while it "had initially offset" its G&A "expenses by the amount of these management fees" it revised its calculation "to remove the offset."  Appx86714, n.2.

In its <u>Final Determination</u>, Commerce reversed Assan's exclusion of its management fee revenues from Kibar Americas by reincorporating it into Assan's G&A.    Appx92078 (incorporating "Other income - Management fee from Kibar Americas" in Assan's G&A).  As a result, even presuming that Assan's expenses related to its provision of management services to Kibar Americas are in its G&A, such expenses are offset (<u>i.e.</u>, removed) by the inclusion of Assan's receipt of management fee revenue from Kibar Americas.   Accordingly, contrary to Assan's claim, there is no "double count{ing}."  Assan's Br. at 44.

Importantly,  [

]

Appx82807-08; Appx85917.   Thus, [

]  By including the management fee revenue offset (<u>i.e.</u>, [

]) in Assan's G&A, as

46

Commerce did in the Final Determination, Commerce merely ensured that Assan's reported G&A mirrors its normal records.  19 U.S.C. § 1677b(f)(1)(A); Appx82807-08.

### E.      Contrary to Assan's Claims, Commerce Includes Expenses Incurred By A Parent On Behalf Of the U.S. Selling Entity in CEP ISE

Assan argues that the management fees at issue are not Kibar Americas' expense, but Kibar Americas' parent's (i.e., Assan's) expense.  Assan's Br. at 45.  Assan further argues that "it was never Commerce's intention that parent company management fee charges should be included in INDIRSU." Id.  Assan's argument should be rejected.

First, as explained in **Section I.B.1.**, the management fees at issue are Kibar Americas' expense, not Assan's expense, making Assan's argument moot.

Second, even if the management fees were Assan's expense, contrary to Assan's argument, Commerce has a well-established practice of including in CEP ISE those expenses that a parent incurred on behalf of its affiliated U.S. reseller.  In particular, the Glossary of Terms in Commerce's antidumping questionnaire states that in calculating CEP, "Commerce will also deduct any selling expenses incurred to support the U.S. resale that are paid by the producer or exporter on behalf of its affiliated U.S. reseller." Appx1181.

Similarly, the preamble to Commerce's regulations explains:

> {T}he phrase "no matter where or when paid" is intended to indicate that if commercial activities occur in the United States and relate to the sale to an unaffiliated purchaser, expenses associated with those activities will be deducted from CEP **even if, for example, the foreign parent of the affiliated U.S. importer pays those expenses.**

Final Rule, 62 Fed. Reg. at 27,351 (emphasis added).  Commerce applied this principle in Structural Steel Beams from Germany, where it included in CEP ISE those expenses incurred on behalf of the U.S. affiliated reseller by one of its affiliates.  Notice of Final Determination of

Sales at Less Than Fair Value: Structural Steel Beams From Germany, 67 Fed. Reg. 35,497 (May 20, 2002), and accompanying Issues and Decisions Memorandum at Comment 9. Similarly, in Aramide, the CIT sustained Commerce's inclusion in ISE of those expenses that were incurred on behalf of the affiliated U.S. reseller by the affiliated U.S. reseller's parent. Aramide, 901 F. Supp. at 360.

Here, if Assan insists on mischaracterizing the management fees as Assan's expense, then that expense was indisputably incurred by Assan on Kibar Americas' behalf.  [

]  Appx86732 ([                                                    ]).  By Assan's own account, the management fees capture the expenses for the portion of their time that Assan's management dedicates to managing Kibar Americas.  Assan's Br. at 44.  As a result, the management fees belong in CEP ISE, because they would comprise expenses that were incurred by Assan on Kibar Americas' behalf.

## V.      CONCLUSION

For the reasons set forth above, Consolidated Plaintiffs respectfully urge this Court to reject Assan's arguments and to affirm Commerce's Final Determination, as modified by the issues addressed in the memorandum of law in support of the Consolidate Plaintiff's USCIT R. 56.2 Motion for Judgment on the Agency Record.

NON-CONFIDENTIAL

Respectfully submitted,


/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Consolidated Plaintiffs


Dated:  August 5, 2022

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's July 26, 2022 Order (ECF No. 35), setting the word limitation to the response brief of the Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas Inc., JW Aluminum Company, and Novelis Corporation (collectively, "Consolidated Plaintiffs") to 14,000 words, counsel for Consolidated Plaintiffs certifies that this Response Brief contains 13,971 words, including footnotes.  The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Consolidated Plaintiffs

Dated:  August 5, 2022