NON-CONFIDENTIAL

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S.,  <br><br>                 **Plaintiff,** <br><br>     v. <br><br> UNITED STATES, <br><br>                 **Defendant,** <br><br>    and <br><br> ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, ET AL., <br><br>               **Defendant-Intervenors.** | Consol. Court No. 21-00616 |

**CONSOLIDATED PLAINTIFFS' REPLY TO DEFENDANT'S AND PLAINTIFF'S RESPONSE TO CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD**

JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to the Aluminum Association Trade
Enforcement Working Group and Its Individual
Members

Dated:  September 2, 2022

NON-CONFIDENTIAL

## Table of Contents

Page

I.   ASSAN DOES NOT HEDGE RISK ON RAW MATERIAL PURCHASES ..............................................................................1

A.   Defendant's Repetition of Its Unsupported Claim That "Aluminum Price Fluctuations" Refers to Raw Materials Evinces A Lack of Understanding of the Term "Aluminum" and Requires Remand ..........................1

B.   Evidence Cited by Defendant Does Not Support Its Claim That Assan's Hedging Relates to Its Raw Material Purchases .......................4

C.   By Linking Its Hedging Operations to Mark-to-Market Losses on Raw Material Inventory, Assan Undermines Commerce's Final Determination ..............................................................................10

D.   Assan's Reliance on Other Cases Fails ..............................................14

II.   IF ASSAN'S HEDGING GAINS ARE NOT EXCLUDED ENTIRELY, COMMERCE SHOULD INSTEAD INCORPORATE THEM IN ASSAN'S INTEREST EXPENSES, INSTEAD OF ASSAN'S COST OF MANUFACTURE ..............................................................................16

III.   CONCLUSION ..............................................................................19

NON-CONFIDENTIAL

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Hynix Semiconductor, Inc. v. United States,
    248 F. Supp. 2d 1297 (Ct. Int'l Trade 2003), aff'd in part,
    424 F.3d 1353 (Fed. Cir. 2005)..................................................................................13

Nucor Corp. v. United States.,
    612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ..........................................................13

## Administrative Determinations

Certain Aluminum Foil From the Republic of Turkey:
    Final Affirmative Determination of Sales at Less Than Fair Value,
    86 Fed. Reg. 52,880 (Dep't Commerce Sept. 23, 2021)
    ("Final Determination") ................................................................................... *passim*

Certain Oil Country Tubular Goods From the Republic of Korea:
    Final Results of Antidumping Duty Administrative Review; 2016-2017,
    84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019), and accompanying
    Issues and Decision Memorandum (May 17, 2019), remanded,
    Seah Steel Corp. v. United States, 513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021) .............14, 15

Certain Orange Juice From Brazil:
    Final Results of Antidumping Duty Administrative Review and Final No
    Shipment Determination, 77 Fed. Reg. 63,291
    (Dep't Commerce Oct. 16, 2012), and accompanying
    Issues and Decision Memorandum (Oct. 9, 2012)..................................................18

Certain Steel Concrete Reinforcing Bars From Turkey;
    Final Results and Rescission of Antidumping Duty Administrative Review in
    Part, 71 Fed. Reg. 65,082 (Dep't Commerce Nov. 7, 2006), and
    accompanying Issues and Decision Memorandum (Nov. 1, 2006) .........................................13

NON-CONFIDENTIAL

Common Alloy Aluminum Sheet From Turkey:
      Preliminary Affirmative Determination of Sales at Less Than Fair Value,
      Preliminary Negative Determination of Critical Circumstances, Postponement
      of Final Determination, and Extension of Provisional Measures,
      85 Fed. Reg. 65,346 (Dep't Commerce Oct. 15, 2020), and accompanying
      Decision Memorandum for the Preliminary Affirmative Determination in the
      Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from
      Turkey (Oct. 6, 2020), unchanged in 86 Fed. Reg. 13,326 (Mar. 8, 2021)
      (final determ.). .................................................................................................15, 16

Large Power Transformers From the Republic of Korea:
      Final Results of Antidumping Duty Administrative Review; 2016-2017,
      84 Fed. Reg. 16,461 (Dep't Commerce Apr. 19, 2019), aff'd,
      Hyundai Elec. & Energy Sys. Co. v. United States, 466 F. Supp. 3d 1303
      (Ct. Int'l Trade 2020), aff'd without op., 2021 U.S. App. LEXIS 29810
      (Fed. Cir., Oct. 4, 2021) ..................................................................................... 15-16

Phosphor Copper From the Republic of Korea:
      Final Affirmative Determination of Sales at Less Than Fair Value and
      Negative Final Determination of Critical Circumstances,
      82 Fed. Reg. 12,433 (Dep't Commerce Mar. 3, 2017), and accompanying
      Issues and Decision Memorandum (Feb. 27, 2017) .......................................... 17-18

Seamless Refined Copper Pipe and Tube From Mexico:
      Preliminary Results of Antidumping Duty Administrative Review and
      Preliminary  Determination of No Shipments; 2014-2015,
      81 Fed. Reg. 89,434 (Dep't Commerce Dec. 12, 2016), and accompanying
      Decision Decision Memorandum for Preliminary Results of Antidumping
      Duty Administrative Review; 2014-2015 Memorandum (Dec. 5, 2016),
      unchanged in 82 Fed. Reg. 11,178 (Feb. 21, 2017) (final results)..........................................15

Stainless Steel Sheet and Strip in Coils from Mexico;
      Final Results of Antidumping Duty Administrative Review,
      73 Fed. Reg. 7,710 (Dep't Commerce Feb. 11, 2008), and accompanying
      Issues and Decision Memorandum (Feb. 4, 2008) .......................................... 13-14

NON-CONFIDENTIAL

## CONSOLIDATED PLAINTIFFS' REPLY BRIEF

This brief, filed on behalf of the Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas Inc., JW Aluminum Company, and Novelis Corporation (collectively, "Consolidated Plaintiffs"), replies to Defendant's Response to Plaintiff's and Consolidated Plaintiffs' Rule 56.2 Motions for Judgement on the Agency Record (ECF No. 39) (hereinafter, "Def.'s Resp."), submitted by Defendant, the United States, as well as the Response Brief of Assan Aluminyum Sanayi Ve Ticaret A.S. to Petitioners' Rule 56.2 Motion for Judgement on the Agency Record (ECF No. 36) (hereinafter, "Assan's Resp.") submitted on behalf of Assan Aluminyum Sanayi ve Ticaret A.S. (hereinafter, "Assan").

For the reasons set forth in the Memorandum of Law In Support of Consolidated Plaintiffs' Rule 56.2 Motion for Judgement on the Agency Record, submitted on May 23, 2022 (ECF Nos. 31-32) (hereinafter, "Consol. Pls.' Br.") and this reply, the Court should grant Consolidated Plaintiffs' Rule 56.2 motion for judgement on the agency record and remand the agency's decision for reconsideration consistent with Consolidated Plaintiffs' request for relief.

## I.    ASSAN DOES NOT HEDGE RISK ON RAW MATERIAL PURCHASES

### A.    Defendant's Repetition of Its Unsupported Claim That "Aluminum Price Fluctuations" Refers to Raw Materials Evinces A Lack of Understanding of the Term "Aluminum" and Requires Remand

As Consolidated Plaintiffs explained in their opening brief, the Department's claim that

> Assan's audited financial statement accompanying footnotes state that the company enters into commodity contracts to mitigate its risk on aluminum price fluctuations (i.e., raw material inputs, not finished goods)

is not supported by substantial evidence.  Consol. Pls.' Br. at 12-13.  In particular, because the London Metal Exchange (hereinafter, "LME") value of aluminum is used in *both* Assan's raw

material purchase contracts ([                                        ]) and its

finished goods selling contracts, there is no basis to conclude that the term "aluminum" in

Assan's financial statements is a reference to "raw material inputs" – and not to "finished

goods." Id.  Moreover, the timing of Assan's hedges demonstrates that Assan does not hedge

risk associated with raw material purchases, which is already fixed at the time the hedging

contracts are purchased, but rather the LME value of aluminum in Assan's sales of finished

goods, which has not been determined at the time the hedges are purchased. Id. at 14-16.

In its response, Defendant does not address Consolidated Plaintiffs' arguments, but

merely reiterates its conclusion that the statement in Assan's financial statements involves "raw

material inputs, not finished goods." Def.'s Resp. at 36.  Defendant's simple repetition of the

decision memorandum evinces a clear misunderstanding regarding the meaning of "aluminum"

in Assan's financial statements (i.e., the LME value of aluminum versus physical metal), and the

Court should, therefore, remand the agency's determination as unsupported by substantial

evidence.

Assan contends that Consolidated Plaintiffs' argument is wrong because it "improperly

conflates Assan's purchases and sales, ignoring that the LME hedge in Assan's purchases of raw

materials are set independently and during a separate period of time than the LME hedge in

Assan's sales price for finished products." Assan's Resp. at 7.  Assan's argument misses the

point.  Regardless of when fluctuations in aluminum prices affect sales prices, or whether this

happens separately or together with purchases of raw materials, aluminum price fluctuations ***do***

affect Assan's sales prices for finished goods, which is a well-established fact that neither

Defendant nor Assan can deny.  See Appx80055, 80057; Appx82993-94; Appx85510.  Because

Assan's sales of finished goods are exposed to the risk of aluminum price fluctuations (i.e.,

fluctuations in the LME price of aluminum), the reference to such risk in Assan's financial statements cannot reasonably be attributed *only* to Assan's purchase of raw materials.  Indeed, as noted above, and discussed in detail in Consolidated Plaintiffs' response brief, the timing of Assan's hedges demonstrates that the only risk being hedged is the LME aluminum component of Assan's sales price (and not the risk associated with purchases of raw materials).  See Consol. Pls.' Br. at 20-22.

Assan also attempts to confuse the issue by claiming that a "lower LME does not necessarily create a lower sales revenue" because "the LME component of its sales price is fixed during invoicing, and may be based on the monthly average, quarterly average, or spot cash LME based on the preference of the customer."  Assan's Resp. at 9.  Assan suggests that a lower LME aluminum price would not necessarily translate into a lower invoice price because the LME portion of the invoice price could be fixed using an average value in some cases.  See id. (Assan fixes the LME portion of the invoice price at either "the monthly average, quarterly average, or spot cash LME based on the preference of the customer").

Contrary to this claim, however, Assan has explained and demonstrated with documentation that the LME aluminum price portion of its finished good selling price is fixed upon the issuance of its sales invoice – regardless of what LME value is incorporated in the contractual price formula (i.e., monthly average, quarterly average, etc.).  See Appx82993-94; see also Appx83299-301, 83303-14.  As a result, any fluctuations in the LME price prior to Assan's issuance of its sales invoice would be reflected in that invoice's price.  Obviously, averaging lower prices results in a lower average.  If LME aluminum prices have been declining prior to the issuance of the invoice – at which point the LME portion of the invoice price is fixed – then any resulting average of such prices (whether quarterly or monthly) would be lower than

NON-CONFIDENTIAL

if LME aluminum prices had not declined.  As such, declining LME aluminum prices would *always* result in a lower invoice price and, therefore, less sales revenue.

Indeed, as Assan itself acknowledges:

> Assan's sales of aluminum foil are structured such that the London Metal Exchange ('LME') value of aluminum is a component in the price as a pass-through in the *sale of the final product*.

Assan's Resp. at 4 (emphasis in original).  The only risk Assan hedges is that the sales prices of the finished goods will reflect a lower aluminum value than the aluminum value of the raw materials purchased to produce the finished goods.

In sum, there is no reasonable basis for Defendant's and Assan's interpretation of Assan's financial statements.

### B. Evidence Cited by Defendant Does Not Support Its Claim That Assan's Hedging Relates to Its Raw Material Purchases

As explained in Consolidated Plaintiffs' opening brief, the examples on the record of Assan's raw material purchases and hedges do not indicate that the latter are directly associated with the former.  See Consol. Pls.' Br. at 14-16.  In its response, Defendant refers to Exhibit S10D-7 of Assan's "Section D Fifth Supplemental Questionnaire Response Part II (May 17, 2021) at Exhibit S10-D7" (i.e., Appx89140-89162) to claim that Assan's "net hedging gains were directly associated with the purchases of its aluminum material inputs." Def.'s Resp. at 36. Consolidated Plaintiffs addressed this very exhibit in their opening brief and explained why it does not demonstrate what Defendant claims it does.  See Consol. Pls.' Br. at 14-15.  In its response brief, Defendant does not address any of the arguments in Consolidated Plaintiffs' opening brief.  See Def.'s Resp. at 35-36.  Further, both Defendant and Assan fail to address Assan's explicit admission that the purpose of its hedges is to offset losses incurred once the

purchased aluminum raw material is "consumed" in Assan's production operations and *sold* as a finished product.  Consol. Pls.' Br. at 21 (citing Appx85523-24).

Assan claims that it "exhaustively" linked its hedging activities to specific raw material purchases, referring to the "Ninth Supp. QR Part II at 1-6 and accompanying exhibits (Appx87808-87813, 87820-88263)" and the Tenth Supp. QR Part II "at 1-9 and accompanying exhibits (Appx89122-89130, 89138-89171)" as support.  Assan's Resp. at 7.  As an initial matter, Assan's record citations are overly broad, spanning many exhibits and hundreds of pages.  See id.  Consolidated Plaintiffs presume that Assan means to refer to Exhibit S9D-9 of the "Ninth Supp. QR Part II" and Exhibit S10D-7 of the "Tenth Supp. QR Part II," because those are the exhibits within Assan's over-broad record citations that actually provide documentation for examples of Assan's raw material purchases and hedging operations.  See Appx87829-30 (Exh. S9D-9); Appx89140-62 (Exh. S10D-7).  These exhibits, however, do not support Assan's contention that its "hedges {are linked} to specific raw material purchases."  Assan's Resp. at 7.

Regardless of any connection between Assan's raw material purchases and subsequent purchases of hedging contracts, Assan purchases the hedging contracts *after* the LME value of its raw materials has been fixed.  As a result, there is no risk of those LME values changing – and the hedging contracts can only be hedging the future change in LME value of aluminum that will be incorporated in Assan's finished goods selling price.

Moreover, Assan's business records do not indicate any connection between Assan's raw material purchases and its purchases of hedging contracts. In Exhibit S10D-7 (on which Defendant also relies (see Def.'s Resp. at 35-36)), Assan shows [

     ]  See  Appx89144.  Thereafter,  Assan  provides  [

NON-CONFIDENTIAL

] hedge transactions it initiated [

] after this raw material purchase (id.), [

] See Appx89153-60.  None of Assan's actual records (as opposed to documents prepared for submission to the Commerce Department during the course of the underlying antidumping investigation) shows any links between the hedges (see Appx89145-60) and the raw material purchase.  See Appx89142-44.  For example, Assan has not provided a hedging contract that mentions a raw material purchase invoice or order number.  Rather, Assan has grouped [         ] hedges of [

] and claimed this is somehow evidence of a linkage.

Similarly, Exhibit S9D-9 contains two examples of raw material purchases and hedges –

[                        ] See Appx87829-30, subpart *Tab1*.  In both instances, [

] provide information on Assan's raw material purchase and [

].  See id.  Neither Assan nor the Department, however, has identified any information explicitly linking the hedging activities in [

] to the raw material purchases in [                        ] See id.  Again, the supposed evidence of linkage amounts to nothing more than Assan's grouping a raw material purchase and the initiation of hedges together in an exhibit prepared by Assan for submission to the Department in the course of the underlying investigation and declaring them to be related.

At most, the documentation on the record shows that, at some point after completing a raw material purchase, Assan initiates short hedges.  Further, as Consolidated Plaintiffs explained in their opening brief with respect to these same examples and exhibits, those short hedges do not hedge any risk associated with raw materials because they occur *after* the raw

material purchases (i.e., at a time when the price of the aluminum at issue in the raw material purchase has been fixed). See Consol. Pls.' Br. at 14-16. At the time of Assan's initiation of the short hedges, the raw material purchase cost has already been conclusively established, with no remaining uncertainty and, therefore, there is no need for hedging by Assan to manage the non-existent uncertainty. Id.

Indeed, Assan sets the maturity of its hedges to the "estimated conclusion of finished goods production." Appx89124. The hedges, therefore, protect Assan from adverse LME fluctuations before the finished product has been manufactured and is ready to be sold. As such, the purpose of the hedges is to manage the risk of an uncertain, future LME value at the time the finished product has been manufactured and is ready for sale – where that uncertain, future LME value will be incorporated into the finish product's selling price. See Appx80055, 80057. This conclusion comports with Assan's statement that the purpose of its hedges is to offset the "loss {incurred} when th{e purchased raw} material was consumed and sold." Appx85523-24. The "loss" here is Assan's earning lower sales revenue on the sale, because the LME component of its selling price is lower. See Consol. Pls.' Br. at 20-22.

Assan takes issue with Consolidated Plaintiffs' argument that "there is no uncertainty or risk left for Assan to manage or 'hedge' with respect to its purchases of primary aluminum" after those purchases occur – and claims that this argument is premised on the "erroneous" assumption that lower LME prices results in lower sales revenue. Assan's Resp. at 9. Consolidated Plaintiffs' argument, however, is not premised on such an assumption. Rather, Consolidated Plaintiffs' argument is premised on record information, which shows that, at the time of Assan's initiation of short hedges, its purchase cost was already conclusively established. In one example, Assan initiates short hedges [                                                      ],

NON-CONFIDENTIAL

subsequent to its purchase cost having been finally and firmly established on [

] *See* Consol. Pls.' Br. at 14-15.  In a second example, Assan initiated short hedges on

[                    ], after its purchase cost was already finally and firmly established on [

] *See* id. at 15-16.  Once the purchase cost has been established, there is no remaining

uncertainty (i.e., risk) related to the raw material purchase.  The effect of LME prices on Assan's

sales revenue is completely irrelevant to this argument.  Further, even if it was relevant, Assan is

wrong, as lower LME prices do necessarily cause lower sales revenues.  See supra **Section I.A**.

Relatedly, Assan disagrees with Consolidated Plaintiffs that the purpose of a hedge must

be to manage the risk of a future transaction or event.  See Assan's Resp. at 11.  Assan

disparages one of Consolidated Plaintiffs' sources – the Center for Farm Financial Management

at the University of Minnesota – which Assan claims is inapplicable to its own situation because

the source presents hedging in an agricultural context.  See id. at 11-12.  Assan's argument fails.

Consolidated Plaintiffs' main source for claiming that hedges pertain to future

transactions was [

] Consol. Pls.' Br. at 17-18 (citing

Appx80452).  Notably, Assan does not address this fact anywhere in the response brief it

submitted to this Court.  See generally Assan's Resp.

Consolidated Plaintiffs pointed out that this purpose of hedges (i.e., managing the risk of

*future* (or [                    ]) transactions or events) is consistent with factual information on the

record from other sources – including the source that Assan disparages (i.e., the Center for Farm

Financial Management at the University of Minnesota).  See Consol. Pls.' Br. at 18.  Assan's

criticisms of these other sources also fail.

First, while Assan initially contends that the University of Minnesota source is inapplicable to Assan's own situation because the source presents hedging in an agricultural context, Assan then continues to state that its own hedging activities are "precisely what the University of Minnesota describes." Assan's Resp. at 12. Apparently, the University of Minnesota's description of hedging is, simultaneously, completely inapplicable and precisely applicable to Assan's own situation. Id.

Second, these other sources, including the University of Minnesota source, explain the general principles of hedging, which do not depend on the specific commodity that is being hedged. See Appx88314, 88339, 88343-44, 88351, 88355-56.

Third, Assan attempts to distinguish its own experience from hedging in an agricultural context by claiming that "Assan does not know what end products it will manufacture, when it will manufacture them, or how much it will manufacture at the time it purchases raw materials." Assan's Resp. at 12. None of these claims withstands scrutiny. Assan produces *only* downstream aluminum products – both subject CAF and non-subject aluminum sheet (see Appx80066) – and the sale of all such products will include an LME portion in the selling price. See Appx85510. Thus, regardless of the specific types of downstream aluminum products Assan manufactures from its purchased raw material, the selling prices of those products will inevitably include an LME component – and Assan can hedge that LME component. Further, Assan's claim that it does not know *when* it will manufacture end products at the time of its raw material purchase (see Assan's Resp. at 12) directly contradicts its assertion to the Department that it sets the maturity of its hedging transactions based on the "estimated conclusion of finished goods production." Appx89124. Assan also stated that purchased raw materials are in inventory for "up to [        ], before it is used to produce foil in finished inventory" (Appx89122) and that

production then takes "20 to 45 days." Appx89123.  Contrary to its claims, therefore, Assan has estimates of or target dates for finished good production at the time of its purchase of raw material.  Moreover, Assan's claim that it does not know *how much* it will manufacture at the time of its raw material purchase is likewise inaccurate.  The quantity of end products Assan will manufacture is simply the quantity of its raw material purchases less its estimated yield loss.  <u>See</u> Appx82614 (stating that "{d}uring the POI, the average yield loss for foil was [        ] for Assan").

### C. <u>By Linking Its Hedging Operations to Mark-to-Market Losses on Raw Material Inventory, Assan Undermines Commerce's *Final Determination*</u>

Once Assan has purchased raw material, it can incur losses due to the IFRS-required marking-to-market of the LME portion of its inventory, as Assan explained in response to a supplemental questionnaire, in which it stated:

> Under IFRS rules, Assan must revise inventory values at the end of each month based on current LME value.  Because aluminum costs are subject to significant change, Assan hedges the aluminum when purchased to ensure predictable costing for its financials.
>
> *   *   *
>
> {T}hese items concern adjustments posted in relation to an IFRS requirement to calculate the current value of the LME portion of the *physical* inventory as well as value of the LME hedge positions at the time of the preparation of the financial statements.  Assan calculates the current market value of the LME portion by mark to market method and if the current market value is higher, posts a gain.  If the current value is lower, the company posts a loss.

Appx89122, 89130 (emphasis in original) (citations omitted).  That is, when LME prices decline, Assan will incur mark-to-market losses because the LME price embedded in its inventory value is higher than the current LME price.  <u>See</u> Assan's Resp. at 9-10 (citing Appx89165).  Assan

NON-CONFIDENTIAL

maintains that the purpose of its hedges is to protect itself against these mark-to-market losses on raw material inventory, stating:

> Assan engages in short hedges for the purpose of protecting the value of its raw material inventory *after* the raw material is purchased, but *before* the end product is manufactured.

Assan's Resp. at 12 (emphasis in original); see also id. at 9-11.

By claiming that the purpose of Assan's hedging is to manage the risk of mark-to-market losses in raw material inventory, Assan directly undermines Commerce's Final Determination.[1] In particular, in their administrative case brief, Consolidated Plaintiffs raised the possibility that the purpose of Assan's hedges could be to offset mark-to-market losses on its raw material inventory.    See Appx91204-05; Appx007652-53.    In the Final Determination, Commerce determined that "petitioners' argument with regard to marking to market is misplaced," finding that:

> the marking to market refers to the valuation of assets (i.e., inventory) on the balance sheet that are on hand at a point specific point in time (i.e., the end of the POI), whereas the gains and losses on closed hedging contracts are related to inventory that was consumed during the POI, not assets remaining on the balance sheet.

Appx007658-59.  Thus, in arguing that its hedges pertain to mark-to-market losses on its raw material inventory (see Assan's Resp. at 9-11), Assan directly contradicts Commerce's finding in the Final Determination.  Assan's apparent admission that the purpose (or at least *a* purpose) of its hedging contracts is to hedge the risk of inventory re-evaluations undermines the Department's analysis and requires remand so the Department can account for these facts.

---

[1]    See Certain Aluminum Foil From the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 52,880 (Dep't Commerce Sept. 23, 2021) (hereinafter, "Final Determination") (Appx7669-7671).

NON-CONFIDENTIAL

Finally, Assan's insistence in its response brief filed with this Court that the purpose of its hedging gains is to offset mark-to-market losses on raw material inventory (see Assan's Resp. at 9-11) raises significant issues and discrepancies that should be further addressed by Commerce.

First, while Assan's hedges generated a [        ] net gain for Assan during the period of investigation ("POI") (see Consol. Pls.' Br. at 5 (citing Appx82709-10, 85909-10)),[2] Assan's marking-to-market of inventory [                    ][3]  Specifically, Assan records mark-to-market gains and losses on inventory in account [        ] (see Appx89130), which had a [                    ] during the POI.  See Appx89165; Appx85910; see also Assan's Resp. at 11 n.3 ("Assan reported a POI [        ] of [        ] in its [

        ]. . . .").  If the purpose of Assan's hedges is to offset mark-to-market losses on inventory, then [

        ]  See, e.g., Consol. Pls.' Br. at 19 (explaining that hedges protect against risk by generating a gain when a company would otherwise incur a loss).

Assan attempts to explain away this inconvenient fact by pointing out that it "also reported a loss of [        ] during the POI for inventory related to finished goods."  Assan's

---

[2]  See also Assan's Resp. at 10 ("Assan's hedging practices resulted in a net gain during the POI . . . .").

[3]  While Assan initially acknowledges that it "reported a POI [        ] of [
        ]" for inventory revaluations (Assan's Resp. at 11 n.3), [
        ]  Id. at 11.
Assan's latter inaccurate claim is belied by Assan's own record citation, which shows that [
        ]  See Appx87828.

NON-CONFIDENTIAL

Resp. at 11 n.3.  Assan's appeal to its experience on finished goods does not help its argument, however, given its insistence that its hedges have nothing to do with finished goods,[4] but only pertain to raw material inventory.  See Assan's Resp. at 8-13.

Second, Commerce's practice is to include gains in cost only to the extent that related expenses are also in cost.  See Nucor Corp. v. United States., 612 F. Supp. 2d 1264, 1299 (Ct. Int'l Trade 2009) (sustaining the Department's determination "to limit the recognition of" certain gains "to offset only" the associated expenses); Hynix Semiconductor, Inc. v. United States, 248 F. Supp. 2d 1297, 1322 (Ct. Int'l Trade 2003) (sustaining the Department's denial of an offset to certain foreign currency translation losses with unrelated gains in the value of fixed assets), aff'd in part, 424 F.3d 1353, 1372-93 (Fed. Cir. 2005); see also Certain Steel Concrete Reinforcing Bars From Turkey; Final Results and Rescission of Antidumping Duty Administrative Review in Part, 71 Fed. Reg. 65,082 (Dep't Commerce Nov. 7, 2006), and accompanying Issues and Decision Memorandum at 34 (Comment 9) (Nov. 1, 2006) ("We determined that the income offset for rental income from vehicles should be disallowed because the related expenses were not included in the submitted G&A expenses.  We allowed the income related to hotel activities because the related hotel expenses are included in Yazici's Demir's G&A expenses."); Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of Antidumping Duty Administrative Review, 73 Fed. Reg. 7,710 (Dep't Commerce Feb. 11, 2008), and accompanying Issues and Decision Memorandum at 35 (Comment 13) (Feb. 4, 2008) ("Consequently, Mexinox's reported

---

[4]   Assan's Resp. at 8 ("{T}he raw material hedge is unrelated to Assan's sales of finished goods or sales revenue."); id. at 11 ("{T}he goal is not to 'protect against declining prices' . . . for finished products . . . .").

NON-CONFIDENTIAL

costs include a small portion of the cost of tolling, and the revenue generated from this amount is appropriately used as an offset to the reported costs.").

By Assan's own account, the purpose of its hedging activities is to offset mark-to-market losses on inventory.  See Assan's Resp. at 9-11.  Such losses, however, are not in Assan's reported cost of production; [

] Because Assan's reported costs do not include any mark-to-market losses on inventory, Commerce should also have excluded the related hedging gains.

**D.    Assan's Reliance on Other Cases Fails**

Assan cites to various administrative determinations, which it claims support its contention that hedging gains and losses should be in its reported cost of manufacture ("COM"). See Assan's Resp. at 13-14.

First, Assan refers to Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017.[5]  See Assan's Resp. at 13.  That case, however, addressed whether Commerce should include "inventory valuation losses" in a respondent's cost – not hedging gains and losses.  See OCTG Korea IDM at 83 (Comment 8).[6]

---

[5]    84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019), and accompanying Issues and Decision Memorandum at 82-83 (Comment 8) (May 17, 2019) (hereinafter, "OCTG Korea IDM").

[6]    Moreover, the issue was remanded by the Court.  See Seah Steel Corp. v. United States, 513 F. Supp. 3d 1367, 1405-06 (Ct. Int'l Trade 2021) ("The court concludes, therefore, that because
(cont'd on next page)

Second, Assan refers to Seamless Refined Copper Pipe and Tube From Mexico: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2014-2015,[7] where Commerce included an adjustment for hedging gains and losses. See Assan's Resp. at 13. Commerce's public decision memorandum, however, provides no information on the nature of the hedging gains and losses that it included. See Copper Mexico IDM at 15. While those hedges could have pertained to the respondent's purchase cost of raw material, in the instant case, the record demonstrates that Assan's hedges do not pertain to its raw material purchase cost because it only hedges **after** its purchase of raw material is complete. See supra **Section I.B**; see also Consol. Pls.' Br. at 14-20.

Finally, Assan cites Common Alloy Aluminum Sheet From Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,[8] where Assan was also a mandatory respondent. See Assan's Resp. at 13-14. First, there is no mention in Commerce's decision memorandum that this issue was raised or addressed by Commerce or the interested parties in that investigation. Moreover, as both Commerce and the Court have recognized:

---

Commerce did not cite any relevant record evidence, Commerce's decision to include SeAH's inventory valuation losses as G&A expenses is not supported by substantial evidence.").

[7]   81 Fed. Reg. 89,434 (Dep't Commerce Dec. 12, 2016), and accompanying Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review; 2014-2015 Memorandum at 15 (Dec. 5, 2016) (hereinafter, "Copper Mexico IDM"), unchanged in 82 Fed. Reg. 11,178 (Feb. 21, 2017) (final results).

[8]   85 Fed. Reg. 65,346 (Dep't Commerce Oct. 15, 2020) (hereinafter, "CAAS from Turkey"), and accompanying Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Common Alloy Aluminum Sheet from Turkey at 15 (Oct. 6, 2020), unchanged in 86 Fed. Reg. 13,326 (Mar. 8, 2021) (final determination).

> each segment stands on its own.  In fact, the courts have recognized that "each administrative review is a separate segment of proceedings with its own unique facts."

Large Power Transformers From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017, 84 Fed. Reg. 16,461 (Dep't Commerce Apr. 19, 2019), and accompanying Issues and Decision Memorandum at 12 (Apr. 12, 2019), aff'd, Hyundai Elec. & Energy Sys. Co. v. United States, 466 F. Supp. 3d 1303, 1318 n.20 (Ct. Int'l Trade 2020), aff'd without op., 2021 U.S. App. LEXIS 29810 (Fed. Cir., Oct. 4, 2021) (citing Shandong Huarong Mach. Co. v. United States, 29 CIT 484, 491 (2005)).  That applies even more to completely different proceedings, involving different merchandise, such as CAAS from Turkey and the instant proceeding.  There is no indication that the record in CAAS from Turkey included facts that are present on the instant record, which indicate that Assan's hedges do not pertain to its raw material purchases.  See supra **Section I.B**; see also Consol. Pls.' Br. at 14-20.

**II.   IF ASSAN'S HEDGING GAINS ARE NOT EXCLUDED ENTIRELY, COMMERCE SHOULD INSTEAD INCORPORATE THEM IN ASSAN'S INTEREST EXPENSES, INSTEAD OF ASSAN'S COST OF MANUFACTURE**

Consolidated Plaintiffs argued that if Commerce declined to exclude hedging gains from Assan's cost of manufacture ("COM"), then it should include those gains within Assan's interest expenses ("INTEX") instead of its COM.  See Consol. Pls.' Br. at 23-27.  In response, Defendant argues that its treatment of hedging gains in COM was appropriate because those gains are recorded in Assan's cost of goods sold ("COGS").  See Def.'s Resp. at 36.  Assan echoes this argument.  See Assan's Resp. at 15.  As Consolidated Plaintiffs pointed out, however, Assan's COGS also includes an [                                                                    ]

– [                                    ] – which Commerce did not include in Assan's COM.  See Consol. Pls.' Br. at 24 (citing Appx85883, 82694).  As a result, Commerce's different treatment

of these two accounts, without providing an adequate explanation, is arbitrary and unlawful and requires remand to the agency.  See id. at 23.

Assan also argues that the exclusion of [                              ] from its COM is appropriate because it is related to "financing activities, rather than manufacturing or production."  Assan's Resp. at 16-17.  Assan, therefore, admits that certain gains and losses – i.e., those in [                                                        ] – should not be in its COM, ***despite being recorded in the COGS*** in Assan's [                    ], because those gains and losses relate to financing activities.  Accordingly, Defendant and Assan cannot rely on the fact that Assan records its hedging gains in its COGS to argue that those gains should be in COM.

Regarding Defendant's and Assan's argument that the hedging gains should be in COM, not INTEX, because those gains pertain to Assan's purchases of raw materials (see Def.'s Resp. at 36; Assan's Resp. at 15), Consolidated Plaintiffs have explained that those gains do not pertain to raw material purchases (see supra **Sections I.B and I.C**; Consol. Pls.' Br. at 12-20), but rather to Assan's sales of finished goods.  See Consol. Pls.' Br. at 20-22.

In its opening brief, Consolidated Plaintiffs cited to Phosphor Copper From the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances,[9] where Commerce included gains and losses on derivative transactions in the respondent's INTEX.  See Consol. Pls.' Br. at 24-25.  Assan excerpts a portion of that decision memorandum that makes it appear as if Commerce determined

---

[9]   82 Fed. Reg. 12,433 (Dep't Commerce Mar. 3, 2017), and accompanying Issues and Decision Memorandum at 11-12 (Comment 2) (Feb. 27, 2017) (hereinafter, "Phosphor Copper Korea IDM").

NON-CONFIDENTIAL

that the "investments in derivatives {were} entirely unconnected to {the respondent's} production operations." Assan's Resp. at 17-18 (citing Phosphor Copper Korea IDM at 11). The portion of the decision memorandum that Assan excerpted, however, *is not from Commerce's decision, but rather from the respondent's arguments, which Commerce rejected*. See Phosphor Copper Korea IDM at 11. Contrary to Assan's erroneous characterization, Commerce instead decided that:

> the cost management mechanisms practiced by {the respondent} by way of these particular derivative transactions are reasonably associated with the company's cash management and how the entity as a whole manages its primary raw material input price exposure.

Id. at 12. As such, Commerce added the "gains and losses on derivative transactions to {the respondent's} financial expense rate calculation." Id.

Assan also cites to Certain Orange Juice From Brazil: Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination,[10] to argue that Commerce correctly deferred to how hedging gains and losses are classified in [

] Assan's Resp. at 18. Here, however, Assan's [                    ] classification of hedging gains and losses is ambiguous. While the LME hedging gains at issue are recorded in COGS in Assan's [                              ] (see Consol. Pls.' Br. at 24 (citing Appx85883, 82694)), which Assan itself argues should not be in COM. See Assan's Resp. at 16-17. Because the classification in Assan's [            ] is not dispositive, [

---

[10] 77 Fed. Reg. 63,291 (Dep't Commerce Oct. 16, 2012), and accompanying Issues and Decision Memorandum at 43 (Comment 10) (Oct. 9, 2012).

NON-CONFIDENTIAL

], Commerce should have included the hedging gains in INTEX.

## III.  <u>CONCLUSION</u>

For the reasons discussed above, Consolidated Plaintiffs respectfully request that this Court:

1.    Grant Consolidated Plaintiffs' motion for judgement upon the agency record;

2.    Remand the Department's <u>Final Determination</u> for the agency to reconsider its determination consistent with Consolidated Plaintiffs' opening brief and this reply; and

3.    Provide such other relief as this Court deems just and appropriate.

Respectfully submitted,

<u>/s/ John M. Herrmann</u>
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to the Aluminum Association Trade Enforcement Working Group and Its Individual Members

Dated:  September 2, 2022

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's Order dated July 26, 2022 (ECF No. 35), setting the word limitation to the reply brief of the Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas Inc., JW Aluminum Company, and Novelis Corporation (collectively, "Consolidated Plaintiffs") to 7,000 words, counsel for Consolidated Plaintiffs certifies that this Reply Brief contains 5,734 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to the Aluminum Association Trade Enforcement Working Group and Its Individual Members

Dated:  September 2, 2022