**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) Consol. Court No. 21-00616 |
| *Defendant,* | ) ) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, et al., | ) ) ) ) |
| *Defendant-Intervenors.* | ) ) ) |

## ASSAN'S NOTICE OF SUPPLEMENTAL AUTHORITIES

Plaintiff Assan Aluminyum Sanayi ve Ticaret A.S. ("Assan") respectfully submits this notice to supplement the authorities cited in Assan's Memorandum of Points and Authorities in Support of its Motion for Judgment on the Agency Record filed on May 23, 2022, ECF No. 28, and its Reply Brief filed on September 2, 2022, ECF No. 43.

Since Assan filed its briefs, three U.S. Court of International Trade opinions, as well as a remand redetermination and a preliminary administrative review determination filed by the U.S. Department of Commerce ("Commerce") in a parallel proceeding also involving Assan, have been issued.

Assan believes these supplemental authorities are relevant to this proceeding. Assan is therefore attaching the following for the Court's convenience:

1) *Noksel Celik Bory Sanayi A.S. v. United States*, No. 21-140, Slip Op. 23-125 (Aug. 8, 2023);

2) *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, No. 21-306, Slip Op. 23-124 (Aug. 23, 2023);

3) *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States,* Consol. No. 21-00246, Slip Op. 23-26 (Mar. 8, 2023);

4) Redetermination Pursuant to Court Remand Order in *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States,* Consol. Court No. 21-00246 (May 31, 2023), ECF No. 94 ("Common Alloy Aluminum Sheet Antidumping Remand"); and,

5) *Common Alloy Aluminum Sheet From Turkey*, 88 Fed. Reg. 30089 (Dep't Commerce May 10, 2023) (prelim AD results; 2020-2022) ("*Preliminary Common Alloy Aluminum Sheet Antidumping Determination*"), and accompanying Preliminary Decision Memorandum and Preliminary Analysis Memorandum.

Assan respectfully notifies the Court of the recent opinions of the U.S. Court of International Trade issued by Judge Jane A. Restani in *Noksel Celik Bory Sanayi A.S. v. United States*, No. 21-140 and *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, No. 21-306, which involve the duty drawback adjustment and Commerce's requirement that only closed inward processing certificates be included in the numerator of Commerce's per unit calculation. In addition, Assan notifies the Court of the recent opinion of the U.S. Court of International Trade issued by Judge Gary S. Katzmann, which involves Commerce's application of the duty drawback adjustment to Assan in a parallel proceeding. Finally, the Common Alloy Aluminum Sheet Antidumping Remand and *Preliminary Common Alloy Aluminum Sheet Antidumping Determination* are relevant because they address Commerce's revisions to the duty drawback calculation in that parallel proceeding.

Assan will be further addressing these decisions and opinions in more detail in a supplemental brief per the Court's minute order, ECF No. 59.

Respectfully submitted,

**/s/ Leah N. Scarpelli**
Leah N. Scarpelli
Matthew M. Nolan
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 715-8403

*Counsel to Assan Aluminyum Sanayi ve Ticaret A.S.*

Dated: October 30, 2023

# ATTACHMENT 1:

*Noksel Celik Bory Sanayi A.S. v. United States*, No. 21-140, Slip Op. 23-125 (Aug. 8, 2023)

Slip Op. 23-125

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NOKSEL CELIK BORU SANAYI A.S., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Jane A. Restani, Judge |
| Defendant, | Court No. 21-00140 |
| and | |
| NUCOR TUBULAR PRODUCTS INC., | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Antidumping Duty Determination in Review of Order on Light-Walled Rectangular Pipe and Tube from Turkey Sustained.]

Dated: August 23, 2023

<u>Leah N. Scarpelli</u> and <u>Jessica R. DiPietro</u>, ArentFox Schiff LLP, of Washington, DC, argued for Plaintiff Noksel Celik Boru Sanayi A.S. With them on brief was <u>Matthew M. Nolan</u>.

<u>Eric J. Singley</u>, Trial Attorney, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the Defendant. With him on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Franklin E. White, Jr.</u>, Assistant Director. Of counsel on the brief was <u>Ashlande Gelin</u>, Staff Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Maureen Elizabeth Thorson</u>, Wiley Rein LLP, of Washington, DC, argued for Defendant-Intervenor Nucor Tubular Products Inc. With her on the brief were <u>Alan H. Price</u>, <u>Robert E. DeFrancesco, III</u>, and <u>Theodore P. Brackemyre</u>.

Restani, Judge: Before the court is a motion for judgment on the agency record pursuant to

United States Court of International Trade ("USCIT") Rule 56.2, in an action challenging a final

determination of the United States Department of Commerce ("Commerce"). The final determination at issue resulted from Commerce's findings during an administrative review of the antidumping ("AD") order covering steel light-walled rectangular pipe and tube from Turkey. Plaintiff Noksel Celik Boru Sanayi A.S. ("Noksel") challenges the calculation.

**BACKGROUND**

a.        **Antidumping Administrative Review and Determination**

On July 15, 2019, Commerce initiated an antidumping duty administrative review of light-walled rectangular pipe and tube products from Turkey for the period of May 1, 2018, through April 30, 2019.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 33,739, 33,748 (Dep't Commerce July 15, 2019).

On July 24, 2020, Commerce issued its preliminary results and accompanying Preliminary Decision Memorandum, and published the results in the Federal Register.  Light-Walled Rectangular Pipe and Tube From Turkey: Preliminary Results of Antidumping Duty Administrative Review; 2018-2019, 85 Fed. Reg. 44,861 (Dep't Commerce July 24, 2020) ("Preliminary Results"); Decision Memorandum for Preliminary Results of the Antidumping Duty Administrative Review: Light-Walled Rectangular Pipe and Tube from Turkey; 2018-2019, A-489-815, POR 5/1/2018-4/30/2019 (Dep't Commerce July 20, 2020).  Commerce issued the final results on May 27, 2021.  Light-Walled Rectangular Pipe and Tube from Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019, 86 Fed. Reg. 11,230 (Dep't Commerce Feb. 24, 2021), and accompanying 2018-2019 Antidumping Duty Administrative Review of Light-Walled Rectangular Pipe and Tube from

Turkey: Issues and Decision Memorandum for the Final Results, A-489-815, POR 5/1/2018-

4/30/2019 (Dep't Commerce Feb. 16, 2021) ("IDM").

      **b.**     **Background of Section 232 Duties**

      On March 8, 2018, the President exercised his authority under Section 232 of the Trade

Expansion Act of 1962, as amended, and mandated the imposition of a global tariff of 25 percent

on imports of steel articles from all countries, except Canada and Mexico.  Proclamation No. 9705

of March 8, 2018, 83 Fed. Reg. 11,625, 11,626 (Mar. 15, 2018) ("Proclamation 9705").  The

Section 232 duties went into effect on March 23, 2018, and applied "in addition to any other

dut[y]."  Id. at 11,627–28.  By its terms, Proclamation 9705 was issued in order to "enable domestic

steel producers to use approximately 80 percent of existing domestic production capacity and

thereby achieve long-term economic viability through increased production" and to "ensure that

domestic producers can continue to supply all the steel necessary for critical industries and national

defense."  Id. at 11,625–26; see also 19 U.S.C. § 1862(d).

      On August 10, 2018, the President issued another proclamation, increasing the tariff on

Turkish steel imports from 25 percent to 50 percent, effective August 13, 2018.  Proclamation No.

9772 of August 10, 2018, 158 Fed. Reg. 40,429 (Aug. 15, 2018) ("Proclamation 9772").[1]  In the

proclamation, the President stated that he increased the tariffs because Turkey was a major exporter

of steel, and the increased tariff would "be a significant step toward ensuring the viability of the

domestic steel industry."  Id. at 40,429.  On May 16, 2019, the President issued a proclamation

---

[1] The lawfulness of the Proclamation 9772 increased tariffs on Turkey has been affirmed by the U.S. Court of Appeals for the Federal Circuit.  See Transpacific Steel LLC v. United States, 4 F.4th 1306 (Fed. Cir. 2021), cert. denied, 142 S. Ct. 1414 (2022).

ending the increased Section 232 tariff on Turkish steel imports.  <u>Proclamation No. 9886 of May 16, 2019</u>, 84 Fed. Reg. 23,421 (May 16, 2019).

In the final results, Commerce treated the Section 232 duties paid by Noksel as "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) and therefore deducted the Section 232 duties on the United States price side of the dumping comparison from export ("EP") and constructed export price ("CEP").  <u>IDM</u> at 4–5.  Commerce determined that Section 232 duties were more akin to normal customs duties than to antidumping or countervailing duties or Section 201 duties, codified as 19 U.S.C. § 2251, which are not deducted.  <u>Id.</u>  Commerce reasoned that the President indicated that national security was the concern when issuing <u>Proclamation 9705</u> and stated that the duties were to be imposed in addition to other duties.  <u>Id.</u> at 4.

### c.    Challenge to AD Review Determination

On March 26, 2021, Noksel commenced the instant action against the United States pursuant to 19 U.S.C. § 1516a(a)(2).  Compl., ECF No. 4 (Mar. 26, 2021).  Noksel claims that the AD determination is unsupported by substantial evidence or is otherwise contrary to law because Commerce incorrectly treated Section 232 duties as normal U.S. customs duties and denied a duty-drawback adjustment.  Compl. ¶¶ 19–24; Pl. R. 56.2 Mot. For J. on the Agency R., ECF Nos. 24–25 (Sept. 3, 2021) ("Pl. Br.").

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2). The court sustains Commerce's results of an administrative review of an AD duty order unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.       Section 232 Duties May Be Deducted From United States Price

Noksel raises two issues related to whether Section 232 duties may be deducted from United States price.  First, Noksel argues that Commerce erred by treating the Proclamation 9705 Section 232 duties as a United States import duty under § 1677a(c)(2)(A).  Pl. Br. at 19–37.  This argument is foreclosed, however, by binding precedent from the U.S. Court of Appeals for the Federal Circuit.  Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 63 F.4th 25, 37 (Fed. Cir. 2023) ("Borusan Mannesmann II") ("[W]e conclude that the specific duty imposed by the President in Proclamation 9705 was properly treated by the President's subordinate, the Secretary of Commerce, as a 'United States import dut[y]' under § 1677a(c)(2)(A).").  Noksel's remaining argument is that Proclamation 9772's temporary increase of Section 232 duties on Turkey is sufficiently distinct, and thus, that those increased duties cannot be treated as a United States import duty under § 1677a(c)(2)(A) because the increase was temporary and remedial.  Pl. Br. at 37–39.[2]

Antidumping duties depend on the "dumping margin," 19 U.S.C. § 1677(35)(A), which is the difference between "the normal value," (or home country value) and the EP or CEP[3] for the

---

[2] The government and Defendant-Intervenor argue that Noksel did not exhaust administrative remedies for the temporarily increased duties, and, thus, the court should not consider the issue. Gov't Resp. Br. at 22, ECF Nos. 30–31 (Dec. 3, 2021); Defendant-Intervenor Resp. Br. at 29, ECF Nos. 27–28 (Dec. 3, 2021).  During the administrative proceeding, Noksel asserted that Commerce should "at the very least" not deduct the additional 25 percent.  Noksel's Case Brief at 16, P.R. 109 (Aug. 24, 2020).  Noksel sufficiently raised the issue by presenting it to Commerce, and the court will consider it.  See Timken Co. v. United States, 26 CIT 434, 460, 201 F. Supp. 2d 1316, 1340 (CIT 2002).

[3] EP and CEP may be referred to as the "U.S. price" in the dumping margin comparison.  See United States Steel Corp. v. United States, 621 F.3d 1351, 1353 & n.1 (Fed. Cir. 2010).

merchandise, id. § 1673.  The adjustments of EP and CEP are set forth in section 772(c) of the

Tariff Act of 1930, codified at 19 U.S.C. § 1677a(c).  EP and CEP are to be reduced by "the

amount, if any, included in such price, attributable to any additional costs, charges, or expenses,

and United States import duties, which are incident to bringing the subject merchandise from the

original place of shipment in the exporting country to the place of delivery in the United States . .

. ." 19 U.S.C. § 1677a(c)(2)(A) (emphasis added).  These adjustments are made "in an attempt to

get back to an ex-factory price that is comparable to the price of goods in the home market."

Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 45 CIT __, __, 494 F. Supp.

3d 1365, 1373 (2021) ("Borusan Mannesmann I"), aff'd on other grounds, Borusan Mannesmann

II, 63 F.4th at 33; see also S. Rep. No. 67-16, at 12 (1921); H.R. Rep. No. 67-1, at 23–24 (1921);

H.R. Rep. No. 67-79, at 2–3 (1921).[4]

    Regarding Section 201 safeguard duties, Commerce has previously concluded that they

should not be deducted as import duties under § 1677a(c)(2)(A).  Stainless Steel Wire Rod from

the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg.

19,153, 19,157–61 (Dep't Commerce Apr. 12, 2004) ("SSWR from Korea").  Commerce reached

this because Section 201 duties were remedial and temporary in nature, and deducting from EP

and CEP would result in an inappropriate double remedy.  Id. at 19,160–61.  In Wheatland Tube

Co. v. United States, the Federal Circuit held that Commerce's construction of "United States

---

[4] "Antidumping duties cannot be subtracted in the calculation of dumping margins (and hence
antidumping duties), because doing so would produce a spiraling circularity."  Borusan
Mannesmann II, 64 F.4th at 35; see also Borusan Mannesmann I, 494 F. Supp. 3d at 1372–73
(citing S. Rep. No. 67-16, at 4 (1921)) ("[S]uch duties were 'special duties,' not the import duties
that were to be deducted from price in the United States market.").

import duty" statute was reasonable in the light of the specific Section 201 duties.  495 F.3d 1355, 1359–66 (Fed. Cir. 2007); but see Borusan Mannesmann II, 63 F.4th at 36–37 (declining to decide whether intervening developments in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.[5] affect Wheatland Tube).

        More recently, in Borusan Mannesmann II, the Federal Circuit stated that "[n]othing in § 1677a(c)(2)(A) requires the uniform treatment of all duties prescribed under a particular statutory authorization," and more specifically, there is nothing "in the § 232 framework that requires the uniform treatment of all duties imposed by the President under § 232." 63 F.4th at 33.  The Federal Circuit, accordingly, declined to "make a statute-wide categorical determination regarding all duties imposed on imports by presidential action under § 232."  Id. at 34.  Instead, Borusan Mannesmann II requires courts to use a "proclamation-specific approach" that focuses "on the character" of the proclamation to determine if the President intended a specific duty to qualify as a United States import duty.  Id.

        The Federal Circuit proceeded to analyze the text of Proclamation 9705, emphasizing that the text made "clear that the duty newly being imposed was to add to, not partly or wholly offset, the antidumping duties[.]"  Id. (referring to Proclamation 9705, 83 Fed. Reg. at 11,627 ("This rate of duty, which is in addition to any other duties . . . .")); see also Proclamation 9705, 83 Fed. Reg. at 11,629, Annex ("All anti-dumping, countervailing, or other duties and charges applicable to such goods shall continue to be imposed.").  Based on this, the Federal Circuit concluded that the

---

[5] 467 U.S. 837 (1984).

specific Proclamation 9705 duty was properly treated as a United States import duty under §

1677a(c)(2)(A).  Borusan Mannesmann II, 63 F.4th at 37.

Now, the court is tasked with following this "proclamation-specific approach" and

analyzing the character of Proclamation 9772.  See id. at 34.  Similar to Proclamation 9705,

Proclamation 9772 provides:

> Further, except as otherwise provided in notices published pursuant to clause 3 of
> this proclamation, all steel articles imports from Turkey specified in the Annex shall
> be subject to a 50 percent ad valorem rate of duty with respect to goods entered for
> consumption, or withdrawn from warehouse for consumption, on or after 12:01
> a.m. eastern daylight time on August 13, 2018.  These rates of duty, which are in
> addition to any other duties, fees, exactions, and charges applicable to such
> imported steel articles, shall apply to imports of steel articles from each country as
> specified in the preceding two sentences."

Proclamation 9772, 158 Fed. Reg. at 40,430 (emphasis added).  As the court explained in Icdas

Celik Enerji Tersane ve Ulsasim Sanayi A.S. v. United States, the same language that the Federal

Circuit emphasized is present in Proclamation 9772.  For a more complete analysis, see Icdas Celik

Enerji Tersane ve Ulsasim Sanayi A.S. v. United States, No. 21-00140, Slip Op. No. 23-124, at

*8–9 (CIT Aug. 23, 2023), issued simultaneously with this opinion.   There is no reason to vary

here.  Accordingly, Commerce's treatment of the Section 232 duties is sustained.

## II.      Duty Drawback Adjustment

Another adjustment Commerce must make to calculate the dumping margin, known as the

duty drawback adjustment, calls for U.S. price to be increased by the amount of any "import duties

imposed by the country of exportation which have been rebated, or which have not been collected,

by reason of the exportation of the subject merchandise to the United States."   19 U.S.C. §

1677a(c)(1)(B).  In determining whether a duty drawback adjustment is warranted, Commerce

applies a two-pronged test in which respondent must demonstrate 1) that the rebate and import duties, or exemption from import duties, are directly linked to, and dependent upon, the exportation of the subject merchandise; and 2) that there are sufficient imports of the raw material to account for the drawback upon exportation of subject goods.  Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback, 71 Fed. Reg. 61,716, 61,723 (Dep't Commerce Oct. 19, 2006); see also Saha Thai Steel Pipe (Pub.) Co. v. United States, 635 F.3d 1335, 1340 (Fed. Cir. 2011).

The government of Turkey's ("GOT") duty drawback program, the Inward Processing Regime ("IPR") involves exemptions from duties, rather than rebates.  Noksel Section B-D Questionnaire Response at C-35, P.R. 42, C.R. 15, 19 (Sept. 20, 2019) ("Noksel QR").  Under the program, a company that imports raw materials and exports finished goods made from such raw materials may obtain an inward processing certificate ("IPC") (also known by its Turkish acronym, "DIIB"), which sets forth the quantity of raw material allowed to be imported duty-free and the quantity of export required to close the IPC.  Noksel QR at C-35, Ex. C-15.  Noksel submitted an application to the GOT to close an IPC, which the GOT was then reviewing.  Noksel QR at C-35. Noksel stated that it would "submit documentation substantiating the IPR completion" when the closing was approved.  Noksel QR at C-35.

In the final results, Commerce found that it should not grant Noksel a duty drawback adjustment.  IDM at 6.  Commerce proceeded to explain that its current practice for the IPR was to require "sufficient documentation establishing [the IPC's] closure by the GOT."  IDM at 7. Commerce reasoned that an application for closure is not sufficient because "an IPC may be modified or suspended even after it has been submitted to the GOT."  IDM at 7.  Following that

practice, Commerce declined to grant Noksel the duty drawback adjustment because there was no record documentation that Noksel could not suspend or modify its IPC application.  IDM at 7–8.

The court has long relied on the duty drawback adjustment's two-prong test, and has rejected attempts to "add a new hurdle to the drawback test that is not required by the statute." Chang Tieh Industry Co. v. United States, 17 CIT 1314, 1320, 840 F. Supp. 141, 147 (1993); see also Arcelormittal USA Inc. v. United States, 32 CIT 440, 463 n.23 (2008) (declining plaintiff's "invitation to alter Commerce's reasonable interpretation of 19 U.S.C. § 1667a(c)(1)(B)"). Commerce's requirement of IPC closure is not new, but Commerce's evaluation of when an IPC is closed has evolved.  Toscelik Profil ve Sac Endustrisi A.S. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1321, 1328 n.1 (2018); Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, 44 CIT __, __, 439 F. Supp. 3d 1342, 1349 (2020).

In Toscelik, for a period of investigation ("POI") of October 1, 2013, through September 30, 2014, Commerce considered an IPC closed after it "expired" because then the company "could no longer apply any additional imports or exports to the DIIB," regardless of whether the GOT may have officially closed the IPC.  Toscelik, 348 F. Supp. 3d at 1328 n.1.[6]  At some point after the Toscelik investigation, Commerce defined closure as when "the DIIB holder applies for closure of the DIIB with the Turkish Government."  Id.  Subsequently, during a POI of July 1, 2015,

---

[6] In Toscelik, the Turkish plaintiffs argued that Commerce's requirement that IPCs must be closed during the POI was unreasonable.  348 F. Supp. 3d at 1325.  The court agreed, holding that limiting the acceptance of IPCs to those closed during the POI ignored "verified record information" when plaintiffs had IPCs that Commerce considered closed but only after the conclusion of the POI.  Id. at 1327–28.

through June 30, 2016,[7] Commerce stated its practice was to provide a duty drawback adjustment

only "upon evidence that the subject country's government has forgiven those duties." Habas, 429

F. Supp. 3d at 1347.[8]   The court sustained Commerce's rationale as reasonable because duty

drawback eligibility required record evidence that showed the GOT had "forgiven the duty

liability." Id. at 1349.

    As indicated, Commerce has not been consistent in how it defines closure of IPCs.  In one

proceeding, Commerce considered an IPC closed "[f]or practical purposes . . . when the exporting

company has applied to the Turkish government for closure." Heavy Walled Rectangular Welded

Carbon Steel Pipes and Tubes From the Republic of Turkey: Final Determination of Sales at Less

Than Fair Value, 81 Fed. Reg. 47355 (Dep't Commerce July 21, 2016) ("HWRP from Turkey"),

and accompanying Issues and Decision Memorandum for the Final Affirmative Determination in

the Less-Than-Fair-Value Investigation of Heavy Walled Rectangular Welded Carbon Steel Pipes

and Tubes from the Republic of Turkey at Comment 4, A-489-824, POI 7/1/2014-6/30/2015

(Dep't Commerce July 14, 2016).  But in a later proceeding, Commerce explained that applying

for IPC closure is insufficient because "a company's application to close a DIIB may be modified

or suspended." Light-Walled Rectangular Pipe and Tube from the Republic of Turkey, 82 Fed.

---

[7] The investigation at issue was for steel concrete reinforcing bar from Turkey.  Steel Concrete Reinforcing Bar From the Republic of Turkey, 82 Fed. Reg. 23,192 (Dep't Commerce May 22, 2017).

[8] As Commerce explained in its remand results in the Habas case, Commerce needed more record evidence than that "Habas had exports under these IPCs during POI."  Redetermination Pursuant to Court Remand Order, Habas Sinai Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, Consol. Ct. No. 17-00204, ECF No. 83 (Jan. 15, 2020).  Instead, Commerce required record evidence that the GOT "actually refund[ed] any paid duties or ha[d] forgiven the imputed duties." Id. at 8–9.

Reg. 47,477 (Dep't Commerce Oct. 12, 2017) ("LWRPT from Turkey"), and accompanying 2015–

2016 Antidumping Duty Administrative Review of Light-Walled Rectangular Pipe and Tube from

Turkey: Issues and Decision Memorandum for the Final Results at Comment 9, A-489-815, POR

5/1/2015-4/30/2016 (Dep't Commerce Oct. 12, 2017) ("LWRPT from Turkey IDM").  Further,

Commerce noted in LWRPT from Turkey that, in HWRPT from Turkey, Commerce actually

"disallowed two of the three DIIBs under which the respondent requested a duty drawback

adjustment because one DIIB remained open and the other DIIB was suspended after the

respondent had applied for closure."  LWRPT from Turkey IDM at Comment 9.

Here, the court recognizes that Commerce has not always been clear as to when it will

consider an IPC closed.  In two recent instances though, LWRPT from Turkey and Habas,

Commerce clearly stated that it required more than closure application and instead required

"evidence that the subject country's government has forgiven those duties."  See Habas, 429 F.

Supp. 3d at 1347; LWRPT from Turkey IDM at Comment 9 ("Thus the Department is not satisfied

that a DIIB has been closed until a respondent can provide sufficient documentation establishing

its closure by the GOT.").  As the court explained in Icdas, it appears that in recent years

Commerce's practice has been to require some indication from the GOT that the IPC was

approved, and Noksel should have been on notice that this was likely the requirement.  See Icdas,

No. 21-00140, Slip Op. No. 23-124, at *16.  It is not unreasonable for Commerce to require more

proof than it has in the past cases.  See Huvis Corp. v. United States, 570 F.3d 1347, 1353 (Fed.

Cir. 2009) ("Commerce need only show that its methodology is permissible under the statute and

that it had good reasons for the new methodology.").  Noksel's statement that it would "submit the

documentation substantiating the IPR completion" indicates that Noksel likely was aware

Court No. 21-00140                                                    Page 13

Commerce required the GOT's approval.  See Noksel QR at C-35.  Accordingly, Commerce's

rejection of Noksel's request for a duty drawback adjustment is sustained.

## CONCLUSION

The court sustains Commerce's determination regarding the AD order for light-walled

rectangular pipe and tube from Turkey.

/s/       Jane A. Restani
Jane A. Restani. Judge

Dated: August 23, 2023
         New York, New York

# ATTACHMENT 2:

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, **No. 21-306, Slip Op. 23-124 (Aug. 23, 2023)**

Slip Op. 23-124

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI A.S., and KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | |
| Plaintiffs, | |
| v. | Before: Jane A. Restani, Judge |
| UNITED STATES, | Court No. 21-00306 |
| Defendant, | |
| and | |
| REBAR TRADE ACTION COALITION, ET AL, | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Antidumping Duty Determination in Review of Order on Steel Concrete Reinforcing Bar from Turkey Sustained.]

Dated: August 23, 2023

<u>Leah N. Scarpelli</u> and <u>Jessica R. DiPietro</u>, ArentFox Schiff LLP, of Washington, D.C., argued for Plaintiffs Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. and Kaptan Demir Celik Endustrisi ve Ticaret A.S. With them on brief was <u>Matthew M. Nolan</u>.

<u>Daniel Francis Roland</u>, Trial Attorney, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for the Defendant. With him on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>L. Misha Preheim</u>, Assistant Director. Of counsel on the brief was <u>David W. Richardson</u>, Counsel, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

      <u>Maureen Elizabeth Thorson</u>, Wiley Rein LLP, of Washington, D.C., argued for Defendant-Intervenors Rebar Trade Action Coalition, et al.  With her on the brief were <u>Alan Hayden Price</u> and <u>John R. Shane</u>.

      Restani, Judge: Before the court is a motion for judgment on the agency record pursuant to United States Court of International Trade ("USCIT") Rule 56.2, in an action challenging a final determination of the United States Department of Commerce ("Commerce"). The final determination at issue resulted from Commerce's findings during an administrative review of the antidumping ("AD") order covering steel concrete reinforcing bar ("rebar") products from Turkey. Plaintiffs Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas") and Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") (collectively, "Respondents") challenge the calculation.

## BACKGROUND

### a.    Antidumping Administrative Review and Determination

      On September 9, 2019, Commerce initiated an antidumping duty administrative review of rebar products from Turkey for the period of July 1, 2018, through June 30, 2019.  <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>, 84 Fed. Reg. 47,242, 47,250–51 (Dep't Commerce Sept. 9, 2019).  On February 20, 2020, Commerce selected Icdas and Kaptan as mandatory respondents.  <u>Commerce Respondent Selection Memorandum</u>, P.R. 27 (Feb. 20, 2020).

      On November 24, 2020, Commerce issued its preliminary results and accompanying Preliminary Decision Memorandum, and published the results in the Federal Register.  <u>Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review; 2018-2019</u>, 85 Fed. Reg. 74,983 (Dep't Commerce Nov. 14, 2020); <u>Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review: Steel Concrete Reinforcing Bar from the Republic of Turkey; 2018-2019</u>, POR 7/1/2018-

6/30/2019 (Dep't Commerce Nov. 17, 2020) ("PDM").  Commerce issued the final results on May

27, 2021.  Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results on

Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 28,574 (Dep't Commerce

May 27, 2021), and accompanying Issues and Decision Memorandum for the Final Results of the

2018–2019 Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing

Bar from Turkey, A-489-829, POR 7/1/2018–6/30/2019 (Dep't Commerce May 21, 2021)

("IDM").

> **b.**     **Background of Section 232 Duties**

On March 8, 2018, the President exercised his authority under Section 232 of the Trade

Expansion Act of 1962, as amended, and mandated the imposition of a global tariff of 25 percent

on imports of steel articles from all countries, except Canada and Mexico.  Proclamation No. 9705

of March 8, 2018, 83 Fed. Reg. 11,625, 11,626 (Mar. 15, 2018) ("Proclamation 9705").  The

Section 232 duties went into effect on March 23, 2018, and applied "in addition to any other

dut[y]."  Id. at 11,627–28.   By its terms, Proclamation 9705 was issued in order to "enable

domestic steel producers to use approximately 80 percent of existing domestic production capacity

and thereby achieve long-term economic viability through increased production" and to "ensure

that domestic producers can continue to supply all the steel necessary for critical industries and

national defense."  Id. at 11,625–26; see also 19 U.S.C. § 1862(d).

On August 10, 2018, the President issued another proclamation, increasing the tariff on

Turkish steel imports from 25 percent to 50 percent, effective August 13, 2018.  Proclamation No.

9772 of August 10, 2018, 158 Fed. Reg. 40,429 (Aug. 15, 2018) ("Proclamation 9772").[1]  In the

proclamation, the President stated that he increased the tariffs because Turkey was a major exporter

of steel, and the increased tariff would "be a significant step toward ensuring the viability of the

domestic steel industry."  Id. at 40,429.  On May 16, 2019, the President issued a proclamation

ending the increased Section 232 tariff on Turkish steel imports.  Proclamation No. 9886 of May

16, 2019, 84 Fed. Reg. 23,421 (May 16, 2019).

In the final results, Commerce treated the Section 232 duties paid by Respondents as

"United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) and therefore deducted the Section

232 duties on the United States price side of the dumping comparison from export ("EP") and

constructed export price ("CEP").  IDM at 26–27.  Commerce determined that Section 232 duties

were more akin to normal customs duties than to antidumping or countervailing duties or Section

201 duties, codified as 19 U.S.C. § 2251, which are not deducted.  Id.  Commerce reasoned that

the President indicated national security was the concern when issuing Proclamation 9705 and

stated that the duties were to be imposed in addition to other duties.  Id. at 27–28.  Commerce also

concluded that the temporarily increased Section 232 duties under Proclamation 9772 did not

warrant any adjustment and therefore deducted the additional duties as well.  Id. at 28.

### c.    Challenge to AD Review Determination

On June 28, 2021, Respondents commenced the instant action against the United States

pursuant to 19 U.S.C. § 1516a(a)(1).  Compl., ECF No. 5 (June 28, 2021).  Respondents claim that

---

[1] The lawfulness of the Proclamation 9772 increased tariffs on Turkey has been affirmed by the
U.S. Court of Appeals for the Federal Circuit.  See Transpacific Steel LLC v. United States, 4
F.4th 1306 (Fed. Cir. 2021), cert. denied, 142 S. Ct. 1414 (2022).

the AD determination is unsupported by substantial evidence or is otherwise contrary to law

because Commerce incorrectly treated Section 232 duties as normal U.S. customs duties, denied

an adjustment based on inflation, and denied a duty-drawback adjustment.  Compl. ¶¶ 19–26; Pl.

R. 56.2 Mot. For J. on the Agency R., ECF Nos. 25–26 (Oct. 15, 2021) ("Pl. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2).

The court sustains Commerce's results of an administrative review of an AD duty order unless it

is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"

19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.     Section 232 Duties May Be Deducted From United States Price

Respondents raise two issues related to whether Section 232 duties may be deducted from

United States price.  First, they argue that Commerce erred by treating the Proclamation 9705

Section 232 duties as a United States import duty under § 1677a(c)(2)(A) and deducting it from

the United States price side of the less-than-fair-value comparison.  Pl. Br. at 23–39.  This

argument is foreclosed, however, by binding precedent from the U.S. Court of Appeals for the

Federal Circuit.  Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 63 F.4th 25,

37 (Fed. Cir. 2023) ("Borusan Mannesmann II") ("[W]e conclude that the specific duty imposed

by the President in Proclamation 9705 was properly treated by the President's subordinate, the

Secretary of Commerce, as a 'United States import dut[y]' under § 1677a(c)(2)(A).").

Respondents' remaining argument is that Proclamation 9772's temporary increase of Section 232

duties on Turkey is sufficiently distinct, and thus, that those increased duties cannot be treated as

a United States import duty under § 1677a(c)(2)(A) because the increase was temporary and remedial.  Pl. Br. at 40–41.

Antidumping duties depend on the "dumping margin," 19 U.S.C. § 1677(35)(A), which is the difference between "the normal value," (or home country value) and the EP or CEP[2] for the merchandise, id. § 1673.  The adjustments of EP and CEP are set forth in section 772(c) of the Tariff Act of 1930, codified at 19 U.S.C. § 1677a(c).  EP and CEP are to be reduced by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States . . ." 19 U.S.C. § 1677a(c)(2)(A) (emphasis added).  These adjustments are made "in an attempt to get back to an ex-factory price that is comparable to the price of goods in the home market." Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 46 CIT __, __, 494 F. Supp. 3d 1365, 1373 (2021) ("Borusan Mannesmann I"), aff'd on other grounds, Borusan Mannesmann II, 63 F.4th at 33; see also S. Rep. No. 67-16, at 12 (1921); H.R. Rep. No. 67-1, at 23–24 (1921); H.R. Rep. No. 67-79, at 2–3 (1921).[3]

Regarding Section 201 safeguard duties, Commerce has previously concluded that they should not be deducted as import duties under § 1677a(c)(2)(A).  Stainless Steel Wire Rod from

---

[2] EP and CEP can be referred to as the "U.S. price" in the dumping margin comparison.  See United States Steel Corp. v. United States, 621 F.3d 1351, 1353 & n.1 (Fed. Cir. 2010).

[3] "Antidumping duties cannot be subtracted in the calculation of dumping margins (and hence antidumping duties), because doing so would produce a spiraling circularity."  Borusan Mannesmann II, 64 F.4th at 35; see also Borusan Mannesmann I, 494 F. Supp. 3d at 1372–73 (citing S. Rep. No. 67-16, at 4 (1921)) ("[S]uch duties were 'special duties,' not the import duties that were to be deducted from price in the United States market.").

the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg.

19,153, 19,157–61 (Dep't Commerce Apr. 12, 2004) ("SSWR from Korea").  Commerce reached

this because Section 201 duties were remedial and temporary in nature, and deducting from EP

and CEP would result in an inappropriate double remedy.  Id. at 19,160–61.  In Wheatland Tube

Co. v. United States, the Federal Circuit held that Commerce's construction of "United States

import duty" statute was reasonable in the light of the specific Section 201 duties.  495 F.3d 1355,

1359–66 (Fed. Cir. 2007); but see Borusan Mannesmann II, 63 F.4th at 36–37 (declining to decide

whether intervening developments in Chevron, U.S.A., Inc. v. Natural Resources Defense Council,

Inc.[4] affect Wheatland Tube).

    More recently, in Borusan Mannesmann II, the Federal Circuit stated that "[n]othing in §

1677a(c)(2)(A) requires the uniform treatment of all duties prescribed under a particular statutory

authorization," and more specifically, there is nothing "in the § 232 framework that requires the

uniform treatment of all duties imposed by the President under § 232."  63 F.4th at 33.  The Federal

Circuit, accordingly, declined to "make a statute-wide categorical determination regarding all

duties imposed on imports by presidential action under § 232."  Id. at 34.  Instead, Borusan

Mannesmann II requires courts to use a "proclamation-specific approach" that focuses "on the

character" of the proclamation to determine if the President intended a specific duty to qualify as

a United States import duty.  Id.

    The Federal Circuit proceeded to analyze the text of Proclamation 9705, emphasizing that

the text made "clear that the duty newly being imposed was to add to, not partly or wholly offset,

---

[4] 467 U.S. 837 (1984).

the antidumping duties[.]"  Id. (referring to Proclamation 9705, 83 Fed. Reg. at 11,627 ("This rate

of duty, which is in addition to any other duties . . . .")); see also Proclamation 9705, 83 Fed. Reg.

at 11,629, Annex ("All anti-dumping, countervailing, or other duties and charges applicable to

such goods shall continue to be imposed.").  Based on this, the Federal Circuit concluded that the

specific Proclamation 9705 duty was properly treated as a United States import duty under §

1677a(c)(2)(A).  Borusan Mannesmann II, 63 F.4th at 37.

     Now, the court is tasked with following this "proclamation-specific approach" and

analyzing the character of Proclamation 9772.  See id. at 34.  Similar to Proclamation 9705,

Proclamation 9772 provides:

> Further, except as otherwise provided in notices published pursuant to clause 3 of
> this proclamation, all steel articles imports from Turkey specified in the Annex shall
> be subject to a 50 percent ad valorem rate of duty with respect to goods entered for
> consumption, or withdrawn from warehouse for consumption, on or after 12:01
> a.m. eastern daylight time on August 13, 2018.  These rates of duty, which are in
> addition to any other duties, fees, exactions, and charges applicable to such
> imported steel articles, shall apply to imports of steel articles from each country as
> specified in the preceding two sentences."

Proclamation 9772, 158 Fed. Reg. at 40,430 (emphasis added).  And the President tied these

increased tariffs to the same indicated national security concern present in Proclamation 9705.

Compare id. at 40,429 ("[I]t is necessary and appropriate in light of our national security interests

to adjust the tariff imposed by previous proclamations.") with Proclamation 9705, 83 Fed. Reg. at

11,626 ("[T]his tariff is necessary and appropriate to address the threat that imports of steel articles

pose to the national security.").  Thus, the President stated in essence that these increased tariffs

had the same purpose, function, and character as the original § 232 steel tariffs, and were to be

imposed in addition to the antidumping duties that had been in place for decades prior to the

proclamations.[5]   Accordingly, under the <u>Borusan Manessman II</u> proclamation-specific test, the

Proclamation 9772 tariffs must be considered the same as the Proclamation 9705 tariffs: as United

States import duties.[6]  Accordingly, Commerce's treatment of the Section 232 duties is sustained.

## II.    Duty Drawback Adjustment

Another adjustment Commerce must make to calculate the dumping margin, known as the

duty drawback adjustment, calls for U.S. price to be increased by the amount of any "import duties

imposed by the country of exportation which have been rebated, or which have not been collected,

by reason of the exportation of the subject merchandise to the United States."  19 U.S.C. §

1677a(c)(1)(B).  In determining whether a duty drawback adjustment is warranted, Commerce

applies a two-pronged test in which respondent must demonstrate 1) that the rebate and import

duties, or exemption from import duties, are directly linked to, and dependent upon, the exportation

of the subject merchandise; and 2) that there are sufficient imports of the raw material to account

for the drawback upon exportation of subject goods.  <u>Antidumping Methodologies: Market

Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback</u>, 71 Fed. Reg. 61,716,

---

[5] <u>See</u>, <u>e.g.</u>, <u>Antidumping Duty Order; Welded Carbon Steel Standard Pipe and Tube Products From Turkey</u>, 51 Fed. Reg. 17,784 (May 15, 1986).

[6] The court also notes that Section 232 lacks the clear statutory interplay that the courts have concluded exists between Section 201 duties and antidumping duties.  <u>See</u> <u>Borusan Mannesmann I</u>, 494 F. Supp. 3d. at 1375 ("There is a clear statutory interplay between Section 201 duties and antidumping duties, while Section 232 does not reveal any such coordination concerns.").  This statutory distinction between Section 232 and Section 201 exists regardless of presidential proclamations, and potentially warrants distinct treatment by Commerce, because Section 232 duties are quite unrelated to antidumping duties.  <u>Compare</u> 19 U.S.C. § 2252(b), (c)(5) (requiring injury determinations attributable to dumping or subsidization, similar to antidumping and countervailing duty law) <u>with</u> 19 U.S.C. § 1862 (requiring a presidential determination of a threat to national security); <u>see also</u> <u>Borusan Mannesmann I</u>, 494 F. Supp. 3d. at 1375.  The court does not perceive the more temporary existence of the additional 25 percent duty on Turkish goods to alter the analysis under either a purely statutory approach or a proclamation-based approach.

61,723 (Dep't Commerce Oct. 19, 2006); see also Saha Thai Steel Pipe (Pub.) Co. v. United States,

635 F.3d 1335, 1340 (Fed. Cir. 2011).

      The government of Turkey's ("GOT") duty drawback program, the Inward Processing

Regime ("IPR") involves exemptions from duties, rather than rebates.  Response of Icdas Celik

Enerji Tersane Ve Ulasim Sanayi A.S. and its Affiliates to Section C of the U.S. Department of

Commerce Antidumping Duty Questionnaire at C-38, P.R. 56, C.R. 45–46 (Apr. 15, 2020) ("Icdas

CQR").  Under the program, a company that imports raw materials and exports finished goods

made from such raw materials may obtain an inward processing certificate ("IPC") (also known

by its Turkish acronym, "DIIB"), which sets forth the quantity of raw material allowed to be

imported duty-free and the quantity of export required to close the IPC.  Response of Kaptan Demir

Celik Endustrive Ticaret A.S. to Section C of the U.S. Department of Commerce Antidumping

Questionnaire at C-35–C-36, P.R. 58, C.R. 78 (Apr. 15, 2020) ("Kaptan CQR").  "After confirming

that all inputs imported with IPR exceptions are used in the production of the exported goods, the

Ministry of Trade of the Turkish Government closes out the certificates."  Icdas CQR at C-39.

"When an IPC has been closed, and the closure is approved by Turkish Ministry of Trade, the IPC

holder is released of any liability for import duties otherwise payable on the entries under the IPC."

Kaptan CQR at C-36.

      On April 15, 2020, during the administrative review, Icdas timely provided Commerce its

IPCs and applications for closure of the IPCs, but it did not provide documentation from the GOT

that indicated that the IPCs were closed or approved.  Icdas CQR at C-39, Ex. C-19.  On September

17, 2020, Icdas submitted additional factual information to update its Section C questionnaire,

which Commerce rejected as an untimely addition.  Letter from Commerce to Icdas Rejecting New

Factual Information, P.R. 91 (Sept. 25, 2020) ("Commerce Rejection of New Information").[7]

Commerce stated that the deadline for information regarding duty drawbacks was April 15, 2020,

which was the date for responses to questionnaires. Commerce Rejection of New Information at

1. Although Icdas claimed that the submission should be accepted as timely under 19 C.F.R. §

351.301(c)(3)(ii), Commerce explained that provision only applied to information for "value

factors under 19 C.F.R. § 351.408(c) or to measure the adequacy of remuneration under 19 C.F.R.

§ 351.511(a)(2)," neither of which were applicable. Commerce Rejection of New Information at

2. But in a memorandum to the case file, Commerce stated that it rejected Icdas's factual

submission "because it was untimely filed under 19 CFR 351.301(c)(5)." Commerce

Memorandum Removing Rejected Submission, P.R. 92 (Sept. 28, 2020). This indicated that

Commerce understood Icdas was not attempting to submit irrelevant information normally

required in non-market economy questionnaires because 19 C.F.R. § 351.301(c)(5) does not seem

to apply to deficient responses to questionnaires.

Subsequently, in the preliminary results Commerce found that the GOT's duty drawback

program satisfied the traditional two-prong test for a duty drawback adjustment. PDM at 14.

Commerce proceeded to explain that its current practice for the IPR was to use only closed IPCs[8]

to calculate the adjustment. PDM at 15. Following that practice, Commerce provided Kaptan

Demir an adjustment for the IPCs that the GOT had determined were closed, but Commerce

---

[7] At oral argument, Icdas proffered that the rejected factual information was a certificate from
GOT stating that one of Icdas's IPCs had been approved.
[8] Commerce stated that requiring closed IPCs meant that "the company was no longer permitted
by the [GOT] to add import or export information." PDM at 15.

declined to provide Icdas any adjustment because Icdas did not provide evidence that demonstrated that any of the IPCs were closed.  <u>PDM</u> at 15; <u>see also</u> <u>Icdas CQR</u> at Ex. C-19.

In the final results, Commerce continued to deny Icdas's request for the adjustment.  <u>IDM</u> at 19.  Further, Commerce explained that Icdas did not follow instructions to request an extension to file the additional factual information, which requires a party to "notify the official in charge and submit a request for an extension" when filing factual information in response to a questionnaire.  <u>IDM</u> at 17.  Commerce also cited 19 C.F.R. § 351.301(c)(1)(iii), which requires that parties provide Commerce a notification within 14 days of the questionnaire for submitting further responsive information.  <u>IDM</u> at 18.  Commerce stated that it cannot know what information a party has, so it cannot issue supplemental questionnaires to obtain additional information for a voluntary claim such as duty drawbacks and that providing such information is a respondent's burden.  <u>IDM</u> at 18.  Commerce stated that it would have considered the factual submission had Icdas refiled it under 19 C.F.R. § 351.301(c)(5) with the necessary written explanation under the regulation.  <u>IDM</u> at 18–19.  Why this regulation might apply has not been explained by either party.

Putting aside the procedural ambiguities, Icdas argues that Commerce has unlawfully modified its long-standing practice for Turkish duty drawback adjustments by requiring proof that the GOT officially closed an IPC, which Icdas suggests adds a third prong to the established two-prong test.[9]  Pl. Br. at 8–11.  Icdas asserts that it provided sufficient record evidence of a letter

---

[9] In support of its argument, Icdas relies on a verification report from a previous administrative review to illustrate Commerce's past practice of accepting that the closed date is the date the IPC expires.  Pl. Br. at 12.  The government contends that the verification report is not part of the

guaranteeing duties owed to the GOT, a report linking the exported finished goods with the

imported inputs, and the IPCs closing applications along with the IPCs and a report certifying the

imports and exports.  Pl. Br. at 16–17.  Icdas contends that it has completed all steps within its

control, but official liquidation of the IPCs by the GOT may take several years.  Pl. Br. at 18.

Alternatively, Icdas argues that, even if final closure is required, Commerce erred in rejecting the

new factual submission regarding the IPCs as untimely.  Pl. Br. at 20–22.  Icdas asserts that it

never would have known it could have refiled the information under 19 C.F.R. § 351.301(c)(5)

because the file memorandum stated it was untimely under that specific regulation.  Pl. Br. at 22.

     The court has long relied on the duty drawback adjustment's two-prong test, and has

rejected attempts to "add a new hurdle to the drawback test that is not required by the statute."

Chang Tieh Industry Co. v. United States, 17 CIT 1314, 1320, 840 F. Supp. 141, 147 (1993); see

also Arcelormittal USA Inc. v. United States, 32 CIT 440, 463 n.23 (2008) (declining plaintiff's

"invitation to alter Commerce's reasonable interpretation of 19 U.S.C. § 1667a(c)(1)(B)").

Commerce's requirement of IPC closure is not new, but Commerce's evaluation of when an IPC

is closed has evolved.  Toscelik Profil ve Sac Endustrisi A.S. v. United States, 42 CIT __, __, 348

F. Supp. 3d 1321, 1328 n.1 (2018); Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United

States, 44 CIT __, __, 439 F. Supp. 3d 1342, 1349 (2020).

     In Toscelik, for a period of investigation ("POI") of October 1, 2013, through September

30, 2014, Commerce considered an IPC closed after it "expired" because then the company "could

---

administrative record, and thus the court should not consider it.  The verification report is being
cited only as an illustration of Commerce's past practice, not as a fact or evidence of a fact.  Thus,
the court will consider the verification report along with Commerce's other previous
administrative statements.

no longer apply any additional imports or exports to the DIIB," regardless of whether the GOT may have officially closed the IPC.  Toscelik, 348 F. Supp. 3d at 1328 n.1.[10]  At some point after the Toscelik investigation, Commerce defined closure as when "the DIIB holder applies for closure of the DIIB with the Turkish Government."  Id.  Subsequently, during a POI of July 1, 2015, through June 30, 2016,[11] Commerce stated its practice was to provide a duty drawback adjustment only "upon evidence that the subject country's government has forgiven those duties."  Habas, 429 F. Supp. 3d at 1347.[12]  The court sustained Commerce's rationale as reasonable because duty drawback eligibility required record evidence that showed the GOT had "forgiven the duty liability."  Id. at 1349.

As indicated, Commerce has not been consistent in how it defines closure of IPCs.  In one proceeding, Commerce considered an IPC closed "[f]or practical purposes . . . when the exporting company has applied to the Turkish government for closure."  Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 47355 (Dep't Commerce July 21, 2016) ("HWRP from Turkey"),

---

[10] In Toscelik, the Turkish plaintiffs argued that Commerce's requirement that IPCs must be closed during the POI was unreasonable.  348 F. Supp. 3d at 1325.  The court agreed, holding that limiting the acceptance of IPCs to those closed during the POI ignored "verified record information" when plaintiffs had IPCs that Commerce considered closed but only after the conclusion of the POI.  Id. at 1327–28.

[11] The investigation at issue was for steel concrete reinforcing bar from Turkey.  Steel Concrete Reinforcing Bar From the Republic of Turkey, 82 Fed. Reg. 23,192 (Dep't Commerce May 22, 2017).

[12] As Commerce explained in its remand results in the Habas case, Commerce needed more record evidence than that "Habas had exports under these IPCs during POI."  Redetermination Pursuant to Court Remand Order, Habas Sinai Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, Consol. Ct. No. 17-00204, ECF No. 83 (Jan. 15, 2020).  Instead, Commerce required record evidence that the GOT "actually refund[ed] any paid duties or ha[d] forgiven the imputed duties."  Id. at 8–9.

and accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey at Comment 4, A-489-824, POI 7/1/2014–6/30/2015 (Dep't Commerce July 14, 2016). But in a later proceeding, Commerce explained that applying for IPC closure is insufficient because "a company's application to close a DIIB may be modified or suspended." Light-Walled Rectangular Pipe and Tube from the Republic of Turkey, 82 Fed. Reg. 47,477 (Dep't Commerce Oct. 12, 2017) ("LWRPT from Turkey"), and accompanying 2015–2016 Antidumping Duty Administrative Review of Light-Walled Rectangular Pipe and Tube from Turkey: Issues and Decision Memorandum for the Final Results at Comment 9, A-489-815, POR 5/1/2015–4/30/2016 (Dep't Commerce Oct. 12, 2017) ("LWRPT from Turkey IDM"). Further, Commerce noted in LWRPT from Turkey that, in HWRPT from Turkey, Commerce actually "disallowed two of the three DIIBs under which the respondent requested a duty drawback adjustment because one DIIB remained open and the other DIIB was suspended after the respondent had applied for closure." LWRPT from Turkey IDM at Comment 9. In this proceeding, Commerce acknowledged its conflicting statements, and clarified that "an IPC may be modified or suspended even after it has been submitted," and thus an IPC cannot be closed without sufficient documentation establishing that GOT had forgiven the liability. IDM at 16.

Here, the court recognizes that Commerce has not always been clear as to when it will consider an IPC closed. In two recent instances, however, LWRPT from Turkey and Habas, Commerce clearly stated that it required more than closure application and instead required "evidence that the subject country's government has forgiven those duties." See Habas, 439 F. Supp. 3d at 1347; LWRPT from Turkey IDM at Comment 9 ("Thus the Department is not satisfied

that a DIIB has been closed until a respondent can provide sufficient documentation establishing its closure by the GOT.").  Thus, it appears to the court that in recent years Commerce's practice has been to require some indication from the GOT that the IPC was approved, and Icdas should have been on notice that this was likely the requirement.[13]

In this review, Commerce addressed its past practice and reasoned that it needed more definite information to grant the § 1677a(c)(1)(B) adjustment under the statute.  IDM at 16.  There are factual differences and inconsistencies in Commerce's past practice, but the most recent cases make Commerce's current practice clear.  Because Commerce has long required some evidence of finality for the drawback adjustment, this is not adding a third prong to the § 1677a(c)(1)(B) test.  Rather it is clarification of the level of proof required.  Commerce can seek better proof than it has in the past cases.  See Huvis Corp. v. United States, 570 F.3d 1347, 1353 (Fed. Cir. 2009) ("Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology").  This is not unreasonable.  The questions remaining are whether Icdas did all it reasonably could under Commerce's procedures given the lack of clarity of such procedures, whether it was harmed by this lack of clarity and thus should be given an opportunity to comply, and whether Commerce's substantive requirements for a drawback adjustment are fair.

---

[13] Icdas relies on Toscelik to suggest that the court has scrutinized Commerce's attempts to change the definition of a closed IPC.  Pl. Br. at 14.  Toscelik is one example of Commerce's lack of clarity regarding the definition of closure because it is an earlier administrative review where Commerce considered IPCs closed when the applications "expired."  348 F. Supp. 3d at 1325–26 n.1.  Its holding, however, is limited to the rejection of Commerce's then-requirement that an IPC must be closed during the POI in order to be accepted.  Id. at 1327.  Thus, it is inapposite to this case.

The court sees two scenarios under which Icdas's and Commerce's actions in the administrative proceedings can be explained. In the first scenario, Icdas's original duty drawback submissions were a questionnaire response. If so, Commerce should have found Icdas's response unsatisfactory, and Commerce would have needed to send a deficiency notice under 19 U.S.C. § 1677m(d) and provide Icdas an opportunity to correct its filing within 30 days. See 19 U.S.C. § 1677m(d); 19 C.F.R. § 351.301(c)(1). Icdas likely could not have complied because, here, it did not attempt to submit its new factual information until five months after its Section C questionnaire response. See Icdas CQR at C-39; Commerce Rejection of New Information at 1. In the second scenario, Icdas's submission was not a questionnaire response. Thus, Icdas likely could have filed its supplemental information later under 19 C.F.R. § 351.301(c)(5). Here, though, Icdas's new factual information submission, allegedly applicable to one drawback request, failed to comply with the requirements for such late filed information of "clearly explain[ing] why the information [] does not meet the definition of factual information described in § 351.102(b)(21)(i)–(iv)" as well as providing a detailed narrative of the information. 19 C.F.R. § 351.301(c)(5); IDM at 18–19. Likely such a narrative would describe the proper purpose and not refer to irrelevant non-market economy provisions.[14] Regardless, Icdas did not fully describe the rejected factual information to the court and make a clear case for finding Commerce's decision erroneous. Further, when a party asks the court to rule on information Commerce rejected from the record, the party should proffer

---

[14] Icdas appears to believe that its proposed information is not governed by rules regarding questionnaire responses because Icdas argues that the new factual submission was timely under 19 C.F.R. § 351.301(c)(5) and does not argue before the court that it was owed a deficiency notice under 19 U.S.C. § 1677m(d).

the rejected information to the court for examination so that the court can properly determine if the record should be corrected on remand.

Finally, the record in this case does not show that the GOT fails to process IPCs and grant duty drawbacks in a timely fashion, so as to make Commerce's requirements unfair. Kaptan was able to provide a certificate from the GOT approving an IPC, which Commerce accepted as sufficient proof under this closure standard. See Kaptan CQR at Ex. C-15; PDM at 15. Thus, there is nothing in this record that shows that the evidence that Commerce seeks ordinarily cannot be obtained in a timely manner. Nonetheless, the court is concerned that Commerce is not being clear about what procedures apply for drawback information. Commerce refers to both strict questionnaire response time limits but seems to believe there is a category of adjustments that are "voluntary," to which other more lenient rules may apply. The court does not find a clear path in the regulations themselves. The court, however, cannot conclude that Icdas was harmed by this lack of clarity. Icdas neither applied for an extension of time to file nor followed the requirements for the regulations that might have allowed it to otherwise submit information late in the proceeding. Accordingly, Commerce reasonably rejected Icdas's request for a duty drawback adjustment.

## III.    Inflation Adjustment

At issue here is Commerce's denial of Icdas's request for a monthly indexation methodology to account for the effects of high inflation in Turkey during the POR. See Pl. Br. at 41–43; IDM at 21–23. Commerce calculates the normal value of the subject merchandise based on home market sales that are made "in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i). Commerce, therefore, disregards sales at prices that are less than the cost of

production, id. § 1677b(b)(1)(B), because those sales are not made within the ordinary course of trade, id. § 1677(15)(A).  The cost of production "equal[s] of the sum of . . . the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business."  Id. § 1677b(b)(3)(A).

Section 1677b(b)(3)(A) does not define the "period" to be used or the method Commerce must use to calculate the costs of production.  See id.; see also Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, 43 CIT __, __, 361 F. Supp. 3d 1314, 1324 (2019).  Commerce's normal methodology requires respondents to report costs using "a POR annual average basis."  IDM at 22.  Commerce may depart from its usual methodology and rely on quarterly cost-averages when "significant cost changes are evident [and] . . . sales can be accurately linked with the concurrent quarterly costs."  Pastificio Lucio Garofalo, S.p.A. v. United States, 35 CIT __, __, 783 F. Supp. 2d 1230, 1235–36 (2011), aff'd 469 F. App'x 901 (Fed. Cir. 2012).  These significant situations include periods of high inflation.  See IDM at 22; Certain Steel Concrete Reinforcing Bars from Turkey, 66 Fed. Reg. 56,274 (Dep't Commerce Nov. 7, 2001).  One significant change is inflation greater than 25 percent during the POR.  IDM at 21–22; Habas, 361 F. Supp. 3d at 1324.

During the administrative proceeding, Respondents reported that, based on Turkish Statistical Institute data and the producer price index ("PPI"), inflation exceeded 25 percent during the POR, which was July 1, 2018, to June 30, 2019.  See Icdas and Kaptan Notice of Inflation Rate Above 25 Percent at 1–2 P.R. 37 (Mar. 6, 2020); Icdas Section D Questionnaire Response at D-22–D-23 and Ex. D-11, C.R. 112, P.R. 60 (Apr. 20, 2020); Kaptan Section D Questionnaire

Response at D-14 and Ex. D-8, C.R. 97, P.R. 59 (Apr. 20, 2020).  The PPI data depicts the index

price for each month on an annual basis.  Kaptan Section D Questionnaire Response at Ex. D-8.

Notably, the June 2018 PPI was 365.60, July 2018 was 372.06, June 2019 was 457.16, and July

2019 was 452.63.  Kaptan Section D Questionnaire Response at Ex. D-8.  Respondents calculated

inflation to be 25.04 percent by subtracting June 2018 data from June 2019 data and dividing the

difference by June 2018 data.  Kaptan Section D Questionnaire Response at Ex. D-8.  Defendant-

Intervenor Rebar Trade Action Coalition ("RTAC") submitted information explaining that

Respondents' inflation calculations included data from June 2018, the month before the POR, and

that the POR-only data of July 2018 to June 2019 resulted in an inflation calculation of 22.87

percent, less than 25 percent.  RTAC Comments on High Inflation, C.R. 156, P.R. 63 at 3–5.

   In the final results, Commerce determined that there was not sufficiently high inflation

during the POR.  IDM at 21.  Commerce explained that it relied on the PPI numbers from July

2018 and June 2019, representing the POR, and found that inflation was 22.87 percent.  IDM at

22.  Although Commerce acknowledged that Respondents' data from June 2018 to June 2019

showed inflation of 25.04 percent, Commerce stated that using the full 12-month POR was its

long-established practice, and it saw no need to use the June 2018 data for a 13-month review.

IDM at 22.  Commerce found that the monthly indexes in the PPI data reflected data for the entire

month, based on collected prices on the 5th, 15th, and 25th of each month.  IDM at 22.  Thus,

Commerce concluded that the June 2018 data was from outside the POR and accordingly should

not be considered.  IDM at 22–23.

   Now, Respondents argue that Commerce should have included the June 2018 data in its

analysis.  Pl. Br. at 41.  Respondents assert that, by not considering the June 2018 data, Commerce

has only measured inflation for an 11-month period and "improperly exclude[d] July 2018 from the analysis." Pl. Br. at 42.[15]  Respondents contend that June 2018 to June 2019 is a review of the full 12-month period and shows that inflation was greater than 25 percent during the POR.  Pl. Br. at 43.

Here, Commerce's decision that high inflation did not exist in the Turkey during the POR is supported by substantial evidence.  Commerce's methodology, comparing the July 2018 data to June 2019 data, is a reasonable choice to measure inflation over the POR and on an annual basis. IDM at 22.  That comparison, showing inflation to be 22.87 percent, fails to rise to the 25 percent change that Commerce has required for quarterly-cost averages.  See Kaptan Section D Questionnaire Response at Ex. D-8; see also Habas, 361 F. Supp. 3d at 1324.  The court sees no reason for Commerce to include June 2018 data for comparing the change in price from the beginning of the POR when the June 2018 data predates the POR.[16]  Accordingly, Commerce's decision is sustained.

---

[15] Respondents also appear to argue that, because PPI data is published on the third business day of the following month, there is a one-month lag in the data.  Pl. Br. at 42.  There is no evidence that, because June 2018 data would be published in July 2018, that data would be reported as the July 2018 data.  Commerce already considered this argument and determined that the data is correctly identified based on the month from which it is collected, not the month in which it is published.  IDM at 22.  Further, the International Monetary Fund record evidence explained that the inflation data was collected on the 5th, 15th, and 25th of each month and then only published on the third day of the next month.  See Commerce Memorandum: New Factual Information at 17, P.R. 116 (Nov. 18, 2020).  Thus, this argument fails.

[16] If there is any potential problem with Commerce's methodology, it may be in not using July 2019 as part of the calculation in order to fully capture one year after the July 1, 2018, beginning of the POR.  Nevertheless, the July 2018 to July 2019 rate of inflation is only 21.66 percent, also below Commerce's required amount.  Thus, the court need not weigh in on the methodology further.

**CONCLUSION**

The court sustains Commerce's determination regarding the AD order for rebar products

from Turkey.

/s/        Jane A. Restani
Jane A. Restani. Judge

Dated: August 23, 2023
        New York, New York

# ATTACHMENT 3:

## *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. No. 21-00246, Slip Op. 23-26 (Mar. 8, 2023)

Slip Op. 23-26

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., <br><br>        Plaintiff and Consolidated Defendant-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br>        Defendant, <br><br> and <br><br> ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, ET AL., <br><br>        Defendant-Intervenors and Consolidated Plaintiffs. | Before: Gary S. Katzmann, Judge <br> Consol. Court No. 21-00246 <br><br> ***PUBLIC VERSION*** |

## <u>OPINION</u>

[Plaintiff's Motion for Judgment on the Agency Record is granted in part and denied in part. Consolidated Plaintiffs' Motion for Judgment on the Agency Record is granted in part and denied in part. The court stays consideration of the Section 232 tariff issue pending final resolution by the Federal Circuit. Commerce's <u>Final Determination</u> is remanded for reconsideration or further explanation consistent with this opinion.]

Dated: <u>March 1, 2023</u>

<u>Leah Scarpelli</u>, Arent Fox LLP, of Washington, D.C., argued for Plaintiff and Consolidated Defendant-Intervenor Assan Aluminyum Sanayi Ve Ticaret A.S. With her on the briefs were <u>Matthew M. Nolan</u> and <u>Yun Gao</u>.

<u>Kyle S. Beckrich</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department

of Justice, of Washington, D.C., argued for Defendant United States. With him on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the briefs were Natalie Marie Zink and Ashlande Gelin, Attorneys, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Joshua R. Morey, Kelley Drye & Warren LLP, of Washington, D.C., argued for Defendant Intervenors and Consolidated Plaintiffs Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members, et al. With him on the brief were John Herrmann, Paul C. Rosenthal, R. Alan Luberda, and Julia A. Kuelzow.

Katzmann, Judge: This is an appeal from the U.S. Department of Commerce ("Commerce")'s final affirmative determination in the sales at less-than-fair value ("LTFV") investigation of Common Alloy Aluminum Sheet ("CAAS") from Turkey. See Common Alloy Aluminum Sheet from Turkey: Final Affirmative Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 13,326 (Dep't Com. Mar. 8, 2021), P.R. 358 ("Final Determination"). Before the court, Petitioner[1] the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group & Individual Members ("the Association" or "Consolidated Plaintiffs" or "Defendant-Intervenors") and Mandatory Respondent[2] Assan Aluminyum Sanayi ve Ticaret A.S.

---

[1] An LFTV investigation is "initiated whenever an interested party . . . files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of [antidumping] dut[ies]." 19 U.S.C. § 1673a(b)(1).

[2] In LTFV investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f–1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping margin determinations [in investigations or administrative reviews] because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to-
>
> > (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or

("Assan" or "Plaintiff" or "Consolidated Defendant-Intervenor") challenge various adjustments

that Commerce made -- or declined to make -- to the values Commerce uses to determine whether

foreign goods are being introduced into the United States at less than fair value to the detriment of

domestic producers and in violation of American laws designed to promote fair trade.  It is

Commerce's practice to adjust the examined values to account for, among other things, U.S. import

duties and other shipping costs paid to bring the investigated product into the United States, import

duties rebated or not collected by the country of origin upon exportation of the product, and

discounts or rebates given on the product in the home market.

Because, as established herein, the court concludes that only certain of Commerce's

adjustment choices were supported by substantial evidence and otherwise in accordance with law

-- namely, Commerce's treatment of Assan's shipping costs and home market rebates -- the court

sustains Commerce's Final Determination in part and remands it in part for further consideration

consistent with this opinion.

## BACKGROUND

The court begins by setting out the overarching legal, factual, and procedural background

necessary to contextualize the challenges posed by Plaintiff and Consolidated Plaintiffs.  The court

will expand upon certain legal, factual, and procedural elements as relevant and necessary in the

forthcoming discussion of specific issues, infra pp. 12–59.

### I.    *Legal Background*

Under the Tariff Act of 1930 ("the Act"), Congress empowered Commerce to investigate

and, if appropriate, impose duties to counteract dumping.  Sioux Honey Ass'n v. Hartford Fire Ins.

---

(B) exporters and producers accounting for the largest volume of the subject
merchandise from the exporting country that can be reasonably examined.

Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012). Dumping occurs when a foreign firm sells an identified

product ("subject merchandise") for "less than fair value" in the United States, meaning that the

product is sold at an export price -- or, as in the case at bar, a constructed export price -- that is

lower than the product's normal value. See Saha Thai Steel Pipe (Pub.) Co. v. United States, 635

F.3d 1335, 1338 (Fed. Cir. 2011). "[N]ormal value is generally the 'price at which the foreign . . .

product is first sold . . . for consumption in the . . . country [of export],'" reflecting the "home

market price," Maverick Tube Corp. v. Toscelik Profil, 861 F.3d 1269, 1271 (Fed. Cir. 2017)

("Maverick Tube III") (quoting 19 U.S.C. § 1677b(a)(1)(B)(i)); while the constructed export price

is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United

States . . . to a purchaser not affiliated with the producer or exporter," reflecting the "U.S. sales

price," 19 U.S.C. § 1677a(b).

     Where Commerce determines that goods are being, or are likely to be, sold at less than fair

value,[3] the agency imposes antidumping duties on the foreign merchandise. See 19 U.S.C. § 1673.

Commerce determines the appropriate amount of antidumping duties by calculating the "dumping

margin," which is the amount by which the normal value exceeds the export or constructed export

price. See 19 U.S.C. § 1677(35)(A). In completing this calculation, Commerce seeks to compare

prices "at a common point in the chain of commerce." APEX Exports v. United States, 777 F.3d

1373, 1374 (Fed. Cir. 2015).

     Achieving "a common point in the chain of commerce," id., requires Commerce to make

certain adjustments to the prices representing normal value and export/constructed export price,

---

[3] And where the United States International Trade Commission makes the additional requisite finding -- not at issue in the case at bar -- that the sale of such merchandise below fair value is materially injuring, threatening, or impeding the establishment of an industry in the United States. See Diamond Sawblades Mfrs. Coal. v. United States, 866 F.2d 1304, 1306 (Fed. Cir. 2017).

see, e.g., 19 U.S.C. § 1677b;[4] id. § 1677a;[5] 19 C.F.R. § 351.401(c).  As described in greater detail, infra pp. 12–59, such adjustments can include, inter alia, increasing constructed export price to reflect "duty drawbacks," or import duties rebated and/or not collected by the country of origin upon exportation of subject merchandise, see 19 U.S.C. § 1677a(c)(1)(B), decreasing constructed export price to account for U.S. import duties and other costs paid to bring subject merchandise into the United States, see id. § 1677a(c)(2)(A), and decreasing normal value to reflect discounts or rebates given on subject merchandise in the home market, see 19 C.F.R. § 351.102(b)(38).

Because Commerce identifies dumping by assessing whether a foreign producer/exporter is selling its products in the United States at less than normal value, as a general rule, it is in the Petitioner's interest[6] -- who is seeking imposition of antidumping duties -- if the assessed U.S. sales price (i.e., constructed export price) is low, and the home market price (i.e., normal value) is high.  By contrast, it is generally in the Respondent's interest[7] -- who is seeking to avoid the imposition of antidumping duties -- if the assessed U.S. sales price (i.e., constructed export price) is high, and the home market price (i.e., normal value) is low.  In light of these divergent interests, Commerce is wary of attempts by parties to manipulate dumping margins, particularly through so-called "after-the-fact" or "post-sale" adjustments.[8]  "The interested party that is in possession of

---

[4] Section 773 of the Act, as codified at 19 U.S.C. § 1677b, provides the statutory basis for price adjustments to normal value.

[5] Subsection 772(a) of the Act, as codified at 19 U.S.C. § 1677a, provides the statutory basis for price adjustments to constructed export price.

[6] In this case, the Association.

[7] In this case, Assan.

[8] To illuminate how such "manipulation" can occur, take home market rebates and discounts as an example.  Under 19 C.F.R. § 351.102(b)(38), Commerce deducts from normal value discounts and

the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment."  19 C.F.R. § 351.401(b)(1).

## II.    *Factual Background*

On March 9, 2020, the Association filed an antidumping petition[9] concerning imports of Common Alloy Aluminum Sheet ("CAAS") from Turkey.  <u>See</u> Mem. to DAS for Operations Pertaining to Interested Parties Resp't Selection at 1 (Apr. 29, 2020), C.R. 15, P.R. 49 ("Mem. to DAS").  In response, on March 30, 2020, Commerce initiated a LTFV investigation of CAAS from Turkey covering the period of January 1, 2019 through December 31, 2019.  <u>Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Republic of Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations</u>, 85 Fed. Reg. 19,444 (Dep't Com. Apr. 7, 2020), P.R. 34 ("<u>LTFV Initiation</u>").  Commerce defined the scope of the products covered by the investigation as follows:

> [C]ommon alloy aluminum sheet, which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width.  Common alloy sheet within the scope of this investigation includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association.  With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX series core, to which cladding layers are applied to either one or both sides of the core.  The use of a proprietary alloy or non - proprietary alloy that is not specifically registered by the Aluminum Association as a discrete

---

rebates given on sales of subject merchandise in the home market.  If Commerce were to permit deductions for home market rebates and/or discounts granted "after it became known that certain sales would be subject" to an antidumping duty, producers/exporters could use discounts and rebates to lower normal value (i.e., home market prices) relative to export value (i.e., U.S. prices) post-hoc, and thereby reduce or eliminate dumping margins.  <u>China Steel Corp. v. United States</u>, 43 CIT__, __, 393 F. Supp. 3d 1322, 1347 (2019).

[9] <u>Supra</u> note 1.

1XXX-, 3XXX-, or 5XXX-series alloy, but that otherwise has a chemistry that is consistent with these designations, does not remove an otherwise in-scope product from the scope.

LTFV Initiation App. at 19,449.

Commerce selected Assan, a Turkish manufacturer and exporter of CAAS, as a mandatory respondent,[10] see Mem. to DAS at 7, and preliminary assigned Assan a dumping margin of 12.65 percent on October 6, 2020, see Common Alloy Aluminum Sheet from Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 85 Fed. Reg. 65,346, 65,347 (Dep't Com. Oct. 15, 2020), P.R. 264 ("Preliminary Determination").  In calculating this preliminary margin, Commerce granted and denied certain adjustments requested by the parties to Assan's constructed export price:[11]  Namely, Commerce both increased the constructed export price by granting a duty drawback adjustment to Assan for import duties rebated and/or not collected and depressed the constructed export price through: the (1) denial of billing adjustments claimed by Assan to correct certain errors and (2) application of a reduction for freight expenses Assan paid to an affiliated service provider.  See generally PDM.

On January 6, 2021, Assan filed an administrative case brief challenging Commerce's preliminary margin calculation.  Specifically, Assan claimed Commerce erroneously: (i) depressed the constructed export price by using a "duty neutral" methodology to implement Assan's duty

---

[10] Supra note 2.

[11] Commerce utilized constructed export price because Assan reported no sales of subject merchandise to an unaffiliated purchaser in the United States.  See 19 U.S.C. § 1677a(a)–(b).  As such, Commerce relied on sales made on Assan's behalf by its U.S. sales affiliate, Kibar Americas, to unaffiliated purchasers in the United States.  See Mem. from J. Maeder to J. Kessler, re: Dec. Mem. for the Prelim. Affirmative Determ. in the Less Than Fair Value Investigation of Common Alloy Aluminum Sheet from Turkey at 9 (Dep't Com. Oct. 6, 2020), P.R. 247 ("PDM").

**PUBLIC VERSION**

drawback adjustment as well as by improperly deducting tariffs imposed on Assan's subject merchandise under Section 232 of the Trade Expansion Act of 1962;[12] and (ii) inflated Assan's normal value by denying Assan a downward home market rebate adjustment for customers who received discounts for certain volume purchases in a given period.  See Case Br. of Assan Aluminyum Sanayi ve Ticaret A.S. (Jan. 6, 2021), P.R. 309, C.R. 400 ("Pl.'s Case Br."); Rebuttal Br. of Assan Aluminyum Sanayi ve Ticaret A.S. (Jan. 19, 2021), P.R. 317, C.R. 404 (Pl.'s Rebuttal Br.").  For its part, the Association filed an administrative case brief contending that Commerce erroneously: (i) inflated the constructed export price by granting Assan a duty drawback adjustment for which it was ineligible as well as by declining to apply adverse facts available ("AFA")[13] both in calculating the deduction for affiliated freight charges and in determining Assan's eligibility for certain billing adjustments; and (ii) lowered Assan's normal value by declining to apply AFA where Assan failed to provide documentation for its claimed home market rebate adjustments.  See Pet'r's Case Br. (Jan. 6, 2021), P.R. 309, C.R. 401 ("Consol. Pls.' Case Br.").

The Department issued its Final Determination on March 8, 2021, assigning Assan a final dumping margin of 2.02 percent.  Final Determination at 13,327.  In calculating this final dumping margin, Commerce made no changes to its adjustments for duty drawbacks, Section 232 tariffs, home market rebates, or affiliated freight charges; however, Commerce modified its billing adjustments by using Assan's reported information on the record -- rather than the lowest reported value, as in the Preliminary Determination -- to lower the constructed export price.  See Issues and

---

[12] Background information on Section 232 of the Trade Expansion Act of 1962 is provided, infra pp. 54–55.

[13] Background information on AFA is provided, infra pp. 46–47.

Dec. Mem. for the Final Affirmative Determ. in the Less-Than-Fair-Value Investigation of

Common Alloy Aluminum Sheet from Turkey, and Final Negative Determination of Critical

Circumstances at 11, 14–18, 22–24 (Dep't Com. Mar. 1, 2021), P.R. 330 ("IDM").

### III.    Procedural Background

On May 21, 2021, Assan filed a complaint challenging Commerce's <u>Final Determination</u>.

<u>See</u> Assan Compl., May 21, 2021, ECF No. 4.  On June 7, 2021, the Association intervened in the

case as a matter of right.   <u>See</u> Mot. to Intervene as Def.-Inter., June 6, 2021, ECF No. 10.

Separately, the Association initiated its own appeal of Commerce's determination, <u>see</u> Ass'n

Compl., June 22, 2021, ECF No. 10, which this court consolidated into Assan's case upon a

consent motion made on July 26, 2021, <u>see</u> Order Granting Mot. to Consolidate Cases, July 27,

2021, ECF No. 18.  Assan and the Association each moved for judgment on the agency record on

November 22, 2021.  <u>See</u> Assan's Mem. of L. in Supp. of Mot. for J. on Agency R., Nov. 22, 2021,

ECF No. 27 ("Pl.'s Br."); <u>see also</u> Ass'n's Mem. of L. in Supp. of Mot. for J. on Agency R., Nov.

22, 2021, ECF No. 29 ("Consol. Pls.' Br.").  Assan, the Association, and the Government filed

responses to the respective motions on February 22, 2022.  <u>See</u> Resp. Br. of Assan to Pet'r's Rule

56.2 Mot. for J. on Agency R., Feb. 22, 2022, ECF No. 33 ("Pl.'s Resp."); Ass'n's Resp. in Opp.

to Pl.'s Mot. for J. on Agency R., Feb. 22, 2022, ECF No. 35 ("Consol. Pls.' Resp."); U.S. Gov't's

Consol. Resp. to Pl.'s & Consol. Pls.' Mot. for J. on the Agency R., Feb. 22, 2022, ECF No. 40

("Def.'s Br.").  On March 24, 2022, Assan and the Association filed their respective replies.  <u>See</u>

Reply Br. of Assan, Mar. 24, 2022, ECF No. 43 ("Pl.'s Reply"); Ass'n's Reply Br., Mar. 24, 2022,

ECF No. 45 ("Consol. Pls.' Reply").

On June 10, 2022, this court issued a preliminary question to the parties, <u>see</u> Ct.'s Prelim.

Q., Jun. 10, 2022, ECF No. 54, to which all parties responded in writing on June 24, 2022, <u>see</u>

Case 1:21-cv-00246-SAK   Document 93   Filed 03/30/23   Page 51 of 152

Consol. Court No. 21-00246                                                    Page 10
*PUBLIC VERSION*

Assan's Resp. to Ct.'s Prelim. Q. of Jun. 10, 2022, Jun. 24, 2022, ECF. No. 55 ("Pl.'s Prelim. Q. Resp."); Ass'n's Resp. to Ct.'s Prelim. Q., Jun. 24, 2022, ECF. No. 56 ("Consol. Pls.' Prelim. Q. Resp."); U.S. Gov't's Resp. to Ct.'s Prelim. Q., Jun. 24, 2022, ECF. No. 57 ("Def.'s Prelim. Q. Resp.").  The court then issued questions for oral argument on July 5, 2022, see Ct.'s Qs. for Oral Arg., July 5, 2022, ECF Nos. 58–59, and an additional question for the Government on July 7, 2022, see Ct.'s Supp. Q. for Oral Arg., July 7, 2022, ECF No. 60, to which the parties responded in writing on July 15, 2022, see Assan's Resp. to Ct.'s Qs. for Oral Arg., July 15, 2022, ECF No. 68 ("Pl.'s Oral Arg. Subm."); Ass'n's Resp. to Ct.'s Qs. for Oral Arg., July 15, 2022, ECF No. 63 ("Consol. Pls.' Oral Arg. Subm."); U.S. Gov't's Resp. to Ct.'s Qs. for Oral Arg., July 15, 2022, ECF No. 64 ("Def.'s Oral Arg. Subm.").  After examining the parties' written responses, the court presented parties with supplemental questions to be addressed verbally at oral argument.  See Ct.'s Suppl. Qs. for Oral Arg., July 18, 2022, ECF Nos. 66–67.

Oral argument took place on Tuesday, July 19, 2022.  ECF No. 71.  Following oral argument, the parties submitted post-oral argument briefing to the court.  See Assan's Post-Arg. Subm., July 26, 2022, ECF No. 72 ("Pl.'s Suppl. Br."); U.S. Gov't's Post Arg. Subm., July 26, 2022, ECF No. 74 ("Def.'s Suppl. Br."); Ass'n's Post Arg. Subm., July 26, 2022, ECF No. 76 ("Consol. Pls.' Suppl. Br.").

Finally, to aid its adjudication, the court submitted supplemental questions to the parties on October 14, 2022 for answers in writing.  See Ct.'s Oct. 14, 2022 Suppl. Qs., Oct. 14, 2022, ECF Nos. 79–80.  With the parties' responses in hand, see Assan's Resp. to Ct.'s Oct. 14, 2022 Suppl. Qs., Oct. 28, 2022, ECF No. 81 ("Pl.'s Suppl. Qs. Resp."); Ass'n's Resp. to Ct.'s Oct. 14, 2022 Suppl. Qs., Oct. 28, 2022, ECF No. 83 ("Consol. Pl.'s Suppl. Qs. Resp."); U.S. Gov't's Resp.

to Ct.'s Oct. 14, 2022 Suppl. Qs., Oct. 28, 2022, ECF No. 85 ("Def.'s Suppl. Qs. Resp."), the case

is now decision ready.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19

U.S.C. § 1516a(a)(2)(A)(i)(II) and (B)(i); see also NEC Corp. v. United States, 151 F.3d 1361,

1374 (Fed. Cir. 1998) (Under 28 U.S.C. § 1581(c), "[a]n importer may appeal from Commerce's

final determination to the United States Court of International Trade.").  In reviewing antidumping

determinations, the court will sustain "'any determination, finding or conclusion' by Commerce

unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with

law.'"  Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19

U.S.C. § 1516a(b)(1)(B)).

The substantial evidence standard is satisfied by "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," Universal Camera Corp. v. NLRB, 340

U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)), which

requires "less than the weight of the evidence," Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620

(1966), but "more than a mere scintilla," Elbit Systems of America, LLC v. Thales Visionix, Inc.,

881 F.3d 1354, 1355 (Fed. Cir. 2018) (quoting In re Nuvasive, Inc., 842 F.3d 1376, 1379 (Fed.

Cir. 2016)).  That a court could draw inconsistent conclusions from the record does not render

Commerce's findings unsupported by substantial evidence, see Consolo, 383 U.S. at 620, so long

as the agency has "examine[d] the relevant data[,] articulate[d] a satisfactory explanation," Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (citing Burlington Truck

Lines v. United States, 371 U.S. 156, 168 (1962)), and accounted for detracting evidence,

Universal Camera, 340 U.S. at 488.

An agency acts contrary to law if its decision-making is arbitrary or unreasoned.  See Burlington Truck Lines, 371 U.S. at 167–68.  To be sufficiently reasoned, Commerce must establish "a 'rational connection between the facts found and the choice[s] made.'"  State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at 168); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013).   In reviewing Commerce's determinations, the court "may not supply a reasoned basis for the agency's action that the agency itself has not given," State Farm, 463 U.S. at 43 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)), but may uphold an agency's action "where the agency's decisional path is reasonably discernable," Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (citing Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

## DISCUSSION

Before the court, Assan argues that Commerce's Final Determination is unsupported by substantial evidence and otherwise not in accordance with law because Commerce erroneously: (1) employed a "duty neutral" methodology when adding Assan's duty drawback adjustment to the constructed export price; (2) declined to deduct home market rebates granted by Assan from the normal value; and (3) deducted tariffs paid by Assan under Section 232 of the Trade Expansion Act of 1962 from the constructed export price.  See generally Assan Compl.  For its part, the Association argues that Commerce's Final Determination is unsupported by substantial evidence and otherwise not in accordance with law because Commerce erroneously: (1) added any duty drawback adjustment to the constructed export price; and (2) deducted too little from the constructed export price for Assan's affiliated freight charges and certain billing adjustments.  See generally Ass'n Compl.

For the reasons stated herein, the court sustains Commerce's general grant of a duty drawback adjustment to Assan but assesses that Commerce's specific implementation of said adjustment contravened Federal Circuit precedent.  The court further sustains Commerce's treatment of the adjustments pertaining to Assan's home market rebates and affiliated freight costs.  However, the court holds that Commerce's treatment of Assan's billing adjustments does not accord with law.  Finally, the court stays consideration of the Section 232 tariff issue pending final resolution by the Federal Circuit of an identical issue in a separate case.

Accordingly, the court grants Plaintiff's Motion for Judgment on the Agency Record in part and denies it in part and grants Consolidated Plaintiffs' Motion for Judgment on the Agency Record in part and denies it in part.  The court remands Commerce's Final Determination for reconsideration or further explanation consistent with this opinion.

## I.      *Commerce's Awarded Duty Drawback Adjustment Does Not Accord with Law.*

### A.      *Issue-specific Legal Background*

#### 1.      *Duty Drawback Adjustments*

A "duty drawback adjustment" comes into play where "a foreign country would normally impose an import duty on an input used to manufacture the subject merchandise, but offers a rebate or exemption from the duty if the input is exported to the United States." Saha Thai, 635 F.3d at 1338.  Under such circumstances, Commerce adjusts upward a respondent's export or constructed export price by the amount of the rebated or unpaid import duty.  The agency does as such, because antidumping duties are calculated by measuring the amount by which normal value (as here measured by sales price in the home market) exceeds constructed export price (as measured by U.S. sales price); accordingly, where producers remain subject to import duties only when they sell subject merchandise domestically, home market price (i.e., normal value) is inflated relative

Case 1:21-cv-00246-SAK Document 83 Filed 10/30/23 Page 55 of 152

Consol. Court No. 21-00246                                                    Page 14
PUBLIC VERSION

to U.S. sales price (i.e., export or constructed export price), thereby potentially resulting in the calculation of inaccurately high dumping margins. Id.

Subparagraph 1677a(c)(1)(B) of 19 U.S.C. provides for Commerce's grant of a duty drawback adjustment, instructing:

> The price used to establish export price and constructed export price shall be . . . increased by . . . the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States.

19 U.S.C. § 1677a(c)(1)(B). Commerce has developed a two-prong test -- upheld by the Federal Circuit as lawful in Saha Thai, 635 F.3d at 1040–41 -- to assess duty drawback eligibility under 19 U.S.C. § 1677a(c)(1)(B). The Saha Thai test asks:

> (1) [whether] the [relevant] rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise; and
>
> (2) [whether] there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise.

635 F.3d at 1340, 1341. In applying this test, Commerce "looks for a reasonable link between the duties imposed and those rebated or exempted." IDM at 8 (emphasis added). Although parties here agree that this "reasonable link" requires that the relevant imports be "capable of" producing the exported subject merchandise, see, e.g., Def.'s Br. at 12; Pl.'s Resp. at 9; Consol. Pls.' Br. at 18, parties disagree as to what "capability" requires following the Federal Circuit's decision in Maverick Tube III, 861 F.3d 1269.[14]

---

[14] The court notes that in their briefing, parties refer to the Federal Circuit's decision as "Maverick Tube II." See, e.g., Consol. Pls.' Br. at 2; Pl.'s Resp. at 7. However, because the Maverick Tube line of cases comprises three opinions, see Maverick Tube Corp. v. United States, 39 CIT __, __, 107 F. Supp. 3d 1318, 1335 (2015) ("Maverick Tube I"), Maverick Tube Corp. v. United States, 40 CIT __, __, 163 F. Supp. 3d 1345, 1355 (2016) ("Maverick Tube II"), Maverick Tube III, 861 F.3d 1269, the court refers to the Federal Circuit's decision as Maverick Tube III.

## 2.    *Turkey's Inward Processing Regime*

Turkey maintains an Inward Processing Regime ("IPR"), under which exporters of merchandise that has been processed in Turkey may have their duty liability on imports forgiven if the exporter satisfies certain requirements.  See Section C Questionnaire Resp. of Assan Aluminyum Sanayi ve Ticaret A.S. at Ex. C-8 (June 29, 2020) C.R. 52; P.R. 142-143 ("Pl.'s Sec. C QR Resp.").  Specifically, interested firms in Turkey secure Inward Processing Certificates ("IPC"), which represent that inputs used for the production of relevant exports fall within the same 8-digit HTS[15] classification as those inputs for which an exemption has been sought.  Id. at Ex. C-8, 7–8.  Duty liability is extinguished when an IPC is "closed," meaning that an exporter has demonstrated sufficient amounts of corresponding imports and exports to Turkish authorities.  See id. at Ex. C-8, 42–43.  "In prior investigations Commerce has found that Turkish companies that meet the requirements under Turkey's [IPR] . . . have satisfied the statute and [Saha Thai] two-prong test for duty drawback adjustments."  PDM at 10; see, e.g., Welded Line Pipe from the Republic of Turkey, 80 Fed. Reg. 61,362 (Dep't Com. Oct. 13, 2015), and accompanying Issues and Dec. Mem. at 7 (Oct. 5, 2015).

## B.    *Issue-specific Factual and Procedural Background*

On March 30, 2020, Commerce initiated a LTFV investigation into Turkish exports of not

---

[15] "Harmonized Tariff Schedules" derive from the international Harmonized System ("HS"), which "is a standardized numerical method" "used by customs authorities around the world to identify [traded] products when assessing duties and taxes and for gathering statistics." Harmonized Sys. (HS) Codes, Int'l Trade Admin., www[.]trade[.]gov/harmonized-system-hs-codes (last visited Feb. 17, 2022).  "The HS assigns specific six-digit codes [to] . . . commodities." Id.  Although the first six-digit are standardized across countries, individual nations may "add longer codes to the first six digits for further [country-specific] classification," generally at the eight- or ten-digit level.  Id.  [Please note, in order to disable links to outside websites, the court has removed the "http" designations and bracketed the periods within hyperlinks.  For archived copies of any webpages cited in this opinion, please consult the docket.]

clad aluminum sheet manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy[16] and multi-alloy, clad aluminum sheet produced from a 3XXX series[17] at a thickness of greater than 0.2 mm but less than 6.3 mm.  LTFV Initiation App. at 19,449.  In response to a questionnaire from Commerce, Assan reported that it both exported subject merchandise and imported [[

]] under Turkey's IPR.  See Pl.'s Sec. C QR Resp. Ex. C-11 at 44–45.  Specifically, Assan reported that under IPC [[     ]], it exported to the United States subject merchandise -- as captured under HTS codes [[              ]][18] and [[              ]][19] -- after it had imported into Turkey [[   ]] entries of what it referred to as [[                ]] inputs -- covered by HTS [[          ]][20] and [[              ]].[21]  See Resp. to Req. for Docs. in Lieu of Verification of Assan Aluminyum Sanayi ve Ticaret A.S. at Ex. V-20 (Dec. 18, 2020), C.R. 373, 374, 379; P.R. 305 ("Pl.'s Resp. to Req. for Docs.").  Although the Harmonized Tariff Schedule does not define aluminum by alloy, supra notes 18–21, Turkish authorities closed IPC [[     ]] upon Assan's submission of yield/loss ratios demonstrating, to the Turkish Government's satisfaction, the

---

[16] Or other consistent chemistry.

[17] Or other consistent chemistry.

[18] HTS [[          ]] covers [[

]].  See Pl.'s Sec. C QR Resp. at Ex. S4-4.

[19] HTS [[          ]] covers [[

]].  See Pl.'s Sec. C QR Resp. at Ex. S4-4.

[20] HTS [[            ]] covers [[                ]].  See Pl.'s Sec. C QR Resp. at Ex. S4-4.

[21] HTS [[            ]] covers [[
]].  See Pl.'s Sec. C QR Resp. at Ex. S4-4.

amount of imported input used to produce the exported products under the IPC, see Pl.'s Sec. C

QR Resp. at Ex. C-10.

At the Preliminary Determination stage, Commerce granted Assan a duty drawback

adjustment, citing prior agency findings that participation in Turkey's IPR satisfies the Saha Thai

two-prong test. See PDM at 10. In applying said adjustment, Commerce "allocate[ed] the amount

[of import duties] rebated or not collected to all production for the relevant period based on the

cost of inputs during the period of investigation." Id. The Association thereafter submitted

comments to Commerce asserting that because "[t]he scope of th[e] investigation covers aluminum

sheet produced from only certain alloys" -- namely, alloys from a 1XXX-, 3XXX-, or 5XXX-

series -- "to the extent Assan's imports involve merchandise produced from a different alloy, i.e.,

a 2XXX-, 4XXX-, 6XXX-, 7XXX-, or 8XXX-series alloy, these imports could not be used by

Assan to produce subject merchandise." Letter from Kelley Drye & Warren LLP to Sec. of Com.

Pertaining to Pet'r's Post-Prelim. Cmts. at 4, 6 (Nov. 11, 2020) C.R. 359, P.R. 279. Accordingly,

the Association advocated that "the Department should . . . require Assan to establish that its

imports are capable of being used to produce the merchandise under consideration." Id. at 6.

On December 10, 2020, Commerce sent a questionnaire "in lieu of verification" to Assan

asking it to, inter alia:

> (a) . . . Confirm that the grades of the[] imported [[                ]] [under IPC
> [[     ]] sequence numbers [[   ]] to [[   ]]] could have been used in the
> production of the subject merchandise.
> (b) For the purchase sequence number [[   ]] and [[   ]], . . . identify the alloy
> specification of each imported [[              ]].

Letter from USDOC to Mayer Brown Pertaining to Assan Req. Doc. in Lieu of Verification at 7

(Dep't Com. Dec. 11, 2020) C.R. 372, P.R. 301 ("Req. for Docs.").

In response to request (a), Assan stated that "the transactions identified by Commerce" --

namely, sequence numbers [[    ]] to [[    ]] -- "are all inputs suitable for production of [[

            ]]."  Pl.'s Resp. to Req. for Docs. at 374, 379 (emphasis added).  In response to

request (b), Assan likewise stated that "[t]he transactions listed by Commerce" -- namely, sequence

numbers [[    ]] and [[    ]] -- "are inputs suitable for production of [[                        ]]."

Id. at 15 (emphasis added).  Despite not confirming that the inputs specifically identified in

Commerce's "spot check" were suitable for production of the subject merchandise, see id.; see

also Pl.'s Oral Arg. Subm. at 5 ("The alloy series for the [[            ]] imported under IPC [[      ]]

is not on the record."), Assan maintained "that imports under th[e] IPR include also inputs suitable

for the production of CAAS," as purportedly evidenced by Assan's export of [[            ]] tons of

subject merchandise under IPC [[        ]], id. at 14–15.

Commerce continued to grant Assan a duty drawback adjustment in the Final

Determination on the grounds that, consistent with the Saha Thai two-prong test, (1) the exemption

Assan received under Turkey's IPR was linked to exportation of the subject merchandise, and (2)

there were sufficient imports of the raw material to account for the duty drawback on the export

of subject merchandise.  See IDM at 8.  Commerce explained that where "the record evidence does

not demonstrate that none of the inputs imported under [Assan's] closed IPC are suitable for the

production of subject merchandise," but rather "suggests that at least one imported input under the

closed IPC can be used in the production of subject merchandise," Commerce was satisfied that

"the consumption of imported inputs during the [period of investigation], including imputed duty

costs for imported inputs, properly account[ed] for the amount of duties imposed," id. at 9, 11.

Finally, in applying the duty drawback adjustment, Commerce continued to allocate the amount

rebated or not collected to all production for the relevant period based on the cost of inputs during the period of investigation.  Id. at 8.

> ### C.    Analysis

Before the court, parties raise two issues concerning Commerce's grant of a duty drawback adjustment to Assan.  As a preliminary matter, the Association argues that Assan is ineligible for a duty drawback adjustment.  See Consol. Pls.' Br. at 15–16.  By contrast, Assan argues that although Commerce was correct in granting it a duty drawback adjustment, the "duty neutral" methodology that Commerce employed to calculate Assan's specific adjustment was not in accordance with law.  See Pl.'s Br. at 12–16.  For its part, the Government acknowledges that its "duty neutral" methodology conflicts with intervening Federal Circuit precedent and requests a voluntary remand to recalculate the granted adjustment.  Def.'s Br. at 15.  For the reasons stated below, the court sustains Commerce's general grant of a duty drawback adjustment to Assan, but remands for Commerce to reapply the adjustment in accordance with the Federal Circuit's latest directive.

> ### 1.    Commerce's General Grant of a Duty Drawback Adjustment to Assan Accords with Law.

Resolution of this threshold aspect of the duty drawback issue turns on the definition of "capability" and who gets to define it.  The Association argues that because "[t]he only evidence concerning sample imported inputs [[                    ]] demonstrates that [Assan's] imported inputs are incapable of being used to produce CAAS," such failure to prove "capability" precludes Assan from receiving a duty drawback adjustment under the Federal Circuit's decision in Maverick Tube III.  See Consol. Pls.' Oral Arg. Subm. at 5.  By contrast, although the Government and Assan agree that Commerce's two-prong Saha Thai test requires relevant imports to be "capable

of" producing the exported subject merchandise, <u>see</u> Def.'s Br. at 12; Pl.'s Resp. at 9, they assert

the Association misreads <u>Maverick Tube III</u>; the Government and Assan maintain that where

"there are sufficient imports of the imported raw materials to account for the drawback received

upon the export of the subject merchandise," a respondent's inputs are imputably "capable of"

producing the exported product.  <u>See</u> Def.'s Br. at 13–15; Pl.'s Resp. at 8, 11 (substantively

similar).  Adhering to fundamental principles of administrative law, the court sustains Commerce's

general grant of a duty drawback adjustment to Assan.

As a starting point, the court agrees that the Association overstates the implications of the

Federal Circuit's holding in <u>Maverick Tube III</u>.  <u>See, e.g.</u>, Consol. Pls.' Br. at 18 ("Petitioners

argue[] that[] pursuant to <u>Maverick Tube [III]</u>, a respondent claiming a duty drawback adjustment

is required to demonstrate that the imported inputs are <u>capable of</u> being used in the production of

subject merchandise." (emphasis in original)).  In that case -- concerning Commerce's LTFV

investigation into certain Oil Country Tubular Goods from Turkey -- the Federal Circuit reviewed

Commerce's decision to deny a duty drawback adjustment to a respondent, who despite satisfying

the requirements of Turkey's duty drawback regime, otherwise "admitted that none of the inputs

for which duties were exempted were used, or capable of being used, in the production of subject

merchandise."  <u>Maverick Tube II</u>, 163 F. Supp. 3d at 1355.  The Federal Circuit framed the

question before it as whether Commerce's determination "that duty drawbacks are only available

for potential inputs of the subject merchandise" constituted a permissible interpretation of 19

U.S.C. § 1677a(c)(1)(B).  <u>Id.</u> at 1274.  In concluding that "Commerce's interpretation was entirely

reasonable," the Federal Circuit explained:

> Section 1677a(c)(1)(B) neither endorses nor prohibits Commerce's view that duty
> drawback adjustments are only available to offset duties on goods that are suitable
> for use as inputs for the subject merchandise.  The statutory text emphasizes that

duty drawback adjustments are allowed only when import duties are rebated or not collected "by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B).  This language signals that Congress intended Commerce to grant duty drawback adjustments only when there is some kind of connection between the nonpayment of import duties and the exportation of the subject merchandise to the United States.  But the statute does not specify whether Commerce should or should not grant an adjustment for the nonpayment of import duties on materials incapable of producing the merchandise exported to the United States.

Id. at 1273, 1274.  Accordingly, Maverick Tube III did not impose a threshold "capability" test onto Commerce's grant of a duty drawback adjustment, but merely held that Commerce's own requirement of "capability" was a permissible interpretation of 19 U.S.C. § 1677a(c)(1)(B).

In the absence of either statute or Federal Circuit precedent establishing a "capability" requirement, the question before this court is, consequently, whether Commerce arbitrarily deviated from its prior interpretation and practice in granting a duty drawback adjustment to Assan. SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]gency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." (quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996))).

Of course, "[t]he fact that Commerce [may have] changed its policy is" not dispositive, "as Commerce is entitled to change its views, and a new administrative policy based on a reasonable statutory interpretation is nonetheless entitled to . . . deference."  Saha Thai, 635 F.3d at 1342 (quoting Rust v. Sullivan, 500 U.S. 173, 186–87 (1991)); see also Maverick Tube I, 107 F. Supp. 3d at 1335 (acknowledging "Commerce may in the future change its views on which circumstances warrant a duty drawback adjustment").  However, Commerce does not purport to change its interpretation, but rather suggests that Petitioners simply do not understand the agency's "capability" requirement, as evidenced by Commerce's disagreement that the present case is

factually analogous to that of <u>Maverick Tube</u>.  <u>See</u> IDM at 11.[22]  The court is satisfied that

Commerce has here "articulate[d] a satisfactory explanation for its" determination.  <u>State Farm</u>,

463 U.S. at 43 (quoting <u>Burlington Truck Lines</u>, 371 U.S. at 168).

Commerce granted a duty drawback adjustment to Assan in the <u>Final Determination</u>

because the agency found that, consistent with the <u>Saha Thai</u> test: (1) the exemption that Assan

received under Turkey's IPR was linked to exportation of the subject merchandise; and (2) there

were sufficient imports of the raw material -- namely, [[                    ]] -- to account for the duty

drawback on the export of subject merchandise CAAS.  <u>See</u> IDM at 8.  In so deciding, Commerce

expressly rejected Petitioners' argument that <u>Maverick Tube III</u> portends Assan's ineligibility, <u>see</u>

IDM at 5, explaining that where "the record evidence does not demonstrate that <u>none</u> of the inputs

imported under the closed IPC are suitable for the production of subject merchandise" "the

conditions noted by the petitioners in <u>Maverick Tube [III]</u> are not met in this case."  IDM at 11

(emphasis added).  "None" is the operative word.

For example, in the investigation underlying <u>Maverick Tube</u>, the subject merchandise

could only be produced from a grade of coil known as "J55 coil" and the respondent admitted that

it "sourced all its J55 coils from a domestic Turkish producer," such that "<u>none</u> of the [inputs] for

which duties were exempted [under the Turkish IPR], i.e., the non-J55 coils, were capable of being

used to produce [the subject merchandise]."  <u>Maverick Tube III</u>, 861 F.3d at 1272 (emphasis

added).  Logically, where there are admittedly no imports of the required inputs, there can be no

---

[22] The court notes that the Association relies exclusively on the <u>Maverick Tube</u> line of cases and underlying investigation to establish its interpretation of "capability" and Commerce's past practice.  Where, as explained <u>infra</u>, the court is satisfied that Commerce has sufficiently distinguished <u>Maverick Tube</u> on the facts, the Association has supplied no alternative basis to support its conception of Commerce's past practice.

"import duties . . . rebated, or . . . not collected, by reason of . . . exportation" for purposes of 19 U.S.C. § 1677h(c)(1)(B).  As such, Commerce denied the Maverick Tube respondent a duty drawback adjustment despite otherwise qualifying under Turkey's duty drawback regime. However, in so denying, Commerce was clear that its decision was limited to "these unique facts" "rarely . . . faced by the Department in prior antidumping proceedings involving Turkey."  See Redetermination Pursuant to Ct. Remand Order in Maverick Tube Corp. v. United States at 26, Consol. Ct. No. 14-00244, Feb. 2, 2016, ECF No. 111 (footnotes omitted).

By contrast, Commerce has supportably found that such "unique facts" do not exist here. Specifically, Commerce explained that where Assan "identified [[                    ]] as one of the three major inputs used to produce the subject merchandise" and "reported that it had substantial purchases of the imported input during the [period of investigation] and that this input was used in the production of subject merchandise during the [period of investigation]," IDM at 11, "evidence suggests at least one imported input under the closed IPC can be used in the production of subject merchandise," id. (emphasis added).

In sum, it is not that parties disagree that imports must be "capable of" producing the exported subject merchandise in order to merit a duty drawback adjustment, see, e.g., Def.'s Br. at 12; Pl.'s Resp. at 9; Consol. Pls.' Br. at 18, but rather that parties disagree as to the definition of "capable of."  The Association posits that "capable of" means demonstrably capable of, see, e.g., Consol. Pls.' Reply at 5 (arguing that where Assan "did not establish that [its] inputs could be used to produce CAAS," it "failed to meet its burden of establishing eligibility for a duty drawback adjustment under Maverick Tube [III]"); whereas Commerce's decisional document suggests that "capable of" means potentially capable of, or in other words, not demonstrably incapable of, see IDM at 11 (finding Maverick Tube III satisfied where "evidence suggests that at least one imported

***PUBLIC VERSION***

input under the closed IPC <u>can be</u> used in the production of subject merchandise and "the record

. . . does not demonstrate that <u>none</u> of the inputs imported under the closed IPC <u>are suitable</u>"

(emphasis added)).

    Because the Federal Circuit has already determined that the relevant statute imposes no

"capability" requirement <u>at all</u>, 861 F.3d at 1273–74 (discussing 19 U.S.C. § 1677a(c)(1)(B)), and

because Commerce has articulated a reasonable conception of "capability" -- that factually

distinguishes the case at bar from <u>Maverick Tube III</u> while still requiring "<u>some kind of connection</u>

between the nonpayment of import duties and the exportation of . . . subject merchandise to the

United States," <u>id.</u> (emphasis added) -- the court sustains Commerce's general grant of a duty

drawback adjustment to Assan.[23],[24]

---

[23] In light of the above, the court deems unavailing the Association's argument that Assan "failed" the Department's "spot check" for certain [[                    ]].  <u>See, e.g.</u>, Consol. Pls.' Oral Arg. Subm. at 5 ("The only evidence concerning sample imported inputs [[o        ]] demonstrates that [Assan's] imported inputs are incapable of being used to produce CAAS.").  While this "spot check" may have revealed that certain inputs imported under sequence numbers [[   ]] to [[   ]] of IPC [[      ]] were unsuitable for production of subject merchandise -- a point that Assan does not concede, <u>see, e.g.</u>, Pl.'s Resp. at 11–12 ("Petitioners' premise that inputs <u>suitable</u> for production of non-subject merchandise are not <u>capable</u> of producing subject merchandise is not supported by the record." (emphasis in original)); Pl.'s Oral Arg. Subm. at 5 ("The alloy series for the [[           ]] imported under IPC [[       ]] is not on the record.") -- it has not been established that <u>none</u> of the imports under the [[   ]] sequence numbers were "capable." As such, the case at bar is not analogous to <u>Maverick Tube III</u>.

[24] The court notes in closing that while it might have been ideal if Commerce had asked respondents to affirmatively prove that the inputs for which they received duty exemptions or rebates were capable of producing the subject merchandise, Commerce "must [be allowed to] exercise some discretion in determining how wide a search it will make in order to arrive at a proper adjustment."  <u>Far East Mach. Co. v. United States</u>, 12 CIT 972, 978, 699 F. Supp. 309, 315 (1988).  Commerce constantly balances its obligation "to facilitate the determination of dumping margins as accurately as possible," <u>Allied–Signal Aerospace Co. v. United States</u>, 996 F.2d 1185, 1191 (Fed. Cir. 1993)), with its prerogative to leverage its expertise "to draw . . . appropriate line[s] under various fact patterns between the various types of investigations it performs," <u>Far East Mach. Co.</u>, 12 CIT at 978, 699 F. Supp. at 315.  Commerce has exercised such discretion here and, for the reasons articulated above, the court discerns no error.

### 2. Commerce's Specific Calculation of Assan's Duty Drawback Adjustment Does Not Accord with Law.

Having sustained Commerce's general grant of a duty drawback adjustment to Assan, the court next considers Commerce's specific calculation of the duty drawback adjustment. Commerce allocated the exempted duties over Assan's total production rather than over only Assan's total exports of the subject merchandise, thereby utilizing a so-called "duty neutral methodology." See IDM at 8–9 ("Commerce will make an upward adjustment to [export price] and [constructed export price] based on the amount of the duty imposed on the input and rebated or not collected on the export of the subject merchandise by properly allocating the amount rebated or not collected to all production for the relevant period based on the cost of inputs during the [period of investigation]."). In so proceeding, Commerce asserted "there has been no finding in the [Federal Circuit] that Commerce's duty neutral methodology, as applied here, is inconsistent with the statute." Id. at 9.

Since Commerce issued its Final Determination, the Federal Circuit has ruled that a "duty neutral methodology" is incompatible with the plain language of section 1677a(c)(1)(B). See Uttam Galva Steels Ltd. v. United States, 42 CIT __, 311 F. Supp. 3d 1345, 1355 (2018), aff'd 997 F.3d 1192 (Fed Cir. 2021). Commerce does not contest that the methodology it used to calculate Assan's duty drawback adjustment is inconsistent with this subsequent Federal Circuit precedent and now asks the court for a voluntary remand so that the agency may recalculate the adjustment. Def.'s Br. at 15. A remand is generally required when an intervening event affects the validity of the agency action, see SKF USA Inc. v. United States, 254 F.3d 1022, 1028 (Fed. Cir. 2001), and "a new legal decision" qualifies as an "intervening event" justifying remand, see MaxLinear, Inc. v. CF CRESPE LLC, 880 F.3d 1373, 1377 (Fed. Cir. 2018) (quoting SKF USA

Inc., 254 F.3d at 1028).  As such, the court grants Commerce's voluntary remand request so that

the agency may recalculate Assan's duty drawback adjustment in accordance with the latest

Federal Circuit precedent.

> **II.      Commerce's Denial of a Home Market Rebate Adjustment to Assan is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

> > **A.      Issue-Specific Legal Background**

> > > **1.      Home Market Rebate Adjustments**

Before calculating a dumping margin, Commerce adjusts normal value so that it is "net of

price adjustments."  19 C.F.R. § 351.401(c).  This means that Commerce decreases normal value

to account for, inter alia, discounts or rebates given to buyers of subject merchandise in the home

market, which lower home market prices.  See 19 C.F.R. § 351.102(b)(38).  While such

adjustments are intended to allow Commerce to compare prices "at a common point in the chain

of commerce," APEX Exports, 777 F.3d at 1374, they also create an "opportunity for

manipulation" of normal value, and thereby dumping margins;[25] to decrease the chances that an

investigated party will receive an adjustment for rebates/discounts granted "after it bec[o]me[s]

known that certain sales [are] subject to [antidumping duty] review" for the purpose of reducing

dumping margins, Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. Am. Cast Iron Pipe Co.,

5 F.4th 1367, 1375 (Fed. Cir. 2021), Commerce has developed "a non-exhaustive list of factors

that it may consider" to evaluate requests for "post-sale price adjustments."  These factors include:

> (1) whether the terms and conditions of the adjustment were established and/or known to the customer at the time of sale, and whether this can be demonstrated through documentation;
> (2) how common such post-sale price adjustments are for the company and/or industry;
> (3) the timing of the adjustment;

---

[25] Supra note 8.

(4) the number of such adjustments in the proceeding; and
(5) any other factors tending to reflect on the legitimacy of the claimed adjustment.

Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 81

Fed. Reg. 15,641, 15,644–45 (Dep't Com. Mar. 24, 2016) ("Modification of Regulations").

### 2.      *Deficient Submissions*

If Commerce determines "that a response to a request for information . . . does not comply

with [its] request, [Commerce] shall promptly inform the [respondent] of the nature of the

deficiency and shall, to the extent practicable, provide [the respondent] with an opportunity to

remedy or explain the deficiency."  19 U.S.C. § 1677m(d).  If Commerce finds the "information

[submitted] in response to such deficiency" is "not satisfactory," the agency may "disregard all or

part of the original and subsequent responses," "subject to subsection (e)."[26]  Id.

### B.      *Issue-Specific Factual and Procedural Background*

In an initial Section B Questionnaire, Commerce asked Assan to report rebates granted on

sales of subject merchandise in the home market and to explain its policies and practices attending

such grants, including when in the sales process the rebate terms and conditions are set.  See

Section B Questionnaire Resp. of Assan Aluminyum Sanayi ve Ticaret A.S. at 31–32 (June 29,

2020) C.R. 28–29; P.R. 141 ("Pl.'s Sec. B QR Resp.").  Assan responded on June 29, 2020, that it

granted rebates to [[          ]] customers during the period of investigation, id. at Ex. B-10.1, which

---

[26] Although not pertinent to the court's resolution of this issue, infra, for the sake of completeness, the court notes subsection (e) further instructs that Commerce may not "decline to consider information that is . . . necessary to the determination but does not meet all the applicable requirements" when the information is: (1) timely; (2) verifiable; (3) "not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination;" (4) submitted by a party acting to the best of its ability; and (5) usable without undue difficulties.  Id. § 1677m(e).

were awarded based on customer-specific consumption-targets[27] that Assan sets annually, id. at

31–32.  As just [[    ]] examples, Assan reported awarding customer [[

]] a rebate of [[                         ]] for its purchases in 2019 of [[                ]]

of products, while Assan awarded customer [[                              ]] a rebate of

[[                        ]] for its purchases in 2019 of [[              ]] of products.  Id. at Ex.

B-10.1.

Upon consideration of Assan's initial Section B Questionnaire responses, Commerce

issued a supplemental questionnaire on August 13, 2020, asking Assan to provide documentation

-- including sample agreements -- demonstrating how the "annual volume targets" were calculated

for [[                          ]] and [[                        ]].  See Letter from

USDOC to Mayer Brown Pertaining to Assan Section B Suppl. Questionnaire at 3 (Dep't Com.

Aug. 13, 2020) C.R. 141, P.R. 186 ("Suppl. Sec. B QR.").  Commerce further directed Assan to

provide proof of payment of the claimed rebates to the identified customers.  Id.

Assan submitted documentation to substantiate the rebates awarded to customer [[

]] on September 3, 2020.  See Suppl. Section B Questionnaire Resp. of

Assan Aluminyum Sanayi ve Ticaret A.S. (Sept. 3, 2020) C.R. 253, 255; P.R. 217, 218 ("Pl.'s

Suppl. Sec. B QR Resp.").   First, Assan included a 2019 Rebate Agreement enumerating

consumption targets, the achievement of which would entitle [[                              ]]

to a rebate.  By the terms of this Agreement, [[                        ]] was not entitled

to any annual rebate until its consumption of Assan's products in 2019 exceeded [[        ]].

Id. at Ex. S3-19.  Second, Assan included a bank receipt showing payment of [[

---

[27] As measured by volume of products purchased.

]] to customer [[                                    ]] on [[                        ]]. <u>Id.</u>

In addition, on September 3, 2020, Assan submitted documentation to substantiate the rebates awarded to customer [[                                    ]]. <u>Id.</u> First, Assan included a 2019 Supply Contract, which likewise enumerated consumption targets that would entitle [[                                    ]] to a rebate. By its terms, if in 2019 [[                                    ]] purchased over [[            ]] of certain products, Assan would provide [[            ]] with a rebate of [[                            ]], and if [[                            ]] purchased over [[            s]], Assan would provide [[                            ]] with a rebate of [[                        ]]. <u>Id.</u> Second, Assan included a bank receipt showing payment of [[                        ]] to customer [[                            ]] on [[            ]]. <u>Id.</u>

With this supplemental documentation in hand, Commerce declined to grant a home market rebate adjustment to Assan in calculating the preliminary dumping margin. <u>See</u> Mem. from S. Carey to the File, re: Prelim. Determ. Margin Calc. for Assan Aluminyum Sanayi ve Ticaret A.S. (Dep't Com. Oct. 6, 2020) C.R. 329, 330 ("Prelim. Margin Calc. Mem."). Commerce's stated rationale for this preliminary denial was that Assan's "[s]ample documentation d[id] not demonstrate customer met sales threshold and proof of payment d[id] not match rebate reported." <u>Id.</u> Following the <u>Preliminary Determination</u>, Commerce issued a questionnaire "in lieu of verification" in which the Department sought no additional information pertaining to Assan's requested home market rebate adjustment. <u>See</u> Pl.'s Resp. to Req. for Docs. Assan, thereafter, submitted a case brief challenging Commerce's characterization of the sample documentation. <u>See</u> Pl.'s Case Br. at 11–13.

In the <u>Final Determination</u>, Commerce continued to deny Assan a home market rebate adjustment on the grounds that "Assan [had] failed to demonstrate its eligibility for" one.  IDM at 22.  Commerce reiterated its prior reasoning that "for one customer, Assan did not demonstrate that the customer reached the sales volume target specified in the rebate agreement, and for the other customer, it failed to demonstrate that the full amount of the rebate was actually paid."  <u>Id.</u>

### C.    *Analysis*

Before the court, Assan argues that Commerce erred in denying it a home market rebate adjustment on two grounds:  First, Assan argues that where Commerce did not discuss any of the <u>Modification of Regulations</u> factors in its various decisional documents, Commerce's denial was conclusory and otherwise not in accordance with law, Pl.'s Br. at 36–37; and second, Assan argues that to the extent Commerce assessed deficiencies in Assan's documentation, the agency was required to afford Assan an opportunity to cure, <u>id.</u> at 38.  By contrast, the Association and the Government argue that Commerce's explanation for the adjustment denial was sufficient, <u>see</u> Def.'s Br. at 17–18; Consol. Pl.'s Resp. at 25, and that because the agency simply assessed Assan to be ineligible for a home market rebate adjustment -- and not that its responses were deficient -- the agency had no obligation to afford Assan an opportunity to cure, <u>see</u> Def.'s Br. at 18; Consol. Pl.'s Resp. at 26–28.  The court agrees with the Association and the Government on both points.

### 1.    *Commerce's Explanation was Legally Sufficient.*

It is uncontested that Commerce did not "specifically cite" any of the <u>Modification of Regulations</u> factors in denying Assan a home market rebate adjustment.  <u>See, e.g.</u>, Consol. Pls.' Resp. at 26.  However, it is not clear -- as a threshold matter -- that Commerce was required to do so.  The Federal Register notice announcing the <u>Modification of Regulations</u> factors states that Commerce "adopted in this final rule a non-exhaustive list of factors that it <u>may</u> consider in

Case 1:21-cv-00246-SAK   Document 63   Filed 10/30/23   Page 72 of 152

Consol. Court No. 21-00246                                                    Page 31
**PUBLIC VERSION**

determining whether to accept a price adjustment that is made after the time of sale." 81 Fed. Reg. at 15,641 (emphasis added); see also id. at 15,642–43 ("The Department has further provided in this final rule, . . . a non-exhaustive list of factors which it may consider in determining whether to accept price adjustments that are made after the time of sale (emphasis added)). "The word 'may[]' . . . usually implies some degree of discretion." United States v. Rodgers, 461 U.S. 677, 706 (1983); see also Kingdomware Techs., Inc. v. United States, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").

But even assuming arguendo that Commerce had to consider at least one of the Modification of Regulations factors in denying Assan a home market rebate adjustment, see 81 Fed. Reg. at 15,645 (instructing Commerce "may consider any one or a combination of these factors in making its determination" (emphasis added)), it is "reasonably discernible" that the agency did so, see Wheatland Tube, 161 F.3d at 1369–70 (A court may sustain an agency's action "where the agency's decisional path is reasonably discernible."). Consistent with the fifth factor of the Modification of Regulations -- which directs Commerce to consider "other factors tending to reflect on the legitimacy of the claimed adjustment" -- the agency identified that "for one customer, Assan did not demonstrate that the customer reached the sales volume target specified in the rebate agreement, and for the other customer, it failed to demonstrate that the full amount of the rebate was actually paid." IDM at 22.

To understand why these identified issues "reflect on the legitimacy of the claimed adjustment," 81 Fed. Reg. at 15,645, recall that the "mischief" that motivated Commerce's development of the Modification of Regulations factors was the concern that investigated parties could use post-sale rebates/discounts to reduce home market sales prices (i.e., normal value) "after

it became known that certain sales were subject to [antidumping duty] review," Am. Cast Iron Pipe Co., 5 F.4th at 1375.  Such manipulation by investigated parties would allow them to artificially eliminate disparities between normal value and U.S. sales prices (i.e., export or constructed export price), thereby reducing dumping margins post hoc.  Id.  This "mischief" is implicated by both of the issues that Commerce identified with Assan's claimed rebates.

For instance, Commerce first noted that Assan claimed a rebate for a customer but was unable to demonstrate "that the customer reached the sales volume target specified in the rebate agreement" to entitle it to such a rebate, IDM at 22; this raises questions as to whether Assan awarded unearned rebates post hoc to reduce normal value.  Commerce next noted that Assan claimed to have awarded a rebate for a certain amount to a customer but was unable "to demonstrate that the full amount of the rebate was actually paid," id.; this raises questions as to whether Assan reported inflated rebate amounts to the agency -- that Assan did not actually pay -- to secure greater reductions to normal value than deserved.  Both issues, thus, undermine "the legitimacy of [Assan's] claimed adjustment," such that Commerce's reasoning accords with the fifth factor of the Modification of Regulations.  Because Commerce -- at most -- only had to "consider any one . . . of the[] [Modification of Regulations] factors," 81 Fed. Reg. at 15,645 (emphasis added), the court finds Commerce's rationale for denying a home market rebate adjustment to Assan to be legally sufficient.

### 2.    *Commerce had No Obligation to Afford Assan an Opportunity to Cure.*

In the alternative, Assan argues that if Commerce assessed deficiencies in the submitted documentation, the agency was required to provide sufficient notice of said deficiency and afford an opportunity to cure under 19 U.S.C. § 1677m(d).  Pl.'s Br. at 38.  By contrast, the Government

and the Association assert that where Commerce did not assess Assan's responses to be deficient -- but simply found that Assan was not entitled to an adjustment -- the agency had no obligation to issue an additional supplemental questionnaire under 19 U.S.C. § 1677m(d).  See Consol. Pl.'s Resp. at 26–28; Def.'s Br. at 18–19.  Here too, the court agrees with the Government and the Association.

In response to Assan's claim of rebates paid to [[   ]] customers in the initial Section B Questionnaire, Commerce issued a Supplemental Section B Questionnaire requesting the following:

> Please provide documentation, including sample agreements, showing how the "annual volume target" was calculated for [[
>                                         ]]  Include proof of payment for the reported rebates granted to these customers in Exhibit B-10.1.

Suppl. Sec. B QR at 3.  As explained below, on their face, certain of Assan's responsive documents demonstrated that Assan was not eligible for the home market rebate adjustment it claimed before the agency.

Concerning customer [[                                    ]], in its supplemental reply, Assan included a 2019 Rebate Agreement enumerating consumption targets, the achievement of which would entitle [[                              ]] to a rebate.  By the Agreement's plain terms, customer [[                            ]] was not entitled to any rebate until its consumption of Assan's products in 2019 exceeded [[            ]].  See Pl.'s Suppl. Sec. B QR Resp. at Ex. S3-19.  In its original Section B Questionnaire response, Assan reported awarding a rebate of [[                          ]] to customer [[                              ]] during the period of investigation, despite the fact that customer [[                            ]] purchased only [[              ]] of Assan's products in 2019, see Pl.'s Sec. B QR Resp. at Ex. B-10.1 -- an amount

below the minimum consumption threshold established in the 2019 Rebate Agreement.  Thus, the

documentation Assan submitted in response to Commerce's Supplemental Section B

Questionnaire revealed that, at least per the terms of the 2019 Rebate Agreement, customer [[

                                        ]] was not entitled to the rebate claimed by Assan in its original

questionnaire.

    Turning to customer [[                                        ]], in its original questionnaire

response, Assan reported granting a rebate of [[                              ]] to [[

                ]] for its purchases in 2019.  See id. at Ex. B-10.1.  Nevertheless, when subsequently

asked by Commerce for "proof of payment for the reported rebates granted . . . in Exhibit B-10.1,"

see Suppl. Sec B QR at 3, Assan submitted a bank receipt showing payment of [[

        ]] to customer [[                                ]], see Pl.'s Suppl. Sec. B QR Resp. at Ex.

S3-19 -- an amount significantly below[28] the rebate amount of [[                        ]] claimed

in Assan's original Section B submission.[29]  Thus, here too, Assan's documentation contradicted

its originally claimed rebate amount.

---

[28] Even by a rough conversion.

[29] The court notes that the discrepancy with Assan's proof of payment might be the result of a typographical error.  For instance, Assan initially submitted a rebate invoice indicating that [[                                ]] was entitled to a rebate amount of [[            ]] Turkish Lira or [[        ]] U.S. dollars.  See Pl.'s Sec B QR Resp. at Ex. B-10.1.  The bank receipt Assan later submitted documents a payment of [[          ]] U.S. dollars, a figure that is off by [[    ]] -- admittedly significant -- digit.  See Pl.'s Suppl. Sec. B QR Resp. at Ex. S3-19.  Thus, it is possible that Assan's proof of payment contained a typo; alternatively, it is possible that Assan paid a rebate that was lower by [[        ]] U.S. dollars than the one claimed before the agency.  Regardless, as established infra, because the submitted document on its face appeared to be "complete and accurate," but simply demonstrated Assan's ineligibility for a rebate adjustment, Commerce was "not require[d] . . . to issue a supplemental questionnaire seeking assurances that the initial response was [indeed] complete and accurate."  ABB Inc. v. United States, 42 CIT __, __, 355 F. Supp. 3d 1206, 1222 (2018).

Assan's invocation of 19 U.S.C. § 1677m(d) to suggest legal error is unavailing. Subsection 1677m(d) instructs that where a respondent's "response to a request for information . . . does not comply with [Commerce's] request, [Commerce] shall promptly inform the [respondent] of the nature of the deficiency and shall, to the extent practicable, provide [the respondent] with an opportunity to remedy or explain the deficiency." But here, Assan <u>complied</u> with Commerce's request -- consistent with the agency's Supplemental Questionnaire, Assan submitted "sample agreements, showing how the 'annual volume target' was calculated for [[                                    ]] and [[                                                  ]]" as well as "proof of payment." Suppl. Sec B QR. at 3. Commerce had no reason to question whether Assan's submissions were complete or accurate, but rather -- as demonstrated above -- supportably found that certain of these documents, <u>on their face</u>, revealed that Assan was not entitled to the home market rebate adjustments originally claimed. "Commerce [was] not obligated to issue a[n additional] supplemental questionnaire to the effect of, 'Are you sure?'" <u>ABB Inc.</u>, 355 F. Supp. 3d at 1222.

In sum, where Assan's supplemental documents more than failed to substantiate -- but rather contradicted -- Assan's claimed rebate amounts, Commerce's denial of a home market rebate adjustment was supported by substantial evidence and otherwise in accordance with law.

### III. *Commerce's Reliance on Assan's Affiliated Freight Costs is Supported by Substantial Evidence and Otherwise in Accordance with Law.*

#### A. *Issue-Specific Legal Background*

##### 1. *Affiliated Freight Adjustments*

In calculating constructed export price, Commerce deducts "any additional costs, charges, or expenses . . . which are incident to bringing the subject merchandise from the original place of

shipment in the exporting country to the place of delivery to the United States."  19 U.S.C.

§ 1677a(c)(2).  Because, as previously noted, Commerce identifies dumping by assessing whether

a product is being sold in the United States at a price lower than its normal value (as here, measured

by home market prices), logically, "costs . . . incident to bringing the subject merchandise . . . to

the United States" are only relevant to exported products and are not reflected in the prices of

subject merchandise sold in the home market.  As such, these costs inflate export or constructed

export price (as measured by U.S. sales prices) relative to normal value, potentially distorting the

dumping margin.  Thus, in order to compare prices "at a common point in the chain of commerce,"

APEX Exports, 777 F.3d at 1374, Commerce deducts "costs . . . incident to bringing the subject

merchandise . . . to the United States" from export and/or constructed export price.

> Where a respondent uses a service provider with which it is affiliated to transport its subject

merchandise, "Commerce must determine whether [such] transactions with the affiliated company

were made at arm's-length" or whether such transactions are "comparable to transactions

conducted with an unaffiliated party."  Hyundai Steel Co. v. United States, 41 CIT __, __, 279 F.

Supp. 3d 1349, 1355 (2017).  Commerce undertakes such an inquiry because "the prices paid to

. . . affiliated providers may not reflect . . . market price for those services," Hyundai Steel Co. v.

United States, 42 CIT __, __, 319 F. Supp. 3d 1327, 1334 (2018), and deducting too much or too

little from the constructed export price will distort the dumping margin.[30]

---

[30] To give a concrete example, imagine that an affiliated shipper charges a respondent $10 to bring
its subject merchandise to the United States, when the market rate is $100.  If Commerce relies on
this $10 affiliated rate to reduce constructed export price, the respondent's U.S. sales prices will
appear higher than if Commerce had relied upon the $100 market rate.  Accordingly, under the
$10 scenario, constructed export price is inflated such that a comparison against normal value will
result in a distorted dumping margin (or no dumping margin at all).
> Thus, the foregoing illuminates another "opportunity for manipulation" of dumping
margins, Am. Cast Iron Pipe Co., 5 F.4th at 1375; namely, that an affiliated shipper could charge

### 2.      *Facts Otherwise Available*

Where an interested party "withholds information" or otherwise does not comply with

Commerce's requests, see 19 U.S.C. § 1677e(a)(2), or "necessary information is not available on

the record," id. § 1677e(a)(1), Commerce uses "facts otherwise available" to fill informational

gaps and render determinations, id. § 1677e(a).  If Commerce "finds that an interested party . . .

failed to cooperate by not acting to the best of its ability to comply with a request for information,"

Commerce "may" apply an adverse inference in selecting among the facts otherwise available.  Id.

§ 1677e(b)(1).

### B.      *Issue-Specific Factual and Procedural Background*

In its initial submission to Commerce, Assan indicated that it relies on an affiliated freight

supplier, [[                    ]], to transport merchandise from its plant to the port of export.  See Pl.'s

Sec C QR Resp. at 35.  Accordingly, in the Supplemental Section C Questionnaire, Commerce

asked Assan to:

> (a) [P]rovide a worksheet calculating the average price that the affiliated company
> [[                    ]] charged to unaffiliated customers for the same logistical
> services related to transporting subject merchandise to the port for export.
> Provide a price comparison of this average price to the average price reported
> for foreign inland freight, noting the discount or premium between the two
> average prices.
>
> (b) Provide sample documentation related to [[                    ]]'s charge to Assan
> (identify the sale observation), and the charge to unaffiliated companies using
> [[                    ]]'s same logistical services.

---

a purposefully low shipping price in order to secure a smaller reduction from constructed export
price, and thereby artificially prop up U.S. prices relative to home market prices/normal value.
Hence, Commerce undertakes to verify that affiliated freight charges are transacted at arm's-
length.

Letter from M. Hoadley to Assan Aluminyum Sanayi ve Ticaret A.S., re: Section C Suppl. Questionnaire at 5 (Dep't Com. Aug. 24, 2020) C.R. 221, P.R. 203 ("Suppl. Sec. C QR").

Assan responded by submitting: (1) a worksheet comparing the average price -- derived from [[     ]] invoices -- of [[                              ]] that [[              ]] charged Assan for inland freight to port services, versus the price of [[                    ]] that [[

]] charged to [[   ]] unaffiliated customer -- derived from [[              ]] bearing the notation [[

]]; (2) [[   ]] invoice for inland freight to port services issued by [[             ]] to [[   ]] unaffiliated customer; (3) [[   ]] invoice for such services issued by [[             ]] to Assan; and (4) [[   ]] invoice for inland freight to port services issued by a third-party service provider to Assan.  <u>See</u> Suppl. Section C Questionnaire Resp. of Assan Aluminyum Sanayi ve Ticaret A.S. at Ex. S4-15 (Sept. 10, 2020) C.R. 283, 284; P.R. 227 ("Pl.'s Suppl. Sec. C QR Resp.").  Upon review of Assan's submissions, Commerce utilized Assan's reported affiliated freight costs in rendering the <u>Preliminary Determination</u>.

Although Commerce did not request additional information on this field in its post-<u>Preliminary Determination</u> questionnaire in lieu of verification, <u>see</u> Req. for Docs., the Association challenged the sufficiency of certain aspects of Assan's Supplemental C Questionnaire response in its administrative case brief, <u>see</u> Consol. Pls.' Case Br. at 19–22.  Specifically, the Association argued that where Assan supplied only [[              ]] that [[            ]] issued to [[   ]] unaffiliated customer, Assan failed to comply with Commerce's request for average pricing; moreover, because, in the Association's estimation, Assan did not provide all of the requested documentation, substantial evidence did not support the agency's affirmative arm's-length finding and Commerce should have instead relied on adverse facts available to supply the missing

information.  Id.  By contrast, Assan explained in its rebuttal brief to the agency that because there

was [[          ]] transaction between [[                ]] and [[   ]] unaffiliated customer during

the period of investigation, its submission complied with Commerce's request.  Pl.'s Rebuttal Br.

at 16–17.

Commerce continued to rely on Assan's reported affiliated freight costs in the Final

Determination.  In so proceeding, Commerce noted several objections raised by the Association in

response to the agency's preliminary reliance on Assan's reported affiliated freight charges,

including, inter alia, that [[              ]] did not make a profit during the period of investigation

and that the invoices submitted for Assan versus those submitted for [[   ]] unaffiliated customer

represented transportation services covering dissimilar distances.  See IDM at 17.  Nevertheless,

Commerce concluded that:

> We find no indication that the evidence on the record concerning the accuracy and
> completeness of the freight costs provided by Assan's affiliated freight service
> provider is insufficient.  The petitioners did not identify any deficiencies regarding
> the information reflected in the supporting documentation on the record or contest
> the accuracy of the calculation that was used to establish the price charged by the
> affiliated freight service provider to Assan and its unaffiliated customers.  Rather,
> the petitioners' arguments did not address the accuracy of the information and
> documents reported by Assan.  Assan has fully cooperated and provided all the
> information and documentation requested by Commerce in order to determine
> whether the price paid by Assan to the affiliated freight service provider was at
> arms-length.  In addition, Commerce finds no evidence of broader use of the
> affiliated freight service provider for subject merchandise that would suggest that
> the information reported by Assan is incomplete.  Therefore, we will continue to
> rely on the information on the record and use Assan's reported per unit cost . . . in
> this final determination.

Id. at 18.

### C.    *Analysis*

Before the court, the Association argues that Commerce unlawfully relied on Assan's

reported affiliated freight costs because Assan did not comply with the agency's requests for

information and substantial evidence otherwise does not support a finding of arm's-length pricing.

See Consol. Pls.' Br. at 22–27.  By contrast, the Government and Assan maintain that where Assan

provided all of the information requested by the agency, Commerce was right to use Assan's

affiliated freight costs without reliance on facts otherwise available or adverse inferences, and that

the record otherwise establishes the arm's-length nature of Assan's reported freight charges.  See

Def.'s Br. at 19–21; Pl.'s Resp. at 15–20.  Because the court agrees that substantial evidence

supports both of the agency's determinations -- that Assan fully cooperated in the investigation

and that Assan paid arm's-length prices for inland freight services -- Commerce lawfully deducted

Assan's reported affiliated freight costs from the constructed export price.

### 1.   *Substantial Evidence Supports Commerce's Determination That Assan Fully Cooperated in Responding to the Agency's Information Requests.*

Recall that in order to assess whether Assan paid arm's-length prices to affiliated freight

service provider [[            ]], Commerce asked Assan to submit four batches of documents:

(i)    A worksheet calculating the average price that affiliated company [[
       ]] charged to unaffiliated customers;
(ii)   A price comparison with the average price that affiliated company [[
       ]] reportedly charged to Assan;
(iii)  Sample documentation showing [[            ]]'s charges to Assan; and
(iv)   Sample documentation showing [[            ]]'s charges to unaffiliated
       customers.

Suppl. Sec. C QR at 5.  Parties do not contest that Assan satisfied its submission obligations under

(ii), (iii), and (iv); however, the Association argues that because Assan submitted only [[

                                    ]], it failed to comply with

Commerce's request for average prices paid by unaffiliated customers under (i).  Moreover, the

Association argues that the explanation Assan proffered in its rebuttal brief to the agency --

namely, that there was [[        ]] transaction between [[            ]] and [[   ]] unaffiliated

customer during the period of investigation -- comprised untimely new factual information that Commerce impermissibly considered in deeming Assan cooperative. See Consol. Pls.' Br. at 25–26 (citing 19 C.F.R. § 351.301(c) (specifying deadlines for submitting factual information)). Because the court assesses that Assan's rationale is evident from the documentation submitted in response to the Supplemental Section C Questionnaire, the court holds that substantial evidence supports Commerce's determination that Assan cooperated in the investigation and provided the agency with the requested information.

First, Assan included the unaffiliated freight pricing information in a document entitled "Weighted Average Price for Inland Freight," directly below a table in which Assan calculated the average price it paid to [[          ]], as derived from [[     ]] invoices. See Pl.'s Suppl. Sec. C QR Resp. at Ex. S4-15. The court construes this title and placement as strong evidence that the unaffiliated freight costs included in the document likewise reflect an average. Moreover, contrary to the Association's argument that Assan failed to indicate in its Supplemental Section C Questionnaire response that the [[          ]] submitted for [[   ]] unaffiliated customer was also the [[          ]] issued by [[          ]], see id. at 25–26, the unaffiliated freight price of [[          ]] is directly preceded by the notation [[

          ]], see id. at Ex. S4-15. Thus, Assan discernibly explained -- and in a timely fashion -- that there was [[

     ]] transaction between [[          ]] and [[   ]] unaffiliated customer to report. Of course, where there is [[                    ]], the price listed in [[     ] invoice is also [[          ]].

In light of the above, the court agrees that substantial evidence supports Commerce's determination that Assan fully cooperated in responding to the affiliated freight-related

information requests, such that Commerce did not need to rely on facts otherwise available or

adverse inferences.

> **2.      *Substantial Evidence Supports Commerce's Determination that
> Assan's Affiliated Freight Charges were Made at Arm's-Length.***

The Association further argues that "record evidence indicates [Assan's] affiliated charges

were not made at arm's length, and [that] the Department failed to address . . . detracting evidence"

in holding otherwise, see Consol. Pls.' Br. at 22; the Government and Assan disagree, see Def.'s

Br. at 20 ("[R]ecord evidence demonstrates that Assan's freight charges were made at arm's

length."); Pl.'s Resp. at 18–20 (substantively similar).   Because the court determines that

Commerce's affirmative arm's-length finding is supported by substantial evidence and that the

agency's explanation is legally sufficient, the court holds that Commerce permissibly deducted

Assan's reported affiliated freight costs from the constructed export price.

To begin, Commerce noted in its decisional document that the Association:

did not identify any deficiencies regarding the information reflected in the
supporting documentation on the record or contest the accuracy of the calculation
that was used to establish the price charged by the affiliated freight service provider
to Assan and its unaffiliated customers.  Rather, the petitioners' arguments did not
address the accuracy of the information and documents reported by Assan.

IDM at 18.  The court understands this to mean that the Association did not challenge before the

agency the authenticity or accuracy of the underlying figures presented in Assan's documentation.

Stated more concretely, where Assan submitted that the average price charged by [[

        ]] to Assan was [[                                    ]], the Association did not challenge

the accuracy of this figure; and where Assan submitted that [[              ]] charged [[   ]]

unaffiliated customer [[                        ]], the Association did not question whether this was

indeed the price charged for the stated services.  Accordingly, because the court has already



Consol. Court No. 21-00246                                      Page 43
*PUBLIC VERSION*

accepted that Assan's worksheet reflects average pricing, <u>supra</u>, and because the Association has

not challenged the accuracy of these attendant figures, <u>see</u> IDM at 18, the court holds that

Commerce supportably assessed [[                    ]]'s charge of [[

        ]] to Assan to be sufficiently comparable to [[                  ]]'s charge of [[

   ]] to [[    ]] unaffiliated customer, such that Assan's reported freight charges reflect arm's-

length prices.

 Nevertheless, the Association maintains that Commerce's affirmative arm's-length finding

was legally deficient because the agency's explanation failed to account for the following

detracting evidence: (i) that the [[                    ]] issued by [[                    ]] to an unaffiliated

customer was for a comparatively short distance, such that it was incomparable to the invoice

issued to Assan; (ii) that [[                    ]]'s tax returns and other financial documents revealed

the company incurred a loss during the period of investigation, such that it was unlikely that

[[                ]] charged Assan arm's-length prices; and (iii) that [[                  ]] had a high

level of [[                        ]], such that "it is unlikely" that the [[                      ]] to an

unaffiliated customer represented [[                      ]] that [[                  ]] served an

unaffiliated customer. <u>See</u> Consol. Pls.' Br. at 26–27. While it is true as a general proposition that

Commerce "must take into account whatever in the record fairly detracts" from the weight of

evidence, <u>CS Wind Viet. Co. v. United States</u>, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting

<u>Gerald Metals, Inc. v. United States</u>, 132 F.3d 716, 720 (Fed. Cir. 1997))), as a threshold matter,

the court is not convinced that the above "evidence" "fairly detracts" from Commerce's

determination. Accordingly, this line of argument is unavailing.

 Concerning the Association's first contention, parties draw differing inferences from the

invoices of [[                  ]]. <u>Compare</u> <u>id.</u> at 26 (maintaining the distance documented in [[    ]]

***PUBLIC VERSION***

unaffiliated customer invoice -- from [[                    ]] to the [[        ]] port -- is comparatively short), with Pl.'s Resp. at 18 (maintaining that the [[        ]] port is approximately the same distance to both [[          ]] and Assan's plant in [[        ]]). Thus, whether one views the distance information documented in the invoices as "supporting" or "detracting" evidence is a matter of interpretation. Where Commerce explicitly recited the Association's distance-derived concerns in its decisional document, see IDM at 17, yet continued to rely on Assan's reported affiliated freight charges in rendering the Final Determination, id. at 18, it is reasonably discernible that on-net Commerce viewed the invoices as supportive of an arm's-length finding. Absent maps in the record, "more than one competing inference regarding distance 'seem[s] plausible.'" SMA Surfaces, Inc. v. United States, 47 CIT __, __, 2023 WL 166022, at *10 (Jan. 12, 2023). For the court to now characterize the differing distances as "detracting evidence" would amount to "favor[ing] [Consolidated] Plaintiffs' preferred evidentiary inference over another reasonable [one]," which "the court cannot do." Id. (quoting Aristocraft of Am., LLC v. United States, 42 CIT __, __, 331 F. Supp. 3d 1372, 1380 (2018), as amended (Apr. 17, 2019)).

The Association's second and third contentions rely on "evidence" that is speculative at best, inapposite at worst. Concerning the second contention, the Association invokes [[

]]'s lack of profitability during the period of investigation to make the broader argument that [[             ]] would have been profitable had it charged Assan arm's-length prices. See Consol. Pls.' Br. at 27. First, such an argument rests on "mere speculation" and "[i]t is well established that speculation does not constitute 'substantial evidence.'" Jinxiang Yuanxin Imp. & Exp. Co. v. United States, 39 CIT __, __, 71 F. Supp. 3d 1338, 1351 (2015) (quoting Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009)). But more importantly, although Commerce did acknowledge Petitioner's objection in its decisional document, see IDM at 17, the

Association itself concedes that "there is no 'requirement' to demonstrate that the []affiliated company was profitable," Consol. Pls.' Reply at 9 n.5.  Inapposite evidence does not "fairly detract" from Commerce's determination.

The Association's third line of argument -- that "it is unlikely" [[                ]] served only [[     ]] unaffiliated customer given its high level of [[                     ]] -- likewise rests on impermissible speculation.  Moreover, it fails to recognize that "Commerce's analysis is specific to the shipping of <u>subject merchandise</u> between Assan and [[                ]]." Def.'s Oral Arg. Subm. at 10 (emphasis added).  Accordingly, as Commerce itself seems to acknowledge in its decisional document, whether [[               ]] had [[           ]] unaffiliated customers during the period of investigation is not the relevant inquiry.  <u>See</u> IDM at 18 ("Commerce finds no evidence of broader use of the affiliated freight service provider <u>for subject merchandise</u> that would suggest that the information reported by Assan is incomplete." (emphasis added)).  In short, because the court is not persuaded that the Association has identified "evidence" that "fairly detracts" from Commerce's determination, the Association's assertion of legal error on the grounds that Commerce insufficiently accounted for such "detracting evidence" is correspondingly unpersuasive.

Having held that substantial evidence supports both of the agency's findings -- that Assan fully cooperated in the investigation and that Assan paid arm's-length prices for inland freight services -- the court sustains Commerce's deduction of Assan's reported affiliated freight costs from the constructed export price.

    **IV.**    *Commerce's Treatment of Assan's Billing Adjustments Does Not Accord with Law.*

        **A.**    *Issue-Specific Legal Background*

### 1.      *Billing Adjustments*

In determining constructed export price, Commerce uses a price that is "net of price adjustments," including "other adjustment[s]."  See 19 C.F.R. §§ 351.401(c), 351.102(b).  Such "other adjustment[s]" can include billing adjustments that capture, inter alia, invoicing errors or product quality adjustments.  See Pl.'s Suppl. Sec. C QR Resp. at 5–6.  Before the agency, Assan claimed an invoicing error adjustment -- reflecting revenue resulting from billing errors, see Pl.'s Case Br. at 13 -- which would increase U.S. sales price/constructed export price,[31] Pl.'s Oral Arg. Subm. at 16, as well as a product quality adjustment -- reflecting expenses resulting from quality errors, see Pl.'s Case Br. at 13 -- which would decrease U.S. sales price/constructed export price,[32] Pl.'s Oral Arg. Subm. at 16.  The burden of demonstrating entitlement to and the extent of an adjustment lies with the interested party in possession of the relevant information.  See 19 C.F.R. § 351.401(b)(1).

### 2.      *Adverse Facts Available*

Where Commerce has made a "valid decision to use facts otherwise available," Shandong Huarong Mach. Co. v. United States, 30 CIT 1269, 1301, 435 F. Supp. 2d 1261, 1289 (2006), Commerce "may" then make the additional decision to "'use an inference that is adverse to the interests of [a respondent] in selecting from among the facts otherwise available,'" if Commerce finds that the respondent "'has failed to cooperate by not acting to the best of its ability . . . .'" Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1677e(b)(1)).  "Commerce has . . . discretion" both in "choos[ing] among the available record

---

[31] And thereby, reduce dumping margins.

[32] And thereby, increase dumping margins.

information," <u>Nan Ya Plastics Corp. v. United States</u>, 810 F.3d 1333, 1346 (Fed. Cir. 2016), and

in whether to "use an inference that is adverse" under § 1677e(b), <u>Uttam Galva Steels Ltd. v.</u>

<u>United States</u>, No. 2021-2119, 2022 WL 1419596, at *2 n.5 (Fed. Cir. May 5, 2022).  Moreover,

"Commerce is not statutorily required to select a method that is the 'most' or 'more' reasonably

adverse." <u>Timken Co. v. United States</u>, 354 F.3d 1334, 1346 (Fed. Cir. 2004) (quotation omitted).

### B.    *Issue-Specific Factual and Procedural Background*

In an initial questionnaire, Commerce asked Assan to report price adjustments as follows:

> Report any price adjustments made for reasons other than discounts or rebates.
> State whether these billing adjustments are reflected in your gross unit price.
> Report a decrease in price as a negative figure and an increase in price as a positive
> figure.  Report zero in this field if no adjustments were made to the price.  Create a
> separate field for each type of billing adjustment (e.g., corrections of invoicing
> errors, post-invoicing price adjustments).  Describe the nature of each type of
> billing adjustment that is recognized in your sales records.  Describe the document
> flow employed to process the price changes.

Pl.'s Sec. C QR Resp. at 28–29.  Despite Commerce's instructions to "[c]reate a separate field for

each type of billing adjustment," <u>id.</u>, Assan initially reported its billing adjustments and discounts

incurred within a single field, entitled "BILLADJU," <u>see</u> Pl.'s Case Br. at 14.

Accordingly, in the Supplemental Section C Questionnaire, Commerce again asked Assan

to separate each billing adjustment into its own field and further asked Assan to submit sample

documentation for each reported billing adjustment on an invoice-specific and customer-specific

basis.  <u>See</u> Pl.'s Suppl. Sec. C QR Resp. at 5–6.  In reply, Assan "aligned the reporting of billing

adjustments and other discounts with the accounting classification" and reported the following,

separate billing adjustments:

BILLADJ1U: [[                        ]]
BILLADJ2U: [[                                    ]]
BILLADJ3U: [[                                ]]

   BILLADJ4U: [[              ]]
   OTHDISU: [[      ]]

Id. at 5.  With regard to BILLADJ1U -- which reflects revenue resulting from billing errors, see Pl.'s Case Br. at 13, Assan reported revenue of [[      ]], see Pl.'s Oral Arg. Subm. at 16; and with regard to BILLADJ2U -- which reflects expenses resulting from quality errors, see Pl.'s Case Br. at 13, Assan reported expenses of [[      ]], see Pl.'s Oral Arg. Subm. at 16.  Assan further purported to submit "sample billing adjustment credit notes f[or] each type" of adjustment, see Pl.'s Suppl. Sec. C QR Resp. at 5, but responded that it had "no invoice specific billing adjustments" to submit, id. at 6.

   In rendering the Preliminary Determination, Commerce rejected the adjustments recorded in BILLADJ1U and BILLADJ2U on the basis that Assan had only provided sample documentation related to BILLADJ3U and BILLADJ4U in response to the Supplemental Section C Questionnaire.  See Pl.'s Case Br. at 14.  Accordingly, where "no sample supporting documentation was provided or the sample supporting documentation could not be tied to the respective per unit amounts reported in the U.S. database," see Prelim. Margin Calc. Mem. at 5–6, Commerce preliminarily set BILLADJ1U -- which would result in an upward adjustment to U.S. sales price and, thereby, benefit Assan by decreasing the dumping margin -- to zero, and set BILLADJ2U -- which would result in a downward adjustment to U.S. sales price, and thereby, disadvantage Assan by increasing the dumping margin -- to the lowest reported value for such adjustments.  See id.  Although Commerce did not claim to have applied an adverse inference in its Preliminary Determination, Assan noted the "adverse impact" of Commerce's billing adjustments in its case brief before the agency.  See Pl.'s Case Br. at 15.

Commerce asked no further questions nor requested additional documentation on these other adjustments in its questionnaire sent "in lieu of verification" following the <u>Preliminary Determination</u>.  <u>See</u> Req. for Docs.  Nevertheless, in the <u>Final Determination</u>, Commerce changed its approach with respect to BILLADJ2U and relied on Assan's specifically reported information -- rather than relying on the lowest reported value in the record -- to adjust downward Assan's U.S. sales price.  <u>See</u> Mem. from S. Carey to the File, re Final Determ. Margin Calc. for Assan Aluminyum Sanayi ve Ticaret A.S. at 3 (Dep't Com. Mar. 1, 2021) C.R. 407; P.R. 333 ("Final Margin Calc. Mem.").

Commerce split its rationale for this change across several decisional documents.  In Commerce's memorandum explaining its final margin calculation, Commerce explained:

> Assan reported certain home market and U.S. price adjustments where no sample supporting documentation was provided or the sample supporting documentation could not be tied to the respective per unit amounts reported in the home market database.[3]  For BILLADJ2U, LATEPAYH and MARNINU, we are now using Assan's reported information.[4]
>
> . . .

--------------------------------------------------

[3] <u>See</u> IDM, at 4 and Comments 5-7.
[4] <u>Id.</u> at Comment 5.

<u>Id.</u> at 3.  Commerce further stated in the final Issues and Decision Memorandum:

> As explained in detail in the <u>Preliminary Determination</u>, Assan failed to demonstrate that it is entitled to these two adjustments to U.S. price.  Although aggregate totals for each of these billing adjustments were reported and tied to the SAP accounts and trial balance, no customer-specific documentation was provided.  Specifically, the sample documentation which was provided for Assan's other reported billing adjustments included copies of credit notes which verified the purpose of these adjustments.  In the case of the reported billing adjustments related to billing and quality errors under BILLADJ1U and BILLADJ2U, we have no credit notes or other source documentation on the record to confirm the validity of these adjustments.  Since Assan has not demonstrated that it is entitled to

> BILLADJ1U which benefits Assan, we will continue to deny this adjustment for
> the final determination[.]
>
> As discussed above, we disagree that use of an adverse inference under section
> 776(b) of the Act is warranted.  In the <u>Preliminary Determination</u>, we incorrectly
> set BILLADJ2U to the lowest reported value.  For the final determination, we will
> use the reported information on the record for BILLADJ2U since this adjustment
> does not benefit Assan because it results in a lower U.S. price.

IDM at 23–24.  The introductory clause of Commerce's second paragraph -- i.e., "[a]s discussed

above" -- refers to the portion of the Issues and Decision Memorandum in which Commerce

addressed its treatment of Assan's price adjustments for Marine Insurance and Late Payments.

There Commerce stated:

> We disagree with the petitioners that Commerce applied facts available with an
> adverse inference (AFA) under section 776(b) of the Act in the <u>Preliminary
> Determination</u>, or that it is warranted for this final determination.  We find that,
> throughout the course of this investigation, Assan has cooperated with Commerce's
> requests for this information, and it has answered each request for this information
> to the best of its ability.  Therefore, we find no basis to apply AFA in this case.

See <u>Id.</u> cmt. 5 at 20–21.

### C.    Analysis

Before the court, the Association argues that because Commerce "failed to explain its

decision not to apply an adverse inference in its selection of facts available," Consol. Pls.' Reply

at 11, the agency's "conclusion in the <u>Final Determination</u> is unreasonable and contrary to law,"

Consol. Pls.' Br. at 30.  By contrast, the Government and Assan maintain that "the record contains

no evidence that Assan failed to cooperate by acting to the best of its ability to comply with

Commerce's request," such that "an adverse inference is not warranted."  Def.'s Br. at 22; Pl.'s

Resp. at 22 (substantively similar).  Moreover, Assan maintains that "Commerce's rationale is

clearly detailed in the <u>Final [] Determination</u>."  <u>Id.</u>  The court agrees with the Association that

Commerce's reasoning was legally deficient and remands to the agency for further explanation.

As noted above, although in the Preliminary Determination Commerce used the lowest reported value in the record to implement Assan's BILLADJ2U adjustment, see Prelim. Margin Calc. Mem. at 5–6, in the Final Determination, Commerce instead relied on Assan's reported values, see Final Margin Calc. Mem. at 3.   The practical implication of this change is that Commerce's original billing adjustment methodology reduced Assan's U.S. price to a greater extent -- and thereby increased Assan's dumping margin to a greater extent -- than the revised methodology that Commerce employed in rendering the Final Determination.  Of course, as a general matter, "Commerce may change its stance on issues decided preliminarily in its final determinations," Gov't of Arg. v. United States, 45 CIT __, __, 542 F. Supp. 3d 1380, 1391 (2021), however, in so doing, Commerce must "explain[] [its] reasoning for the change and 'its decision [must be] supported by substantial evidence and in accordance with law.'"  Id.  Commerce has not satisfied these requirements here.

Commerce's rationale for revising the BILLADJ2U adjustment consists of the agency's statement that it "incorrectly set BILLADJ2U to the lowest reported value" "[i]n the Preliminary Determination" and that it "disagree[d] that use of an adverse inference . . . is warranted."  IDM at 24.  Commerce further cross-referenced its treatment of Assan's price adjustments for Marine Insurance and Late Payments, see id. ("As discussed above . . . "), in which the agency stated:

> We disagree with the petitioners that Commerce applied facts available with an adverse inference (AFA) under section 776(b) of the Act in the Preliminary Determination, or that it is warranted for this final determination.  We find that, throughout the course of this investigation, Assan has cooperated with Commerce's requests for this information, and it has answered each request for this information to the best of its ability.  Therefore, we find no basis to apply AFA in this case.

Id. cmt. 5 at 20–21.  As an initial matter, the Association contests that Commerce's Marine Insurance and Late Payments explanation can be imputed to the BILLADJ2U adjustment context.

*PUBLIC VERSION*

See Consol. Pls.' Reply at 12 ("Given that the application of adverse facts available relates to

specific gaps in the record, and not the total disregard of information, Commerce's reference to its

'discuss[ion] above' on an unrelated issue is not supported by substantial evidence or in

accordance with law." (alteration in original)).  The court need not resolve this point of contention,

because even assuming arguendo that the Marine Insurance and Late Payments explanation can be

imputed, it is insufficient.

　　　The court so finds, because it is not "reasonably discernible" what evidence supports the

agency's conclusions that "Assan . . . cooperated with Commerce's requests for . . . information[]

and . . . answered each request for . . . information to the best of its ability" -- the crux of

Commerce's proffered rationale.  IDM cmt. 5 at 20–21.  It is axiomatic that "[c]onclusory

statements that do not explain how a determination was reached are . . . insufficient."  In re Section

301 Cases, 46 CIT __, __, 570 F. Supp. 3d 1306, 1338 (2022) (citing Int'l Union, United Mine

Workers of Am. v. Mine Safety & Health Admin., 626 F.3d 84, 94 (D.C. Cir. 2010)).  This

proposition is especially impactful here because the agency has summarily asserted that Assan

acted to "the best of its ability" while enumerating -- without any attempt to reconcile -- evidence

that seemingly detracts from this conclusion.  See, e.g., IDM at 23 (noting that Assan provided "no

customer-specific documentation" for BILLADJ1U and BILLADJ2U, despite providing "copies

of credit notes" for other reported billing adjustments, such that Commerce could not "confirm the

validity of these adjustments").  The agency may have a reason as to why such a failure to provide

the requested information is not inconsistent with its assessment that Assan acted to "the best of

its ability," but any such rationale is not, as of now, reasonably discernible.

　　　Finally, the court acknowledges -- and it is undisputed -- that whether to apply adverse

inferences is a matter within Commerce's discretion.  See, e.g., Consol. Pls.' Oral Arg. Subm. at

12 (that "this authority is discretionary is manifested by section 1677e(b)'s use of the permissive

term 'may,' which stands in contraposition to section 1677e(a)'s use of the mandatory term

'shall.'" (quoting <u>Dorbest Ltd. v. United States</u>, 30 CIT 1671, 1736, 462 F. Supp. 2d 1262, 1317

(2006)). Accordingly, Commerce <u>could</u> have declined to apply adverse facts available <u>even if</u> it

had affirmatively found that Assan failed to act to the best of its ability. But as it stands, that is

not what Commerce did. Commerce "did not [purport to] rely on its discretion under 19 U.S.C.

§ 1677e(b) to not apply an adverse inference, despite Assan's failure to cooperate," <u>id.</u> at 13, but

rather made an affirmative factual finding that "Assan . . . cooperated with Commerce's requests

for . . . information[] and . . . answered each request for . . . information to the best of its ability."

<u>Id.</u> cmt. 5 at 20–21. Because "an agency's action must be upheld, if at all, on the basis articulated

by the agency itself," <u>State Farm</u>, 463 U.S. at 50 (citing <u>SEC v. Chenery</u>, 332 U.S. 194, 196

(1947)), Commerce's "best of its ability" finding must be supported by substantial evidence; as of

now, for the reasons stated above, it is not reasonably discernible that the agency's determination

is so supported.

The court, thus, remands this issue to the agency for further explanation consistent with the

court's opinion.

> **V.      *The Court Stays Consideration of Commerce's Deduction of Section 232 Tariffs
> From Constructed Export Price Pending Resolution of the Issue by the Federal
> Circuit.***

> #### A.      *Issue-Specific Legal Background*

> ##### 1.      *United States Import Duties*

Section 1677a(c)(2)(A) of 19 U.S.C. directs Commerce to reduce constructed export price

by "the amount, if any, included in such price, attributable to any additional costs, charges, or

expenses, and United States import duties." Def.'s Br. at 23. Logically, no "United States import

Case 1:21-cv-00246-SAK   Document 83   Filed 10/30/23   Page 95 of 152

Consol. Court No. 21-00246                                                    Page 54
**PUBLIC VERSION**

duties" are paid on subject merchandise sold in the home market, but prices paid in the United

States likely reflect such duties -- creating the possibility that constructed export price could be

inflated relative to normal value. Consequently, to further Commerce's goal of comparing prices

"at a common point in the chain of commerce," APEX Exports, 777 F.3d at 1374, Commerce

deducts "United States import duties" paid from the U.S. sales price (i.e., constructed export price).

In a series of prior litigations, the Federal Circuit has declared the phrase "United States

import duties" in 19 U.S.C. § 1677a(c)(2)(A) to be ambiguous and sustained various Commerce

determinations that certain duties -- including antidumping duties and safeguard duties imposed

under Section 201 of the Trade Act of 1974[33] -- comprise "special tariffs," rather than "United

States import duties," that should not be deducted from constructed export price. See Wheatland

Tube Co. v. United States, 495 F.3d 1355, 1359–60, 1365 (Fed. Cir. 2007).

### 2.    *Section 232 Tariffs*

Under Section 232 of the Trade Expansion Act of 1962, as codified at 19 U.S.C. § 1862,

the President may impose tariffs -- herein referred to as "Section 232 tariffs" -- to remedy assessed

threats posed to national security by implicated imports. Commerce has previously assessed

Section 232 tariffs to constitute "United States import duties" for purposes of 19 U.S.C.

§ 1677a(c)(2)(A) and deducted them from constructed export price in prior investigations. See,

e.g., Borusan Mannesmann Boru Sanayi Ve Ticaret v. United States, 45 CIT __, __, 494 F. Supp.

3d 1374 (2021), appeal docketed, Fed. Cir. No. 2021-2097;  Deacero S.A.P.I de C.V. v. United

---

[33] "Section 201 of the Trade Act of 1974 . . . [a]llows the President to impose temporary duties
and other trade measures if the U.S. International Trade Commission . . . determines a surge in
imports is a substantial cause or threat of serious injury to a U.S. industry."  BROCK R. WILLIAMS,
CONG. RSCH. SERV., R45529, TRUMP ADMINISTRATION TARIFF ACTIONS:
FREQUENTLY ASKED QUESTIONS 2 (2020).

States ("Daecero"), 45 CIT __, Slip Op. 21-171, 2021 WL 6067010 (Dec. 20, 2021), appeal

docketed, Fed. Cir. No. 2022-1486; Power Steel Co., Ltd. v. United States, 45 CIT __, Slip Op.

21-173, 2021 WL 6098309 (Dec. 23, 2021).   The Federal Circuit is currently considering

Commerce's treatment of Section 232 tariffs in Borusan, Fed. Cir. No. 2021-2097.

### B.    Issue-specific Factual and Procedural Background

Certain CAAS imported during the period of investigation by Turkish Respondents --

including Assan -- were subject to Section 232 tariffs imposed pursuant to Publication of a Report

on the Effect of Imports of Aluminum on the National Security: An Investigation Conducted under

Section 232 of the Trade Expansion Act of 1962, as amended, 85 Fed. Reg. 40,508 (Dep't

Commerce Jul. 6, 2020).   See Pl.'s Sec. C QR Resp. at App. V.   In the Final Determination,

Commerce concluded that "section 232 duties should be treated as U.S. import duties" under 19

U.S.C. § 1677a(c)(2)(A) and, thus, deducted the amount paid by Assan from U.S. sales

prices/constructed export value.   IDM at 14–15.

### C.    Analysis

Before the court, Assan contests Commerce's deduction of Section 232 tariffs from

constructed export price and argues that such duties should be treated as "special tariffs" -- akin to

antidumping duties and section 201 safeguard duties -- rather than as "United States import duties."

Pl.'s Br. at 18–19.   In contrast, the Government and the Association maintain that Commerce's

decision accords with law, as demonstrated by recent decisions from this court sustaining such

deductions.   See, e.g., Borusan, 494 F. Supp. 3d at 1374; Deacero, 2021 WL 6067010; Power Steel

Co., 2021 WL 6098309.   This precise issue is currently before the Federal Circuit in Borusan, Fed.

Cir. No. 2021-2097, and as the parties agree,[34] the Federal Circuit's ruling in Borusan will be dispositive on the matter in the case at bar.

Accordingly, on June 10, 2022, the court issued to the parties a preliminary question asking:

> Can and should this court stay consideration of the Section 232 tariff issue pending final adjudication by the Federal Circuit?

Ct.'s Prelim. Q. at 2.  The court received a range of answers:  Although all parties agree that this court has the authority to stay the Section 232 issue pending final resolution by the Federal Circuit, see Pl.'s Prelim. Q. Resp. at 2; Consol. Pls.' Prelim. Q. Resp. at 2; Def.'s Prelim. Q. Resp. at 2, Assan responded that yes, the court should stay the issue, but should also proceed to resolve the remaining issues, see Pl.'s Prelim. Q. Resp.; the Government responded that yes, the court should stay the Section 232 issue, but should also stay the entire case pending resolution of the 232 issue by the Federal Circuit, see Def.'s Prelim. Q. Resp.; and the Association responded that no, the court should not stay the Section 232 issue, but to the extent the court chooses to, it should proceed to resolve the remaining issues in the interim, see Consol. Pls.' Prelim. Q. Resp.

When contemplating a stay, a court must "weigh [the] competing interests," Landis v. N. Am. Co., 299 U.S. 248, 254–55 (1936), but ultimately the decision rests "within the sound discretion of the trial court," Cherokee Nation of Okla. v. United States, 124 F.3d 1413, 1416 (Fed.

---

[34] See, e.g., Pl.'s Prelim. Q. Resp. at 5 ("The Borusan appeal involves the identical issue to that raised by Assan in this appeal and the CAFC's ruling will govern the Court's ruling with regards to that issue without the need for oral argument or further briefing."); Def.'s Prelim. Q. Resp. at 3 ("If the Federal Circuit reverses Commerce's determination and holds that section 232 duties are not 'United States import duties' and cannot be deducted when determining U.S. price, this Court will need to remand the case to Commerce with the instructions to comply with the Federal Circuit's decision."); Consol. Pls.' Prelim. Q. Resp. at 2 ("Should the Court of Appeals uphold the Department's interpretation, its decision would very likely be dispositive of whether the Department's deduction of Section 232 duties from constructed export price is also in accordance with law in this case.").

Cir. 1997).  In the past, this court has issued a stay where "pending litigation in the Court of

Appeals [wa]s likely to affect the disposition" of the case at bar.  See SKF USA Inc. v. United

States, 36 CIT 842, 844 (2012); see also RHI Refractories Liaoning Co. v. United States, 35 CIT

407, 774 F. Supp. 2d 1280 (2011).  Because the Federal Circuit has already heard oral argument

in Borusan, see Oral Arg., No. 21-2097, Feb. 7, 2023, ECF No. 80 -- such that any stay "will not

[be] indefinite" -- and because "a stay will promote judicial economy and preserve the resources

of the parties and the court," the court deems a stay of the Section 232 issue appropriate.  RHI

Refractories, 35 CIT at 411, 774 F. Supp. 2d at 1285.

        The court next considers the appropriate scope of the stay.  The United States asks the court

to stay the entire case pending the Federal Circuit's resolution of Borusan, Def.'s Prelim. Q. Resp.

at 3, while Assan and the Association ask the court to presently resolve the remaining issues, see

Pl.'s Prelim. Q. Resp. at 2; Consol. Pls.' Prelim. Q. Resp. at 3.  On the one hand, the court

acknowledges that the remaining issues "are factually and legally distinct," Pl.'s Prelim. Q. Resp.

at 2, such that the Federal Circuit's answer to the Section 232 question will not resolve them; on

the other hand, the court acknowledges that each of the remaining issues feeds into the calculation

of a single dumping margin for Assan, such that the case may not be fully resolvable until all of

the issues are resolved.

        Overcoming this latter point, the court assesses certain unique facts that render separable

the Section 232 issue.  Specifically, as of now, Commerce has calculated a final dumping margin

of 2.02 percent for Assan.  Final Determination at 13,327.  As Plaintiff notes, under 19 U.S.C.

§ 1673b(b)(3), a dumping margin that is "less than 2 percent" is "de minimis" and must be

disregarded by Commerce.  See 19 U.S.C. § 1673b(b)(3); id. at § 1673d(a)(4) (both stating "the

administering authority shall disregard any weighted average dumping margin that is de minimis").

Assan maintains that "[i]f the [c]ourt agrees with [it] on either of the other two counts raised in its complaint -- [i.e.,] the calculation of Assan's duty drawback adjustment (Count I) or the denial of its home market rebate adjustment (Count II) -- the recalculated dumping margin for Assan will be less than 2 percent, or de minimis" and Commerce must disregard it.  Pl.'s Prelim. Q. Resp. at 4.  Such an occurrence would render Assan no longer subject to the antidumping duty order on CAAS from Turkey, thereby mooting Assan's remaining arguments before this court.[35]

Because the court has already resolved to: (1) remand[36] Commerce's calculation of Assan's duty drawback adjustment to comply with the Federal Circuit's latest direction; (2) sustain[37] Commerce's denial of a home market rebate adjustment to Assan; (3) sustain Commerce's reliance on Assan's affiliated freight costs; and (4) remand Commerce's treatment of Assan's billing adjustment for further explanation, it is conceivable[38] that Commerce may calculate a de minimis rate for Assan upon remand, even assuming arguendo the proper deduction of Section 232 tariffs from constructed export price.  As such an outcome would ultimately dispose of Assan's claims, the court -- balancing the "historic federal policy against piecemeal appeals," Timken Co. v. Regan, 5 CIT 4, 6 (1983) (internal quotation marks and citation omitted), with the "suppleness" of "the processes of justice" to "adapt[] to varying conditions," Landis, 299 U.S. at 256 -- stays

---

[35] Any such outcome would also seem to conserve party resources beyond the scope of this litigation where Commerce has already begun the first administrative review of the antidumping duty order on CAAS from Turkey.  Pl.'s Prelim. Q. Resp. at 5.  As Plaintiffs note, "Commerce's selection of Assan as a mandatory respondent, and Assan's participation in the first administrative review, will be moot if it is assigned a de minimis dumping margin in the investigation underlying the review and no longer subject to the antidumping duty order on CAAS from Turkey."  Id.

[36] In accordance with Assan's request.

[37] Contrary to Assan's request.

[38] Though the court does not presuppose.

consideration of the Section 232 tariff issue pending final resolution by the Federal Circuit and resolves the remaining issues in accordance with the foregoing.  The court hereby:

**ORDERS** Commerce to assess -- assuming arguendo the proper deduction of Section 232 tariffs from constructed export price and in light of the court's foregoing resolution of the remaining issues -- whether the recalculated dumping margin for Assan will be de minimis.  If Commerce renders such a de minimis finding, Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised remand determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court; the court further

**ORDERS** that if Commerce does not render such a de minimis finding or is unable to make such an assessment at this time, Commerce shall file with this court and provide to the parties a status report explaining as such within 90 days of the date of this order.  Under such a scenario, Commerce shall file with this court and provide to the parties its remand results within 90 days of the final resolution by the Federal Circuit of <u>Borusan Mannesmann Boru Sanayi Ve Ticaret v. United States</u>, 45 CIT __, 494 F. Supp. 3d 1374 (2021), <u>appeal docketed</u>, Fed. Cir. No. 21-2097; thereafter, the parties shall have 30 days to submit briefs addressing the revised remand determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court.

**SO ORDERED.**

*/s/  Gary S. Katzmann*
 Gary S. Katzmann, Judge

Dated:  March 1, 2023
        New York, New York

# ATTACHMENT 4:

# Redetermination Pursuant to Court Remand Order in *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Court No. 21-00246 (May 31, 2023), ECF No. 94

**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of the General Counsel**
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C. 20230

May 31, 2023

**FILED ELECTRONICALLY VIA CM/ECF**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re:  Redetermination Pursuant to Court Remand Order in
  *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Court No. 21-00246

Dear Mr. Toscano:

Pursuant to the Court's order of May 31, 2023, please find attached the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the above-captioned action. The Department's remand redetermination is a public document.

In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for the remand proceeding will follow under separate cover. Furthermore, the Department understands that it is filing the remand redetermination a day late and is filing in accordance with the Court's instructions as relayed on May 31, 2023. Should you have any questions concerning the matter, please contact me at (240)-449-5911.

Respectfully submitted,

/s Ashlande Gelin
Ashlande Gelin
Attorney
Office of the Chief Counsel
  for Trade Enforcement & Compliance

Attachment

Mr. Mario Toscano
May 31, 2023
Page 2


cc:

Leah N. Scarpelli
ArentFox Schiff LLP
1717 K Street, NW.
Washington, DC 20006-5344
(202) 715-8403
Fax: (202) 857-6395
Email: leah.scarpelli@afslaw.com

Diana Dimitriuc-Quaia
ArentFox Schiff LLP
1717 K Street, NW.
Washington, DC 20006-5344
(202) 857-6291
Fax: (202) 857-6395
Email: diana.dimitriuc-quaia@afslaw.com

Jessica R. DiPietro
ArentFox Schiff LLP
1717 K Street, NW.
Washington, DC 20006-5344
(202) 350-3622
Fax: (202) 857-6395
Email: jessica.dipietro@afslaw.com

John A. Gurtunca
ArentFox Schiff LLP
1717 K Street, NW.
Washington, DC 20006-5344
(202) 857-6174
Fax: (202) 857-6395
Email: john.gurtunca@afslaw.com

John M. Herrmann , II
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8488
Fax: (202) 342-8451
Email: jherrmann@kelleydrye.com

Mr. Mario Toscano
May 31, 2023
Page 3

Matthew Mosher Nolan
ArentFox Schiff LLP
1717 K Street, NW.
Washington, DC 20006-5344
(202) 857-6013
Fax: (202) 857-6395
Email: matthew.nolan@afslaw.com

Nancy Aileen Noonan
ArentFox Schiff LLP
1717 K Street, NW.
Washington, DC 20006-5344
(202) 857-6479
Fax: (202) 857-6395
Email: nancy.noonan@afslaw.com

Yun Gao
ArentFox Schiff LLP
1301 Avenue of the Americas
Floor 42
New York, NY 10019
(212) 492-3337
Fax: (212) 484-3990
Email: yun.gao@afslaw.com

John M. Herrmann , II
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8488
Fax: (202) 342-8451
Email: jherrmann@kelleydrye.com

Joshua Rubin Morey
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8867
Fax: (202) 342-8451
Email: jmorey@kelleydrye.com

Mr. Mario Toscano
May 31, 2023
Page 3

Julia A. Kuelzow
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(908) 461-1685
Fax: (202) 342-8451
Email: jkuelzow@kelleydrye.com

Paul Charles Rosenthal
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8485
Fax: (202) 342-8451
Email: prosenthal@kelleydrye.com

R. Alan Luberda
Kelley Drye & Warren, LLP
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108
(202) 342-8835
Fax: (202) 342-8451
Email: aluberda@kelleydrye.com

Kyle S. Beckrich
U.S. Department of Justice
Commerical Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-9322
Fax: (202) 305-7644
Email: kyle.beckrich@usdoj.gov

A-489-839
Remand
Slip Op. 23-26
POI: 01/01/2019 – 12/31/2019
**Public Document**
E&C/OVII: SC

***Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,**
**Consol. Court No. 21-00246, Slip Op. 23-26 (CIT March 1, 2023)**
**Common Alloy Aluminum Sheet from the Republic of Turkey**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

in *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Court No. 21-00246, Slip

Op. 23-26 (CIT March 1, 2023) (*Remand Order*).  These final results of redetermination concern

the final determination of the antidumping duty investigation of common alloy aluminum sheet

from the Republic of Turkey (Turkey).[1]  The petitioner is the Aluminum Association Common

Alloy Aluminum Sheet Trade Enforcement Working Group & Individual Members (the

Association).  The respondents in this investigation are the following companies:  Assan

Aluminyum Sanayi ve Ticaret A.S. (Assan); and Teknik Aluminyum Sanayi A.S.

On March 1, 2023, the Court sustained, in part, and remanded, in part, Commerce's *Final*

*Determination*.  As an initial matter, the Court stayed consideration of the section 232 tariff

issue[2] pending final resolution by the U.S. Court of Appeals for the Federal Circuit (Federal

---

[1] *See Common Alloy Aluminum Sheet from Turkey:  Final Affirmative Determination of Sales at Less Than Fair
Value*, 86 FR 13326 (March 8, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum
(IDM).  This final affirmative determination for Turkey was inadvertently published under the case number for the
Italy proceeding (A-475-842).  The correct case number for Turkey is A-489-839.
[2] *See Remand Order* at 13 and 53-59.

Circuit) of an identical issue in a separate case.[3]  The Court upheld Commerce's determinations

concerning Assan's shipping costs[4] and home market rebates[5] as supported by substantial

evidence and otherwise in accordance with law.  With respect to Commerce's determination

regarding its application of a "duty neutral" methodology for duty drawback, the Court sustained

Commerce's grant of a duty drawback adjustment to Assan but held that Commerce's specific

implementation of this duty drawback adjustment contravenes Federal Circuit precedent.[6]

Commerce also acknowledged that its "duty neutral" methodology was inconsistent with current

court precedent and requested a voluntary remand, which the Court granted in its *Remand*

*Order*.[7]  Finally, the Court held that Commerce's modification to Assan's billing adjustments

related to quality errors[8] was unlawful, and remanded to Commerce for further explanation.[9]

## II.     ANALYSIS OF REMANDED ISSUES

### A.  Duty Drawback Adjustment

In the *Final Determination*, Commerce found that Assan satisfied the criteria for a duty

drawback adjustment.  Following the "duty neutral" methodology, we made an upward

adjustment to constructed export price (CEP) based on the amount of the duty imposed on the

input that was not collected as a result of the export of subject merchandise, by allocating the

amount not collected to all production for the relevant period based on the cost of inputs during

the period of investigation (POI), January 1, 2019, through December 31, 2019.  This ensures

---

[3] On March 15, 2023, the Federal Circuit affirmed that section 232 duties are considered U.S. import duties under the antidumping statute; thus, Commerce will not make any changes to its section 232 analysis on remand.  *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023).
[4] *See Remand Order* at 13 and 35-45.
[5] *Id.* at 13 and 26-35.
[6] *Id.* at 13-26; *see also Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192, 1197 (Fed. Cir. 2021) (*Uttam Galva Steels*).
[7] *See Remand Order* at 25-26.
[8] *See Final Determination* IDM at Comment 7.
[9] *See Remand Order* at 13 and 45-53.

that the amount added to both sides of the comparison of export price (EP) or CEP with normal

value is equitable.[10]  The Court sustained Commerce's general grant of a duty drawback

adjustment to Assan, explaining that Commerce properly exercised its discretion in determining

that some of the inputs in question were "capable" of being used to produce subject

merchandise.[11]  However, the Court held that Commerce's calculation of Assan's duty drawback

adjustment was unlawful, in light of the Federal Circuit's holding in *Uttam Galva Steels* that the

"duty neutral" methodology used by Commerce is incompatible with the plain language of

section 772(c)(1)(B) of the Tariff Act of 1930, as amended (the Act).[12]  Because Commerce

acknowledged this point, the Court granted the agency's request for a voluntary remand to

recalculate the adjustment.

On remand, Commerce has revised its duty drawback methodology by adopting a

methodology that divides the amount of duties exempted on the Inward Processing Certificate

(IPC) closed during the POI over the total quantity of exports made under that closed IPC to

calculate a per-unit duty drawback adjustment that reasonably reflects the duties actually

exempted for the exports of subject merchandise made to the United States during the POI.[13]

The information needed to make this adjustment was reported in the field DTYDRAWU of the

U.S. sales database that was used in the *Final Determination*.[14]  This methodology is consistent

with both the Court's *Remand Order* and the Federal Circuit's ruling – that the statute requires

an upward adjustment to EP or CEP based on the entire drawback that occurred "by reason of the

---

[10] *See Final Determination* IDM at Comment 1.

[11] *See Remand Order* at 24 (footnotes 23-24).

[12] *Id.* at 25 (citing *Uttam Galva Steels Ltd. v. United States*, 311 F. Supp. 3d 1345, 1355 (CIT 2018), *aff'd Uttam Galva Steels*, 997 F.3d 1192.

[13] *See, e.g.*, *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 FR 7941 (February 7, 2023) (*Rebar from Turkey Final Results*), and accompanying IDM at Comment 5.

[14] *See* Memorandum, "Final Determination Margin Calculation for Assan Aluminyum Sanayi ve Ticaret A.S.," dated March 1, 2020 (Final Analysis Memorandum), at 2.

3

exportation of the subject merchandise to the United States," in accordance with section 772(c)(1)(B) of the Act.[15]  As evident from the disclosed calculations, we have not made any changes to the duty drawback adjustment made to cost.[16]

### B.  Home Market Product Quality Adjustment

In the underlying review, Commerce instructed Assan to report any billing adjustments – other than discounts or rebates – by creating a separate field for each billing adjustment type as reflected in its gross unit price.[17]  Specifically, Assan was instructed to report a decrease in price as a negative figure, an increase in price as a positive figure, and to report zero if no adjustments were made to its U.S. price.[18]  Because Assan failed to follow these instructions and, instead, reported its billing adjustments within a single field,[19] Commerce again instructed Assan to separate each billing adjustment and to submit sample documentation for each reported adjustment.[20]  In responding to Commerce's second request, however, Assan failed to provide supporting documentation for the field BILLADJ2U (*i.e.*, quality adjustments).[21]  Consequently, for purposes of its *Preliminary Determination*,[22] Commerce relied on the lowest value that Assan reported under the variable BILLADJ2U, noting that no sample supporting documentation was provided that could be tied to the respective per-unit amounts reported in the U.S. sales

---

[15] *See Remand Order* at 50-53.

[16] *See* Final Analysis Memorandum at 3.

[17] *See* Assan's Letter, "Common Alloy Aluminum Sheet from Turkey:  Section C Questionnaire Response Section," dated June 29, 2020 (Assan June 29, 2020 QR), at 28-29.

[18] *Id*.

[19] *Id*.

[20] *See* Assan's Letter, "Common Alloy Aluminum Sheet from Turkey:  Supplemental Section C Questionnaire Response," dated September 10, 2020 (Assan September 10, 2020 SQR), at 5-6.

[21] *Id*.

[22] *See Common Alloy Aluminum Sheet from Turkey:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 FR 65346 (October 15, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

database.[23]  Because the "lowest value" in this case is the most negative number, and because

BILLADJ2U is added to U.S. price, the effect of relying on the lowest value reported by Assan

was that the net U.S. price calculated by Commerce was lower than if Commerce had relied on

all of the values reported by Assan under this variable.  Therefore, in the *Preliminary*

*Determination*, Commerce effectively made an adverse adjustment in calculating Assan's

dumping margin, though Commerce did not reference sections 776(a) and (b) of the Act.

Because relying on the lowest value had the effect of reducing the net U.S. price, this

preliminary adjustment resulted in a higher margin for Assan than if Commerce had relied on all

of the values reported by Assan.  The Court acknowledges this outcome in describing the

preliminary adjustment:

> Commerce preliminarily set … BILLADJ2U – which would result in a downward
> adjust to U.S. sales price, and thereby, disadvantage Assan by increasing the
> dumping margin – to the lowest reported value for such adjustments.  Although
> Commerce did not claim to have applied an adverse inference in its *Preliminary*
> *Determination*, Assan noted the "adverse impact" of Commerce's billing
> adjustments in its case brief before the agency.[24]

In the *Final Determination*, Commerce revised its approach by relying, instead, on all of Assan's

reported information, explaining that relying on the reported information on the record for

BILLADJ2U "{…} does not benefit Assan because it results in a lower U.S. price."[25]  However,

as the Court explained:

> The practical implication of {the change between the *Preliminary Determination*
> and the *Final Determination*} is that Commerce's original billing adjustment
> methodology reduced Assan's U.S. price to a greater extent – and thereby
> increased Assan's dumping margin to a greater extent – than the revised
> methodology that Commerce employed in rendering the *Final Determination*.[26]

---

[23] *See Final Determination* IDM at Comment 7; *see also* Memorandum, "Preliminary Determination Margin
Calculation for Assan Aluminyum Sanayi ve Ticaret A.S.," dated October 6, 2020 (Preliminary Analysis
Memorandum), at section V.B. "Price Adjustments."
[24] *See Remand Order* at 48 (citations omitted).
[25] *See Final Determination* IDM at Comment 7.
[26] *See Remand Order* at 51.

The Court held that Commerce's unexplained modification to the approach taken for adjusting for billing adjustments reported by Assan for quality errors, in which Commerce relied on the reported information on the record instead of the lowest reported value that was used in the *Preliminary Determination*,[27] was unlawful. Specifically, the Court held that while "Commerce may change its stance on issues decided preliminarily in its final determinations,"[28] Commerce had failed to explain its reasoning for the change or to support the decision with substantial evidence.[29] The Court elaborated that the lack of an explanation for the reversal was especially important here because Commerce had enumerated evidence that seemingly detracts from the decision not to apply adverse facts available (AFA).[30] In particular, the Court referenced Commerce's concern with the lack of customer-specific documentation for BILLADJ2U, such as copies of credit notes, such that Commerce could not confirm the validity of the adjustment.[31] Therefore, the Court remanded to Commerce for further explanation.[32]

On remand, upon further reconsideration, Commerce finds that it is necessary to rely on the facts otherwise available, pursuant to section 776(a) of the Act, in determining the proper value for Assan's billing adjustments for quality errors. Under section 776(a) of the Act, the application of facts available requires Commerce to: (1) identify necessary information missing from the record; or (2) determine whether a party has (A) withheld requested information; (B) failed to provide information by established deadlines or in the form or manner requested; (C) significantly impeded the review; or (D) provided information that cannot be verified. Here, we

---

[27] *See Preliminary Determination*; and Preliminary Analysis Memorandum at section V.B. "Price Adjustments."
[28] *See Remand Order* at 51 (citations omitted).
[29] *Id.*
[30] *Id.* at 52.
[31] *Id.*
[32] *Id.* at 13 and 52.

find that the application of facts available is warranted, pursuant to sections 776(a)(1) and (2)(A)-(B) and 2(D) of the Act.

Commerce requested that Assan provide supporting documentation (*e.g.*, customer specific documentation) for each billing adjustment as reflected in its U.S. price. Instead, Assan withheld information and provided incomplete supporting documentation needed to corroborate and verify the proper adjustment for BILLADJ2U.[33] Indeed, as the Court explains, Commerce found in the *Final Determination* that Assan provided inadequate information to allow the agency to confirm the validity of the adjustment;[34] however, Commerce did not invoke section 776(a) of the Act, as it does now. Specifically, Assan provided no customer-specific documentation, such as credit notes detailing the billing adjustments for quality errors, in response to Commerce's requests to do so in its initial and supplemental questionnaires.[35]

Furthermore, Commerce determines that an adverse inference is warranted in selecting from among the facts otherwise available, because Assan failed to act to the best of its ability in complying with Commerce's requests for information in the initial and supplemental questionnaires.[36] Accordingly, on remand, we have assumed that the correct billing adjustment is the lowest value Assan reported as a billing adjustment for quality errors. Specifically, as explained above, because the lowest value Assan reported is a negative number, and because the variable BILLADJ2U is added to U.S. price, this adjustment results in the largest deduction from U.S. price that can be made based on the various values Assan reported under this variable and, thus, results in a higher dumping margin than if Commerce had relied on the variable as reported by Assan. In summary, the proper application of AFA results in a return to the BILLADJ2U

---

[33] *See* Assan September 10, 2020 SQR at 5-6.
[34] *See Remand Order* at 52; and Final Determination IDM at 23.
[35] *See Final Determination* IDM at 23.
[36] *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (*Nippon Steel*).

adjustment made in the *Preliminary Determination*.  Consequently, we have recalculated

Assan's dumping margin using the lowest billing adjustment reported for a quality error as

BILLADJ2U, as we did in the *Preliminary Determination*.

## III.    INTERESTED PARTY COMMENTS

On May 10, 2023, Commerce issued its draft results of redetermination and provided

interested parties an opportunity to comment on Commerce's analysis and redetermination.[37]

Commerce received comments from the petitioner and Assan.[38]  These comments are addressed

below.  After considering these comments, we made no changes to our conclusions in the Draft

Results for these final results of redetermination.

Comment 1:  Whether Assan is Eligible for a Duty Drawback

*Petitioner's Comments*:

- Contrary to the court's opinion, Assan is not eligible for a duty drawback adjustment.

- Satisfying the Turkish drawback system is an insufficient reason to be granted a duty

  drawback adjustment under U.S. law.

- Because the record shows that the imported materials used by Assan to satisfy the

  Turkish drawback system were not capable of being used to produce subject

  merchandise, Commerce's grant of a duty drawback adjustment to Assan is unreasonable

  and contrary to the Federal Circuit's decision in *Maverick Tube III*.[39]

---

[37] *See* Draft Results of Redetermination Pursuant to Court Order, *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Court No. 21-00246, Slip Op. 23-26 (CIT March 1, 2023), dated May 10, 2023 (Draft Results).
[38] *See* Petitioners' Letter, "Common Alloy Aluminum Sheet from Turkey – Petitioners' Comments on Draft Redetermination Concerning Assan Aluminyum Sanayi ve Ticaret A.S.," dated May 18, 2023 (Petitioner's Comments); *see also* Assan's Letter, "Common Alloy Aluminum Sheet From Turkey:  Assan's Comments on Draft Remand Redetermination Pursuant to Court Remand," dated May 17, 2023 (Assan's Comments).
[39] *See Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S.*, 861 F.3d 1269, 1271 (Fed. Cir. 2017) (*Maverick Tube III*).

8

*Assan's Comments*:

- Commerce's duty drawback adjustment to U.S. price without applying its so called "duty neutral" methodology is correct, and consistent with the Court's *Remand Order* and with the Federal Circuit's precedent.

**Commerce's Position:**  As an initial matter, the Turkish duty drawback program satisfies Commerce's criteria for granting a U.S. price adjustment under section 772(c)(1)(B) of the Act and has been repeatedly acknowledged and upheld by the courts.[40]  To decide whether to make a duty drawback adjustment, Commerce applies a two-pronged test, which requires a party seeking the adjustment to demonstrate:

> (1) that the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise, and (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise.[41]

The Court ruled that Commerce's general grant of a duty drawback adjustment to Assan is in accordance with the law.[42]  Specifically, the Court stated that the Federal Circuit's ruling in *Maverick Tube III* found that section 772(c)(1)(B) of the Act does not impose a threshold "capability" test onto Commerce's grant of a duty drawback adjustment, explaining instead that Commerce's decision to limit adjustments to inputs capable of being used to produce the exported product was a permissible interpretation of section 772(c)(1)(B) of the Act.[43]  Moreover, the Court ruled that Commerce articulated a reasonable conception of "capability" based on the record evidence that at least one imported input under the closed IPC can be used in

---

[40] *See, e.g.*, *Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1340 (Fed. Cir. 2011) (*Saha Thai Steel*); *Icdas Celik Enerji  Tersane ve Ulasim Sanayi, A.S. v. United States*, 429 F. Supp. 3d 1353, 1362 (CIT 2020); *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 361 F. Supp. 3d 1314, 1319 (CIT 2019); and *Eregli Demir ve Celik Fabrikalari T.A.S v. United States*, 357 F. Supp. 3d 1325, 1329 (CIT 2018)
[41] *See Saha Thai Steel*, 635 F.3d at 1338.
[42] *See Remand Order* at 19.
[43] *Id.* at 21 (citing *Maverick Tube III*, 861 F.3d at 1271-74).

the production of subject merchandise.[44]  The statutory text "by reason of the exportation of the
subject merchandise to the United States" signaled Congress's intention for Commerce to grant
duty drawback adjustments "only when there is some kind of connection between the
nonpayment of import duties and the exportation of the subject merchandise to the United
States."[45]  Because Commerce was able to find a connection between the non-payment of import
duties and the exportation of subject merchandise to the United States, Commerce's general
grant of a duty drawback adjustment to Assan is reasonable and in accordance with the statute.

Comment 2:  Calculation of Assan's Duty Drawback

*Petitioner's Comments*:

- By assigning to each U.S. sale a per-unit drawback amount that applies only to exports
  made pursuant to the closed IPC, regardless of whether Assan exported that U.S. sale
  pursuant to that closed IPC, Commerce exaggerates the duty drawback applicable to
  Assan's U.S. sales.

- Commerce's duty drawback calculation incorrectly assumes that Assan exported all of its
  U.S. sales pursuant to this closed IPC.

- Commerce's calculation of the duty drawback adjustment is inaccurate because it relies
  on all the exports reflected on the closed IPC which includes export destinations other
  than the United States as well as exports made outside of the POI.

- Commerce's calculation is inconsistent with the statute under section 772a(c)(1)(B) of
  the Act, which defines a duty drawback adjustment as "the amount of any import duties
  imposed by the country of exportation which have been rebated, or which have not been
  collected, by reason of the exportation of the subject merchandise to the United States."

---

[44] *Id.* at 24.
[45] *See Maverick Tube III*, 861 F.3d at 1274.

- Commerce should use the methodology in *Aluminum Foil from Turkey* that relied only on exports of aluminum foil to the United States during the period of review as documented on closed IPCs, and allocated the amount of this benefit to all reported U.S. sales.[46]  This complies with the statutory directive under section 772 a(c)(1)(B) of the Act that the amount of drawback be the amount of duties exempted "by reason of the exportation of the subject merchandise to the United States."

*Assan's Comments*:

- Commerce's calculation of the duty drawback adjustment is in accordance with the *Remand Order* and is consistent with the Federal Circuit's precedent.

**Commerce's Position:**  In the underlying investigation, Commerce made it clear that the duty drawback provision, Commerce's regulations, and Commerce's practice do not require actual use of the imported input in the production of the exported subject merchandise as a condition to receiving a duty drawback adjustment.[47]  Instead, Commerce, in accordance with the law, requires a respondent to demonstrate that a reasonable link exists between the duties imposed and those rebated or exempted, which the record supports in this case.[48]  The purpose of the duty drawback adjustment is to "account for the fact that the producers  remain subject to the import duty when they sell the subject merchandise domestically, which increases home market sales prices and thereby increases {normal value}."[49]  A duty drawback adjustment ensures that the

---

[46] *See Certain Aluminum Foil from the Republic of Turkey:  Preliminary Negative Determination of Sales at Less Than Fair Value, Postponement of Final Determination*, 84 FR 23686 (May 4, 2021), and accompanying PDM, at 11, unchanged in *Certain Aluminum Foil from the Republic of Turkey:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 52880 (September 23, 2021) (*Aluminum Foil from Turkey*), and accompanying IDM at Comment 7.
[47] *See Final Determination* IDM at 9.
[48] *See Maverick Tube III*, 861 F.3d at 1274.
[49] *See Saha Thai Steel*, 635 F.3d at 1338 (explaining how to account for the fact that a producer remains subject to the import duty when it sells the subject merchandise domestically, the duty drawback adjustment provides an "apples-to-apples" comparison between the foreign market value and the U.S. price.); *see also Apex Exports v.*

results of participating in a duty drawback program do not affect the dumping calculation.[50]
Furthermore, Commerce explained that it is unnecessary to trace specific inputs into the
production of specific exports, as claimed by the petitioners.[51] As such, Commerce's current
duty drawback methodology, as explained in *Rebar from Turkey*, divides the amount of total
duties exempted on the IPC closed during the POI over the total quantity of exports made under
that closed IPC to calculate a per-unit duty drawback adjustment.[52] This methodology reasonably
reflects the duties actually exempted for the exports of subject merchandise made to the United
States during the POI.[53]

The petitioner's comments which argue for the use of Commerce's methodology in
*Aluminum Foil from Turkey* raise the same arguments that Commerce subsequently addressed in
*Rebar from Turkey*, finding that the statutory purpose of the duty drawback provision is fulfilled
by eliminating, to the extent possible, any effect of the Turkish duty drawback system on the
dumping calculations by spreading the duty actually drawn back generally over all the exports in
the closed IPC.[54] The petitioners' argument suffers the same deficiencies as those noted by
Commerce in *Rebar from Turkey Final Results*, where Commerce rejected a similar argument on
the basis that it amounts to attempting specific tracing of imported inputs into a specific product
being produced and whether that specific product is exported, even though the Turkish duty
drawback system does not require these specific links for duty drawback to be granted.[55] As
articulated in the Federal Circuit case *Uttam Galva Steels*, "the duty drawback statute requires an

---

*United States*, 777 F.3d 1373, 1374-75 (Fed. Cir. 2015) (noting that "{t}he overall goal {of the antidumping
calculation methodology} is to arrange an apples-to-apples comparison between the domestic and foreign price of
merchandise.")
[50] *Id*.
[51] *See Final Determination* IDM at 9.
[52] *See Rebar from Turkey Final Results* IDM at Comment 5.
[53] *Id*.
[54] *Id*.
[55] *Id*.

adjustment to "export price" based on the full extent of the duty drawback."[56]  The statute does not impose an additional requirement that the respondent trace particular imported goods to U.S. exports.[57]  Moreover, the Federal Circuit went as far as to state that "{i}t does not make a difference whether the imported inputs that qualified for a drawback were actually incorporated into goods sold in the exporter's domestic market because the {foreign} government credited the drawback to the quantity of goods that were in fact exported … ."[58]  The Court explained that the entire drawback was allowed "by reason of exportation."[59]

Accordingly, we continue to find Commerce's current methodology as described in the steel concrete reinforcing bar from Turkey proceeding to be the most appropriate methodology to calculate a per-unit duty drawback adjustment.  This methodology reasonably reflects the duties actually exempted for the exports of subject merchandise made to the United States during the POI, consistent with the current Federal Circuit precedent in *Uttam Galva Steels* that the statute does not require that the imported material be traced directly from importation through exportation.[60]  In this case, the consumption ratios associated with the closed IPC define the limits of the per-unit duty drawback benefit, which reasonably spreads these associated import duty exemptions generally over the proper universe of exports that actually fulfilled the export obligation.[61]  In other words, we find that any other method to reallocate specific duty exemptions on a closed IPC over a different universe of exports would likely introduce inaccuracies, as the Turkish duty drawback system does not trace the actual use of the imported

---

[56] *See Uttam Galva Steels*.
[57] *Id*.
[58] *Id*.
[59] *Id*.
[60] *See Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 82 FR 23192 (May 22, 2017) (*Rebar from Turkey Final Determination*), and accompanying IDM at Comment 1.
[61] *See* Assan June 29, 2020 QR at 44-45 and Exhibit C-10; *see also* Assan September 10, 2020 SQR at 1 and Exhibit S4-1.

input to the actual finished product that is exported.[62]  Given the current Federal Circuit

precedent in *Uttam Galva Steels*,[63] instructing Commerce to consider the entire drawback when

calculating duty drawback adjustments, Commerce reasonably granted and calculated Assan's

duty draw back adjustment.[64]

Comment 3:  Whether to Apply AFA to Assan's Home Market Quality Bill Adjustments

*Assan's Comments:*

- The Court explained that Commerce could have declined to apply AFA even if it had

  affirmatively found that Assan failed to act to the best of its ability.

- Assan was not uncooperative and had used its best efforts in providing available

  documentation and records to confirm the validity of the claimed billing adjustments.

- Commerce has previously noted that Assan had acted to the best of its ability in

  responding to Commerce's request for information.[65]

The petitioner did not comment on this issue.

**Commerce's Position:**  Although the Court acknowledged that Commerce has discretion on

whether to apply AFA, the Court ruled that Commerce failed to explain the reason for its change

of decision with regard to this billing adjustment for quality errors, which the Court ruled was

not supported by substantial evidence.[66]  Moreover, in remanding this matter, the Court

highlighted evidence of Commerce's concern with the lack of customer-specific documentation

---

[62] *See Final Determination* IDM at Comment 1 (citing *Rebar from Turkey Final Determination* IDM at Comment 1); *see also Habas Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*, 439 F. Supp. 3d 1342 (CIT 2020) (holding that a proposed methodology by domestic producers was unsupported by statute or regulation).
[63] *See Uttam Galva Steels Ltd.*, 997 F.3d at 1197.
[64] Courts have recognized the need for Commerce to have "some discretion in determining how wide {of} a search it will make," and "some methodological flexibility," as to comply with the statutory mandate of calculating "the most accurate dumping margins possible."  *See Far E. Mach. Co. v. United States*, 699 F. Supp. 309, 315 (CIT 1988); *see also Maverick Tube Corp. v. United States*, 163 F. Supp. 3d 1345, 1358 (CIT 2016).
[65] *See Final Determination* IDM at Comment 5.
[66] *See Remand Order* at 51.

for BILLADJ2U, such as copies of credit notes, such that Commerce could not confirm the validity of the adjustment.[67]  Therefore, Commerce has revisited its reasoning as instructed by the Court and now acknowledges that the deficiencies noted by this failure to provide the supporting documentation after multiple requests constitutes a failure by Assan to act to the best of its ability under sections 776(a) and (b) of the Act.  Therefore, consistent with the Court's opinion, Commerce determines that an adverse inference is warranted in selecting from among the facts otherwise available, because Assan failed to act to the best of its ability in complying with Commerce's specific requests for information in the initial and supplemental questionnaires.[68]  Accordingly, on remand, we have assumed that the correct billing adjustment is the lowest value Assan reported as a billing adjustment for quality errors.

Comment 4:  Assan's Exclusion from the Order and Termination of Administrative Review

*Assan's Comments*:

- Because Commerce properly calculated a *de minimis* margin for Assan, Assan should be excluded from the antidumping duty order.[69]

- Commerce's first administrative review of Assan should be terminated as a result of Assan's exclusion from the order.[70]

The petitioner did not comment on this issue.

---

[67] *Id*.

[68] *See Nippon Steel*, 337 F.3d at 1382.

[69] *See* section 733(b)(3) of the Act; *see also Beijing Tianhai Industry Co., Ltd. v. United States*, 255 F. Supp. 3d 1311 (CIT 2017) (sustaining Commerce's remand redetermination excluding a respondent from the order after calculating a *de minimis* margin on remand).

[70] *See, e.g.*, *Certain Hot-Rolled Steel Flat Products from the Republic of Turkey:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 47058 (August 23, 2021), and accompanying IDM at 1-2 (discontinuing the review with respect to respondent after the Court judgment that merchandise produced and exported by respondent was excluded from the order).

**Commerce's Position:** The net effect of the changes made by Commerce pursuant to the *Remand Order* results in a *de minimis* margin for Assan.[71]  Should the Court sustain these final results of redetermination, Commerce intends to publish a notice of court decision not in harmony with the results of the *Final Determination* and notice of amended final determination and order.  The effect of these final results of redetermination on the first administrative review is beyond the purview of this segment of the proceeding.  The implications of a *de minimis* margin, once a final and conclusive decision is issued, is appropriately addressed in that segment of the proceeding.

## IV.    FINAL RESULTS OF REDETERMINATION

As a result of this *Remand Order*, Commerce has recalculated Assan's duty drawback adjustment in accordance with the latest Federal Circuit precedent in *Uttam Galva Steels* and our current methodology for making the upward adjustment to U.S. price under the Turkish duty drawback regime.  In addition, Commerce has determined that the record evidence supports the application of AFA with respect to the billing adjustment for quality errors and has recalculated Assan's dumping margin using the lowest billing adjustment reported for a quality error as BILLADJ2U, as we did in the *Preliminary Determination*.

We made no changes to the Draft Results.  The net effect of the two changes noted above results in a *de minimis* margin for Assan.[72]  Should the Court affirm these final results of redetermination, Commerce intends to publish a notice of amended final determination and order in the *Federal Register*.  In the event that the Court's ruling is not appealed or, if appealed,

---

[71] *See* Memorandum, "Draft Results of Redetermination; Revised Margin Calculation for Assan Aluminyum Sanayi ve Ticaret A.S.," dated May 10, 2023.
[72] *Id*.

16

upheld by a final and conclusive court decision, Commerce intends to issue appropriate customs instructions to U.S. Customs and Border Protection.

5/30/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

17

# ATTACHMENT 5:

***Common Alloy Aluminum Sheet From Turkey*, 88 Fed. Reg. 30089 (Dep't Commerce May 10, 2023) (prelim AD results; 2020-2022), and accompanying Preliminary Decision Memorandum and Preliminary Analysis Memorandum**

**Assessment Rates**

Upon completion of the administrative review, Commerce shall determine, and CBP shall assess, antidumping duties on all appropriate entries covered by this review.[13]

For the company that was not selected for individual examination, we will instruct CBP to assess antidumping duties at an *ad valorem* rate equal to the weighted-average dumping margin determined in the final results of review.

For individually examined respondents whose weighted-average dumping margin is not zero or *de minimis,* we will calculate importer-specific assessment rates in accordance with 19 CFR 351.212(b)(1). Where the respondent reported reliable entered values, we intend to calculate importer-specific *ad valorem* assessment rates by dividing the total amount of dumping calculated for all reviewed U.S. sales to the importer by the total entered value of the merchandise sold to the importer.[14] Where the respondent did not report entered values, we will calculate importer-specific assessment rates by dividing the total amount of dumping calculated for all reviewed U.S. sales to the importer by the total quantity of those sales. We also will calculate an estimated *ad valorem* importer-specific assessment rate to determine whether the per-unit assessment rate is *de minimis;* however, we will use the per-unit assessment rate where entered values were not reported.[15]

Where an importer-specific *ad valorem* assessment rate is not zero or *de minimis,* we will instruct CBP to collect the appropriate duties at the time of liquidation. Where either the respondent's *ad valorem* weighted-average dumping margin is zero or *de minimis,* or an importer-specific *ad valorem* assessment rate is zero or *de minimis,*[16] we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.

Commerce's "automatic assessment" practice will apply to entries of subject merchandise during the POR produced or exported by the examined companies for which the examined respondents did not know that the merchandise they sold was destined for the United States. In such instances, we will instruct CBP to liquidate unreviewed entries at the all-others rate if there is no rate for the

intermediate company(ies) involved in the transaction.[17]

Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of the final results of this review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.,* within 90 days of publication).

The final results of this review shall be the basis for the assessment of antidumping duties on entries of merchandise covered by the final results of this review and for future deposits of estimated duties, where applicable.[18]

**Cash Deposit Requirements**

The following cash deposit requirements will be in effect for all shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of the notice of the final results of this administrative review in the **Federal Register**, as provided for by section 751(a)(2)(C) of the Act: (1) the cash deposit rate for the exporters listed above will be equal to the weighted-average dumping margin established in the final results of this review, except if the rate is less than 0.50 percent, and, therefore, *de minimis* within the meaning of 19 CFR 351.106(c)(1), in which case the cash deposit rate will be zero; (2) for previously reviewed or investigated companies not participating in this review, the cash deposit rate will continue to be the company-specific rate published for the most recently-completed segment of this proceeding in which the company was reviewed; (3) if the exporter is not a firm covered in this review or a previous segment of this proceeding, but the producer is, then the cash deposit rate will be the rate established in the most recently completed segment for the producer of the subject merchandise; and (4) the cash deposit rate for all other producers or exporters will continue to be 49.40 percent, the all-others rate established in the less-than-fair-value investigation.[19]

These deposit requirements, when imposed, shall remain in effect until further notice.

**Notification to Importers**

This notice serves as a preliminary reminder to importers of their responsibility under 19 CFR 351.402(f) to file a certificate regarding the reimbursement of antidumping duties and/or countervailing duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties and/or countervailing duties occurred and the subsequent assessment of double antidumping duties and/or antidumping duties increased by the amount of the countervailing duties.

**Notification to Interested Parties**

We are issuing and publishing these preliminary results of review in accordance with sections 751(a)(1) and 777(i)(l) of the Act, and 19 CFR 351.213 and 351.221(b)(4).

Dated: April 28, 2023.

**Lisa W. Wang,**
*Assistant Secretary for Enforcement and Compliance.*

**Appendix**

**List of Sections in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope of the *Order*
IV. Successor-in-Interest Analysis
V. Discussion of the Methodology
VI. Currency Conversion
VII. Recommendation

[FR Doc. 2023–09922 Filed 5–9–23; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–489–839]**

**Common Alloy Aluminum Sheet From Turkey: Preliminary Results of Antidumping Duty Administrative Review; 2020–2022**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) preliminarily determines that common alloy aluminum sheet (CAAS) from the Republic of Turkey (Turkey) was sold in the United States at less than normal value during the period of review (POR) October 15, 2020, through March 31, 2022. Interested parties are invited to comment on these preliminary results.

**DATES:** Applicable May 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Mark Hoadley, AD/CVD Operations,

---

[13] *See* 19 CFR 351.212(b).

[14] *See* 19 CFR 351.212(b)(1).

[15] *Id.*

[16] *See* 19 CFR 351.106(c)(2).

[17] For a full discussion of this practice, see *Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties,* 68 FR 23954 (May 6, 2003).

[18] *See* section 751(a)(2)(C) of the Act.

[19] *See Common Alloy Aluminum Sheet from Germany: Final Determination of Sales at Less Than Fair Value,* 86 FR 13318 (March 8, 2021).

**30090**    **Federal Register** / Vol. 88, No. 90 / Wednesday, May 10, 2023 / Notices

Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–3148.

**SUPPLEMENTARY INFORMATION:**

**Background**

On April 27, 2021, Commerce published the antidumping duty order on common alloy aluminum sheet from Turkey.[1] On May 2, 2022, the petitioners requested an administrative review of six companies.[2] On June 9, 2022, in accordance with 19 CFR 351.221(c)(i), Commerce initiated an administrative review of the *Order*, covering two producers/exporters selected for individual examination, Assan Aluminyum Sanayi ve Ticaret A.S. (Assan) and Teknik Aluminyum Sanayi A.S. (Teknik), and four additional companies not selected for individual examination: ASAS Aluminyum Sanayi ve Ticaret A.S.; Panda Aluminyum A.S.; PMS Metal Profil Aluminyum Sanayi ve Ticaret A.S.; and TAC Metal Ticaret Anonim Sirketi.[3] Pursuant to section 751(a)(3)(A) of the Tariff Act of 1930, as amended (the Act), on December 2, 2022, Commerce determined that it was not practicable to complete the preliminary results of this review within 245 days and extended the deadline for the preliminary results of this review until April 28, 2023.[4]

For a detailed description of the events that followed the initiation of this review, see the Preliminary

Decision Memorandum.[5] A list of topics discussed in the Preliminary Decision Memorandum is attached as an appendix to this notice. The Preliminary Decision Memorandum is a public document and is available via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov*. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *https://access.trade.gov/public/FRNoticesListLayout.aspx*.

**Scope of the Order**

The merchandise subject to the *Order* is CAAS from Turkey. Products subject to the *Order* are currently classified under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7606.11.3060, 7606.11.6000, 7606.12.3096, 7606.12.6000, 7606.91.3095, 7606.91.6095, 7606.92.3035, and 7606.92.6095. Further, merchandise that falls within the scope of the *Order* may also be entered into the United States under HTSUS subheadings 7606.11.3030, 7606.12.3015, 7606.12.3025, 7606.12.3035, 7606.12.3091, 7606.91.3055, 7606.91.6055, 7606.92.3025, 7606.92.6055, 7607.11.9090. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the merchandise subject to this scope is dispositive. For a complete description of the scope of the *Order, see* the Preliminary Decision Memorandum.

**Methodology**

Commerce is conducting this review in accordance with section 751(a)(1)(B) and (2) of the Act. We calculated export price in accordance with section 772(a) of the Act. For a full description of the methodology underlying these preliminary results, *see* the Preliminary Decision Memorandum.

**Preliminary Results of the Review**

We preliminarily determine the following weighted-average dumping margins for the period October 15, 2020, through March 31, 2022.

| Exporter or producer | Weighted-average dumping margin (percent) |
|---|---|
| Assan Aluminyum Sanayi ve Ticaret A.S ............................ | 2.61 |
| Teknik Aluminyum Sanayi A.S ... | 12.24 |
| Non-Selected Companies .......... | 7.40 |

**Rate for Companies Not Individually Examined**

Generally, when calculating margins for non-selected respondents, Commerce looks to section 735(c)(5) of the Act for guidance, which provides instructions for calculating the all-others rate in an investigation. Section 735(c)(5)(A) of the Act provides that when calculating the all-others rate, Commerce will exclude any zero and *de minimis* weighted-average dumping margins, as well as any weighted-average dumping margins based on total facts available. Accordingly, Commerce's usual practice has been to average the margins for selected respondents, excluding margins that are zero, *de minimis,* or based entirely on facts available. In this review, we calculated a weighted-average dumping margin of 2.61 percent for Assan and 12.24 percent for Teknik. In accordance with section 735(c)(5)(A) of the Act, Commerce has assigned the weighted average of these two calculated weighted-average dumping margins based on their publicly ranged sales quantities, 7.40 percent, to the non-selected companies in these preliminary results.

**Disclosure and Public Comment**

Commerce intends to disclose the calculations performed for these preliminary results of review to interested parties within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b). Interested parties may submit case briefs to Commerce no later than 30 days after the date of publication of this notice.[6] Rebuttal briefs, limited to issues raised in the case briefs, may be filed not later than seven days after the date for filing case briefs.[7] Parties who submit case briefs or rebuttal briefs in this proceeding are encouraged to submit with each argument: (1) a statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.[8]

---

[1] *See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, Southern Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders,* 86 FR 22139 (April 27, 2021) (*Order*).

[2] Aleris Rolled Products, Inc.; Arconic Corporation; Commonwealth Rolled Products Inc.; Constellium Rolled Products Ravenswood, LLC; JW Aluminum Company; Novelis Corporation; and Texarkana Aluminum, Inc. (collectively, the petitioners).

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Review,* 87 FR 35165 (June 9, 2022). On August 23, 2022, Commerce clarified with the petitioners that they intended to request a review of ASAS Aluminyum Sanayi ve Ticaret A.S., not ASA Aluminyum Sanayi ve Ticaret A.S., the name listed in the initiation notice published in June 2022. *See* Memorandum, "Clarification of Certain Companies Requested for Review," dated August 26, 2022. The correct name was noted in a subsequent initiation notice published in September 2022. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 87 FR 54463 (September 6, 2022).

[4] *See* Memorandum, "Extension of Deadline for Preliminary Results of 2020–2022 Antidumping Duty Administrative Review," dated December 2, 2022.

[5] *See* Memorandum, "Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review: Common Alloy Aluminum Sheet from Turkey; 2020–2022," dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

[6] *See* 19 CFR 351.309(c)(1)(ii).

[7] *See* 19 CFR 351.309(d)(1) and (2); *see also Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19,* 85 FR 17006, 17007 (March 26, 2020).

[8] *See* 19 CFR 351.309(c)(2) and (d)(2).

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing must submit a written request to the Assistant Secretary for Enforcement and Compliance, filed electronically via ACCESS. An electronically filed document must be received successfully in its entirety by ACCESS by 5:00 p.m. Eastern Time within 30 days after the date of publication of this notice. Requests should contain: (1) the party's name, address, and telephone number; (2) the number of participants; (3) whether any participant is a foreign national; and (4) a list of issues the party intends to discuss. Issues raised in the hearing will be limited to those raised in the respective case and rebuttal briefs. If a request for a hearing is made, Commerce intends to hold the hearing at a date and time to be determined.[9]

All submissions should be filed using ACCESS,[10] and must be served on interested parties.[11] Note that Commerce has temporarily modified certain of its requirements for serving documents containing business proprietary information, until further notice.[12]

Unless otherwise extended, Commerce intends to issue the final results of this administrative review, including the results of its analysis of the issues raised in any written briefs, not later than 120 days after the date of publication of this notice, pursuant to section 751(a)(3)(A) of the Act and 19 CFR 351.213(h)(1).

**Assessment Rates**

Pursuant to section 751(a)(2)(A) of the Act and 19 CFR 351.212(b)(1), Commerce will determine, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries of subject merchandise in accordance with the final results of this review. Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of the final results of this administrative review in the **Federal Register**. If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.,* within 90 days of publication).

If Assan's or Teknik's weighted-average dumping margin is not zero or *de minimis* (*i.e.,* less than 0.50 percent)

in the final results of this review, Commerce intends to calculate importer-specific assessment rates on the basis of the ratio of the total amount of dumping calculated for each importer's examined sales to the total entered value of those sales. Where we do not have entered values for all U.S. sales to a particular importer, we will calculate an importer-specific, per-unit assessment rate on the basis of the ratio of the total amount of dumping calculated for the importer's examined sales to the total quantity of those sales.[13] To determine whether an importer-specific, per-unit assessment rate is *de minimis,* in accordance with 19 CFR 351.106(c)(2), we also will calculate an importer-specific *ad valorem* ratio based on estimated entered values. If either Assan's or Teknik's weighted-average dumping margin is zero or *de minimis* or where an importer-specific *ad valorem* assessment rate is zero or *de minimis,* we will instruct CBP to liquidate appropriate entries without regard to antidumping duties.[14]

In accordance with Commerce's "automatic assessment" practice, for entries of subject merchandise during the POR produced by Assan or Teknik for which they did not know that the merchandise was destined for the United States, we intend to instruct CBP to liquidate those entries at the all-others rate in the original less-than-fair-value investigation if there is no rate for the intermediate company(ies) involved in the transaction.[15]

**Cash Deposit Requirements**

The following cash deposit requirements will be effective for all shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results of this administrative review, as provided for by section 751(a)(2)(C) of the Act: (1) the company-specific cash deposit rate for Assan and Teknik will be equal to the weighted-average dumping margin established in the final results of this review for each respondent (except, if that rate is *de minimis* within the meaning of 19 CFR 351.106(c)(1), then the cash deposit rate will be zero); (2) for producers or exporters not covered

in this review but covered in a prior segment of the proceeding, the cash deposit rate will continue to be the company-specific rate published for the most recently-completed segment of this proceeding in which they were reviewed; (3) if the exporter is not a firm covered in this review or a prior segment of the proceeding but the producer is, then the cash deposit rate will be the rate established for the most recently completed segment of this proceeding for the producer of the merchandise; and (4) the cash deposit rate for all other producers or exporters will continue to be 4.85 percent, the all-others rate established in the less-than-fair-value investigation.[16] These cash deposit requirements, when imposed, shall remain in effect until further notice.

**Notification to Importers**

This notice serves as a preliminary reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping and/or countervailing duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping and/or countervailing duties occurred and the subsequent assessment of double antidumping duties, and/or an increase in the amount of antidumping duties by the amount of the countervailing duties.

**Notification to Interested Parties**

We are issuing and publishing these preliminary results in accordance with sections 751(a)(1) and 777(i) of the Act, and 19 CFR 351.213(h)(2) and 351.221(b)(4).

Dated: April 28, 2023.

Lisa W. Wang,
*Assistant Secretary for Enforcement and Compliance.*

**Appendix**

**List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope of the *Order*
IV. Affiliation
V. Companies Not Selected for Individual Examination
VI. Discussion of the Methodology
VII. Currency Conversion
VIII. Recommendation

[FR Doc. 2023–09962 Filed 5–9–23; 8:45 am]

**BILLING CODE 3510–DS–P**

---

[9] *See* 19 CFR 351.310(c).

[10] *See* 19 CFR 351.303.

[11] *See* 19 CFR 351.303(f).

[12] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).

[13] *See* 19 CFR 351.212(b)(1).

[14] *See* 19 CFR 351.106(c)(2); *see also Antidumping Proceeding: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings; Final Modification,* 77 FR 8101, 8103 (February 14, 2012).

[15] For a full discussion of this practice, *see Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties,* 68 FR 23954 (May 6, 2003).

[16] *See Order,* 86 FR at 22142.

Barcode:4371358-02 A-489-839 REV - Admin Review 10/15/20...3/31/22

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

A-489-839
Administrative Review
POR:  10/15/2020 – 3/31/2022
**Public Document**
E&C/OVII:  MEH

April 28, 2023

**MEMORANDUM TO:**        Lisa W. Wang
                          Assistant Secretary
                            for Enforcement and Compliance

**FROM:**                 James Maeder
                          Deputy Assistant Secretary
                            for Antidumping and Countervailing Duty Operations

**SUBJECT:**              Decision Memorandum for the Preliminary Results of the
                          Antidumping Duty Administrative Review:  Common Alloy
                          Aluminum Sheet from Turkey; 2020-2022

---

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) is conducting an administrative review of the antidumping duty (AD) order on common alloy aluminum sheet (CAAS) from Turkey for the period of review (POR) October 15, 2020, through March 31, 2022.  The review covers two exporters of the subject merchandise selected for individual examination, Assan Aluminyum Sanayi ve Ticaret A.S. (Assan) and Teknik Aluminyum Sanayi A.S. (Teknik), and four additional companies not selected for individual examination (discussed below).  We preliminarily find that Assan and Teknik sold the subject merchandise at prices below normal value (NV) during the POR.

## II.   BACKGROUND

On April 27, 2021, Commerce published in the *Federal Register* the AD order on CAAS from Turkey.[1]  On April 1, 2022, Commerce published in the *Federal Register* a notice of opportunity to request an administrative review of the *Order* for the POR.[2]  Pursuant to section 751(a)(1) of the Tariff Act of 1930, as amended (the Act) and 19 CFR 351.213(b)(1), Commerce received timely requests to conduct an administrative review of the *Order*.  Assan and Teknik requested

---

[1] *See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey:  Antidumping Duty Orders*, 86 FR 22139 (April 27, 2021) (*Order*).

[2] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 87 FR 19075 (April 1, 2022).



administrative reviews on April 18 and 25, 2022, respectively.[3]  On May 2, 2022, the petitioners[4] requested an administrative review of six companies.[5]  On June 9, 2022, we initiated an administrative review of six companies:  ASAS Aluminyum Sanayi ve Ticaret A.S. (ASA); Assan; Panda Aluminyum A.S. (Panda); PMS Metal Profil Aluminyum Sanayi ve Ticaret A.S. (PMS); TAC Metal Ticaret Anonim Sirketi (TAC); and Teknik.[6]

On August 30, 2022, Commerce selected Assan and Teknik as mandatory respondents for individual examination,[7] and on September 1, 2022, issued the initial AD questionnaire to Assan and Teknik.[8]  On September 15, 2022, Assan and Teknik notified Commerce that the inflation rate in Turkey exceeded 25 percent during certain months of the POR.[9]  In addition, Assan requested that it be exempt from completing the high inflation version of section D of the Initial AD Questionnaire (HIDQ) because its "functional currency" is U.S. dollars (USD).[10]  On September 20, 2022, the petitioners submitted their objections to Assan's request,[11] and on September 23, 2022, Assan submitted rebuttal comments in response to the petitioners' objections.[12]  On November 8, 2022, Commerce requested that Teknik complete the HIDQ.[13]  On the same day, Commerce issued a letter stating that it was unnecessary for Assan to complete the HIDQ because Assan's functional currency is USD.[14]

Between October 3 and December 14, 2022, Assan and Teknik timely responded to Commerce's initial questionnaire.[15]  Between October 14 and December 21, 2022, the petitioners submitted

---

[3] *See* Assan's Letter, "Assan's Request for Antidumping Administrative Review," dated April 18, 2022; and Teknik's Letter, "Request for Administrative Review," dated April 25, 2022.

[4] Aleris Rolled Products, Inc.; Arconic Corporation; Commonwealth Rolled Products Inc.; Constellium Rolled Products Ravenswood, LLC; JW Aluminum Company; Novelis Corporation; and Texarkana Aluminum, Inc. (collectively, the petitioners).

[5] *See* Petitioners' Letter, "Petitioners' Request for Initiation of First Administrative Review," dated May 2, 2022.

[6] *See Initiation of Antidumping and Countervailing Duty Administrative Review*, 87 FR 35165 (June 9, 2022).  On August 23, 2022, Commerce clarified with the petitioners that they intended to request a review of ASAS Aluminyum Sanayi ve Ticaret A.S., not ASA Aluminyum Sanayi ve Ticaret A.S., the name listed in the initiation notice published in June 2022.  *See* Memorandum, "Clarification of Certain Companies Requested for Review," dated August 26, 2022.  The correct name was noted in a subsequent initiation notice published in September 2022. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 FR 54463 (September 6, 2022).

[7] *See* Memorandum, "Respondent Selection," dated August 30, 2022.

[8] *See* Commerce's Letters, "Request for Information," dated September 1, 2022.

[9] *See* Assan's Letter, "Assan's Notification Regarding Inflation," dated September 15, 2022 (Assan High Inflation Notification); and Teknik's Letter, "Reporting Notification," dated September 15, 2022.

[10] *See* Assan High Inflation Notification.

[11] *See* Petitioners' Letter, "Petitioners' Response to Assan's Notification Regarding Inflation," dated September 19, 2022.

[12] *See* Assan's Letter, "Assan's Rebuttal to Petitioners' Response Regarding Inflation," dated September 23, 2022.

[13] *See* Commerce's Letter, "Request for High Inflation Section D Response from Teknik," dated November 8, 2022.

[14] *See* Commerce's Letter, "Assan's Notification Regarding Inflation and the High Inflation Cost of Production Questionnaire," dated November 8, 2022.

[15] *See* Assan's Letters, "Teknik Aluminyum Sanayi A.S.– Section A Questionnaire Response," dated October 3, 2022 (Assan AQR); "Assan's Response to the Section B Questionnaire," dated October 24, 2022 (Assan BQR); "Assan's Response to the Section C Questionnaire," dated October 24, 2022 (Assan CQR); and "Assan's Response to the Section D Questionnaire," dated October 24, 2022; *see also* Teknik's Letters, "Teknik's Section A Response," dated October 3, 2022 (Teknik AQR); "Teknik Aluminyum Sanayi A.S.– Sections BCD Questionnaire Response," dated October 24, 2022 (Teknik BCDQR); and "Teknik Aluminyum Sanayi A.S.– High Inflation Section D Questionnaire Response," dated December 14, 2022.

deficiency comments concerning Assan's and Teknik's questionnaire responses.[16]  Commerce issued supplemental questionnaires to Assan and Teknik between February 13 and March 3, 2023.[17]  Between March 14 and 28, 2023, Assan and Teknik timely responded to Commerce's supplemental questionnaires.[18]

Pursuant to section 751(a)(3)(A) of the Act and 19 CFR 351.213(h)(2), Commerce determined on December 2, 2022, that it was not practicable to complete the preliminary results of this review within 245 days and extended the preliminary results by 118 days until April 28, 2023.[19]

On April 5 and 6, 2023, the petitioners submitted comments in advance of the preliminary results.[20]  On April 17 and 19, 2023, Teknik and Assan, respectively, submitted comments in advance of the preliminary results and in response to the petitioners' comments.[21]

## III.    SCOPE OF THE *ORDER*

The products covered by the *Order* are common alloy aluminum sheet, which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width.  Common alloy sheet within the scope of the *Order* includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet.  With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX- or 5XXX-series alloy as designated by the Aluminum Association.  With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.  The use of a proprietary alloy or non-proprietary alloy that is not specifically registered by the Aluminum Association as a discrete 1XXX-,

---

[16] *See* Petitioners' Letters, "Petitioners' Comments Concerning the Response of Teknik Aluminyum Sanayi A.S. to Section A of the Antidumping Questionnaire," dated October 13, 2022; "Petitioners' Comments on Assan's Section A Questionnaire Response," dated October 17, 2022; "Petitioners' Comments Concerning Teknik Aluminyum Sanayi A.S.'s Sections B and C Questionnaire Responses," dated November 7, 2022; "Petitioners' Comments Concerning Teknik Aluminyum Sanayi A.S.'s Section D Questionnaire Response," dated November 14, 2022; "Petitioners' Comments on Assan's Sections B and C Questionnaire Responses," dated November 14, 2022; "Petitioners' Comments on Assan's Section D Questionnaire Response," dated November 21, 2022; and "Petitioners' Comments Concerning Teknik Aluminyum Sanayi A.S.'s High Inflation Section D Questionnaire Response," dated December 20, 2022.
[17] *See* Commerce's Letters, "Assan Sections A-C First Supplemental Questionnaire," dated February 13, 2023; "Teknik Sections A-C First Supplemental Questionnaire," dated February 13, 2023; "Assan Section D First Supplemental Questionnaire," dated March 2, 2023; and "Teknik Section D First Supplemental Questionnaire," dated March 3, 2023.
[18] *See* Assan's Letter, "Assan's Response to the Supplemental Sections A-C Questionnaire," dated March 14, 2023, Teknik's Letter, "Teknik Aluminyum Sanayi A.S.– Section A Supplemental Questionnaire Response," dated March 15, 2023; Teknik's Letter, "Teknik Aluminyum Sanayi A.S.– Sections B and C Supplemental Questionnaire Response," dated March 20, 2023 (Teknik SBCQR); Assan's Letter, "Assan's Response to the Supplemental Section D (2nd Supplemental) Questionnaire," dated March 21, 2023; and Teknik's Letter, "Teknik Aluminyum Sanayi A.S.– Section D Supplemental Questionnaire Response," dated March 28, 2023.
[19] *See* Memorandum, "Extension of Deadline for Preliminary Results of 2020-2022 Antidumping Duty Administrative Review," dated December 2, 2022.
[20] *See* Petitioners' Letters, "Petitioners' Comments Concerning Teknik Aluminyum Sanayi A.S. In Advance of the Department's Upcoming Preliminary Results," dated April 4, 2023, and "Petitioners' Pre-Preliminary Comments Concerning Assan," dated April 5, 2023.
[21] *See* Teknik's Letter, "Teknik Aluminyum Sanayi A.S. Pre-Preliminary Comments," dated April 17, 2023; and Assan's Letter, "Assan Group's Rebuttal to Petitioners' Pre-Preliminary Comments," dated April 19, 2023.

3

Barcode:4371358-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

3XXX-, or 5XXX-series alloy, but that otherwise has a chemistry that is consistent with these designations, does not remove an otherwise in-scope product from the scope.

Common alloy sheet may be made to ASTM specification B209-14 but can also be made to other specifications.  Regardless of specification, however, all common alloy sheet meeting the scope description is included in the scope.  Subject merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the *Order* if performed in the country of manufacture of the common alloy sheet.

Excluded from the scope of the *Order* is aluminum can stock, which is suitable for use in the manufacture of aluminum beverage cans, lids of such cans, or tabs used to open such cans. Aluminum can stock is produced to gauges that range from 0.200 mm to 0.292 mm, and has an H-19, H-41, H-48, H-39, or H-391 temper.  In addition, aluminum can stock has a lubricant applied to the flat surfaces of the can stock to facilitate its movement through machines used in the manufacture of beverage cans.  Aluminum can stock is properly classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7606.12.3045 and 7606.12.3055.

Where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set for the above.

Common alloy sheet is currently classifiable under HTSUS subheadings 7606.11.3060, 7606.11.6000, 7606.12.3096, 7606.12.6000, 7606.91.3095, 7606.91.6095, 7606.92.3035, and 7606.92.6095.  Further, merchandise that falls within the scope of the *Order* may also be entered into the United States under HTSUS subheadings 7606.11.3030, 7606.12.3015, 7606.12.3025, 7606.12.3035, 7606.12.3091, 7606.91.3055, 7606.91.6055, 7606.92.3025, 7606.92.6055, 7607.11.9090.  Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the *Order* is dispositive.

## IV.   AFFILIATION

Assan provided questionnaire responses on behalf of itself, Kibar Americas, Inc. (Kibar Americas), and Kibar Dis Ticaret A.S. (Kibar Dis).[22]  Kibar Americas and Kibar Dis perform selling functions for sales to the United States of CAAS produced by Assan.[23]  A fourth company, Kibar Holdings, owns a majority of shares in Assan, Kibar Americas, and Kibar Dis.[24]

Teknik provided questionnaire responses on behalf of itself and AA Metals, a trading company located in the United States that sells CAAS produced by Teknik and other manufacturers.[25]

---

[22] *See* Assan AQR.
[23] *Id.* at A-6.
[24] *Id.* at A-8.
[25] *See* Teknik AQR at A-7.

4

Teknik and AA Metals are indirectly owned and controlled by a single "person," within the context of section 771(33) of the Act.[26]

Section 771(33) of the Act states, in pertinent part, that Commerce shall consider the following persons to be affiliated:

(A)   Members of a family, including brothers and sisters (whether by whole or by half-blood), spouse, ancestors, and lineal descendants.
(B)   Any officer or director of an organization and such organization.
(C)   Partners.
(D)   Employer and employee.
(E)   Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
(F)   Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
(G)   Any person who controls any other person and such person.

Section 771(33) of the Act further states that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." "Actual control … is not required by the statute … . Rather, a person is considered to be in a position of control if he is legally in a position to exercise restraint or direction over the other person."[27] "Person" is defined to include "any interested party as well as any other individual, enterprise, or entity, as appropriate."[28]

Thus, we preliminarily determined that Assan, Kibar Americas, and Kibar Dis are affiliated pursuant to section 771(33)(F) as a result of the common control by Kibar Holdings. Likewise, we preliminarily determine that Teknik and AA Metals are affiliated pursuant to section 771(33)(F) as a result of the common control of a single person.

## V.   COMPANIES NOT SELECTED FOR INDIVIDUAL EXAMINATION

As indicated above, this review includes four companies that were not selected for individual examination:  ASA, Panda, PMS, and TAC.  None submitted a claim of no shipments.

The statute and Commerce's regulations do not address the establishment of a rate to be applied to companies not selected for individual examination when Commerce limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act.  Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for companies which were not selected for individual examination in an administrative review.  Under section 735(c)(5)(A) of the Act, the all-others rate is normally "an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually

---

[26] *Id.* at A-8 to A-9 and Exhibit A-5 (the identity of the "person" is business proprietary information).
[27] *See TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1293 (CIT 2005).
[28] *See* 19 CFR 351.102(b)(37).

5

investigated, excluding any zero or *de minimis* margins, and any margins determined entirely {on the basis of facts available}."

Using section 735(c)(5)(A) of the Act as guidance, we have preliminarily assigned to the companies not individually examined in this review a dumping margin of 7.40 percent, which is a weighted average of the dumping margins calculated for Assan and Teknik based on publicly ranged sales quantities, both of which are above *de minimis* and neither of which is determined on the basis of facts available.

## VI.    DISCUSSION OF THE METHODOLOGY

We are conducting this administrative review of the *Order* in accordance with section 751(a) of the Act, and 19 CFR 351.213.

### A.    Date of Sale

Section 351.401(i) of Commerce's regulations states that, "{i}n identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business."  The regulation provides further that Commerce may use a date other than the date of invoice if Commerce is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[29]  Commerce has a long-standing practice of finding that, where shipment date precedes invoice date, shipment date better reflects the date on which the material terms of sale are established.[30]  For home market and U.S. sales, Assan and Teknik both reported invoice date as the date of sale, as the material terms of sale are not set until that date.[31]  Therefore, Commerce preliminarily determines to rely on invoice date as the date of sale for both respondents, in both markets, unless invoice date is preceded by shipment date.

### B.    Comparisons to Normal Value

Both companies reported selling to the United States exclusively through U.S. affiliates.[32]  Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether sales of subject merchandise from Turkey to the United States were made at less than NV, Commerce compared the constructed export price (CEP) to the NV, as described in the "Constructed Export Price" and "Normal Value" sections of this memorandum.

---

[29] *See* 19 CFR 351.401(i); *see also Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (CIT 2001) (quoting 19 CFR 351.401(i)).

[30] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances:  Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004), and accompanying Issues and Decision Memorandum (IDM) at Comment 10; *see also Notice of Final Determination of Sales at Less Than Fair Value:  Structural Steel Beams from Germany*, 67 FR 35497 (May 20, 2002), and accompanying IDM at Comment 2.

[31] *See* Assan BQR at B-26; Assan CQR at C-23; and Teknik BCDQR at B-22 and C-21.

[32] *See* Assan CQR at C-20; and Teknik BCDQR at C-1.

1.     Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping margins by comparing weighted-average NVs to weighted-average CEPs (or export prices (EP)) (*i.e.*, the average-to-average (A-A) method) unless Commerce determines that another method is appropriate in a particular situation.  In a less-than-fair-value (LTFV) investigation, Commerce examines whether to compare weighted-average NVs with the CEPs (or EPs) of individual sales (*i.e.*, the average-to-transaction (A-T) method) as an alternative comparison method using an analysis consistent with section 777A(d)(l)(B) of the Act.  Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of an administrative review, Commerce nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in an administrative review is, in fact, analogous to the issue in an LTFV investigation.[33]

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-T method is appropriate in a particular situation consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[34]  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method in this administrative review. Commerce will continue to evaluate its approach in this area based on comments received in this administrative review and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-A method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used in these preliminary results examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-A method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the consolidated customer codes reported by the respondent.  Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POR based upon the U.S. date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable

---

[33] *See Ball Bearings and Parts Thereof from France, Germany, and Italy:  Final Results of Antidumping Duty Administrative Reviews; 2010–2011*, 77 FR 73415 (December 10, 2012), and accompanying IDM at Comment 1; *see also JBF RAK LLC v. United States*, 790 F.3d 1358, 1363-65 (Fed. Cir. 2015) ("{T}he fact that the {Act} is silent with regard to administrative reviews does not preclude Commerce from filling gaps in the statute to properly calculate and assign antidumping duties.") (citations omitted).

[34] *See, e.g., Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013); *see also Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014); and *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

Filed By: Daniel Alexander, Filed Date: 5/1/23 2:31 PM, Submission Status: Approved

Barcode:4371358-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's $d$ test" is applied. The Cohen's $d$ coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group.  First, for comparable merchandise, the Cohen's $d$ coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise.  Then, the Cohen's $d$ coefficient is used to evaluate the extent to which the prices to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise.  The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's $d$ test:  small, medium, or large (0.2, 0.5, and 0.8, respectively).  Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists.  For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's $d$ test, if the calculated Cohen's $d$ coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's $d$ test.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's $d$ test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the A-T method to all sales as an alternative to the A-A method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's $d$ test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an A-T method to those sales identified as passing the Cohen's $d$ test as an alternative to the A-A method and application of the A-A method to those sales identified as not passing the Cohen's $d$ test.  If 33 percent or less of the value of total sales passes the Cohen's $d$ test, then the results of the Cohen's $d$ test do not support consideration of an alternative to the A-A method.

If both tests in the first stage (*i.e.*, the Cohen's $d$ test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-A method can appropriately account for such differences.  In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's $d$ and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-A method only.  If the difference between the two calculations is meaningful, then this demonstrates that the A-A method cannot account for differences such as those observed in this analysis and, therefore, an alternative comparison method would be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if:  (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-A method and the

Filed By: Daniel Alexander, Filed Date: 5/1/23 2:31 PM, Submission Status: Approved

Barcode:4371358-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

appropriate alternative method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-A method and the appropriate alternative method move across the *de minimis* threshold.  Interested parties may present arguments and justifications in relation to the above-described differential pricing approach used in these preliminary results.

## 2. Results of the Differential Pricing Analysis

For Assan, based on the results of the differential pricing analysis, Commerce preliminarily finds that 72.67 percent of U.S. sales pass the Cohen's *d* test,[35] which confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce preliminarily determines that the A-A method cannot account for such differences because there is a 25 percent relative change between the weighted-average dumping margin calculated using the A-A method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the A-T method to all U.S. sales.  Thus, for these preliminary results, we are applying the A-T method to all U.S. sales to calculate the weighted-average dumping margin for Assan.

For Teknik, based on the results of the differential pricing analysis, Commerce preliminarily finds that 62.10 percent of U.S. sales pass the Cohen's *d* test,[36] which confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce preliminarily determines that the A-A method cannot account for such differences because there is a 25 percent relative change between the weighted-average dumping margin calculated using the A-A method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the A-T method to U.S. sales identified as passing the Cohen's *d* test and applying the A-A method to U.S sales identified as not passing the Cohen's *d* test.  Accordingly, Commerce preliminarily determines to apply the A-T method for all U.S. sales identified as passing the Cohen's *d* test as an alternative to the A-A method and to apply the A-A method for U.S. sales identified as not passing the Cohen's *d* test.

## 3. Product Comparisons

In accordance with section 771(16) of the Act, we considered all products produced or sold by the respondents in Turkey during the POR that fit the description above, in the "Scope of the *Order*" section, to be foreign like products for purposes of determining NVs for comparison to U.S. sale prices.  We compared U.S. sale prices to NVs based on sale prices made in the home market, where appropriate.

If there are no home market sales of identical merchandise, then NV is based on home market sale prices of the product sold in the home market that is the most similar to the product sold in the U.S. market.  We identified the foreign like products that are identical or similar to the subject merchandise based on the physical characteristics reported by the respondents in the following order of importance:  alloy content, clad or not clad, casting method, non-mechanical surface treatment, coiled or not coiled, nominal width, gauge/nominal thickness, and mechanical

---

[35] *See* Memorandum, "Assan Preliminary Analysis Memorandum," dated concurrently with this memorandum, at 2.
[36] *See* Memorandum, "Teknik Preliminary Analysis Memorandum," dated concurrently with this memorandum, at 2.

surface finish, and temper application.  For Assan's and Teknik's sales of CAAS in the United States, the reported CONNUM concatenates these physical characteristics of CAAS.  Assan and Teknik did not report sales of non-prime CAAS to the United States.

As noted above, Commerce is applying its high inflation methodology to Teknik.  As part of the high inflation methodology, it is Commerce's practice to limit the comparisons of U.S. sales prices to NV during the same month in which the U.S. sale occurred.[37]  This methodology minimizes the extent to which calculated dumping margins may be overstated or understated due solely to inflation in the Turkish market.

### C.   Constructed Export Price

#### 1.   Constructed Export Price

Pursuant to section 772(b) of the Act, the CEP is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," as adjusted under sections 772(c) and (d) of the Act.  In accordance with section 772(b) of the Act, we used CEP methodology for all of Assan and Teknik's sales because the sales were made on their behalf by their U.S. sales affiliate in the United States (*i.e.*, Kibar Americas and AA Metals, respectively) to unaffiliated purchasers in the United States.[38]

For these sales, we calculated CEP based on delivered prices to unaffiliated purchasers in the United States.  We made additions to the starting price for packing in accordance with section 772(c)(1)(A) of the Act.  We made deductions from the U.S. sales price for movement expenses in accordance with section 772(c)(2) of the Act.  These adjustments included, where applicable, foreign inland freight from plant to the port of exportation, foreign brokerage and handling, U.S. brokerage and handling, international freight, marine insurance, U.S. inland freight from the warehouse to the unaffiliated customer, U.S. warehousing, and U.S. customs duties.

As noted above, Commerce is applying its high inflation methodology to Teknik.  To neutralize the impact of high inflation as measured by changes in the domestic producer price index (PPI) over the POR, consistent with our practice in *Honey from Argentina*,[39] *OCTG from Argentina*,[40]

---

[37] *See Certain Quartz Surface Products from the Republic of Turkey:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 84 FR 68111 (December 13, 2019), and accompanying Preliminary Decision Memorandum (PDM), unchanged in *Certain Quartz Surface Products from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 FR 25389 (May 1, 2020).

[38] *See* Assan CQR at C-20; and Teknik BCDQR at C-1.

[39] *See Raw Honey from Argentina:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measur*es, 86 FR 66531 (November 23, 2021) (*Honey from Argentina*), and accompanying PDM at 21.

[40] *See Oil Country Tubular Goods from Argentina:  Preliminary Affirmative Determinations of Sales at Less than Fair Value and Critical Circumstances, Postponement of Final Determination an, and Extension of Provisional Measures*, 87 FR 28801 (May 11, 2022) (*OCTG from Argentina*), and accompanying PDM at 10.

10

and *Rebar from Turkey*,[41] for allocated expenses that were incurred in Turkish lira, Teknik inflated the nominal monthly expenses to the last month of the POR using the Turkish PPI, calculated a total amount of POR expenses at the end-of-POR PPI-level. Next, Teknik divided this total amount by the total quantity sold to calculate a per-unit expense amount, and then deflated the POR per-unit value to each month of the POR. The only allocated sales expense reported by Teknik was packing,[42] and thus, packing is the only sales variable adjusted according to this methodology.

Teknik also reported a duty drawback adjustment for its U.S. sales.[43] The drawback is provided pursuant to Turkey's Inward Processing Certificate (IPC) program.[44] Pursuant to the program, during the POR, Teknik used IPCs for exemptions from the payment of import duties on imports of raw materials to be used in the production of goods for exportation.[45] Teknik also reported that none of the IPCs used in the POR have been "closed."[46] Specifically, Teknik reported that it "has applied for closure of the IPCS … . However, so far none of the IPCs has been closed."[47] According to Commerce practice, a respondent may "use only closed inward processing certificates (IPCs) (*i.e.*, import certificates to which the company was no longer permitted by the Government of Turkey to add import or export information) for purposes of calculating a duty drawback adjustment."[48] Therefore, because none of the IPCs underlying the reported drawback amounts have been closed, we preliminarily determine not to make the adjustment.

## 2. Treatment of Duties Under Section 232 of the Trade Expansion Act of 1962

We preliminarily determine that duties imposed under section 232 of the Trade Expansion Act of 1962 should be treated as "United States import duties" for the purpose of section 772(c)(2)(A) of the Act, and thereby as "U.S. customs duties," which are deducted from U.S. price, as noted above. *Proclamation 9705* states that it "is necessary and appropriate to adjust imports of steel articles so that such imports will not threaten to impair the national security … ."[49] Section 232

---

[41] *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020-2021*, 87 FR 47975 (August 5, 2022) (*Rebar from Turkey*), and accompanying PDM at 15.

[42] *See* Teknik SBCQR at S1-27 and Exhibit S1-16.c.

[43] *See* Teknik BCDQR at C-43 to C-44.

[44] *Id.*

[45] *Id.*

[46] *See* Teknik SBCQR at S1-24 to S1-25.

[47] *Id.*

[48] *See, e.g.*, *Light-Walled Rectangular Pipe and Tube from Turkey: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission, and Preliminary Determination of No Shipments; 2018-2019*, 85 FR 44861 (July 24, 2020), and accompanying PDM at 8 (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 81 FR 47355 (July 21, 2016), and accompanying IDM at Comment 4); *see also Certain Aluminum Foil From the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 52880 (September 23, 2021), and accompanying IDM at 28.

[49] *See Proclamation 9705 of March 8, 2018*, 83 FR 11625, 11627 (March 15, 2018) (*Proclamation 9705*); *see also Proclamation 9711 of March 22, 2018*, 83 FR 13361, 13363 (March 28, 2018) (*Proclamation 9711*) ("In proclaiming this tariff, I recognized that our Nation has important security relationships with some countries whose exports of steel articles to the United States weaken our national economy and thereby threaten to impair the national security"); *Proclamation 9740 of April 30, 2018*, 83 FR 20683 (May 7, 2018) (*Proclamation 9740*)

11

also clearly concerns itself with "the effects on the national security of imports of the article."[50] The particular national security risk identified in *Proclamation 9705* is that the "industry will continue to decline, leaving the United States at risk of becoming reliant on foreign producers of steel to meet our national security needs—a situation that is fundamentally inconsistent with the safety and security of the American people."[51]   In other words, section 232 duties are focused on addressing imports that threaten to impair national security, separate and apart from any function performed by antidumping and 201 safeguard duties to remedy injury to a domestic industry.[52]

Furthermore, the Presidential Proclamation states that section 232 duties are to be imposed in addition to other duties unless expressly provided for in the proclamations.[53]   As correctly noted by the petitioners, the Annex to *Proclamation 9740* refers to section 232 duties as "ordinary" customs duties, and it also states that "{a}ll anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed, except as may be expressly provided herein."  Notably, there is no express exception in the HTSUS revision in the Annex.  Had the President intended that ADs would be reduced by the amount of section 232 duties imposed, then the Presidential Proclamation would have expressed that intent. For the reasons noted, we continue to follow our practice to treat section 232 duties as U.S. import duties for purposes of section 772(c)(2)(A) of the Act, and thereby customs duties which are deducted from U.S. price.[54]

### D.    Normal Value

Section 773(a)(1)(B)(i) of the Act defines NV as "the price at which foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as {EP} or {CEP}."  Alternatively, section 773(a)(1)(B)(ii) of the Act provides that NV may be based on "the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States."  Section 773(a)(4) of the Act provides that if Commerce determines that NV cannot be

---

(similar); *Proclamation 9759 of May 31, 2018*, 83 FR 25857 (June 5, 2018) (*Proclamation 9759*) (similar); *Proclamation 9772 of August 10, 2018*, 83 FR 40429 (August 15, 2018) (*Proclamation 9772*) (similar); and *Proclamation 9777 of August 29, 2018*, 83 FR 45025 (September 4, 2018) (*Proclamation 9777*) (similar).

[50] *See* section 232(b)(1)(A) of the Trade Expansion Act of 1962; *see also* section 232(a) of the Trade Expansion Act of 1962 (explaining that "{n}o action shall be taken … to decrease or eliminate the duty or other import restrictions on any article if the President determines that such reduction or elimination would threaten to impair the national security").

[51] *See Proclamation 9705*, 83 FR at 11627.

[52] *See Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023).

[53] *See Proclamation 9705*, 83 FR at 11627; *see also Proclamation 9711*, 83 FR at 13363; *Proclamation 9740*, 83 FR at 20685-87 ("All anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed, except as may be expressly provided herein."); *Proclamation 9759*, 83 FR at 25857; *Proclamation 9772*, 83 FR at 40430-31; and *Proclamation 9777*, 83 FR at 45025.  The proclamations do not expressly provide that 232 duties receive different treatment.

[54] *See Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 84 FR 34345 (July 18, 2019), and accompanying PDM at 11-13, unchanged in *Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 3616 (January 22, 2020), and accompanying IDM at Comment 3.

Barcode:4371358-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

determined under section 773(a)(1)(B)(i), "then, notwithstanding section 773(a)(1)(B)(ii)," NV may be based on constructed value (CV) under section 773(e) of the Act.

### 1. Home Market Viability

In order to determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV, *i.e.*, the aggregate volume of home market sales of the foreign like product is equal to or greater than five percent of the aggregate volume of U.S. sales, we normally compare the respondent's volume of home market sales of the foreign like product to the volume of U.S. sales of subject merchandise, in accordance with sections 773(a)(1)(A) and (B) of the Act. If we determine that no viable home market exists, then we may, if appropriate, use a respondent's sales of the foreign like product to a third country market as the basis for comparison market sales in accordance with section 773(a)(1)(C) of the Act and 19 CFR 351.404.

We have determined that the aggregate volume of Assan's and Teknik's home market sales of CAAS is greater than five percent of the aggregate volume of each respondent's U.S. sales of subject merchandise. Therefore, we used home market sale prices as the basis for NV for Assan and Teknik in accordance with section 773(a)(1)(B) of the Act.

### 2. Affiliated Party Transactions and Arm's-Length Test

Commerce may calculate NV based on a sale to an affiliated party only if it is satisfied that the price to the affiliated party is comparable to the price at which sales are made to parties not affiliated with the exporter or producer, *i.e.*, sales were made at arm's-length prices.[55] Commerce excludes home market sales to affiliated customers that are not made at arm's-length prices from our margin analysis because Commerce considered them to be outside the ordinary course of trade. Consistent with 19 CFR 351.403(c) and (d) and our practice, "{Commerce} may calculate NV based on sales to affiliates if satisfied that the transactions were made at arm's length."[56]

During the POR, Assan reported that it made sales of the foreign-like product in the home market to affiliated parties, as defined by section 771(33)(F) of the Act, for their own consumption.[57] Commerce preliminarily finds that Assan's home market sale prices charged to the affiliated customers for certain sales are not at arm's length. Accordingly, Commerce has excluded from the dumping analysis Assan's home market sale prices for certain sales to affiliated customers. Teknik reported no sales of the foreign like product to affiliates in the home market during the POR.[58]

---

[55] *See* 19 CFR 351.403(c).
[56] *See China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1367 (CIT 2003), *aff'd* 306 F. Supp. 2d 1291 (CIT 2004); *see also Light-Walled Rectangular Pipe and Tube from Mexico: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review*, 76 FR 55352, 55355 (September 7, 2011).
[57] *See* Assan BQR at B-4.
[58] *See* Teknik BCDQR at B-3.

13

### 3.    Level of Trade

Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sale prices at the same level of trade (LOT) as the U.S. sale prices.[59]  Sales are made at different LOTs if they are made at different marketing stages (or their equivalent).[60] Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing.[61]  In order to determine whether the comparison market sale prices are at different stages in the marketing process than the U.S. sale prices, we examine the distribution system in each market (*i.e.*, the chain of distribution), including selling functions, class of customer (customer category), and the level of selling expenses for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs for EP and comparison market sales (*i.e.*, NV based on either home market or third country prices),[62] we consider the starting prices to be the gross unit prices less all discounts and rebates.  For CEP, we consider only the selling activities reflected in the price after the deduction of expenses and profit under section 772(d) of the Act.[63]

When Commerce is unable to base NV on sales of the foreign like product in the comparison market or CV at the same LOT as the LOT of the EP or CEP, Commerce may compare the U.S. sale price to a NV at a different LOT.  In comparing EP or CEP to an NV at a different LOT, where available data make it possible, we make an LOT adjustment under section 773(a)(7)(A) of the Act.  Finally, for CEP only, if the NV LOT is at a more advanced stage of distribution than the LOT of the CEP and there is no basis for determining whether the difference in LOTs between NV and CEP affects price comparability (*i.e.*, no LOT adjustment is possible), Commerce will grant a CEP offset, as provided in section 773(a)(7)(B) of the Act.[64]

In this review, we obtained information from Assan and Teknik regarding the marketing stages involved in making their reported home market and U.S. sales, including a description of the selling activities performed by each respondent for each channel of distribution.[65]  Assan reported a single LOT in both the home market and U.S. market,[66] as did Teknik.[67]  Neither of the respondents claims an LOT adjustment.  Commerce's examination of the information provided by the respondents confirms their claims of a single LOT that is the same in both the U.S. and comparison markets.

---

[59] *See* section 773(a)(7)(A) of the Act.

[60] *See* 19 CFR 351.412(c)(2).

[61] *Id.*; *see also Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010) (*OJ from Brazil*), and accompanying IDM at Comment 7.

[62] Where NV is based on CV, we determine the NV LOT based on the LOT of the sales from which we derive selling, general and administrative (SG&A) expenses, and profit for CV, where possible.  *See* 19 CFR 351.412(c)(1).

[63] *See Micron Tech, Inc. v. United States*, 243 F.3d 1301, 1314-16 (Fed. Cir. 2001).

[64] *See, e.g.*, *OJ from Brazil* IDM at Comment 7.

[65] *See* Assan AQR at A-14 to A-17; *see also* Teknik AQR at A-14 to A-18.

[66] *See* Assan BQR at B-37; and Assan CQR at C-34.

[67] *See* Teknik BCDQR at B-31 and C-31.

14

Barcode:4371358-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

Therefore, we preliminarily find that sales to the United States and home market during the POR were made at the same LOT and, as a result, we did not make an LOT adjustment under 19 CFR 351.412(e).

### 4.    Cost of Production (COP) Analysis

*Calculation of COP*

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of costs of material and fabrication for the foreign like product, plus amounts for SG&A expenses and financial expenses.  We examined Assan's cost data and determined that our quarterly cost methodology is not warranted; therefore, we are applying our standard methodology of using period-wide costs based on Assan's reported data.  To determine that the quarterly cost methodology is warranted, Commerce will normally require that a majority of the top five U.S. and top five home market CONNUMs experience cost changes between quarters of the POR above 37.5 percent.  In this case, changes above the 37.5 percent threshold occurred with only five of the ten CONNUMs.  Thus, we relied on the POR-wide COP data submitted by Assan, without adjustments.

For Teknik, as noted above, we are applying our high inflation methodology.  Although Commerce requests monthly costs from respondents where there is high inflation, Commerce still adheres to its long-standing practice of using POR weighted-average costs which smooths out the normal cost fluctuations that occur during a reporting period.  Under high inflation, the reported monthly costs essentially reflect different purchasing powers for the months of the period.  To neutralize the impact of high inflation on calculating the period-wide costs, we restated the reported monthly costs in a consistent level of purchasing power by:  (1) inflating the monthly costs to the level of purchasing power of the last month of the period; (2) calculating weighted-average COPs for the period; and (3) deflating the period-wide weighted-average COPs to the purchasing power of each month of the period.  Thus, the high inflation methodology does not increase the reported costs; instead, it accounts for the impact of high inflation on calculating the annualized cost.[68]  While we have accounted for high inflation, we recognize that distortions may still persist in times of significant cost changes since our normal high inflation methodology ultimately relies on period-wide weighted-average costs.[69]  In determining whether to deviate from our normal methodology of calculating period-wide weighted-average COPs, we evaluate the case-specific record evidence by examining two primary criteria:  (1) the change in the cost of manufacturing (COM) recognized by the respondent during the POR must be deemed significant; and (2) the record evidence must indicate that sales during the shorter cost-averaging periods could reasonably linked with the COM during the same shorter cost-averaging periods.[70]  After examining these two criteria, we

---

[68] *See Light-Walled Rectangular Pipe and Tube from Turkey:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 11230 (February 24, 2021), and accompanying IDM at 9.

[69] *See Raw Honey from Argentina:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 FR 22179 (April 14, 2022), and accompanying IDM at Comment 2.

[70] *See Stainless Steel Sheet and Strip in Coils from Mexico:  Final Results of Antidumping Duty Administrative Review*, 75 FR 6627 (February 10, 2010), and accompanying IDM at Comment 6; *see also Stainless Steel Plate in*

preliminarily find that the quarterly cost methodology is not warranted and rely on the reported POR-wide costs.

*Test of Comparison Market Sales Prices*

On a product-specific basis, pursuant to section 773(b) of the Act, we compared the adjusted weighted-average COPs to the home market sales prices of the foreign like product, to determine whether the sales prices were below the COPs. For purposes of this comparison, we used COPs exclusive of selling and packing expenses. The prices were inclusive of any billing adjustments and freight revenue (capped by freight expenses) but exclusive of discounts, movement expenses, direct and indirect selling expenses, and packing expenses, where appropriate.

*Results of COP Test*

In determining whether to disregard home market sales made at prices below the COP, we examined, in accordance with sections 773(b)(1)(A) and (B) of the Act, whether: (1) within an extended period of time, such sales were made in substantial quantities; and (2) such sales were made at prices which permitted the recovery of all costs within a reasonable period of time in the normal course of trade. In accordance with sections 773(b)(2)(B) and (C) of the Act, where less than 20 percent of a respondent's home market sales of a given product are at prices less than the COP, we do not disregard any of the below-cost sales of that product because we determine that in such instances the below-cost sales were not made within an extended period of time and in "substantial quantities." Where 20 percent or more of a respondent's sales of a given product are at prices less than the COP, we disregard the below-cost sales when: (1) the sales were made within an extended period of time in accordance with section 773(b)(2)(B) of the Act; and (2) based on our comparison of prices to the weighted-average COPs for the POR, the sales were at prices which would not permit the recovery of all costs within a reasonable period of time, in accordance with section 773(b)(2)(D) of the Act.

We found that, for certain products, more than 20 percent of Assan's and Teknik's home market sales were at prices less than the COP, were made within an extended period of time in substantial quantities, and that such sales did not provide for the recovery of costs within a reasonable period of time. Therefore, we excluded these sales as being outside the ordinary course of trade and used the remaining sales as the basis for determining NV in accordance with section 773(b)(1) of the Act as matches for certain U.S. sales.

5. Calculation of NV Based on Home Market Prices

For the foreign like products for which there are sales at prices in the ordinary course of trade, we based NV on home market prices. For Assan, we calculated NV based on packed, delivered or ex-works prices to unaffiliated customers in the home market. We made a deduction from the starting price for movement expenses, including inland freight, warehouse expenses and insurance, under section 773(a)(6)(B)(ii) of the Act. We made adjustments for differences in export and home market packing, in accordance with sections 773(a)(6)(A) and 773(a)(6)(B)(i)

---

*Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 73 FR 75398 (December 11, 2008), and accompanying IDM at Comment 4.

Barcode:4371358-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

of the Act, respectively.  Further, we made adjustments for circumstances of sale (imputed credit expenses and other selling expenses in the U.S. and home markets), in accordance with section 773(a)(6)(c)(iii) of the Act and 19 CFR 351.410.

For Teknik, we calculated NV based on packed, delivered or ex-works prices to affiliated and unaffiliated customers in the home market.  We made a deduction from the starting price for movement expenses, including inland freight, under section 773(a)(6)(B)(ii) of the Act.  We made adjustments for differences in export and home market packing, in accordance with sections 773(a)(6)(A) and 773(a)(6)(B)(i) of the Act, respectively.  Further, we made adjustments for circumstances of sale (imputed credit expenses and other selling expenses in the U.S. and home markets), in accordance with section 773(a)(6)(c)(iii) of the Act and 19 CFR 351.410.

As noted above, Commerce is applying its high inflation methodology to Teknik.  To neutralize the impact of high inflation as measured by changes in the domestic PPI over the POR, consistent with our practice in *Honey from Argentina*,[71] *OCTG from Argentina*,[72] and *Rebar from Turkey*,[73] for allocated expenses that were incurred in Turkish lira, Teknik inflated the nominal monthly expenses to the last month of the POR using the Turkish PPI, calculated a total amount of POR expenses at the end-of-POR PPI-level, divided this total amount by the total quantity sold to calculate a per-unit expense amount, and then deflated the POR per-unit value to each month of the POR.  The only allocated sales expense reported by Teknik was packing,[74] and thus, packing is the only sales variable adjusted according to this methodology.

When comparing U.S. sales with home market sales of similar merchandise, we also made an adjustment for physical differences in merchandise in accordance with section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411(b).  We based this adjustment on the difference in the variable COM for the foreign like products and the subject merchandise.

Because we are applying the high inflation methodology to Teknik, we calculated NVs for Teknik based on weighted-average comparison market prices on a monthly basis.

6.     <u>Calculation of NV Based on CV</u>

In accordance with section 773(e) of the Act, and where applicable (*i.e.*, when, in certain circumstances, matching home market sales were unavailable to use as NV), we based NV on CV and calculated CV based on the sum of Assan's and Teknik's material and fabrication costs, G&A expenses, as described above in the "Cost of Production" section.  We also made adjustments for selling expenses and profit.  In accordance with section 773(e)(2)(A) of the Act, we based selling expenses and profit on the amounts incurred and realized by Assan and Teknik in connection with the production and sale of the foreign like product in the ordinary course of trade, for consumption in the home market.  We made adjustments to CV for differences in circumstances of sale (*i.e.*, for imputed credit expenses and other selling expenses in the U.S. and

---

[71] *See Honey from Argentina* PDM at 21.
[72] *See OCTG from Argentina* PDM at 10.
[73] *See Rebar from Turkey* PDM at 15.
[74] *See* Teknik SBCQR at S1-24-S1-25.

17

home markets), in accordance with section 773(a)(6)(C)(iii) of the Act and 19 CFR 351.410.  We added export packing in accordance with section 773(a)(6)(A) of the Act.

For Teknik, to account for the impact of high inflation as measured by changes in the PPI during the POR, for home market selling expenses, profit and packing that were incurred in Turkish lira, we inflated the nominal monthly revenue and expenses to the end of the POR using the Turkish PPI, calculated a total amount of POR revenue and expenses at the end-of-POR PPI-level, calculated the per-unit adjustments for CV, and then deflated the per-unit values for each month during the POR.

## VII.   CURRENCY CONVERSION

We made currency conversions into U.S. dollars in accordance with section 773A of the Act and 19 CFR 351.415(a), based on the exchange rates in effect on the date of the U.S. sales as certified by the Federal Reserve Bank.

## VIII.   RECOMMENDATION

We recommend applying the above methodology for these preliminary results.

☒                                    ☐

_____                   _____

Agree                              Disagree

4/28/2023

X

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance

18

Barcode:4375792-01 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-489-839
Administrative Review
POR: 10/15/2020 – 3/31/2022
**Public Version** ~~Business Proprietary Information~~
E&C/Office VII: MEH

April 28, 2023

MEMORANDUM TO:     The File

FROM:     Mark Hoadley
     Program Manager, Office VII
     Antidumping and Countervailing Duty Operations

RE:     Common Alloy Aluminum Sheet from Turkey:   Assan
     Preliminary Analysis Memorandum

---

## I.  PRELIMINARY MARGIN

Total Quantity Sold in the United States:   [     ] metric tons (MT)
Total Sales Value (USD):     $[     ]
Total Amount of Dumping:     $[     ]
Weight-Averaged Dumping Margin:     0.00%

We used the following databases in the margin calculation:

U.S. sales:     assan_ar2022_us02 (barcode: 4354046-37)
Comparison market sales:     assan_ar2022_hm02 (barcode: 4354046-45)
Cost database:     assan_ar2022_cop01 (4304676-18)

*See* Attachments 1 and 2 for the SAS home market (HM) program log and output, respectively.
*See* Attachments 3 and 4 for the SAS margin program log and output, respectively.

## II.  BACKGROUND

The period of review is (POR) is October 15, 2020, through March 31, 2022.

For our analysis, we used information provided in the questionnaire responses and submissions from Assan Aluminyum Sanayi ve Ticaret A.S., Kibar Americas, Inc., and Kibar Dis Ticaret (collectively, Assan).



Barcode:4375792-01 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

## III.   GENERAL ISSUES

### A.  DIFFERENTIAL PRICING ANALYSIS

In order to determine whether a respondent's sales of subject merchandise to the U.S. were made at less than normal value (NV), we conduct a differential pricing (DP) analysis of the company's U.S. sales during the POR.   The results of the DP analysis on Assan's sales to the United States are as follows:

| Value of Passing Sales | Value of All Sales | U.S. Sales Passing the Cohen's *d* test |
|---|---|---|
| [          ] | [          ] | 72.87% |

The weight-averaged dumping margin calculated using the three methodologies are shown below:

| A-to-A Method for All U.S. Sales | A-to-T Method for U.S. Sales Which Pass the Cohen's *d* Test; A-to-A Method for Sales Which Do Not Pass | A-to-T Method for All U.S. Sales |
|---|---|---|
| 0.00% | 2.34% | 2.61% |

Based on the results of the DP analysis, 72.87% of Assan's U.S. sales pass the Cohen's *d* test, which confirms the existence of a pattern of prices that differ significantly among purchasers, regions or time periods.   Thus, the results of the Cohen's d and ratio tests support consideration of an alternative to the average-to-average (A-A) method.   Further, Commerce preliminarily determines that the A-A method cannot account for such differences because the resulting weight-averaged dumping margins between the A-A method and the appropriate alternative method move across the *de minimis* threshold.

### B.  DATE OF SALE

Pursuant to 19 CFR 351.401(i), the respondent identified what it believed to be the proper date of sale for each reported HM sale and U.S. sale; Commerce has preliminarily relied on these reported sales.   For HM and U.S. sales, Assan reported invoice date as the date of sale, as materials terms of sale are not set until that date.

## IV.   NORMAL VALUE

### A.  HOME MARKET VIABILITY

We determine that Assan's aggregate volumes of sales of the foreign like product in Turkey were greater than five percent of the aggregate volume of U.S. sales of the subject merchandise based on record evidence.   Accordingly, we have used the home market sales database as the HM data in our analysis.

2

Barcode:4375792-01 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

B.   HOME MARKET PRICE ADJUSTMENTS

Using the information provided in Assan's questionnaire responses, we calculated the home market price adjustments as indicated in section 4-B-i of the attached comparison market (CM) program.

We preliminarily determine that Assan's home market sales to [                    ] customers ([                                              ]) failed the arm's-length test and were therefore excluded from the calculation of the margin.   Because both customers consumed the products they purchased from Assan, there were no "downstream" sales to examine.

In addition, we also preliminarily find that Assan's home market sales during the POR were made at the same level of trade as its U.S. sales.

We made no adjustments to inland freight to account for payments to an [                                ] provide, which appear to have been made on an arm's length basis.

C.   CALCULATION OF HOME MARKET PRICE

Assan's net home market price for use as a basis for normal value and for purposes of conducting the sales-below-cost test was calculated in accordance with the formula at section 4-B-ii of the attached CM program.

**V.      U.S. PRICE**

A.  U.S. MARKET PRICE ADJUSTMENTS

Using the information provided in Assan's questionnaire responses, we calculated U.S. price adjustments as indicated in section 4-A of the attached margin program.   Among other adjustments, Commerce adjusted U.S. price upwards to account for duty drawback using the variable DTYDRAWU reported by Assan without revisions.

We made no adjustments to domestic inland freight to account for payments to an [        ] provide, which appear to have been made on an arm's length basis.

B.  CALCULATION OF U.S. PRICE

Assan's net U.S. price was calculated in accordance with the formula at section 4-C of the attached margin program.

**VI.     COST OF PRODUCTION**

Our analysis determines that [      ] of [      ] reported home market sales failed the cost test and were disregarded for the purpose of calculating normal value.

Filed By: Daniel Alexander, Filed Date: 5/12/23 11:47 AM, Submission Status: Approved

Barcode:4375792-01 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

Commerce relied upon Assan's period-wide cost of production (COP) and constructed value (CV) information from the company's submissions without revisions as indicated in section 3-C of the attached CM program.

In determining whether to rely on the quarterly cost information provided by Assan, Commerce examined the cost information Assan provided for its top five control numbers (CONNUMs) in each market to determine whether a majority of the top five U.S. and top five home market CONNUMs (*i.e.*, 6 or greater) had cost changes above the 37.5% significance threshold.   As only five of the 10 had changes greater than 37.5%, we concluded that quarterly costs are not appropriate.

## VII.   CUSTOMS INSTRUCTIONS

We intend to issue instructions to U.S. Customs and Border Protection following publication of the final results in the *Federal Register* liquidating entries suspended during the POR at the following importer-specific rates as indicated in the attached margin program output.

| Importer | Rate |
|---|---|
| [            ] | 2.90% *ad valorem* |
| [      ] – [                        ] | $56.86 / MT (entered values unknown/not reported) |
| [      ] – [              ] | *de minimis* (liquidate without regard to dumping duties) |

Following the publication of the final results, Commerce will also issue instructions directing the collection of cash deposits at a rate equal to the weight-averaged dumping margin for Assan.

## VIII.   LIST OF ATTACHMENTS

Attachment 1:        SAS Log – Comparison Market
Attachment 2:        SAS Output – Comparison Market
Attachment 3:        SAS Log – Margin Program
Attachment 4:        SAS Output – Margin Program

Filed By: Daniel Alexander, Filed Date: 5/12/23 11:47 AM, Submission Status: Approved

# Attachment 1:
# SAS Log – Comparison Market

## Not Susceptible to Public Summarization

Barcode:4375792-01 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

# Attachment 2:
# SAS Output – Comparison Market

## Not Susceptible to Public Summarization

Barcode:4375792-01 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

# Attachment 3:
## SAS Log – Margin Program

**Not Susceptible to Public Summarization**

Barcode:4375792-01 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

# Attachment 4:
# SAS Output– Margin Program

## Not Susceptible to Public Summarization