UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) Consol. Court No. 21-00616 |
| *Defendant*, | ) ) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, et al., | ) ) ) ) |
| *Defendant-Intervenors.* | ) ) ) |

## ASSAN'S SECOND NOTICE OF SUPPLEMENTAL AUTHORITIES

Plaintiff Assan Aluminyum Sanayi ve Ticaret A.S. ("Assan") respectfully submits this second notice to supplement the authorities cited in Assan's Memorandum of Points and Authorities in Support of its Motion for Judgment on the Agency Record filed on May 23, 2022, ECF No. 28, and its Reply Brief filed on September 2, 2022, ECF No. 43.

Since Assan's Notice of Supplemental Authorities filed on October 30, 2023, ECF No. 61, the U.S. Department of Commerce ("Commerce") has issued a final determination in the 2020-2022 administrative review of the antidumping duty order on *Common Alloy Aluminum Sheet From Turkey.* The signature date for the final determination was Friday, November 3, 2023, but the final determination and Issues and Decision memorandum was only made available to Assan on November 6, 2023.

Assan had previously submitted Commerce's preliminary determination in the 2020-2022 administrative review of the antidumping duty order on *Common Alloy Aluminum Sheet from*

*Turkey* in its October 30, 2023 submission, ECF No. 43 at Attachment 5, and seeks to update the record with Commerce's final determination and Issues and Decision Memorandum now that they have been issued. Assan therefore attaches the following for the Court's convenience:

1)  *Common Alloy Aluminum Sheet From Turkey, Final Results of Antidumping Administrative Review; 2020-2022*, Federal Register Pre-Publication Notice (released Nov. 6, 2023); and

2)  Memorandum from J. Maeder to A. Elouaradia re: Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet from Turkey; 2020-2022 (Nov. 3, 2023) (released Nov. 6, 2023).

Assan will further address this decision in its November 8, 2023 supplemental brief per the Court's minute order, ECF No. 59.

Respectfully submitted,

**/s/ Leah N. Scarpelli**
Leah N. Scarpelli
Matthew M. Nolan
Jessica R. DiPietro

ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC 20006
Phone: (202) 715-8403

*Counsel to Assan Aluminyum Sanayi ve Ticaret A.S.*

Dated: November 6, 2023

# ATTACHMENT 1

***Common Alloy Aluminum Sheet From Turkey: Final Results of Antidumping Duty Administrative Review; 2020-2022*** **(pre-*Federal Register* Publication notice, released November 6, 2023)**

BILLING CODE:  3510-DS-P

DEPARTMENT OF COMMERCE

INTERNATIONAL TRADE ADMINISTRATION

A-489-839

Common Alloy Aluminum Sheet from Turkey:  Final Results of Antidumping Duty
Administrative Review; 2020-2022

AGENCY:     Enforcement and Compliance, International Trade Administration, Department of
Commerce.

SUMMARY:  The U.S. Department of Commerce (Commerce) determines that common alloy

aluminum sheet (CAAS) from the Republic of Turkey (Turkey) was sold in the United States at

less than normal value during the period of review (POR) October 15, 2020, through March 31,

2022.

DATES:  Applicable [Insert date of publication in the *Federal Register*].

FOR FURTHER INFORMATION CONTACT:  Mark Hoadley, AD/CVD Operations, Office

VII, Enforcement and Compliance, International Trade Administration, U.S. Department of

Commerce, 1401 Constitution Avenue, NW, Washington, DC 20230; telephone:  (202) 482-

3148.

SUPPLEMENTARY INFORMATION:

Background

On May 10, 2023, Commerce published its *Preliminary Results* in the *Federal Register*

and invited interested parties to comment.[1]  The review covers the mandatory respondents Assan

Aluminyum Sanayi ve Ticaret A.S., Kibar Americas, Inc., and Kibar Dis Ticaret A.S.

---

[1] *See Common Alloy Aluminum Sheet from Turkey:  Preliminary Results of Antidumping Duty Administrative Review; 2020-2022*, 88 FR 30089 (May 10, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

(collectively, Assan) and Teknik Aluminyum Sanayi A.S. (Teknik) as well as four companies not

selected for individual examination.  A summary of the events that occurred since publication of

the *Preliminary Results*, as well as a full discussion of the issues raised by parties for these final

results, are discussed in the Issues and Decision Memorandum.[2]  Commerce conducted this

administrative review in accordance with section 751(a)(1)(B) of the Tariff Act of 1930, as

amended (the Act).

Scope of the *Order*[3]

The merchandise subject to the *Order* is CAAS from Turkey.  Products subject to the

Order are currently classified under the Harmonized Tariff Schedule of the United States

(HTSUS) subheadings 7606.11.3060, 7606.11.6000, 7606.12.3096, 7606.12.6000,

7606.91.3095, 7606.91.6095, 7606.92.3035, and 7606.92.6095.  Further, merchandise that falls

within the scope of the *Order* may also be entered into the United States under HTSUS

subheadings 7606.11.3030, 7606.12.3015, 7606.12.3025, 7606.12.3035, 7606.12.3091,

7606.91.3055, 7606.91.6055, 7606.92.3025, 7606.92.6055, 7607.11.9090.  Although the

HTSUS subheadings are provided for convenience and customs purposes, the written description

of the merchandise subject to this scope is dispositive.  For a complete description of the scope

of the *Order*, *see* the Preliminary Decision Memorandum.

Analysis of Comments Received

All issues raised in parties' case and rebuttal briefs are addressed in the Issues and

Decision Memorandum and are listed in the appendix to this notice.  The Issues and Decision

---

[2] *See* Memorandum, "Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet from Turkey; 2020-2022," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).
[3] *See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey:  Antidumping Duty Orders*, 86 FR 22139 (April 27, 2021) (*Order*).

Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at https://access.trade.gov. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at https://access.trade/gov/public/FRNoticesListLayout.aspx.

Changes Since the *Preliminary Results*

Based on our analysis of the comments received from interested parties, Commerce made certain changes to the margin calculations for Assan Aluminyum Sanayi ve Ticaret A.S. (Assan) and Teknik Aluminyum Sanayi A.S. (Teknik).[4]

Rate for Non-Examined Companies

The statute and Commerce's regulations do not address the establishment of a weighted-average dumping margin to be determined for companies not selected for individual examination when Commerce limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act. Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when determining the weighted-average dumping margin for companies which were not selected for individual examination in an administrative review. Under section 735(c)(5)(A) of the Act, the all-others rate is normally an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding rates that are zero, *de minimis*, or determined entirely on the basis of facts available. For these final results of review, we calculated weighted-average dumping margins for Assan and Teknik that are not zero, *de minimis*, or based entirely on facts available. Therefore,

---

[4] *See* the Issues and Decision Memorandum for descriptions of these changes.

3

Barcode:4457999-01 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

consistent with Commerce's practice, we determined a dumping margin for the non-examined companies by weight-averaging the margins for Assan and Teknik using publicly ranged sales values for sales of subject merchandise to the United States.

Final Results of the Administrative Review

We determine that the following weighted-average dumping margins exist for the period October 15, 2020, through March 31, 2022.

| Exporter or Producer | Weight-Average Dumping Margin (percent) |
|---|---|
| Assan Aluminyum Sanayi ve Ticaret A.S. | 1.25 |
| Teknik Aluminyum Sanayi A.S. | 18.20 |
| Non-Selected Companies[5] | 10.88 |

Disclosure

We intend to disclose the calculations performed in connection with these final results to interested parties in this proceeding within five days of the date of publication of this notice, in accordance with 19 CFR 351.224(b).

Assessment Rates

Commerce has determined, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries in this review, in accordance with section 751(a)(2)(C) of the Act and 19 CFR 351.212(b).  Commerce intends to issue assessment instructions to CBP no earlier than 35 days after the date of publication of these final results in the *Federal Register*.  If a timely summons is filed at the U.S. Court of International Trade, the assessment instructions will direct CBP not to liquidate relevant entries until the time for parties to file a request for a statutory injunction has expired (*i.e.*, within 90 days of publication).

---

[5] ASAS Aluminyum Sanayi ve Ticaret A.S.; Panda Aluminyum A.S.; PMS Metal Profil Aluminyum Sanayi ve Ticaret A.S.; and TAC Metal Ticaret Anonim Sirketi.

4

Barcode:4457999-01 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

Pursuant to 19 CFR 351.212(b)(1), because Assan's and Teknik's weighted-average dumping margin is not zero or *de minimis* (*i.e.*, less than 0.5 percent), we calculated importer-specific *ad valorem* assessment rates based on the ratio of the total amount of dumping calculated for the examined sales to the total entered value of the sales.  Where an importer-specific assessment rate is zero or *de minimis*, we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.[6]

Consistent with Commerce's clarification of its assessment practice, for entries of subject merchandise during the POR produced by any of the above-referenced respondents for which they did not know the merchandise was destined for the United States, we will instruct CBP to liquidate such entries at the all-others rate established in the less-than-fair-value (LTFV) investigation of 4.85 percent *ad valorem*[7] if there is no rate for the intermediate company(ies) involved in the transaction.[8]

For the non-examined companies subject to review, we will instruct CBP to liquidate all applicable entries of subject merchandise during the POR at the rate listed in the table above.

<u>Cash Deposit Requirements</u>

The following cash deposit requirements will be effective for all shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of the final results of this administrative review as provided by section 751(a)(2)(C) of the Act:  (1) the cash deposit rate for the companies listed above will be equal to the weighted-average dumping margin established in the final results of the review; (2) for subject

---

[6] *See Antidumping Proceedings:  Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings; Final Modification*, 77 FR 8101, 8102 (February 14, 2012).
[7] *See Order*, 86 FR at 22142.
[8] For a full discussion of this practice, *see Antidumping and Countervailing Duty Proceedings:  Assessment of Antidumping Duties*, 68 FR 23954 (May 6, 2003).

5

merchandise exported by a company not covered in this review but covered in a prior completed segment of the proceeding, the cash deposit rate will continue to be the company-specific rate published in the completed segment for the most recent period; (3) if the exporter is not a firm covered in this review or the original LTFV investigation, but the producer is, then the cash deposit rate will be the rate established in the completed segment for the most recent period for the producer of the subject merchandise; (4) the cash deposit rate for all other producers or exporters will continue to be 4.85 percent *ad valorem*, the all-others rate established in the LTFV investigation.

These cash deposit requirements, when imposed, shall remain in effect until further notice.

Notification to Importers

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping and/or countervailing duties prior to liquidation of the relevant entries during this POR. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping and/or countervailing duties occurred and the subsequent assessment of double antidumping duties, and/or an increase in the amount of antidumping duties by the amount of the countervailing duties.

Administrative Protective Orders

This notice also serves as a reminder to parties subject to administrative protective order (APO) of their responsibility concerning the return or destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3), which continues to govern business proprietary information in this segment of the proceeding. Timely written notification

of the return or destruction of APO materials, or conversion to judicial protective order, is hereby requested.  Failure to comply with the regulations and terms of an APO is a violation subject to sanction.

<u>Notification to Interested Parties</u>

We are issuing and publishing these final results of administrative review in accordance with sections 751(a) and 777(i) of the Act, and 351.221(b)(5).

Dated:  November 3, 2023

*/S/ Abdelali Elouaradia*

_____

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

7

Barcode:4457999-01 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

## Appendix

### List of Topics Discussed in the Issues and Decision Memorandum

I.      Summary
II.     Background
III.    Scope of the *Order*
IV.     Changes Since the *Preliminary Results*
V.      Discussion of the Issues
        Comment 1:    Calculation of Assan's Duty Drawback Adjustment
        Comment 2:    Ministerial Error Regarding "Other Discounts" (OTHDISU) in Assan's U.S. Sales Database
        Comment 3:    Partial Adverse Facts Available (AFA) for Certain Freight Charges Reported by Assan
        Comment 4:    Application of the High Inflation Methodology to Assan
        Comment 5:    Ministerial Errors in Teknik's Calculations
        Comment 6:    The Transactions Disregarded Rule
        Comment 7:    Teknik's Reported Net Interest Expenses
        Comment 8:    Teknik's Imputed Credit Expenses in the Home Market
        Comment 9:    Teknik's U.S. Warehousing Expenses
        Comment 10:  Section 232 Tariffs
        Comment 11:  Ministerial Errors in Assan's Calculations
        Comment 12:  Exclusion of Assan from the AD Order on CAAS from Turkey
        Comment 13:  Inclusion of Certain Expenses in the Indirect Selling Expense Ratio
        Comment 14:  Freight Revenue
        Comment 15:  Differential Pricing Methodology
VI.     Recommendation

8

**ATTACHMENT 2:**

**Memorandum from J. Maeder to A. Elouaradia re: Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet from Turkey; 2020-2022 (Nov. 3, 2023) (released Nov. 6, 2023).**

Barcode:4457999-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-489-839
Administrative Review
POR:  10/15/2020 – 03/31/2022
**Public Document**
E&C/OVII:  AD

November 3, 2023

**MEMORANDUM TO:**　　Abdelali Elouaradia
　　　　　　　　　　　　Deputy Assistant Secretary
　　　　　　　　　　　　　for Enforcement and Compliance

**FROM:**　　　　　　　James Maeder
　　　　　　　　　　　　Deputy Assistant Secretary
　　　　　　　　　　　　　for Antidumping and Countervailing Duty Operations

**SUBJECT:**　　　　　Issues and Decision Memorandum for the Final Results of
　　　　　　　　　　　　the Administrative Review of the Antidumping Duty
　　　　　　　　　　　　Order on Common Alloy Aluminum Sheet from Turkey;
　　　　　　　　　　　　2020-2022

## I.　　SUMMARY

We analyzed the comments submitted by interested parties in the 2020-2022 administrative review of the antidumping duty (AD) order on common alloy aluminum sheet (CAAS) from the Republic of Turkey (Turkey).[1]  Based on our analysis of the comments received, we made certain changes to the preliminary dumping margins calculated for the mandatory respondents in this review:  (1) Assan Aluminyum Sanayi ve Ticaret A.S., Kibar Americas, Inc., and Kibar Dis Ticaret A.S. (collectively, Assan); and (2) Teknik Aluminyum Sanayi A.S. (Teknik).

We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Below is a list of the issues on which we received comments from interested parties:

　　　　Comment 1:　Calculation of Assan's Duty Drawback Adjustment
　　　　Comment 2:　Ministerial Error Regarding "Other Discounts" (OTHDISU) in Assan's
　　　　　　　　　　U.S. Sales Database
　　　　Comment 3:　Partial Adverse Facts Available (AFA) for Certain Freight Charges
　　　　　　　　　　Reported by Assan
　　　　Comment 4:　Application of the High Inflation Methodology to Assan
　　　　Comment 5:　Ministerial Errors in Teknik's Calculations
　　　　Comment 6:　The Transactions Disregarded Rule

---

[1] *See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey:  Antidumping Duty Orders*, 86 FR 22139 (April 27, 2021) (*Order*).



INTERNATIONAL
**T R A D E**
ADMINISTRATION

Comment 7:   Teknik's Reported Net Interest Expenses
Comment 8:   Teknik's Imputed Credit Expenses in the Home Market
Comment 9:   Teknik's U.S. Warehousing Expenses
Comment 10:  Section 232 Tariffs
Comment 11:  Ministerial Errors in Assan's Calculations
Comment 12:  Exclusion of Assan from the AD Order on CAAS from Turkey
Comment 13:  Inclusion of Certain Expenses in the Indirect Selling Expense Ratio
Comment 14:  Freight Revenue
Comment 15:  Differential Pricing Methodology

## II.   BACKGROUND

On September 6, 2022, we published the *Preliminary Results* of this administrative review in the *Federal Register*.[2]  On June 16, 2023, we received case briefs from Assan,[3] Teknik,[4] and the petitioners.[5]  On June 28, 2023, we received rebuttal briefs from Assan,[6] Teknik,[7] and the petitioners.[8]  On August 17, 2023, Commerce extended the deadline for these final results to November 3, 2023.[9]

## III.  SCOPE OF THE *ORDER*

The products covered by the *Order* are common alloy aluminum sheet, which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width.  Common alloy sheet within the scope of the *Order* includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet.  With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX- or 5XXX-series alloy as designated by the Aluminum Association.  With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.  The use of a proprietary alloy or non-proprietary alloy that is not specifically registered by the Aluminum Association as a discrete 1XXX-,

---

[2] *See Common Alloy Aluminum Sheet from Turkey:  Preliminary Results of Antidumping Duty Administrative Review; 2020-2022*, 87 FR 54463 (September 6, 2022) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

[3] *See* Assan's Letter, "Assan's Case Brief," dated June 16, 2022 (Assan's Case Brief).

[4] *See* Teknik's Letter, "Teknik Aluminyum Sanayi A.S.'s Case Brief," dated June 16, 2023 (Teknik's Case Brief).

[5] The petitioners include:  the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members, Arconic Corporation; Commonwealth Rolled Products, Inc.; Constellium Rolled Products Ravenswood, LLC; JW Aluminum Company; Novelis Corporation; and Texarkana Aluminum, Inc.  *See* Petitioners' Letter, "Petitioners' Case Brief Concerning Assan," dated June 16, 2022 (Petitioners' Case Brief for Assan); *see also* Petitioners' Letter, "Petitioners' Case Brief Concerning Teknik," dated June 16, 2022 (Petitioners' Case Brief for Teknik).

[6] *See* Assan's Letter, "Assan Group's Rebuttal Case Brief," dated June 28, 2023 (Assan's Rebuttal Brief).

[7] *See* Teknik's Letter, "Teknik Aluminyum Sanayi A.S.'s Rebuttal Case Brief," dated June 28, 2023 (Teknik's Rebuttal Brief).

[8] *See* Petitioners' Letter, "Petitioners' Letter in Lieu of Rebuttal Case Brief for Assan," dated June 28, 2022 (Petitioners' Rebuttal Brief for Assan); *see also* Petitioners' Letter, "Petitioners' Case Brief Concerning Teknik," dated June 28, 2022 (Petitioners' Rebuttal Brief for Teknik).

[9] *See* Memorandum, "Common Alloy Aluminum Sheet from the Republic of Turkey:  Extension of Deadline for Final Results of Antidumping Duty Administrative Review; 2020-2022," dated August 17, 2023.

Barcode:4457999-02 A-489-839 REV - Admin Review 10/15/20 – 3/31/22

3XXX-, or 5XXX-series alloy, but that otherwise has a chemistry that is consistent with these designations, does not remove an otherwise in-scope product from the scope.

Common alloy sheet may be made to ASTM specification B209-14 but can also be made to other specifications.  Regardless of specification, however, all common alloy sheet meeting the scope description is included in the scope.  Subject merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the *Order* if performed in the country of manufacture of the common alloy sheet.

Excluded from the scope of the *Order* is aluminum can stock, which is suitable for use in the manufacture of aluminum beverage cans, lids of such cans, or tabs used to open such cans. Aluminum can stock is produced to gauges that range from 0.200 mm to 0.292 mm, and has an H-19, H-41, H-48, H-39, or H-391 temper.  In addition, aluminum can stock has a lubricant applied to the flat surfaces of the can stock to facilitate its movement through machines used in the manufacture of beverage cans.  Aluminum can stock is properly classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7606.12.3045 and 7606.12.3055.

Where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set for the above.

Common alloy sheet is currently classifiable under HTSUS subheadings 7606.11.3060, 7606.11.6000, 7606.12.3096, 7606.12.6000, 7606.91.3095, 7606.91.6095, 7606.92.3035, and 7606.92.6095.  Further, merchandise that falls within the scope of the *Order* may also be entered into the United States under HTSUS subheadings 7606.11.3030, 7606.12.3015, 7606.12.3025, 7606.12.3035, 7606.12.3091, 7606.91.3055, 7606.91.6055, 7606.92.3025, 7606.92.6055, 7607.11.9090.  Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the *Order* is dispositive.

## IV.    CHANGES SINCE THE *PRELIMINARY RESULTS*

Based on our analysis of the comments received from interested parties, we made the following changes:

*Assan*

- We have corrected ministerial errors regarding discounts and rebates involving the variables OTHDISH/U and REBATEH/1H/2H, U.S. commissions (COMMU), constructed export price (CEP) profit, and home market movement expenses.

The details of these changes are described in Assan's Final Calculation Memorandum.[10]

---

[10] *See* Memorandum "Final Results Calculations for Assan," dated concurrently with this memorandum (Assan's Final Calculation Memorandum).

Barcode:4457999-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

*Teknik*

- We corrected ministerial errors regarding duty drawback, U.S. commissions (COMMU) and CEP profit.
- We have applied the transactions disregarded rule in determining the cost of aluminum ingots and semi-processed coils.
- We have revised Teknik's U.S. warehousing expenses to remove a credit to the relevant account.

The details of these changes are described in Teknik's Final Calculation Memorandum.[11]

## V.    DISCUSSION OF THE ISSUES

**Comment 1:       Calculation of Assan's Duty Drawback Adjustment**

The petitioners claim that Commerce's duty drawback calculation is contrary to the plain language of the statue and that Commerce's methodology inflated the duty drawback adjustment applying a per unit adjustment to all U.S. sales based on duty liability forgiven by the Turkish government on only certain U.S. sales.  Assan asserts that it is entitled to a duty drawback adjustment and that the per unit adjustment was calculated properly by Commerce.

*Petitioners' Case Brief for Assan[12]*

- Commerce based Assan's drawback adjustment on the values Assan reported in the duty drawback adjustment variable (DTYDRAWU), which Assan calculated "by dividing the total amount of customs duties and charges corresponding to the imports made under the identified {Inward Processing Certificate (IPC)} by the total of exports made as a commitment against the imports to close the IPC."
- Assan's calculation – and Commerce's reliance on that calculation, however, contravene the plain language of the statute and are contradicted by record evidence.
- Assan calculated a drawback adjustment by dividing the total customs duties pursuant to IPCs by the total quantity of exports Assan made pursuant to these same IPCs.
- Consequently, the resulting drawback adjustment applies only to an export made pursuant to IPCs.  Assan then assigns this per-unit drawback amount to all U.S. sales.
- By assigning to each U.S sale a per-unit drawback amount that applies only to exports pursuant to IPCs, regardless of whether Assan exported that U.S. sale pursuant to these IPCs, Assan overstates the duty drawback applicable to its U.S. sales.
- In order to remedy these deficiencies, Commerce should rely on the same methodology it applied previously in the case of *Aluminum Foil from Turkey*.[13]  Specifically, Commerce should limit the numerator of the calculation to exempted duties on exports of subject

---

[11] *See* Memorandum "Final Results Calculations for Teknik," dated concurrently with this memorandum (Teknik's Final Calculation Memorandum).

[12] *See* Petitioners' Case Brief for Assan at 3-7.

[13] *See Certain Aluminum Foil from the Republic of Turkey:  Preliminary Negative Determination of Sales at Less Than Fair Value, Postponement of Final Determination*, 84 FR 23686 (May 4, 2021) (*Aluminum Foil from Turkey*).

4

Barcode:4457999-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

merchandise to the United States during the POR and the denominator should be all U.S. sales.

*Assan's Rebuttal Brief*[14]

- In the *Preliminary Results*, Commerce granted Assan a duty drawback adjustment based on the values it reported under the variable DTYDRAWU.
- This calculation utilized "the total amount of customs duties and charges corresponding to the imports made under the identified IPC" divided by "the total of exports made as a commitment against the imports to close the IPC."
- The petitioners' proposed calculation contradicts Commerce's well-established practice in other determinations involving the Turkish duty drawback system.
- Having found that Assan satisfied its requirements for duty drawback, Commerce properly granted Assan a full adjustment to U.S. price by dividing the amount of the uncollected duty under the closed IPCs by Assan's total exports covered by those closed IPCs, in accordance with its usual practice.
- The adjustment as calculated is properly applied to all U.S. sales because all U.S. sales were made pursuant to closed or currently open IPCs, and are thus eligible for a duty drawback adjustment.

**Commerce's Position:**  Commerce determines that Assan has properly reported its duty drawback adjustment by taking the entire amount of exemptions under the closed IPCs and dividing by the total quantity of exports under the same IPCs.  This calculation is consistent with that for the underlying less-than-fair value (LTFV) investigation.[15]

In the investigation, Commerce made it clear that the duty drawback provision, Commerce's regulations, and Commerce's practice do not require use of the imported input in the production of the exported subject merchandise as a condition to receiving a duty drawback adjustment.[16] Instead, Commerce, in accordance with the law, requires a respondent to demonstrate that a reasonable link exists between the duties imposed and those rebated or exempted,[17] which the record supports in this case.[18]  The purpose of the duty drawback adjustment is to "account for the fact that the producers remain subject to the import duty when they sell the subject merchandise domestically, which increases home market sales prices and thereby increases

---

[14] *See* Assan's Rebuttal Brief at 2-8.
[15] *See Final Results of Redetermination Pursuant to Court Remand, Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Court No. 21-00246, Slip Op. 23-26 (CIT March 1, 2023), dated May 30, 2023, available at https://www.cit.uscourts.gov/content/slip-opinions (*Final Remand Redetermination*); *see also Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343 (CIT 2023).
[16] *See Common Alloy Aluminum Sheet from Turkey:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 13326 (March 8, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM) at 9.
[17] *See Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S.*, 861 F.3d 1269, 1274 (Fed. Cir. 2017).
[18] *See* Assan's Letter, "Assan's Response to the Section C Questionnaire," dated October 24, 2022 (Assan's ICQR), at C-45 – C-47.

{normal value}."[19]  A duty drawback adjustment ensures that the results of participating in a duty drawback program do not affect the dumping calculation.[20]

Furthermore, Commerce explained that it is unnecessary to trace specific inputs into the production of specific exports, as claimed by the petitioners.[21]  As such, Commerce's current duty drawback methodology, as explained in *Rebar from Turkey*, divides the amount of total duties exempted on closed IPCs by the total quantity of exports made under those closed IPCs to calculate a per-unit duty drawback adjustment.[22]  This methodology reasonably reflects the duties actually exempted for the exports of subject merchandise made to the United States during the period of investigation (POI).[23]

The petitioners' argument in favor of using the methodology in *Aluminum Foil from Turkey* raises the same concerns that were addressed by Commerce in *Rebar from Turkey Final Results*, finding that the statutory purpose of the duty drawback provision is fulfilled by eliminating, to the extent possible, any effect of the Turkish duty drawback system on the dumping calculations by spreading the duty actually drawn back generally over all the exports in the closed IPC.[24]  The petitioners' argument suffers the same deficiencies as those noted by Commerce in *Rebar from Turkey Final Results*, where Commerce rejected a similar argument on the basis that it amounts to attempting to trace imported inputs into specific products and export markets, even though the Turkish duty drawback system does not require these specific links for duty drawback to be granted.[25]  As articulated by the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Uttam Galva Steels*, "the duty drawback statute requires an adjustment to 'export price' based on the full extent of the duty drawback."[26]  The statute does not impose an additional requirement that the respondent trace particular imported goods to U.S. exports.[27]  Moreover, the Federal Circuit went so far as to state that "{i}t does not make a difference whether the imported inputs that qualified for a drawback were actually incorporated into goods sold in the exporter's domestic market because the {foreign} government credited the drawback to the quantity of goods that were in fact exported…."[28]  The Federal Circuit explained that the entire drawback was allowed "by reason of exportation."[29]

---

[19] *See Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1338 (Fed. Cir. 2011) (explaining how to account for the fact that a producer remains subject to the import duty when it sells the subject merchandise domestically, the duty drawback adjustment provides an "apples-to-apples" comparison between the foreign market value and the U.S. price.); *see also Apex Exports v. United States*, 777 F.3d 1373, 1374-75 (Fed. Cir. 2015) (noting that "{t}he overall goal {of the antidumping calculation methodology} is to arrange an apples-to-apples comparison between the domestic and foreign price of merchandise.").

[20] *Id.*

[21] *See Final Determination* IDM at 9; *see also Final Remand Redetermination* at 13.

[22] *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 FR 7941 (February 7, 2023) (*Rebar from Turkey Final Results*), and accompanying IDM at Comment 5.

[23] *Id.*

[24] *Id.*

[25] *See* Assan's ICQR at C-45 – C-48.

[26] *See Uttam Galva Steels Limited v. United States*, 997 F.3d 1192, 1197 (Fed. Cir. 2021) (*Uttam Galva Steels*).

[27] *Id.* at 1198.

[28] *Id.*

[29] *Id.*

6

Accordingly, we continue to find Commerce's current methodology, as described in *Rebar from Turkey Final Results*, is appropriate for purposes of calculating a per-unit duty drawback adjustment (*i.e.*, by taking the total value of exempted duties under closed IPCs and dividing by the total amount of exports under the same IPCs to derive a per-unit adjustment).  This methodology reasonably reflects the duties actually exempted for the exports of subject merchandise made to the United States during the POI, and is consistent with the Federal Circuit's decision in *Uttam Galva Steels* that the statute does not require the imported material be traced directly from importation through exportation.[30]  Here, the consumption ratios associated with the closed IPC define the limits of the per-unit duty drawback benefit, which reasonably spreads the associated import duty exemptions generally over the proper universe of exports that actually fulfilled the export obligation.[31]  In other words, we find that any other method to reallocate specific duty exemptions on a closed IPC over a different universe of exports would likely introduce inaccuracies, as the Turkish duty drawback system does not trace the actual use of the imported input to the actual finished product that is exported.[32]  Given the current Federal Circuit precedent in *Uttam Galva Steels*,[33] instructing Commerce to consider the entire drawback when calculating duty drawback adjustments, Commerce reasonably granted Assan's duty draw back adjustment as reported.[34]

**Comment 2:**       **Ministerial Error Regarding "Other Discounts" (OTHDISU) in Assan's U.S. Sales Database**

The petitioners claim that Commerce made a ministerial error regarding the treatment of OTHDISU in the U.S. sales database.  Assan claims it made an error in its reporting and advises Commerce to correct it in its *Final Determination*.

*Petitioners' Case Brief for Assan:*[35]

- In the *Preliminary Results*, Commerce explained that "{u}sing the information provided in Assan's questionnaire responses, we calculated U.S. price adjustments as indicated in section 4-A of the attached margin program."
- These U.S. price adjustments, however, include an error involving the variable OTHDISU.  Specifically, the discount values are reported as negative values, which means Commerce should have added the values to U.S. price instead of subtracting them.

---

[30] *See Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 82 FR 23192 (May 22, 2017) (*Rebar from Turkey Final Determination*), and accompanying IDM at Comment 1 (explaining how Commerce's analysis of the Turkish drawback system is consistent with the Federal Circuit's holdings concerning the Indian drawback system).

[31] *See* Assan's ICQR at C-48 – C-49 and Exhibits C-11 – C-13.

[32] *See Final Determination* IDM at Comment 1 (citing *Rebar from Turkey Final Determination* IDM at Comment 1); *see also Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 439 F. Supp. 3d 1342 (CIT 2020) (holding that a proposed methodology by domestic producers was unsupported by statute or regulation).

[33] *See Uttam Galva Steels*, 997 F.3d at 1197.

[34] Courts have recognized the need for Commerce to have "some discretion in determining how wide {of} a search it will make," and "some methodological flexibility," as to comply with the statutory mandate of calculating "the most accurate dumping margins possible."  *See Far E. Mach. Co. v. United States*, 699 F. Supp. 309, 315 (CIT 1988); *see also Maverick Tube Corp. v. United States*, 163 F. Supp. 3d 1345, 1358 (CIT 2016).

[35] *See* Petitioners' Assan Case Brief at 7-8.

- This is clearly a ministerial error that should be remedied by Commerce in the final results.

*Assan Case Brief:*[36]

- As with OTHDISH, OTHDISU was inadvertently reported as a negative value.

**Commerce's Position:**  Commerce's intent was to lower gross unit price by the amounts reported for all discounts in order to determine net unit price.  The calculation programs assume discounts are reported as positive values and thus deducts them from gross unit price.  However, given that Assan reported its discounts as negative values, Commerce agrees that the programs need to be revised in order to add the reported discount values to determine net unit price.

**Comment 3:**     **Partial AFA for Certain Freight Charges Reported by Assan**

The petitioners claim that Commerce should rely on partial AFA regarding Assan's reporting of certain inland freight charges.  Assan asserts that it properly reported foreign inland freight expenses and AFA should not be applied.

*Petitioners' Case Brief for Assan:*[37]

- In a supplemental questionnaire, Commerce clearly and explicitly instructed Assan to provide information related to determining whether these expenses were at arm's length prices.
- Specifically, Assan did not provide data "on the average prices the affiliate . . . charged to unaffiliated customers" and Assan during the POR for the same services.
- Assan did not provide any data on the average price charged to unaffiliated customers or Assan as explicitly requested by Commerce, but instead provided data and documentation on only six transactions (three related to unaffiliated customers and three related to Assan) that Assan hand-picked.
- As a result, necessary information relating to an evaluation of whether these expenses were at arm's length prices is missing from the record, and Assan failed to cooperate to the best of its ability by failing to respond to Commerce's direct and explicit request for information.

*Assan's Rebuttal Brief:*[38]

- The petitioners' arguments, which were also made in their Pre-Preliminary Comments[39] and thus rejected by Commerce in the *Preliminary Results*, remain equally unavailing now.

---

[36] *See* Assan's Case Brief at 6.
[37] *See* Petitioners' Assan Case Brief at 8-15.
[38] *See* Assan's Rebuttal Case Brief at 8-11.
[39] *See* Petitioners' Letter, "Petitioners' Comments Concerning Teknik Aluminyum Sanayi A.S. in Advance of the Department's Upcoming Preliminary Results," dated April 4, 2023 (Petitioners' Pre-Preliminary Comments).

8

- Assan submitted the information requested by Commerce, and no further requests for information were made.  The information provided mirrored that relied upon and found to be sufficient by Commerce in the LTFV investigation.  There is thus no basis to apply AFA in this review.

**Commerce's Position:**  We agree with Assan that the information it submitted was responsive to our request and demonstrates the arm's length nature of the prices paid to the affiliated freight company.[40]  Given the requirements of 776(a) are not satisfied, we find no need to resort to facts available, let alone AFA.  Additionally, as Assan argues, the information mirrors that submitted by the company in the LTFV investigation for the same purpose, which Commerce deemed to be acceptable.  Specifically, in both the LTFV investigation and this review, Assan provided three comparisons of the per-unit freight amounts charged by the affiliate to Assan to the per-unit amounts charged by the affiliate to its largest unaffiliated customers.[41]  Commerce's determination in this regard was upheld by the U.S. Court of International Trace (CIT).[42]

**Comment 4:**       **Application of the High Inflation Methodology to Assan**

The petitioners claim that Commerce incorrectly determined not to issue a high inflation questionnaire to Assan.  Assan responds that the high inflation questionnaire is not necessary or appropriate because Assan's functional currency is U.S. dollars (USD).

*Petitioners' Case Brief for Assan:[43]*

- In a letter dated September 15, 2022, Assan notified Commerce that the inflation rate in Turkey exceeded the threshold for Commerce to apply its high inflation methodology.
- Commerce, however, issued a letter to Assan on November 8, 2022, in which it determined that "a high inflation questionnaire response is not necessary" and proceeded not to issue a high inflation questionnaire to Assan at any point during its conduct of this segment.
- Commerce's failure to issue the high inflation questionnaire is contrary to Commerce's established practice and the record evidence.

*Assan's Rebuttal Brief:[44]*

- The petitioners allege that Commerce's "failure to issue the high inflation questionnaire is contrary to {its} established practice and the record evidence."

---

[40] *See* Assan's Letter, "Assan Sections A-C First Supplemental Questionnaire," dated March 14, 2022, at S1-16 – S1-17 and Exhibits S1-17a – S1-17d (in particular, S1-17c, which provides a comparison of freight paid by Assan to freight paid by other customers of the affiliate at issue).

[41] *See* Assan's Letter, "Assan's Response to the Supplemental Sections A-C Questionnaire," dated March 14, 2023, at S1-16 – S1-17 and Exhibits S1-17b – S1-17c; *see also Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Slip Op. 23-26 (March 1, 2023 CIT) (*Assan*), at 38-39.

[42] *See Assan* at 35-45 ("substantial evidence supports both of the agency's findings – that Assan fully cooperated in the investigation and that Assan paid arm's-length prices for inland freight services . . . .").

[43] *See* Petitioners' Case Brief for Assan at 15-19.

[44] *See* Assan's Rebuttal Brief at 12-13.

- As the petitioners acknowledge, this matter has been fully explored and Commerce's finding that "a high inflation questionnaire response is not necessary because Assan's functional currency appears to be United States dollars (USD)" remains appropriate.

**Commerce's Position:** Commerce continues to find that the high inflation questionnaire is unwarranted for Assan. The high inflation questionnaire seeks monthly production cost and selling expense data from respondents in a high inflation economy (such as Turkey) which can then be adjusted using a price index in a manner that negates the distortive effects of high inflation. The assumption behind this methodology is that the respondent's production costs are denominated in their home market currency, and the production costs form the foundation for the respondent's operations, including selling merchandise in the U.S. and comparison markets. In Assan's situation, however, although there will likely be instances where certain costs or revenues are denominated in the domestic currency, *i.e.*, Turkish lira (TL), Assan's functional currency is USD.[45] Assan's books and records are prepared and maintained in USD, Assan prepares and reports its financial statements using USD, and Assan reports its sales and cost data to Commerce in USD.[46] Thus, a high inflation methodology is not appropriate.

The petitioners reference no convincing evidence on the record contradicting what Assan reported to Commerce, or Commerce's conclusion that Assan's functional currency is USD. The petitioners' argument focuses on a requirement under Turkish law that appears to obligate companies to maintain and provide financial reporting in TL, as well as Commerce precedent considering that obligation as one reason not to exempt a Turkish company from the high inflation methodology.[47] While Commerce did, in fact, cite such legal obligations in *CWP from Turkey*, we also noted that, in that review, the respondent's reported costs were "derived from its TL-denominated financial statements, which were based on its TL normal books and records at the unconsolidated level."[48] That is not the situation here. Assan's reported production costs were derived from USD-denominated books and records, which in turn were based on USD-denominated transactions.[49]

Moreover, Commerce concludes that, in all likelihood, the requirement referenced by the petitioners does not obligate Assan to conduct its business in TL (which it obviously does not do based on its extensive records shown in USD), nor does it preclude Assan from incurring costs in

---

[45] *See* Assan's Letter, "Assan's Rebuttal to Petitioners' Response Regarding Inflation," dated September 23, 2022, at Exhibits 1-4 and fn. 47 *infra.*

[46] *See Ferrosilicon from Venezuela: Final Determination of Sales at Less Than Fair Value*, 79 FR 44,397 (July 31, 2014), and accompanying IDM at Comment 3.

[47] *See* Petitioners' Case Brief for Assan at 16-17 (citing *Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 15190 (March 15, 2021) (*CWP from Turkey*), and accompanying IDM at 9-13; and Assan's financial statements at Assan's Letter, "Assan's Response to the Section A Questionnaire," dated October 3, 2022, at Exhibit A-17).

[48] *See CWP from Turkey* IDM at 12-13.

[49] *See, e.g.*, Assan's Letter, "Assan's Response to the Section D Questionnaire," dated October 25, 2022, at Exhibits D-19 (trial balance), D-20 (cost reconciliation), and D-07, D-15, and D-22 (inventory movement tables for primary aluminum, casted coil and scrap; by products; and subject merchandise, respectively); *see also* Assan's Letter, "Assan's Response to the Supplemental Section D (2nd Supplemental) Questionnaire," dated March 21, 2023, at Exhibits S2-5, S2-6a, and S2-6b (documentation for purchases of primary aluminum and cast coil, including invoices and screen shots of ledgers, all in USD).

Barcode:4457999-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

USD (it purchases ingot and coil in USD).  What the requirement likely means is that for certain purposes (*e.g.*, tax purposes, shareholder reporting purposes), the values in its accounting system have to be presented in TL (*i.e.*, the values incurred and booked in another currency must be converted to TL for certain reporting purposes).  For example, at Exhibit A-15 of its initial section A questionnaire response, Assan submits its tax returns which include "statutory" financials in TL.[50]  These are financial statements specially prepared for tax authorities, who unsurprisingly require information in their own currency regardless of the taxpayer's functional currency.

**Comment 5:        Ministerial Errors in Teknik's Calculations**

The petitioners claim that Commerce made four calculation errors in the *Preliminary Results* for Teknik.  Specifically, the petitioners claim that Commerce:  (1) incorporated a duty drawback adjustment in its U.S. price calculation, despite finding that Teknik was not entitled to a duty drawback adjustment; (2) omitted Teknik's commission expenses from its CEP calculations; (3) deleted home market sales that are outside the period of review (POR) but fall within the 90/60-day window period; and (4) failed to extend revenues for purposes of calculating CEP profit. Teknik argues that Commerce properly limited U.S. price comparisons to home market sales made during the same month.

*Petitioners' Case Brief for Teknik on Issue (1):[51]*

- Commerce stated explicitly that it "preliminarily determine{d} not to make the {drawback} adjustment" for Teknik."
- Contrary to Commerce's stated intention not to grant Teknik a duty drawback adjustment, Commerce added Teknik's reported drawback adjustment to U.S. price in calculating Teknik's dumping margin.

No other party commented on this issue.

*Petitioners' Case Brief for Teknik on Issue (2):[52]*

- Teknik's affiliate AA Metals paid commissions to unaffiliated selling agents for U.S. sales of the subject merchandise, and it reported information on the commissions paid in variable (COMMU).
- Teknik's reported commissions in variable COMMU are commissions incurred in the United States.
- In the calculations underlying the *Preliminary Results*, Commerce inadvertently omitted these expenses from its U.S. price calculation.

No other party commented on this issue.

---

[50] *See* Assan's Letter, "Assan's Response to the Section A Questionnaire," dated October 4, 2023, at Exhibit A-15.
[51] *See* Petitioners' Case Brief for Teknik at 5-6.
[52] *Id.* at 6-7.

Filed By: Mark Hoadley, Filed Date: 11/6/23 12:16 PM, Submission Status: Approved

*Petitioners' Case Brief for Teknik on Issue (3):*[53]

- Commerce mistakenly set the beginning and end dates for the comparison window for home market sales.
- As a result, Commerce removed from consideration home market sales that fall within the 90/60-day window.

*Teknik's Rebuttal Case Brief on Issue (3):*[54]

- Contrary to the petitioners' argument, this is not a clerical error.  Rather, Commerce properly limited comparisons to home market sales made during the same month in which U.S. sales occurred.
- Commerce regularly chooses not to utilize sales in the 90/60-day window and limits comparisons of U.S. price to home market sales made during the same month.

*Petitioners' Case Brief for Teknik on Issue (4):*[55]

- While Commerce used home market quantities to extend (*i.e.*, multiply values by quantities) costs of goods sold, selling expenses, and moving expenses, it failed to extend revenues.

No other interested party commented on this issue.

**Commerce's Position:**  Commerce agrees that certain inadvertent calculation errors were made in determining Teknik's AD margin; namely:  (1) duty drawback was added to U.S. price despite the preliminary determination (uncontested) that Teknik was not entitled to a duty drawback adjustment for the POR; (2) U.S. commissions were improperly excluded from the calculation of CEP; and (3) total revenue was not properly calculated.  We therefore have fixed these three errors for these final results.  Commerce does not agree, however, with the petitioners that it improperly limited U.S. price comparisons to home market sales made in the same month.  That limitation is part of the high inflation methodology applied to Teknik and is intended to help neutralize the distortive effects of inflation by limiting the period over which comparison sales are selected.  This practice is consistent with prior determinations.[56]  Thus we have not changed the comparison window for these final results.

---

[53] *Id.* at 7-8.
[54] *See* Teknik's Rebuttal Brief at 6-7.
[55] *See* Petitioners' Case Brief for Teknik at 9.
[56] *See, e.g.*, *Certain Quartz Surface Products from the Republic of Turkey:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 84 FR 68111 (December 13, 2019), and accompanying PDM at 12 ("We note that, because Turkey's economy experienced high inflation (*i.e.*, above 25 percent) during the POI, it is Commerce's practice to limit our comparisons of U.S. sales to calculated NV during the same month in which the U.S. sale occurred.  This methodology minimizes the extent to which calculated dumping margins are overstated or understated due solely to inflation."), unchanged in *Certain Quartz Surface Products from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 FR 25389 (May 1, 2020).

Barcode:4457999-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

**Comment 6:**     **The Transactions Disregarded Rule**

*Petitioners' Case Brief for Teknik:*[57]

- Teknik reported that during the POR it purchased raw materials from its affiliate, AA Metals Inc. (AA), for use in the production of the merchandise under consideration.
- Based on Teknik's description of these transactions, AA Metals acts as a reseller for the raw materials, purchasing them from its own suppliers.
- Commerce's practice is to test the transfer price between the affiliated supplier and the respondent with the available market prices for the input.
- Available market prices may relate to a respondent's purchases of the same input directly from unaffiliated suppliers, and/or an affiliated reseller's average acquisition price plus the affiliated reseller's selling, general, and administrative (SG&A) expenses.
- Where both types of market prices are available, Commerce calculates a weighted-average market price using both sources.
- Teknik provided information on prices paid for both (1) its purchases of aluminum ingots and semi-finished coils directly from unaffiliated persons, and (2) its affiliated supplier's purchases of aluminum ingots and semi-finished coils from unaffiliated persons.
- Because both types of market prices are available, Commerce should weight average them in applying the transactions-disregarded rule.

No other interested party commented on this issue.

**Commerce's Position:**  Commerce agrees that the higher of market price or transfer price should be used in the determination of the cost of Teknik's purchases of aluminum ingots and semi-finished coils from AA.  Commerce also agrees that, given the case record, market price should be determined as the weighted-average of direct purchases by Teknik from unaffiliated suppliers and AA's acquisition costs.[58]  All of this information exists on the record to determine AA's acquisition costs, including not just the prices it paid to unaffiliated suppliers but its SG&A expenses.[59]  Thus, we have made this adjustment for these final results.

**Comment 7:**     **Teknik's Reported Net Interest Expenses**

*Petitioners' Case Brief:*[60]

- Commerce instructed Teknik to calculate a net interest expense (INTEX) ratio and to do so "based on the consolidated audited fiscal year financial statements of the highest consolidation level available."

---

[57] *See* Petitioners' Case Brief for Teknik at 10-12.
[58] *See Certain Circular Welded Carbon Steel Pipes and Tubes from Taiwan:  Final Results of Antidumping Duty Administrative Review, 2018-2019*, 86 FR 6302 (January 21, 2021), and accompanying IDM at 4.
[59] Commerce will also add interest expenses in determining the affiliate's acquisition costs if the affiliate is not part of the consolidated financial statements used to determine the respondent's interest expenses, which is not the case here.
[60] *See* Petitioners' Case Brief for Teknik at 12-13.

Filed By: Mark Hoadley, Filed Date: 11/6/23 12:16 PM, Submission Status: Approved

- In its response to Commerce's supplemental section D questionnaire, Teknik submitted an INTEX ratio calculation based on consolidated financial statements.
- To calculate INTEX, Teknik offset expenses with "Interest Income."
- Commerce, however, only allows short-term interest income to offset INTEX.
- Because Teknik has not demonstrated the short-term nature of the interest income, Commerce should not allow the offset.

*Teknik's Rebuttal Brief:[61]*

- Contrary to the petitioners' assertions, the administrative record demonstrates that Teknik is entitled to an offset to its net interest expenses.
- Teknik provided Commerce with a calculation and supporting documentation consistent with the explicit instructions from Commerce's questionnaires.

**Commerce's Position:**  Commerce disagrees with the petitioners' argument and continues to allow the offset to interest expenses.  In a supplemental questionnaire,[62] Commerce directed Teknik to recalculate its initial interest expense ratio using financial statements at a higher level of consolidation.  We also instructed Teknik to document that the interest income in its initial calculation was short-term and we referred to the exhibit containing the initial calculation.[63] Teknik complied with both requests, but when determining a new interest expense ratio at the higher level of consolidation, Teknik relied on additional interest income and did not document whether that additional income was short-term or long-term in nature.[64]  The petitioners' argument suggests that Teknik should have deduced an obligation to document that any interest income in the new calculation was short-term.  However, a plain reading of the questionnaire would not result in any such obligation.  Also, Commerce does not agree that the initial questionnaire states a clear obligation to demonstrate the nature of interest income.  Therefore, we do not agree that Teknik failed to comply with a request for information and we have not revised its interest expense ratio calculation.

**Comment 8:**      **Teknik's Imputed Credit Expenses in the Home Market**

*Petitioner's Case Brief for Teknik:[65]*

- Commerce has frequently relied on AFA when a respondent revises its data so extensively in a supplemental questionnaire response that those revisions undermine its initially reported data.
- Teknik's revision of its reported payment dates in the home market undermines its initial questionnaire response and warrants the application of partial AFA, especially as those payment dates are still not accurate, and Teknik has failed to satisfactorily explain the cause of so many errors.

---

[61] *See* Teknik's Rebuttal Brief at 1-3.
[62] *See* Teknik's Letter, "Teknik Aluminyum Sanayi A.S.—Section D Supplemental Questionnaire Response," dated March 28, 2023, at S2-13.
[63] *Id.* at S2-14.
[64] *Id.* at S2-13 and Exhibit S2-13.
[65] *See* Petitioners' Case Brief for Teknik at 17-23.

Barcode:4457999-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

*Teknik's Rebuttal Brief:*[66]

- Teknik's reported credit expenses should be used in Commerce's final results.
- Teknik corrected certain clerical errors (both date and year) and its methodology for reporting installment payments in its supplemental questionnaire. These revisions ensure that Commerce has accurate information on the record for its dumping analysis.
- The information reported in the supplemental questionnaire response is verifiable by Commerce. While the petitioners are correct that one date had not been corrected, one incorrect date is certainly no factual basis for AFA.

**Commerce's Position:** Commerce does not agree that the application of partial AFA is appropriate in determining credit expenses. To warrant the application of facts available under section 776(a) of the Act, Commerce must find that necessary information is not on the record or that an interested party or any other person has withheld requested information, failed to provide information by the deadlines, significantly impeded a proceeding, or provided unverifiable information. The petitioners argue that necessary information is not available on the record under section 776(a)(1). However, we disagree with the petitioner's characterization of the facts. The revisions made by Teknik were in response to a supplemental question from Commerce regarding the accuracy of reported values for several home market sales,[67] and we do not agree that the revisions were so extensive as to call into question the accuracy of Teknik's response. The revisions fall into two categories: revisions resulting from a methodological change for determining payment dates for sales paid for in installments, and revisions resulting from Teknik's discovery of clerical errors in response to Commerce's supplemental questionnaire. The methodological change involved reporting a weight averaged payment date for sales paid for in installments,[68] and Commerce does not see any reason to question its appropriateness (and the petitioner does not appear to have an issue with the new methodology, only with the number of sales affected). The clerical errors are typographical (reporting the wrong dates for payments) and not extensive, affecting three invoices and less than a dozen sales.[69] The overall effect of both sets of revisions is minor (less than one percent) and results in a smaller deduction for credit expenses and thus a higher normal value. Moreover, while the petitioners express concerns (as they did in pre-preliminary comments) that the response is still erroneous, Commerce does not see any evidence of unaddressed errors beyond the one date that Teknik concedes is a mistake.[70] We agree with Teknik that neither its supplemental revisions nor the one remaining error warrants replacing Teknik's reported data with partial AFA in determining credit expenses. Thus, because Commerce did not find that facts available was warranted under section 776(a), Commerce does not have a statutory basis to make an adverse inference among the facts under section 776(b) and apply partial AFA.

---

[66] *See* Teknik's Rebuttal Brief at 3-6.
[67] *See* Teknik's Letter, "Teknik Aluminum Sanayi A.S. – Sections B and C Supplemental Questionnaire Response," dated March 20, 2023, at S-13 – S-15.
[68] *Id.* at S-14 and Exhibits S1-26.a and S1-26.b.
[69] *See* Teknik's Rebuttal Brief at 4-5.
[70] *Id.* at 4.

Barcode:4457999-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

**Comment 9:** **Teknik's U.S. Warehousing Expenses**

*Petitioners' Case Brief for Teknik:* [71]

- Teknik calculated per unit warehousing expenses by allocating "warehousing costs for the POR" over "the total quantity (in KG) sold from the warehouse (both subject and non-subject) during the corresponding period."
- The detail submitted to support Teknik's calculations indicates large credits to the expense account at issue, suggesting either that income was earned, in contradiction to the description of how U.S. warehousing takes place, or that expenses previously recorded in the account at issue were reclassified and not reported to Commerce.

No other interested party commented on this issue.

**Commerce's Position:**  Commerce agrees that the credit amount at issue, which acts to offset U.S. warehousing expenses, appears anomalous and should be excluded from the final calculations.

**Comment 10:** **Section 232 Tariffs**

*Assan's Case Brief:* [72]

- During the POR, certain imports of CAAS were subject to tariffs imposed under section 232 of the Trade Expansion Act of 1962 (Section 232).
- Despite the ruling by the Federal Circuit in *Borusan*,[73] the Section 232 tariffs are special tariffs imposed to remedy threats to national security – in this case a threat to the viability of the U.S. aluminum industry and should not be deducted from U.S. price.
- In the *Preliminary Results*, Commerce stated that it is appropriate to "treat section 232 duties as U.S. import duties for purposes of section 772(c)(2)(A) of the Act, and thereby customs duties which are deducted from U.S. price."
- However, because the Section 232 special tariffs are distinct from "normal" customs duties, they should not be deducted from U.S. price.
- Commerce's deduction of these special tariffs in the *Preliminary Result*s effectively increased the AD margin, in contradiction of Federal Circuit precedent that adjustments for "special tariffs," such as AD and countervailing duties (CVD) and section 201 safeguards, should be excluded.

*Petitioners' Rebuttal Brief for Assan:* [74]

- The Federal Circuit has sustained Commerce's deduction of Section 232 duties from U.S. price.

---

[71] *See* Petitioners' Case Brief for Teknik at 23-25.
[72] *See* Assan's Case Brief at 2-3.
[73] *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F. 4th 25, 35 (Fed. Cir. 2023) (*Borusan*).
[74] *See* Petitioners' Rebuttal Brief for Assan at 2-3.

Filed By: Mark Hoadley, Filed Date: 11/6/23 12:16 PM, Submission Status: Approved

- Assan has not identified any legal or factual basis to distinguish the circumstances at issue in this administrative review and the agency's decision sustained in *Borusan*.
- Commerce should continue to deduct Section 232 duties from the U.S. price.

**Commerce's Position:**  Commerce explained at length in the *Preliminary Results* its decision to deduct Section 232 duties from U.S. price.[75]  As the petitioners note, Assan has not differentiated the facts of this review from the facts of *Borusan* and Commerce sees no differences.  In fact, there are none, as these are the same Section 232 duties at issue in that case.

**Comment 11:     Ministerial Errors in Assan's Calculations**

Assan requests that Commerce make the following corrections to its margin calculations for (1) home market discounts and rebates, (2) U.S. commissions, (3) CEP profit and, (4) discounts and movement expenses.

*Assan Case Brief for Issue (1):*[76]

- In the *Preliminary Results*, Commerce made unnecessary currency conversions to two discount and rebate fields reported by Assan.  Moreover, Commerce included a field in its calculations that was reported by Assan solely for reconciliation purposes.  Finally, Assan inadvertently reported certain discounts as negative values, inconsistent with the assumptions of Commerce's boilerplate SAS program.

*Assan Case Brief for Issue (2):*[77]

- Commerce inadvertently deducted U.S. commissions twice.

*Assan Case Brief for Issue (3) CEP Profit:*[78]

- In determining CEP profit, Commerce inadvertently made unnecessary currency conversions to total expenses and revenue.

*Assan Case Brief for Issue (4):*[79]

- Commerce made duplicative currency conversions to home market discounts and rebates and movement expenses.

No other interested party commented on this issue.

---

[75] *See Preliminary Results* PDM at 11-12.
[76] *See* Assan's Case Brief at 3-5.
[77] *Id.* at 6.
[78] *Id.* at 6-7.
[79] *Id.* at 7-8.

17

**Commerce's Position:**  Commerce agrees that it made inadvertent currency conversion errors in calculating Assan's preliminary AD margin, as described above, and inadvertently deducted U.S. commissions twice.  Commerce has corrected these errors for these final results.

## Comment 12:     Exclusion of Assan from the AD Order on CAAS From Turkey

*Assan's Case Brief:*[80]

- In the LTFV investigation underlying this review, Assan was assigned a weighted-average dumping margin of 2.02 percent.
- On May 21, 2021, Assan timely appealed the results of the LTFV investigation to the CIT and a *Remand Order* was issued on March 1, 2023.
- Pursuant to the CIT's *Remand Order*, Commerce issued *Remand Results* on May 31, 2023, determining that Assan now has a *de minimis* margin in the LTFV investigation.
- Because Assan's revised margin will be *de minimis*, Assan should be excluded from the *Order* and this ongoing first administrative review should be terminated.

*Petitioners' Rebuttal Brief for Assan:*[81]

- Assan has not identified any prior instances of Commerce taking such action in advance of the CIT issuing a final and conclusive decision.
- The petitioners intend to continue challenging Commerce's final determination that Assan is eligible for a duty drawback adjustment, as well as the duty drawback methodology employed by Commerce in the remand redetermination.

**Commerce's Position:**  As the petitioners note, a final and conclusive decision regarding the remand redetermination has not been issued and the matter is still subject to litigation.[82]  Should the CIT sustain the remand redetermination, Commerce intends to publish a notice of court decision not in harmony with the results of the investigation final determination and notice of amended final determination and order.

## Comment 13:     Inclusion of Certain Expenses in the Indirect Selling Expense Ratio

*Teknik's Case Brief:*[83]

- Commerce preliminarily determined to include certain expenses in U.S. indirect selling expenses, after concluding the expenses were not "extraordinary."
- The expenses at issue are in fact extraordinary and must be excluded to ensure a fair and accurate AD calculation.
- The expenses do not relate to the day-to-day operations of the company and arise from circumstances occurring well before the POR.  Moreover, the expenses bear no relationship to the merchandise under consideration.

---

[80] *See* Assan's Case Brief at 8-9.
[81] *See* Petitioners' Rebuttal Brief for Assan at 2-3.
[82] *See* Final Remand Redetermination.
[83] *See* Teknik's Case Brief at 2-3.

Barcode:4457999-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

*Petitioners' Rebuttal Brief for Teknik:*[84]

- Commerce's standard practice is to treat all expenses incurred by an affiliated U.S. importer as selling expenses.
- The expenses at issue are not extraordinary.
- The expenses at issue were incurred during the POR.

**Commerce's Position:**  The specific facts of this issue constitute business proprietary information.  In the preliminary analysis memorandum for Teknik,[85] Commerce concluded the expenses at issue are not "extraordinary" consistent with Commerce precedent regarding indirect selling expenses.  Commerce continues to conclude, for these final results, that the expenses are not extraordinary and thus should be included in the calculation of indirect selling expenses.  Our precedent refers to "unusual," "infrequent," "not expected to recur in the near future," and "unrelated or incidentally related to the ordinary and typical activities of the company."  Our precedent also indicates that even if an expense is not "typical," it may nevertheless be unextraordinary if it is "neither unusual nor infrequent in today's business world."[86]  We determine for these final results that the expense at issue is certainly not unusual or infrequent in "today's business world" and thus is not extraordinary despite not being a routine or typical expense for Teknik.  Moreover, we agree with the petitioners that it is irrelevant that the expense arose from circumstances that occurred before the POR.  What matters is that the expense itself was incurred during the POR.  Thus, we continue to include the expense in the calculation of indirect selling expenses for these final results.

**Comment 14:      Freight Revenue**

*Teknik's Case Brief:*[87]

- Commerce should not cap the freight revenue reported by AA with freight expenses.
- To calculate a net freight expense, "Commerce offsets {a} respondent{'s} freight expenses with related freight revenues, capping those revenues at the level of the associated expenses."
- Based on the administrative record, capping is not appropriate.  Reporting of the freight amount on the invoice by AA is additional information provided to the customer and does not reflect the recovery of freight as a separate line item.
- Should Commerce continue to cap freight revenue, Commerce should not limit the cap to only certain freight expenses as it did in the *Preliminary Results*.

---

[84] *See* Petitioners' Rebuttal Brief for Teknik at 5-12.
[85] *See* Memorandum, "Teknik Preliminary Analysis Memorandum," dated April 28, 2023, at 3.
[86] *See Notice of Final Results of Antidumping Duty Administrative Review and Final Partial Rescission: Certain Cut-to-Length Carbon Steel Plate from Romania*, 72 FR 6522 (February 12, 2007), and accompany IDM at 14-15.
[87] *See* Teknik's Case Brief at 3-5.

Filed By: Mark Hoadley, Filed Date: 11/6/23 12:16 PM, Submission Status: Approved

*Petitioners' Rebuttal Brief for Teknik:*[88]

- Commerce should continue to cap Teknik's reported freight revenue.
- The statute allows U.S. price to be increased only by (A) the cost of all containers and coverings to pack the subject merchandise, (B) duty drawback, and (C) the export subsidy component of the amount of any CVD imposed on the subject merchandise.
- To prevent U.S. price from being overstated by any upward adjustments other than the three instances above, Commerce's practice is to cap service-related revenue by the corresponding expense when making adjustments to U.S. price.
- Commerce should limit the cap to the amount of U.S. inland freight from the warehouse to the customer.

**Commerce's Position:**  Commerce continues to cap freight revenue by freight expense for these final results.  Teknik clearly reported a field for "freight revenue" in its U.S. sales database and its reported "gross" prices exclude this amount.[89]  Moreover, the invoices do not indicate the amount for freight is an estimate and it is hard to understand why the amount would be indicated on a separate line item of the invoice if it is not considered independently of the price paid for the merchandise by the U.S. customer.[90]  Therefore, we continue to cap freight revenue in order not to increase U.S. price inconsistently with the limitations indicated in section 772 of the Act.

Regarding the amount of the cap, we continue to limit the cap to U.S. inland freight from the warehouse to the customer.  Freight revenue is a line item on the invoice from Teknik's U.S. sales affiliate, AA, and Teknik describes the revenue as recovering "truck" freight.  Truck freight obviously does not include ocean freight and it would be uncommon for a U.S. customer to be charged explicitly for transportation between a foreign producer and the warehouse of the foreign producer's U.S. supplier.  Thus, we are relying solely on U.S. inland freight expenses from the warehouse to the customer as the cap for freight revenue.

**Comment 15:    Differential Pricing Methodology**

*Teknik's Case Brief:*[91]

- Commerce's preliminary decision to apply an alternative comparison methodology is inconsistent with the administrative record in this proceeding.
- In the *Preliminary Results*, Commerce applied an alternative methodology that was inconsistent with its own findings regarding differential pricing.
- Based upon its own analysis, Commerce should have applied the average-to-average (A-to-A) methodology.

---

[88] *See* Petitioners' Rebuttal Brief for Teknik at 14-19.
[89] *See* Teknik's Letter, "XXX," dated October 24, 2022, at C-27 ("Field Number 18.2:  Freight Recovered in Invoice.").
[90] *Id.* at Exhibit C-7.b (example of invoice showing freight recovery line item).
[91] *See* Teknik's Case Brief at 5-7.

Barcode:4457999-02 A-489-839 REV - Admin Review 10/15/20 - 3/31/22

*Petitioners' Rebuttal Brief to Teknik:*[92]

- Commerce should base its comparison methodology on the results of its differential pricing analysis in the final results.

**Commerce's Position:**  Commerce inadvertently misapplied its differential pricing methodology in the *Preliminary Results*.  While Commerce preliminarily determined that 62.10 percent of Teknik's U.S. sales passed the Cohen's *d* test, there was not a 25 percent relative change between the A-to-A method and the appropriate alternative method (which in this case was the average-to-transaction method for U.S. sales which passed the Cohen's *d* test).  The difference was in fact only slightly more than 20 percent.  Commerce has now applied the correct methodology for these final results consistent with its differential pricing methodology – the A-to-A method.

## VI.      RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting all of the above positions.  If this recommendation is accepted, we will publish these final results in the *Federal Register*.

☒                                    ☐
_____          _____
Agree                               Disagree


X  *Elouaradia*
_____

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

---

[92] *See* Petitioners' Rebuttal Brief for Teknik at 20-21.

21