Slip. Op. No. 24-56

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

ASSAN ALUMINYUM SANAYI VE TICARET A.S.,

    *Plaintiff*,

v.

UNITED STATES,

    *Defendant*,

*and*

ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, *et al.*,

    *Defendant-Intervenors/Consolidated Plaintiffs*.

</td><td>

Before: Stephen Alexander Vaden, Judge

Consol. Court No. 1:21-cv-00616 (SAV)

</td></tr>
</table>

## OPINION

[Granting Defendant's Motion for Voluntary Remand, Granting in Part and Denying in Part Plaintiff's Motion for Judgment on the Agency Record, and Granting Defendant Intervenors'/Consolidated Plaintiffs' Motion for Judgment on the Agency Record.]

Dated: May 8, 2024

*Leah N. Scarpelli* and *Matthew M. Nolan*, ArentFox Schiff LLP, Washington, DC, for Plaintiff Assan Aluminyum Sanayi ve Ticaret A.S. With them on the briefs were *Yun Gao* and *Jessica R. DiPietro*.

Case 1:21-cv-00616-SAV    Document 74    Filed 05/08/24    Page 2 of 39

Consol. Court No. 1:21-cv-00616                                    Page 2

*Emma E. Bond*, Trial Attorney, U.S. Department of Justice, Civil Division, Washington, DC, and *JonZachary Forbes*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, DC, for Defendant United States.  With them on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Reginald T. Blades, Jr.*, Assistant Director, and *Catharine M. Parnell*, Trial Attorney.

*John M. Herrmann II* and *Joshua R. Morey*, Kelly Drye & Warren LLP, Washington, DC, for Defendant-Intervenors/Consolidated Plaintiffs Aluminum Association Trade Enforcement Working Group and Its Individual Members.  With them on the briefs were *Paul C. Rosenthal* and *Julia A. Kuelzow*.

**Vaden, Judge:**  This case involves an assortment of challenges to the U.S. Department of Commerce's (Commerce) Final Determination in its investigation of aluminum foil from Turkey.  Plaintiff Assan Aluminyum Sanayi ve Ticaret A.S. (Assan) is a Turkish aluminum foil manufacturer.  Assan alleges that four deficiencies in Commerce's Final Determination resulted in its receiving an inflated dumping margin:  (1) the denominator used in the duty drawback calculation, (2) the treatment of late filing fees in the duty drawback calculation, (3) the treatment of certain management fees as indirect selling expenses, and (4) the averaging of raw material costs.  Conversely, the Aluminum Association Trade Enforcement Working Group, made up of individual members Gränges Americas Inc., JW Aluminum Company, and Novelis Corporation (collectively, the Aluminum Association), alleges Commerce's treatment of Assan's hedging revenues as part of Assan's cost of production resulted in Assan's receiving a deflated dumping margin.  Commerce also asks the Court for a voluntary remand to reconsider the denominator it used to calculate the duty drawback adjustment and urges the Court to sustain the remainder of its Final Determination.  For the reasons set forth

Case 1:21-cv-00616-SAV    Document 74    Filed 05/08/24    Page 3 of 39

Consol. Court No. 1:21-cv-00616                                                    Page 3

below, the Court **GRANTS** Commerce's request for a voluntary remand on the duty drawback denominator issue, **REMANDS** the case to Commerce for further proceedings consistent with this opinion regarding Commerce's averaging of Assan's raw material costs and treatment of Assan's hedging revenues, and **SUSTAINS** the remainder of Commerce's Final Determination.

**BACKGROUND**

**I.    Procedural Background**

In October 2020, Commerce published a notice of its initiation of a less-than-fair-value investigation. *See Certain Aluminum Foil from the Republic of Armenia, Brazil, the Sultanate of Oman, the Russian Federation, and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 67,711 (Dep't of Com. Oct. 26, 2020). The period of investigation ran from July 1, 2019, through June 30, 2020. *Certain Aluminum Foil from the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52,880 (Dep't of Com. Sept. 23, 2021) (Final Determination). Assan was a mandatory respondent in the investigation. Pl.'s Mem. of Law in Supp. of Mot. for J. on the Agency R. at 5, ECF No. 29 (Pl.'s Br.); Def.'s Consol. Resp. to Pl.'s and Consol. Pls.' Mot. for J. on the Agency R. at 3, ECF No. 39 (Def.'s Resp.). Commerce published a preliminary negative determination on May 4, 2021, assigning Assan a zero percent dumping margin. *Certain Aluminum Foil from the Republic of Turkey: Preliminary Negative Determination of Sales at Less Than Fair Value, Postponement of Final Determination*, 86 Fed. Reg. 23,686, 23,687 (Dep't of Com. May 4, 2021). It

published the Final Determination on September 23, 2021, assigning Assan a 2.28 percent dumping margin.  Final Determination, 86 Fed. Reg. at 52,881.

Assan filed suit challenging Commerce's Final Determination.  Summons, ECF No. 1.  The Aluminum Association filed its own challenge the next day. Summons, *Aluminum Ass'n Trade Enf't Working Grp. and Its Individual Members v. United States*, No. 21-618 (CIT Dec. 10, 2021), ECF No. 1.  The Aluminum Association intervened as Defendant-Intervenor in Assan's challenge, and Assan did the same in the Aluminum Association's challenge.  Order Granting Aluminum Ass'n's Mot. to Intervene, ECF No. 18; Order Granting Assan's Mot. to Intervene, *Aluminum Ass'n Trade Enf't Working Grp. and Its Individual Members v. United States*, No. 21-618 (CIT Feb. 7, 2022), ECF No. 22.  The Court later consolidated the two cases under this court number.  *See* Def.'s Mot. to Consolidate, ECF No. 20; Consolidation Order Granting Def.'s Mot. to Consolidate, ECF No. 21.  Assan and the Aluminum Association each moved for judgment on the agency record.  Pl.'s Br., ECF No. 29; Def.-Ints.'/Consol. Pls.' Mem. of Law in Supp. of Mot. for J. on the Agency R., ECF No. 31 (Def.-Ints.'/Consol. Pls.' Br.).  The Court heard oral argument on the Motions.  ECF No. 60.  Following Oral Argument, the Court ordered supplemental briefing.  Minute Order, ECF No. 59.

## II.    The Present Dispute

This case involves antidumping duties.  Antidumping duties are imposed on merchandise that is "sold in the United States at less than its fair value."  19 U.S.C. § 1673.  They are "equal to the amount by which the normal value exceeds the …

constructed export price … for the merchandise." *Id.* That amount is called the dumping margin. 19 U.S.C. § 1677(35)(A). Normal value is the price in the home market — in this case Turkey — and constructed export price is the price in the United States. *See Nagase & Co. v. United States*, 47 CIT __, 628 F. Supp. 3d 1326, 1331 (2023) (citing *Koyo Seiko Co. v. United States*, 258 F.3d 1340, 1342 (Fed. Cir. 2001)). Here, a lower normal value and higher constructed export price result in lower duties for Assan.

To fairly compare the normal value and the constructed export price, Commerce must compare apples to apples. *Shanghai Tainai Bearing Co. v. United States*, 47 CIT __, 658 F. Supp. 3d 1269, 1291 (2023) (quoting *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1578 (Fed. Cir. 1983)). That is, Commerce must factor in the inherent cost differences between selling in the home market and selling in the United States. To achieve an apples-to-apples comparison, Commerce uses a series of calculations and adjustments to account for factors such as unequal transportation costs, rebated duties, and other differences between the home market and the U.S. market. *See generally* 19 U.S.C. §§ 1677a, 1677b; 19 C.F.R. § 351.402(a) ("[T]o establish export price, constructed export price, and normal value, the Secretary must make certain adjustments to the price … in both the United States and foreign markets."). Assan and the Aluminum Association each challenge portions of these calculations.

### A.    Duty Drawback Adjustment

Assan's first two challenges involve the duty drawback adjustment.  When a producer normally pays import duties on a manufacturing input but receives some type of duty rebate or exemption for exporting goods containing that input to the United States, Commerce must adjust the constructed export price to factor in the forgiven duties.  19 U.S.C. § 1677a(c)(1)(B); *Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1338 (Fed. Cir. 2011).  The duty drawback adjustment thus accounts for the fact that producers pay duties on subject merchandise sold domestically but not on subject merchandise sold in the United States.  *Saha Thai*, 635 F.3d at 1338.

Turkey's duty drawback program, the Inward Processing Regime, provides duty exemptions.  *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 47 CIT __, 654 F. Supp. 3d 1311, 1318 (2023).  A company imports raw materials without paying duties and receives an inward processing certificate.  *Id.*  The company must then export a set quantity of goods within a given time to "close" the certificate and be officially released from duty liability by the Turkish government.  *Id.*  If the company does not export enough goods within the given time, it can still receive a drawback under certain circumstances if it later exports sufficient goods and pays a late fee.  Pl.'s Br. at 31, ECF No. 29; *see also* Issues and Decisions Mem. at 29, J.A. at 7,645, ECF No. 53 (IDM).  Commerce's practice here, which no party expressly challenges, is to only award a drawback adjustment for closed certificates.  IDM at 29, J.A. at 7,645, ECF No. 53; *see also Icdas Celik*, 47

Case 1:21-cv-00616-SAV    Document 74    Filed 05/08/24    Page 7 of 39

Consol. Court No. 1:21-cv-00616                                    Page 7

CIT __, 654 F. Supp. 3d at 1319 (explaining Commerce's practice). Commerce previously allowed drawback adjustments even for open certificates but in recent years has imposed stricter requirements on respondents to prove certificate closure. *See Icdas Celik*, 47 CIT __, 654 F. Supp. 3d at 1320–21 (explaining Commerce's evolving practices on closure requirements); *Tosçelik Profil ve Sac Endüstrisi A.S. v. United States*, 42 CIT __, 348 F. Supp. 3d 1321, 1324–25 (2018) (explaining Commerce's new policy of requiring certificate closure to grant a duty drawback adjustment).

### i.    Methodology

Commerce applies the duty drawback adjustment by calculating a per-unit adjustment that Commerce then applies to all U.S. sales. IDM at 28, J.A. at 7,644, ECF No. 53. To calculate a per-unit adjustment, Commerce selects a numerator — an amount of exempted or rebated duties — and a denominator — a quantity of sales. *See id.*; *see also Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 44 CIT __, 429 F. Supp. 3d 1353, 1362–65 (2020) (analyzing the lawfulness of a previous duty drawback methodology). Commerce then divides the numerator by the denominator to get a per-unit adjustment, which it applies to every U.S. sale. *See* IDM at 28, J.A. at 7,644, ECF No. 53; *Icdas Celik*, 44 CIT __, 429 F. Supp. 3d at 1362–65.

Assan's first challenge is to the denominator Commerce used. Pl.'s Br. at 26, ECF No. 29. To calculate the per-unit adjustment, Commerce divided the duties forgiven under closed inward processing certificates by total U.S. sales of subject

Case 1:21-cv-00616-SAV    Document 74    Filed 05/08/24    Page 8 of 39

Consol. Court No. 1:21-cv-00616                                        Page 8

merchandise. IDM at 28, J.A. at 7,644, ECF No. 53. Assan argues that Commerce should instead have divided the duties forgiven under closed inward processing certificates only by the sales of goods exported under those closed certificates, a smaller denominator. *Id.* at 26–27, J.A. at 7,642–43 (summarizing Assan's arguments to Commerce). Commerce rejected this approach and said it would, in effect, give Assan credit for drawbacks it did not receive. *Id.* at 27–28, J.A. at 7,643–44 (summarizing the Aluminum Association's arguments and then rejecting Assan's proposed methodology). By dividing the drawbacks received under closed certificates only by sales of goods exported under those closed certificates, but then multiplying that per-unit adjustment across all U.S. sales, the Aluminum Association says Commerce would essentially credit Assan as though all U.S. sales were made under closed certificates even though that is not the case. Def.-Ints.'/Consol. Pls.' Resp. at 17, ECF No. 40. Commerce similarly claimed at oral argument that Assan's challenge to the denominator is really a challenge to the numerator — a challenge to Commerce's practice of only awarding a drawback for closed certificates. Oral Arg. Tr. at 59:22–24, ECF No. 66 ("Assan, in a way … actually challenged the numerator under the guise of challenging the denominator."). *See generally Icdas Celik*, 47 CIT __, 654 F. Supp. 3d at 1320–21 (explaining Commerce's evolving practices on closure requirements).

    At oral argument, the parties disagreed over Commerce's evolving duty-drawback practices. Assan informed the Court that Commerce, in the time since issuing its Final Determination, used Assan's preferred denominator in other

Case 1:21-cv-00616-SAV   Document 74   Filed 05/08/24   Page 9 of 39

Consol. Court No. 1:21-cv-00616                                              Page 9

investigations. Oral Arg. Tr. at 24:11–25:9, ECF No. 66. Counsel for the Aluminum Association acknowledged that Commerce adopted Assan's preferred denominator in its investigation of common alloy aluminum sheet from Turkey, which the Aluminum Association is currently challenging in litigation before this Court. *Id.* at 67:12–68:18. Commerce's counsel claimed that she did not know of any investigation where Commerce used Assan's preferred denominator. *Id.* at 33:17–23. Following oral argument, the Court requested supplemental briefing to clarify this uncertainty. Minute Order, ECF No. 59.

In response to the Court's order, Assan filed two notices of supplemental authority and a supplemental brief arguing Commerce's approach in this case differs from Commerce's practice in other cases involving the Turkish Inward Processing Regime. *See* Pl.'s First Notice of Supp. Authority, ECF No. 61; Pl.'s Second Notice of Supp. Authority, ECF No. 63; Pl.'s Supp. Br., ECF No. 64. Assan's filings cited multiple instances after the Final Determination where Commerce used Assan's preferred methodology and rejected suggestions that it employ the methodology used here. In a pending case — involving the same parties as this case — challenging Commerce's final determination in its investigation of common alloy aluminum sheet from Turkey, Commerce rejected the drawback methodology it used here. Remand Determination at 13, *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, No. 21-246 (CIT May 31, 2023), ECF No. 94. In its Remand Determination in that case, Commerce used Assan's proposed methodology, which it described as "the most appropriate methodology." *Id.* It further stated that "any

Case 1:21-cv-00616-SAV    Document 74    Filed 05/08/24    Page 10 of 39

Consol. Court No. 1:21-cv-00616                                    Page 10

other method … would likely introduce inaccuracies ….” *Id.*  Commerce similarly applied Assan's preferred methodology in its first administrative review of the antidumping order on common alloy aluminum sheet from Turkey.  Pl.'s Supp. Br. at 12–13, ECF No. 64; Def.'s Mot. for Voluntary Remand at 5, ECF No. 67 (Remand Mot.).

In the wake of Assan's filings, Commerce filed a Motion for Voluntary Remand.  Remand Mot., ECF No. 67.  Commerce acknowledged that, on multiple occasions after the Final Determination, it rejected the methodology it used here and instead used Assan's preferred methodology.  *Id.* at 3–4.  Because of the conflict between its Final Determination and later agency actions, Commerce requests "that the case be remanded for Commerce to reconsider its previous position regarding the applied ratio in its duty drawback adjustment, without confessing error." *Id.* at 5.  Assan supports the voluntary remand request.  *Id.* at 2.  The Aluminum Association argues a remand is unnecessary and asks the Court to sustain Commerce's methodology and deny the remand request.  Def.-Ints.'/Consol. Pls.' Supp. Br. at 9–10, ECF No. 71.

### ii.  Late Fees

Assan also challenges Commerce's treatment of late fees in its duty drawback adjustment.  Pl.'s Br. at 31, ECF No. 29.  Turkey's duty drawback regime allows a company to receive drawbacks for untimely exports if the company pays a late fee. *Id.*; *see also* IDM at 29, J.A. at 7,645, ECF No. 53.  Assan did this during the period of investigation, and Commerce offset the duty drawback adjustment by the amount

Case 1:21-cv-00616-SAV   Document 74   Filed 05/08/24   Page 11 of 39

Consol. Court No. 1:21-cv-00616                                    Page 11

of the late fees.  IDM at 29, J.A. at 7,645, ECF No. 53.  The statute instructs
Commerce to increase the constructed export price by "the amount of any import
duties imposed by the country of exportation which have been rebated, or which
have not been collected, by reason of the exportation of the subject merchandise to
the United States."  19 U.S.C. § 1677a(c)(1)(B).  Assan contends that the statute
does not permit Commerce to offset the duty drawback adjustment by the amount of
the late fees.  However, Assan concedes that it only paid the fees because of its
participation in Turkey's drawback system.  Oral Arg. Tr. at 30:14–20, ECF No. 66.
Commerce found that it was appropriate to offset the duty drawback adjustment by
the late filing fees because Assan would not have received any drawback without
paying the late fees.  IDM at 29, J.A. at 7,645, ECF No. 53 (Assan "would have no
duty drawback benefit" without paying late filing fees.).  Accordingly, Commerce
says the late fees are equivalent to unforgiven duty liability.  *See* Def.'s Resp. at 27,
ECF No. 39.

## B.    Management Fees

Assan's third challenge is to Commerce's treatment of certain management
fees related to Assan's wholly-owned affiliate, Kibar Americas (Kibar).  *See* Pl.'s Br.
at 39, ECF No. 29; IDM at 3, J.A. at 7,619, ECF No. 53.  Commerce must deduct
from the constructed export price "expenses generally incurred by or for the account
of the producer or exporter, or the affiliated seller in the United States, in selling
the subject merchandise."  19 U.S.C. § 1677a(d)(1).  Commerce treated management

fees Kibar paid to Assan as selling expenses, which Assan contests.  IDM at 8–11, J.A. at 7,624–27, ECF No. 53; Pl.'s Br. at 39, ECF No. 29.

Kibar is Assan's U.S. reseller; it does no manufacturing.  Oral Arg. Tr. at 72:25–73:11, ECF No. 66.  Kibar paid management fees to Assan for "overall group support," which Assan describes as "head office administrative activities to manage group operations."  Pl.'s Br. at 39, ECF No. 29.  Commerce treated these fees as selling expenses, saying "[general and administrative] expenses of a company that is exclusively a reseller … should be treated as indirect selling expenses, because the expenses can only be in support of the company's sole function as a reseller."  IDM at 10, J.A. at 7,626, ECF No. 53.  Assan argues that the management fees are not properly treated as selling expenses because they were incurred in Turkey rather than the United States and because they "did not relate to sales or economic activities" in the United States.  Pl.'s Br. at 43, ECF No. 29.

### C.    Raw Material Costs

Assan's fourth and final challenge is to Commerce's raw material cost calculation, which is part of Commerce's cost of production calculation.  Pl.'s Br. at 32, ECF No. 29.[1]  Cost of production does not directly affect the dumping margin because it does not directly factor into the normal value or constructed export price.  However, cost of production can affect the dumping margin because, while calculating normal value, Commerce may disregard "sales made at less than the

---

[1] Assan initially raised a fifth argument regarding Section 232 tariffs.  Pl.'s Br. at 10, ECF No. 29.  It now concedes that this argument is foreclosed by *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023).  Oral Arg. Tr. at 5:18–6:1, ECF No. 66.

Case 1:21-cv-00616-SAV    Document 74    Filed 05/08/24    Page 13 of 39

Consol. Court No. 1:21-cv-00616                                                    Page 13

cost of production." 19 U.S.C. § 1677b(b)(1). A higher cost of production therefore allows Commerce to disregard low-priced sales in the home market. Disregarding low-priced sales raises the normal value, which increases the dumping margin.

Assan buys its raw material inputs in three different forms: scrap, sheet, and primary aluminum. *See* IDM at 34, J.A. at 7,650, ECF No. 53. The inputs vary in cost and, according to Assan, in the labor and other expenses it requires to convert them into aluminum foil. Oral Arg. Tr. at 42:24–43:14, ECF No. 66. Although Assan prefers to use certain inputs for certain products, it can generally use any of the three inputs in any of its products. IDM at 34, J.A. at 7,650, ECF No. 53; Oral Arg. Tr. at 43:19–44:3, ECF No. 66. *But see* Oral Arg. Tr. at 44:6–17 (counsel for Assan explaining that using scrap is impractical for a "small percentage" of Assan's products).

Assan's aluminum cost contains two elements, the market price for aluminum on the London Metal Exchange and the raw material premium. *See* IDM at 33–34, J.A. at 7,649–50, ECF No. 53. The raw material premium is an adjustment to the London Metal Exchange market price that reflects the "conversion cost plus profit of the raw material supplier." Assan Section D Second Suppl. Questionnaire Resp. at 5S-21, J.A. at 85,510, ECF No. 53. For both elements, Commerce used an average cost from across the period of investigation rather than the actual cost Assan reported for each product. IDM at 34–35, J.A. at 7,650–51, ECF No. 53.

Commerce used an average for the London Metal Exchange element to eliminate distortions caused by changing aluminum prices throughout the period of investigation. *Id.* at 34, J.A. at 7,650. Assan does not challenge that decision. Pl.'s Br. at 33, ECF No. 29 ("Assan agreed with Commerce's decision to average [the London Metal Exchange] costs …."). Commerce used an average for the raw material premium because it found the differences in premium costs across products were not attributable to physical differences in the products. IDM at 35, J.A. at 7,651, ECF No. 53. Assan challenges this decision because it claims its records are accurate and Commerce did not properly find that Assan's reported costs were distortive. Pl.'s Br. at 32, 37, ECF No. 29 (arguing "Commerce made no finding that Assan's reported costs either did not reasonably reflect costs or were distortive" and Assan's records are "more accurate" than using an average) (emphasis omitted); *see also* Oral Arg. Tr. at 48:4–17, ECF No. 66. Assan further argues that Commerce should have examined any cost of manufacturing differences by comparing total cost of manufacturing rather than focusing on raw material costs. Pl.'s Br. at 34–35, ECF No. 29.

Commerce must rely on Assan's records if the records (1) "are kept in accordance with the generally accepted accounting principles" in Turkey and (2) "reasonably reflect" the cost of production. 19 U.S.C. § 1677b(f)(1)(A); IDM at 33, J.A. at 7,649, ECF No. 53. Commerce claims it can depart from Assan's records because they contain "significant cost differences" between products that are

unrelated to the physical characteristics of those products.[2]  IDM at 35, J.A. at
7,651, ECF No. 53; Def.'s Resp. at 30, ECF No. 39.  Commerce found that the cost
differences from using different raw material inputs were not related to the physical
characteristics of the products in large part because Assan acknowledged that it can
use any of the three inputs for any of its products.  IDM at 35, J.A. at 7,651, ECF
No. 53.  It thus departed from Assan's records and used an average.  *Id.*

Assan makes several arguments for why Commerce erred by averaging the
raw material premium costs.  It argues that Commerce did not appropriately find
Assan's reported costs were distortive.  Pl.'s Br. at 37, ECF No. 29 ("Commerce
made no finding that Assan's reported costs either did not reasonably reflect costs
or were distortive.").  Assan claims this is a prerequisite for Commerce to depart
from Assan's reported costs.  *Id.* at 36 (Commerce must rely "on the actual books
and records used by a respondent to report costs unless the cost allocation is
distortive.").  Assan also says its reported costs are more accurate than Commerce's
averaging method and that averaging results in distortions.  *Id.* at 37.

Assan makes one other argument:  that Commerce should have examined
cost differences using the total cost of manufacturing rather than focusing on raw
material costs.  *Id.* at 35.  This is because differences in labor and other costs offset
differences in raw material costs.  *Id.*  Considering either in isolation might give the
mistaken impression of cost differences where none exist.  *Id.*  Assan asserts that
any analysis of price differences must consider the total cost of manufacturing.  *Id.*

---

[2] Commerce identified "gauge, coating, width, casting method, alloy, temper, and surface
finish" as the relevant physical characteristics.  IDM at 33, J.A. at 7,649, ECF No. 53.

It further argues that, if Commerce does any averaging, Commerce should average the total cost of manufacturing rather than just the raw material costs. *Id.*; Pl.'s Reply at 19–20, ECF No. 45.

Assan made this same argument during the administrative proceedings before Commerce. *See* Assan's Case Br. at 5, J.A. at 91,263, ECF No. 53. Commerce noted Assan's argument in its Issues and Decisions Memorandum but otherwise failed to engage with it. *See* IDM at 31, J.A. at 7,647, ECF No. 53. In fact, the memo only mentions total cost of manufacturing when summarizing Assan's argument; it does not mention total cost of manufacturing in its discussion of Commerce's position or explain why Commerce elected not to use the total cost of manufacturing. *See id.* at 29–35, J.A. at 7,645–51. Only the Aluminum Association addresses this argument in its briefing. *See* Def.-Ints.'/Consol. Pls.' Resp. at 33, ECF No. 40 ("Commerce reasonably analyzed cost differences based on material costs and not the total cost of manufacture[.]"). The Aluminum Association argues other portions of the total cost of manufacture — such as labor costs and overhead costs — did not contain differences unrelated to products' physical characteristics, making it unnecessary to average them. *Id.* It further argues that the record does not support Assan's claim that metal premium costs are inversely related to conversion costs. *Id.* at 33–34.

### D.    Hedging

The Aluminum Association challenges Commerce's decision to include Assan's hedging revenues as part of its cost of production. *See* Def.-Ints.'/Consol.

Pls.' Br. at 8–9, ECF No. 31; IDM at 36–43, J.A. at 7,652–59, ECF No. 53. As described above, Commerce uses Assan's records to calculate cost of production if the records (1) "are kept in accordance with the generally accepted accounting principles" in Turkey and (2) "reasonably reflect" the cost of production. 19 U.S.C. § 1677b(f)(1)(A). The Aluminum Association claims hedging revenues are unrelated to production and thus do not reasonably reflect the cost of production. Def.-Ints.'/Consol. Pls.' Br. at 2–3, ECF No. 31.

Assan's business model subjects it to risk from changing aluminum prices. Assan purchases raw aluminum from suppliers, converts it into aluminum foil, and then sells it. When Assan sells aluminum foil, it passes on the cost of aluminum to its customers. Pl.'s Resp. at 4–5, ECF No. 36. However, the price customers pay for aluminum is based on the value of raw aluminum at the time of sale, not at the time Assan purchased the raw aluminum.[3] Pl.'s Resp. at 9; ECF No. 36. Assan also uses mark-to-market accounting. IDM at 42, J.A. at 7,658, ECF No. 53. Mark-to-market accounting means that the value of Assan's inventory is periodically adjusted in Assan's books to match the inventory's current market value. Pl.'s Resp. at 10 n.2, ECF No. 36. If aluminum prices rise or fall, Assan records an accounting gain or loss on aluminum held in its inventory. *Id.* at 9–10.

---

[3] Depending on Assan's contractual agreement with its customer, the sales price may use the current (or "spot") London Metal Exchange price or an average London Metal Exchange price from a given time period (*e.g.*, the monthly average or three-month average). Pl.'s Resp. at 9; ECF No. 36. Regardless, the price at the time of sale differs from Assan's purchase price. *Id.*

Assan hedges with aluminum futures contracts to combat the risk of changing aluminum prices. *Id.* at 5 ("Assan engages in raw material hedging … in the normal course of business."); IDM at 41–42, J.A. at 7,657–58, ECF No. 53. These contracts obligate Assan to either purchase or sell aluminum at a fixed price at a given point in the future when the contract matures. *Id.* at 41–42, J.A. at 7,657–58. Assan's futures contracts play out without Assan's physically taking possession of any of the aluminum involved. *Id.* at 42, J.A. at 7,658 ("Assan closes the hedging contracts by reversing its position in the commodities market."). It primarily engages in "short hedging," meaning Assan agrees to sell aluminum at a fixed price when the contract matures. Pl.'s Resp. at 5, ECF No. 36; Def.-Ints.'/Consol. Pls.' Br. at 11, ECF No. 31. To fulfill this obligation, Assan buys aluminum on the London Metal Exchange at the current market price at the time the contract matures. IDM at 42, J.A. at 7,658, ECF No. 53. This means Assan profits on its hedging if the price of aluminum declines between the contract's start and its maturation. In this way, Assan reduces the risk it faces in its purchase of raw aluminum for conversion into aluminum foil. If the price of raw aluminum declines over a given time, Assan loses money on the raw aluminum it took physical possession of to make aluminum foil but gains money on its aluminum hedging.

Assan records its hedging gains and losses as part of its cost of production. *Id.* at 41, J.A. at 7,657 (Hedging revenues "were recorded as a part of cost of goods sold in the audited financial statements."). Assan profited on its hedging contracts during the period of investigation. *Id.* Commerce treated Assan's hedging revenues

as part of its cost of production, which resulted in a lower cost of production. *Id.*
The Aluminum Association challenges this decision and argues recording hedging
revenues as part of the cost of production does not reasonably reflect the cost of
production. Def.-Ints.'/Consol. Pls.' Br. at 8, ECF No. 31.

The Aluminum Association claims Assan's hedging revenues are unrelated to
its cost of production and are instead related to the sales price of Assan's finished
goods. *Id.* at 2. According to the Aluminum Association, hedging protects against a
future risk. *Id.* at 17 ("The purpose of hedging … is to manage the risk associated
with an expected future transaction.") (emphasis omitted). It notes that Assan
opens hedging contracts only after purchasing raw materials. *Id.* at 18–19. By that
time, Assan's raw material cost is set. *Id.* The only risk comes from a later event.
*Id.* The Aluminum Association points to the sale price as the risk source. *Id.* at 22
("Assan's hedges pertain to its sales …."). During the administrative proceeding,
the Aluminum Association also pointed to mark-to-market accounting losses as a
potential risk source. IDM at 36–37, J.A. at 7,652–53, ECF No. 53.

Commerce rejected the Aluminum Association's arguments. *Id.* at 42–43,
J.A. at 7,658–59. It stated: "We disagree with [the Aluminum Association] that
Assan's hedging transactions are related to Assan's sales of finished goods, and thus
the hedging gains are unrelated to Assan's cost of production." *Id.* at 42, J.A. at
7,658. Commerce further stated that the Aluminum Association's "argument with
regard to marking to market is misplaced," rejecting the argument that Assan's

hedges were intended to mitigate potential losses from mark-to-market accounting. *Id.* at 42–43, J.A. at 7,658–59.

Assan and Commerce now make a different claim — that the Aluminum Association's arguments have some merit but that Commerce's Final Determination is nonetheless supported by substantial evidence. Assan concedes two key points. First, it concedes that its hedging is in some way related to the sales price of its finished goods. Oral Arg. Tr. at 89:11–12, ECF No. 66 ("Everything at some level is related to the final transaction by necessity."). Second, it concedes that it does hedge — at least in part — against the risk imposed by mark-to-market accounting of its raw material inventory. Pl.'s Resp. at 12–13, ECF No. 36. Commerce, for its part, acknowledges that the record may support the Aluminum Association's view but argues that the record also supports Commerce's view. Oral Arg. Tr. at 100:17–25, ECF No. 66.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over these challenges to Commerce's Final Determination under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting final determinations in antidumping investigations. The Court must sustain Commerce's "determination[s], finding[s], or conclusion[s]" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). If they are unsupported by substantial evidence or not in accordance with the law, the Court must "hold unlawful any determination, finding,

or conclusion found." *Id.* "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *See New Am. Keg v. United States*, 45 CIT __, 2021 Ct. Intl. Trade LEXIS 34, at *15. Furthermore, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).

Reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit describes "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## DISCUSSION

The parties raise a variety of challenges to Commerce's Final Determination. The Court first grants Commerce's voluntary remand request. It then examines the

four remaining challenges to the Final Determination. Assan's challenges to Commerce's treatment of its late fees and management fees fail because Commerce's decision was supported by substantial evidence and in accordance with the law. Assan's raw materials premium challenge and the Aluminum Association's hedging challenge succeed because Commerce's contemporaneous explanations are unsupported by substantial evidence.

## I.    Duty Drawback

### A.    The Voluntary Remand Request

Commerce seeks a voluntary remand "to further explain or to reconsider its duty drawback adjustment." Remand Mot. at 6, ECF No. 67. Commerce does not confess any error but wishes to reconsider its duty drawback methodology "in light of developments in practice." *Id.* Assan supports Commerce's request, but the Aluminum Association does not. *Id.* at 2; Def.-Ints.'/Consol. Pls.' Supp. Br. at 9, ECF No. 71. The Court grants Commerce's request because Commerce's concern is substantial and legitimate. *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001).

Commerce may, without confessing error, ask for a voluntary remand to reconsider its decision. *Id.* at 1028. "[T]he reviewing court has discretion over whether to remand" and may refuse a request that is "frivolous or in bad faith." *Id.* at 1029. A remand is appropriate "if the agency's concern is substantial and legitimate." *Id.* An agency's concern is substantial and legitimate if "(1) [the agency] supports its request with a compelling justification, (2) the need for finality

Case 1:21-cv-00616-SAV    Document 74    Filed 05/08/24    Page 23 of 39

Consol. Court No. 1:21-cv-00616                                    Page 23

does not outweigh the justification, and (3) the scope of the request is appropriate." *Baroque Timber Indus. (Zhongshan) Co., Ltd. v. United States*, 37 CIT 1123, 1127 (2013) (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 37 CIT 67, 71 (2013)). Allowing agencies to address issues first promotes accuracy and judicial economy. *Cf. Ellwood City Forge Co. v. United States*, 46 CIT __, 582 F. Supp. 3d 1259, 1272 (2022) ("Exhaustion … promotes judicial efficiency …."). Even if the Court ultimately must decide the issue, allowing the parties to develop a record before Commerce will still create "'a useful record for subsequent judicial consideration.'" *Id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).

Commerce's request for a voluntary remand satisfies the requisite factors. *See Baroque Timber*, 37 CIT at 1127. First, Commerce provides an appropriate justification for remand by invoking its evolving agency practices on duty drawback. *See* Remand Mot. at 6, ECF No. 67. Commerce rejected Assan's proposed methodology as "not consistent with [Commerce's] practice." IDM at 28, J.A. at 7,644, ECF No. 53. Since its Final Determination, Commerce has done an about-face and stated that any methodology other than Assan's proposed methodology "would likely introduce inaccuracies." Remand Determination at 13, *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, No. 21-246 (CIT May 31, 2023), ECF No. 94. It may need to consider the issue further. *Cf. Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 48 CIT __, 2024 Ct. Intl. Trade LEXIS 42, at *14–25 (Apr. 11, 2024) (holding that Assan's suggested methodology may not comply with the statute). The need to reexamine a decision in light of changing

agency practice is a compelling justification. *Cf. SKF*, 254 F.3d at 1029 ("[E]ven if there are no intervening events, the agency may request a remand … to reconsider its previous position.").

Second, the need for finality does not outweigh Commerce's justification. Allowing Commerce to reconsider its decision will provide a more complete record if the Court eventually needs to decide this issue. *See Ellwood City*, 46 CIT __, 582 F. Supp. 3d at 1272. Both Plaintiff and Defendant-Intervenor can argue their positions before Commerce, and they may argue those positions again before the Court if necessary. *Cf. Baroque Timber*, 37 CIT at 1133 ("[T]he possibility that any decision this court would make on the merits regarding the targeted dumping challenges will become moot diminishes concerns of finality.") (citing *Ad Hoc Shrimp*, 37 CIT at 71). Third, the scope of Commerce's remand request, which is limited to one issue in this case where Commerce's practice has changed since issuing its Final Determination, is appropriate. The Court therefore **GRANTS** Commerce's Motion for Voluntary Remand and **REMANDS** the case to Commerce to reconsider or further explain its duty drawback methodology.

## B.   Late Fees

Separate from the methodology question discussed above, Assan also challenges Commerce's decision to offset the duty drawback adjustment by the amount of late filing fees Assan paid. Pl.'s Br. at 31, ECF No. 29. The relevant statute directs Commerce to increase the export price of merchandise — and thus decrease the dumping margin — by the amount of certain "duties imposed by the

country of exportation" that have been rebated or not collected "by reason of the exportation of the subject merchandise to the United States."    19 U.S.C. § 1677a(c)(1)(B).    According to Assan, Commerce's decision was unlawful because "nothing in the statute … authorize[s] offsetting a drawback adjustment based on late penalties paid …."  Pl.'s Br. at 31, ECF No. 29.  Commerce, however, interprets the statute to allow an offset for late fees.  Def.'s Resp. at 27, ECF No. 39. Commerce's interpretation is both correct and common sense.

During the period of investigation, Assan received duty drawbacks through the Turkish Inward Processing Regime.  IDM at 26, J.A. at 7,642, ECF No. 53. However, Assan paid late fees to receive its drawback.  *Id.*; *see also* Pl.'s Br. at 31, ECF No. 29 (The Turkish Inward Processing Regime "authorizes companies to export goods under an [Inward Processing Certificate] within two months after the expiration date … by being subject to a fine.").    Those late fees are part of the Inward Processing Regime.  Assan acknowledged at oral argument that it only paid the late fees because of its participation in the Inward Processing Regime.  Oral Arg. Tr. at 30:14–20, ECF No. 66 (counsel for Assan responding "no" when asked if Assan would have been required to pay the late fees if it did not seek a drawback). Commerce adjusted Assan's duty drawback to account for the filing penalties, offsetting the drawback by the amount of the penalties.  IDM at 26, J.A. at 7,642, ECF No. 53.  Assan says the statute does not allow for this offset.  Pl.'s Br. at 31, ECF No. 29.

The statute instructs Commerce to increase the export price by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B). Assan's argument rests on a semantic distinction. Because the filing penalty is stylized as a separate ledger item rather than as a reduction of the drawback granted by the Turkish government, Assan claims it is not part of the "amount of any import duties … which have been rebated, or which have not been collected." *Id.*; *see also* Oral Arg. Tr. at 30:21–24, ECF No. 66 (Assan's counsel arguing the late fees are "a separate line item"). This does not comport with the statute.

The word "amount" means the "sum total of two or more sums or quantities," the "aggregate," or the "whole effect, substance, value, significance, or result." WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY 88 (1954); *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 61 (4th ed. 2000) (defining amount as "the aggregate" and the "full effect or meaning"). An amount is not a single number standing alone; it is an aggregate or a total. Assan would have the Court read "amount" to mean the single number that is labeled as a drawback, ignoring the related number labeled as a late fee. This would not fairly reflect the entirety of Assan's participation in Turkey's duty drawback system. Assan's reading of the statute is not the most natural reading; it distorts the text and ignores economic reality, leading to an unfair windfall for Assan. *Cf. Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 539 (Fed. Cir. 2019) ("accuracy

and fairness must be Commerce's primary objectives") (citing *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1354 (Fed. Cir. 2016)). The late fees are akin to duty not forgiven by the Turkish government because Assan needed to pay the fees to receive its drawback. *See* Oral Arg. Tr. at 30:14–20, ECF No. 66; *see also* IDM at 29, J.A. at 7,645, ECF No. 53 ("Assan would have no duty drawback benefit" without paying the late fees.). Under Assan's proposed interpretation, it would receive credit for the full duty drawback as though it never had to pay late fees to receive that drawback. Commerce's interpretation abides by the statute and gives Assan fair credit for the amount of the actual benefit it received. The Court **SUSTAINS** Commerce's decision to deduct the late fees from Assan's duty drawback adjustment.

## II.    Raw Material Costs

Assan's aluminum raw material costs contain two components: the London Metal Exchange price for aluminum and the raw material premium. *See* IDM at 34–35, J.A. at 7,650–51, ECF No. 53; Def.-Ints.'/Consol. Pls.' Resp. at 23–24, ECF No. 40. The raw material premium includes conversion cost and the profit of the raw material supplier. Assan Section D Second Suppl. Questionnaire Resp. at 5S-21, J.A. at 85,510, ECF No. 53. Commerce departed from Assan's reported costs for both portions of its raw material costs and instead used an average calculated across the period of investigation. IDM at 33–34, J.A. at 7,649–50, ECF No. 53. Assan agrees with Commerce's decision to average the London Metal Exchange price but challenges Commerce's decision to average the raw material premium.

Pl.'s Br. at 33–34, ECF No. 29.  The Court remands because Commerce failed to address one of Assan's arguments in its Final Determination.

Assan argues that Commerce improperly focused on differences in raw material premium costs while ignoring related differences in other production costs, such as labor.  *Id.* at 35.  It claims metal premiums vary between inputs because some are easier to convert to foil than others.  *Id.* at 34–35.  *But see* Def.-Ints.'/Consol. Pls.' Resp. at 33–34, ECF No. 40 ("Assan offers no record evidence for this supposed relationship.").  Cheaper inputs require more work to convert into foil and thus have higher labor and other costs.  Pl.'s Br. at 34–35, ECF No. 29.  Accordingly, "any analysis of cost differentials" should look at the total cost of manufacturing, not just the raw material costs.  *Id.* at 35.  Assan made this argument in the proceedings before Commerce, which Commerce acknowledged in its Issues and Decisions Memorandum.  *See* Assan's Case Br. at 5, J.A. at 91,263, ECF No. 53; IDM at 31, J.A. at 7,647, ECF No. 53.  However, Commerce did not address Assan's argument aside from acknowledging its existence.

Commerce must provide an explanation for its decisions.  The Court will uphold a less-than-perfect agency decision "if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  However, the Court can only sustain Commerce's decision on the grounds Commerce articulated at the time of its decision.  *Id.* at 285–86 ("[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given …").  And it is legal error for an agency to fail to consider an important aspect of

Case 1:21-cv-00616-SAV    Document 74    Filed 05/08/24    Page 29 of 39

Consol. Court No. 1:21-cv-00616                                    Page 29

the problem before it. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency … entirely failed to consider an important aspect of the problem …."); *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1356–57 (Fed. Cir. 2005) (holding that 19 U.S.C. § 1677f(i) codifies the *State Farm* standard's application to antidumping and countervailing duty final determinations). The Court cannot consider *post hoc* rationalizations to justify an agency's decision. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action[.]").

Assan argued to Commerce that it should analyze cost differences using the total cost of manufacturing rather than focusing on just the raw material costs. Assan's Case Br. at 5, J.A. at 91,263, ECF No. 53 ("[A]ny analysis of the cost differentials between [products] should be based on [total cost of manufacturing] rather than material costs."). Commerce failed to address Assan's argument. Assan now raises that same argument to the Court. *See* Pl.'s Br. at 35, ECF No. 29; Pl.'s Reply at 19–20, ECF No. 45. Commerce failed to provide any explanation for why it rejected Assan's argument. *See* IDM at 29–35, J.A. at 7,645–51, ECF No. 53. The Aluminum Association provided an argument in its briefing, but the Court cannot consider answers Commerce never gave. *See* Def.-Ints.'/Consol. Pls.' Resp. at 33–34, ECF No. 40; *Burlington Truck Lines*, 371 U.S. at 168; *Bonney Forge Corp. v. United States*, 46 CIT __, 560 F. Supp. 3d 1303, 1315 (2022) ("The Court cannot review an explanation not given."). Because the Court has no basis on which to

sustain Commerce's decision and Commerce failed to consider an important aspect of the problem, the Court **REMANDS** the issue to Commerce to reconsider or further explain its treatment of Assan's raw material premium costs. The Court declines to address the parties' other arguments at this time because Commerce's actions on remand may change the Court's analysis or moot the arguments.

### III.    Management Fees

In its Final Determination, Commerce included as indirect selling expenses certain management fees Kibar Americas — Assan's wholly-owned affiliate and U.S. reseller — incurred. IDM at 3, J.A. at 7,619, ECF No. 53. Assan challenges this decision and argues that the management fees were for services unrelated to U.S. sales and that the management fees were incurred in Turkey. Pl.'s Br. at 39–40, ECF No. 29. Because the management fees were related to U.S. sales and where they were incurred is irrelevant, the Court sustains Commerce's treatment of the management fees as indirect selling expenses.

The relevant statute instructs Commerce to deduct from the constructed export price "expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise." 19 U.S.C. § 1677a(d)(1). The corresponding regulation requires Commerce to deduct "expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid." 19 C.F.R. § 351.402(b). When applying the statute to a U.S. reseller, this Court previously upheld Commerce's decision to treat "intercompany transfers" for

services performed by the reseller's parent company as indirect selling expenses. *See Aramide Maatschappij V.o.F. v. United States*, 19 CIT 1094, 1101–02 (1995).[4] In *Aramide*, the Court sustained Commerce's decision to treat administrative charges, such as for legal and audit services, as indirect selling expenses. *Id.* This supports Commerce's position in its Final Determination that "[general and administrative] expenses of a company that is exclusively a reseller, with no manufacturing activities, should be treated as indirect selling expenses, because the expenses can only be in support of the company's sole function as a reseller." IDM at 10, J.A. at 7,626, ECF No. 53.

Commerce found Kibar Americas was Assan's U.S. reseller. *Id.* Assan admits Kibar is only a reseller, not a manufacturer. Oral Arg. Tr. at 72:25–73:11, ECF No. 66. The management fees here are exactly the type of administrative expenses *Aramide* found properly classifiable as indirect selling expenses. 19 CIT at 1101–02. Indeed, logic dictates that an affiliate's expenses are all selling expenses if the affiliate's only commercial activity is selling. Accordingly, Commerce may classify the intercompany transfers from Kibar to Assan as indirect selling expenses. *See id.*

Assan additionally argues Commerce's treatment of the management fees was also improper because the fees were incurred in Turkey, not the United States. *See* Pl.'s Br. at 44–45, ECF No. 29; Pl.'s Reply at 20–21, ECF No. 45. The Court

---

[4] The Court in *Aramide* analyzed an earlier version of § 1677a with slightly different language: "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." 19 CIT at 1101 (citing 19 U.S.C. § 1677a(e)(2) (1988)). The Court continues to find the case analysis persuasive.

begins with the text of the statute. *See Van Buren v. United States*, 593 U.S. 374, 381 (2021) ("[W]e start where we always do: with the text of the statute."). Even if the fees were incurred in Turkey and not the United States, the statutory language does not limit indirect selling expenses to those incurred in the United States. The statute instructs Commerce to deduct from the constructed export price "expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise." 19 U.S.C. § 1677a(d)(1).

Although the statute contains the phrase "in the United States," that phrase does not modify the word "expenses" or the word "incurred." Instead, applying the nearest-reasonable-referent canon, the phrase modifies the nearest reasonable referent "seller," not a more remote alternative like "expenses" or "incurred." *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 152–53 (2012) (describing the nearest-reasonable-referent canon); *Hall v. United States Dep't of Agric.*, 984 F.3d 825, 837–38 (9th Cir. 2020) (same); *Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of Internal Revenue Serv.*, 926 F.3d 819, 824–25 (D.C. Cir. 2019) (same); *see also Lockhart v. United States*, 577 U.S. 347, 352 (2016) (describing the related last-antecedent canon). That the phrase "or the affiliated seller in the United States" is offset by commas further supports reading "in the United States" as modifying only "affiliated seller" and not an earlier word or phrase before the offsetting comma. This interpretation makes

sense in context; it would be strange indeed if a company were rewarded with a lower duty rate for offshoring its American operations.

A plain reading of the statute confirms the cannon's construction. The statute references expenses "generally incurred by … the producer or exporter." 19 U.S.C. § 1677a(d)(1). Both the producer and the exporter are outside the United States. By definition, products exported to the United States must come from outside the country. A common sense reading of the statute thus dictates that expenses "incurred by" a producer or exporter outside the United States can qualify as indirect selling expenses. *Id.*

The relevant regulation is even less favorable to the Plaintiff. It expressly disclaims a geographic limitation and instructs Commerce to deduct indirect selling expenses "no matter where … paid." 19 C.F.R. § 351.402(b). As long as the expense is "associated with commercial activities in the United States that relate to the sale" of subject merchandise, the regulation instructs Commerce to deduct them as indirect selling expenses. *Id.* The fees here meet that standard because Kibar is a reseller only so that all its expenses are appropriately considered to be associated with sales in the United States. *See Aramide*, 19 CIT at 1101–02. Assan's argument fails because it is unsupported by both the relevant statute and its accompanying regulation. The Court **SUSTAINS** Commerce's treatment of the management fees as indirect selling expenses.

## IV.    Hedging

The Aluminum Association challenges Commerce's decision to treat Assan's hedging gains and losses as part of its cost of manufacturing.  Def.-Ints.'/Consol. Pls.' Br. at 8, ECF No. 31.  According to the Aluminum Association, Assan's hedging revenues are unrelated to its cost of manufacturing and thus do not reasonably reflect the cost of production.  *Id.* at 17 ("[T]he very nature of Assan's futures contracts … indicate that they do not manage the risk of Assan's raw material purchases ….");  *see also* 19 U.S.C. § 1677b(f)(1)(A).  Because the explanation Commerce originally gave is unsupported by substantial evidence and the Court cannot consider its *post hoc* rationalizations, the Court remands this portion of the case to Commerce.

The dispute here centers around whether one could reasonably view Assan's hedging as mitigating risks from raw material purchases and thus as part of its cost of production.  That is how Assan's books treat the hedging, and Commerce will accept Assan's books and records if they reasonably reflect the cost of production. *See* 19 U.S.C. § 1677b(f)(1)(A); IDM at 36, J.A. at 7,652, ECF No. 53 (explaining that Assan records its hedging gains and losses as part of its cost of production).

As the Aluminum Association sees it, hedging protects against a future risk. Def.-Ints.'/Consol. Pls.' Br. at 17, ECF No. 31.  Because Assan's hedging happens after it purchases aluminum, its hedge is not against any risk from the purchase price.  *Id.* at 19.  ("The fact that Assan enters into futures contracts after a raw material purchase indicates that those contracts do not manage the risk of the past

raw material purchase ….") (emphasis omitted).  Rather, the risk is from the sale price of the finished good.  *Id.* at 7 ("[H]edges are related to the aluminum price included as part of the total sales price to purchasers of Assan's finished goods ….").  In the proceedings before Commerce, the Aluminum Association also argued that Assan hedges against risks from mark-to-market accounting losses.  IDM at 36, J.A. at 7,652, ECF No. 53.

Commerce rejected the Aluminum Association's arguments in its Final Determination.  *Id.* at 42, J.A. at 7,658.  It explicitly rejected the notion that Assan's hedging is related to Assan's sales.  *Id.* ("We disagree … that Assan's hedging transactions are related to Assan's sales of finished goods….").  Commerce also rejected the notion that Assan's hedges mitigate risks from mark-to-market accounting.  *Id.* ("The [Aluminum Association's] argument with regard to marking to market is misplaced.").

Assan now admits that the Aluminum Association's arguments have some merit but says Commerce was still correct to accept Assan's books.  Assan claims its hedging serves to maintain a consistent cost for its raw material inputs.  Pl.'s Resp. at 5, ECF No. 36 (Assan hedges to "ensure that raw material costs are fixed during the production of downstream products.").  It agrees that, in a certain sense, its hedges relate to the eventual sale of its goods.  Oral Arg. Tr. at 89:11–12, ECF No. 66 ("Everything at some level is related to the final transaction by necessity.").  It also agrees that its hedging, at least in part, combats accounting losses because of price changes and marking its inventory to market.  Pl.'s Resp. at 12–13, ECF No.

36 (Assan "engag[es] in short hedges to protect the value of its … raw materials inventory."). However, Assan says Commerce's finding that its records reasonably reflect the cost of production was nonetheless supported by substantial evidence. *Id.* at 4, 19. Assan's argument rests on the fact that the substantial evidence standard allows Commerce to choose between multiple options when the record supports either. *See Matsushita Elec.*, 750 F.2d at 933.

Commerce and Assan's new explanation is a *post hoc* rationalization that differs in several key areas from Commerce's contemporaneous explanation. Assan now says its hedging, at least in part, combats losses because Assan marks its inventory to the market. Oral Arg. Tr. at 87:2–6, ECF No. 66 ("[Assan hedges] to make sure that [it does not] lose money because … aluminum prices collapsed … which obviously from [mark-to-market accounting] results in a reduction in [Assan's] inventory."); Pl.'s Resp. at 12–13, ECF No. 36. But Commerce's contemporaneous explanation rejected this notion. IDM at 42, J.A. at 7,658, ECF No. 53. ("The [Aluminum Association's] argument with regard to marking to market is misplaced."). Similarly, Assan now concedes that, as the Aluminum Association argues, its hedging relates "at some level" to the sale. Oral Arg. Tr. at 89:9–12, ECF No. 66. Again, Commerce's contemporaneous explanation rejected this notion. *See* IDM at 42, J.A. at 7,658, ECF No. 53 ("We disagree … that Assan's hedging transactions are related to Assan's sales of finished goods, and thus … are unrelated to Assan's cost of production.").

At oral argument, counsel for Commerce went so far as to suggest that the record may support either the Aluminum Association's preferred approach or the approach Commerce actually took. Oral Arg. Tr. at 100:17–25, ECF No. 66 (stating that the "substantial evidence standard allows for two inconsistent results in the record" and the Aluminum Association's "view is not the only view that is supported by the record"). Commerce is correct that the substantial evidence standard allows the Court to sustain Commerce's decision even if the record also supports a different outcome. *See Matsushita Elec.*, 750 F.2d at 933. But this feature of the substantial evidence standard still requires Commerce's *explanation* be supported by substantial evidence. Here, Commerce's Final Determination rests on the rejection of a series of claims that Commerce and Assan now concede are at least partially correct. It is thus unsupported by substantial evidence.

The Court can only sustain Commerce's actions based on the rationale Commerce gave at the time of its Final Determination; *post hoc* rationalizations will not suffice. *See Burlington Truck Lines*, 371 U.S. at 168; *Shanghai Tainai*, 47 CIT __, 658 F. Supp. 3d at 1285 (rejecting Commerce's attempt to change its rationale); *Bonney Forge*, 46 CIT __, 560 F. Supp. 3d at 1312 ("[T]he Court may not 'presume' an answer for Commerce."). This is even more true when, as here, the *post hoc* rationalizations directly contradict Commerce's original explanation. *See Shanghai Tainai*, 47 CIT __, 658 F. Supp. 3d at 1285. Because Commerce's contemporaneous explanation — the only explanation that counts — is unsupported by substantial evidence, the Court **REMANDS** the issue to Commerce to reconsider or further

explain its treatment of Assan's hedging revenues and to support that explanation with substantial evidence.

## CONCLUSION

The parties raise a variety of claims in this case. Some challenges fail because Commerce's decision followed the law and was supported by substantial evidence. Others succeed because Commerce failed to provide an adequate explanation at the time of its Final Determination and now relies on *post hoc* rationalizations. For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Voluntary Remand, **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Judgment on the Agency Record, **GRANTS** Defendant-Intervenors'/Consolidated Plaintiffs' Motion for Judgment on the Agency Record, and **REMANDS** this case to Commerce for it to reconsider or further explain: (1) its duty drawback methodology, (2) its treatment of the raw material premium, and (3) its treatment of Assan's hedging revenues. It is hereby:

**ORDERED** that Commerce shall file its Remand Determination with the Court within 120 days of today's date;

**ORDERED** that Defendant shall supplement the administrative record with all documents considered by Commerce in reaching its decision in the Remand Determination; and it is further

**ORDERED** that Plaintiffs and Consolidated Plaintiffs shall have 30 days from the filing of the Remand Determination to submit comments to the Court;

Consol. Court No. 1:21-cv-00616                                         Page 39

    **ORDERED** that Defendant shall have 30 days from the date of Plaintiffs' and Consolidated Plaintiffs' filing of comments to submit a response; and

    **ORDERED** that Plaintiffs and Consolidated Plaintiffs shall have 15 days from the date of Defendant's filing of comments to submit any reply.

    **SO ORDERED.**

                                      _____
                                      Stephen Alexander Vaden, Judge

Dated: My 8, 2024
       New York, New York