A-489-844
Remand – Slip Op. 24-56
POI:  7/1/19 – 6/30/20
**Public Document**
E&C/OI:  BH

***Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,**
**Consol. Court No. 21-00616, Slip Op. 24-56 (CIT May 8, 2024)**
**Certain Aluminum Foil from the Republic of Türkiye**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion and order of the United States Court of

International Trade (Court or CIT) in *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,

Slip Op. 24-56 (CIT May 8, 2024) (*Remand Order*).  These final results of redetermination

concern the investigation of sales at less-than-fair-value of certain aluminum foil (aluminum foil)

from the Republic of Türkiye (Türkiye) covering the period of investigation (POI) July 1, 2019,

through June 30, 2020.[1]  The Court granted Commerce's request to reconsider or further explain,

upon remand, its duty drawback methodology, and for Commerce to reconsider or further

explain its treatment of Assan's:[2]  (1) raw material premium costs; and (2) hedging gains.[3]  On

remand, Commerce revised its duty drawback methodology by making the denominator the

quantity of only U.S. sales associated with a closed Inward Processing Certificate (IPC)[4] and

---

[1] *See Certain Aluminum Foil from the Republic of Turkey:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 52880 (September 23, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[2] In the underlying investigation, Commerce determined to treat Assan Aluminyum Sanayi ve Ticaret A.S., a producer of aluminum foil and the sole mandatory respondent in the investigation, Kibar Dis Ticaret A.S., an affiliated exporter, and Ispak Esnek Ambalaj Sanayi A.S., an affiliated manufacturer and reseller of aluminum foil in Türkiye, as a single entity (collectively, Assan).  *See Final Determination* IDM at 1, 3; *see also* Memorandum "Preliminary Affiliation and Collapsing Memorandum for Assan Aluminyum Sanayi ve Ticaret A.S., Kibar Dis Ticaret A.S. and Ispak Esnek Ambalaj Sanayi A.S.," dated April 27, 2021.
[3] *See Remand Order* at 38.
[4] In Commerce's discussion for this remand, we used "IPC" as both a singular noun and a plural noun to protect the mandatory respondents' business proprietary information (BPI).

applying the resulting per-unit adjustment to the same U.S. sales associated with a closed IPC, and not all U.S. sales during the POI.  Additionally, Commerce provided further explanation for its treatment of the raw material premium costs and hedging gains but has made no change to its underlying calculations with respect to these two issues.  Consequently, the revised estimated weighted-average dumping margin for Assan is, now, 2.30 percent.[5]  Moreover, because Commerce recalculated the estimated weighted-average dumping margin for Assan, the revised all-others rate is, now, 2.30 percent.

## II.    BACKGROUND

Commerce published its *Final Determination* on September 23, 2021.[6]  The respondent in the underlying investigation is Assan; the petitioner in the underlying investigation is the Aluminum Association Trade Enforcement Working Group and its individual members (the Aluminum Association, or the petitioner).  Assan challenged Commerce's *Final Determination* with respect to the duty drawback methodology and raw material premium cost issues; the petitioner challenged Commerce's *Final Determination* with respect to the hedging gains issue. The Court remanded for Commerce to reconsider or further explain the agency's:  (1) duty drawback methodology, (2) the treatment of Assan's raw material premium costs, and (3) the treatment of Assan's hedging gains in light of certain statements made at oral arguments.[7]

---

[5] *See* Memorandum "Draft Results of Redetermination Calculation Memorandum for the Assan Single Entity," dated concurrently with the draft results of redetermination (Draft Remand Calculation Memorandum).
[6] *See Final Determination*, 86 FR at 52880.
[7] *See Remand Order* at 38.

## III.    REMANDED ISSUES

### A.    Duty Drawback

#### 1.    Background

In the underlying investigation, we found that Assan's calculations of the duty drawback adjustment were not consistent with Commerce's policy of determining the U.S. price adjustment for duty drawback based only on *closed* IPC[8] to quantify the total amount of the duty drawback benefit, *i.e.*, the amount of finalized exempted import duties associated with exports of merchandise to the United States during the POI that fall under the Harmonized Tariff Schedule of the United States subheadings for in-scope merchandise.[9]  Commerce's practice is to limit a claimed duty drawback benefit to that included on only closed IPC with exports of subject merchandise during the POI.

In the per-unit duty drawback adjustment calculation for the *Final Determination*, the numerator consisted of the estimated amount of the duty drawback benefit for exempted import duties realized by Assan for exports to the United States during the POI of merchandise similar to scope merchandise as documented on the closed IPC.  For the denominator, we used the total quantity of sales in Assan's U.S. sales data.  We then applied this per-unit benefit to all sales in the U.S. sales data.

Further, we determined that allocating the total amount of duty drawback benefit (the numerator of the per-unit duty drawback adjustment) to all sales in the U.S. sales data (*i.e.*, the

---

[8] Commerce considers an IPC to be closed after the applicant has applied to the Turkish Government for closure of an IPC and the application is then officially approved by Turkish authorities, at which point the IPC holder is officially released of these liabilities.  *See Light-Walled Rectangular Pipe and Tube from Turkey:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 11230 (February 24, 2021), and accompanying IDM at Comment 2; *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015) (*Line Pipe from Türkiye*), and accompanying IDM at Comment 3; and *Habas Sinai ve Tibbi Gazlar lstihsal Endustrisi A.Ş. v. United States*, 439 F. Supp. 3d 1342, 1348-49 (CIT 2019); *see also* Assan's Letter, "Response to Section C Questionnaire," dated January 14, 2021 (CQR) at C-40 to C-42.
[9] *See* CQR at C-40 to C-42 and Exhibits C-10 to C-13.

denominator of the per-unit duty drawback adjustment and the universe of sales to which we applied the per-unit adjustment) is preferable to allocating that amount only to the sales which the respondents have identified in their U.S. sales data as being associated with closed IPC (*i.e.*, having the denominator be U.S. sales associated with a closed IPC and applying that per-unit adjustment to U.S. sales associated with a closed IPC).[10]

Assan initially challenged the *Final Determination* and the denominator used in Commerce's duty drawback calculation, *i.e.*, whether the exempted import duties should be divided by the quantity of Assan's U.S. sales associated with the closed IPC rather than by the total quantity of Assan's U.S. sales. As a result of subsequent litigation filings that demonstrate differences between Commerce's duty drawback calculation methodologies in different cases, *e.g.*, *CAAS from Türkiye*,[11] Commerce requested a voluntary remand to further evaluate its duty drawback calculation and application of the duty drawback adjustment.[12]

In its *Remand Order*, the Court granted Commerce's request for a voluntary remand and ordered the agency "to consider the issue further" considering the holding in *Assan Aluminyum 2024* that Assan's suggested methodology may not comply with the statute.[13]

    2.  <u>Analysis</u>

After the Court granted Commerce's remand request on this issue, for the final results of redetermination, Commerce reconsidered its duty drawback calculation and recalculated the

---

[10] *See Final Determination* IDM at Comment 7 ("because: (1) the {two-prong} test does not require a material-input-to-exported-merchandise-specific link between the imports where the import duties have been exempted or refunded and the exports which generate the duty drawback benefit; (2) POI-exempted import duties are allocated to all production of aluminum foil and are not applied to the production of the specific sales of aluminum foil that are only associated with closed IPCs (*i.e.*, there is a single, CONNUM-specific cost of production (COP) and COP is generally not a sale-specific amount); and (3) in general, individual U.S. sales may not be linked with specific exports from the country of origin, especially when U.S. sales may be made from inventory after importation into the United States.").

[11] *See Common Alloy Aluminum Sheet from Turkey: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 FR 77550 (November 13, 2023) (*CAAS from Türkiye*), and accompanying IDM at 5-7.

[12] *See Remand Order* at 10.

[13] *Id.* at 23 (citing *Assan Aluminyum Sanayi ve Ticaret v. United States*, Slip Op. 24-44 (CIT April 11, 2024) (*Assan Aluminyum 2024*).

estimated weighted-average dumping margin for Assan by using only the quantity of U.S. sales associated with closed IPC in the denominator and applying the duty drawback per-unit adjustment only to U.S. sales associated with the closed IPC used to calculate the duty drawback adjustment.  While we find the methodology used in the *Final Determination* involving Commerce's "two-prong" test continues to be reasonable, we made one modification for this draft remand redetermination consistent with Commerce's current practice and *Assan Aluminyum 2024*.  The record of the underlying investigation allowed us to make this modification.

Section 772(c)(1)(B) of the Tariff Act of 1930, as amended (the Act) provides that "{t}he price used to establish export price and constructed export price shall be — increased by — the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States."  Accordingly, "a duty drawback adjustment shall be granted when, but for the exportation of the subject merchandise to the United States, the manufacturer would have shouldered the cost of an import duty."[14]

In determining whether a respondent is entitled to a duty drawback adjustment, we look for a reasonable link between the import duties imposed by the exporting country, and those import duties exempted or refunded, *i.e.*, "two-pronged" test:  (1) the exemption from or refund of import duties is linked to exportation of the subject merchandise;[15] and (2) there are sufficient imports of materials to account for the exemption or refund granted for the export of the subject merchandise.[16]  In general, we have found that the Turkish Inward Processing Regime (IPR) satisfies the "two-pronged" test.[17]  Further, regarding the Turkish IPR system, our practice, as

---

[14] *See Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1341 (Fed. Cir. 2011) (*Saha Thai*).
[15] *See* section 772(c)(1)(B) of the Act.
[16] *See, e.g.*, *Saha Thai*, 635 F.3d at 1340.
[17] *See, e.g.*, *Line Pipe from Türkiye* IDM at Comment 1.

recognized by the CIT, has been to consider only closed IPC that include exports of subject merchandise to the United States during the POR, and that include imports of the material inputs usable for the production of the subject merchandise, to determine the amount of duty drawback benefit.[18]

In the underlying investigation, we determined that allocating the total amount of duty drawback benefit to all sales in the U.S. sales data is preferable to allocating that amount only to the sales which the respondents have identified in their U.S. sales data as being associated with closed IPC. However, on remand, after further evaluation of the information on the record of the underlying investigation and the CIT's decision in *Assan Aluminyum 2024*,[19] we find it appropriate to allocate the total amount of duty drawback benefit only to U.S. sales associated with closed IPC, *i.e.*, the IPC used to calculate the duty drawback benefit, so that the calculation and application of the per-unit adjustment are done using the same quantity of U.S. sales.

In the *Final Determination*, we did not use the duty drawback calculation and application methodologies used in other Türkiye cases, *e.g.*, *Rebar from Türkiye*[20] and *CAAS from Türkiye*,[21] which the CIT recently held to be inconsistent with the statute.[22] In *Rebar from Türkiye* and *CAAS from Türkiye*, the per-unit duty drawback adjustment was calculated using total IPC imports divided by total IPC exports, regardless of whether the exports were of in-scope merchandise, to the United States, or during the POR. However, on remand we find this calculation of the duty drawback benefit in those cases to be contrary to the statute, which requires that the exemption from paying a duty on the imported raw material is contingent upon

---

[18] *See, e.g.*, *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 439 F. Supp. 3d 1342, 1349 (CIT 2020); and *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 654 F. Supp. 3d 1311, 1319 (2023).
[19] *See Assan Aluminyum 2024.*
[20] *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 28574 (May 27, 2021) (*Rebar from Türkiye*).
[21] *See CAAS from Türkiye* IDM at 5-7.
[22] *See Assan Aluminyum 2024.*

the exportation of the finished subject merchandise to the United States.[23]  In the *Rebar from Türkiye* and *CAAS from Türkiye* methodologies, we do not find that the duty drawback benefit calculation accurately captures the amount of exempted import duties associated with "subject merchandise" (*i.e.*, in-scope merchandise exported to the United States), as stipulated by the statute, and, thus, exceeds the intended scope of the statute.  We find that, because the purpose and scope of the adjustment to U.S. price described in section 772(c)(1)(B) of the Act pertain to subject merchandise, the basis of the duty drawback benefit should also be limited to import duties associated only with subject merchandise.  Further, with respect to any noted inconsistency in Commerce's duty drawback calculation currently, in the most recent administrative review final results of this order, Commerce employed the same duty drawback calculation methodology used here.[24]

With respect to the application of the per-unit adjustment to sales in the respondent's U.S. sales database, we reconsidered what is most appropriate to meet the requirement of the statute.  In the underlying investigation, we calculated the per-unit duty drawback adjustment using as the numerator exempted import duties associated with subject exports and using as the denominator the total quantity of all U.S. database sales.[25]  We then applied the per-unit amount to all U.S. database sales, effectuating an adjustment to each sale regardless of whether it was associated with the closed IPC.[26]  After further consideration of this issue, however, we find that this application of the per-unit amount was not appropriate and we find it more appropriate to use as

---

[23] *See* section 772(c)(1)(B) of the Act (*i.e.*, "{t}he price used to establish export price and constructed export price shall be — increased by — the amount of any import duties imposed by the country of exportation which have… not been collected, by reason of the exportation of the subject merchandise to the United States"); *see also Assan Aluminyum 2024*, Slip Op. 24-44 at 19.

[24] *See Common Alloy Aluminum Sheet from Turkey:  Preliminary Results of Antidumping Duty Administrative Review; 2022–2023*, 89 FR 36759 (May 3, 2024), and accompanying Preliminary Decision Memorandum (PDM) at 10; *see also Certain Aluminum Foil from the Republic of Türkiye:  Final Results of Antidumping Duty Administrative Review; 2021–2022*, 89 FR 48889 (June 10, 2024), and accompanying IDM at Comments 1 and 2.

[25] *See Final Determination* IDM at Comment 7.

[26] *Id.*

the denominator the quantity of U.S. database sales associated with the closed IPC and apply that per-unit amount only to U.S. database sales associated with the closed IPC. Therefore, the duty drawback adjustment is applied only to the U.S. sales that were entitled to the benefit. Importantly, we maintained the correspondence of values between the denominator and the universe of U.S. sales to which the resultant per-unit adjustment is applied. This methodology is consistent with the statutory language[27] and *Assan Aluminyum 2024.*[28]

In sum, we modified our duty drawback calculation methodology in this final results of redetermination to calculate the per-unit adjustment to U.S. price using the methodology employed in the underlying investigation, but with one modification, *i.e.*, to use as the denominator the quantity of U.S. sales associated with the closed IPC and apply that per-unit duty drawback amount only to U.S. sales associated with the closed IPC. Specifically, we calculated the per-unit duty drawback adjustment using: (1) as the numerator import duties associated with exports of in-scope merchandise to the United States during the POI in the closed IPC used to calculate the duty drawback adjustment; and (2) as the denominator the quantity of U.S. sales associated with the closed IPC only (*i.e.*, not all U.S. sales). Then we applied the per-unit amount only to U.S. sales associated with the closed IPC (*i.e.*, the same quantity of U.S.

---

[27] *See* section 772(c)(1)(B) of the Act ("The price used to establish export price and constructed export price shall be increased by the amount of any import duties imposed by the country of exportation which *have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States* … (emphasis added)"); *see also Assan Aluminyum 2024*, Slip Op. 24-44 at 11-14 ("Even though certain open-IPC sales did not earn 'benefits of the exempted duties,' Commerce adjusted its calculation of their U.S. prices as though they did. There was no clear statutory basis for doing so. (Internal citations omitted.)").

[28] *See Assan Aluminyum 2024*, Slip Op. 24-44 at 13 n.5; and *Id.* at 11-14 ("Even though certain open-IPC sales did not earn 'benefits of the exempted duties,' Commerce adjusted its calculation of their U.S. prices as though they did. There was no clear statutory basis for doing so. … The court does not read {section 772 (c)(1)(B) of the Act} to allow deeming the background operation of an IPC scheme to confer exempt status on certain unexempted duties under open IPCs for the narrow purpose of calculating drawbacks. … Recall that the per-unit adjustment is intended to reflect, as a practical matter, 'the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States.' Even if this adjustment is based on an internally correct numerator and denominator as to one IPC, it may cease to reflect 'the amount' of exempted duties if it is subsequently applied to sales of merchandise whose exportation did not earn any duty exemptions at all during the period of investigation. It would be analogously incongruous to apply one taxpayer's properly-calculated deductions to another taxpayer's income. (Internal citations omitted.)").

sales used to calculate the per-unit adjustment), which ensures that the per-unit duty drawback adjustment is calculated with and applied to the same U.S. sales.[29]

### B. Raw Material Premium

#### 1. Background

In the underlying investigation, Commerce required Assan to report the physical characteristics of its products (*i.e.*, gauge, coating, width, casting method, alloy, temper, and surface finish), which Commerce used to define unique merchandise sold in the United States, and to identify identical or similar merchandise sold in the comparison market to serve as the basis for normal value. Importantly, these physical characteristics differentiate the production costs between distinct, unique product control numbers (CONNUMs).[30] Consequently, under sections 773(f)(1)(A) and 773(a)(6)(c)(ii) and (iii) of the Act, a respondent's reported costs should reflect meaningful cost differences attributable to these different physical characteristics. This approach ensures that the CONNUM-specific costs that Commerce uses for the test of sales made below cost, constructed value (CV), and difference-in-merchandise adjustments accurately reflect the physical characteristics of the products used in Commerce's margin calculations. Thus, Commerce normally does not rely on a respondent's reported costs where cost differentials between CONNUMs are driven by factors other than the difference in the physical characteristics, such as timing differences or routing variations or cost system conventions.[31]

---

[29] Because these data require business proprietary treatment, *see* Draft Remand Calculation Memorandum for Commerce's revised margin calculations for Assan. We made no changes to our calculations since the draft results of redetermination and, therefore, are not issuing a calculation memorandum with these final results of redetermination.

[30] *See, e.g.*, Commerce's Letter, "Finalized Product Characteristics," dated December 3, 2020.

[31] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*; 2010-2011, 78 FR 35248 (June 12, 2013) (*Welded Pipe from Korea*), and accompanying IDM at Comment 6; *see also Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*; 2014-2015, 82 FR 18105 (April 17, 2017) (*OCTG from Korea*), and accompanying IDM at Comment 23; and *Certain Steel Nails from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*; 2014-2016, 83 FR 4028 (January 29, 2018) (*Nails from Korea*), and accompanying IDM at Comment 3.

The CIT has sustained Commerce's reallocation of costs for the sales-below-cost test, the calculation of CV, and then difference-in-merchandise adjustments where a respondent's reported costs reflect cost differences due to factors other than Commerce's established physical characteristics.[32]

During the underlying investigation, Assan explained that the reported London Metal Exchange (LME) portion of the aluminum cost (*i.e.*, DIRMATLME) for each CONNUM is based on the actual average cost for all production records, and in turn, the individual production records are based on the LME price specific to that production order in that period (*i.e.*, month).[33]  Therefore, according to Assan, the reported DIRMATLME may show variances between products that are due to timing and are unrelated to the differences in product's physical characteristics.[34]  Thus, Assan provided a single average DIRMATLME for the entire POI so that the differences in CONNUM-specific costs only reflect the differences in the product's physical characteristics rather than the LME fluctuations.[35]  In contrast, Assan reported the CONNUM-specific reported raw material aluminum premium costs (DIRMATMP) and stated that averaging of DIRMATMP was not necessary because the CONNUM-specific yield losses are reflected in DIRMATMP.[36]

During the underlying investigation, because DIRMATMP is closely related to the reported DIRMATLME and the component of the reported raw material costs, Commerce analyzed Assan's reported raw materials aluminum costs (*i.e.*, sum of DIRMATLME and DIRMATMP) to determine whether the reported aluminum costs reflected significant cost

---

[32] *See Thai Plastic Bag Indus. Co. Ltd. v. United States*, 752 F. Supp. 2d 1316, 1324-25 (CIT 2010).
[33] *See* Assan's Letter, "Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S.'s Response to the March 8, 2021 Section D Second Supplemental Questionnaire," dated March 29, 2021 (SDQR) at 5S-13- 5S-14.
[34] *Id.* at 5S-13- 5S-14.
[35] *Id.* at 5S-13- 5S-14.
[36] *Id.*; *see also* Assan's Letter, "Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S.'s Response to Questions 1, 2, and 3 of the May 4, 2021, section D Fifth Supplemental Questionnaire," dated May 17, 2021 (4SDQR Part II) at 11-12.

differences between CONNUMs that were unrelated to the product's physical characteristics. Based on the analysis, the reported aluminum costs (*i.e.*, sum of DIRMATLME and DIRMATMP) reflected significant cost differences between CONNUMs that are unrelated to the product's physical characteristics such as timing and the type of raw material input used.[37]  Thus, in the *Preliminary Determination*,[38] Commerce determined that the reported DIRMATLME and DIRMATMP amounts reflect cost differences between CONNUMs that are unrelated to differences in the physical characteristics of the products.  As such, Commerce relied on the costs of production that reflect the LME portion of the aluminum costs based on a single weighted average (*i.e.,* DIRMATLME).  In addition, Commerce calculated a single weighted-average DIRMATMP to mitigate the fluctuation of the aluminum premium costs among CONNUMs that was unrelated to the product's physical characteristics.[39]  During the *Final Determination*, Assan contended that Commerce's analysis for the DIRMATMP differentials between CONNUMs should have been based on its total costs of manufacturing (TOTCOM) instead of material costs.

The Court held that Commerce failed to address, and provide a reason for rejecting, Assan's argument that Commerce should analyze cost differences using the TOTCOM rather than focusing on just the raw material costs (*i.e.,* DIRMATLME and DIRMATMP).[40] Consequently, Commerce was remanded to reconsider or further explain its treatment of Assan's raw material premium costs.[41]

---

[37] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Assan Aluminyum Sanayi ve Ticaret A.S. and Ispak Esnek Ambalaj San. A. S.," dated April 27, 2021 (Preliminary Cost Calculation Memorandum).  *See also* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Assan Aluminyum Sanayi ve Ticaret A.S. and Ispak Esnek Ambalaj San. A. S.," dated September 16, 2021 (Final Cost Calculation Memorandum).
[38] *See Certain Aluminum Foil from the Republic of Turkey:  Preliminary Negative Determination of Sales at Less Than Fair Value, Postponement of Final Determination*, 86 FR 23686 (May 4, 2021) (*Preliminary Determination*), and accompanying PDM.
[39] *See* Preliminary Cost Calculation Memorandum.  *See also* Final Cost Calculation Memorandum.
[40] *See Remand Order* at 29-30.
[41] *Id.* at 30.

2.   <u>Analysis</u>

Consistent with the CIT's *Remand Order*, for these final results of redetermination, Commerce has provided further explanation as it continues to weight average the reported raw material aluminum premium costs for all CONNUMs.  Commerce also considered Assan's arguments from the *Final Determination*.

We disagree with Assan's contention that the analysis of the DIRMATMP differential between CONNUMs should be based on the TOTCOM rather than the material costs.  Where we find that cost differences between CONNUMs are driven by factors other than the product's physical characteristics, our analysis is normally based on a particular cost component (*e.g.*, direct materials or a component of fabrication costs) that is affected by the relevant product physical characteristic.  In this way, Commerce can isolate the cost differences associated with the relevant product physical characteristic from the cost differences associated with factors other than product physical characteristics.[42]  If the analysis is based on TOTCOM, the cost differences cannot be isolated or distinguished by the relevant product physical characteristic because the result will represent the aggregated cost difference for all product physical characteristics.  Consequently, we find that it is inappropriate to also include the fabrication costs (*i.e.*, labor and conversion costs) in the aluminum premium cost differential analysis because the fabrication costs are not associated with the reported raw material costs.

When Commerce evaluates a respondent's submitted costs, section 773(f)(1)(A) of the Act directs that costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles (GAAP) of the exporting country (or the producing country, where

---

[42] *See Welded Pipe from Korea* IDM at Comment 6; *OCTG from Korea* IDM at Comment 23; and *Nails from Korea* IDM at Comment 3.

appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. Accordingly, Commerce will typically rely on a company's normal books and records if two conditions are met: (1) the books are kept in accordance with the home country's GAAP; and (2) the books reasonably reflect the cost to produce and sell the merchandise. In the underlying investigation, Assan's reported costs are derived from its normal books and records, and those books and records are kept in accordance with Turkish GAAP.[43] Thus, the question facing Commerce is whether the reported material costs from Assan's normal books and records reasonably reflect the cost to produce the merchandise under consideration based on the physical characteristics identified by Commerce.

According to Assan, the LME portion of the raw material cost denotes the current aluminum index price published by the LME and the aluminum premium cost denotes the conversion cost plus the profit of the raw material supplier.[44] When Assan purchases raw material inputs, the supplier invoice is based on the LME raw material cost plus aluminum premium cost.[45] Assan also stated that the LME portion of the raw material cost plus aluminum premium cost equals the full cost of the raw material input.[46] Thus, aluminum premium cost is closely linked to the LME portion of the raw material cost and the component of Assan's raw material costs. Assan reported a single average LME portion of the raw material cost for the entire POI so that the difference in CONNUM-specific costs only reflected the differences in the product physical characteristics rather differences that were due to the timing of production (*i.e.*, DIRMATLME).[47] However, Assan reported a CONNUM-specific aluminum premium cost (*i.e.,*

---

[43] *See Final Determination* IDM at 33.
[44] *See* Assan's Letter, "Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S.'s Response to Section D Questionnaire," dated January 19, 2021 (DQR) at D-37.
[45] *Id.* at D-37.
[46] *Id.* at D-48 – D-49.
[47] *See* Assan's Letter, "Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S.'s Response to Questions 2a, 2b, 2c, 2e and 4 of the May 4, 2021, Section D Fifth Supplemental Questionnaire," dated May 14, 2021 (4SDQR Part I) at Exhibit S10D-5.

DIRMATMP) even though those costs are closely linked to the LME portion of the metal costs. Based on our analysis, the reported aluminum premium cost reflected the cost differences unrelated to the product physical characteristics.[48]  Further, Commerce's analysis of the aluminum premium cost differentials is consistent with another proceeding in which Assan participated as an individually examined respondent.[49]  Thus, based on the reasons stated above, Commerce finds that the analysis of the aluminum premium cost differential between CONNUMs should be based on the raw material costs instead of the TOTCOM.  Commerce has provided further explanation of its treatment of raw material premium costs consistent with the *Remand Order* and has made no changes from the *Final Determination*.

### C.  Hedging Revenues

#### 1.  Background

Assan routinely engages in aluminum commodity hedging transactions for purposes of eliminating the risk of fluctuations in the cost of the input aluminum used in production of merchandise under consideration and records the related gains and losses arising from these hedging transactions as part of cost of sales in the normal books and records.[50]

During the underlying investigation, Assan explained that to meet customer demands and offer a reasonable delivery time to its customers, Assan maintains extra raw material inventory in the normal course of business.[51]  However, because raw material prices are subject to significant fluctuation, Assan engages in hedging transactions for the purchased raw materials to eliminate

---

[48] *See* Preliminary Cost Calculation Memorandum.
[49] *See Common Alloy Aluminum Sheet from Turkey:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 FR 65346 (October 15, 2020) (*CAAS from Türkiye LTFV Prelim*), and accompanying PDM at 15, unchanged in *Common Alloy Aluminum Sheet from Turkey:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 13326 (March 8, 2021) (*CAAS from Türkiye LTFV Final*), and accompanying IDM at 3 (wherein Commerce's analysis of the aluminum premium cost differentials was final and conclusive with no subsequent litigation); *see also Assan Aluminyum 2023*, and further remanded in *Assan Aluminyum* for an unrelated issue.
[50] *See* SDQR at 5S-33-5S-35 and *Final Determination* IDM at Comment 9.
[51] *See* 4SDQR Part II at 1-3.

the risk of fluctuations in the metal costs. Assan routinely monitors its total raw material inventory "position" and the related hedging positions are updated several times each week to ensure stability of its raw material costs.[52] During the underlying investigation, Assan generated net hedging gains from its hedging activities, and they were recorded as a part of cost of goods sold in the audited financial statements. Thus, for the costs of production reported to Commerce, Assan reduced the reported total cost of manufacturing (COM) by the net hedging gains as reflected in its normal books and records.

In the *Preliminary Determination*, Commerce allowed the net gains to offset the reported COM. For the *Final Determination*, Commerce continued to allow Assan's net hedging gains to offset the reported COM. However, Commerce adjusted the reported net hedging gains to account for the timing difference related to the purchases of aluminum input and the settlement of the associated commodity hedging contract.[53]

The Aluminum Association contends that Assan conducted the hedging transactions after it purchased raw materials. As such, it asserts that the net hedging gains were related to the sales price of finished goods instead of raw materials. Thus, the Aluminum Association contends that Commerce should not allow Assan's net hedging gains to offset the reported COM because they were unrelated to the cost of production.

The Court remanded for Commerce to reconsider or further explain its treatment of Assan's hedging gains as part of Assan's cost of production considering certain statements made at oral arguments indicating that Assan's hedging may be related to its sales.[54]

2. Analysis

---

[52] *Id.*
[53] *See* Final Cost Calculation Memorandum.
[54] *See Remand Order* at 37-38.

Pursuant to the CIT's *Remand Order*, for these final results of redetermination, we have provided further explanation on this issue, and Commerce continues to offset treat the net hedging gains as part of Assan's reported cost of manufacturing (COM) with Assan's net hedging gains.

In its *Remand Order,* the CIT states that "{t}he dispute here centers around whether one could reasonably view Assan's hedging as mitigating risk from raw material purchases and thus as part of its cost of production."[55] We reexamined this issue on remand and continue to find that Assan's hedging revenues are more appropriately treated as related to the raw material inputs it uses to produce the merchandise under consideration and are thus properly included in the company's production costs. We explain below why such treatment is reasonable in light of the record evidence and case precedent. Importantly, the possibility of drawing two inconsistent conclusions from the record evidence does not prevent Commerce's finding from being supported by substantial evidence.[56]

During the underlying investigation, Assan generated net hedging gains and they were recorded in four different accounts which grouped under two different categories: "gains and losses from hedging operation - LME" and "gains and losses from hedging operation - raw material premium."[57] The two accounts included in the first category "gains and losses from hedging operation - LME" represent the gains and losses from concluded hedging transactions for LME portion of raw materials purchases and raw material inventory.[58] The two accounts included in the second category "gains and losses from hedging operation – raw material premium" represent the gains and losses from hedging transactions for raw material premium

---

[55] *Id.* at 34.
[56] *See Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).
[57] *See* 4SDQR Part II at 7-9.
[58] *Id.* at 7-9.

portion of raw material purchases and raw material inventory.[59]  During the POI Assan recorded an overall net gain in these accounts and included this income in the reported COM.[60]  In addition, Assan maintains two accounts to record adjustments under the International Financial Reporting Standards (IFRS) mark to market requirements - "IFRS metal hedge position open inventory evaluation" and "IFRS metal hedge position evaluation."  The adjustments recorded in these accounts relate to the current value of the LME portion of the physical inventory and the current value of open LME hedge contracts <u>at the time of the preparation of the financial statements</u>.[61]  Thus, Assan calculates the current market value of the LME portion of the physical inventory <u>at the time of the preparation of the financial statements</u>, and if the current market value of the physical inventory is higher than the cost, Assan records a gain.  If the current market value of the physical inventory is lower, it records a loss.  Thus, the gains and losses recorded in these two accounts under the third category group are purely related to the inventory valuation gains and losses under the IFRS and they are not generated from actual hedging transactions.[62]  Assan included the valuation adjustments recorded in these accounts in the reported COM.[63]

Section 773(f)(1)(A) of the Act instructs Commerce to calculate costs based on a respondent's normal books and records if they are kept in accordance with home country GAAP and reasonably reflect the costs associated with the production and sale of the merchandise.  Assan's normal books and records are kept in according with Turkish GAAP.  Each of the accounts described above are included in the cost of goods sold line item in the company's audited financial statements.  For reporting to Commerce, Assan included these items in the

---

[59] *Id*.
[60] *See* SDQR at Exhibit S5D-38.
[61] *See* 4SDQR Part II at 7-9.
[62] *Id.* at 7-9.
[63] *See* SDQR at Exhibit S5D-38.

reported costs in the same manner as in its normal books and records.  Thus, the question is whether including the net hedging gains in Assan's cost of production reasonably reflect the cost to produce the merchandise under consideration.

When Assan purchases its raw material aluminum, it enters into commodity hedging contracts to sell a similar quantity of aluminum metal in the future.  At the time the hedging contracts expire, Assan closes the hedging contracts by reversing its position in the commodities market.[64]  Consequently, it is reasonable to determine that the sum of the resulting gain or loss on the commodities hedging contracts and the raw material purchases that triggered the hedging contract represent Assan's total net raw material costs incurred to produce the merchandise under consideration.[65]

During the underlying investigation, Assan provided record evidence demonstrating that its hedging activities are to protect the value of its purchased raw material aluminum.[66] Specifically, Assan explained that its hedging objective is to fully hedge its raw material position.  To ascertain this, Assan consistently monitors its total raw material "position" (*i.e.,* beginning inventory, raw materials imported during the month, and raw material shipments in transit).  From this total inventory position, Assan subtracts the total finalized sales for which LME is already set.  The remaining net figure is the total raw material inventory balance for which Assan must have a hedge in future markets.[67]  Assan provided the monthly calculation of raw material inventory position during the POI.  The record shows that the POI monthly open hedge position quantity was very close to the POI monthly raw material inventory position

---

[64] *See Final Determination* IDM at Comment 9.
[65] *Id.*
[66] *See* SDQR at 5S-33 – 5S-35; *see also* Assan Single Entity's Letter, "Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S.'s Response to Questions 5 through 10 of the April 9, 2021, Section D Fourth Supplemental Questionnaire," dated April 15, 2021, at 3-4; 4SDQR Part II at 1-3 and Exhibit S10D-7.
[67] *See* 4SDQR Part II at 2.

quantity which illustrated that Assan is hedging its raw material costs.[68]  As such, there is record evidence linking Assan's raw material purchases to its hedging transactions (*i.e.,* linking purchases raw material quantities to hedging quantities).  Assan's hedging contracts are initiated against the purchase of the aluminum.  Any resulting gains or losses on these contracts are recorded in the cost of goods sold at the time the contracts are closed.  When viewed from this perspective, it is reasonable to conclude that Assan's hedging activities are to mitigate the risk of fluctuation of raw material costs which will be consumed in the production of merchandise under consideration, and that they are properly considered as part of the COM.  We find that neither Assan's pricing mechanisms (*i.e.*, foil prices are based in part on an LME value at time of sale) nor the chronology of the hedging contracts (*i.e.*, the purchases precede the hedges) are sufficient to render unreasonable a finding that the gains or losses at issue are appropriately considered in COM.

With regards to the mark-to-market accounting for inventory, the GAAP concept of marking to market value refers to a method that ensures company's assets and liabilities on the balance sheet at a particular point in time reflect fair market value (*i.e.*, valuation of inventory).  As described above, Assan evaluated the current value of its physical inventories on hand and the value of open hedging contracts in the balance sheet (*i.e.*, assets and liabilities) as of the end of the POI (*i.e.*, a particular point in time) based on the mark to market accounting method in accordance with the IFRS requirements and recorded inventory valuation adjustments in the accounts "mark to market valuation gains and losses for physical inventory and hedging positions."  Thus, the net inventory revaluation adjustments recorded in these two accounts are different from the net hedging gains generated from Assan's actual hedging activities that were recorded in the accounts grouped under the first and second categories.  In other words, the net

---

[68] *Id.* at Exhibit S10D-6.

hedging gains recorded in the accounts grouped under the first and second categories were associated with the closed hedging contracts for the inventory consumed during the POI whereas the inventory revaluation gains under IFRS valuation accounts are associated with the inventory (*i.e.*, assets) remaining on the balance sheet as of the end of the POI.  Because the gains on the mark to market inventory valuation represent the valuation adjustment for Assan' inventory to fair market value, it is reasonable to include it in the cost of production calculation. Commerce's analysis and the treatment of gains and losses on hedging activities is consistent with past practice.  For example, in *CAAS from Greece* Commerce considered the treatment of the respondent's hedging losses related to the changes in the price of aluminum that were recorded as part of the cost of goods sold but that were excluded from the reported COM.  There, Commerce revised the respondent's submitted costs to include these items.[69]  In addition, in *CAAS from Türkiye* in which Assan participated as an individually examined respondent, Commerce accepted Assan's treatment of net gains on closed hedging contracts in its reported COM.[70]  Therefore, based on the reasons stated above we have provided further explanation consistent with the *Remand Order* and consistent with the *Final Determination* we have continued to find that Assan's net hedging gains should be included in the calculation of Assan's cost of production.

## IV.    INTERESTED PARTIES' COMMENTS

On August 15, 2024, Commerce issued its draft results of redetermination and provided

---

[69] *See Common Alloy Aluminum Sheet from Greece:  Final Negative Determination of Sales at Less Than Fair Value*, 86 FR 43 (March 8, 2021) (*CAAS from Greece*), and accompanying IDM at 16.
[70] *See CAAS from Türkiye LTFV Prelim* PDM at 15, unchanged in *CAAS from Türkiye LTFV Final* (wherein Commerce's analysis of the metal hedger position evaluation and the metal hedge position inventory evaluation was final and conclusive with no subsequent litigation); *see also Assan Aluminyum 2023*, and further remanded in *Assan Aluminyum* for an unrelated issue.

interested parties an opportunity to comment on Commerce's analysis and redetermination.[71]
Commerce received comments from the Aluminum Association and Assan.[72]  These comments
are summarized verbatim from the executive summaries in the relevant submissions and are
addressed below.  After considering these comments, we have made no changes to the Draft
Results of Redetermination.  Because Assan's initial comments to the Draft Results of
Redetermination[73] contained untimely filed new factual information, Commerce rejected Assan's
August 21, 2024, submission, providing Assan an opportunity to refile its comments.[74]  Assan
resubmitted is comments to the Draft Results of Redetermination,[75] noting it disagreed with
Commerce's determination.[76]

Comment 1:  Duty Drawback

*Assan's Comments:*

The following is a verbatim summary of the comments submitted by Assan.  For further details,
*see* Assan's Comments at 2-3.

> Assan Group maintains that Commerce should reopen the record to request
> additional information relevant to Commerce's duty drawback calculations.[77]
> {}[78] {}.[79]  {}.  This inclusion is consistent with the CIT's directive that "exports

---

[71] *See* Draft Results of Redetermination Pursuant to Court Remand, *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Court No. 21-00616, Slip Op. 24-56 (CIT May 8, 2024), dated August 15, 2024 (Draft Results of Redetermination)

[72] *See* Aluminum Association's Letter, "Petitioners' Comments on Draft Redetermination Concerning Assan Aluminyum Sanayi ve Ticaret A.S.," dated August 21, 2024 (Aluminum Association's Comments); and Assan's Letter, "Assan Group's Resubmission of Comments on Draft Results of Redetermination Pursuant to Court Remand Under Protest," dated August 21, 2024 (Assan's Comments).

[73] *See* Assan's Letter, "Assan Group's Comments on Draft Results of Redetermination Pursuant to Court Remand," dated August 21, 2024 (Assan's Rejected Comments).

[74] *See* Commerce's Letter, "Rejection of Assan's Draft Remand Comments," dated August 26, 2024; *see also* Petitioners' Letter, "Petitioners' Request That the Department Reject Untimely New Factual Information Submitted by Assan Aluminyum Sanayi ve Ticaret A.S. on August 21, 2024," dated August 22, 2024.

[75] *See* Assan's Comments.

[76] *See* Assan's Letter, "Assan Group's Formal Protest of Commerce's Rejection of Assan's Comments on Draft Results of Redetermination Pursuant to Court Remand and Request for More Limited Redactions," dated August 28, 2024 (Assan's Protest).

[77] *See* Draft Results of Redetermination at 22, b.72.

[78] *See Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Consol. Court No. 21-00246; Slip Op. 24-44 (CIT April 11, 2024) Common Alloy Aluminum Sheet from the Republic of Türkiye, Final Results of Second Redetermination Pursuant to Court Remand (July 31, 2024), ACCESS Barcode:  4607225-01 (CAAS Remand Redetermination).

[79] *See* Request to Reopen the Record on Remand (August 12, 2024), ACCESS Barcode:  4612835-01.

that are in different administrative review periods that occur on the same {IPC} are entitled to the same adjustment."[80]

*Aluminum Association's Comments:*

The following is a verbatim summary of the comments submitted by the Aluminum Association.

For further details, *see* Aluminum Association's Comments at 2.

> {Commerce's} revised duty drawback methodology is consistent with the statute and is otherwise lawful. Both the methodology employed by {Commerce} in the original investigation, as well as the methodology applied in the {Draft Results of Redetermination}, are lawful because they both "maintain{} the correspondence of values between the denominator" in the per unit duty drawback calculation "and the universe of U.S. sales to which the resultant per-unit adjustment is applied."[81] By maintaining this consistency, {Commerce's} methodologies both satisfy {section 772(c)(1)(B) of the Act}, which provides that export price shall be increased by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States."

**Commerce's Position:** As a threshold matter, we note that no party challenged the methodology employed in Commerce's duty drawback calculation, therefore for the final results of redetermination, we continue to use the calculation methodology articulated above.

For this remand segment, we have declined to reopen on the record, and we continue to rely on the information already existing on the record. This is reasonable and consistent with the *Remand Order*, as nothing in the *Remand Order* directs Commerce to reopen the record. Further, there is no information missing from the record for Commerce to complete this redetermination. The remanded issue surrounding duty drawback concerns Commerce's calculation methodology of the duty drawback adjustment, not the underlying data used in the calculation. Assan did not preserve any arguments with respect to the data Commerce employed

---

[80] *See* CAAS Remand Redetermination at 7 and n.40 (quoting *Toscelik Profil v. Sac Endustrisi A.S.*, 348 F. Supp. 3d 1321, 1327 (CIT 2018)).
[81] *See* Draft Results of Redetermination at 8.

in its calculation in its complaint before this Court.[82]  Therefore, Commerce's use of the

information already on the record in the calculation of the per-unit duty drawback adjustment

was laid to rest long ago and cannot be resurrected in this remand proceeding.[83]

      Commerce's determination is accurate "if it is correct as a mathematical and factual

matter…."[84]  Commerce does not reopen the record to admit evidence when the parties have

introduced otherwise-acceptable evidence that allows an accurate margin calculation.[85]

Commerce has significant deference in determining whether to reopen the record, and

Commerce was not obligated to reopen the record when the record already contained a usable

data set with all information needed.[86]

      Assan's duty drawback information already on the record was factually correct at the

time of its submission as part of the LTFV investigation.[87]  There is no dispute that the

---

[82] *See* Assan Complaint, ECF No. 10 at Count III (Jan. 1, 2022); *See also Zhaoqing Tifo New Fibre Co., Ltd. v. United States*, 256 F. Supp. 3d 1314 (CIT 2017) ("Issues that are not the subject of a timely-filed complaint are, as a general rule, beyond the court's jurisdiction and cannot be entertained by the court.") (citing *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) (stating that, in the interests of finality, "{p}ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of that contest, and that matters once tried shall be considered forever settled as between the parties"); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (acknowledging, on appeal in an antidumping duty case, that "{i}n some instances, a tension may arise between finality and {a} correct result"); *Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn Bhd.*, 334 F.3d 1284, 1292 (Fed. Cir. 2003) (recognizing the "strong interest in the finality of Commerce's decisions").
[83] *See Zhaoqing Tifo New Fibre Co., Ltd. v. United States*, 355 F. Supp. 3d 1285, 1303 (CIT 2018) (*Zhaoqing Tifo*) ("As Zhaoqing Tifo has maintained, and as has been explained previously and yet again here, the scope of this action is determined by the claim set forth in Zhaoqing Tifo's Complaint, which does not contest Commerce's decision in the Final Determination to select the financial statements of P.T. Tifico (rather than those of P.T. Asia Pacific).  Because the Domestic Producer elected not to file its own action contesting Commerce's decision on the selection of financial statements, and because the 'double-counting' claim asserted by Zhaoqing Tifo is laser-focused on the implications of Commerce's decision to select the financial statements of P.T. Tifico – and does not challenge that decision itself – Commerce's selection of the financial statements of P.T. Tifico was laid to rest long ago and cannot be resurrected in this action.  Unlike Lazarus, Commerce's selection of financial statements cannot rise from the dead.  (Internal citation omitted.)").
[84] *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016) (*Nan Ya*).
[85] *See New American Keg v. United States*, Slip Op. 24-11 (CIT January 31, 2024) at 5.
[86] *See, e.g.*, *Pro-Team Coil Nail Enter. Inc. v. United States*, 587 F. Supp. 3d 1364, 1374 (CIT 2022) ("While Commerce retains significant discretion to determine whether to reopen the record on remand, in most cases, this is not something the court will require simply based on a plaintiff's argument that better information is available.").
[87] *See* CQR at 39-43 and Exhibits C-9 through C-13; DQR at D-32 through D-35 and Exhibit D-15; Assan's Letter, "Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S.'s Response to the March 12 Section C Second Supplemental Questionnaire," dated March 31, 2021 (SQR5) at 25 through 29 and Exhibits S6C-1, S6C-2, S6C-27, and S6C-28.

information on the record is factually incorrect and needs to be corrected with superseding information.  Assan requests that Commerce allow Assan to submit additional information to allegedly enhance the accuracy of our calculation.  However, record information allows Commerce to apply the modified duty drawback adjustment methodology without a need for reopening the record to ask Assan to correct or revise the information already on the record.  If we were to apply the modified duty drawback adjustment methodology during the administrative LTFV investigation, the information currently on the record would be complete to perform the necessary calculations.  Therefore, Commerce's duty drawback adjustments in these final results of redetermination are "correct as a mathematical and factual matter."[88]  In these final results of redetermination, we do not find that the accuracy concern overrides the need for the finality of the underlying LTFV investigation.

 With respect to the specific issue of closed IPCs, the CIT has concluded that it is reasonable for Commerce to expect that the information Assan is allegedly attempting to provide to have been submitted during the underlying investigation.[89]

 Our decision to not reopen the record is based on our analysis of the information already on the record and we find that reopening the record is not required.  In our decision-making process, we may take into consideration our policies and methodologies as expressed in different administrative determinations without placing them on the record of this investigation but we "cannot take the factual information underlying those decisions into consideration unless those

---

[88] *See Nan Ya*, 810 F.3d at 1344.
[89] *See Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 654 F. Supp. 3d 1311, 1322 (CIT 2023) ("Finally, the record in this case does not show that the GOT fails to process IPCs and grant duty drawbacks in a timely fashion, so as to make Commerce's requirements unfair.  Kaptan was able to provide a certificate from the GOT approving an IPC, which Commerce accepted as sufficient proof under this closure standard.  Thus, there is nothing in this record that shows that the evidence that Commerce seeks ordinarily cannot be obtained in a timely manner.") (internal citations omitted).

facts are properly on the record of the proceeding before it."[90]  For the final results of redetermination, we took into consideration CAAS Remand Redetermination but the factual information underlying the CAAS Remand Redetermination segment that led to the reopening of the record in that remand does not exist in this remand segment.[91]  Accordingly, we relied on the factual information on the record of the investigation underlying the Court's *Remand Order* and this remand segment to determine that reopening the record is not necessary.[92]  Our decision here to decline to reopen the record is not arbitrary and capricious as there are factual distinctions between the separate proceeding that Assan raises and the proceeding here.[93]

If Commerce were to reopen the record with additional new factual information, "it would be a very slippery slope.  If one begins tugging at the thread, there is no telling where the unraveling will end or what will be left.  The statutory scheme plainly contemplates that Commerce's final determinations will be exactly that – final – except to the extent that one or more aspects of a final determination are properly preserved for judicial review."[94]  Additionally,

---

[90] *See Clearon Corp. v. United States*, 38 CIT 1122, 1147 (2014) (*Clearon Corp.*) ("Although Commerce can and does take into consideration its policies and methodologies as expressed in different administrative case precedent when making its determination, it cannot take the factual information underlying those decisions into consideration unless those facts are properly on the record of the proceeding before it."); *see also Jiaxing Brother Fastener Co., Ltd. v. United States*, 428 F. Supp. 3d 1364, 1379-80 (CIT 2020) (*Jiaxing Brother*) ("Although Commerce notes that it relies on the same NSO quarterly data to calculate labor hours as in the previous administrative review, …the records of the two proceedings are not the same. … The agency must make its determinations based on the record before it.  (internal citations omitted).");  and *Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*, 322 F. Supp. 3d 1308, 1324 (CIT 2018).

[91] *See* CAAS Remand Redetermination at 6 ("However, because information on the record of the underlying investigation, regarding Assan's closed-IPC and reported U.S. sales was inadequate (*i.e.*, for purposes of allocating the duty drawback benefit only to those reported U.S. sales associated with the closed-IPC), on remand, we re-opened the record to request that Assan identify the relevant in-scope merchandise exported to the United States associated with the IPC that was closed during the POI, and to tie these sales to the company's U.S. sales database.").

[92] *See, e.g.*, *Oil Country Tubular Goods from Mexico:  Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 87 FR 59041 (September 29, 2022), and accompanying IDM at Comments 1 and 2.

[93] *See Jiaxing Brother Fastener Co., Ltd. v. United States*, 380 F. Supp. 3d 1343, 1356 (CIT 2019) ("Agency action is arbitrary and capricious if 'the agency offers insufficient reasons for treating similar situations differently.'") (citing *West Deptford Energy, LLC v. Fed. Energy Regul. Comm'n*, 766 F.3d 10, 21 (Fed. Cir. 2014)).

[94] *See Zhaoqing Tifo*, 355 F. Supp. 3d at 1303 n.18; *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.*, 435 U.S. 519, 554-55 (1978) ("Administrative consideration of evidence. . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated. . . .  If, upon the

the Federal Circuit has made clear that it is well within Commerce's discretion on whether to reopen the record or not on remand.[95]

Further, while the methodology used in the calculation and application of the duty drawback adjustment was preserved for judicial review in Assan's challenge before the CIT, the underlying data used in the calculation of the duty drawback adjustment was not preserved for judicial review as discussed above. Finally, Commerce has provided a reasoned explanation of why this case is factually distinct from the CAAS Remand that Assan relies on, such that Commerce's decision is not arbitrary and capricious.

Accordingly, Commerce declined to reopen the record for purposes of this remand redetermination.

Comment 2:  Raw Material Premium Costs

*Assan's Comments:*

The following is a verbatim summary of the comments submitted by Assan. For further details, *see* Assan's Comments at 8-12.

> Assan Group disagrees with Commerce's determination regarding raw material premiums (DIRMATMP). The CIT remanded Commerce's DIRMATMP determination for failure to consider Assan Group's arguments, which reflected "an important aspect of the problem."[96] Though Commerce's {Draft Results of Redetermination} purports to address Assan Group's argument that "Commerce improperly focused on differences in raw material premium costs while ignoring related differences in other production costs, such as labor,"[97] Commerce only considers whether there are physical differences in the end products. The important

---

coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.") (citations omitted)

[95] *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) ("Certainly Commerce could have requested that the trial court remand to allow them to reopen the record if it believed that was warranted. The trial court could have remanded the case to Commerce with instructions for Commerce to decide whether to reopen and supplement the record. It was improper in this case, however, for the trial court to remand and require that Commerce reopen and supplement the record. The government is correct that the trial court's order usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance.") (emphasis in original).

[96] *See Remand Order* at 10

[97] See *Remand Order* at 10 and Draft Results of Redetermination at 12.

consideration, however, is whether there are physical differences in the raw materials used to produce those end products. Commerce's {Draft Results of Redetermination} continues to ignore fundamental cost differences related to yield loss for specific CONNUMS and production runs. In addition, Commerce does not consider or give any weight to the fact that its reporting is consistent with Assan Group's books and records kept in the normal course of business and consist with GAAP. Commerce's decision to reject Assan Group's actual recorded costs in favor of an average raw material premium, which unreasonably results in all subject merchandise having the same unit metal cost, is unsupported by substantial evidence and otherwise not in accordance with law.

*Aluminum Association's Comments:*

The following is a verbatim summary of the comments submitted by the Aluminum Association.

For further details, *see* Aluminum Association's Comments at 6-10.

The {Draft Results of Redetermination} properly continues to average Assan's raw material premium costs (*i.e.,* DIRMATMP). Petitioners urge {Commerce}, however, to incorporate three additional justifications in support of its determination in the agency's final redetermination. First, Assan's argument for analyzing TOTCOM cost differences is based on Assan's claim that "differences in labor and other costs offset differences in raw material costs."[98] Assan's claims, however, are purely declarative and are contrary to record evidence. Second, {Commerce} cited several administrative determinations in support of its normal practice of analyzing cost differences between CONNUMs based on a particular cost component (*e.g.,* direct materials or a component of fabrication costs) that is affected by the relevant product physical characteristic.[99] There are also several determinations of the {CIT} and U.S. Court of Appeals for the Federal Circuit {(Federal Circuit)} that supports {Commerce's} normal practice as lawful that {Commerce} should cite in its final remand redetermination.[100] Third, Assan admitted that "significant fluctuations' in the London Metal Exchange ("LME") costs based on differences in timing support relying on a single average DIRMATLME cost for the period of investigation.[101] The same is true for raw material premium costs, as Assan admitted during the original investigation that these costs also fluctuate significantly.[102] Accordingly, because both DIRMATLME and DIRMATMP fluctuate significantly over time, {Commerce's}

---

[98] *See Remand Order* at 15 and 28 (noting Assan's claim that "{c}heaper inputs require more work to convert into foil and thus have higher labor and other costs") (citation omitted).

[99] *See* Draft Results of Redetermination at 12 footnote 41 (citing *Welded Pipe from Korea* at Comment 6 (ACCESS Barcode: 3142991-01); *OCTG Korea* at Comment 23 (ACCESS barcode: 3562289-01); and *Nails from Korea* at Comment 3 (ACCESS barcode: 3664285-01)).

[100] *See Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1363 (Fed. Cir. 2014) (*Thai Plastic Bags*); *Marmen Inc. v. Unites States*, 545 F Supp. 3d 1305, 1314-15 (CIT 2021) (*Marmen*); and *Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1371 (CIT 2018) (*Dong-A Steel*).

[101] *See* Draft Results of Redetermination at 14.

[102] *See* 4SDQR Part II at 9.

rationale for averaging DIRMATLME, with which Assan agrees, also supports {Commerce's} decision to average DIRMATMP.[103]

**Commerce's Position:** We continue to disagree with Assan that its books and records "reasonably reflect the cost to produce the merchandise under consideration based on the physical characteristics" identified by Commerce.

In the underlying investigation, Commerce stated that although Assan's reported costs are derived from its normal books and records which are kept in accordance with Turkish GAAP, the question facing Commerce was whether the reported material costs from Assan's normal books reasonably reflect the costs to produce the merchandise under consideration based on the physical characterizes identified by Commerce.[104] To determine whether Assan's reported costs reflected the significant raw material cost differences among CONNUMs that were unrelated to the product's physical chanceries, Commerce analyzed Assan's reported raw material costs. Because Assan stated that the reported DIRMATLME may show variances between products that are due to timing and are unrelated to the differenced in product's physical characteristics, and weight-averaged the DIRMATLME based on the total POI period, we compared the CONNUM-specific per-unit raw material cost for each CONNUM (*i.e.,* sum of CONNUM-specific DIRMATLME and DIRMATMP) to the POI average per-unit raw material cost for all CONNUMs (*i.e.,* sum of DIRMATLME and DIRMATMP) to determine the variances between the CONNUM-specific raw material cost and the POI weighted average raw material cost.[105] Based on the analysis, we found that the reported raw material costs (*i.e.,* sum of DIRMATLME and DIRMATMP) reflected the significant cost differences between CONNUMs that are unrelated to the product's physical characteristics.[106] Thus, in the underlying investigation,

---

[103] *See Dong-A Steel*, 337 F. Supp. 3d at 1370 (Commerce found that the timing of the coil purchase and pipe production influenced the cost, not the pipe's physical characteristics.").
[104] *See Final Determination* IDM at 33.
[105] *Id*.; *see also* Preliminary Cost Calculation Memorandum and Final Cost Calculation Memorandum.
[106] *Id.*

Commerce determined that Assan's raw material costs recorded in the normal books and record did not reasonably reflect the cost to produce the merchandise under consideration. This is consistent with precedent from the Federal Circuit and the CIT accepting similar analysis by Commerce.[107]

We also disagree with Assan that we only considered the physical differences for the finished products and did not adequately address the differences in raw materials used to produce the finished products. In the underlying investigation, Commerce inquired as to the different raw material inputs consumed in the production such as interchangeability among different raw material inputs and the factors used to determine the specific raw material input used for finished products, *i.e.,* specification, alloy, *etc*.[108] In its response, Assan stated that it has a preference to use a specific type of input for a certain product because it has a preferred production routing due to certain characteristics of its production equipment. Assan also stated that all raw material input types (*i.e.,* primary aluminum, aluminum sheet, or scrap) can be used interchangeably in the production of merchandise under consideration.[109] Thus, Commerce determined that with the exception of production yield losses, the significant DIRMATMP cost differences among CONNUMs were driven by factors other than the product's physical characteristics.[110]

To address the product yield losses that were reflected in the DIRMATMP, Commerce requested that Assan identify and separately report the costs associated with yield losses for each CONNUM. Specifically, Commerce requested that Assan break out from the reported DIRMATMP costs associated with the product yield losses. However, Assan failed to provide

---

[107] *See Thai Plastic Bags*, 746 F.3d at 1364-67. ("Because TPBI departed from its normal accounting principles and failed to base its costs on physical characteristics, Commerce relied on substantial evidence in determining the reported conversion costs were distortive and did not reasonably reflect the actual costs. Commerce was therefore not required to rely upon those records."); *see also Marmen*, 545 F Supp. 3d at 1314-15; and *Dong-A Steel*, 337 F. Supp. 3d at 1371.
[108] *See* 4SDQR Part II at 12-13.
[109] *Id.*
[110] *See Final Determination* IDM 33.

this information.[111]  It is common that respondents providing data in an antidumping duty proceeding are faced with accounting system limitation, and generally, those respondents determine reasonable methods that enable them to provide the information to Commerce in the manner in which the data was requested.  We find it reasonable to consider a large, sophisticated company like Assan can reasonably determine CONNUM-specific yield losses and the related costs embedded in the DIRMATMP field.[112]  Providing this information would require some effort.  However, it could have been accomplished using information from production runs, engineering specifications, and other production records.  Assan, however, made no attempt to provide Commerce with the CONNUM-specific yield loss costs embedded in the DIRMATMP in the underlying investigation.  It was clear based on both Commerce's request and the timing of the request (*i.e.,* after the *Preliminary Determination*) that the requested information was necessary to properly address the issues related to the DIRMATMP cost differences unrelated to the differences in physical characteristics and the product yield losses.  However, Assan did not provide the requested cost breakout and thus, this information to calculate product-specific yield losses is not available on the record.[113]  For these reasons, we continue on remand to weight average the reported DIRMATMP cost for all CONNUMs to mitigate the cost differences unrelated to the product physical characteristics.

Comment 3:  Treatment of Hedging Gains

*Assan's Comments:*

The following is a verbatim summary of the comments submitted by Assan.  For further details, *see* Assan's Comments at 12-13.

> Assan Group agrees with Commerce's determination regarding Assan Group's hedging transaction.

---

[111] *See* 4SDQR Part II at 14-15.
[112] *See Final Determination* IDM 34-35.  *See also* 4SDQR Part II at 10 where Assan stated that "the cost accounting system employed by Assan is quite advanced and sophisticated."
[113] *See* 4SDQR Part II at 14-15.  *See also Final Determination* IDM 34-35.

*Aluminum Association's Comments:*

The following is a verbatim summary of the comments submitted by the Aluminum Association.

For further details, *see* Aluminum Association's Comments at 10-12.[114]

> Petitioners urge {Commerce} to include gains from Assan's hedging transactions as an offset to interest expenses (INTEX), rather than as an offset to Assan's cost of manufacture, in the final determination. Both the {CIT} in the *Remand Oder*, as well as {Commerce}, acknowledge there is ambiguity regarding whether Assan's hedges related to its raw material purchases or its sales prices.[115] In the {Draft Results of Redetermination}, {Commerce} does not explain why Assan would attempt to manage the aluminum price risk associated with its raw material purchases, but completely ignores that aluminum price risk is associated with its sale of finished goods of its inventory. The only reasonable inference is that Assan's hedging transactions are part of a holistic cash and risk management strategy, meant to mitigate Assan's total aluminum price risk, which arises not only from its purchases of raw materials, but also its sales of finished goods and inventory position. As transactions meant to manage Assan's overall risk exposure, Assan's hedging transactions are financial in nature and the associated gains belong in interest expenses as {Commerce} and the {CIT} have previously found.[116]  {}

**Commerce's Position:**  We continue to disagree with the Aluminum Association that the net hedging gains should be included in Assan's interest expense calculation as necessarily financial in nature and have continued to include them as part of the company's manufacturing costs. Hedging instruments can be extremely complicated in terms of how they are structured and how related gains and losses must be reported. Contributing to the complexity of hedging instruments

---

[114] We note that we requested that interested parties provide a public, executive summary in comments to the Draft Results of Redetermination. *See* Draft Results of Redetermination at 22. Therefore, because the executive summary in the Aluminum Association's Comments contains BPI, we have redacted that content herein.

[115] *See* Draft Results of Redetermination at 17; *see also Remand Order* at 20 (noting that Assan "concedes that its hedging is in some way related to the sales price of its finished goods" and that it does hedge – at least in part – against the risk imposed by mark-to market accounting of its raw material inventory").

[116] *See Phosphor Copper from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value and negative Final Determination of Critical Circumstances*, 82 FR 12433 (March 3, 2017) (*Phosphor Copper from Korea*), and accompanying IDM Comment 2 (explaining that because the respondent "incurs gains and losses on derivative transaction," and the respondent "uses copper as the main input in producing the merchandise under consideration," a material that "is a commodity metal traded on the London Metal Exchange (LME)," it "is reasonable to include the full amount of such gains and losses in {the respondent's} financial expense rate calculation"); and *Fischer S.A. Comercio, Industria and Agricultura v. United States*, 38 CIT 775, 784-87 (2014) (*Fischer*) (upholding the Department's determination that "including all incurred hedging losses in Fisher's financial expenses ratio accurately depicted 'how the entity as a whole manages its overall foreign currency exposure and risk associated with interest rate variations'" (citation omitted).

is that they are not only financial instruments that generate their own gains and losses, but they are also related to underlying monetary assets and liabilities that generate offsetting gains and losses.[117]  Commerce's preference to include hedging gains and losses as reported on a respondent's audited <u>income statement</u>, and to rely on how such transactions are recorded and reported in a respondent's normal books and records falls within the discretion given to Commerce when dealing with complicated financial and accounting issues.[118]  The Federal Circuit has held that Commerce is entitled to great deference in matters involving complex economic and accounting decisions.[119]

The record shows that Assan:  1) routinely monitors its total raw material inventory "position" and related hedging position were updated to ensure stability of its raw material costs;[120] 2) linked the monthly open hedge position quantity to the monthly raw material inventory position quantity;[121] 3) recorded the net hedging gains as a part of costs of goods sold in the audited financial statements;[122] and, 4) included net hedging gains in the reported costs in the same manner as in its normal books and records.[123]  As such, the record demonstrates linkage between Assan's hedging transactions and the purchase of raw materials.  As Commerce stated, the possibility of drawing two inconsistent conclusions from the record evidence does not

---

[117] *See Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination,* 77 FR 63291 (October 16, 2012) (*Orange Juice from Brazil*), and accompanying IDM at Comment 10.
[118] *Id.*
[119] *See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("Similarly, this court has repeatedly held that Commerce's special expertise makes it the "master" of the anti-dumping law, entitling its decisions to great deference from the courts.  Thus, factual determinations supporting anti-dumping margins are best left to the agency's expertise.") (citing *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1394 (Fed. Cir. 1997); *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed.Cir.1995); *Smith–Corona v. United States*, 713 F.2d 1568, 1571 (Fed.Cir.1983).
[120] *See* 4SDQR Part II at 1-3.
[121] *Id.* at Exhibit S10D-6.
[122] *See* SDQR at 5S-33—5S-35 and *Final Determination* IDM at Comment 9.
[123] *See Final Determination* IDM at Comment 9.

prevent Commerce's finding from being supported by substantial evidence.[124]  In the *Remand Order*, the Court also stated that "the substantial evidence standard allows the Court to sustain Commerce's decision even if the record also supports a different outcome… But this feature of the substantial evidence standard still requires Commerce's explanation to supported by substantial evidence."[125]  While Commerce acknowledges the Association's arguments that the gains and losses related to the sale of finished goods, there is likewise record evidence for linking Assan's hedging transactions to its purchases of raw materials as explained above.  Thus, it is reasonable for Commerce to include the net hedging gains in the cost of manufacturing.

The Aluminum Association relies on *Phosphor Copper from Korea* and *Fischer* as support for the argument that Assan's net hedging gains should be included in the interest expense rate calculation because the hedging transactions are part of Assan's overall cash and risk management strategy.  However, we find that *Phosphor Copper from Korea* and *Fischer* are distinguishable from the underlying investigation.  In the underlying investigation, the net hedging gains are recorded in Assan's audited income statement as a part of cost of sales.[126]  However, the factual basis as it relates to how the respondents in *Phosphor Copper from Korea* and *Fischer* recorded and treated the gains or losses at issues may have been different  For example, the gains and losses on derivatives at issue in *Phosphor Copper from Korea* and the hedging losses at issue in *Fischer*  would have been likely recorded in each respondent's income statement as part of interest expense, instead of cost of manufacturing, because:  1) the respondent's reported costs were based on its normal books and records; 2) Commerce normally relies on the company's normal books and records and how these items were recorded in the

---

[124] *See Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).
[125] *See Remand Order* at 37.
[126] *See* SDQR at 5 S-33-5S-35 and *Final Determination* IDM at Comment 9.

company's income statement; and, 3) the issues were discussed in the context of company's interest expense calculation. Specifically, the disputes in those cases were whether the items at issues should have been included or excluded from the respondents' interest expense calculation.[127] However, in the underlying investigation, the dispute is where the net hedging gains should be included in the reported in cost of production (*i.e.,* COM vs. interest expense calculation).

Further with respect to *Fischer,* Commerce explained in the underlying proceeding that Fischer's income statement reflected amounts for "unrealized" hedging gains and losses.[128] In light of Commerce's descriptions in the decision memorandum for that case, it is reasonable to conclude that the related gains and losses were not (as they are for Assan) included in the company's cost of goods sold. The terms "unrealized" or "realized" when referring to various income or expense items are not associated with the cost of goods sold line item on an income statement. As such, the facts of the underlying investigation are distinguishable from *Phosphor Copper from Korea* and *Fischer.*

We also disagree with the Aluminum Association that the net hedging gains should be included in the interest expense calculation because of how the hedging transactions are presented in Assan's cash flow statement. As stated above, Assan recorded the net gains on hedging activity that were triggered by its raw material purchases as part of cost of goods sold in its <u>audited income statement</u>. When Commerce evaluates a respondent's submitted costs, section 773(f)(1)(A) of the Act directs that costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the GAAP of the exporting country (or the producing country, where appropriate) and reasonably reflect the

---

[127] *See Phosphor Copper from Korea* IDM at Comment 2 and *Orange Juice from Brazil* IDM at Comment 10.
[128] *See Orange Juice from Brazil* IDM at Comment 10.

costs associated with the production and sale of the merchandise.  Accordingly, Commerce will typically rely on a company's normal books and records if two conditions are met:  (1) the books are kept in accordance with the home country's GAAP; and (2) the books reasonably reflect the cost to produce and sell the merchandise.  We find that both conditions are satisfied based on the facts of this investigation.  Thus, consistent with how the company records these items in its normal accounting records, we continue to find it reasonable to include Assan's net hedging gains in the cost of manufacturing.

## V.    FINAL RESULTS OF REDETERMINATION

For these final results of redetermination, we made no changes to the Draft Results of Redetermination.  As a result, consistent with the Draft Results of Redetermination, the weighted-average dumping margin for Assan and the all-others rate[129] for the period July 1, 2019, through June 30, 2020, are as follows:

| Exporter/Producer | Final Results of Redetermination Weighted-Average Dumping Margin[130] (percent) |
|---|---|
| Assan Aluminyum Sanayi ve Ticaret A.S.; Kibar Dis Ticaret A.S.; Ispak Esnek Ambalaj Sanayi A.S. | 2.30 |
| All Others | 2.30 |

Because the weighted-average dumping margins for Assan and all-other companies are different from those in the *Final Determination*, we intend to issue a *Timken*[131] notice with the amended final determination should the Court sustain these final results of redetermination.

---

[129] *See* section 735(d)(5)(A) of the Act ("{T}he estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely under section 776"); and *United States Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1254 (CIT 2018) (holding that Commerce has an established practice of recalculating the all-others rate upon revision of a mandatory respondent's rate); *see also Final Determination*, 86 FR at 52880-81.

[130] *See* Draft Remand Calculation Memorandum.

[131] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken); see also Diamond Sawblades Manufacturers Coalition v. United States*, 626 F.3d 1374 (Fed. Cir. 2010).

In addition, Commerce intends to issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

9/5/2024

X _____

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
 for Enforcement and Compliance