**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) |
| | ) |
| *Plaintiff*, | ) **Public Version** |
| v. | ) |
| THE UNITED STATES, | ) Consol. Court No. 21-00616 |
| | ) |
| *Defendant*, | ) **Business Proprietary Information deleted from page: 7.** |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, et al., | ) |
| | ) |
| *Defendant-Intervenors*. | ) |

**ASSAN ALUMINYUM SANAYI VE TICARET A.S.'S COMMENTS ON REMAND REDETERMINATION**

Leah N. Scarpelli
Matthew M. Nolan
Jessica R. DiPietro

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6013
Fax: (202) 857-6395
Email: leah.scarpelli@afslaw.com

October 17, 2024

**TABLE OF CONTENTS**

**Page**

I.     SUMMARY OF THE ARGUMENT ................................................................. 1

II.    COMMERCE'S REMAND REDETERMINATION........................................ 4

III.   ARGUMENT ................................................................................................... 6

      A.     THE DUTY DRAWBACK METHODOLOGY IMPROPERLY LIMITS ASSAN'S ADJUSTMENT.............................................................. 6

      B.     DIRMATMP SHOULD BE BASED ON ASSAN'S ACTUAL REPORTED COSTS ......................................................................... 11

      C.     THE HEDGING OFFSET IS SUPPORTED BY RECORD EVIDENCE.......... 15

IV.   CONCLUSION............................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Assan Aluminyum Sanayi Ve Ticaret A.S. v. United States,* 2024 WL 2044061 (Ct. Int'l Trade May 8, 2024) ................................................................................ passim

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States,* Consol. Court No. 21-00246; Slip Op. 24-44 (Ct. Int'l Trade April 11, 2024) ............................................7

*Dongkuk S&C Co., Ltd. v. United States,* 600 F. Supp. 3d 1331, 1337 (Ct. Int'l Trade 2022) .................................................................................................14

*Parkdale Int'l v. United States,* 475 F.3d 1375, 1380 (Fed. Cir. 2007) ........................................10

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 348 F. Supp. 3d 1321 (Ct. Int'l Trade 2018) ..............................................................................................3, 10

*Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192 (Fed. Cir. 2021) .......................... passim

**Federal Statutes**

19 U.S.C. § 1677a(c)(1)(B) ................................................................................2, 7, 9, 10

**Other Authorities**

*Common Alloy Aluminum Sheet From Turkey*, 85 Fed. Reg. 65346 (Dep't Commerce Oct. 15, 2020) ...............................................................................16

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) |
| *Plaintiff*, | ) ) **Public Version** |
| v. | ) ) |
| THE UNITED STATES, | ) Consol. Court No. 21-00616 ) |
| *Defendant*, | ) **Business Proprietary** ) **Information deleted from** |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, et al., | ) **page: 7** ) ) ) |
| *Defendant-Intervenors*. | ) ) ) |

## ASSAN ALUMINYUM SANAYI VE TICARET A.S.'S COMMENTS ON REMAND REDETERMINATION

Pursuant to the U.S. Court of International Trade's opinion and order dated May 8, 2024, ECF No. 74, Plaintiff Assan Aluminyum Sanayi ve Ticaret A.S. ("Assan") provides the following comments in response to the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand filed on September 5, 2024, ECF No. 75 ("*Remand Redetermination*"), Appx125-161. The *Remand Redetermination* was issued pursuant to the remand order of the U.S. Court of International Trade ("CIT") in *Assan Aluminyum Sanayi Ve Ticaret A.S. v. United States*, 2024 WL 2044061 (Ct. Int'l Trade May 8, 2024) ("*Remand Order*"), Appx1-39. These comments are timely filed pursuant to the Court's October 1, 2024 order amending the scheduling order, ECF No. 79.

### I. SUMMARY OF THE ARGUMENT

In *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, the Court remanded Commerce's final determination in the underlying antidumping duty investigation of Aluminum

Foil from Turkey ("AD order") for Commerce to "reconsider or further explain: (1) its duty drawback methodology, (2) its treatment of the raw material premium, and (3) its treatment of Assan's hedging revenues." *Remand Order* at *14, Appx38-39. Assan disagrees with Commerce's *Remand Redetermination* with respect to the first two issues, but agrees with its treatment of Assan's hedging revenues, as detailed below.

With regards to duty drawback, Commerce revised its methodology to make the denominator the quantity of only U.S. sales associated with a closed Inward Processing Certificate ("IPC"), but limited its application of that adjustment to only U.S. sales associated with a single IPC, rather than all U.S. sales during the period of investigation ("POI"). *Remand Redetermination* at 8, Appx133. Despite what Commerce now claims, there is no requirement in the statute that there be a "correspondence of values between the denominator and the universe of U.S. sales to which the resultant per-unit adjustment is applied." *Id.* Instead, the statute requires only that the U.S. price be increased by "the amount of any import duties . . . which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States{.}" 19 U.S.C. § 1677a(c)(1)(B). Commerce's methodology in the *Remand Redetermination* is not only a reversal of course from its previous position regarding the drawback adjustment, but also inconsistent with its treatment of Assan's IPCs in the parallel investigation involving *Common Alloy Aluminum Sheet from Turkey* ("*CAAS*"), in which Assan is also a mandatory respondent. Though Commerce dismisses "any noted inconsistency in Commerce's duty drawback calculation currently," *Remand Redetermination* at 7, Appx132, this ignores Commerce's determination in *CAAS* to reopen the record to accept additional documentation establishing IPC closure and the rebate of duties during the POI. Commerce should have adopted the same methodology in this case, consistent with the CIT's directive that

2

"exports that are in different administrative review periods that occur on the same {IPC} are entitled to the same adjustment." *Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 348 F. Supp. 3d 1321, 1327 (Ct. Int'l Trade 2018). Commerce's failure to do so unlawfully limits the drawback adjustment to which Assan is entitled due and violates the statutory requirement that "{t}he *entire* drawback {be} allowed 'by reason of the exportation.'" *Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192, 1198 (Fed. Cir. 2021) (emphasis added).

With regards to raw material premiums ("DIRMATMP"), Commerce did not change its methodology and continued to weight average the reported raw material aluminum premium costs for all CONNUMs. *Remand Redetermination* at 12, Appx137. Assan disagrees with Commerce's determination regarding DIRMATMP and maintains that the "further explanation" provided still fails to consider Assan's arguments that "Commerce improperly focused on differences in raw material premium costs while ignoring related differences in other production costs, such as labor." *Remand Order* at *10, Appx28. There is no basis to ignore Assan's reported CONNUM-specific aluminum premium costs in the total cost of manufacturing, which best account for physical differences in the raw materials used to produce Assan's end products. Commerce's circuitous rationale that it should exclude "the fabrication costs (*i.e.*, labor and conversion costs) in the aluminum premium cost differential analysis because the fabrication costs are not associated with the reported raw material costs," *Remand Redetermination* at 12, Appx137, continues to overlook fundamental cost differences related to yield loss for specific CONNUMs and productions runs depending upon the type of raw material used in production. Commerce does not address how its methodology accounts for the fact that "metal premiums vary between inputs because some are easier to convert to foil than others," with "{c}heaper inputs require{ing} more work to convert into foil and thus hav{ing} higher labor and other

costs. *Remand Order* at \*10, Appx28. It also ignores that these costs are included in Assan's books and records kept in the normal course of business, which have otherwise been found to "reasonably reflect the cost to produce and sell the merchandise." *Remand Redetermination* at 13, Appx138. Commerce should have relied on Assan's actual recorded costs rather than an average raw material premium, and its methodology in the Remand Determination unreasonably results in all subject merchandise having the same unit metal cost despite these clear differences.

Finally, Assan agrees with Commerce's determination regarding hedging transactions and further explanation to support inclusion of net hedging gains in the calculation of Assan's cost of production.

## II.    COMMERCE'S REMAND REDETERMINATION

As detailed above, Commerce's *Remand Redetermination* addresses three substantive issues – (1) duty drawback, (2) DIRMATMP, and (3) hedging revenues.

First, with regards to duty drawback, the Court granted Commerce's voluntary remand request "to further explain or to reconsider its duty drawback adjustment" due to "its evolving agency practices on duty drawback." *Remand Order* at \*8, Appx23. Specifically, after first finding Assan's proposed methodology to be "not consistent with {its} practice," Commerce did "an about-face and stated that any methodology other than Assan's proposed methodology 'would likely introduce inaccuracies.'" *Id.* (internal citations omitted). In the *Remand Redetermination*, Commerce does another "about-face," rejecting its methodologies in past cases involving the Turkish drawback system and invoking a wholly new methodology, which decreases Assan's duty drawback benefit by "allocat{ing} the total amount of duty drawback benefit only to U.S. sales associated with {a} closed IPC." *Remand Redetermination* at 4, Appx129. In its new calculation, Commerce prioritized "the correspondence of values between the denominator and the universe of  U.S. sales to which the resultant per-unit adjustment is

4

applied." *Id.* at 8, Appx133. Though Commerce revised the per-unit adjustment to have a consistent numerator and denominator associated with a closed IPC, it also changed the universe of sales to which that per-unit adjustment was applied to "only to the U.S. sales that were entitled to the benefit," *id.* at 7-8,  Appx132-133, despite the fact that all of Assan's U.S. sales were made pursuant to an IPC. Appx86044-86045; Appx86968-86982, Appx87283-87297.

Second, regarding DIRMATMP, the Court found that Commerce failed to address Assan's arguments that "Commerce improperly focused on differences in raw material premium costs while ignoring related differences in other production costs, such as labor." *Remand Order* at *10, Appx28. In its *Remand Redetermination*, Commerce continues to disregard differences in metal premiums between various inputs, some of which require more processing to convert into foil than others, leading to higher labor and other costs. *Id.* Instead, Commerce simply stated that it was "inappropriate" to include such costs because they "are not associated with the reported raw material costs." *Remand Redetermination* at 12, Appx137. Commerce further claimed that it is appropriate to use a single average for Assan's metal premiums because it uses a single average for the London Metal Exchange ("LME") portion of the raw material cost ("DIRMATLME") and "those costs are closely linked," *id.* at 13-14, Appx138-139.

Finally, Commerce provided further explanation for its determination to treat Assan's hedging gains as part of its cost of manufacturing. The Court remanded this issue for Commerce to explain its view that Assan's hedging mitigates "risks from raw material purchases," rather than "protect{ing} against a future risk. *Remand Order* at *12, Appx34. On remand, Commerce explained that Assan's hedge metal adjustments are "purely related to the inventory valuation gains and losses under the {International Financial Reporting Standards} and they are not generated from actual hedging transactions," and are thus recorded in the reported cost of

AFSDOCS:300365493.6

manufacturing in Assan's financial statements. *Remand Redetermination* at 17, Appx142. As Commerce found, it is appropriate to rely on Assan's normal financial reporting because "Assan's cost of production reasonably reflect{s} the cost to produce the merchandise under consideration." *Id.* at 18, Appx143. Specifically, Commerce determined that record evidence supports Assan's contention that "its hedging activities are to protect the value of its purchased raw material aluminum," and to "mitigate the risk of fluctuation of raw material costs which will be consumed in the production of merchandise under consideration." *Id.* at 18-19, Appx143-144. Because "the raw material purchases that triggered the hedging contract represent Assan's total net raw material costs incurred to produce the merchandise under consideration," Commerce found that they are properly considered as part of the cost of manufacturing. *Id.*

### III.    ARGUMENT

#### A. The Duty Drawback Methodology Improperly Limits Assan's Adjustment

In the *Remand Order*, the Court granted Commerce's request for "voluntary remand to reconsider the denominator it used to calculate the duty drawback adjustment." *Remand Order* at *1, Appx2. This request was granted based, in part, on the Court's finding that, in *CAAS*, a case "involving the same parties as this case . . . Commerce rejected the drawback methodology it used {in *Foil*}," finding that Assan Group's proposed methodology was "the most appropriate methodology" and "any other method . . . would likely introduce inaccuracies." *Id*. at *3, Appx9-10. In its *Remand Redetermination*, Commerce's disparate treatment of Assan's IPCs continues to result in inconsistencies between the appeal involving *CAAS* and this case involving *Foil*. Despite Commerce's objection that *CAAS* "is factually distinct," *Remand Redetermination* at 26, Appx151, for the reasons that follow, there is no basis to treat Assan's IPCs in these two cases differently and doing so violates the statute.

As an initial matter, Assan maintains that it is reasonable to treat all IPCs used during the POI of investigation as closed for the purpose of calculating duty drawback adjustments, as it has argued throughout this case. *See, e.g.*, ECF No. 64 at 6. Commerce's calculation limits the drawback adjustment afforded to Assan to only [    ] IPC, despite the fact that Assan imported subject merchandise under [    ] IPCs during the POI and "*all* subject foil U.S. sales are made pursuant to an IPC. Appx86044-86045 (emphasis in original); Appx86968-86982, Appx87283-87297. In the *Remand Redetermination*, however, Commerce limited its application of the drawback adjustment to sales under the [    ] IPC that received official certification from the Government of Turkey during the period of investigation. Commerce's rationale is based on its rejection of the "assumption that an IPC that is open during the {POI} will close . . . such that it is reasonable to treat all IPCs, open or closed, as closed for the purpose of calculating drawback adjustments," 701 F. Supp. 3d at 1329. However, there is no reasonable basis for Commerce to find that IPCs used by Assan will not ultimately be closed by the Turkish government and the grant of a duty drawback adjustment to *all* U.S. sales made pursuant to an IPC is consistent with the statute, 19 U.S.C. § 1677a(c)(1)(B), which requires an adjustment based on the "entire drawback." *Uttam Galva*, 997 F.3d at 1198.

Commerce's *Remand Redetermination* also perpetuates Commerce's disparate treatment of Assan's IPCs in the two appeals involving *CAAS* and *Foil*. In the proceeding involving *CAAS*, Commerce "re-opened the record to request additional information necessary for purposes of calculating Assan Group's duty drawback adjustment," *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States,* Consol. Court No. 21-00246; Slip Op. 24-44 (Ct. Int'l Trade April 11, 2024) *Common Alloy Aluminum Sheet from the Republic of Turkey*, Final Results of Second Redetermination Pursuant to Court Remand at 5 (Aug. 1, 2024), Appx198 ("*CAAS Remand*

*Redetermination*"), enabling Assan to provide closure documentation issued by the GOT for all

IPCs used during the POI. Commerce subsequently found that it was appropriate "to use IPCs

that are closed outside the {POI} for purposes of calculating duty drawback adjustments when

sufficient evidence exists on the record to demonstrate their closure." *CAAS Remand*

*Redetermination* at 8, Appx201.

In this parallel remand involving *Foil*, Assan filed a corresponding request for Commerce

to reopen the record to request the same information Commerce found to be relevant to its duty

drawback calculations in *CAAS*. Request to Reopen the Record on Remand (Aug. 12, 2024),

Appx40-45. As Assan explained in its request:

> This requested action is consistent with Commerce's recent second
> remand redetermination in {*CAAS*}. In {the *CAAS*} case involving
> the same parties and same duty drawback system at issue here,
> Commerce reopened the record for Assan Group to submit
> "additional information necessary for purposes of calculating
> Assan's duty drawback adjustment." Specifically, Commerce issued
> a supplemental questionnaire for Assan Group to submit official
> closure documentation from the GOT for an IPC used by Assan
> Group during the period of investigation and accepted this
> "additional factual information to demonstrate that all {Assan
> Group's} reported U.S. sales in the POI can be tied to a closed-IPC,
> including IPCs that were closed outside of the POI." Commerce
> subsequently "calculated the duty drawback adjustment using both
> the one IPC that closed during the POI that was addressed in the
> investigation, and this one additional IPC that closed after the POI
> but whose duty drawback adjustment is related to sales reported
> during the POI." . . . {T}he closure documentation Assan Group
> seeks to submit to Commerce in this investigation relates to the
> exact same IPC considered in the *CAAS* investigation remand and
> first administrative review, which was accepted by Commerce in
> both of those proceedings. *Id.* at 2-3, Appx41-42 (internal citations
> omitted).

However, Commerce did not allow Assan the same opportunity to submit closure documentation

from the GOT in this proceeding, instead "rely{ing} on the information already existing on the

AFSDOCS:300365493.6

record," even though its treatment of that information departs from its methodology in *CAAS*.[1] *Remand Redetermination* at 22, Appx147.

In *CAAS*, Commerce specifically found that it was necessary to calculate "the duty drawback adjustment using both the one closed IPC during the POI that was addressed in the investigation, and {the} additional IPC that closed after the POI but whose duty drawback adjustment is related to sales reported during the POI" in order to "fulfil{l} Commerce's statutory requirement to calculate fair and accurate dumping margins." *CAAS Remand Redetermination* at 14, Appx207. Indeed, the drawback statute provides:

> The price used to establish export price and constructed export price shall be . . . increased by . . . the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States{.} 19 U.S.C. § 1677a(c)(1)(B).

The CAFC has affirmed that the statute requires that "{t}he *entire* drawback {be} allowed 'by reason of the exportation.'" *Uttam Galva*, 997 F.3d at 1198 (emphasis added).

In the *Remand Redetermination*, Commerce notes that its determination is acceptable "if it is correct as a . . . factual matter" and "allows an accurate margin calculation." *Remand Redetermination* at 23, Appx148. But Commerce's calculation in *Foil*, which excludes exempted duties under a closed IPC accepted in *CAAS*, is neither factual, nor accurate. As a factual matter, having accepted that Assan received import duty exemptions in *CAAS*, it is unlawful for Commerce to now ignore the same evidence demonstrating receipt of import duty exemptions in *Foil*. Further, as Commerce has recognized, excluding closed IPCs from the drawback

---

[1] Assan disagrees with and objects to Commerce's decision to strike certain portions of its Comments on Draft Results of Redetermination Pursuant to Court Remand filed on August 21, 2024. Assan Group's Formal Protest Of Commerce's Rejection of Assan's Comments on Draft Results of Redetermination Pursuant to Court Remand and Request for More Limited Redactions (Aug. 28, 2024), Appx162-169.

AFSDOCS:300365493.6

calculation violates Commerce's mandate to calculate margins as accurately as possible using the best information available. *Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible"). Indeed, the CIT has explicitly found that "exports that are in different administrative review periods that occur on the same {IPC} are entitled to the same adjustment," and that Commerce cannot "confine {its} margin calculation to IPCs closed during the POI." *CAAS Remand Redetermination* at 7-9 and n.40, Appx146-147 (quoting *Toscelik*, 348 F. Supp. 3d at 1327). Doing so unlawfully limits Assan's adjustment in a manner inconsistent with the CAFC's directive that "{t}he duty drawback statute requires an adjustment to 'export price' *based on the full extent of the duty drawback*." *Uttam Galva*, 997 F.3d at 1197 (emphasis added).

Finally, Commerce claims that accepting evidence of Assan's IPC closure "would be a very slippery slope" and that the "statutory scheme plainly contemplates that Commerce's final determinations will be exactly that - final." *Remand Redetermination* at 25, Appx150. However, overlooking documentation that Assan's import duties "have been rebated, or . . . have not been collected, by reason of the exportation of the subject merchandise to the United States," and excluding those rebated or exempted duties from its drawback calculation, explicitly violates the requirements in the statute, necessitating acceptance of the additional documentation in this narrow circumstance. 19 U.S.C. § 1677a(c)(1)(B).

Because Commerce's treatment of Assan's IPCs in *Foil* continues to be inconsistent with its treatment of Assan's IPCs in *CAAS*, Commerce's *Remand Redetermination* does not comply with the Court's *Remand Order*.

## B.  DIRMATMP Should Be Based on Assan's Actual Reported Costs

In the *Remand Order*, Commerce found that "Commerce did not address Assan's argument {regarding the variation of metal premiums between inputs} aside from acknowledging its existence." *Remand Order* at *10, Appx28. In the *Remand Redetermination*, Commerce again fails to grapple with Assan's arguments regarding raw material premiums and does not provide evidentiary support for its determination to depart from Assan's normal books and records to weight average the reported raw material aluminum premium costs for all CONNUMs. For the reasons that follow, however, Assan maintains that any analysis of the cost differentials between CONNUMs should be based on TOTCOM rather than material costs alone.

In the *Remand Order*, the Court explicitly directed Commerce to explain its failure to consider "related differences in other production costs, such as labor," which the Court recognized as "an important aspect of the problem." *Remand Order* at *10, Appx29-30. Specifically, Commerce did not address the fact that certain inputs "are easier to convert to foil than others" and "{c}heaper inputs require{ing} more work to convert . . . thus have higher labor and other costs." *Id.* On remand, however, Commerce provided no more insight on its decision to disregard these differences, making only the conclusory statement "the fabrication costs are not associated with the reported raw material costs." *Remand Redetermination* at 12, Appx137.

But Commerce provides no explanation for its conclusion that "DIRMATMP cost differences among CONNUMs were driven by factors other than the product's physical characteristics," *id.* at 29, Appx154. Commerce bases its finding that DIRMATMP "reflected the significant cost differences between CONNUMs that are unrelated to the product's physical characteristics" on an analysis of the *sum* of DIRMATMP and DIRMATLME. *Id.* at 28, Appx153. This ignores fundamental differences between the two components of Assan's raw material costs – the spot or average LME price, which differs from Assan's purchase price at the

11

time of sale, and the raw material premium, which includes conversion costs and the profit of the raw material supplier. *Remand Order* at *5 and n.3, Appx13, Appx17. "Commerce used an average for the London Metal Exchange element to eliminate distortions caused by changing aluminum prices throughout the period of investigation," *id.* at *14, Appx14, which is reasonable given Assan's reporting that the LME price "*may* show variances between products that are due to timing and are unrelated to the differenced in product's physical characteristics." *Remand Redetermination* at 28, Appx153 (emphasis added). However, with respect to DIRMATMP alone, Assan made no such statement, and the Department made no such finding. Trends in the *sum* of DIRMATMP and DIRMATLME are driven by DIRMATLME and cannot be used to support Commerce's conclusion that "the reported raw material costs . . . reflected the significant cost differences between CONNUMs that are unrelated to the product's physical characteristics." *Id.*

Commerce further maintains that because DIRMATMP and DIRMATLME are "closely linked," they must be treated the same way. *Id.* at 13, Appx138. In other words, because the LME portion of the raw material cost is weight averaged, the raw material premium portion must necessarily be weight averaged too. *Id*. However, as Assan explained, it is appropriate to set a single POI average LME cost because LME is subject to significant fluctuation from month to month and is not impacted by yield loss. Raw material premiums on the other hand are set as a negative value for scrap and reflect the over or under usage of raw material based on the yield loss rate on the material input used. Response of Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S. to Questions 1, 2d, and 3 of the U.S. Department of Commerce May 4, 2021, Section D Fifth Supplemental Antidumping Duty Questionnaire (May 17, 2021) at 11, Appx006762 ("May 17 Supplemental Response"). As Assan demonstrated, the value of each material input is different, consistent with its physical attributes. *Id.* at Exhibit S10D-10,

12

Appx006780-Appx006781. For example, a foil product that is manufactured using more scrap (as opposed to more finished aluminum sheet) has a lower per unit raw material premium cost, but this is offset by higher labor and overhead costs necessitated by the additional manufacturing required when more scrap is used. *Id.* Clearly, raw material premium cost differences among CONNUMs are related to yield loss, which relate to the physical characteristics of the material inputs used.

Commerce next takes issue with Assan's inability to isolate and separately report the costs associated with the yield losses for each CONNUM, *Remand Redetermination* at 29-30, Appx154-155. Though acknowledging that its request that Commerce separate the DIRMATMP field into four discrete fields (DIRMATMP metal premium, DIRMATMP conversion, DIRMATMP yield, and DIRMATMP scrap offset) "would require some effort," Commerce speculates that it "could have been accomplished." *Remand Redetermination* at 30, Appx155. However, as Assan explained, it is unable to include the separate fields requests because the cost component breakdown in SAP limits the defined fields for raw materials to LME, raw material premium, and other costs, and there is no functionality to separate cost components "as the SAP structure does not summarize from multiple layers of production and costing data." May 17 Supplemental Response at 15, Appx006766. Assan even contacted its SAP contractor and provided an email reply detailing why Commerce's request was not possible. *Id.* at Exhibit S5D-47, Appx006766. This contradicts Commerce's claim that Assan "made no attempt to provide Commerce with the CONNUM-specific yield loss costs embedded in the DIRMATMP." *Remand Redetermination* at 30, Appx155.

Regardless, Commerce's arguments ignore that Assan provided the actual recorded production costs down to the specific production order and raw materials consumed per order.

AFSDOCS:300365493.6

May 17 Supplemental Response at 11, Appx006762. As Assan specifically reported, its "cost accounting system calculates costs specific to each production order based on the specific raw material consumption and conversion costs incurred for that order in that period (month)" as well as "the actual consumption of inputs, including consumption of purchased semi-finished goods, such purchased aluminum sheet." *Id.* Further, Assan reported that its cost accounting system "tracks each material cost based on its pricing components" and "provides the raw material costs always in three separate components *i.e.* LME, raw material premium and other costs." *Id.* Still, Commerce did not address the clear physical differences in the raw materials used to produce end products in the data presented, which enabled it to isolate raw material premiums including the CONNUM-specific yield loss costs. Instead it simply compared the cumulated data and found any differences to be "driven by factors other than the difference in the physical characteristics," without identifying what those factors may be. *Remand Redetermination* at 12, 29, Appx137, Appx154.

Finally, Commerce provides no evidentiary basis for its conclusion that Assan's books do not "reasonably reflect the cost to produce and sell the merchandise," which led it to set aside Assan's reported costs maintained in its normal books and records. *Id* at 13, Appx138. This is especially problematic given Commerce's finding in other sections of its *Remand Redetermination* that Assan has "satisfied" this condition "based on the facts of this investigation." *Id.* at 35, Appx160. Commerce's explanation and analysis does not properly grapple with the record evidence provided, including the detailed explanations regarding how differing compositions of raw materials used in production (scrap versus finished aluminum sheet) affect CONNUM costing. *See Dongkuk S&C Co., Ltd. v. United States*, 600 F. Supp. 3d 1331, 1337 (Ct. Int'l Trade 2022) (requiring Commerce to actually consider the identified

physical characteristics in its analysis and to consider each of the reported costs' impact on the ultimate raw material cost). Assan's raw material premiums reflect the physical characteristics, *i.e.* the actual composition of metal costs, which are recorded in Assan's cost accounting system in accordance with Turkish GAAP.[2]

Commerce's continued rejection in the *Remand Redetermination* of Assan's reported CONNUM costs despite important differences in the CONNUMs based on physical attributes (*i.e.*, the composition of raw materials used – scrap or sheet) does not comply with the Court's *Remand Order*.

### C.  The Hedging Offset Is Supported by Record Evidence

Commerce's additional explanation and determination in the *Remand Redetermination* to continue to "offset treat the net hedging gains as part of Assan's reported cost of manufacturing (COM) with Assan's net hedging gains" complies with the Court's *Remand Order*. *Remand Redetermination* at 16, Appx141.

Commerce must "calculate costs based on a respondent's normal books and records if they are kept in accordance with home country GAAP and reasonably reflect the costs associated with the production and sale of the merchandise." *Id.* at 17-18, Appx142-143. As Commerce recognized, "Assan included these items in the reported costs in the same manner as in its normal books and records." *Id.* The record also demonstrates that the "net hedging gains in Assan's cost of production reasonably reflect the cost to produce the merchandise under consideration." *Id.* at 18, Appx143. Specifically, Assan "enters into commodity hedging contracts to sell a similar

---

[2] *See* Response of Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S. to the U.S. Department of Commerce  Section D Antidumping Duty Questionnaire (Jan. 19, 2021) at 47, Appx003013; Response of  Assan Aluminyum Sanayi ve Ticaret A.S. and Kibar Dis Ticaret A.S. to Questions 2A, 2B, 2C, 2E and 4 of the U.S. Department of Commerce May 4, 2021, Fifth Section D supplemental Antidumping Duty Questionnaire (May 14, 2021) at Exh. S10D-5, Appx006738-Appx006742; May 17 Supplemental Response at Exh. S10D-10, Appx006780-Appx006781.

AFSDOCS:300365493.6

quantity of aluminum metal in the future" when it purchases its raw material aluminum and, when the "contracts expire, Assan closes the hedging contracts by reversing its position in the commodities market." *Id.* Thus, the gains and losses are directly associated with "Assan's total net raw material costs incurred to produce the merchandise under consideration." *Id.*

Commerce's treatment of Assan's hedging revenues is consistent with Assan's audited financial statements, record evidence showing that hedging is related to raw material purchases, and with Commerce's methodology used in other recent cases, including the parallel case involving *CAAS. See, e.g. Common Alloy Aluminum Sheet From Turkey, Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 65346 (Dep't Commerce Oct. 15, 2020) (unchanged in final determination), and accompanying I&D Memo at 15. Commerce's methodology complies with the Court's *Remand Order* and should be sustained.

## IV.    CONCLUSION

For the reasons set forth above, Assan respectfully requests that the Court determine the Commerce's *Remand Redetermination* is not supported by substantial evidence and other not in accordance with law with regards to duty drawback and raw material premiums. We therefore urge the Court to remand the *Remand Redetermination* to Commerce with regards to these issues. We also respectfully request that the Court sustain Commerce's *Remand Redetermination* as it relates to the treatment of Assan's hedging revenues.

AFSDOCS:300365493.6

Respectfully submitted,

**<u>/s/ Leah N. Scarpelli</u>**
Leah N. Scarpelli
Jessica R. DiPietro
Matthew M. Nolan

October 17, 2024                    *Counsel for Assan Aluminyum Sanayi ve Ticaret A.S.*

AFSDOCS:300365493.6

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiff's Comments on the Final Remand Redetermination filed on October 17, 2024 complies with the word limitation requirement. The word count for Plaintiff's Comments, as computed by ArentFox Schiff LLP's word processing system is 4,771.

 <u>/s/ Leah N. Scarpelli</u>
Leah N. Scarpelli