NONCONFIDENTIAL

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, ET AL., <br><br> Defendant-Intervenors. | Consol. Court No. 21-00616 |

## CONSOLIDATED PLAINTIFFS' REPLY COMMENTS ON REMAND REDETERMINATION

John M. Herrmann
Paul C. Rosenthal
Joshua R. Morey
Kelley Drye & Warren LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Aluminum Association
Trade Enforcement Working Group and
its Individual Members, et al.

December 10, 2024

NONCONFIDENTIAL

# **TABLE OF CONTENTS**

Page

I.   COMMERCE'S DUTY DRAWBACK CALCULATION IS LAWFUL .......................... 1

    A.   Commerce Lawfully Declined to Reopen the Record and Rejected Assan's Attempt to Submit Unsolicited New Factual Information ..................................... 1

    B.   The Records of the Original Investigations of Certain Aluminum Foil and Common Alloy Aluminum Sheet from Turkey Are Distinct and Required Different Actions by Commerce on Remand ........................................................... 4

    C.   The Department's Determination to Calculate a Drawback Adjustment Solely on Assan's Closed IPC Is Lawful ................................................................ 5

II.  THE DEPARTMENT'S DETERMINATION TO CONTINUE WEIGHT-AVERAGING ASSAN'S RAW MATERIAL PREMIUM COSTS IS LAWFUL ........... 6

    A.   The London Metal Exchange Component and Raw Material Premium Component of Assan's Raw Material Costs Are Fundamentally Linked and Both Fluctuate Significantly Over Time ............................................................ 6

    B.   Commerce Reasonably Concluded That There is No Relationship Between Raw Material Costs and Fabrication Costs ............................................................ 8

    C.   Assan's Reported Raw Material Premium Costs Are Driven By Factors Unrelated to The Physical Characteristics of Subject Merchandise ...................... 9

    D.   Commerce's Application of Facts Available is Supported By Substantial Record Evidence .......................................................................................................... 10

III. THE DEPARTMENT'S DETERMINATION TO CONTINUE OFFSETTING ASSAN'S COST OF MANUFACTURE WITH HEDGING-RELATED GAINS IS UNLAWFUL ............................................................................................................... 11

IV.  CONCLUSION ............................................................................................................... 13

NONCONFIDENTIAL

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Assan Aluminyum Sanayi ve Ticaret A.S. v. United States,
 701 F. Supp. 3d 1321 (Ct. Int'l Trade 2024) .................................................................4, 6, 11

Bonney Forge Corp. v. United States,
 560 F. Supp. 3d 1303 (Ct. Int'l Trade 2022) ..........................................................................11

Navneet Educ. Ltd. v. United States,
 Ct. No. 22-00132, Slip Op. 23-191 at 34, 2023 WL 9018387 (Ct. Int'l Trade
 Dec. 29, 2023)..........................................................................................................................3

Nippon Steel Corp. v. Int'l Trade Comm'n,
 345 F.3d 1379 (Fed. Cir. 2003)................................................................................................2

Pro-Team Coil Nail Enter., Inc. v. United States,
 587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022), aff'd on other grounds,
 No. 2022-2241, 2024 WL 3824005 (Fed. Cir. Aug. 15, 2024) ................................................2

Risen Energy Co. v. United States,
 665 F. Supp. 3d 1335 (Ct. Int'l Trade 2023) ...........................................................................3

Transactive Corp. v. United States,
 91 F.3d 232, 319 U.S. App. D.C. 428 (D.C. Cir. 1996) ..........................................................5

United States v. Nova Scotia Food Products Corp.,
 568 F.2d 240 (2d Cir. 1977)...................................................................................................11

Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.,
 435 U.S. 519 (1978)..............................................................................................................3, 4

**Statutes**

19 U.S.C. § 1677e(a)(2)(A) .....................................................................................................10, 11

**Administrative Determinations**

Final Results of Second Redetermination Pursuant to Court Remand;
 *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Ct. No. 21-00246
 (Dep't Commerce July 31, 2024)............................................................................................4

# CONSOLIDATED PLAINTIFFS' REPLY COMMENTS ON REMAND REDETERMINATION

This reply, filed on behalf of the Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas Inc., JW Aluminum Company, and Novelis Corporation (collectively, "Consolidated Plaintiffs"), responds to Assan Aluminyum Sanayi ve Ticaret A.S.'s ("Assan") Comments on Remand Redetermination (ECF No. 81) (hereinafter "Assan's Cmts.") and Defendant's Comments Supporting Remand Redetermination (ECF No. 87) (hereinafter "Def.'s Cmts."). Contrary to Assan's assertions, and consistent Defendant's comments in support of its remand redetermination, Commerce's redetermination concerning the duty drawback issue and the raw material premium issue is lawful. Moreover, as set forth in Consolidated Plaintiffs' comments on Commerce's remand redetermination (ECF No. 83) (hereinafter "Consol. Pls.' Cmts."), Commerce's decision to continue including Assan's hedging-related gains as an offset to the cost of manufacture is unlawful.[1]

## I. COMMERCE'S DUTY DRAWBACK CALCULATION IS LAWFUL

### A. Commerce Lawfully Declined to Reopen the Record and Rejected Assan's Attempt to Submit Unsolicited New Factual Information

Assan's contention that Commerce erred in declining to reopen the record is contrary to Court precedent. See Assan's Cmts. at 7-10. Assan does not cite to any authority or case that would support reopening the record where, as here, Commerce had adequate information to

---

[1] Documents in the administrative record compiled in connection with the Department's original determination are cited based on the Appx number assigned in the joint appendix filed with this Court on June 21, 2023 (ECF No. 53). Documents in the administrative record compiled in connection with the Department's remand proceeding are cited based on the Appx number assigned in the remand joint appendix that will be filed with the Court following briefing.

calculate the duty drawback adjustment without doing so. Cf. Appx147-Appx151.[2] Commerce has "significant discretion" in determining whether to reopen the record on remand and appropriately exercised that discretion in declining to do so here. See Pro-Team Coil Nail Enter., Inc. v. United States, 587 F. Supp. 3d 1364, 1374 (Ct. Int'l Trade 2022), aff'd on other grounds, No. 2022-2241, 2024 WL 3824005 (Fed. Cir. Aug. 15, 2024); see also Nippon Steel Corp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1382 (Fed. Cir. 2003).

Indeed, the U.S. Court of International Trade has determined Commerce unlawfully reopens the record where there already is sufficient information to calculate a dumping margin. For example, in New American Keg v. United States, the Court held that Commerce erred in reopening the record to consider and use Mexican wage data, over Brazilian data, to calculate surrogate labor cost values because Commerce's cited rationale to improve "informational accuracy" was contrary not only to principles of finality but expressed mere preference. No. 20-00008, Slip Op. 24-11 at 3, 2024 WL 379968, at *1 (Ct. Int'l Trade Jan. 31, 2024). As the Court observed, Commerce does not "reopen the record to admit evidence that it prefers."[3] Id. at 5, 2024 WL 379968, at *2 (citation omitted). Nor should Commerce reopen the record based on a litigant's preference. Cf. Assan's Cmts. at 9-10.

---

[2] As Commerce observed in its Remand Results, "{i}f we were to apply the modified duty drawback adjustment methodology during the administrative LTFV investigation, the information currently on the record would be complete to perform the necessary calculations." Appx149.

[3] Similarly, in Pro-Team Coil Nail Enterprise, Inc., Commerce declined to reopen the record to obtain additional data to calculate the rate for a non-individually examined respondent, when no party had challenged Commerce's respondent selection. The Court observed that "reopen{ing} the record on remand . . . is not something the court will require simply based on a plaintiff's argument that better information is available." 587 F. Supp. 3d at 1374.

NONCONFIDENTIAL

Assan also has not made, and not preserved, any argument that the information it submitted during the original investigation concerning its IPCs is defective and that reopening the record to allow Assan to submit closure documentation would remedy that inadequacy.  See id. at 8-9.  In essence, Assan argues that because Commerce adjusted its methodology to calculate the duty drawback adjustment, it should now have an opportunity to place additional information on the record even though Assan does not challenge the adequacy of the existing record evidence.  There is no dispute that Commerce had adequate information to calculate the duty drawback adjustment.  See Appx 40-44.  Assan has forfeited any claim to the contrary.  Cf. Navneet Educ. Ltd. v. United States, Ct. No. 22-00132, Slip Op. 23-191 at 34, 2023 WL 9018387, at *12 (Ct. Int'l Trade Dec. 29, 2023) ("An undeveloped claim made before an agency — or a court — is forfeited.") (citing Qingdao Sea-Line Trading Co. v. United States, 36 CIT 451, 470-71 (2012)).

Reopening the record would be inefficient and contrary to the important interest of finality.  See Risen Energy Co. v. United States, 665 F. Supp. 3d 1335, 1345 (Ct. Int'l Trade 2023) ("Interests in finality supports making a decision on the record as it is whenever possible.  'To allow constant reopening and supplementation of the record would lead to inefficiency and delay in finality.'") (quoting Essar Steel Ltd. v. United States, 678 F.3d 1268, 1277 (Fed. Cir. 2012)); New American Keg, Ct. No. 20-00008, Slip Op. 24-11 at 5, 2024 WL 379968, at *2 (Ct. Int'l Trade Jan. 31, 2024).  Contrary to Assan's claims, reopening the record so that Assan could place its preferred information would indeed be a "slippery slope." Assan's Cmts. at 10 (quoting Appx150).  Just because "some new circumstance has arisen . . . there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc., 435

-3-

U.S. 519, 554-55 (1978). Commerce lawfully declined to reopen the record here when it applied a modified duty drawback methodology and had adequate information to calculate a duty drawback adjustment.

> B. **The Records of the Original Investigations of Certain Aluminum Foil and Common Alloy Aluminum Sheet from Turkey Are Distinct and Required Different Actions by Commerce on Remand**

Assan also argues that the Department's determination is unlawful because the agency treated Assan disparately in the proceedings involving certain aluminum foil and common alloy aluminum sheet. Assan's Cmts. at 7. Specifically, Assan argues that in the common alloy aluminum sheet proceeding Commerce reopened the record on remand and but did not in certain aluminum foil. Id. at 7-8. However, Commerce's different actions on remand in each proceeding were necessitated by the underlying records and the information Commerce need to implement its updated duty drawback methodology.

In Assan v. U.S.,[4] the court held that Commerce's application of a duty drawback adjustment to all U.S. sales, despite the fact that certain U.S. sales were not made pursuant to a closed IPC, was contrary to the plain-language of 19 U.S.C. § 1677a(c)(1)(B). 701 F. Supp. 3d at 1328-31. Thus, based on the Court's decision, Commerce determined it was necessary to identify, which U.S. sales were made pursuant to a closed IPC, information Commerce had not collected in the original investigation. See Final Results of Second Redetermination Pursuant to Court Remand; *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, Ct. No. 21-00246 (Dep't Commerce July 31, 2024) (ECF No. 122) at 5.

---

[4] Assan Aluminyum Sanayi ve Ticaret A.S. v. United States, 701 F. Supp. 3d 1321 (Ct. Int'l Trade 2024) ("Assan v. U.S.").

In contrast, in the original antidumping investigation of the certain aluminum foil from Turkey proceeding, the Department instructed Assan to identify the IPC number associated with each of its U.S. sales thereby making clear which sales were made pursuant to a closed IPC and which were not. Appx84176. In response, Assan included a variable in its U.S. sales database identifying the applicable IPC number associated with each of its U.S. sales. Appx86045.

While it is true that "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently,"[5] the situations in the common alloy aluminum sheet and certain aluminum foil were not "similar situations." Thus, Commerce did not unlawfully treat Assan differently in the remand proceedings involving certain aluminum foil and common alloy aluminum sheet from Turkey.

### C. The Department's Determination to Calculate a Drawback Adjustment Solely on Assan's Closed IPC Is Lawful

Assan argues as "an initial matter" that "it is reasonable to treat all IPCs used during the POI of investigation as closed for the purpose of calculating duty drawback adjustments." Assan's Cmts. at 7. Again, Assan's real dispute is with the Department's "closure" methodology. See Consol. Pls.' Supp. Br. at 1-4 Dec. 11, 2023 (ECF No. 69). As Consolidated Plaintiffs' have previously explained, the Department's practice in proceedings involving merchandise from Turkey is to grant a duty drawback adjustment only with respect to inward processing certificates that have closed, and this practice has been affirmed by the Court of International Trade. Id. 3-4 (citations omitted). Indeed, in litigation involving the Department's duty drawback methodology applied to Assan in the proceeding on common alloy aluminum

---

[5] Transactive Corp. v. United States, 91 F.3d 232, 237, 319 U.S. App. D.C. 428 (D.C. Cir. 1996) (citing Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 57, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).

sheet from Turkey, the Court found unlawful and contrary to the plain-language of 19 U.S.C. § 1677a(c)(1)(B) the Department's grant of a duty drawback adjustment to U.S. sales that were not made pursuant to a closed IPC.  Assan v. U.S., 701 F. Supp. 3d at 1329-31.

II.   **THE DEPARTMENT'S DETERMINATION TO CONTINUE WEIGHT-AVERAGING ASSAN'S RAW MATERIAL PREMIUM COSTS IS LAWFUL**

In the Final Determination, Commerce averaged Assan's reported raw material premium costs (i.e., DIRMATMP) because those costs "reflect cost differences between CONNUMs that are unrelated to differences in the physical characteristics of the products."  Appx136.  The CIT remanded Commerce's determination to average Assan's reported raw material premium costs (i.e., DIRMATMP) solely because Commerce failed to address one of Assan's arguments, which the Court summarized as follows:

> Assan makes one other argument: that Commerce should have examined cost differences using the total cost of manufacturing rather than focusing on raw material costs . . . .  This is because differences in labor and other costs offset differences in raw material costs . . . .  Considering either in isolation might give the mistaken impression of cost differences where none exist.

Appx15-16.  In its final results of redetermination, Commerce continued to average Assan's reported DIRMATMP costs and provided an explanation for its decision to analyze DIRMATMP cost differences, rather than differences in the total cost of manufacture (i.e., TOTCOM).  See Appx137-139, 153-155.  Consolidated Plaintiffs urge the Court to uphold Defendant's decision and explanations.

   A.   **The London Metal Exchange Component and Raw Material Premium Component of Assan's Raw Material Costs Are Fundamentally Linked and Both Fluctuate Significantly Over Time**

In challenging Commerce's final results of redetermination, Assan argues that Defendant "ignore{d} fundamental differences between the two components of Assan's raw material

-6-

costs"– i.e., the London Metal Exchange ("LME") component in variable DIRMATLME and the raw material premium component in variable DIRMATMP.  Assan's Cmts. at 11-12.  As Commerce explained, however, "{w}hen Assan purchases raw material inputs, the supplier invoice is based on the LME raw material cost plus aluminum premium cost."  Appx138.  Indeed, Assan itself explained that when its [



] Appx82626.  Thus, as Commerce found, "the LME portion of the raw material cost plus aluminum premium cost equals the full cost of the raw material input." Appx138 (citing Appx82637-38); see also Def.'s Cmts. at 12.

Assan, however, contends that DIRMATLME and DIRMATMP differ fundamentally because Assan reported that "the LME price 'may show variances between products that are due to timing and are unrelated to the differenced in product's physical characteristics,'" but Assan purportedly made no similar statement concerning the raw material premium component. Assan's Cmts. at 12.  Assan is wrong.  Assan explained that it hedges the "*raw material premium portion* of raw material purchases" in order "to protect itself from significant fluctuations in the metal premium."  Appx89129-30 (emphasis in original).  Assan explained the rationale for its LME hedging using virtually identical language, stating that it hedges the "*LME* portion of raw material purchases" "because aluminum costs are subject to significant change."  Appx89128-29 (emphasis in original).  Since Assan concedes that "it is appropriate to set a single POI average LME cost because LME is subject to significant fluctuation from month to month" (Assan's Cmts. at 12), the "significant fluctuations in the metal premium" (Appx89129-30) likewise justifies Defendant's averaging of the raw material premium.

NONCONFIDENTIAL

B.    **Commerce Reasonably Concluded That There is No Relationship Between Raw Material Costs and Fabrication Costs**

In defending its decision to analyze DIRMATMP cost differences, Commerce explained that, in an "analysis {} based on TOTCOM, the cost differences cannot be isolated or distinguished by the relevant product physical characteristic because the result will represent the aggregated cost difference for all product physical characteristics." Appx137. Commerce concluded that "it is inappropriate to also include the fabrication costs (i.e., labor and conversion costs) in the aluminum premium cost differential analysis because the fabrication costs are not associated with the reported raw material costs." Id.; see also Def.'s Cmts. at 14. Assan complains that Commerce's assertion about the lack of a relationship between fabrication costs and raw material costs is "conclusory." Assan's Cmts. at 11. Assan improperly attempts to transfer its own evidentiary burden onto Commerce. Assan is the party arguing that there is an inverse relationship between raw material costs and conversion costs, meaning the onus was on Assan to identify or furnish relevant evidence supporting its contention. Appx15, 28 (summarizing Assan's arguments that "differences in labor and other costs offset differences in raw material costs" and that "{c}heaper inputs require more work to convert into foil and thus have higher labor and other costs."). Assan, however, has failed to identify even a scintilla of record evidence establishing the claimed relationship. When making this claim in its comments, Assan cites to Exhibit S10D-10 of its May 17, 2021 questionnaire response. Assan's Cmts. at 13. Far from establishing a relationship between raw material costs and conversion costs, the exhibit in question [                                              ] Appx89171. Based on Assan's failure to identify evidence establishing an inverse relationship between its reported

-8-

DIRMATMP costs and its reported conversion costs, Commerce reasonably concluded that such a relationship does not exist. Appx137.

### C. **Assan's Reported Raw Material Premium Costs Are Driven By Factors Unrelated to The Physical Characteristics of Subject Merchandise**

Assan uses three types of aluminum inputs to produce subject merchandise: primary aluminum, aluminum sheet, and aluminum scrap. Appx89134. Assan argues that its reported DIRMATMP costs are driven by "the composition of raw materials used – scrap or sheet" and, therefore, reflect differences in physical characteristics. Assan's Cmts. at 15; see also id. at 14 (stating that "differing compositions of raw materials used in production (scrap versus finished aluminum sheet) affect CONNUM costing"); Appx89133. While Assan contends that the Commerce did not "grapple" with these facts, Commerce's final results of redetermination explained that, according to Assan itself, "all raw material input types (i.e., primary aluminum, aluminum sheet, or scrap) can be used interchangeably in the production of merchandise under consideration." Appx154 (citing Appx89133-34). Accordingly, "Assan's own description of its processes support the conclusion that its use of different inputs—with different costs—are unrelated to the physical characteristics of the finished merchandise." Def.'s Cmts. at 14. Further, contrary to Assan's claim (Assan's Cmts. at 14), Commerce identified at least one factor (i.e., raw material composition) that drives Assan's raw material premium costs, but is unrelated to the physical characteristics of the subject merchandise. See Appx154.

Assan, however, contends that its reported raw material premium costs "relate to the physical characteristics of the material inputs used." Assan's Cmts. at 13. Commerce correctly counters that Assan "confuses the physical characteristics of the input products with the physical characteristics of the final finished products." Def.'s Cmts. at 16. Since "all raw material input

types . . . can be used interchangeably in the production of merchandise under consideration" (Appx154), the physical differences among input types does not affect the physical characteristics of the subject merchandise.

### D. Commerce's Application of Facts Available is Supported By Substantial Record Evidence

Commerce's averaging of DIRMATMP costs is also warranted as facts available under 19 U.S.C. § 1677e(a) because Assan failed to provide product-specific yield losses, despite Commerce's request for such information. Appx154-55. Assan complains that its SAP accounting system has no built-in functionality to separate yield losses and points to an email from its SAP contractor as evidence. Assan's Cmts. at 13. Thus, argues Assan, responding to Commerce's request for information was not feasible. See id.

According to Assan itself, however, its cost accounting system is "quite advanced and sophisticated" and tracks the consumption of raw materials through all stages, including liquid metal, semi-finished continuous cast coils, semi-finished cold-rolled coils/sheets, and finished foil. Appx89131-32; see also Appx82626-27. Assan confirmed that its accounting system tracks exact input and output quantities. See Appx89131 ("the weight consumed is tracked as well as the output weight"); Appx89132 ("The cost accounting system . . . tracks the actual consumption of inputs"). For example, [



] Appx82716-17. Because yield loss is simply the amount by which input quantities exceed output quantities, Assan should have been able to use the product-specific input and output quantities in its cost accounting system to derive product-specific yield losses. Assan's failure to do so, notwithstanding Commerce's explicit request

NONCONFIDENTIAL

(Appx89135), justifies Commerce's application of facts available. 19 U.S.C. § 1677e(a)(2)(A) (stating that Commerce shall use facts otherwise available in reaching a determination if "an interested party . . . withholds information that ha{d} been requested.").

### III. THE DEPARTMENT'S DETERMINATION TO CONTINUE OFFSETTING ASSAN'S COST OF MANUFACTURE WITH HEDGING-RELATED GAINS IS UNLAWFUL

Consolidated Plaintiffs argued that Defendant's final results of redetermination failed to explicitly address Assan's concession that its hedging activities relate in part to the sales price of its finished goods. Consol. Pls.' Cmts. at 1-2. Defendant counters that Commerce's redetermination addressed Assan's pricing mechanism, the chronology of Assan's hedges, and Assan's marking-to-market of inventory. Def.'s Cmts. at 18-19 (citing Appx144-145). However, neither Commerce's final results of redetermination, nor Defendant's response brief even mention Assan's concession that "its hedging is in some way related to the sales price of its finished goods." Appx20; see also Assan v. U.S., 701 F. Supp. 3d at 1331-33; Bonney Forge Corp. v. United States, 560 F. Supp. 3d 1303, 1310 (Ct. Int'l Trade 2022) ("The Federal Circuit has thus found that the Court of International Trade properly remanded determinations when Commerce 'fail[ ed ] to consider all relevant arguments' made by the parties.") (quoting Altx, Inc. v. United States, 370 F.3d 1108, 1119-20 (Fed. Cir. 2004)); United States v. Nova Scotia Food Products Corp., 568 F.2d 240, 252 (2d Cir. 1977) ("{i}t is not in keeping with the rational {agency} process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered"). Defendant has not explained how it can reasonably conclude that "Assan's hedging activities are to mitigate the risk of fluctuation of raw material costs which will be consumed in the production of merchandise under consideration" (Def.'s Cmts. at 17 (citing Appx144)), when Assan itself has explicitly contradicted this conclusion. Indeed, Commerce's

-11-

final results of redetermination acknowledges that record evidence also supports the conclusion that Assan's hedging relates to its sales. Appx158 ("While Commerce acknowledges the Association's arguments that the gains and losses related to the sale of finished goods, there is *likewise* record evidence for linking Assan's hedging transactions to its purchases of raw materials as explained above.") (emphasis added).

In its final results of redetermination, Commerce defends its inclusion of Assan's hedging-related gains in the cost of manufacture by noting that those gains are recorded in the cost of goods sold in Assan's income statement. Appx159. Consolidated Plaintiffs argued that Commerce cannot rely on the classification on Assan's income statement because (1) Assan's cash flow statement treats those gains differently (Appx159 (citing Appx109-110)) and (2) [

] See Consol. Pls.' Rule 56.2 Mot. J. on the Agency R. at 24-25 (May 23, 2022) (ECF No. 27); Appx85883, 82694, 92075, 85910. Commerce counters that it "did not rely on the income statements alone, but instead considered the *substance* of the hedging transactions." Def.'s Cmts. at 21 (emphasis in original). This argument ignores the substantial weight Commerce placed on Assan's income statement classification of the hedging-related gains. Specifically, Commerce stated that its "preference {is} to include hedging gains and losses as reported on a respondent's audited income statement, and to rely on how such transactions are recorded and reported in a respondent's normal books and records." Appx157 (emphasis in original). As part of summarizing record evidence that it claims supports its position, Commerce noted that Assan "recorded the net hedging gains as a part of costs of goods sold in the audited financial statements" and "included net hedging gains in the reported costs in the same manner as in its normal books and records." Id. Commerce also disagreed that the net hedging gains

-12-

NONCONFIDENTIAL

should be classified in interest expenses because "Assan recorded the net gains on hedging activity that were triggered by its raw material purchases as part of cost of goods sold in its <u>audited income statement</u>." Appx159 (emphasis in original). Commerce does not explain why it attaches such deference to Assan's audited income statement, while simultaneously ignoring Assan's audited cash flow statement.

## IV. CONCLUSION

For the reasons discussed above, the Court should:

(1) remand Commerce's determination to continue offsetting Assan's cost of manufacture with hedging-related gains and instruct the Department to include hedging gains within its calculation of Assan's interest expense ratio; and

(2) sustain Commerce's final results of redetermination in all other respects.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C. 20007
(202) 342-8400
jherrmann@kelleydrye.com
prosenthal@kelleydrye.com
jmorey@kelleydrye.com

Counsel to Consolidated Plaintiffs

Dated: December 10, 2024

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**

Pursuant to the Court of International Trade Standard Chambers procedures, counsel for the Aluminum Association Trade Enforcement Working Group and its individual members, Gränges Americas Inc., JW Aluminum Company, and Novelis Corporation (collectively, "Consolidated Plaintiffs") certifies that Consolidated Plaintiffs' Reply Comments on Remand Redetermination contain 3,690 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft 365 – Enterprise.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C. 20007
(202) 342-8400
prosenthal@kelleydrye.com
jherrmann@kelleydrye.com
jmorey@kelleydrye.com

Counsel to Consolidated Plaintiffs

Dated: December 10, 2024