# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., <br><br> Plaintiff, <br><br> ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP and ITS INDIVIDUAL MEMBERS, <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> United States, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     Consol. No. 21-00616 |

## DEFENDANT'S COMMENTS
## SUPPORTING REMAND REDETERMINATION

OF COUNSEL

JONZACHARY FORBES
Senior Attorney
Office of the Chief Counsel for
Trade Enforcement and
Compliance
U.S. Department of Commerce

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES
Assistant Director

EMMA E. BOND
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-2034
E-mail: Emma.E.Bond@usdoj.gov

August 20, 2025                    *Attorneys for Defendant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................i

TABLE OF AUTHORITIES ............................................................ ii

DEFENDANT'S COMMENTS SUPPORTING REMAND
REDETERMINATION...................................................................1

BACKGROUND ...........................................................................2

    I.    The Court's May 5, 2024 Remand Order ...............................2

    II.    Commerce's Remand Results..................................................3

        A.    Commerce Applied A Modified Duty Drawback
            Methodology To The Existing Record, Which Contained
            A Usable Data Set With All Required Information ......4

        B.    Commerce Continued To Weight Average The Reported
            Raw Material Premium Costs For All Product Control
            Numbers..........................................................................6

        C.    Commerce Continued To Include Assan's Net Hedging
            Gains In The Calculation Of Assan's Cost Of
            Production, Consistent With Assan's Books And
            Records ...........................................................................9

ARGUMENT ..............................................................................10

    I.    Standard Of Review ..............................................................10

    II.    Commerce's Remand Results Comply With The Remand
        Order And Are Supported By Substantial Evidence And In
        Accordance With Law ..........................................................11

        A.    Commerce Lawfully Declined To Reopen The Record
            On Remand...................................................................12

B.    Commerce Reasonably Continued To Weight Average
The Reported Raw Material Aluminum Premium Costs
For All Product Control Numbers ................................ 17

C.    Commerce Reasonably Continued To Include Assan's
Hedging Gains Under The Cost Of Manufacturing----As
Reported In Assan's Financial Records ....................... 26

CONCLUSION ........................................................................ 38

# TABLE OF AUTHORITIES

## CASES

*Assan Aluminyum Sanayi ve Ticaret v. United States*,
    701 F. Supp. 3d 1321, (Ct. Int'l Trade 2024) .....................................12

*Assan Aluminyum Sanayi Ve Ticaret A.S. v. United States*,
    Consol. Ct. No. 21-00616, (Ct. Int'l Trade May 8, 2024) .....................2

*Consol. Bearings Co. v. United States*,
    412 F.3d 1266 (Fed. Cir. 2005) ............................................................34

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966)...............................................................................32

*Dongkuk S&C Co. v. United States*,
    600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022)...................................6, 24

*Downhole Pipe & Equip., L.P. v. United States*,
    776 F.3d 1369 (Fed. Cir. 2015) ............................................................28

*Essar Steel Ltd. v. United States*,
    678 F.3d 1268 (Fed. Cir. 2012) ...........................................5, 12, 13, 14

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000) ............................................................32

*Fischer S.A. Comercio, Industria and Agricultura v. United States*,
    2014 WL2853909 (Ct. Int'l Trade May 27, 2024) ............. 33, 34, 36, 37

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ..............................................................21

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*,
    439 F. Supp. 3d 1342 (Ct. Int'l Trade 2020).......................................12

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States,*
654 F. Supp. 3d 1311 (Ct. Int'l Trade 2023) ........................................ 16

*MacLean-Fogg Co. v. United States,*
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................ 10

*Matsushita Elec. Indus. Co. v. United States,*
750 F.2d 927 (Fed. Cir. 1984) .............................................................. 32

*PSC VSMPO-Avisma Corp. v. United States,*
688 F.3d 751 (Fed. Cir. 2012) ........................................................ 12, 21

*QVD Food Co., Ltd. v. United States,*
658 F.3d 1318 (Fed. Cir. 2011) ............................................................ 25

*Royal Brush Mfg., Inc. v. United States,*
75 F.4th 1250 (Fed. Cir. 2023) ............................................................ 13

*SeAH Steel VINA Corp. v. United States,*
950 F.3d 833 (Fed. Cir. 2020) .............................................................. 28

*SolarWorld Ams., Inc. v. United States,*
910 F.3d 1216 (Fed. Cir. 2018) ............................................................ 28

*Stupp Corp. v. United States,*
5 F.4th 1341 (Fed. Cir. 2021) .............................................................. 12

*Thai Plastic Bags Indus. Co. v. United States,*
746 F.3d 1358 (Fed. Cir. 2014) ............................................................ 23

*Thai Plastic Bags Indus. Co. v. United States,*
853 F. Supp. 2d 1267 (Ct. Int'l Trade 2012), *aff'd*, 746 F.3d 1358 (Fed.
Cir. 2014) ...................................................................... 17, 18, 23

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
435 U.S. 519 (1978) ............................................................................ 13

*Zhaoqing Tifo New Fibre Co., Ltd. v. United States*,
  256 F. Supp. 3d 1314 (Ct. Int'l Trade 2017).........................16

*Zhaoqing Tifo New Fibre Co., Ltd. v. United States*,
  355 F. Supp. 3d 1285 (Ct. Int'l Trade 2018).........................16

## STATUTES

19 U.S.C. § 773(a)(6)(c)(ii) ..............................................................7

19 U.S.C. § 773(a)(6)(c)(iii) .............................................................7

19 U.S.C. § 773(f)(1)(A) ...................................................................7

19 U.S.C. § 1516(a)(b)(1)(B)(i) ......................................................10

19 U.S.C. § 1677b(a) .......................................................................17

19 U.S.C. § 1677b(b) .......................................................................23

19 U.S.C. § 1677b(a)(6)(c)(ii) ...........................................................7

19 U.S.C. § 1677b(a)(6)(c)(iii) ..........................................................7

19 U.S.C. § 1677b(b)(1)-(b)(2)(c) ...................................................23

19 U.S.C. § 1677b(f)(1)(A) ...................................................... passim

19 U.S.C. § 2637 .............................................................................12

## FEDERAL REGISTER NOTICES

*Phosphor Copper From the Republic of Korea: Final Affirmative
  Determination of Sales at Less Than Fair Value and Negative Final
  Determination of Critical Circumstances*,
  82 Fed. Reg. 12,433 (Dep't Commerce Mar. 3, 2017)...................33, 35

*Common Alloy Aluminum Sheet from Turkey: Preliminary Affirmative
  Determination of Sales at Less Than Fair Value*,
  85 Fed. Reg. 65,346 (Dep't of Commerce, Oct. 15, 2020), ...................37

*Common Alloy Aluminum Sheet from Greece: Final Negative*
*Determination of Sales at Less Than Fair Value,*
86 Fed. Reg. 43 (March 8, 2021).........................................................37

*Certain Aluminum Foil From the Republic of Turkey: Final Affirmative*
*Determination of Sales at Less Than Fair Value,*
86 Fed. Reg. 52,880 (Dep't of Commerce, Sept. 23, 2021) ...................2

## GLOSSARY

| Description | Acronym / Abbreviation |
|---|---|
| Aluminum Association Trade Enforcement Working Group and its individual members | Aluminum Association |
| Assan Aluminyum Sanayi ve Ticaret | Assan |
| *Assan Aluminyum Sanayi Ve Ticaret A.S. v. United States*, Consol. Ct. No. 21-00616, Slip Opinion 24-56 (Ct. Int'l Trade May 8, 2024) | Remand Order |
| *Common Alloy Aluminum Sheet from the Republic of Türkiye*, Final Results of Second Redetermination Pursuant to Court Remand (July 31, 2024) | *CAAS from Turkey* |
| Final Results of Redetermination Pursuant to Court Remand (Sept. 5, 2024) | Remand Results |
| *Fischer S.A. Comercio, Industria and Agricultura v. United States*, 2014 WL 2853909 (Ct. Int'l Trade May 27, 2014) | *Fischer* |
| Generally Accepted Accounting Principles | GAAP |
| Issues and Decision Memorandum | IDM |

| | |
|---|---|
| *Phosphor Copper From the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances*, 82 Fed. Reg. 12,433 (Dep't Commerce Mar. 3, 2017) | *Phosphor Copper from Korea* |
| Product control number | CONNUM |

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |
|---|---|
| ASSAN ALUMINYUM SANAYI VE TICARET A.S., | ) ) ) |
| Plaintiff, | )  Consol. No. 21-00616 ) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP and ITS INDIVIDUAL MEMBERS, | ) ) ) ) |
| Consolidated Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant. | ) ) |

_____

## DEFENDANT'S COMMENTS
## SUPPORTING REMAND REDETERMINATION

Defendant, the United States, respectfully responds to the comments of plaintiff, Assan Aluminyum Sanayi ve Ticaret (Assan), and consolidated plaintiffs, the Aluminum Association Trade Enforcement Working Group and its individual members (collectively, Aluminum Association), concerning the Department of Commerce's remand results in this matter.  Final Results of Redetermination Pursuant to Court

Remand (Sept. 5, 2024), Appx126-161 (Remand Results).[1]  We respectfully request that the Court sustain the remand results because they comply with the Court's remand order and because they are supported by substantial evidence and otherwise lawful.

## **BACKGROUND**

### I .   The Court's May 5, 2024 Remand Order

This case concerns Commerce's final affirmative determination in the less-than-fair-value investigation of certain aluminum foil from the Republic of Turkey, for the period of investigation from July 1, 2019, to June 30, 2020.  *See Certain Aluminum Foil From the Republic of Turkey: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 52,880 (Dep't of Commerce, Sept. 23, 2021), Appx007669-007671, and accompanying Issues and Decision Memorandum (IDM), Appx007617-007668.  On May 8, 2022, the Court sustained-in-part and remanded Commerce's final determination.  *See Assan Aluminyum Sanayi Ve Ticaret A.S. v. United States*, Consol. Ct.

---

[1]  Citations to the underlying investigation reference the joint appendix filed with this Court on June 21, 2023 (ECF Nos. 53, 54). Citations to the remand administrative record reference the Appx number assigned in the remand joint appendix that will be filed with the Court following briefing.

No. 21-00616, Slip Opinion 24-56 (Ct. Int'l Trade May 8, 2024) (Remand Order), Appx1-39.

The Court remanded three issues for further consideration by Commerce.  First, the Court granted Commerce's request for voluntary remand with respect to its duty drawback methodology.  Remand Order at 24, Appx24.  Second, the Court held that Commerce failed to address Assan's argument regarding the treatment of Assan's raw material premium costs—specifically, Assan's claim that any cost differences in the raw material premium costs should be addressed by comparing the total cost of manufacturing rather than by averaging raw material costs.  *Id.* at 27-30, Appx27-30.  Finally, the Court remanded Commerce's treatment of Assan's hedging gains as part of the cost of production, stating that Commerce's explanation was unsupported by substantial evidence and that the Court was unable to consider post-hoc rationalizations.  *Id.* at 34-38, Appx34-38.

II.    Commerce's Remand Results

On August 14, 2024, Commerce issued the draft remand results to interested parties.  Draft Results of Redetermination Pursuant to Court Remand, Appx51-72.  Assan and the Aluminum Association filed timely

remand comments.  Appx99-111 (Aluminum Association); Appx175-189 (Assan).  Commerce filed the remand results with the Court on September 5, 2024, discussing the three issues remanded by the Court and the parties' comments on the draft remand.  Remand Results, ECF No. 75, Appx126-161.

A.  Commerce Applied A Modified Duty Drawback Methodology Using Data From The Existing Record, Which Contained All Required Information

On the first issue—the duty drawback methodology—Commerce applied a modified methodology that was "calculated with and applied to the same U.S. sales" that benefited from the duty drawback.  Remand Results at 4-9, Appx129-134.  Specifically, Commerce revised its duty drawback methodology by applying a per-unit adjustment consisting of the estimated amount of the duty drawback (the numerator), divided by the quantity of U.S. sales associated with a closed Inward Processing Certificate for which the Turkish government had forgiven the duty liability (the denominator).  Remand Results at 1-3, Appx126-128.  Commerce then applied "the resulting per-unit adjustment to the same U.S. sales associated" with the closed certificate.  Remand Results at 2, Appx127.  No party challenged

4

Commerce's updated duty drawback methodology during the remand proceeding. Remand Results at 22, Appx147.

Instead, Assan disputed Commerce's decision not to reopen the factual record on remand. Remand Results at 21-22, Appx146-147. On remand, Assan requested to "submit additional information to allegedly enhance the accuracy" of Commerce's duty drawback calculation. Remand Results at 24, Appx149. Commerce declined Assan's request, explaining that "the Federal Circuit has made clear that it is well within Commerce's discretion" whether to "reopen the record" on remand. Remand Results at 25-26 & n.95, Appx150-151 (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012)). Commerce determined that the existing record "already contained a usable data set with all information needed" to apply Commerce's chosen duty drawback methodology. Remand Results at 23, Appx148. Thus, there was no need to reopen the record on remand.

Assan cited another proceeding in which Commerce reopened the record on remand, arguing that Commerce should do the same in this case. *See* Remand Results at 25 & n.91, Appx150 (citing *Common Alloy Aluminum Sheet from the Republic of Türkiye* (*CAAS from Turkey*),

5

Final Results of Second Redetermination Pursuant to Court Remand (July 31, 2024), Appx194-210).  In *CAAS from Turkey*, the "record of the underlying investigation . . . was inadequate" to apply Commerce's updated duty drawback methodology.  *Id.* (citing *CAAS from Turkey*, Final Results of Second Redetermination Pursuant to Court Remand, Appx194-210).  In this remand proceeding, by contrast, Commerce explained that the record information was "complete" for purposes of "perform{ing} the necessary calculations."  Remand Results at 23-24, Appx148-149.

B.    Commerce Continued To Weight Average The Reported Raw
        Material Premium Costs For All Product Control Numbers

On the second issue, Commerce continued to weight average the reported raw material premium costs for all product control numbers.[2]

---

[2] A product control number—referred to by Commerce using the contraction "CONNUM"—is Commerce's jargon for a unique product "defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding{.}"  *Dongkuk S&C Co. v. United States*, 600 F. Supp. 3d 1331, 1334 n.4 (Ct. Int'l Trade 2022).  "All products whose product hierarchy characteristics are deemed to be identical are part of the same CONNUM and are regarded as 'identical' merchandise for the purposes of price comparison."  *Id.*  "The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the subject merchandise."  *Id.*

Remand Results at 30, Appx155; *see also id.* at 10-14, 28-30, Appx135-139, Appx153-155.

Commerce explained that "a respondent's reported costs should reflect meaningful cost differences attributable to . . . different physical characteristics" among distinct, unique product control numbers. Remand Results at 9, Appx134 (citing Sections 773(f)(1)(A) and 773(a)(6)(c)(ii), (iii) of the Tariff Act of 1930, as amended, codified at 19 U.S.C. §§ 1677b(a)(6)(c)(ii),(iii), (f)(1)(A)).  During the underlying investigation, Commerce found that Assan's aluminum costs—the market prices for aluminum on the London Metal Exchange and the raw material premium—reflected significant cost differences between product control numbers that were unrelated to physical characteristics of the products.  Remand Results at 10-11, Appx135-136 (citing, *e.g.*, Preliminary Cost Calculation Memorandum (Apr. 27, 2021), Appx6656-6657, Appx6661-6667, Appx89022-89023, Appx89027-89033).  Thus, Commerce weight averaged Assan's London Metal Exchange and aluminum premium costs to mitigate this fluctuation among different product control numbers.  Remand Results at 11, Appx136.

On remand, Commerce considered Assan's argument that "Commerce should analyze cost differences" using the total cost of manufacturing rather than averaging raw material costs. Remand Results at 11, Appx136. Commerce determined that the analysis of differences in costs of the raw material premium should not be based on the total cost of manufacturing. Remand Results at 12, Appx137. As Commerce explained, the analysis of whether "cost differences" between product control numbers are driven by factors other than the product's physical characteristics "is normally based on a particular cost component . . . that is affected by the relevant product physical characteristic." *Id.* This analysis allows Commerce to "isolate the cost differences associated with the relevant product physical characteristics from the cost differences associated with factors other than physical characteristics." *Id.* (citation omitted). By contrast, such cost differences *cannot* "be isolated" when analyzing the total cost of manufacturing. *Id.* Instead, analyzing the total cost of manufacturing would "represent the aggregated cost difference for *all* product physical characteristics." *Id.* (emphasis added).

8

### C. Commerce Continued To Include Assan's Net Hedging Gains In The Calculation Of Assan's Cost Of Production, Consistent With Assan's Books And Records

Finally, Commerce continued to include Assan's net hedging gains in the calculation of Assan's cost of production, consistent with Assan's books and records. Remand Results at 14-20, 31-35, Appx139-145, Appx156-160.

By statute, Commerce calculates costs based on a respondent's normal books and records if they are kept in accordance with home country generally accepted accounting principles (GAAP) and "reasonably reflect the costs associated with the production and sale of the merchandise." Remand Results at 17, Appx142 (citing 19 U.S.C. § 1677b(f)(1)(A)). After reconsidering the issue on remand, Commerce determined that Assan's recording of hedging gains in the cost of manufacturing reasonably reflected Assan's costs for raw materials. Remand Results at 15-20, Appx140-145. Commerce rejected Aluminum Association's argument that Assan's hedging gains were instead "related to the sales price of finished goods." Remand Results at 15, Appx140.

Among other considerations, Commerce explained that Assan's "monthly open hedge position quantity" during the period of investigation was "very close" to its "monthly raw material inventory position quantity."  Remand Results at 18-19, Appx143-144.  This "illustrated that Assan is hedging its raw material costs."  *Id.*  Commerce recognized that certain record evidence could arguably support the argument of the Aluminum Association, but, overall, Commerce determined that Assan's records reasonably reflected its costs to produce the merchandise.  *See, e.g.*, Remand Results at 33-35, Appx158-160.

## ARGUMENT

### I.    Standard Of Review

When reviewing remand determinations in antidumping and countervailing duty proceedings, the Court applies the same standard of review as the one applied when reviewing the original determination.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i)).  Thus, in remand proceedings, the Court will sustain Commerce's determination if it is "in accordance with the remand order," and is "supported by substantial evidence and otherwise in accordance with law."  *See MacLean-Fogg Co. v. United*

*States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19

U.S.C. § 1516a(b)(1)(B)(i)).

II.    Commerce's Remand Results Comply With The Remand Order
       And Are Supported By Substantial Evidence And In Accordance
       With Law

On remand, Commerce complied with the Court's remand order by

reconsidering its duty drawback methodology and providing further

explanation for its treatment of Assan's raw material price premium

and hedging gains.  Commerce's remand determination is supported by

substantial evidence and in accordance with law.

As a threshold matter, no party has challenged the duty drawback

methodology employed by Commerce on remand.  *See* Remand Results

at 22, Appx147.[3]  Thus, the Court should sustain Commerce's duty

---

[3]  Assan now claims that Commerce should not limit its duty
drawback calculation to only closed Inward Processing Certificates and
instead should grant a duty drawback adjustment to all sales.  *See*
Assan Comments at 7 (arguing it is "reasonable" to treat all Inward
Processing Certificates during the period of investigation "as closed for
the purpose of calculating duty drawback adjustments").  However,
Assan failed to present this argument to Commerce when it had the
opportunity to do so and, thus, failed to exhaust administrative
remedies.  *See* 19 U.S.C. § 2637.

In any event, this argument is wrong.  As this Court recently
explained, "Commerce's directive is to predicate drawback adjustments
on the exemption of duties—*not a likelihood of future exemption*

11

drawback methodology.  As discussed below, moreover, Commerce

lawfully declined to reopen the record on remand, and Commerce's

decisions regarding raw material premium and hedging gains are

lawful and supported by substantial evidence.

    **A.**   Commerce Lawfully Declined to Reopen the Record on Remand

Commerce lawfully declined to reopen the record on remand.

"Commerce is entitled to broad discretion regarding the manner in

which it develops the record in an antidumping investigation." *Stupp*

*Corp. v. United States*, 5 F.4th 1341, 1350 (Fed. Cir. 2021) (citing *PSC*

*VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir.

2012)).  This general principle is no less applicable during remand

proceedings.  *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278

(Fed. Cir. 2012).  Overall, administrative agencies should generally be

"free to fashion their own rules of procedure and to pursue methods of

---

through the contingent operation of a foreign government's duty
exemption scheme."  *Assan Aluminyum Sanayi ve Ticaret v. United*
*States* (*Assan Aluminyum 2024*), 701 F. Supp. 3d 1321, 1329 (Ct. Int'l
Trade 2024) (emphasis added); *see also Habas Sinai ve Tibbi Gazlar*
*Istihsal Endustrisi, A.S. v. United States*, 439 F. Supp. 3d 1342, 1349
(Ct. Int'l Trade 2020) (explaining that a closed Inward Processing
Certificate demonstrates that "the Turkish government has forgiven the
duty liability") (citation and internal quotation marks omitted).

inquiry capable of permitting them to discharge their multitudinous duties." *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1261 (Fed. Cir. 2023) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978)).

In one case, for example, the U.S. Court of Appeals for the Federal Circuit reversed a decision requiring Commerce to reopen the record on remand. *Essar Steel*, 678 F.3d at 1272, 1278. As the Federal Circuit explained, "{t}he decision to reopen the record is best left to the agency, in this case Commerce." *Id.* at 1278. Because Commerce did not "abuse{} its discretion by refusing to reopen the record and admit the evidence in this case," the Federal Circuit held that "the trial court exceeded its authority when it ordered the agency to do so." *Id.* As the court of appeals reasoned, ordering Commerce to reopen the record under such circumstances improperly "usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance." *Id.*

In this case, Commerce reasonably explained that it had sufficient information on the record to apply its chosen duty drawback

13

methodology.  Remand Results at 22-26, Appx147-151.  "Assan's duty drawback information already on the record was factually correct at the time of its submission as part of the . . . investigation."  *Id.* at 23, Appx148 (citations omitted).  Assan did not argue that the record data was "factually incorrect and needs to be corrected with superseding information."  *Id.* at 23-24, Appx148-149 (citations omitted).  Indeed, if Commerce had applied the now-uncontested duty drawback methodology in the original investigation, "the information currently on the record would be complete to perform the necessary calculations." *Id.* at 24, Appx149.

Commerce's reconsideration of the methodology does not entitle Assan to a second opportunity to develop the record.  To the contrary, requiring Commerce to "allow constant reopening and supplementation of the record would lead to inefficiency and delay in finality."  *See Essar Steel*, 678 F.3d at 1277.

Assan nonetheless argues that Commerce's decision not to reopen the record was unlawful because Commerce reopened the record in a separate remand involving *CAAS from Turkey*.  Assan Comments at 7-10.  But Commerce provided a reasonable explanation for declining to

14

reopen the record in this proceeding.  Remand Results at 24-25,

Appx149-150.  As Commerce explained, the remand record in *CAAS*

*from Turkey* lacked information to apply the duty drawback

methodology to only reported U.S. sales associated with closed-Inward

Processing Certificates.  *See* Remand Results at 25 n.91 (citing *CAAS*

*from Turkey*, Remand Redetermination, Appx198-199).  Thus,

Commerce elected to reopen the record in the *CAAS from Turkey*

proceeding to solicit information that would allow application of

Commerce's chosen duty drawback methodology.  *CAAS from Turkey*,

Remand Redetermination, Appx198-199.  In this case, by contrast, the

record already contained the information required to apply the duty

drawback methodology—specifically, allocating the duty drawback

adjustment to only reported U.S. sales associated with closed Inward

Processing Certificates.  Remand Results at 22-25, Appx147-150.  Thus,

Commerce was able to perform the duty drawback methodology without

seeking additional information.  Remand Results at 24-25, Appx149-

150.

Finally, having failed to demonstrate any error in Commerce's

reasoning on remand, Assan also fails to establish that its complaint

15

preserved any challenge to the data used by Commerce. "Issues that are not the subject of a timely-filed complaint are, as a general rule, beyond the court's jurisdiction and cannot be entertained by the court." *Zhaoqing Tifo New Fibre Co., Ltd. v. United States*, 256 F. Supp. 3d 1314, 1327 & n.12 (Ct. Int'l Trade 2017); *Zhaoqing Tifo New Fibre Co., Ltd. v. United States*, 355 F. Supp. 3d 1285, 1303 (Ct. Int'l Trade 2018); *see also* Remand Results at 22-23, Appx147-148. Assan's complaint "did not preserve any arguments" challenging the reported data that Commerce relied on in making its final determination.[4] Remand Results at 22-23, Appx147-148 (citation omitted). In sum, Assan has failed to establish that Commerce was required to reopen the record on remand or was otherwise required to solicit new information after compiling the record during the underlying investigation. Accordingly,

---

[4] Plaintiffs in other cases have preserved challenges to the data considered by Commerce in applying its duty drawback methodology. *See, e.g.*, Compl. at ¶ 20, *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 21-cv-306, ECF 5 (June 28, 2021) (arguing that Commerce unlawfully "refused to accept timely submitted data which only became available after the original questionnaire responses were filed"); *see also Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States,* 654 F. Supp. 3d 1311, 1322 (Ct. Int'l Trade 2023) (rejecting challenges to the factual information considered in applying the duty drawback adjustment). Assan did not preserve such a challenge in this case.

this Court should sustain Commerce's decision not to reopen the record on remand.

>    B.    Commerce Reasonably Continued to Weight Average the
>          Reported Raw Material Aluminum Premium Costs for All
>          Product Control Numbers

The Court should also sustain Commerce's determination on remand to continue to weight average Assan's reported raw material aluminum premium costs for all product control numbers. Substantial evidence supports Commerce's determination that Assan's recorded raw material premium costs reflect significant cost difference among product control numbers that are unrelated to physical characteristics, and thus do not reasonably reflect the costs of production. *See, e.g.*, Remand Results at 12-14, Appx137-139. Further, Commerce reasonably explained that analyzing the total cost of manufacturing would not account for this discrepancy. *See id.*

During antidumping duty proceedings, "Commerce strives to create a fair comparison between the export price (or constructed export price) of a foreign producer's sales and its home market sales (or 'normal value')." *See Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1360 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677b(a)). When

calculating normal value, Commerce may disregard sales made below the cost of production and "{i}f no foreign like product sales remain after conducting the below-cost test, Commerce may determine the normal value based on a constructed value . . . of the foreign like product." *Id.* at 1360-1361 (citing 19 U.S.C. § 1677b(a)(4), (b)(1)). "Commerce uses the same method to calculate 'costs'" for both costs of production and constructed value. *Id.* at 1361 (citing *Thai Plastic Bags Indus. Co. v. United States*, 853 F. Supp. 2d 1267, 1270 (Ct. Int'l Trade 2012)). In both cases, costs shall normally "be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles . . . of the exporting country . . . and *reasonably reflect the costs associated with the production and sale of the merchandise.*" *Id.* (quoting 19 U.S.C. § 1677b(f)(1)(A) (emphasis added).

Substantial evidence supports Commerce's finding that Assan's reported costs for the raw material premium did not reasonably reflect its costs to produce products identified by different product control numbers. As Commerce explained, the invoices for Assan's purchases of raw material inputs include the market prices for aluminum on the

London Metal Exchange *and* the raw material premium. Remand Results at 13-14, Appx138-139; *see also* Remand Order at 13, Appx13. For the former, Assan reported a single average cost for the London Metal Exchange portion of the raw material cost for the period of investigation. Remand Results at 13, Appx138. For the raw material premium, Assan reported specific costs for different products identified by different product control numbers, "even though those costs are closely linked to the {London Metal Exchange} portion of the metal costs." Remand Results at 13-14, Appx138-139.

Substantial evidence supports Commerce's factual determination that cost differences associated with the raw material premium are unrelated to the physical characteristics. Commerce determined that the "the reported aluminum premium cost reflected . . . cost differences unrelated to the physical product characteristics." Remand Results at 14, Appx139 (citing Prelim. Cost Calc. Mem., Appx6656-6657, Appx6661-6667, Appx89022-89023, Appx89027-89033). As Commerce explained, the physical characteristics of Assan's products included "gauge, coating, width, casting method, alloy, temper, and surface finish." Remand Results at 9, Appx134. Assan's "reported aluminum

19

premium cost reflected the cost differences unrelated to" these physical characteristics. Remand Results at 14, Appx139 (citing Preliminary Cost Calc. Mem., Appx6656-6657, Appx6661-6667, Appx89022-89023, Appx89027-89033); *see also* Remand Results at 28-29, Appx153-154. In light of these cost differences, Commerce weight averaged the reported raw material premium cost for all product control numbers "to mitigate the cost differences unrelated to the product physical characteristics." Remand Results at 30, Appx155.

Assan's challenges to Commerce's determination are unpersuasive. For example, Assan argues that Commerce provided no explanation for its conclusion that the raw material premium cost differences among product control numbers "were driven by factors other than the product's physical characteristics." Assan Comments at 11 (citing Remand Results at 29, Appx154). But Commerce conducted a detailed analysis documenting these cost differences. *See* Preliminary Cost Calc. Mem., Appx6656-6657, Appx6661-6667, Appx89022-89023, Appx89027-89033; *see also* Remand Results at 14, 28-29, Appx139, Appx153-154 (citing the Preliminary Cost Calc. Mem.). The factual inquiry of whether specific cost data is related to physical

characteristics is precisely the sort of "complex economic and accounting" decision of a technical nature in which courts will not lightly second-guess Commerce's "technical expertise." *See PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (quoting *Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1039 (Fed. Cir. 1996)).

Moreover, Assan's explanation of its production process supports Commerce's data analysis. "Assan stated that it has a preference to use a specific type of input for a certain product because it has a preferred production routing *due to certain characteristics of its production equipment*." Remand Results at 29, Appx154 (emphasis added). "Assan also stated that all raw material input types (*i.e.,* primary aluminum, aluminum sheet, or scrap) can be used interchangeably in the production of merchandise under consideration." Remand Results at 29, Appx154 (citing Appx6764). Thus, Assan's own description of its processes support the conclusion that its use of different inputs—with different costs—are unrelated to the physical characteristics of the finished merchandise.

Assan also claims that Commerce failed to address its argument that the cost differentials between products identified by different product control numbers should be based on total cost of manufacturing rather than material costs alone.  Assan Comments at 11.  Assan is incorrect.  Commerce provided a reasonable explanation for declining to conduct the analysis based on the total cost of manufacturing.  As Commerce explained, focusing on the total cost of manufacturing would not account for cost differences that are unrelated to physical characteristics of the products.  Remand Results at 12, Appx137.  "If the analysis is based on {total cost of manufacturing}, *the cost differences cannot be isolated or distinguished by the relevant product physical characteristic*{.}"  *Id.* (emphasis added).  This is because the result of such an analysis would "represent the aggregated cost difference for *all* product physical characteristics."  *Id.* (emphasis added).

Commerce's concern with using the total cost of manufacturing is reasonable and consistent with Commerce's longstanding practice regarding physical characteristics, which has been sustained by this Court and the Federal Circuit.  Commerce "normally does not rely on a respondent's reported costs where cost differentials between {products

22

identified by different product control numbers} are driven by factors other than the difference in the physical characteristics, such as timing differences or routing variations or cost system conventions."  Remand Results at 9, Appx134 (citations omitted).

As this Court has recognized, "cost allocation *based on physical characteristics* is a primary factor in Commerce's analysis" of cost.  *Thai Plastic Bags Indus. Co. v. United States*, 853 F. Supp. 2d 1267, 1273 (Ct. Int'l Trade 2012), *aff'd*, 746 F.3d 1358 (Fed. Cir. 2014) (emphasis added).  Thus, when a respondent fails to "offer any meaningful evidence to explain why physical differences in the CONNUM pairs resulted in such large differences in conversion costs," then "Commerce may adjust a company's allocation method to more reasonably reflect costs."  *Id.* (citing, *e.g.*, 19 U.S.C. § 1677b(b)(1)–(b)(2)(c)) (other citations omitted).

In a prior proceeding, for example, Commerce recalculated a respondent's "costs by averaging them in order to prevent large discrepancies in costs between merchandise that was physically similar."  *Thai Plastic Bags*, 746 F.3d at 1362 (quoting *Thai Plastic Bags*, 853 F. Supp. 2d at 1273).  The Court sustained Commerce's

decision in relevant part, explaining that substantial evidence supported Commerce's finding that the respondent's methodologies produced "great variability in the costs of similar items having nothing to do with the physical aspects of the specific product." *Thai Plastic Bags,* 853 F. Supp. 2d at 1272 (internal quotation marks and citation omitted). The Federal Circuit affirmed, holding that "Commerce reasonably interpreted its statutory obligation, and its underlying findings are supported by substantial evidence." *Id.* at 1365. Commerce applied a similar analysis in this case. *See* Remand Results at 14, Appx139 (citing Preliminary Cost Calculation Memorandum, Appx6656-6657, Appx6661-6667, Appx89022-89023, Appx89027-89033).

Assan also argues that Commerce disregarded evidence of how differing characteristics of *raw materials* affect the cost of producing different products identified by different product control numbers. Assan Comments at 14-15 (citing *Dongkuk S&C Co., Ltd. v. United States*, 600 F. Supp. 3d 1331, 1337 (Ct. Int'l Trade 2022)). This argument confuses the physical characteristics of the input products with the physical characteristics of the final finished products. *See Dongkuk S&C Co.*, 600 F. Supp. 3d at 1337. In *Dongkuk S&C*, the

24

Court explained that Commerce considered variations in the respondent's "reported costs and concluded that such discrepancies warranted adjustment as they {were} not caused by differences in physical characteristics of the *finished* wind towers." 600 F. Supp. 3d at 1337 (emphasis added). Thus, Assan's reliance on differences in its inputs is unpersuasive because Assan failed to establish relevant physical differences in the finished products.

Finally, Assan argues that Commerce should have taken account of the challenges in reporting yield losses associated with products identified by different product control numbers. Assan Comments at 13. But "the burden of creating an adequate record lies with interested parties and not with Commerce." *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (bracketing and citations omitted). In this proceeding, Commerce "requested that Assan identify and separately report the costs associated with yield losses for each" product identified by each product control number. Remand Results at 29, Appx154. Specifically, Commerce requested that Assan break out from the reported {raw materials premium} costs associated with the product yield losses." *Id.* Yet, "Assan failed to provide this information."

Remand Results at 29-30, Appx154-155 (citing, *e.g.*, Appx6765-6766). Thus, information for Commerce to calculate product-specific yield losses is not available on the record. *Id.*

In sum, Commerce's remand results comply with the Court's remand order and are otherwise lawful and supported by substantial evidence. Thus, we respectfully request that the Court sustain Commerce's adjustment of Assan's costs for raw material inputs.

### C.    Commerce Reasonably Continued to Include Assan's Hedging Gains Under The Cost of Manufacturing—As Reported In Assan's Financial Records

Finally, Commerce's determination to include Assan's hedging gains in the cost of manufacturing is lawful and supported by substantial evidence. Again, Commerce shall normally calculate costs based on respondent's records if those records (1) "are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, when appropriate)," and (2) "*reasonably reflect the costs associated with the production and sale of the merchandise.*" 19 U.S.C. § 1677b(f)(1)(A) (emphasis added). On the first prong, there is no dispute that Assan's records are maintained in compliance with Turkish GAAP. *See* Remand Results at 13, Appx138

(citation omitted).  On the second prong,  Commerce reasonably found

that Assan's hedging revenues are reasonably included in the

company's production costs.  *See, e.g.*, Remand Results at 18, Appx143.

Substantial evidence supports Commerce's determination.  Record

evidence links "Assan's raw material purchases to its hedging

transactions (*i.e.,* linking purchases raw material quantities to hedging

quantities)."  Remand Results at 19, Appx144.   When Assan purchases

raw material aluminum, it "enters into commodity hedging contracts to

sell a similar quantity of aluminum metal in the future."  Remand

Results at 18, Appx143.  When the "contracts expire, Assan closes the

hedging contracts by reversing its position in the commodities market."

*Id.* (citing Appx7657-7659).  Thus, "Assan's hedging contracts are

initiated against the purchase of the aluminum," so "{a}ny resulting

gains or losses on these contracts are recorded in the cost of goods sold

at the time the contracts are closed."  Remand Results at 19, Appx144.

"When viewed from this perspective," Commerce found it was

"reasonable to conclude that Assan's hedging activities are to mitigate

the risk of fluctuation of raw material costs which will be consumed in

the production of merchandise under consideration, and that they are

27

properly considered as part of the {cost of manufacturing}."  Remand
Results at 19, Appx144.  Thus, the record contains such "evidence that a
reasonable mind might accept as adequate" to support Commerce's
finding.  *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 840
(Fed. Cir. 2020) (citing *Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369, 1374 (Fed. Cir. 2015)).  Nothing more is required for
Commerce's finding to be supported by substantial evidence.  *See id.*

To be sure, the substantial evidence standard involves review of
the "the record as a whole, including evidence that supports as well as
evidence that fairly detracts from the substantiality of the evidence."
*SeAH Steel VINA Corp.*, 950 F.3d at 840 (citing *SolarWorld Ams., Inc. v.
United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018)).  On remand,
Commerce considered the record as a whole, acknowledging the
Aluminum Association's arguments that "Assan conducted the hedging
transactions after it purchased raw materials," and that the hedging
transactions were "related to the sales price of finished goods instead of
raw materials."  Remand Results at 15, Appx140.  Overall, however,
Commerce found that the hedging gains were reasonably included in

Assan's cost of manufacturing.[5]  *See, e.g.*, Remand Results at 16-20, Appx141-145.

The Aluminum Association claims that Commerce failed to address "concessions" by Assan.  Aluminum Association Comments at 1-2.  In making this argument, the Aluminum Association apparently references the Court's discussion of Assan's statements at oral argument regarding the sales price of the finished goods and marking to market.  *See* Remand Order at 20, Appx20.  But Commerce specifically addressed chronology and pricing considerations, as well as the Aluminum Association's arguments on marking-to-market.  Remand Results at 18-20, Appx143-145.

With regard to chronology and pricing, Commerce found that neither Assan's pricing mechanisms nor the chronology of its hedging contracts undermined the reasonableness of Assan's books and records.  Remand Results at 19, Appx144.  Commerce specifically addressed "Assan's pricing mechanisms (*i.e.*, foil prices are based in part on an

---

[5]  Commerce adjusted the hedging gains, in part, "to account for the timing difference related to the purchases of aluminum input and the settlement of the associated commodity hedging contract."  Remand Results at 15, Appx140 (citing Appx7672-7673).

{London Metal Exchange} value at time of sale)." *Id.* Commerce also addressed "the chronology of the hedging contracts (*i.e.*, the purchases precede the hedges)." *Id.* Ultimately, Commerce found that neither consideration was "sufficient to render unreasonable a finding that the gains or losses at issue are appropriately considered in {cost of manufacturing}." Remand Results at 19, Appx144.

With regard to marking to market, moreover, Commerce explained that "the GAAP concept of marking to market value refers to a method that ensures a company's assets and liabilities on the balance sheet at a particular point in time reflect fair market value (*i.e.*, valuation of inventory)." Remand Results at 19, Appx144. "Assan evaluated the current value of its physical inventories on hand and the value of open hedging contracts in the balance sheet (*i.e.*, assets and liabilities) as of the end of the {period of investigation} (*i.e.*, a particular point in time) based on the mark to market accounting method in accordance with the {International Financial Reporting Standards} requirements{.}" *Id.* Assan thus "recorded inventory valuation adjustments in the accounts 'mark to market valuation gains and losses for physical inventory and hedging positions.'" *Id.*

30

Commerce determined that "the net inventory revaluation adjustments recorded in these two accounts are different from the net hedging gains generated from Assan's actual hedging activities that were recorded in the accounts grouped under the first and second categories." *Id.* In other words, the net hedging gains were "associated with the closed hedging contracts for the inventory consumed during the {period of investigation.}" Remand Results at 19-20, Appx144-145. "Because the gains on the mark to market inventory valuation represent the valuation adjustment for Assan's inventory to fair market value, it is reasonable to include it in the cost of production calculation." *Id.* Thus, the Aluminum Association is wrong in claiming that Commerce ignored any of the considerations raised in the Court's remand order.

When addressing the Aluminum Association's arguments, moreover, Commerce explained that "{h}edging instruments can be extremely complicated in terms of how they are structured and how related gains and losses must be reported." Remand Results at 31, Appx156. Such instruments "are not only financial instruments that generate their own gains and losses, but they are also related to

31

underlying monetary assets and liabilities that generate offsetting gains and losses." Remand Results at 31-32, Appx156-157 (citation omitted). Commerce correctly explained that it possesses great discretion in such factual determinations "involving complex economic and accounting decisions." Remand Results at 32, Appx157 (citing *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). Further, to the extent such complexity results in "the possibility of drawing two inconsistent conclusions from the record evidence," that "does not prevent Commerce's finding from being supported by substantial evidence." Remand Results at 16, Appx141 (citing *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).

The Aluminum Association nonetheless argues that Commerce's reliance on 19 U.S.C. § 1677b(f)(1)(A) is inconsistent because there were certain transactions in Assan's audited income statement that Commerce did not treat as part of the cost of manufacturing. Aluminum Association Comments at 3 (citing, *e.g.*, Aluminum Association Mot. J. on the Agency Record at 24-25, ECF No. 27). But

32

the fact that another entry on Assan's income statement did not reasonably reflect the cost of manufacturing does not undermine Commerce's detailed analysis regarding hedging gains. *See, e.g.*, Remand Results at 16-20, Appx141-145; Remand Results at 31-32, Appx156-157. Commerce did not rely on the income statements alone, but instead considered the *substance* of the hedging transactions, concluding that "Assan's hedging activities are to mitigate the risk of fluctuation of raw material costs" to produce the merchandise—and thus "are properly considered as part of the {cost of manufacturing}." *See, e.g.*, Remand Results at 19, Appx144.

Finally, the Aluminum Association contends that Commerce did not sufficiently distinguish this case from prior proceedings—namely, *Phosphor Copper From the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances*, 82 Fed. Reg. 12,433 (Dep't Commerce Mar. 3, 2017) (*Phosphor Copper from Korea*), and accompanying Issues and Decision Memorandum at 11-12 (Comment 2) (Feb. 27, 2017), and *Fischer S.A. Comercio, Industria and Agricultura v. United States*, 2014 WL 2853909 (Ct. Int'l Trade May 27, 2014)

33

(*Fischer*).  *See* Aluminum Association Comments at 4-5.  According to the Aluminum Association, Commerce engaged in improper "speculation" by reasoning that the gains and losses on derivatives in those two cases would have likely been recorded in the income statement as an interest expense, rather than cost of manufacturing. Aluminum Association Comments at 4; *see also id.* (citing, *e.g.*, Remand Results at 33, Appx158).

This argument attempts to flip the burden for challenging Commerce's determination.   As the party arguing that Commerce has departed from a past practice, *the Aluminum Association* bears the "burden" to show that "'Commerce consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269, 1272 (Fed. Cir. 2005) (citation omitted). The Aluminum Association has not shown that *Phosphor Copper from Korea* or *Fischer* present "similar circumstances" to this proceeding, in which specific facts about Assan's hedging gains and financial records support treatment in the cost of manufacturing.

34

For example, in *Phosphor from Korea*, the issue was not whether to treat the hedging gains or losses at issue as *either* part of cost of manufacturing or in the interest expense, but whether to include them at all. *See Phosphor from Korea* IDM at 11; *see also* Remand Results at 34. The respondent in that case reported that the relevant "investments in derivatives are entirely unconnected to its production operations" and that the record did not show that such "derivatives are related in any way to either raw material purchases or sales, or that derivative investments were made to manage risk associated with phosphor copper operations." *Phosphor from Korea* IDM at 11 (citation omitted). Commerce determined that "the record does not provide any additional details of the underlying commodities and currency instruments which produced the gains and losses on the derivative transactions." *Id.* at 12. Accordingly, the Aluminum Association has not shown that *Phosphor from Korea* presents circumstances that are similar to this case, in which the record supports Assan's categorization of hedging gains as part of the cost of manufacturing. *See, e.g.*, Remand Results at 19, Appx144.

With respect to *Fischer*, the transactions at issue were financial in nature involving how the company manages its "overall foreign *currency exposure* and risk associated with interest rate variations." *See Fischer*, 2014 WL 2853909 at *8 (citation omitted and emphasis added). The Aluminum Association has not shown that the financial transactions in *Fischer* were tied to the purchase of raw materials, as is the case in this proceeding.

As one of the reasons for distinguishing *Fischer*, Commerce explained that "{t}he terms 'unrealized' or 'realized' when referring to various income or expense items are not associated with the cost of goods sold line item on an income statement." Remand Results at 34, Appx159. Although Assan used terms such as "realized" when describing its hedging gains, *see* Aluminum Association Comments at 4-5 (citing, *e.g.*, Appx87808), this does not undermine the substantial evidence supporting Commerce's determination. Overall, Assan has failed to meet its burden to show that *Fischer* presented a factual scenario like this one—in which (1) the respondent's financial records included hedging gains in the cost of manufacturing, (2) those hedging gains were associated with purchases of raw material inputs used in

manufacturing the merchandise under consideration, and (3) the substance of the transactions supported that designation.  *See* Remand Results at 16-20, Appx141-145.  In sum, Commerce reasonably distinguished this proceeding from *Fischer*.

Finally, Commerce applied the same approach in another proceeding involving the same company, Assan, as well as other proceedings involving similar facts.  Remand Results at 20 (citing *CAAS from Türkiye: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 65,346 (Dep't of Commerce, Oct. 15, 2020), and accompanying PDM at 15, *unchanged in CAAS from Türkiye*, 86 Fed. Reg. 13326 (Dep't of Commerce, Mar. 8, 2021) (final affirmative antidumping determination); *see also, e.g.*, *Common Alloy Aluminum Sheet from Greece: Final Negative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 13300 (Dep't of Commerce, Mar. 8, 2021), and accompanying IDM at 16).  Thus, contrary to the Aluminum Association's claim, Commerce has acted consistently in evaluating the factually-intensive accounting issues in this case.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain

Commerce's remand results and enter judgment for the United States.

OF COUNSEL

JONZACHARY FORBES
Senior Attorney
Office of the Chief Counsel for
Trade Enforcement and
Compliance
U.S. Department of Commerce

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES
Assistant Director

EMMA E. BOND
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-2034
E-mail: Emma.E.Bond@usdoj.gov

August 20, 2025

*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that Defendant's Comments Supporting Remand Redetermination contain no more than 6,669 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare the comments.

<u>/s/ Emma E. Bond</u>
Emma E. Bond